# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

|  |  |
|---|---|
| In re: | Chapter 11 |
| RAVN AIR GROUP, INC., *et al.*,[1] | Case No. 20-10755 (BLS) |
| Debtors. | (Joint Administration Requested) |

**MOTION OF THE DEBTORS FOR ENTRY OF INTERIM AND FINAL ORDERS PURSUANT TO 11 U.S.C. SECTIONS 105, 361, 362, 363, 364 AND 507 AND BANKRUPTCY RULES 2002, 4001, AND 6004 (I) AUTHORIZING THE DEBTORS TO OBTAIN POSTPETITION SENIOR SECURED SUPERPRIORITY FINANCING, (II) AUTHORIZING THE DEBTORS' LIMITED USE OF CASH COLLATERAL, (III) GRANTING ADEQUATE PROTECTION TO THE PREPETITION SECURED PARTIES, (IV) SCHEDULING A FINAL HEARING, AND (V) GRANTING RELATED RELIEF**

The above-captioned affiliated debtors and debtors in possession (the "Debtors") hereby submit this motion (the "Motion"), pursuant to sections 105, 361, 362, 363, 364 and 507 of title 11 of the United States Code, 11 U.S.C. §§ 101 *et seq.* (the "Bankruptcy Code"), Rules 2002, 4001, and 6004 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), and Rules 4001-2 and 9013-1 of the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware (the "Local Rules"), for entry of an order, substantially in the proposed form attached hereto as **Exhibit A** (the "Interim Order") and, after the final hearing, a final order (the "Final Order"): (i) authorizing the Debtors to obtain postpetition financing (the "DIP Financing") pursuant to a Senior Secured, Super-Priority Debtor-In-

---

[1] The Debtors in these chapter 11 cases and the last four digits of each Debtor's U.S. tax identification number are as follows: Ravn Air Group, Inc. (3047), Ravn Air Group Holdings, LLC (5356), JJM, Inc. (4858), HoTH, Inc. (9957), Peninsula Aviation Services, Inc. (6859), Corvus Airlines, Inc. (7666), Frontier Flying Service, Inc. (8091), and Hageland Aviation Services, Inc. (2754).  The notice address for all of the Debtors is 4700 Old International Airport Road, Anchorage, AK 99502.

Possession Credit Agreement substantially in the form attached hereto as **Exhibit B** (as it may be amended from time to time, the "DIP Credit Agreement")[2] together with the other agreements delivered or executed from time to time in connection therewith (as hereafter amended, restated, supplemented or otherwise modified from time to time, together with the DIP Credit Agreement, the "DIP Credit Documents") and the DIP Budget attached hereto as **Exhibit C** (the "DIP Budget"); (ii) granting liens and providing superpriority administrative expense status ("DIP Superpriority Claims") to the DIP Secured Parties (defined herein); (iii) authorizing the Debtors to use Cash Collateral (defined herein) and affording adequate protection; (iv) scheduling a final hearing on the relief requested herein; and (v) granting related relief.  In support of this Motion, the Debtors incorporate the statements set forth in the *Declaration of John Mannion in Support of First Day Motions* filed contemporaneously herewith and further respectfully state as follows:

## JURISDICTION AND VENUE

1.      This Court has jurisdiction to consider this matter pursuant to 28 U.S.C. sections 157 and 1334 and the *Amended Standing Order of Reference* of the United States District Court for the District of Delaware, dated February 29, 2012.  This is a core proceeding pursuant to 28 U.S.C. section 157(b).  The Debtors confirm their consent pursuant to Local Rule 9013-1(f) to the entry of a final order by the Court in connection with this Motion to the extent that it is later determined that the Court, absent consent of the parties, cannot enter final orders or judgments in connection herewith consistent with Article III of the United States Constitution.

2.      Venue for this matter is proper in this district pursuant to 28 U.S.C. sections 1408 and 1409.

---

[2] Capitalized terms not otherwise defined in this Motion shall have the meanings ascribed to such terms in the DIP Credit Agreement.

3.      The statutory predicates for the relief requested herein are (i) sections 105, 361, 362, 363, 364 and 507 of the Bankruptcy Code; (ii) Bankruptcy Rules 2002, 4001, and 6004, and (iii) Local Rules 4001-2 and 9013-1.

## **BACKGROUND**[3]

*General Background*

4.      On April 5, 2020 (the "Petition Date"), the Debtors filed voluntary petitions for relief under chapter 11 of the Bankruptcy Code.

5.      The Debtors continue to operate their businesses and manage their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.  No trustee, examiner, or official committee of unsecured creditors has been appointed in the Debtors' cases.

6.      Simultaneously with the filing of this Motion, the Debtors have sought an order of joint administration pursuant to Rule 1015(b) of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules") that would provide for the joint administration of these cases and for consolidation for procedural purposes only.

*Company Overview*

7.      Ravn Air Group was formed in 2019 through the combination of five well known and long-tenured Alaskan air transportation businesses in 2009, creating the largest regional air carrier and network in the state.  Ravn owns and, until the COVID-19-related disruptions, operated 72 aircraft, at 21 hub airports and 73 facilities, serving 115 destinations in Alaska with up to 400 daily flights. Until the COVID-19-related disruptions, the Debtors had over 1,300 employees (non-union), and it carried over 740,000 passengers on an annual basis.  The Company provides air

---

[3] The facts and circumstances supporting this Motion are set forth in the *Declaration of John Mannion in Support of Chapter 11 Petitions and First Day Motions* (the "First Day Declaration"), filed contemporaneously herewith and incorporated by reference herein.

transportation and logistics services to the passenger, mail, charter, and freight markets in Alaska, pursuant to U.S. Department of Transportation approval as three separate certificated air carriers. Two of the carriers (RavnAir ALASKA and PenAir) operate under Federal Aviation Administration ("FAA") Part 121 certificates and the other (RavnAir CONNECT) operates under an FAA Part 135 certificate. In addition to carrying passengers, many of whom fly on Medicaid-subsidized tickets, other key customers include companies in the oil & gas industry, the seafood industry, the mining industry, and travel and tourism industries.

***Pre-Petition Secured Facility***

8.      Ravn Air Group, Inc. is the borrower under that certain Credit Agreement dated as of July 31, 2015 (as amended, the "Credit Agreement"), with certain lenders (collectively, the "Prepetition Secured Lenders") and BNP Paribas, as administrative agent (the "Prepetition Administrative Agent," and, together with the Prepetition Secured Lenders, the "Prepetition Secured Parties"), with respect to a term loan of up to $95 million and revolving loans in the aggregate amount of up to $15 million. As of March 31, 2020, a total of approximately $90,907,954.51 exclusive of interest and fees payable under the Credit Agreement was owing to the Prepetition Secured Parties.

9.      Debtor Ravn Air Group Holdings, LLC and the other Debtors are guarantors to the Credit Agreement. Each of the Debtors have pledged substantially all of their assets to the Prepetition Secured Parties, including assets pledged to U.S. Bank, N.A., as security trustee (the "Prepetition Security Trustee") for the benefit of the Prepetition Secured Parties, pursuant to the terms of that certain Aircraft and Engine Mortgage and Aircraft Lease Agreement dated as of August 4, 2015 (all such collateral, the "Prepetition Collateral").

***Events Leading Up to Chapter 11***

<u>Seasonal Cash Flow and Impact of COVID-19</u>

10.     Because of Alaska's harsh winter climate, the Debtors' businesses are highly seasonal.  Their operations tend to consume cash during the last and first quarters of each year, when they must cover capital costs and costs associated with the maintenance of their extensive route network and aircraft fleets.  The business model relies heavily on cash flow received during the summer tourism season in the second and third quarters of the year, when passenger revenues are highest.  Indeed, given the capital-intensive nature of the Debtors' business, strong financial results in the summer and fall months are essential to the Debtors' survival.

11.     On March 12, 2020, after several months of increasing outbreaks around the world, and the World Health Organization declaring COVID-19 to be a pandemic, the Governor of Alaska announced the first case of coronavirus in Alaska on live television.  Prior to that point, travel restrictions had already been instituted around the world and in the United States, which caused airlines across the country to experience substantial revenue losses as a result of decreased sales and canceled flights.

12.     These same effects hit Alaska on March 12.  It was at that time that airline bookings at the Company dropped dramatically, with the Company experiencing an astonishing 80-90% decrease in passenger revenue at all three of its airlines, as compared to the Company's historical results for the same period.  In addition, in mid-March, the Company, along with other Alaska carriers, began receiving demands from rural hubs and villages around Alaska not to fly passengers to or from their communities.  Finally, on March 20, 2020, the State of Alaska published Health Alert 9.2, issuing a strong advisory to all Alaskans to cease any non-essential in-state long distance

5

personal, business, or medical travel.  In total, this caused an unprecedented drop in passenger traffic and passenger revenue placing Ravn in a significant negative cash flow situation.

13.     By mid-March 2020, Ravn faced a liquidity crisis.  On March 23rd and 27th, 2020, the Company announced two rounds of drastic flight schedule and route reductions, temporary layoffs, as well as pay cuts.  Such cost-saving measures helped to conserve the Company's cash, but they were not enough to put the Company in a cash flow positive or neutral situation given the magnitude of the decline in passenger revenue relative to the cost to continue operating as a safe and compliant air carrier.  As a result, Ravn very quickly found itself in a situation where it needed additional financing to generate liquidity needed to continue operating.  By the end of March 2020, Ravn did not have sufficient cash to fund operations, including its payroll obligations due and payable after April 5, 2020, and it was unable to secure additional financing given the dramatic COVID-19-related reduction in passenger demand and general uncertainty about when demand would normalize in the future.

Ravn Pursuit of Financing and Decision to File These Chapter 11 Cases

14.     In the weeks leading up to these chapter 11 filings, the Debtors sought much-needed financing from two sources:  (1) its existing lenders and investors, and (2) the State of Alaska and federal government relief packages in the form of grants, loans, or equity investments, particularly under the Coronavirus Aid, Relief, and Economic Security Act (the "CARES Act").  First, the Debtors engaged in extensive negotiations with its existing lenders and investors about the Debtors' liquidity situation.  In addition, the Debtors also sought to identify new sources of capital.

15.     Through the month of March, the Debtors engaged in extensive negotiations with the Prepetition Secured Parties regarding the future of the Debtors and their operations, their ability to weather the COVID-19 pandemic with or without assistance (including grants and loans under

6

the CARES Act), and the willingness of the Prepetition Secured Parties to provide bridge financing in light of the foregoing.  These negotiations (as well as the discussions with government officials described below) were made all the more difficult because of the inherent uncertainty regarding how long and the extent to which the current COVID-19 operating environment will last, as well as the fact that they were conducted telephonically, rather than in-person, as a result of COVID-19.

16.     Separately, the Debtors also spoke with high-ranking representatives of the State of Alaska and the federal government.  Unfortunately, by the end of March 2020, it became clear that any state or federal government financial assistance or other relief was not going to be available before the Debtors ran out of cash and had to suspend operations.

17.     On April 3, 2020, the Debtors submitted applications for grants under the CARES Act.  It is uncertain whether such applications will be granted or the timing of any such funding; however, the Debtors believe that any such government relief will be a key factor to enable the Debtors to resume operations and re-hire the employees the Debtors laid off as a result of the COVID-19-related business disruptions.

18.     On April 5, 2020, prior to the filing of these Chapter 11 Cases, the Debtors laid off almost all of its remaining workforce, other than a very small number of employees necessary to the administration of these Chapter 11 Cases.  In the event that government relief, under the CARES Act or otherwise, becomes available, the Debtors hope to restart operations with as many of its laid-off employees as required and funded by the CARES Act.

19.     Certain of the Prepetition Secured Parties (BNP Paribas, as administrative agent (in such capacity, the "DIP Agent") for itself and certain other financial institutions (collectively, in their capacities as such, the "DIP Lenders" and together with the DIP Agent, collectively, the "DIP

Secured Parties")) have agreed in principle to extend credit, substantially on the terms described below (the "DIP Financing"), which financing will fund the administration of these Chapter 11 Cases and allow the Debtors to pay essential expenses, including the payroll and other employee expenses described in the Employee Wages Motion (as defined below), as well as other payments for which the Debtors seek authority in the other First Day Motions.  The parties are negotiating but have not yet finalized definitive documentation.  The parties anticipate entering into the DIP Credit Agreement before a hearing on the First Day Motions.

20.     The Debtors were unable to identify an investor or lender that would provide the financing necessary for the Debtors to continue operations, either as a chapter 11 debtor-in-possession or outside of bankruptcy, other than the DIP Secured Parties and the DIP Financing. Therefore, the Debtors determined that it was in the best interests of the Debtors' estates, creditors, and other parties-in-interest to agree to the DIP Financing and file these Chapter 11 Cases.

## **RELIEF REQUESTED**

21.     By this Motion, the Debtors seek, among other things:

(a)     authorization for the Debtors to obtain up to $12,000,000 in multiple draw, post-petition financing to finance operations and the costs of these Chapter 11 cases (the "DIP Facility"), which shall have the liens and priorities set forth therein, in and through the form of the Order attached hereto as **Exhibit A**;

(b)     authorization for the Debtors to execute and deliver the DIP Credit Documents and to perform such other and further acts as may be necessary or appropriate in connection therewith;

(c)     authorization for the Debtors to (i) use the Cash Collateral pursuant to section 363 of the Bankruptcy Code, and all other Prepetition Collateral, and (ii) provide adequate protection to the Prepetition Secured Parties;

(d)     subject to the provisions of the Interim Order and any Final Order, modification of the automatic stay under section 362 of the Bankruptcy Code and authorization for the DIP Lender to exercise remedies under the DIP Documents upon the occurrence and during the continuance of an Event of Default;

(e)     at an interim hearing (the "<u>Interim Hearing</u>") on this Motion, pursuant to Bankruptcy Rule 4001, entry of an Interim Order (a) authorizing the Debtors to borrow and be obligated under the DIP Credit Agreement in an aggregate principal amount not to exceed $6,000,000 in accordance with the DIP Budget, (b) authorizing the Debtors to use the Cash Collateral and the other Prepetition Collateral, and (c) granting adequate protection to the Prepetition Secured Parties; and

(f)     to schedule, pursuant to Bankruptcy Rule 4001, a final hearing (the "<u>Final Hearing</u>") for this Court to consider entry of a final order in form and substance reasonably satisfactory to the DIP Secured Parties (the "<u>Final Order</u>") authorizing and approving on a final basis the relief requested in the Motion, including without limitation, for the Debtors on a final basis to use and be obligated for all amounts under the DIP Credit Documents and for the Debtors to continue to use the Cash Collateral and the other Prepetition Collateral subject to the terms of the DIP Credit Documents and the Final Order.

## DIP Financing and Cash Collateral

22.     The Debtors' prepetition secured obligations are secured by first-priority liens and security interests in substantially all of the Debtors' assets.[4]  Those assets, and the proceeds thereof now owned or hereafter acquired by the Debtors, constitute the Prepetition Collateral. Substantially all of the Debtors' cash, including, without limitation, all cash and other amounts on deposit or maintained by the Debtors in their bank accounts, as well as any cash proceeds derived from the disposition of any Prepetition Collateral, constitute proceeds of the Prepetition Collateral and, therefore, are cash collateral of the Prepetition Secured Parties within the meaning of section 363(a) of the Bankruptcy Code (the "<u>Cash Collateral</u>").

23.     The Debtors intend to finance these Chapter 11 Cases with cash generated by their residual operations, if any, the continued use of Cash Collateral, and postpetition financing incurred pursuant to sections 363, 364(c), and 364(d) of the Bankruptcy Code, up to the principal amount of $12,000,000.  The DIP Facility shall be secured by first-priority, valid, priming,

---

[4] The Debtors have identified certain collateral for which the security interests and/or mortgages of the Prepetition Secured Parties may be subject to avoidance.  It is believed that the value of those assets is not substantial relative to the total value of the Debtors' assets.

perfected, and enforceable liens on property of the Debtors' estates pursuant to sections 364(c)(2), 364(c)(3), and 364(d) of the Bankruptcy Code, and with DIP Superpriority Claims senior to all other administrative expenses pursuant to section 364(c)(1) of the Bankruptcy Code, subject to the terms and conditions contained in the Interim Order and the Final Order.

24.     The Debtors believe that this arrangement will meet the Debtors' financing needs during these Chapter 11 cases.  Specifically, the DIP Facility and use of Cash Collateral will provide the Debtors with much-needed liquidity, in order to permit, among other things, the restart and/or wind-down of the Debtors' business and confirmation of a plan.

25.     The Debtors believe that it is appropriate, at the time the Final Order is heard, for the DIP Secured Parties to "roll up" the prepetition secured obligations to the DIP Secured Parties according to the terms set forth herein.  But for the DIP Secured Parties' provision of the DIP Facility, the Debtors would have been wholly unable to make payroll and conduct a managed liquidation.  The rollup is a condition that is necessary to assure the DIP Secured Parties' willingness to advance funds and for creditors to realize greater returns through a managed liquidation process.  As an integrated part of the DIP Secured Parties' package, the Debtors submit that this Court should order the rollup at the hearing on the Final Order.

### Concise Statement and Highlighted Provisions

26.     Consistent with Bankruptcy Rule 4001(c)(1) and Local Rule 4001-2, the following is a concise statement and summary of the proposed material terms for the Debtor's request for the use of Cash Collateral and the DIP Financing.[5]  As discussed herein, the Debtors believe these

---

[5] The complete statement of the terms of the use of Cash Collateral and DIP Financing is set forth in the DIP Credit Agreement and the Interim Order, and this summary is qualified by reference to those documents.

146484.01600/123083711v.2

provisions are reasonable in light of the facts and circumstances of these Chapter 11 Cases and respectfully submits that same should be approved.

## Concise Statement

**DIP Secured Parties:** Certain Lenders Signatory to the DIP Credit Agreement[6]

**DIP Agent:** BNP Paribas

**Borrowers:** The Debtors

**DIP Facility:** Senior secured, super-priority debtor-in-possession loan and security agreement consisting of a $12,000,000 term loan that will be funded in a series of draws, plus (subject to entry of the Final Order) advances to pay the roll-up amount of up to $24,000,000, plus accrued interest and other fees and amounts owing under the respective loan documents. ***DIP Credit Agreement, § 2.02.*** Amounts repaid may not be reborrowed. ***Id., § 2.01.***

**Maturity Date:** Means the earliest to occur of (a) the 90th day following the date of this Agreement; (b) the date upon which the Interim Borrowing Order expires if a Final Borrowing Order with respect thereto shall have not been entered prior to such date; (c) the date that is thirty-five (35) days after the entry of the Interim Borrowing Order if a Final Borrowing Order with respect thereto shall have not been entered prior to such 35th day; (d) if an Acceptable Plan of Reorganization has been confirmed by order of the Bankruptcy Court, the earlier of (x) the effective date of such Acceptable Plan of Reorganization, and (y) the 30th day after the date of entry of a Confirmation Order with respect thereto; (e) the date of the closing of a sale of substantially all of the equity or assets of Borrowers; (f) the date of indefeasible prepayment in full in cash of all Obligations under the Loan Documents; (g) the filing of a Plan of Reorganization that is not an Acceptable Plan of Reorganization; and (g) the date of acceleration of the maturity of the Loans in accordance with <u>Section 8.01</u>. ***DIP Credit Agreement § 1.01.***

**Use of Proceeds:** The proceeds of the DIP Facility shall be used by the Debtors to fund general corporate and working capital requirements during the pendency of the Chapter 11 Cases, and to fund the expenses of the Chapter 11 Cases, including professional fees, as set forth in the DIP Budget. Additionally, upon entry of the Final Order, the proceeds of the DIP Facility shall be used to fund the Roll-Up Obligations. ***DIP Credit Agreement § 8.03.***

**Interest Rate:** The outstanding principal amount of the DIP Facility shall bear interest from the date of disbursement at the Debtors' Alternate Base Rate (as defined in the Prepetition Credit Agreement) plus 800 basis points per annum. ***DIP Credit Agreement § 2.06.***

**Fees:** The DIP Facility includes an upfront fee of 300 basis points, a fee of 200 points for any unused commitment, and an Agent Fee (as defined in the DIP Credit Agreement); additionally, the DIP Credit Agreement provides for payment of the DIP Secured Parties' expenses, which

---

[6] Citations to the DIP Credit Agreement and references to the provisions of the DIP Credit Agreement are to the form of DIP Credit Agreement attached hereto as Exhibit B, which is still subject to negotiation and finalization by the parties thereto.

include without limitation various professional fees of the DIP Secured Parties in negotiating, documenting, administrating and enforcing the DIP Credit Agreement. ***DIP Credit Agreement § 2.05.***

**Security:**  All Obligations under the DIP Facility shall: (i) constitute allowed DIP Superpriority Claims against the Debtors with priority in the Chapter 11 cases over any and all administrative expense claims and unsecured claims, subject only to the Carve-Out, amounts expended under the DIP Budget, and (ii) be secured by Liens on all of the Debtors' assets with the priority set forth in the Orders. ***DIP Credit Agreement § 3.20***.  Effective and perfected upon the date of the Interim Order, or, with respect to certain of the DIP Collateral, the Final Order, the following security interests and liens are granted by the Debtors to the DIP Secured Parties (all property of the Debtors identified below being collectively referred to as the "DIP Collateral"), subject and subordinate only to the Carve-Out and the Permitted Prior Senior Liens (all such liens and security interests granted to the DIP Secured Parties pursuant to the Orders, the "DIP Liens"):

- Pursuant to section 364(d)(1) of the Bankruptcy Code, senior priming liens on, and security interest in, the Prepetition Collateral (as such term is defined in the Interim Order). ***Interim Order § 14(b)***.

- Pursuant to section 364(c)(2) of the Bankruptcy Code, a lien on, and security interest in property of the Debtors, that is not subject to existing liens including, subject to entry of the Final Order, the proceeds and property recovered in respect of the Debtors' claims and causes of action (but not on the actual claims and causes of action) under sections 510, 544, 545, 547, 548, 549, 550 and 553(b) of the Bankruptcy Code or any other similar state or federal law (collectively, the "Avoidance Action Proceeds"). ***Interim Order § 14(c)***.

- Pursuant to section 364(c)(3) of the Bankruptcy Code, junior liens on, and security interests in, property of the Debtors that is subject to the Permitted Prior Senior Liens, which security interests and liens in favor of the DIP Secured Parties shall be junior to the Permitted Prior Senior Liens. ***Interim Order § 14(d)***.

**Adequate Protection:**  The Prepetition Secured Parties are provided with adequate protection of their interests in the Prepetition Collateral, in an amount equal to the aggregate diminution in value of its interest in the Prepetition Collateral (such diminution in value, the "Adequate Protection"), as follows:

- Adequate Protection Liens.  As security for the payment of the Adequate Protection, a valid, perfected replacement security interest in and lien on all of the DIP Collateral, subject and subordinate only to (i) the DIP Liens, (ii) the Carve-Out and (iii) the Permitted Prior Senior Liens. ***Interim Order § 23(a)***.

- Section 507(b) Claims.  The Adequate Protection shall constitute superpriority claims as provided in section 507(b) of the Bankruptcy Code (the "Section 507(b) Claims"), with priority in payment over any and all administrative expenses of the kinds specified or ordered pursuant to any provision of the Bankruptcy Code, subject and subordinate only to (a) the Carve-Out and (b) the DIP Superpriority Claims granted to the DIP Secured Parties in respect of the DIP Obligations.  Except to the extent expressly set forth in the Orders,

12

Prepetition Secured Parties shall not receive or retain any payments or property in respect of the Section 507(b) Claims until all DIP Obligations shall have indefeasibly been paid in full. ***Interim Order* § 23(b)**.

- DIP Budget.  The Debtors shall not make disbursements in excess of those permitted in the DIP Budget. ***DIP Credit Agreement* § 13(e)**.

- Credit Bidding.  Prepetition Secured Parties and DIP Agent shall have the right to credit bid at any sale or auction in accordance with and subject to section 363(k) of the Bankruptcy Code. ***Interim Order* § 37**.

**Carve-Out and Professional Fee Trust:**  The "Carve-Out" includes (i) fees required to be paid to the clerk of the Court and the U.S. Trustee, including statutory interest, (ii) reasonable fees and expenses incurred by a trustee under section 726(b) of the Bankruptcy Code not to exceed $5,000, (iii) Professional Fees as set forth in the DIP Budget before the Carve-Out Trigger Date (as defined below); and (iv) all fee incurred by Retained Professionals on and after the Carve-Out Trigger Date not to exceed $25,000 in the aggregate. ***Interim Order* § 16**.

**Events of Default:**  Shall mean those Events of Default described in the DIP Credit Agreement, including, without limitation, breach of any warranties made by the Debtors to the DIP Secured Parties, the failure of the Debtors to repay any amounts under the DIP Facility at the time due, the failure of the Debtors to meet any of the Chapter 11 Milestones set forth in the DIP Credit Agreement, the making of expenditures not included in the DIP Budget (subject to approved variances), the Debtors' cessation of their business activities, conversion of the Chapter 11 cases to cases under Chapter 7, the appointment of a trustee, or the granting of any lien priming the DIP Secured Parties. ***DIP Credit Agreement* § 8.01**.

**Remedies on Default:**  If any Event of Default occurs, the DIP Secured Parties may (i) declare the principal of, and accrued and unpaid interest on, the DIP Facility to be, and the same in each case, without any further notice and without any presentment, demand, or protest of any kind, all of which are expressly waived by the Debtors, (ii) immediately terminate the DIP Credit Agreement; and (iii) take any further action available at law or in equity, including, without limitation, the sale of the DIP Facility and all other rights acquired in connection with the DIP Facility and otherwise exercise remedies with respect to the Collateral. ***DIP Credit Agreement* § 8.01.**

**Indemnification:**  The Debtors shall indemnify the DIP Agent and DIP Lenders and their respective affiliates, successors and assigns and the officers, directors, employees, agents, advisors, controlling persons and members of each of the foregoing (each, an "Indemnified Person") and hold each of them harmless from and against all costs, expenses (including reasonable fees, disbursements and other charges of counsel) and liabilities of such Indemnified Person arising out of or relating to any claim or any litigation or other proceeding (regardless of whether such Indemnified Person is a party thereto and regardless of whether such matter is initiated by a third party or by the Debtors or any of their affiliates or shareholders) that relates to the DIP Facility or this Interim Order, including the financing contemplated hereby, the Chapter 11 Cases, or any transactions in connection therewith, provided that no Indemnified Person will be indemnified for any cost, expense or liability to the extent determined in a final, non-appealable

13

judgment of a court of competent jurisdiction to have resulted primarily from such Person's gross negligence or willful misconduct. *Interim Order § 24*.

**Automatic Stay:**  The automatic stay under section 362 of the Bankruptcy Code will be modified to the extent necessary to permit the DIP Agent to exercise its rights and remedies under the DIP Credit Agreement, provided that other than termination of the Debtors' right to use Cash Collateral, which can be immediate, the DIP Agent shall provide five (5) business days' notice to prior to the enforcement of the DIP Liens or exercise of any other rights or remedies against the DIP Collateral. *DIP Agreement § 8.01(n), Interim Order § 26*.

**Validity, Enforceability, Priority and Amount of Claims; and Release of Claims Against Prepetition Secured Parties and DIP Secured Parties.**  The Debtors stipulate to the validity, enforceability, priority and amount of the claims of the Prepetition Secured Parties. *Interim Order, § 19(a), (b).*  The Debtors also release their claims against the Prepetition Secured Parties and the DIP Secured Parties. *Interim Order, § 19(d).*  The rights of third parties to challenge the lenders' claims and assert affirmative claims are preserved through the earlier of (i) 60 days from the formation of a Creditors Committee, if any, (ii) 75 days from the Petition Date for all other parties-in-interest. *Interim Order § 20.*

**506(c) Waiver.**  The DIP Facility include a 506(c) waiver effective upon entry of a Final Order. *Interim Order § 17.*

**Lien on and Superior Priority Claim in Proceeds of Avoidance Actions:**  The DIP Credit Agreement and Interim Order provide that the DIP Secured Parties will receive a lien on Avoidance Action Proceeds, but that such lien shall be subject to entry of the Final Order approving the DIP Credit Agreement and such lien provisions. *DIP Credit Agreement § 1.01 (definition of "Collateral" includes avoidance actions); Interim Order § 14(c).*

### Highlighted Provisions

27.    Pursuant to Local Rule 4001-2, the Debtors are required to highlight certain provisions included in the DIP Credit Agreement and the Orders.  As discussed herein, the Debtors believe these provisions are reasonable in light of the facts and circumstances of these Chapter 11 cases.  Indeed, the circumstances of the Chapter 11 Cases virtually precluded any other lender from providing financing that would have alleviated the need for these provisions.  The provisions under Rule 4001-2(a)(i) of the Local Rules included in the Orders and DIP Credit Agreement are as follows:

Cross-Collateralization and Rollup of Prepetition Debt (Local Rule 4001-2(a)(i)(A) & (E)): Upon the entry of the Final Order, the Debtors agree to a "roll up" of the outstanding obligations, which will thereafter become Obligations under the DIP Credit Agreement. ***DIP Credit Agreement* § 2.01 ("Roll-Up Obligations"); *Interim Order* §§ 8, 9**.

Stipulation on Liens (Local Rule 4001-2(a)(i)(B)):  The Debtors agree to the validity, amount, enforceability, unavoidability and perfection of the Prepetition Collateral. ***Interim Order, § 19(a)***. The Interim Order provides for a challenge period, including to the extent that a committee were to obtain standing, a committee could challenge the prepetition claims and liens. ***Interim Order* § 20**.

Waiver of 506(c) Rights (Local Rule 4001-2(a)(i)(C)):  Subject to entry of the Final Order, except to the extent of the Carve-Out, no expenses of administration of the Chapter 11 cases or any future proceeding that may result therefrom, including liquidation in bankruptcy or other proceedings under the Bankruptcy Code, shall be charged against or recovered from the DIP Collateral or the Prepetition Collateral, as the case may be, pursuant to section 506(c) of the Bankruptcy Code or any similar principle of law. ***Interim Order* § 17**.

Liens on Avoidance Actions (Local Rule 4001-2(a)(i)(D)):  Subject to entry of the Final Order, The DIP Credit Agreement and Interim Order provide that the DIP Secured Parties will receive a lien on Avoidance Action Proceeds, but that such lien shall be subject to entry of the Final Order approving the DIP Credit Agreement and such lien provisions. ***DIP Credit Agreement* § 1.01 (definition of "Collateral" includes avoidance actions); *Interim Order* § 14(c).**

Committee Fees (Local Rule 4001-2(a)(i)(F)).  The Carve-Out provides equal treatment for the fees and expenses incurred by Retained Professionals employed by the official committee of unsecured creditors, if any, appointed in this case, subject to the limitations contained in the DIP Budget. **DIP Budget; *Interim Order* §16**.

Equities of the Case (Local Rule 4001-2(a)(i)(H)).  Subject to entry of the Final Order, no costs or expenses of administration shall be imposed upon the DIP Secured Parties under the equities of the case provisions of section 552(b) of the Bankruptcy Code. ***Interim Order* § 17**.

## Basis for Relief Requested

## I.    The DIP Financing and Use of Cash Collateral Should Be Approved

28.    The DIP Credit Agreement is being negotiated in good faith and at arms' length by and among the Debtors, the DIP Secured Parties, and their respective professionals.  Although the DIP Credit Agreement has not yet been finalized, the Debtors and the DIP Secured Parties have agreed in principle to the terms described here and in the Financing Motion.  The Debtors submit that the terms thereof, the use of Cash Collateral, and all other financial accommodations that will be provided under the DIP Credit Agreement and the Orders are fair and reasonable and reflect the

146484.01600/123083711v.2

exercise of the Debtors' prudent business judgment consistent with its fiduciary duties. The Debtors have, in their business judgment, determined that entering into the DIP Financing will give the Debtors the financing needed to preserve their assets and the option of resuming their operations throughout the State of Alaska. In addition, the Debtors have, in their business judgment, determined that the DIP Financing provides the Debtors with the only path by which they might reorganize under Chapter 11.

29.     The Debtors' use of property of their estates, including Cash Collateral, is governed by section 363 of the Bankruptcy Code. Pursuant to section 363(c)(2) of the Bankruptcy Code, a debtor may use cash collateral as long as "(A) each entity that has an interest in such cash collateral consents; or (B) the court, after notice and a hearing, authorizes such use, sale, or lease in accordance with the provisions of this section." 11 U.S.C. § 363(c)(2). Here, the Prepetition Secured Parties—the only entities with an interest in the Cash Collateral—have consented to the Debtors' use of same in accordance with and subject to the terms of the Interim Order and the DIP Budget, as more fully discussed below.

30.     The Debtors' Chapter 11 efforts hinge upon use of Cash Collateral and obtaining access to postpetition financing. Section 364 of the Bankruptcy Code distinguishes among (i) obtaining unsecured credit in the ordinary course of business, (ii) obtaining unsecured credit outside the ordinary course of business, and (iii) obtaining credit with specialized priority or on a secured basis. If a debtor in possession cannot obtain postpetition credit on an unsecured basis, the court may authorize such debtor to obtain credit or incur debt that is entitled to superpriority administrative expense status and/or secured by a senior lien on unencumbered property, a junior lien on encumbered property, or a combination of the foregoing pursuant to section 364(c).

A.      **Incurrence of Secured Superpriority Debt Under Bankruptcy Code Sections 364(c) and 364(d)**

31.      Section 364(c) of the Bankruptcy Code requires a finding, made after notice and a hearing, that debtors in possession cannot "obtain unsecured credit allowable under Bankruptcy Code § 503(b)(1) as an administrative expense." *See Pearl-Phil GMT (Far East) Ltd. v. Caldor Corp.*, 266 B.R. 575, 584 (S.D.N.Y. 2001) (superpriority administrative expenses authorized where debtor could not obtain credit as an administrative expense); *In re Klein Sleep Prods., Inc.*, 173 B.R. 296, 297-98 (S.D.N.Y. 1994) (same); *In re Ames Dept. Stores, Inc.*, 115 B.R. 34, 37-39 (Bankr. S.D.N.Y. 1990) (debtor must show that it made reasonable efforts to seek other sources of financing under sections 364(a) and (b)); *In re Garland Corp.*, 6 B.R. 456, 461 (1st Cir. BAP 1980) (secured credit under section 364(c)(2) authorized, after notice and a hearing, upon showing that unsecured credit unobtainable); *In re Crouse Group, Inc.*, 71 B.R. 544, 549 (Bankr. E.D. Pa. 1987) (debtor seeking unsecured credit under section 364(c) of the Bankruptcy Code must prove that it cannot obtain unsecured credit pursuant to section 364(b)).

32.      In addition, section 364(d)(1), which governs the incurrence of postpetition debt secured by senior or "priming" liens, provides that the court may, after notice and a hearing:

> authorize the obtaining of credit or the incurring of debt secured by a senior or equal lien on property of the estate that is subject to a lien only if –
>
>> (A)      the trustee is unable to obtain credit otherwise; and
>>
>> (B)      there is adequate protection of the interest of the holder of the lien on the property of the estate on which such senior or equal lien is proposed to be granted.

11 U.S.C. 364(d)(1).

33.      A debtor need only demonstrate "by a good faith effort that credit was not available" without the protections afforded to potential lenders by sections 364(c) or 364(d). *See In re Mosello*, 195 B.R. 277, 289 (Bankr. S.D.N.Y. 1996) (citing *In re Snowshoe Co.*, 789 F.2d

17

1085, 1088 (4th Cir. 1986)).  Thus, "[t]he statute imposes no duty to seek credit from every possible lender before concluding that such credit is unavailable." *Ames*, 115 B.R. at 40 (holding that debtor made reasonable effort to secure financing when it selected the least onerous financing option from the remaining two lenders).  Moreover, where few lenders likely can or will extend the necessary credit to a debtor, "it would be unrealistic and unnecessary to require [the debtor] to conduct an exhaustive search for financing."  *In re Sky Valley, Inc.*, 100 B.R. 107, 113 (Bankr. N.D. Ga. 1988), *aff'd sub nom.*, *Anchor Savings Bank FSB v. Sky Valley, Inc.*, 99 B.R. 117, 120 n.4 (N.D. Ga. 1989).

34.     Here, the Debtors negotiated the DIP Financing only after carefully examining all available options.  These options included equity advances from existing or new investors, third-party debt financing, and financing available under the CARES Act or other governmental aid programs.  In the end, the Debtors concluded that they would be unable to timely obtain a facility other than the DIP Financing on terms that afforded the Debtors liquidity for any purpose.  The DIP Secured Parties have offered the only timely and viable source of funding.  Accordingly, the Debtors commenced arm's length and good-faith negotiations with the DIP Secured Parties for the DIP Financing.  The DIP Secured Parties would not otherwise agree to lend without the protections being afforded it under the DIP Credit Agreement.

35.     After fully considering their financing options, and whether other more advantageous financing alternatives would be available to the Debtors, the Debtors exercised their business judgment and accepted the DIP Financing with the DIP Secured Parties.  The DIP Financing provides significant advantages that the Debtors believe are unavailable through other sources on a timely basis.

**B.**    **Adequate Protection Under Bankruptcy Code Sections 364(d) and 361**

36.    In connection with the DIP Financing and use of Cash Collateral, the Debtors propose to provide the Prepetition Secured Parties with adequate protection in accordance with sections 364(d) and 361 of the Bankruptcy Code.  To that end, the Debtors and the Prepetition Secured Parties have negotiated, and the Debtors request that the Court approve as of the Petition Date, the adequate protection of the interests of the Prepetition Secured Parties in the Prepetition Collateral described below.

37.    Pursuant to section 363(c)(2) of the Bankruptcy Code, a debtor in possession may not use cash collateral without the consent of the secured party or without court approval.  Section 363(e) provides that, upon request of an entity that has an interest in property to be used by a debtor, the court shall prohibit or condition such use as necessary to provide adequate protection of such interest.  Under section 364(d), a debtor may obtain credit secured by a senior or equal lien if an existing secured creditor's interest in the collateral security is adequately protected.

38.    What constitutes adequate protection is decided on a case-by-case basis.  *See Mosello*, 195 B.R. at 289; *In re Swedeland Dev. Group, Inc.*, 16 F.3d 552, 56 (3d Cir. 1994); *In re Realty Southwest Assocs.*, 140 B.R. 360 (Bankr. S.D.N.Y. 1992); *In re Beker Indus. Corp.*, 58 B.R. 725 (Bankr. S.D.N.Y. 1986); *see also In re O'Connor*, 808 F.2d 1393, 1396 (10th Cir. 1987); *In re Martin*, 761 F.2d 472 (8th Cir. 1985).  By adequate protection, the Bankruptcy Code seeks to shield a secured creditor from diminution in the value of its interest in the particular collateral during the period of use.  *See In re 495 Central Park Avenue Corp.*, 136 B.R. 626, 631 (Bankr. S.D.N.Y. 1992); *In re Beker Indus. Corp.*, 58 B.R. at 736; *In re Hubbard Power & Light*, 202 B.R. 680 (Bankr. E.D.N.Y. 1996).  When priming of liens is sought pursuant to section 364(d) of the Bankruptcy Code, courts also examine whether the prepetition secured creditors are being provided adequate protection for the value of their liens.  *Beker*, 58 B.R. at 737.

19

39.     The Adequate Protection should be deemed sufficient for the Prepetition Secured Parties.   First, the Debtors have their consent under the Prepetition Credit Agreement.   The Prepetition Credit Agreement provides that the Prepetition Agent has authority to consent to or "enter into any amendment or waiver of any Loan Document, or enter into any new agreement or instrument, to effect," among other things, the "protection" of any security interest in any Collateral.  Section 10.02(c).  The protections afforded to the Prepetition Secured Parties, including the right to make advances under the DIP Credit Agreement, the right to Adequate Protection under the Interim Order (paragraph 23), and the other protections afforded under the Interim Order, all constitute "protections" that the Prepetition Agent is authorized to negotiate and commit to on behalf of the Prepetition Secured Parties.  The Debtors are informed and believe that the Prepetition Agent's decision is supported by Prepetition Secured Parties that constitute "Required Lenders" under the Prepetition Credit Agreement.

40.     Because all of these tests are satisfied here and the Debtors have met all of their obligations under section 364 of the Bankruptcy Code, the Motion should be granted and the DIP Credit Agreement should be approved.

41.     Sections 361(2) and (3) of the Bankruptcy Code expressly describe replacement liens and administrative-claim status as appropriate forms of adequate protection.  Thus, the provision of these forms of adequate protection is appropriate.  Accordingly, the Debtors believe that the adequate protection described above is fair, reasonable, and sufficient to protect any diminution in the value of the Prepetition Secured Parties' interests in the Prepetition Collateral during the period their collateral is used by the Debtor.

**C.     The DIP Financing is Necessary to Preserve the Assets of the Debtors' Estates**

42.     The Debtors do not have the resources to maintain operations at full capacity. However, the prospect of a reorganization around the CARES Act or other rescue funding on the

upside and a thoughtfully-managed wind down on the downside is essential to the Debtors' obligation to maximize the value of their assets during this trying period. The Debtors believe that they must provide various constituents, not the least of them being the citizens of the State of Alaska, with every opportunity to preserve the Debtors' businesses through Chapter 11, restore their business, and ultimately reorganize, sell, or (if no better option can be realized) liquidate their business in the most expedient manner. The DIP Financing will provide the working capital necessary to allow the Debtors to, among other things, continue operating the business in the ordinary course of business, which in turn will help maintain value for the benefit of all creditors and parties in interest.

43.    The success of these Chapter 11 cases at the outset depends on the confidence of the Debtors' constituents, which in turn depends upon the Debtors' ability to minimize the disruption of the bankruptcy filings. Approval and implementation of the DIP Financing will assure functioning of the Debtors at their existing levels and preserve the possibility of a viable airline going forward.

### D.    The Terms of the DIP Financing Are Fair, Reasonable, and Appropriate

44.    After appropriate investigation and analysis, the Debtors' management and Board have concluded that the DIP Financing presents the best available option under the circumstances. Bankruptcy courts routinely defer to a debtor's business judgment on most business decisions, including the decision to borrow money, unless such decision fails the arbitrary and capricious standard. *See Ames*, 115 B.R. at 40 (courts should approve borrowings pursuant to 364(c) and (d) if the debtors was within its business judgment); *In re Mid-State Raceway, Inc.*, 323 B.R. 40, 58-59 (Bankr. N.D.N.Y. 2005) (same); *In re Trans World Airlines, Inc.*, 163 B.R. 964, 974 (Bankr. D. Del. 1994) (noting that approval of interim facility, receivables facility and asset-based facility "reflect[ed] sound and prudent business judgment...[was] reasonable under the circumstances and

21

in the best interest of [the debtor] and its creditors"); *cf. Group of Institutional Investors v. Chicago, Mil., St. P. & Pac. Ry.*, 318 U.S. 523, 550 (1943) (holding that decisions regarding assumption or rejection of leases are left to business judgment of the debtor); *In re Simasko Prods. Co.*, 47 B.R. 444, 449 (D. Colo. 1985) ("[b]usiness judgments should be left to the board room and not to this Court"). Indeed, "more exacting scrutiny [of the debtor's business decisions] would slow the administration of the Debtor's estate and increase its cost, interfere with the Bankruptcy Code's provision for private control of administration of the estate and threaten the court's ability to control a case impartially." *Richmond Leasing Co. v. Capital Bank, N.A.*, 762 F.2d 1303, 1311 (5th Cir. 1985).

45.     The terms and conditions of the DIP Financing are fair and reasonable and were negotiated by the parties in good faith and at arms' length. In the reasonable exercise of the Debtors' business judgment, the DIP Financing is the best financing option available under the present circumstances. As discussed above, the Debtors, with the assistance of their advisors, assessed their financing needs and the DIP Financing proposal. After fully considering all of the Debtors' realistic options, and whether other more advantageous financing alternatives were available to the Debtors, the Debtors decided to accept the DIP Financing from the DIP Secured Parties.

46.     Further, the proposed DIP Financing subjects the security interests and administrative-expense claims of the DIP Secured Parties to a Carve-Out, as described above, thereby ensuring that in the event of a default under the DIP Credit Agreement, the Debtors' estates or other parties-in-interest are not directly or indirectly deprived of possible rights and powers by restricting the services for which professionals, the United States Trustee, and a subsequently appointed trustee may be paid in this case. In *Ames Dept. Stores*, the court found such carve-outs

for professional fees not only reasonable but necessary to ensure that official committees and debtors' estates could retain assistance from counsel. *See Ames*, 115 B.R. at 38, 40 (observing that courts insist on carve-outs for professionals representing parties-in-interest because "absent such protection, the collective rights and expectation of all parties-in-interest are sorely prejudiced").

## II.     Interim Approval Should Be Granted

47.     The Debtors respectfully request entry of the Interim Order on an expedited basis in order to avoid the immediate and irreparable harm that would be suffered by the Debtors' estates if the Debtors did not obtain the financing needed to sustain the Debtors' business as a going concern pending the Final Hearing.  The Debtors have an immediate need to obtain the DIP Financing and use Cash Collateral to permit them, in addition to financing the administration of these Chapter 11 cases, to (i) protect the Debtors' assets; (ii) pay employee wages that accrued before the Petition Date and in the ordinary course going forward; (iii) satisfy other working capital and operational needs; and (vi) allow the Debtors to seek additional capital through the CARES Act or otherwise, all of which are necessary to preserve the Debtors' options and protect the value of the Debtors' assets.

48.     Without the use of Cash Collateral and the additional liquidity, the Debtors would not be able to meet their day-to-day cash needs.  If unable to meet the day-to-day cash needs, the Debtors would halt maintenance operations and abandon further financing efforts, both of which would drastically erode the overall value of the Debtors' assets and businesses.  Further, the Debtors must demonstrate to their laid off and furloughed employees that they will honor their prepetition payment obligations if they have any hope of resuming operations or protecting the value of their owned assets.  Therefore, the Debtors request approval of the proposed financing on an expedited basis due to the immediate and irreparable harm that would be suffered by the Debtors' estates if the Debtors are unable to obtain the financing needed to sustain its business.

146484.01600/123083711v.2

49.    Bankruptcy Rule 4001(c) permits a court to approve a debtor's request for financing during the 14-day period following the filing of a motion requesting authorization to obtain postpetition financing "only to the extent necessary to avoid immediate and irreparable harm to the estate pending a final hearing." In examining requests under this rule, courts apply the same business-judgment standard as is applicable to other business decisions. *See, e.g., Ames*, 115 B.R. at 38.  After the 14-day period, the rule does not limit the request to those amounts necessary to avoid immediate and irreparable harm, and a debtor can borrow those amounts it views as prudent to the maintain its business. *Id*. at 36.

50.    The Debtors request that the Court conduct an expedited interim hearing on the Motion and authorize the Debtors from and after the entry of the Interim Order until the Final Hearing to obtain credit under the DIP Credit Agreement, which the Debtors shall use in accordance with the DIP Budget to, among other things, provide working capital for the Debtors and pay expenses for their Chapter 11 cases.  This authority will allow the Debtors to maintain their operations and avoid immediate and irreparable harm and prejudice to their estates, and all parties-in-interest, pending the conclusion of the Final Hearing.

III.    **Modification of the Automatic Stay**

51.    Section 362 of the Bankruptcy Code provides for an automatic stay upon the filing of a bankruptcy petition.  The DIP Agreement requires a modification of the automatic stay to implement the terms of the DIP Agreement. *See Interim Order* § 26.

52.    Stay modification provisions of this kind are ordinary and standard features of postpetition debtor-in-possession financing facilities and, in the Debtors' business judgment, are reasonable under the present circumstances.  As noted above, the Debtors are unable to obtain unsecured credit allowable as an administrative expense under section 503(b)(1) of the Bankruptcy Code in an amount sufficient and readily available to maintain ongoing operations.  Nor have the

24

Debtors been able to obtain debtor-in-possession financing on terms more favorable than those proposed herein.  The terms and conditions of the DIP Financing, including the modification of the automatic stay described above, are fair and reasonable, and were negotiated extensively by well-represented parties in good faith and at arms' length.  In these circumstances, and importantly, in light of the material benefits afforded to the Debtors by the DIP Financing, the modification of the automatic stay is warranted.

## IV.    Notice and Request for Final Hearing

53.    Notice of this motion shall be given to (a) the office of the United States Trustee for the District of Delaware; (b) those creditors holding the 30 largest unsecured claims against the Debtors' estates; (c) BNP Paribas, as administrative agent for the Prepetition Secured Lenders; (d) the DIP Agent; and (e) the Banks.  As this Motion is seeking "first day" relief, within two business days of the hearing on this Motion, the Debtors will serve copies of this Motion and any order entered in respect to this Motion as required by Local Rule 9013-1(m).

54.    Pursuant to Rules 4001(b)(2) and 4001(c)(2) of the Bankruptcy Rules, the Debtors request that the Court set a date for the Final Hearing that is as soon as practicable but in no event later than twenty-one (21) days following the entry of the Interim Order, subject to the Court's availability.  At the Final Hearing, the Debtors will request Court authority to obtain credit under the DIP Credit Agreement on a final basis.

55.    The Debtors request authorization to serve a copy of the signed Interim Order, which fixes the time and date for the filing of objections, if any, by first class mail upon the following:  (i) counsel to the Debtors:  Keller Benvenutti Kim LLP, 650 California Street, Suite 1900, San Francisco, CA  94108 (Attn: Tobias S. Keller, Esq. (tkeller@kbkllp.com) and Jane Kim, Esq. (jkim@kbkllp.com)), and Blank Rome LLP, 1201 N. Market Street, Wilmington, DE 19801 (Attn: Victoria A. Guilfoyle, Esq. (guilfoyle@blankrome.com)); (ii) counsel to the DIP Secured

Creditors:  Winston & Strawn, LLP, 200 Park Avenue, New York, NY 10166 (Attn: David Neier

(dneier@winston.com)); (iii) the Office of the United States Trustee (the "U.S. Trustee"):  U.S.

Trustee, 844 King Street, Suite 2207, Lockbox #35, Wilmington, Delaware, 19801 (Fax:  302-

573-6497) (Attn: Timothy J. Fox Jr. (timothy.fox@usdoj.gov)), and (iv) counsel to any Official

Committee (collectively, the "Notice Parties").  The Debtors request that the Court consider such

notice of the Final Hearing to be sufficient notice under Rule 4001 of the Bankruptcy Rules.

### Request for Waiver of Stay

56.    The Debtors further seek a waiver of any stay of the effectiveness of the order

approving this Motion.  Pursuant to Bankruptcy Rule 6004(h), "[a]n order authorizing the use,

sale, or lease of property other than cash collateral is stayed until the expiration of 14 days after

entry of the order, unless the court orders otherwise." As set forth above, the DIP Financing is

essential to prevent potentially irreparable damage to the Debtors' operations, value, and ability to

reorganize.  Accordingly, the Debtors submit that ample cause exists to justify a waiver of the 14-

day stay imposed by Bankruptcy Rule 6004(h), to the extent it applies.

*[Signature follows]*

WHEREFORE, the Debtors respectfully request that the Court enter an order, substantially in the form attached hereto as Exhibit A, and for such other and further relief.

Dated: April 5, 2020
       Wilmington, Delaware

**BLANK ROME LLP**

/s/ *Victoria A. Guilfoyle*
Victoria A. Guilfoyle (No. 5183)
Stanley B. Tarr (No. 5535)
Jose F. Bibiloni (No. 6261)
1201 N. Market Street, Suite 800
Wilmington, Delaware 19801
Telephone: (302) 425-6400
Facsimile: (302) 425-6464
Email: guilfoyle@blankrome.com
tarr@blankrome.com
jbibiloni@blankrome.com

-and-

**KELLER BENVENUTTI KIM LLP**
Tobias S. Keller (*pro hac vice* pending)
Jane Kim (*pro hac vice* pending)
Thomas B. Rupp (*pro hac vice* pending)
650 California Street, Suite 1900
San Francisco, California 94108
Telephone:  (415) 496-6723
Facsimile:  (650) 636-9251
Email: tkeller@kbkllp.com
      jkim@kbkllp.com
      trupp@kbkllp.com

*Proposed Attorneys for Debtors*
*and Debtors-in-Possession*