## EXHIBIT A

### DIP CREDIT AGREEMENT

**EXECUTION VERSION**

SENIOR SECURED SUPERPRIORITY DEBTOR-IN-POSSESSION

CREDIT AGREEMENT

Dated as of April 7, 2020

among

RAVN AIR GROUP, INC.,
RAVN AIR GROUP HOLDINGS, LLC,
and
THE OTHER ENTITIES PARTY HERETO,
as Borrowers

THE LENDERS PARTY HERETO

and

BNP PARIBAS,
as Administrative Agent

———————

BNP PARIBAS SECURITIES CORP.,
as Sole Lead Arranger and Bookrunner

TABLE OF CONTENTS

Section                                                                                          Page

ARTICLE I

DEFINITIONS

SECTION 1.01   Defined Terms. .................................................................................. 2
SECTION 1.02   Terms Generally. ............................................................................... 28
SECTION 1.03   Accounting Terms; GAAP. ................................................................ 28
SECTION 1.04   Resolution of Drafting Ambiguities. .................................................. 29
SECTION 1.05   Divisions. .......................................................................................... 29
SECTION 1.06   Administrative Borrower. .................................................................. 29

ARTICLE II

THE CREDITS

SECTION 2.01   Commitments. .................................................................................... 29
SECTION 2.02   Loans and Limitations. ...................................................................... 30
SECTION 2.03   Borrowing Procedure. ....................................................................... 31
SECTION 2.04   Evidence of Debt; Repayment of Loans. ........................................... 31
SECTION 2.05   Fees. .................................................................................................. 32
SECTION 2.06   Interest on Loans. .............................................................................. 32
SECTION 2.07   Termination and Reduction of Commitments. .................................... 33
SECTION 2.08   [Reserved]. ........................................................................................ 34
SECTION 2.09   [Reserved]. ........................................................................................ 34
SECTION 2.10   Optional and Mandatory Prepayments of Loans. ............................... 34
SECTION 2.11   [Reserved]. ........................................................................................ 35
SECTION 2.12   Yield Protection. ............................................................................... 35
SECTION 2.13   [Reserved]. ........................................................................................ 36
SECTION 2.14   Payments Generally; Pro Rata Treatment; Sharing of Setoffs. ........... 36
SECTION 2.15   Taxes. ................................................................................................ 38
SECTION 2.16   Mitigation Obligations; Replacement of Lenders. ............................. 41
SECTION 2.17   [Reserved]. ........................................................................................ 42
SECTION 2.18   [Reserved]. ........................................................................................ 42
SECTION 2.19   Defaulting Lenders. ........................................................................... 42
SECTION 2.20   Joint and Several Liability. ................................................................ 43
SECTION 2.21   No Discharge; Survival of Claims. ..................................................... 44

ARTICLE III

REPRESENTATIONS AND WARRANTIES

SECTION 3.01   Organization; Powers. ....................................................................... 44
SECTION 3.02   Authorization; Enforceability. ........................................................... 44
SECTION 3.03   No Conflicts. ..................................................................................... 45
SECTION 3.04   [Reserved]. ........................................................................................ 45

AmericasActive:14673966.12

SECTION 3.05    Properties. ...................................................................................................... 45
SECTION 3.06    Intellectual Property ...................................................................................... 46
SECTION 3.07    Equity Interests and Subsidiaries. .................................................................. 46
SECTION 3.08    Litigation; Compliance with Laws. ................................................................ 47
SECTION 3.09    Agreements. .................................................................................................... 47
SECTION 3.10    Federal Reserve Regulations........................................................................... 47
SECTION 3.11    Investment Company Act. ............................................................................... 47
SECTION 3.12    [Reserved. ....................................................................................................... 48
SECTION 3.13    Taxes. ............................................................................................................... 48
SECTION 3.14    No Material Misstatements. ............................................................................ 48
SECTION 3.15    Labor Matters. ................................................................................................ 48
SECTION 3.16    [Reserved]. ...................................................................................................... 49
SECTION 3.17    Employee Benefit Plans. ................................................................................. 49
SECTION 3.18    Environmental Matters. ................................................................................... 49
SECTION 3.19    Insurance. ........................................................................................................ 50
SECTION 3.20    Security Documents; Superpriority Claims. .................................................... 50
SECTION 3.21    [Reserved]. ...................................................................................................... 51
SECTION 3.22    Anti-Terrorism Laws. ...................................................................................... 51
SECTION 3.23    AML Laws; Anti-Corruption Laws and Sanctions. ......................................... 51
SECTION 3.24    Holding Companies. ........................................................................................ 52
SECTION 3.25    Aircraft Matters. .............................................................................................. 52

ARTICLE IV

CONDITIONS TO LOANS

SECTION 4.01    Conditions to Initial Loans.............................................................................. 53
SECTION 4.02    Conditions to All Loans. .................................................................................. 55

ARTICLE V

AFFIRMATIVE COVENANTS

SECTION 5.01    Financial Statements, Reports, etc. ................................................................. 56
SECTION 5.02    Litigation and Other Notices............................................................................ 57
SECTION 5.03    Existence; Compliance with Laws; Businesses and Properties. ...................... 57
SECTION 5.04    Insurance. ........................................................................................................ 58
SECTION 5.05    Obligations and Taxes. .................................................................................... 59
SECTION 5.06    Employee Benefits. .......................................................................................... 59
SECTION 5.07    Maintaining Records; Access to Properties and Inspections; Lender Meetings. ......... 60
SECTION 5.08    Use of Proceeds. .............................................................................................. 60
SECTION 5.09    Compliance with Environmental Laws; Environmental Reports...................... 60
SECTION 5.10    [Reserved]. ...................................................................................................... 61
SECTION 5.11    [Reserved]. .............................................................**Error! Bookmark not defined.**
SECTION 5.12    Security Interests; Further Assurances. ........................................................... 61
SECTION 5.13    Post-Closing Matters. ...................................................................................... 61
SECTION 5.14    [Reserved]. ...................................................................................................... 61
SECTION 5.15    Aircraft Matters. .............................................................................................. 61

AmericasActive:14673966.12

# ARTICLE VI

## NEGATIVE COVENANTS

SECTION 6.01    Indebtedness. ................................................................................ 62
SECTION 6.02    Liens. ............................................................................................. 63
SECTION 6.03    Sale and Leaseback Transactions. ................................................. 64
SECTION 6.04    Investment, Loan, Advances. ........................................................ 65
SECTION 6.05    Mergers and Consolidations. ......................................................... 65
SECTION 6.06    Asset Sales. ................................................................................... 66
SECTION 6.07    Dividends. ...................................................................................... 66
SECTION 6.08    Transactions with Affiliates. ......................................................... 66
SECTION 6.09    [Reserved]. ..................................................................................... 67
SECTION 6.10    Prepayments of Other Indebtedness; Modifications of Organizational
                Documents and Other Documents, etc. ......................................... 67
SECTION 6.11    Limitation on Certain Restrictions on Subsidiaries. ..................... 67
SECTION 6.12    Limitation on Issuance of Capital Stock. ...................................... 68
SECTION 6.13    Business. ........................................................................................ 68
SECTION 6.14    Limitation on Accounting Changes. .............................................. 68
SECTION 6.15    Fiscal Year. .................................................................................... 68
SECTION 6.16    No Further Negative Pledge. ......................................................... 68
SECTION 6.17    Compliance with Anti-Terrorism Laws. ....................................... 68
SECTION 6.18    Accounts. ....................................................................................... 69
SECTION 6.19    Information Regarding Collateral. .................................................. 69
SECTION 6.20    Owner Trust. .................................................................................. 69
SECTION 6.21    Certain Bankruptcy Matters. ......................................................... 69

# ARTICLE VII

## [Reserved]

# ARTICLE VIII

## EVENTS OF DEFAULT

SECTION 8.01    Events of Default. ......................................................................... 71
SECTION 8.02    [Reserved]. ..................................................................................... 74
SECTION 8.03    Application of Proceeds. ................................................................ 74

# ARTICLE IX

## THE ADMINISTRATIVE AGENT

SECTION 9.01    Appointment and Authority. ........................................................... 75
SECTION 9.02    Rights as a Lender. ........................................................................ 75
SECTION 9.03    Exculpatory Provisions. ................................................................. 75
SECTION 9.04    Reliance by Administrative Agent. ................................................ 76
SECTION 9.05    Delegation of Duties. ..................................................................... 77
SECTION 9.06    Resignation of Administrative Agent. ............................................ 77

AmericasActive:14673966.12

SECTION 9.07    Non-Reliance on Administrative Agent and Other Lenders. ........................ 78
SECTION 9.08    Withholding Tax. ................................................................................ 78
SECTION 9.09    No Other Duties, etc. ......................................................................... 78
SECTION 9.10    Enforcement. ..................................................................................... 79
SECTION 9.11    Credit Bidding. .................................................................................. 79

ARTICLE X

MISCELLANEOUS

SECTION 10.01    Notices. ........................................................................................... 80
SECTION 10.02    Waivers; Amendment. ....................................................................... 82
SECTION 10.03    Expenses; Indemnity; Damage Waiver. ................................................ 84
SECTION 10.04    Successors and Assigns. .................................................................... 86
SECTION 10.05    Survival of Agreement. ...................................................................... 89
SECTION 10.06    Counterparts; Integration; Effectiveness; Electronic Execution. ............... 89
SECTION 10.07    Severability. ..................................................................................... 90
SECTION 10.08    Right of Setoff. ................................................................................. 90
SECTION 10.09    Governing Law; Jurisdiction; Consent to Service of Process. .................. 90
SECTION 10.10    Waiver of Jury Trial. .......................................................................... 91
SECTION 10.11    Headings. ......................................................................................... 91
SECTION 10.12    Treatment of Certain Information; Confidentiality. ................................. 91
SECTION 10.13    USA PATRIOT Act Notice and Customer Verification. ........................... 92
SECTION 10.14    Interest Rate Limitation. ..................................................................... 92
SECTION 10.15    [Reserved]. ....................................................................................... 92
SECTION 10.16    Obligations Absolute. ........................................................................ 92
SECTION 10.17    Release of Collateral. ......................................................................... 93
SECTION 10.18    Acknowledgment and Consent to Bail-In of Affected Financial Institutions. .......... 93
SECTION 10.19    Certain ERISA Matters. ...................................................................... 94

SCHEDULES

Schedule 1A          Commitments
Schedule 1B          Roll-Up Loans
Schedule 3.05(b)     Real Property
Schedule 3.07(a)     Equity Interests
Schedule 3.19        Insurance
Schedule 3.25        Aircraft Disclosures
Schedule 5.13        Post-Closing Matters
Schedule 6.01        Existing Indebtedness
Schedule 6.02        Existing Liens
Schedule 6.04        Existing Investments
Schedule 6.18        Existing Accounts

EXHIBITS

Exhibit A            Form of Administrative Questionnaire
Exhibit B            Form of Assignment and Assumption

AmericasActive:14673966.12

Exhibit C          Form of Borrowing Request
Exhibit D          [Reserved]
Exhibit E          [Reserved]
Exhibit F          [Reserved]
Exhibit G          [Reserved]
Exhibit H          [Reserved]
Exhibit I          Form of Note
Exhibit J          Form of Perfection Certificate Supplement
Exhibit K          [Reserved]
Exhibit L          [Reserved]
Exhibit M-1        Form of U.S. Tax Compliance Certificate (Foreign Lenders Not Treated As Partnerships)
Exhibit M-2        Form of U.S. Tax Compliance Certificate (Foreign Participants Not Treated As Partnerships)
Exhibit M-3        Form of U.S. Tax Compliance Certificate (Foreign Participants Treated As Partnerships)
Exhibit M-4        Form of U.S. Tax Compliance Certificate (Foreign Lenders Treated As Partnerships)

AmericasActive:14673966.12

SENIOR SECURED SUPERPRIORITY DEBTOR-IN-POSSESSION

CREDIT AGREEMENT

This SENIOR SECURED SUPERPRIORITY DEBTOR-IN-POSSESSION CREDIT AGREEMENT, dated as of April 7, 2020 (this "**Agreement**"), among **RAVN AIR GROUP, INC.**, a Delaware corporation ( "**RAGI**"), **RAVN AIR GROUP HOLDINGS**, LLC, a Delaware limited liability company ("**Holdings**") and **EACH OTHER SUBSIDIARY** (such term and each other capitalized term used but not defined herein having the meaning given to it in Article I) **OF HOLDINGS** (jointly and severally, with RAGI and Holdings, the "**Borrowers**" and each, a "**Borrower**"), **THE LENDERS,** and **BNP PARIBAS**, as administrative agent for the Lenders and as collateral agent for the Secured Parties (in such capacities, collectively,, the "**Administrative Agent**").

RECITALS

WHEREAS, on April 5, 2020 (the "**Petition Date**"), Borrowers filed voluntary petitions for relief under chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the District of Delaware (the "**Bankruptcy Court**"), Chapter 11 Case No. 20-10755 (Jointly Administered) (collectively, the "**Chapter 11 Cases**");

WHEREAS, Borrowers and their respective Subsidiaries continue to operate their businesses and manage their properties as debtors and debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code;

WHEREAS, on July 31, 2015, Borrowers entered into that certain Credit Agreement with BNP Paribas, as administrative agent, collateral agent, issuing bank, swingline lender, and certain of the Lenders party hereto (as amended prior to the date hereof, the "**Prepetition Credit Agreement**");

WHEREAS, as of the Petition Date, the Prepetition Lenders (as defined below) were owed aggregate outstanding principal amount of not less than $90,907,954.51 plus interest accrued and accruing thereon, together with all costs, fees, expenses (including attorneys' fees and legal expenses) and other charges accrued, accruing or chargeable with respect thereto (the "**Prepetition Secured Obligations**");

WHEREAS, the Prepetition Secured Obligations are secured by a security interest in substantially all of the existing and after-acquired assets of Borrowers, as more fully set forth in the Prepetition Loan Documents;

WHEREAS, Borrowers have requested that the Lenders provide financing to Borrowers consisting of senior secured superpriority term loans in an aggregate principal amount of up to Twelve Million Dollars ($12,000,000.00) pursuant to Sections 105, 363, 364(c) and 364(d) of the Bankruptcy Code;

WHEREAS, the Lenders have indicated their willingness to agree to extend the New Money Loans (as defined below) to Borrowers, all on terms and conditions set forth herein and in the other Loan Documents and in accordance with Sections 105, 364(c) and 364(d) of the Bankruptcy Code, so long as the Obligations are (i) secured by Liens on the Collateral granted by Borrowers as hereinafter provided, and (ii) given superpriority status as provided in the Interim Borrowing Order and Final Borrowing Order as applicable;

WHEREAS, Borrowers have agreed to provide the Collateral on a super priority basis as set forth in this Agreement the Interim Borrowing Order and the Final Borrowing Order, subject to the approval of the Bankruptcy Court; and

WHEREAS, Borrowers have agreed that a portion of the Prepetition Secured Obligations will be rolled up and converted into the Obligations under this Agreement as more fully set forth herein and in the Interim Borrowing Order and Final Borrowing Order.

NOW, THEREFORE, in consideration of the premises and of the mutual covenants and agreements contained herein, the parties hereto hereby agree as follows:

## ARTICLE I

### DEFINITIONS

SECTION 1.01 <u>Defined Terms.</u>

As used in this Agreement, the following terms shall have the meanings specified below:

"**Acceptable Plan of Reorganization**" shall mean a Plan of Reorganization which either (i) indefeasibly pays the Obligations (including, without limitation, the Roll-Up Loans) in full and in cash, or (ii) is otherwise acceptable to the Administrative Agent and the Required Lenders hereunder and the Administrative Agent and the Required Lenders under (and as such terms are defined in) the Prepetition Credit Agreement, that, in each case, contains releases, exculpations, waivers and indemnification for the Lenders in form and substance acceptable to the Required Lenders.

"**Accounts**" shall mean all Deposit Accounts (as defined in the Security Agreement and including the Designated Deposit Account), Securities Accounts (as defined in the Security Agreement), Commodity Accounts (as defined in the Security Agreement), and any similar accounts held by any Borrower.

"**Administrative Agent**" shall have the meaning assigned to such term in the preamble hereto and includes each other Person appointed as a successor Administrative Agent pursuant to <u>Article IX</u>.

"**Administrative Agent Fees**" shall have the meaning assigned to such term in <u>Section 2.05(b)</u>.

"**Administrative Borrower**" means RAGI (or its successor) or any other Person appointed and authorized by Borrowers pursuant to Section 1.06.

"**Administrative Questionnaire**" shall mean an Administrative Questionnaire in substantially the form of <u>Exhibit A</u>.

"**Affected Financial Institution**" shall mean (i) any EEA Financial Institution or (ii) any UK Financial Institution.

"**Affiliate**" shall mean, when used with respect to a specified Person, another Person that directly, or indirectly through one or more intermediaries, Controls or is Controlled by or is under common Control with the Person specified; *provided*, *however*, that, for purposes of <u>Section 6.08</u>, the

2

term **"Affiliate"** shall also include any Person that directly or indirectly owns more than 10% of any class of Equity Interests of the Person specified.

**"Aggregate Commitments"** shall mean the aggregate amount of the Commitments of all the Lenders, as reduced from time to time pursuant to Section 2.6.

**"Agreement"** shall have the meaning assigned to such term in the preamble hereto.

**"Air Carrier"** shall mean any Person that is an "air carrier" within the meaning of Section 40102(a)(2) of Title 49 and that holds a valid Air Carrier Certificate.

**"Air Carrier Certificate"** shall mean authorization pursuant to Section 41102(a), in respect of air transportation, or 41103, in respect of all-cargo air transportation, of Title 49.

**"Aircraft"** shall mean each airframe, aircraft engine, propeller, appliance, part, system, component, assembly, rotable, instrument, appurtenance, accessory, furnishing, seat and other equipment of whatever nature that is at any given time incorporated or installed in or attached to an airframe or an aircraft engine.

**"Aircraft Collateral"** shall mean each Mortgaged Aircraft, Mortgaged Engine, Mortgaged Propeller, Mortgaged Spare Parts and Assigned Lease and all related Aircraft Permits.

**"Aircraft Lease"** shall mean any agreement by which any Borrower or the Owner Trust, acting as lessor, leases an Aircraft.

**"Aircraft Lease Assignment"** shall mean any agreement (which may include an Aircraft Mortgage) by which a Borrower or Owner Trust assigns its rights as lessor under an Aircraft Lease as security to the Security Trustee or Administrative Agent, in either case, for the benefit of the Secured Parties.

**"Aircraft Mortgage"** shall mean (a) the Aircraft and Engine Mortgage and Aircraft Lease Assignment executed and delivered pursuant to the Prepetition Credit Agreement and (b) each other mortgage and/or security agreement that creates or purports to create a Lien on any Aircraft Collateral in favor of the Administrative Agent or the Security Trustee, in form and substance reasonably acceptable to the Administrative Agent.

**"Aircraft Operating Party"** shall mean each of Corvus, Frontier and Hageland.

**"Aircraft Permits"** shall mean all certificates, franchises, licenses, registrations, permits, rights, designations, authorizations, exemptions, concessions and consents necessary for each Aircraft Operating Party to conduct its business and operations as an Air Carrier, provided that "Aircraft Permits" shall not include an Air Carrier Certificate.

**"Aircraft Regulations"** shall mean any law or regulation, official directive or recommendation, mandatory requirement, or contractual undertaking, or airworthiness requirement or limitation, which applies to any Aircraft Operating Party or its Aircraft, including any rules or regulations of the FAA.

**"Alternate Base Rate"** shall mean, for any day, a fluctuating rate per annum (rounded upward, if necessary, to the nearest 1/100th of 1%) equal to the greatest of (a) the Base Rate in effect on

3

such day, (b) the Federal Funds Effective Rate in effect on such day *plus* 0.50%, and (c) 2.00%. If the Administrative Agent shall have determined (which determination shall be conclusive absent manifest error) that it is unable to ascertain the Federal Funds Effective Rate for any reason, including the inability or failure of the Administrative Agent to obtain sufficient quotations in accordance with the terms of the definition thereof, the Alternate Base Rate shall be determined without regard to clause (b) of the preceding sentence until the circumstances giving rise to such inability no longer exist. Any change in the Alternate Base Rate due to a change in the Base Rate or the Federal Funds Effective Rate shall be effective on the effective date of such change in the Base Rate or the Federal Funds Effective Rate, respectively.

"**AML Laws**" shall mean all Requirements of Law of any jurisdiction applicable to any Lender or any Borrower from time to time primarily regarding anti-money laundering.

"**Anti-Corruption Laws**" shall mean all Requirements of Law of any jurisdiction applicable to any Borrower from time to time primarily regarding bribery or corruption.

"**Anti-Terrorism Laws**" shall mean all Requirements of Law primarily regarding terrorism financing or money laundering, including the Uniting and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism Act ("**USA PATRIOT Act**") of 2001 (Title III of Pub. L. 107-56), The Currency and Foreign Transactions Reporting Act (also known as the "Bank Secrecy Act", 31 U.S.C. §§ 5311-5330 and 12 U.S.C. §§ 1818(s), 1820(b) and 1951-1959), the Trading With the Enemy Act (50 U.S.C. § 1 et seq., as amended), Executive Order 13224 (effective September 24, 2001), and Requirements of Laws administered by OFAC.

"**Applicable Margin**" shall mean 8.00%.

"**Approved Budget**" shall mean the initial 13-week cash flow budget, prepared by Administrative Borrower in form and substance satisfactory to the Administrative Agent and the Required Lenders, that sets forth in reasonable detail all of Borrowers' projected receipts and disbursements on a weekly basis, separated into line items for each category of receipt or disbursement (such budget to be updated from time to time in accordance with Section 5.01(a)).

"**Approved Fund**" shall mean any Fund that is administered or managed by (a) a Lender, (b) an Affiliate of a Lender or (c) an entity or an Affiliate of an entity that administers or manages a Lender.

"**Asset Sale**" shall mean (a) any conveyance, sale, assignment, transfer or other disposition (including by way of merger or consolidation and including any Sale and Leaseback Transaction) of any property, including any Aircraft, but excluding sales of inventory and dispositions of cash and cash equivalents, in each case, in the ordinary course of business, by any Borrower and (b) any issuance or sale of any Equity Interests of any Subsidiary of Holdings, in each case, to any Person other than Holdings or any Subsidiary of Holdings.

"**Assigned Lease**" shall mean an Aircraft Lease that is the subject of an Aircraft Lease Assignment.

"**Assignment and Assumption**" shall mean an assignment and assumption entered into by a Lender and an Eligible Assignee (with the consent of any party whose consent is required by <u>Section 10.04(b)</u>), and accepted by the Administrative Agent, in substantially the form of <u>Exhibit B</u> or any other

form approved by the Administrative Agent.

"**Bail-In Action**" shall mean the exercise of any Write-Down and Conversion Powers by the applicable Resolution Authority in respect of any liability of an Affected Financial Institution.

"**Bail-In Legislation**" shall mean (i) with respect to any EEA Member Country implementing Article 55 of Directive 2014/59/EU of the European Parliament and of the Council of the European Union, the implementing law, regulation rule or requirement for such EEA Member Country from time to time which is described in the EU Bail-In Legislation Schedule and (ii) with respect to the United Kingdom, Part I of the United Kingdom Banking Act 2009 (as amended from time to time) and any other law, regulation or rule applicable in the United Kingdom relating to the resolution of unsound or failing banks, investment firms or other financial institutions or their affiliates (other than through liquidation, administration or other insolvency proceedings).

"**Bankruptcy Code**" shall mean The Bankruptcy Reform Act of 1978, as heretofore and hereafter amended, and codified as 11 U.S.C. Section 101 et seq.

"**Bankruptcy Court**" has the meaning specified in the recitals to this Agreement.

"**Base Rate**" shall mean, for any day, a rate per annum that is equal to the prime commercial lending rate established by the Administrative Agent from time to time. The prime commercial lending rate is not necessarily the lowest rate charged by the Administrative Agent, as applicable, to its customers.

"**Basel III**" shall mean (i) the agreements on capital requirements, leverage ratio and liquidity standards contained in "Basel III: A global regulatory framework for more resilient banks and banking systems", "Basel III: International framework for liquidity risk measurement, standards and monitoring" and "Guidance for national authorities operating the countercyclical capital buffer" published by the Basel Committee on Banking Supervision in December 2010, each as amended, supplemented or restated; (ii) the rules for global systematically important banks contained in "Global systematically important banks: assessment methodology and the additional loss absorbency requirement – Rules text" published by the Committee on Banking Supervision in November 2011, as amended, supplemented or restated; and (iii) and further guidance or standards published by the Basel Committee on Banking Supervision relating to "Basel III".

"**Beneficial Owner**" and "**Beneficially Own**" shall have the meaning given to such terms in Rules 13d-3 and 13d-5 under the Exchange Act.

"**Beneficial Ownership Certification**" shall mean a certification regarding beneficial ownership as required by the Beneficial Ownership Regulation.

"**Beneficial Ownership Regulation**" shall mean 31 C.F.R. § 1010.230.

"**Benefit Plan**" shall mean any of (i) an "employee benefit plan" (as defined in Section 3(3) of ERISA) that is subject to Title I of ERISA, (ii) a "plan" as defined in Section 4975 of the Code to which Section 4975 of the Code applies, and (iii) any Person whose assets include (for purposes of the Plan Asset Regulations or otherwise for purposes of Title I of ERISA or Section 4975 of the Code) the assets of any such "employee benefit plan" or "plan".

"**Board**" shall mean the Board of Governors of the Federal Reserve System of the United

States.

"**Borrowers**" and "**Borrower**" shall have the meaning assigned to such term in the preamble hereto.

"**Borrowing**" shall mean Loans made on the same date.

"**Borrowing Request**" shall mean a request by Administrative Borrower in accordance with the terms of <u>Section 2.03</u> and substantially in the form of <u>Exhibit C</u>, or such other form as shall be approved by the Administrative Agent.

"**Business Day**" shall mean any day other than a Saturday, Sunday or other day on which banks in New York City are authorized or required by law to close.

"**Cape Town Convention**" shall mean the official English language texts of the Convention on International Interests in Mobile Equipment together with the Protocol to the Convention on International Interests in Mobile Equipment on matters specific to Aircraft Equipment, in each case, adopted in Cape Town, South Africa on November 16, 2001, together with the regulations and procedures thereto and the declarations of the United States of America with respect thereto.

"**Capital Assets**" shall mean, with respect to any Person, all equipment, fixed assets and Real Property or improvements of such Person, or replacements or substitutions therefor or additions thereto, that, in accordance with GAAP, have been or should be reflected as additions to property, plant or equipment on the balance sheet of such Person.

"**Capital Expenditures**" shall mean, for any period, without duplication, the aggregate of all expenditures made directly or indirectly by Borrowers during such period for Capital Assets (whether paid in cash or other consideration, financed by the incurrence of Indebtedness or accrued as a liability), but excluding interest capitalized in respect of Capital Lease Obligations during such period.

"**Capital Lease Obligations**" of any Person shall mean the obligations of such Person to pay rent or other amounts under any lease of (or other arrangement conveying the right to use) real or personal property, or a combination thereof, which obligations are required to be classified and accounted for as capital leases on a balance sheet of such Person under GAAP, and the amount of such obligations shall be the capitalized amount thereof determined in accordance with GAAP; provided, any lease that would have been considered an operating lease under GAAP as in effect as of December 31, 2018 shall be treated as an operating lease for all purposes under this Agreement and the other Loan Documents, and obligations in respect thereof shall be excluded from the definition of Indebtedness.

"**Carve Out Trigger Notice**" shall mean a written notice from the Administrative Agent to Administrative Borrower, its lead counsel, the U.S. Trustee and lead counsel to the Creditors' Committee of the occurrence and during the continuance of an Event of Default.

"**Case Professionals**" shall mean Persons or firms retained by Borrowers or the Creditors' Committee or other statutory committee appointed in the Chapter 11 Cases pursuant to sections 327, 363 and 1103 of the Bankruptcy Code.

"**Cash Equivalents**" shall mean, as to any Person, (a) securities issued, or directly, unconditionally and fully guaranteed or insured, by the United States, or any state or commonwealth thereof, or any agency or instrumentality thereof (provided that the full faith and credit of the United

6

States, such state or commonwealth, as applicable, is pledged in support thereof) having maturities of not more than one year from the date of acquisition by such Person; (b) time deposits and certificates of deposit of any Lender or any commercial bank having, or which is the principal banking subsidiary of a bank holding company organized under the laws of the United States, any state thereof or the District of Columbia having, capital and surplus aggregating in excess of $500,000,000 and a rating of "A" (or such other similar equivalent rating) or higher by at least one nationally recognized statistical rating organization (as defined in Rule 436 under the Securities Act) with maturities of not more than one year from the date of acquisition by such Person; (c) repurchase obligations with a term of not more than 30 days for underlying securities of the types described in clause (a) above entered into with any Person meeting the qualifications specified in clause (b) above, which repurchase obligations are secured by a valid perfected security interest in the underlying securities; (d) commercial paper and fixed or variable notes issued by any Person meeting the qualifications specified in clause (b) above or incorporated in the United States rated at least A1 or the equivalent thereof by Standard & Poor's Rating Services or at least P1 or the equivalent thereof by Moody's Investors Service Inc., and in each case maturing not more than one year after the date of acquisition by such Person; (e) investments in money market funds at least 95% of whose assets are comprised of securities of the types described in clauses (a) through (d) above; (f) demand deposit accounts maintained in the ordinary course of business; and (g) investments generally equivalent to those referred to in clauses (a) through (f) above denominated in foreign currencies customarily used by Persons for cash management purposes in any jurisdiction outside of the United States.

"**Casualty Event**" shall mean any involuntary loss of title, any involuntary loss of, damage to or any destruction of, or any condemnation or other taking (including by any Governmental Authority) of, any property of any Borrower. "**Casualty Event**" shall include but not be limited to any taking of all or any part of any Real Property of any Person or any part thereof, in or by condemnation or other eminent domain proceedings pursuant to any Requirement of Law, or by reason of the temporary requisition of the use or occupancy of all or any part of any Real Property of any Person or any part thereof by any Governmental Authority, civil or military, or any settlement in lieu thereof.

"**CERCLA**" shall mean the Comprehensive Environmental Response, Compensation, and Liability Act of 1980, as amended, 42 U.S.C. § 9601 *et seq.* and all implementing regulations.

"**Change in Law**" shall mean the occurrence, after the date of this Agreement, of any of the following: (i) the adoption or taking effect of any law, rule, regulation or treaty, (ii) any change in any law, rule, regulation or treaty or in the administration, interpretation, implementation or application thereof by any Governmental Authority or (iii) the making or issuance of any request, rule, guideline or directive (whether or not having the force of law) by any Governmental Authority; provided, notwithstanding anything herein to the contrary, (x) the Dodd-Frank Wall Street Reform and Consumer Protection Act and all requests, rules, guidelines or directives thereunder or issued in connection therewith and (y) all requests, rules, guidelines or directives promulgated by the Bank for International Settlements, the Basel Committee on Banking Supervision (or any successor or similar authority) or the United States or foreign regulatory authorities, in each case pursuant to Basel III (including for the avoidance of doubt the implementation or application of or compliance with CRD IV), shall in each case be deemed to be a "Change in Law", regardless of the date enacted, adopted or issued.

"**Chapter 11 Cases**" has the meaning provided in the recitals to this Agreement.

"**Charges**" shall have the meaning assigned to such term in <u>Section 10.14</u>.

"**Citizen of the United States**" shall mean a "citizen of the United States" within the meaning of Section 40102(a)(15) of Title 49.

"**Closing Date**" shall mean the date of the initial New Money Loans made hereunder.

"**Code**" shall mean the Internal Revenue Code of 1986, as amended and any successor statute as in effect from time to time.

"**Collateral**" shall mean, collectively, all of the Security Agreements Collateral, the Mortgaged Property, if any, the Aircraft Collateral, and all other property of whatever kind and nature subject or purported to be subject from time to time to a Lien under any Security Document; *provided* that, for the avoidance of doubt, "Collateral" shall not include any property owned by a Governmental Authority.

"**Commitment**" shall mean, for each Lender, the obligation, if any, of such Lender to make New Money Loans to Borrowers, expressed as an amount representing the maximum possible aggregate principal amount of such Lender's New Money Loans outstanding hereunder. The initial amount of each Lender's Commitment is set forth on Schedule 1A, as it may be modified (i) pursuant to Sections 2.02(d) and 2.07, (ii) as a result of any assignment that has become effective pursuant to Section 10.04(b), or (iii) otherwise from time to time pursuant to the terms hereof. As of the date of this Agreement, the aggregate amount of all Commitments is Twelve Million Dollars ($12,000,000.00).

"**Commitment Fee**" shall have the meaning assigned to such term in Section 2.05(a).

"**Commitment Termination Date**" shall mean the earliest of (x) the Maturity Date, (y) the date of confirmation of an Acceptable Plan of Reorganization, and (z) the date on which the Aggregate Commitment is reduced to zero or otherwise terminated pursuant to the terms hereof.

"**Commodity Exchange Act**" shall mean the Commodity Exchange Act (7 U.S.C. § 1 et. seq.), as amended from time to time, and any successor statute.

"**Confirmation Order**" shall mean an order of the Bankruptcy Court confirming an Acceptable Plan of Reorganization pursuant to Section 1129 of the Bankruptcy Code, in form and substance reasonably acceptable to the Required Lenders, which shall be in full force and effect and shall not be reversed, vacated, stayed, amended, supplemented or otherwise modified or subject to the possibility of appeal, in each case, without the prior written consent of the Required Lenders.

"**Consummation Date**" shall mean the date of the substantial consummation (as defined in Section 1101 of the Bankruptcy Code and which for purposes of this Agreement shall be no later than the effective date) of an Acceptable Plan of Reorganization that is confirmed pursuant to a Confirmation Order of the Bankruptcy Court.

"**Contingent Obligation**" shall mean, as to any Person, any obligation, agreement, understanding or arrangement of such Person guaranteeing or intended to guarantee any Indebtedness, leases, dividends or other obligations ("**primary obligations**") of any other Person (the "**primary obligor**") in any manner, whether directly or indirectly, including any obligation of such Person, whether or not contingent, (a) to purchase any such primary obligation or any property constituting direct or indirect security therefor; (b) to advance or supply funds (i) for the purchase or payment of any such primary obligation or (ii) to maintain working capital or equity capital of the primary obligor or otherwise to maintain the net worth or solvency of the primary obligor; (c) to purchase property, securities or

8

services primarily for the purpose of assuring the owner of any such primary obligation of the ability of the primary obligor to make payment of such primary obligation; (d) with respect to bankers' acceptances, letters of credit and similar credit arrangements, until a reimbursement obligation arises (which reimbursement obligation shall constitute Indebtedness); or (e) otherwise to assure or hold harmless the holder of such primary obligation against loss in respect thereof; *provided, however*, that the term "**Contingent Obligation**" shall not include endorsements of instruments for deposit or collection in the ordinary course of business or any product warranties. The amount of any Contingent Obligation shall be deemed to be an amount equal to the stated or determinable amount of the primary obligation in respect of which such Contingent Obligation is made (or, if less, the maximum amount of such primary obligation for which such Person may be liable, whether singly or jointly, pursuant to the terms of the instrument evidencing such Contingent Obligation) or, if not stated or determinable, the maximum reasonably anticipated liability in respect thereof as determined by such Person in good faith.

"**Control**" shall mean the possession, directly or indirectly, of the power to direct or cause the direction of the management or policies of a Person, whether through the ownership of voting securities, by contract or otherwise, and the terms "**Controlling**" and "**Controlled**" shall have meanings correlative thereto.

"**Controlled Investment Affiliate**" shall mean, as to any Person, any other Person which directly or indirectly is in Control of, is Controlled by, or is under common Control with, such Person and is organized by such Person (or any Person Controlling such Person) primarily for making equity or debt investments in Holdings or other portfolio companies.

"**Corvus**" shall mean Corvus Airlines, Inc., a Washington corporation.

"**CRD IV**" shall mean (i) Regulation (EU) No 575/2013 of the European Parliament and of the Council of 26 June 2013 on prudential requirements for credit institutions and investment firms, and (ii) Directive 2013/36/EU of the European Parliament and of the Council of 26 June 2013 on access to the activity of credit institutions and the prudential supervision of credit institutions and investment firms.

"**Creditors' Committee**" shall mean any official committee of creditors formed, appointed or approved in the Chapter 11 Cases pursuant to the Bankruptcy Code

"**Debt Issuance**" shall mean the incurrence by any Borrower of any Indebtedness after the Closing Date (other than as permitted by Section 6.01).

"**Default**" shall mean any event, occurrence or condition which is, or upon notice, lapse of time or both would constitute, an Event of Default.

"**Defaulting Lender**" shall mean any Lender then holding an unfunded Commitment that (a) has failed to fund any portion of its Loans required to be funded by it hereunder within one Business Day of the date required to be funded by it hereunder, (b) has notified the Administrative Agent, any Lender and/or Administrative Borrower in writing that it does not intend to comply with any of its funding obligations under this Agreement or has made a public statement to the effect that it does not intend to comply with its funding obligations under this Agreement or under other agreements in which it commits to extend credit, (c) has failed, within three Business Days after request by the Administrative Agent or Administrative Borrower, to confirm that it will comply with the terms of this Agreement relating to its obligations to fund prospective Loans, (d) has otherwise failed to pay over to the

9

Administrative Agent or any other Lender any other amount required to be paid by it hereunder within three Business Days of the date when due, unless the subject of a good faith dispute, (e) has, or has a direct or indirect parent company that has, (i) become the subject of a proceeding under the Bankruptcy Code or any other liquidation, conservatorship, bankruptcy, assignment for the benefit of creditors, moratorium, rearrangement, receivership, insolvency, reorganization, or similar debtor relief laws of the United States or other applicable jurisdictions from time to time in effect, or (ii) had appointed for it a receiver, custodian, conservator, trustee, administrator, assignee for the benefit of creditors or similar Person charged with reorganization or liquidation of its business or assets, including the Federal Deposit Insurance Corporation or any other state or federal regulatory authority acting in such a capacity or (f) become the subject of a Bail-in Action; provided, a Lender shall not be a Defaulting Lender solely by virtue of the ownership or acquisition of any equity interest in such Lender or any direct or indirect parent company thereof by a Governmental Authority so long as such ownership interest does not result in or provide such Lender with immunity from the jurisdiction of courts within the United States or from the enforcement of judgments or writs of attachment on its assets or permit such Lender (or such Governmental Authority) to reject, repudiate, disavow or disaffirm any contracts or agreements made with such Lender. Any determination by the Administrative Agent that a Lender is a Defaulting Lender under clauses (a) through (f) above shall be conclusive and binding absent manifest error.

"**Designated Deposit Account**" shall mean a deposit account held in the name of Administrative Borrower with Wells Fargo Bank, N.A. or other financial institution acceptable to the Administrative Agent which shall be used exclusively for the disbursement of proceeds of the Loans hereunder and for the payment of expenses of Borrowers in accordance with the Approved Budget (and until such account has been established, Designated Deposit Account shall be deemed to refer to Administrative Borrower's account with First National Bank of Alaska (account ending with 8213).

"**Designated Deposit Account Control Agreement**" shall mean. with respect to the Designated Deposit Account, an account control agreement in form and substance reasonably acceptable to the Administrative Agent.

"**DIP Orders**" shall mean and refer to the Interim Borrowing Order and the Final Borrowing Order, as applicable.

"**Disqualified Capital Stock**" shall mean any Equity Interest which, by its terms (or by the terms of any security into which it is convertible or for which it is exchangeable), or upon the happening of any event, (a) matures (excluding any maturity as the result of an optional redemption by the issuer thereof) or is mandatorily redeemable, pursuant to a sinking fund obligation or otherwise, or is redeemable at the option of the holder thereof, in whole or in part, in each case earlier than six months after the Maturity Date, (b) is convertible into or exchangeable (unless at the sole option of the issuer thereof) for (i) debt securities or (ii) any Equity Interests referred to in (a) above, in each case at any time earlier than six months after the Maturity Date, or (c) contains any repurchase obligation which may come into effect prior to payment in full of all Obligations; provided, however, that any Equity Interests that would not constitute Disqualified Capital Stock but for provisions thereof giving holders thereof (or the holders of any security into or for which such Equity Interests is convertible, exchangeable or exercisable) the right to require the issuer thereof to redeem such Equity Interests upon the occurrence of a change in control or a sale of substantially all assets shall not constitute Disqualified Capital Stock if such Equity Interests provide that the issuer thereof will not redeem any such Equity Interests pursuant to such provisions prior to the repayment in full of the Obligations (other than contingent Obligations in respect of which no claim has been made).

10

"**Dividend**" with respect to any Person shall mean that such Person has declared or paid a dividend or returned any equity capital to the holders of its Equity Interests or made any other distribution, payment or delivery of property (other than Qualified Capital Stock of such Person) or cash to the holders of its Equity Interests as such, or redeemed, retired, purchased or otherwise acquired, directly or indirectly, for consideration any of its Equity Interests outstanding (or any options or warrants issued by such Person with respect to its Equity Interests), or shall have permitted any of its Subsidiaries to purchase or otherwise acquire for consideration any of the Equity Interests of such Person outstanding (or any options or warrants issued by such Person with respect to its Equity Interests). Without limiting the foregoing, "**Dividends**" with respect to any Person shall also include all payments made by such Person with respect to any stock appreciation rights, equity incentive or achievement plans or any similar plans.

"**Dollars**" or "**$**" shall mean lawful money of the United States.

"**EEA Financial Institution**" shall mean (i) any credit institution or investment firm established in any EEA Member Country which is subject to the supervision of an EEA Resolution Authority, (ii) any entity established in an EEA Member Country which is a parent of an institution described in clause (i) of this definition, or (iii) any financial institution established in an EEA Member Country which is a Subsidiary of an institution described in clauses (i) or (ii) of this definition and is subject to consolidated supervision with its parent.

"**EEA Member Country**" shall mean any of the member states of the European Union, Iceland, Liechtenstein and Norway.

"**EEA Resolution Authority**" shall mean any public administrative authority or any Person entrusted with public administrative authority of any EEA Member Country (including any delegee) having responsibility for the resolution of any EEA Financial Institution.

"**Eligible Assignee**" shall mean any Person to whom a Lender is permitted to assign Loans and Commitments pursuant to Section 10.04(b)(i); *provided* that "**Eligible Assignee**" shall not include the Sponsor, any Borrower, any of their Affiliates or any natural Person.

"**Environment**" shall mean ambient air, indoor air, surface water and groundwater (including potable water, navigable water and wetlands), the land surface or subsurface strata, natural resources, the workplace or as otherwise defined in any Environmental Law.

"**Environmental Claim**" shall mean any claim, notice, demand, order, action, suit, proceeding or other written communication alleging liability for or obligation with respect to any investigation, remediation, removal, cleanup, response, corrective action, damages to natural resources, personal injury, property damage, fines, penalties or other costs resulting from, related to or arising out of (i) the presence, Release or threatened Release in or into the Environment of Hazardous Material at any location or (ii) any violation or alleged violation of any Environmental Law, and shall include any claim seeking damages, contribution, indemnification, cost recovery, compensation or injunctive relief resulting from, related to or arising out of the presence, Release or threatened Release of Hazardous Material or alleged injury or threat of injury to health, safety or the Environment.

"**Environmental Law**" shall mean any and all treaties, laws, statutes, ordinances, regulations, rules, decrees, orders, judgments, consent orders, consent decrees, code or other binding requirements relating to protection of public health or the Environment, the Release or threatened Release, handling, generation, disposal, storage, treatment or recycling of or, exposure to, Hazardous Material,

11

natural resources or natural resource damages, or occupational safety or health, and any and all Environmental Permits.

"**Environmental Permit**" shall mean any permit, license, approval, registration, notification, exemption, consent or other authorization required by or from a Governmental Authority under Environmental Law.

"**Equity Interest**" shall mean, with respect to any Person, any and all legal and beneficial rights, shares, interests, participations or other equivalents, including membership interests (however designated, whether voting or nonvoting), of equity of such Person, including, if such Person is a partnership, partnership interests (whether general or limited) and any other interest or participation that confers on a Person the right to receive a share of the profits and losses of, or distributions of property of, such partnership, whether outstanding on the Closing Date or issued after the Closing Date, but excluding debt securities convertible or exchangeable into such equity.

"**Equity Issuance**" shall mean, without duplication, (i) any issuance or sale by a Borrower of any of its Equity Interests (including any Equity Interests issued upon exercise of any warrant or option) or any warrants or options to purchase its Equity Interests or (ii) any contribution to the capital of a Borrower; *provided*, *however*, that an Equity Issuance shall not include any Preferred Stock Issuance or Debt Issuance.

"**ERISA**" shall mean the Employee Retirement Income Security Act of 1974, as the same may be amended from time to time.

"**ERISA Affiliate**" shall mean, with respect to any Person, any trade or business (whether or not incorporated) that, together with such Person, is treated as a single employer under Section 414 of the Code.

"**ERISA Event**" shall mean (a) any "reportable event," as defined in Section 4043 of ERISA and the regulations issued thereunder, with respect to a Plan (other than an event for which the 30-day notice period is waived by regulation); (b) the existence with respect to any Multiemployer Plan of an "accumulated funding deficiency" (as defined in Section 431 of the Code or Section 304 of ERISA), whether or not waived; (c) the failure to make by its due date a required installment under Section 430(j) of the Code or Section 303(j) of ERISA with respect to any Plan or the failure to make any required contribution to a Multiemployer Plan; (d) the filing pursuant to Section 412(c) of the Code or Section 302(c) of ERISA of an application for a waiver of the minimum funding standard with respect to any Plan; (e) the incurrence by any Borrower or any of its ERISA Affiliates of any liability under Title IV of ERISA with respect to the termination of any Plan; (f) the provision by the PBGC or a plan administrator to any Borrower or any ERISA Affiliate of any Borrower of any notice relating to the intention to terminate any Plan or Plans or to appoint a trustee to administer any Plan or Plans, the institution by the PBGC of proceedings to terminate any Plan or Plans, or the occurrence of any event or condition which could reasonably be expected to constitute grounds under ERISA for the termination of, or the appointment of a trustee to administer, any Plan; (g) the incurrence by any Borrower or any of its ERISA Affiliates of any material liability with respect to the complete or partial withdrawal (within the meaning of Sections 4203 or 4205 of ERISA, respectively) from any Plan or Multiemployer Plan; (h) the receipt by any Borrower or any of its ERISA Affiliates of any notice concerning the imposition of Withdrawal Liability or a determination that a Multiemployer Plan is, or is expected to be, insolvent, within the meaning of Section 4245 of ERISA or in endangered or critical status, within the meaning of Section 432 of the Code or Section 305 of ERISA; (i) the "substantial cessation of operations" within the meaning of

12

Section 4062(e) of ERISA with respect to a Plan or the termination of any such Plan resulting in material liability to any Borrower or any ERISA Affiliate of any Borrower pursuant to Sections 4063 or 4064 of ERISA; (j) the making of any amendment to any Plan, which could result in the imposition of a lien or the posting of a bond or other security; (k) the occurrence of an act or an omission that could reasonably be expected to constitute sufficient grounds for the imposition on any Borrower or any of its ERISA Affiliates of material fines, penalties, taxes, or related charges under the Code in respect of any Plan, including the occurrence of a nonexempt prohibited transaction (within the meaning of Section 4975 of the Code or Section 406 of ERISA), which could reasonably be expected to result in any material liability to any Borrower; (l) the imposition of liability on any Borrower or any of its ERISA Affiliates pursuant to Section 4069 of ERISA or by reason of the application of Section 4212(c) of ERISA; or (m) the assertion of a material claim (other than routine claims for benefits) against any Plan or the assets thereof, or against any Borrower or any of their ERISA Affiliates in connection with any such Plan.

"**EU Bail-In Legislation Schedule**" shall mean the EU Bail-In Legislation Schedule published by the Loan Market Association (or any successor person), as in effect from time to time.

"**Event of Default**" shall have the meaning assigned to such term in <u>Section 8.01</u>.

"**Exchange Act**" shall mean the Securities Exchange Act of 1934, as amended, or any successor federal statute, and the rules and regulations of the Commission promulgated thereunder, all as the same shall be in effect from time to time.

"**Excluded Taxes**" shall mean, with respect to the Administrative Agent, any Lender or any other recipient of any payment to be made by or on account of any obligation of any Borrower hereunder or under any other Loan Document, (a) Taxes imposed on or measured by its overall net income (however denominated), franchise Taxes imposed on it in lieu of net income taxes and branch profits or similar Taxes imposed on it, by a jurisdiction (or any political subdivision thereof) as a result of the recipient being organized or having its principal office or, in the case of any Lender, its applicable lending office in such jurisdiction, (b) in the case of a Lender, any United States federal withholding tax that is imposed on amounts payable to or for the account of such Lender at the time such Lender becomes a party hereto (or designates a new lending office), except (x) to the extent that such Lender (or its assignor, if any) was entitled, at the time of designation of a new lending office (or assignment), to receive additional amounts from Borrowers with respect to such withholding tax pursuant to <u>Section 2.15(a)</u> or (y) if such Lender is an assignee pursuant to a request by Administrative Borrower under <u>Section 2.16</u>; *provided* that subclauses (b)(x) and (b)(y) shall not apply to any Tax imposed on a Lender in connection with an interest or participation in any Loan or other obligation that such Lender was required to acquire pursuant to <u>Section 2.14(d)</u>, except to the extent that the transferor of the participation interest would have been entitled, at the time of the transfer of the participation interest, to additional amounts from Borrowers with respect to such a withholding tax pursuant to <u>Section 2.15(a)</u>, (c) Taxes attributable to such recipient's failure to comply with <u>Section 2.15(e)</u>, and (d) any United States federal withholding taxes imposed under FATCA.

"**Export Control Laws**" shall mean the Arms Export Control Act, the International Traffic in Arms Regulations, the Trading with the Enemy Act and the International Emergency Economic Powers Act and Executive Orders and regulations issued thereunder, including the Export Administration Regulations, and any similar laws of any country to which any Borrowers are subject.

"**FAA**" shall mean the Federal Aviation Administration.

13

"**FATCA**" shall mean:

(i)    Sections 1471 through 1474 of the Code, as of the date of this Agreement (or any amended or successor version that is substantively comparable and not materially more onerous to comply with), any current or future regulations or official interpretations thereof and any agreements entered into pursuant to Section 1471(b)(1) of the Code;

(ii)    Any treaty, law, regulation or other official guidance enacted in any other jurisdiction, or relating to an intergovernmental agreement between the United States and any other jurisdiction, which (in either case) facilitates the implementation of sub-paragraph (i) above; or

(iii)    Any agreement pursuant to the implementation of sub-paragraphs (i) or (ii) above with the United States Internal Revenue Service, the United States government or any governmental or taxation authority in any other jurisdiction.

"**Federal Funds Effective Rate**" shall mean, for any day, the weighted average of the rates on overnight federal funds transactions with members of the Federal Reserve System of the United States arranged by federal funds brokers, as published on the next succeeding Business Day by the Federal Reserve Bank of New York, or, if such rate is not so published for any day that is a Business Day, the average of the quotations for the day for such transactions received by the Administrative Agent from three federal funds brokers of recognized standing selected by it.

"**Fees**" shall mean the Commitment Fees and the Administrative Agent Fees.

"**Final Borrowing Order**" shall mean an order of the Bankruptcy Court which order shall be in form, scope and substance acceptable to Administrative Borrower, the Administrative Agent and the Required Lenders, which, among other matters but not by way of limitation, authorizes Borrowers to obtain credit, incur (or guaranty) Obligations, grant Liens under this Agreement, the other Loan Documents, and the DIP Orders, and provides for the superpriority of the Administrative Agent's and the Lenders' claims, which order is a final and non-appealable.

"**Final Order**" shall mean an order or judgment of the Bankruptcy Court, as entered on the docket of the Bankruptcy Court, that has not been reversed, stayed, modified, or amended, and as to which: (a) the time to appeal, seek review or rehearing or petition for certiorari has expired and no timely-filed appeal or petition for review, rehearing, remand or certiorari is pending; or (b) any appeal taken or petition for certiorari filed has been resolved by the highest court to which the order or judgment was appealed or from which certiorari was sought, provided, however, that the possibility that a motion under Rule 59 or Rule 60 of the Federal Rules of Civil Procedure, or any analogous rule under the Federal Rules of Bankruptcy Procedure or other rules governing procedure in cases before the Bankruptcy Court, may be filed with respect to such order shall not cause such order not to be a Final Order.

"**Financial Adviser**" shall mean John Young, individually, and his firm, Conway MacKenzie, Inc.

"**Financial Officer**" of any Person shall mean any chief executive officer, president, chief financial officer, principal accounting officer, treasurer, controller or equivalent officer of such Person, or any other officer of such Person reasonably acceptable to the Administrative Agent.

14

"**FIRREA**" shall mean the Financial Institutions Reform, Recovery and Enforcement Act of 1989, as amended.

"**Fiscal Month**" shall mean any of the monthly accounting periods of Holdings.

"**Fiscal Quarter**" shall mean any of the quarterly accounting periods of Holdings, ending on March 31, June 30, September 30 and December 31 of each year.

"**Foreign Lender**" shall mean any Lender that is not a US Person.

"**Frontier**" shall mean Frontier Flying Service, Inc., an Alaska corporation.

"**Frontier Hangar Assets**" shall mean that hangar facility, office space, warehouse space and related assets leased from Frontier Hangar Group Inc., as sublessor under that certain sublease agreement, effective as of September 30, 2009, with certain Borrowers with respect to certain property located at Ted Stevens International Airport in the Municipality of Anchorage, Alaska.

"**Fund**" shall mean any Person that is (or will be) generally engaged in making, purchasing, holding or otherwise investing in commercial loans and similar extensions of credit in the ordinary course of its business.

"**Funding and Payment Office**" shall mean such office of the Administrative Agent as may from time to time be designated as such in a written notice delivered by the Administrative Agent to Administrative Borrower and each Lender.

"**GAAP**" shall mean generally accepted accounting principles in the United States as in effect from time to time.

"**Governing Body**" shall mean, with respect to any Person, (i) in the case of any corporation, the board of directors of such Person, (ii) in the case of any limited liability company, the board of managers or directors, or sole member if member-managed, as applicable, of such Person, (iii) in the case of any partnership, the Governing Body of the general partner of such Person and (iv) in any other case, the functional equivalent of the foregoing.

"**Governmental Authority**" shall mean the government of the United States or any other nation, or of any political subdivision thereof, whether state, provincial or local, and any agency, authority, instrumentality, regulatory body, court, central bank or other entity exercising executive, legislative, judicial, taxing, regulatory or administrative powers or functions of or pertaining to government (including any supra-national bodies such as the European Union, the European Central Bank or the Organization for Economic Co-operation and Development).

"**Governmental Real Property Disclosure Requirements**" shall mean any Requirement of Law of any Governmental Authority requiring notification of the buyer, lessee, mortgagee, assignee or other transferee of any Real Property, facility, establishment or business, or notification, registration or filing to or with any Governmental Authority, in connection with the sale, lease, mortgage, assignment or other transfer (including any transfer of control) of any Real Property, facility, establishment or business, of the actual or threatened presence or Release in or into the Environment, or the use, disposal or handling of Hazardous Material on, at, under or near the Real Property, facility, establishment or business to be sold, leased, mortgaged, assigned or transferred.

15

"**Hageland**" shall mean Hageland Aviation Services, Inc., an Alaska corporation.

"**Hazardous Materials**" shall mean the following:  hazardous substances; hazardous wastes; polychlorinated biphenyls ("**PCBs**") or any substance or compound containing PCBs; asbestos or any asbestos-containing materials in any form or condition; radon or any other radioactive materials including any source, special nuclear or by-product material; petroleum, crude oil or any fraction thereof; and any other pollutant or contaminant or chemicals, wastes, materials, compounds, constituents or substances, subject to regulation or liability provisions under any Environmental Laws.

"**Hedging Agreement**" shall mean any swap, cap, collar, forward purchase or similar agreements or arrangements dealing with interest rates, currency exchange rates or commodity prices, either generally or under specific contingencies.

"**Hedging Obligations**" shall mean obligations under or with respect to Hedging Agreements.

"**Holdings**" shall have the meaning assigned to such term in the preamble hereto.

"**Incremental Commitments**" shall have the meaning assigned to such term in Section 2.02(d) hereof.

"**Incremental Effective Date**" shall have the meaning assigned to such term in Section 2.02(d) hereof.

"**Indebtedness**" of any Person shall mean, without duplication, (a) all obligations of such Person for borrowed money; (b) all obligations of such Person evidenced by bonds, debentures, notes or similar instruments; (c) all obligations of such Person issued or assumed as the deferred purchase price of property or services (excluding trade accounts payable and accrued obligations incurred in the ordinary course of business and conditional payment obligations; (d) all Indebtedness of others secured by any Lien on property owned or acquired by such Person, whether or not the obligations secured thereby have been assumed, but limited to the lesser of the amount of such Indebtedness and the fair market value of such property; (e) all Capital Lease Obligations, Purchase Money Obligations and synthetic lease obligations of such Person; (f) solely for purposes of Sections 6.01 and 8.01, all Hedging Obligations to the extent required to be reflected on a balance sheet of such Person; (g) all obligations of such Person for the reimbursement of any obligor in respect of letters of credit, letters of guaranty, bankers' acceptances and similar credit transactions; (h) all Contingent Obligations of such Person in respect of Indebtedness or obligations of others of the kinds referred to in clauses (a) through (g) above; and (i) Disqualified Capital Stock issued by such Person.  The Indebtedness of any Person shall include the Indebtedness of any other entity (including any partnership in which such Person is a general partner) to the extent such Person is liable therefor as a result of such Person's ownership interest in such entity, except (other than in the case of general partner liability) to the extent that terms of such Indebtedness expressly provide that such Person is not liable therefor.  Notwithstanding the foregoing, "Indebtedness" shall be deemed not to include (i) fidelity, customs, bid, surety or performance bonds (or indemnity agreements or Contingent Obligations in respect thereof), to the extent no amount is then due and payable by any Borrower thereunder or (ii) obligations incurred to finance deferred insurance premiums in the ordinary course of business.

"**Indemnified Taxes**" shall mean all Taxes other than Excluded Taxes.

AmericasActive:14673966.12

"**Indemnitee**" shall have the meaning assigned to such term in <u>Section 10.03(b)</u>.

"**Information**" shall have the meaning assigned to such term in <u>Section 10.12</u>.

"**Insurance Policies**" shall mean the insurance policies, entries in protection and indemnity clubs or associations, and coverages required to be maintained by (i) any Borrower which is an owner of Mortgaged Property with respect to such Mortgaged Property or (ii) the Owner Trust or any Borrower which is an owner of Aircraft Collateral with respect to such Aircraft Collateral, in each case pursuant to <u>Section 5.04</u>, and all renewals and extensions thereof.

"**Insurance Requirements**" shall mean, collectively, all provisions of the Insurance Policies, all requirements of the issuer of any of the Insurance Policies and all orders, rules, regulations and any other requirements of the National Board of Fire Underwriters (or any other body exercising similar functions) binding upon each Borrower which is an owner of Mortgaged Property or the Owner Trust and each Borrower which is an owner of Mortgaged Aircrafts, and applicable to such Mortgaged Property or Mortgaged Aircrafts or any use or condition thereof.

"**Intellectual Property**" shall have the meaning assigned to such term in <u>Section 3.06(a)</u>.

"**Interest Payment Date**" shall mean with respect to any Loan, (a) the last day of each consecutive calendar month to occur during any period in which such Loan is outstanding, (b) the Maturity Date, and (c) the Commitment Termination Date.

"**Interim Borrowing Order**" shall mean an order entered by the Bankruptcy Court, in form, scope and substance as may be acceptable to Administrative Borrower, the Administrative Agent and the Required Lenders, authorizing, on an interim basis, inter alia Borrowers to obtain credit and incur (or guaranty) Obligations, granting Liens to secure the Obligations, and providing for the super priority of the Administrative Agent's and the Lenders' claims.

"**International Registry**" shall mean the international registry established in accordance with the Cape Town Convention.

"**Investments**" shall have the meaning assigned to such term in <u>Section 6.04</u>.

"**IPO**" shall mean the first underwritten public offering by Holdings of its Equity Interests after the Closing Date pursuant to a registration statement filed with the Securities and Exchange Commission in accordance with the Securities Act.

"**Junior Financing**" shall mean any Indebtedness for borrowed money of any Borrower that is (i) subordinated in right of payment to the Obligations expressly by its terms and/or (ii) is secured on a junior lien basis to the Liens securing the Obligations.

"**Leases**" shall mean any and all leases, subleases, tenancies, options, rental agreements, occupancy agreements, access agreements, charters and any other agreements (including all amendments, extensions, replacements, renewals, modifications and/or guarantees thereof), whether or not of record and whether now in existence or hereafter entered into, with respect to the use or occupancy of all or any portion of any Real Property.

"**Lenders**" shall mean (a) each financial institutions party hereto as Lender on the Closing Date, (b) each financial institution holding Roll-Up Loans and (c) any financial institution that

17

becomes a party hereto pursuant to an Assignment and Assumption.

"**Lien**" shall mean, with respect to any property, (a) any mortgage, deed of trust, lien, pledge, charge, assignment, hypothecation, security interest or similar encumbrance or any similar security arrangement, in each of the foregoing cases whether voluntary or imposed by law; (b) the interest of a vendor or a lessor under any conditional sale agreement, capital lease or title retention agreement (or any financing lease having substantially the same economic effect as any of the foregoing) relating to such property; and (c) in the case of securities, any purchase option, call or similar right of a third party with respect to such securities.

"**Liquidity Amount**" shall mean, on any day, the sum of (i) the aggregate amount of the undrawn Commitments on such date, plus (ii) the aggregate amount of Unrestricted Cash of Borrowers on such date in which the Administrative Agent has a perfected security interest.

"**Liquidity Report**" shall mean a report for each calendar week setting forth the daily average Liquidity Amount for such calendar week, together with appropriate back-up details for each Business Day of such calendar month in form reasonably satisfactory to the Administrative Agent and the Required Lenders.

"**Loan Documents**" shall mean this Agreement, the Notes (if any), the Security Trustee Agreement, the Security Trustee Fee Letter and the Security Documents.

"**Loans**" shall mean, with respect to a Lender, such Lender's (i) New Money Loans and (ii) Roll-Up Loans.

"**Margin Stock**" shall have the meaning assigned to such term in Regulation U.

"**Material Adverse Effect**" shall mean (a) a material adverse effect on the business, property, results of operations or condition, financial or otherwise, of Borrowers, taken as a whole (for the avoidance of doubt, after giving effect to all protections afforded by applicable insurance policies); (b) material impairment of the ability of Borrowers, taken as a whole, to fully and timely perform their obligations under the Loan Documents, taken as a whole; (c) material impairment of the rights of or remedies available to the Lenders or the Administrative Agent under the Loan Documents, taken as a whole; and (d) a material adverse effect on material Collateral or the Liens in favor of the Administrative Agent (for its benefit and for the benefit of the other Secured Parties) on material Collateral or the priority of such Liens; provided, however, that, for the purposes of clause (a), a Material Adverse Effect shall not be deemed to include events, occurrences, facts, conditions or changes arising out of, relating to or resulting from: (i) the announcement of the transactions contemplated by this Agreement; or (ii) the commencement or pendency of the Chapter 11 Cases, including the layoff of substantially all of the employees of Borrowers.

"**Material Indebtedness**" shall mean Indebtedness (other than the Loans) or Hedging Obligations of any Borrower in a principal amount exceeding $500,000 individually or $1,000,000 in the aggregate at any one time. For purposes of determining Material Indebtedness, the "principal amount" in respect of any Hedging Obligations of any Person at any time shall be the maximum aggregate amount (giving effect to any netting agreements) that such Person would be required to pay if the related Hedging Agreement were terminated at such time.

"**Maturity Date**" shall mean the earliest to occur of (a) the 90th day following the date of

18

this Agreement; (b) the date upon which the Interim Borrowing Order expires if a Final Borrowing Order with respect thereto shall have not been entered prior to such date; (c) the date that is thirty-five (35) days after the entry of the Interim Borrowing Order if a Final Borrowing Order with respect thereto shall have not been entered prior to such 35th day; (d) if an Acceptable Plan of Reorganization has been confirmed by order of the Bankruptcy Court, the earlier of (x) the effective date of such Acceptable Plan of Reorganization, and (y) the 30th day after the date of entry of a Confirmation Order with respect thereto; (e) the date of the closing of a sale of substantially all of the equity or assets of Borrowers; (f) the date of indefeasible prepayment in full in cash of all Obligations under the Loan Documents; (g) the filing of a Plan of Reorganization that is not an Acceptable Plan of Reorganization; and (g) the date of acceleration of the maturity of the Loans in accordance with <u>Section 8.01</u>.

"**Maximum Rate**" shall have the meaning assigned to such term in <u>Section 10.14</u>.

"**Mortgaged Aircraft**" shall mean (a) each Aircraft identified as a Mortgaged Aircraft on Schedule 14(a) to the Perfection Certificate dated the Closing Date and (b) each Aircraft which shall be subject to an Aircraft Mortgage delivered after the Closing Date pursuant to <u>Section 5.12</u>.

"**Mortgaged Engine**" shall mean (a) each engine identified as a Mortgaged Engine on Schedule 14(a) to the Perfection Certificate and (b) each engine subject to an Aircraft Mortgage delivered after the Closing Date pursuant to <u>Section 5.12</u>.

"**Mortgaged Propeller**" shall mean (a) each propeller identified as a Mortgaged Propeller on Schedule 14(a) to the Perfection Certificate and (b) each propeller subject to an Aircraft Mortgage delivered after the Closing Date pursuant to <u>Section 5.12</u>.

"**Mortgaged Property**" shall mean (a) each Real Property identified on <u>Schedule 13(a)</u> to the Perfection Certificate, and (b) each Real Property, if any, subject to a Real Property Mortgage delivered after the Closing Date pursuant to <u>Section 5.12</u>.

"**Mortgaged Spare Parts**" shall mean each Spare Part that is, or becomes, subject to the Spare Parts Mortgage and each Spare Part subject to a mortgage or security agreement by a Borrower or the Owner Trust in favor of the Security Trustee or Administrative Agent for the benefit of the Secured Parties.

"**Multiemployer Plan**" shall mean a multiemployer plan within the meaning of Section 4001(a)(3) or Section 3(37) of ERISA (a) to which any Borrower or any of its ERISA Affiliates is then making or accruing an obligation to make contributions; (b) to which any Borrower or any of its ERISA Affiliates has within the preceding five plan years made contributions; or (c) with respect to which any Borrower or any of its ERISA Affiliates could incur liability (including under Section 4212 of ERISA).

"**Net Cash Proceeds**" shall mean,

(a)    with respect to any Asset Sale (other than any issuance or sale of Equity Interests), the cash proceeds received by any Borrower (including cash proceeds subsequently received (as and when received by any Borrower) in respect of non-cash consideration initially received) net of reasonable and documented out-of-pocket selling expenses (including reasonable brokers' fees or commissions, legal, accounting and other professional and transactional fees, transfer and similar taxes

19

and Administrative Borrower's good faith estimate of income taxes paid or payable in connection with such sale;

      (b)    with respect to any Preferred Stock Issuance, Debt Issuance or Equity Issuance, the cash proceeds thereof, net of fees, commissions, costs and other expenses incurred in connection therewith; and

      (c)    with respect to any Casualty Event, the cash insurance proceeds, cash condemnation awards and other cash compensation received in respect thereof, net of all costs and expenses incurred in connection with the collection of such cash proceeds, awards or other compensation in respect of such Casualty Event.

      "**New Money Loans**" means loans made by each Lender pursuant to its Commitment to lend set forth in Section 2.1(a).

      "**Notes**" shall mean any notes evidencing the Loans issued pursuant to this Agreement, if any, substantially in the form of <u>Exhibit I</u>.

      "**Obligations**" shall mean (a) obligations of Borrowers from time to time arising under or in respect of the Loan Documents (whether in respect of the New Money Loans or the Roll-Up Loans), including, without limitation, the due and punctual payment of (i) the principal of and premium, if any, and interest (including interest accruing during the pendency of any bankruptcy, insolvency, receivership or other similar proceeding, regardless of whether allowed or allowable in such proceeding) on the Loans, when and as due, whether at maturity, by acceleration, upon one or more dates set for prepayment or otherwise, and (ii) all other monetary obligations, including fees, costs, expenses and indemnities, whether primary, secondary, direct, contingent, fixed or otherwise (including monetary obligations incurred during the pendency of any bankruptcy, insolvency, receivership or other similar proceeding, regardless of whether allowed or allowable in such proceeding), of Borrowers under this Agreement and the other Loan Documents, and (b) the due and punctual performance of all covenants, agreements, obligations and liabilities of Borrowers under or pursuant to this Agreement and the other Loan Documents.

      "**OFAC**" means the US Department of Treasury Office of Foreign Assets Control, or any successor thereto.

      "**Officers' Certificate**" shall mean a certificate executed by a Responsible Officer, in his or her official (and not individual) capacity.

      "**Organizational Documents**" shall mean, with respect to any Person, (i) in the case of any corporation, the certificate of incorporation and by-laws (or similar documents) of such Person, (ii) in the case of any limited liability company, the certificate of formation and operating agreement (or similar documents) of such Person, (iii) in the case of any limited partnership, the certificate of formation and limited partnership agreement (or similar documents) of such Person, (iv) in the case of any general partnership, the partnership agreement (or similar document) of such Person and (v) in any other case, the functional equivalent of the foregoing.

      "**Other Taxes**" shall mean all present or future stamp, court or documentary, intangible, recording, filing or similar Taxes that arise from any payment made under, from the execution, delivery, performance, enforcement or registration of, from the receipt or perfection of a security interest under, or

AmericasActive:14673966.12

otherwise with respect to, any Loan Document.

"**Owner Trust**" shall mean the Frontier Alaska Aviation Trust, an Alaska trust.

"**Parent**" shall mean the Person directly holding 100% of the equity interest of Holdings (which as of the Closing Date is JFL-RAG Partners, LLC, a Delaware limited liability company). At any time that no such Person exists, references to Parent in this Agreement shall be disregarded.

"**Participant**" shall have the meaning assigned to such term in Section 10.04(d).

"**Participant Register**" shall have the meaning assigned to such term in Section 10.04(d).

"**PBGC**" shall mean the Pension Benefit Guaranty Corporation referred to and defined in ERISA.

"**Perfection Certificate**" shall mean the Perfection Certificate executed and delivered under the Prepetition Agreement, as the same shall be supplemented from time to time by a Perfection Certificate Supplement or otherwise.

"**Perfection Certificate Supplement**" shall mean a certificate supplement in the form of Exhibit J or any other form approved by the Administrative Agent.

"**Permitted Liens**" shall have the meaning assigned to such term in Section 6.02.

"**Permitted Tax Distributions**" shall mean payments, dividends or distributions by any Borrower to Holdings and by Holdings to its equityholder(s) to pay federal, state, local and/or non-United States taxes payable by Holdings' direct or indirect equityholders to the extent such taxes are attributable to the income of Holdings and its Subsidiaries. Such payments shall be equal to the amount of such income multiplied by the Applicable Rate. As used herein, "Applicable Rate" means a rate equal to the then-applicable maximum combined federal and state rate applicable to a person resident in Alaska (after deducting any Alaska income taxes for U.S. federal income tax purposes), taking into account the character of the income of the income ((i.e., whether such income is subject to income tax at capital gains rates, ordinary income rates or any special rates) and for purposes of determining such rate whether such income in the hands of such direct or indirect equityholder is also net investment income and any foreign tax credit such direct or indirect equityholder is entitled to. For purposes of calculating Permitted Tax Distributions, (i) losses previously allocated to each such equityholder by Holdings shall be taken into account to the extent such losses have not previously been applied to reduce the Permitted Tax Distribution hereunder, provided that capital losses and capital loss carry forwards shall be taken into account only to the extent they are currently usable to offset income or gain allocated by Holdings to an equityholder assuming such equityholder's only income is its income from Holdings and its Subsidiaries; and (ii) the deduction under Section 199A of the Code shall be taken into account assuming each equityholder's only income is its income from Holdings and its Subsidiaries.

"**Person**" shall mean any natural person, corporation, limited liability company, trust, joint venture, association, company, partnership, Governmental Authority or other entity.

"**Petition Date**" has the meaning provided in the recitals to this Agreement.

"**Plan**" shall mean any employee pension benefit plan as such term is defined in Section 3(2) of ERISA (other than a Multiemployer Plan) subject to the provisions of Title IV of ERISA or

21

Section 412 of the Code or Section 302 of ERISA which is maintained or contributed to by any Borrower or its ERISA Affiliate or with respect to which any Borrower could incur liability (including under Section 4069 of ERISA).

"**Plan of Reorganization**" shall mean a plan filed in the Chapter 11 Cases pursuant to chapter 11 of the Bankruptcy Code.

"**Pledge and Security Agreement**" shall mean the Pledge and Security Agreement executed and delivered pursuant to the Prepetition Credit Agreement.

"**Preferred Stock**" shall mean, with respect to any Person, any and all preferred or preference Equity Interests (however designated) of such Person whether now outstanding or issued after the Closing Date.

"**Preferred Stock Issuance**" shall mean the issuance or sale by any Borrower of any Preferred Stock after the Closing Date.

"**Prepetition Credit Agreement**" has the meaning given to such term in the recitals hereto.

"**Prepetition Collateral**" shall mean the "Collateral", as defined in the Prepetition Credit Agreement.

"**Prepetition Lenders**" has the meaning given to such term in the Interim Borrowing Order and upon entry thereof, the Final Borrowing Order.

"**Prepetition Liens**" has the meaning given to such term in the Interim Borrowing Order and upon entry thereof, the Final Borrowing Order.

"**Prepetition Loan Documents**" shall mean the "Loan Documents", as defined in the Prepetition Credit Agreement.

"**Prepetition Secured Obligations**" has the meaning given to such term in the recitals hereto.

"**Professional Fee Carve Out**" shall mean a carve out from the Collateral securing the Obligations under the Loan Documents to ensure payment of the following claims, expenses and costs: (i) all fees required to be paid to the Clerk of the Bankruptcy Court (the "**Court Fees**"); (ii) all statutory fees payable to the U.S. Trustee pursuant to 28 U.S.C. § 1930(a)(6) and 28 U.S.C. § 156(c) (the "**Statutory Fees**"); (iii) all accrued and unpaid fees, disbursements, costs and expenses earned or incurred by Case Professionals to the extent allowed at any time, on or after the Petition Date through and including the date of service by the Administrative Agent of a Carve Out Trigger Notice, as limited by the respective Approved Budget amounts for each Case Professional or category of Case Professionals through the date of service of said Carve Out Trigger Notice, whether allowed by the Bankruptcy Court prior to or after delivery of a Carve Out Trigger Notice less the amount of pre-petition retainers received by such Case Professionals; and (iv) all accrued and unpaid fees, disbursements, costs and expenses earned or incurred by the Case Professionals after the date of service of a Carve Out Trigger Notice and not otherwise covered by clause (iii) above, to the extent allowed at any time, in an aggregate amount not to exceed $25,000 *plus* the Court Fees and Statutory Fees referred in (i) and (ii) in this definition, less the amount of pre-petition retainers received by such Case Professionals and not applied to the fees, disbursements,

22

costs and expenses set forth in clause (iii) above. The Professional Fee Carve Out shall be reduced on a dollar for dollar basis by any payments of fees or expenses by the Case Professionals.

"**Pro Rata Share**" shall mean, with respect to a Lender, a portion equal to a fraction the numerator of which is the sum of such Lender's Loans and Commitments and the denominator of which is the total outstanding Loans and Aggregate Commitments, provided, however, if all of the Commitments are terminated pursuant to the terms of this Agreement, then "Pro Rata Share" means the percentage obtained by dividing (i) the principal amount of such Lender's Loans outstanding at such time by (ii) the principal amount of all Lenders' Loans outstanding at such time.

"**property**" shall mean any right, title or interest in or to property or assets of any kind whatsoever, whether real, personal or mixed and whether tangible or intangible and including Equity Interests or other ownership interests of any Person and whether now in existence or owned or hereafter entered into or acquired, including all Real Property.

"**PTE**" means a prohibited transaction class exemption issued by the U.S. Department of Labor, as any such exemption may be amended from time to time.

"**Purchase Money Obligation**" shall mean, for any Person, the obligations of such Person in respect of Indebtedness (including Capital Lease Obligations) incurred for the purpose of financing all or any part of the purchase price of any property (including Equity Interests of any Person) or the cost of installation, construction or improvement of any property and any refinancing thereof; *provided, however*, that (i) such Indebtedness is incurred within one year after such acquisition, installation, construction or improvement of such property by such Person and (ii) the amount of such Indebtedness (net of transaction fees and expenses) does not exceed 100% of the cost of such acquisition, installation, construction or improvement, as the case may be.

"**Qualified Capital Stock**" of any Person shall mean any Equity Interests of such Person that are not Disqualified Capital Stock.

"**RAGI**" shall have the meaning assigned to such term in the preamble hereto.

"**Real Property**" shall mean, collectively, all right, title and interest (including any leasehold, mineral or other estate) in and to any and all parcels of or interests in real property owned, leased or operated by any Person, whether by lease, license or other means, together with, in each case, all easements, hereditaments and appurtenances relating thereto, all improvements and appurtenant fixtures.

"**Real Property Mortgage**" shall mean an agreement, including, but not limited to, a mortgage, deed of trust or any other document, creating and evidencing a Lien on a Mortgaged Property, which shall be in a form reasonably satisfactory to the Administrative Agent, in each case, with such schedules and including such provisions as shall be necessary to conform such document to applicable local law or as shall be customary under applicable local law.

"**Register**" shall have the meaning assigned to such term in Section 10.04(c).

"**Regulation D**" shall mean Regulation D of the Board as from time to time in effect and all official rulings and interpretations thereunder or thereof.

"**Regulation T**" shall mean Regulation T of the Board as from time to time in effect and all official rulings and interpretations thereunder or thereof.

23

"**Regulation U**" shall mean Regulation U of the Board as from time to time in effect and all official rulings and interpretations thereunder or thereof.

"**Regulation X**" shall mean Regulation X of the Board as from time to time in effect and all official rulings and interpretations thereunder or thereof.

"**Related Parties**" shall mean, with respect to any Person, such Person's Affiliates and the partners, directors, officers, employees, agents and advisors of such Person and of such Person's Affiliates.

"**Release**" shall mean any spilling, leaking, seepage, pumping, pouring, emitting, emptying, discharging, injecting, escaping, leaching, dumping, disposing, depositing, dispersing, emanating or migrating of any Hazardous Material in, into, onto or through the Environment.

"**Required Lenders**" shall mean (i) if only one or two Lenders are party to this Agreement, Lenders in the aggregate holding 100% of the aggregate principal amount of Loans and Aggregate Commitments outstanding at such time, or (ii) if three or more Lenders are party to this Agreement, Lenders in the aggregate having greater than 50% of the Loans and Aggregate Commitments or, if the Commitments have been terminated, Lenders in the aggregate holding greater than 50% of the aggregate principal amount of Loans outstanding at such time; provided that (x) the Loans and unused Commitments held or deemed held by any Defaulting Lender shall be excluded for purposes of making a determination of Required Lenders, and (y) Lenders that are Affiliates or Approved Funds of each other shall be deemed to be a single Lender.

"**Requirements of Law**" shall mean, collectively, any and all applicable requirements of any Governmental Authority including any and all laws, judgments, orders, executive orders, decrees, ordinances, rules, regulations, statutes or case law, including without limitation requirements applicable to Borrowers under the Bankruptcy Code and as ordered by the Bankruptcy Court in the Chapter 11 Cases.

"**Resolution Authority**" means an EEA Resolution Authority or, with respect to any UK Financial Institution, a UK Resolution Authority.

"**Response**" shall mean (a) "response" as such term is defined in CERCLA, 42 U.S.C. § 9601(24), and (b) all other actions required by any Governmental Authority or voluntarily undertaken to (i) clean up, remove, treat, abate or in any other way address any Hazardous Material in the Environment; (ii) prevent the Release or threat of Release, or minimize the further Release, of any Hazardous Material; or (iii) perform studies and investigations in connection with, or as a precondition to, or to determine the necessity of the activities described in, clause (i) or (ii) above.

"**Responsible Officer**" of any Person shall mean any executive officer, manager or Financial Officer of such Person and any other officer or similar official thereof with responsibility for the administration of the obligations of such Person in respect of this Agreement (it being understood that in the case of any Borrower organized under the laws of a jurisdiction other than the United States or any state thereof or the District of Columbia, "officer" shall be deemed to include any director); provided that the Financial Adviser shall be deemed a Responsible Officer of Administrative Borrower).

"**Roll-Up Loans**" means loans made by the Lenders under the Prepetition Credit Agreement which are converted into Loans under this Agreement pursuant to Section 2.01. The initial amount of Roll-Up Loans held by each Lender as of the Closing Date is set forth on Schedule 1B (as such

24

Schedule may be updated from time to time, including pursuant to Section on 2.02(d)).

"**Sanctions**" means (a) economic or financial sanctions or trade embargoes or restrictive measures enacted, imposed, administered or enforced from time to time by (i) the U.S. government, including those administered by the Office of Foreign Assets Control of the U.S. Department of the Treasury, the U.S. Department of State, or the U.S. Department of Commerce, (ii) the United Nations Security Council, (iii) the European Union or any of its member states, (iv) Her Majesty's Treasury and (v) Switzerland; or (b) any corresponding Requirements of Law of jurisdictions in which any Borrower operates, in which the proceeds of any Loan will be used or from which repayment of the Obligations is derived.

"**Sanctioned Country**" means, at any time, a country or territory which is, or whose government is, the subject or target of any Sanctions broadly restricting or prohibiting dealings with such country, territory or government.

"**Sanctioned Person**" means, at any time, any Person with whom dealings are restricted or prohibited under Sanctions, including (a) any Person listed in any Sanctions-related list of designated Persons maintained by the United States (including by the Office of Foreign Assets Control of the U.S. Department of the Treasury, the U.S. Department of State, or the U.S. Department of Commerce), the United Nations Security Council, the European Union or any of its member states, Her Majesty's Treasury or Switzerland, (b) any Person organized under the laws or a resident of, or any Governmental Entity or governmental instrumentality of, a Sanctioned Country or (c) any Person 25% or more directly or indirectly owned by, controlled by, or acting for the benefit or on behalf of, any Person described in clauses (a) or (b) hereof.

"**Sale and Leaseback Transaction**" has the meaning assigned to such term in Section 6.03.

"**Secured Parties**" shall mean, collectively, the Administrative Agent, the Lenders, and the Security Trustee.

"**Securities Act**" shall mean the Securities Act of 1933, as amended, or any successor federal statute, and the rules and regulations of the Commission promulgated thereunder, all as the same shall be in effect from time to time.

"**Securities Collateral**" shall have the meaning assigned to such term in the Pledge and Security Agreement.

"**Security Agreement**" shall mean the Security Agreement executed and delivered pursuant to the Prepetition Credit Agreement.

"**Security Agreements Collateral**" shall mean all property pledged or granted as collateral pursuant to the Security Agreement and pursuant to Section 5.12.

"**Security Documents**" shall mean the Security Agreement, the Pledge and Security Agreement, the Real Property Mortgages, the Aircraft Mortgages, the Aircraft Lease Assignments and each other security document or pledge agreement delivered in accordance with applicable local law to grant a valid, perfected security interest in any property as collateral, initially for the Prepetition Secured Obligations and, as of the Closing Date pursuant to the Interim Borrowing Order and subsequently pursuant to the Final Borrowing Order, in each case with the priorities therein specified, the Obligations

25

and any other document or instrument utilized to pledge or grant or purport to pledge or grant a security interest or lien on any property as collateral for the Obligations.

"**Security Trustee**" means U.S. Bank National Association, not in its individual capacity but solely as security trustee pursuant to the Security Trustee Agreement and each applicable Security Document, including each applicable Aircraft Mortgage, and includes each other Person appointed as a successor Security Trustee pursuant to the Security Trustee Agreement.

"**Security Trustee Agreement**" shall mean the Security Trustee Agreement executed and delivered pursuant to the Prepetition Credit Agreement.

"**Spare Parts**" shall mean spare parts as defined in 49 U.S.C. § 40102(a)(43).

"**Spare Parts Mortgage**" shall mean the Spare Parts Mortgage executed and delivered pursuant to the Prepetition Credit Agreement by each of Corvus, Frontier and Hageland in favor of the Security Trustee.

"**Sponsor**" shall mean each of J.F. Lehman & Company and WCP GP III, LLC.

"**Subsidiary**" shall mean, with respect to any Person (the "**parent**") at any date, (i) any Person the accounts of which would be consolidated with those of the parent in the parent's consolidated financial statements if such financial statements were prepared in accordance with GAAP as of such date, (ii) any other corporation, limited liability company, association or other business entity of which securities or other ownership interests representing more than 50% of the voting power of all Equity Interests entitled (without regard to the occurrence of any contingency) to vote in the election of the Governing Body thereof are, as of such date, owned, controlled or held by the parent and/or one or more subsidiaries of the parent, (iii) any partnership (a) the sole general partner or the managing general partner of which is the parent and/or one or more subsidiaries of the parent or (b) the only general partners of which are the parent and/or one or more subsidiaries of the parent and (iv) any other Person that is otherwise Controlled by the parent and/or one or more subsidiaries of the parent; provided that, for the avoidance of doubt, the Owner Trust shall not be considered a Subsidiary. Unless the context requires otherwise, "**Subsidiary**" refers to a Subsidiary of Holdings.

"**Superpriority Claim**" has the meaning set forth in Section 3.20 of this Agreement.

"**Tax Return**" shall mean all returns, statements, filings, attachments and other documents or certifications required to be filed in respect of Taxes.

"**Taxes**" shall mean all present or future taxes, levies, imposts, duties, deductions, withholdings, assessments, fees or other charges imposed by any Governmental Authority, including any interest, additions to tax or penalties applicable thereto.

"**Title 49**" shall mean Title 49 of the United States Code and the rules and regulations promulgated pursuant thereto.

"**Transactions**" shall mean, collectively, the execution, delivery and performance of the Loan Documents and the initial borrowings hereunder and the consummation of the other transactions contemplated hereby.

"**UCC**" shall mean the Uniform Commercial Code as in effect from time to time (except

AmericasActive:14673966.12

as otherwise specified) in any applicable state or jurisdiction.

"**UK Financial Institution**" means any BRRD Undertaking (as such term is defined under the PRA Rulebook (as amended from time to time) promulgated by the United Kingdom Prudential Regulation Authority) or any person falling within IFPRU 11.6 of the FCA Handbook (as amended from time to time) promulgated by the United Kingdom Financial Conduct Authority, which includes certain credit institutions and investment firms, and certain affiliates of such credit institutions or investment firms.

"**UK Resolution Authority**" means the Bank of England or any other public administrative authority having responsibility for the resolution of any UK Financial Institution.

"**United States**" shall mean the United States of America.

"**Unrestricted Cash**" shall mean, at any time, the aggregate amount of cash and Cash Equivalents included in the cash accounts listed on the consolidated balance sheet of Borrowers on such date not required by GAAP to be listed thereon as "restricted", to the extent the use thereof for application to payment of Indebtedness is not prohibited by law or any material contract (other than a Loan Document) of Borrowers.

"**US DOT**" means the United States Department of Transportation.

"**US Person**" shall mean any Person that is a "United States Person" as defined in Section 7701(a)(30) of the Code.

"**USA PATRIOT Act**" shall have the meaning set forth in the definition of "**Anti-Terrorism Laws**."

"**Variance Report**" shall mean, for any calendar week, a report, the form of which shall be reasonably satisfactory to the Administrative Agent and the Required Lenders, prepared by Administrative Borrower reflecting on a line-item and aggregate basis Borrowers' actual performance compared to (i) the Approved Budget for such calendar week and (ii) for the period from the Petition Date until the end of such calendar week, along with management's explanation, in reasonable detail, of any material variance to the Approved Budget.

"**Withdrawal Liability**" shall mean liability to a Multiemployer Plan as a result of a complete or partial withdrawal from such Multiemployer Plan, as such terms are defined in Part I of Subtitle E of Title IV of ERISA.

"**Write-Down and Conversion Powers**" means, (i) with respect to any EEA Resolution Authority, the write-down and conversion powers of such EEA Resolution Authority from time to time under the Bail-In Legislation for the applicable EEA Member Country, which write-down and conversion powers are described in the EU Bail-In Legislation Schedule, and (ii) with respect to the United Kingdom, any powers of the applicable Resolution Authority under the Bail-In Legislation to cancel, reduce, modify or change the form of a liability of any UK Financial Institution or any contract or instrument under which that liability arises, to convert all or part of that liability into shares, securities or obligations of that person or any other person, to provide that any such contract or instrument is to have effect as if a right had been exercised under it or to suspend any obligation in respect of that liability or any of the powers under that Bail-In Legislation that are related to or ancillary to any of those powers.

SECTION 1.02 <u>Terms Generally.</u>

The definitions of terms herein shall apply equally to the singular and plural forms of the terms defined. Whenever the context may require, any pronoun shall include the corresponding masculine, feminine and neuter forms. The words "include," "includes" and "including" shall be deemed to be followed by the phrase "without limitation." The word "will" shall be construed to have the same meaning and effect as the word "shall." Unless the context requires otherwise (a) any definition of or reference to any Loan Document, agreement, instrument or other document herein shall be construed as referring to such agreement, instrument or other document as from time to time amended, supplemented or otherwise modified (subject to any restrictions on such amendments, supplements or modifications set forth herein), (b) any reference herein to any Person shall be construed to include such Person's successors and assigns, (c) the words "herein," "hereof" and "hereunder," and words of similar import, shall be construed to refer to this Agreement in its entirety and not to any particular provision hereof, (d) all references herein to Articles, Sections, Exhibits and Schedules shall be construed to refer to Articles and Sections of, and Exhibits and Schedules to, this Agreement, (e) any reference to any law or regulation herein shall refer to such law or regulation as amended, modified or supplemented from time to time, (f) the words "asset" and "property" shall be construed to have the same meaning and effect and to refer to any and all tangible and intangible assets and properties, including cash, securities, accounts and contract rights and (g) "on," when used with respect to the Mortgaged Property or any property adjacent to the Mortgaged Property, means "on, in, under, above or about."

SECTION 1.03 <u>Accounting Terms; GAAP.</u>

Except as otherwise expressly provided herein, all financial statements to be delivered pursuant to this Agreement shall be prepared in accordance with GAAP as in effect from time to time and all terms of an accounting or financial nature shall be construed and interpreted in accordance with GAAP, as in effect from time to time unless otherwise agreed to by Administrative Borrower and the Required Lenders, *provided*, *however*, in the event of any material change in GAAP with respect to the treatment of leases as operating or capital, Borrowers may delay, for purposes hereof, the applicability thereof for up to 120 days from the date such change in GAAP is pronounced. If at any time any change in GAAP would affect the computation of any financial ratio set forth in any Loan Document, and Administrative Borrower or the Required Lenders shall so request, the Administrative Agent and Administrative Borrower shall negotiate in good faith to amend such ratio to preserve the original intent thereof in light of such change in GAAP (subject to the approval of the Required Lenders); *provided* that, until so amended, such ratio shall continue to be computed in accordance with GAAP prior to such change therein and Administrative Borrower shall provide to Administrative Agent the reconciliation statements required under <u>Section 5.01</u>. When used herein, the term "financial statement" shall include balance sheets, statements of earnings, statements of equity holders' equity and the notes and schedules thereto, and each reference herein to a balance sheet or other financial statement of Holdings shall be to a statement prepared on a consolidated basis, unless otherwise specified. For purposes of determining compliance with the financial covenants contained in this Agreement, any election by any Borrower to measure any portion of a non-derivative financial liability included in the definition of Indebtedness at fair value (as permitted by Financial Accounting Standards Board No. 159 or any similar accounting standard) other than to reflect a hedge of such non-derivative financial liability (including without limitation, both interest rate and foreign currency hedges) shall be disregarded and such determination shall be made instead using the outstanding amount of such Indebtedness.

SECTION 1.04 Resolution of Drafting Ambiguities.

Each Borrower acknowledges and agrees that it was represented by counsel in connection with the execution and delivery of the Loan Documents to which it is a party, that it and its counsel reviewed and participated in the preparation and negotiation hereof and thereof and that any rule of construction to the effect that ambiguities are to be resolved against the drafting party shall not be employed in the interpretation hereof or thereof.

SECTION 1.05 Divisions.

For all purposes under the Loan Documents, in connection with any division or plan of division under Delaware law (or any comparable event under a different jurisdiction's laws): (a) if any asset, right, obligation or liability of any Person becomes the asset, right, obligation or liability of a different Person, then it shall be deemed to have been transferred from the original Person to the subsequent Person, and (b) if any new Person comes into existence, such new Person shall be deemed to have been organized on the first date of its existence by the holders of its Equity Interests at such time.

SECTION 1.06 Administrative Borrower.

Each Borrower hereby appoints RAGI as the borrowing agent for Borrowers which appointment shall remain in full force and effect unless and until the Administrative Agent and the Lenders shall have received prior written notice signed by all of Borrowers that such appointment has been revoked or that another Borrower has been appointed in such capacity. Each Borrower hereby appoints and authorizes RAGI (or its successor) (i) to provide to the Administrative Agent and the Lenders and receive from the Administrative Agent and the Lenders all notices with respect to Loans obtained for the benefit of any Borrower and all other notices and instructions under this Agreement and (ii) to take such action as RAGI deems appropriate on behalf of Borrowers and to exercise such other powers as are reasonably incidental thereto to carry out the purposes of this Agreement. Any reference to any action or notice required or permitted to be taken or given hereunder and under the Loan Documents by the "Borrowers" or "each Borrower" shall be effective if such action is taken, or such notice is delivered, by Administrative Borrower or, as applicable, a Responsible Officer thereof.

**ARTICLE II**

THE CREDITS

SECTION 2.01 Commitments.

Subject to the terms and conditions and relying upon the representations and warranties herein set forth, each Lender agrees, severally and not jointly, to make New Money Loans to Borrowers, at the times set forth in Section 2.02 prior to the Commitment Termination Date in an aggregate principal amount for all such New Money Loans not to exceed such Lender's Commitment. Subject to entry of the Final Borrowing Order, Prepetition Obligations of each Lender in an amount equal to 200% of its Commitment shall, on a cash-less basis, be automatically converted to Roll-Up Loans of such Lender and such Roll-Up Loans shall thereafter constitute Loans and Obligations for all purposes under this Agreement and shall cease to constitute Prepetition Secured Obligations. Upon entry of the Final Borrowing Order, the Administrative Agent shall update the Register to reflect the outstanding amount of each Lender's Roll-Up Loans and, if applicable, upon an increase of the Commitments pursuant to Section 2.02(d). Amounts paid or prepaid in respect of any Loan may not be reborrowed.

29

SECTION 2.02 Loans and Limitations.

(a)    Each New Money Loan shall be made by the Lenders ratably in accordance with their applicable Commitments; *provided* that the failure of any Lender to make its New Money Loan shall not in itself relieve any other Lender of its obligation to lend hereunder (it being understood, however, that no Lender shall be responsible for the failure of any other Lender to make any New Money Loan required to be made by such other Lender). New Money Loans shall not be made on more than on three (3) separate occasions, unless the Administrative Agent and the Required Lenders shall otherwise agree, and shall be made in the following amounts (or in such lesser amount(s) as Administrative Borrower shall request) and on the following approximate dates:

(i)    $6,000,000.00 of New Money Loans to be made upon satisfaction of the applicable conditions in Article IV and subject to the entry of the Interim Borrowing Order by the Bankruptcy Court;

(ii)    $6,000,000.00 of New Money Loans to be made upon satisfaction of the applicable conditions in Article IV and subject to entry of the Final Borrowing Order by the Bankruptcy Court and the filing of an Acceptable Plan of Reorganization with the Bankruptcy Court, and

(iii)    only to the extent the Commitments have been increased pursuant to Section 2.02(d) below, on the Incremental Effective Date, an amount of New Money Loans in an amount equal to the actual Incremental Commitments (less any associated fees payable in respect thereof).

(b)    Each Lender shall make each New Money Loan to be made by it hereunder on the proposed date thereof by wire transfer of immediately available funds to such account in New York City as the Administrative Agent may designate not later than 12:00 noon, New York City time, and the Administrative Agent shall promptly credit the amounts so received to the Designated Deposit Account or, if a Borrowing shall not occur on such date because any condition precedent herein specified shall not have been met, return the amounts so received to the respective Lenders.

(c)    Unless the Administrative Agent shall have received notice from a Lender at least two hours prior to the time of any Borrowing that such Lender will not make available to the Administrative Agent such Lender's portion of such Borrowing, the Administrative Agent may assume that such Lender has made such portion available to the Administrative Agent on the date of such Borrowing in accordance with paragraph (b) above, and the Administrative Agent may, in reliance upon such assumption, make available to Borrowers on such date a corresponding amount.  If the Administrative Agent shall have so made funds available, then, to the extent that such Lender shall not have made such portion available to the Administrative Agent, each of such Lender and each Borrower severally agrees to repay to the Administrative Agent forthwith on demand such corresponding amount together with interest thereon, for each day from the date such amount is made available to Borrowers until the date such amount is repaid to the Administrative Agent at (i) in the case of each Borrower, the interest rate applicable at the time to the New Money Loans comprising such Borrowing and (ii) in the case of such Lender, the greater of the Federal Funds Effective Rate and a rate determined by the Administrative Agent in accordance with banking industry rules on interbank compensation.  If such Lender shall repay to the Administrative Agent such corresponding amount, such amount shall constitute such Lender's New Money Loan as part of such Borrowing for purposes of this Agreement, and

30

Borrowers' obligation to repay the Administrative Agent such corresponding amount pursuant to this Section 2.02(c) shall cease.

(d)    At any one time (but not more frequently) following the entry of the Final Borrowing Order by the Bankruptcy Court, Administrative Borrower may, by written notice to the Administrative Agent, request an increase of the Commitments in an aggregate amount of up to $2,000,000.00 (the "**Incremental Commitments**"). Such notice shall specify (i) the amount of the Incremental Commitments being requested, (ii) the date (the "**Incremental Effective Date**") on which Administrative Borrower proposes that such increase of the Commitments shall be effective and corresponding Loans shall be made, which shall be a date not less than five Business Days after the date on which such notice is delivered to the Administrative Agent. The Administrative Agent shall notify the Lenders, promptly upon receipt of Administrative Borrower's notice of an Incremental Facility Effective Date, of the amount of the Incremental Commitments, each Lender's pro rata share thereof and the proposed Incremental Effective Date. Subject to approval by the Required Lenders and the satisfaction of the conditions herein (including Section 4.02 hereof), on the Incremental Facility Effective Date (i) each Lender that commits, in its sole and absolute discretion, to the Incremental Commitments shall make a New Money Loan to Borrowers in an amount equal to its Incremental Commitment, and (ii) the aggregate amount of the Incremental Commitments shall be effected pursuant to an amendment to this Agreement, to be entered into by the Required Lenders, the Lenders providing the Incremental Commitments, the Administrative Agent and Administrative Borrower, and Schedule 1A, Schedule 1B, the Register hereunder and the Register under (as such term is defined in) the Prepetition Credit Agreement shall be updated accordingly. Each Loan made in respect of the Incremental Commitments shall be deemed, for all purposes, a New Money Loan hereunder. Each Loan made in respect of the Incremental Commitments shall be deemed, for all purposes, a New Money Loan hereunder and, upon the occurrence of the Incremental Effective Date, the Prepetition Obligations of each Lender having an Incremental Commitment shall, on a cash-less basis, be automatically converted to Roll-Up Loans of such Lender in an amount equal to 200% of its Incremental Commitment and shall cease to constitute Prepetition Secured Obligations.

SECTION 2.03 Borrowing Procedure.

To request a Borrowing of New Money Loans, Administrative Borrower shall deliver, by hand delivery or telecopier (or transmit by electronic communication, if arrangements for doing so have been approved by the Administrative Agent), a duly completed and executed Borrowing Request to the Administrative Agent not later than 10:00 a.m., New York City time, three (3) Business Days prior to the date of the proposed Borrowing except for borrowings under the Interim Borrowing Order, which request has been duly submitted and is acknowledged. Each Borrowing Request shall be irrevocable. Promptly following receipt of a Borrowing Request in accordance with this Section 2.03, the Administrative Agent shall advise each Lender of the details thereof and of the amount of such Lender's New Money Loan to be made as part of the requested Borrowing.

SECTION 2.04 Evidence of Debt; Repayment of Loans.

(a)    Promise to Repay. Each Borrower hereby, jointly and severally, unconditionally promises to pay to the Administrative Agent for the account of each Lender, the then unpaid principal amount of each Loan of each Lender on the Maturity Date.

(b)    Lender and Administrative Agent Records. Each Lender shall maintain in accordance with its usual practice an account or accounts evidencing the Indebtedness of Borrowers to

31

such Lender resulting from each Loan made by such Lender from time to time, including the amounts of principal and interest payable and paid to such Lender from time to time under this Agreement. The Administrative Agent shall maintain records including (i) the amount of each Loan made hereunder; (ii) the amount of any principal or interest due and payable or to become due and payable from Borrowers to each Lender hereunder; and (iii) the amount of any sum received by the Administrative Agent hereunder for the account of the Lenders and each Lender's share thereof. The entries made in the records maintained by the Administrative Agent (including the Register maintained pursuant to Section 10.04(c)) and each Lender pursuant to this paragraph shall be *prima facie* evidence of the existence and amounts of the obligations therein recorded; *provided* that the failure of any Lender or the Administrative Agent to maintain such records or any error therein shall not in any manner affect the obligations of Borrowers to repay the Loans made to it in accordance with the terms hereof. In the event of any conflict between the records maintained by any Lender and the records of the Administrative Agent in respect of such matters, the records of the Administrative Agent (including the Register maintained pursuant to Section 10.04(c)) shall control in the absence of manifest error.

(c)    Promissory Notes. Any Lender by written notice to Administrative Borrower (with a copy to the Administrative Agent) may request that Loans made by it be evidenced by a promissory note. In such event, Administrative Borrower shall prepare, execute and deliver to such Lender a promissory note payable such Lender and its registered assigns in the form of Exhibit I.

SECTION 2.05 Fees.

(a)    Commitment Fee. Each Borrower, jointly and severally, agrees to pay to the Administrative Agent for the account of each Lender a commitment fee (a "**Commitment Fee**") equal to 2.00%, per annum on the average daily unused amount of the Commitment of such Lender during the period from and including the Closing Date to but excluding the Commitment Termination Date. Accrued Commitment Fees shall be payable in arrears (A) on the last day of each Fiscal Month and (B) on the Commitment Termination Date. Commitment Fees shall be computed on the basis of a year of 365 days (or 366 days in a leap year) and shall be payable for the actual number of days elapsed (including the first day but excluding the last day).

(b)    Administrative Agent Fees. Each Borrower agrees, jointly and severally, to pay to the Administrative Agent, for its own account, the administrative fees payable in the amounts and at the times separately agreed upon between Administrative Borrower and the Administrative Agent (the "**Administrative Agent Fees**").

(c)    All Fees shall be paid on the dates due, in immediately available funds to the Administrative Agent for distribution, if and as appropriate, among the Lenders. Once paid, none of the Fees shall be refundable under any circumstances.

SECTION 2.06 Interest on Loans.

(a)    Subject to the provisions of Section 2.06(b):

(i)    the New Money Loans shall bear interest at a rate per annum equal to the Alternate Base Rate in effect from time to time plus the Applicable Margin and shall be payable in cash on each Interest Payment Date.

(ii)    the Roll-Up Loans shall bear interest:

32

(A)      until the date six months after the date that the Obligations in respect of the New Money Loans have been indefeasibly repaid in full in cash, at a rate per annum equal to the Alternate Base Rate in effect from time to time plus the Applicable Margin; provided, that 100% of such interest shall be paid in-kind by adding such accrued interest to the unpaid principal amount of the Roll-Up Loans on each Interest Payment Date (whereupon from and after any such date such additional capitalized amounts shall also accrue interest pursuant to this Section 2.06); and

(B)      thereafter, at a rate per annum equal to the Alternate Base Rate in effect from time to time plus the Applicable Margin; provided, that (x) interest in the amount equal to 1.00% shall be paid in cash on each Interest Payment Date and (y) interest in an amount equal to the Alternate Base Rate in effect from time to time plus 7.00% shall be paid in-kind by adding such accrued interest to the unpaid principal amount of the Roll-Up Loans on each Interest Payment Date (whereupon from and after any such date such additional capitalized amounts shall also accrue interest pursuant to this Section 2.06).

(b)      Default Rate.  Notwithstanding the foregoing, if there is an Event of Default hereunder, then during the continuance of any such Event of Default, at the election of the Required Lenders, all Obligations shall, to the extent permitted by applicable law, bear interest in cash, after as well as before judgment, at a rate per annum equal to (i) in the case of amounts constituting principal on any Loan, 2% *plus* the rate otherwise applicable to such Loan as provided in the preceding paragraphs of this Section 2.06 or (ii) in the case of any other outstanding overdue amount, 2% *plus* the rate applicable to Loans as provided in Section 2.06(a).

(c)      Interest Payment Dates.  Accrued interest on each Loan shall be payable in arrears on each Interest Payment Date for such Loan; *provided* that interest accrued pursuant to Section 2.06(b) shall be payable on demand.

(d)      Interest Calculation.  All interest hereunder shall be computed on the basis of a year of 365 days (or 366 days in a leap year), and in each case shall be payable for the actual number of days elapsed (including the first day but excluding the last day).  The Alternate Base Rate shall be determined by the Administrative Agent in accordance with the provisions of this Agreement and such determination shall be conclusive absent manifest error.

SECTION 2.07 Termination and Reduction of Commitments.

(a)      Termination of Commitments.  The Commitments shall automatically terminate on the Commitment Termination Date.

(b)      Optional Terminations and Reductions.  At its option, Borrowers may at any time terminate, or from time to time permanently reduce, the Commitments; *provided* that each reduction of the Commitments shall be in an amount that is an integral multiple of $100,000, and not less than $200,000.

(c)      Borrower Notice.  Administrative Borrower shall notify the Administrative Agent in writing of any election to terminate or reduce the Commitments under Section 2.07(b) at least three Business Days prior to the effective date of such termination or reduction, specifying such election and the effective date thereof.  Promptly following receipt of any notice, the Administrative Agent shall advise the Lenders of the contents thereof. Each notice delivered by Administrative Borrower pursuant to

33

this Section shall be irrevocable; *provided* that a notice of termination of the Commitments delivered by Administrative Borrower may state that such notice is conditioned upon the sale of a Borrower or an Asset Sale or the effectiveness of another credit facility or the closing of a securities offering, in which case such notice may be revoked by Administrative Borrower (by notice to the Administrative Agent on or prior to the specified effective date) if such condition is not satisfied. Any termination or reduction of the Commitments shall be permanent. Each reduction of the Commitments shall be made ratably among the Lenders in accordance with their respective Commitments.

SECTION 2.08 [Reserved].

SECTION 2.09 [Reserved].

SECTION 2.10 Optional and Mandatory Prepayments of Loans.

(a)    Optional Prepayments. Borrowers shall have the right at any time and from time to time to prepay the Loans, in whole or in part, subject to the requirements of this Section 2.10; *provided* that (i) each partial prepayment shall be in an amount that is an integral multiple of $100,000 and not less than $200,000 or, if less, the then outstanding principal amount of the Loans and (ii) no such prepayments shall be permitted with respect to the Roll-Up Loans until such time as the New Money Loans have been indefeasibly repaid in full in cash.

(b)    Asset Sales. Not later than two Business Days following the receipt of any Net Cash Proceeds of any Asset Sale by any Borrower, Borrowers shall make prepayments in accordance with Sections 2.10(f) and (g) in an aggregate amount equal to 100% of such Net Cash Proceeds; *provided* that no such prepayment shall be required under this Section 2.10(b) with respect to the disposition of property which constitutes a Casualty Event.

(c)    Debt Issuance or Preferred Stock Issuance. Upon receipt of any Net Cash Proceeds of any Debt Issuance by any Borrower, or any Preferred Stock Issuance by any Borrower (other than any such issuance to any other Borrower), Borrowers shall make prepayments in accordance with Sections 2.10(f) and (g) in an aggregate amount equal to 100% of such Net Cash Proceeds.

(d)    Equity Issuance. Upon receipt of any Net Cash Proceeds of any Equity Issuance or any Preferred Stock Issuance by any Borrower (other than any such issuance to any other Borrower), Borrowers shall make prepayments in accordance with Sections 2.10(f) and (g) in an aggregate amount equal to 100% of such Net Cash Proceeds.

(e)    Casualty Events. Not later than two Business Days following the receipt of any Net Cash Proceeds from a Casualty Event by any Borrower, Borrowers shall make prepayments in accordance with Sections 2.10(f) and (g) in an aggregate amount equal to 100% of such Net Cash Proceeds.

(f)    Application of Prepayments.

(i)    Optional prepayments made pursuant to Section 2.10(a) shall be applied to reduce the principal amount of the then outstanding Loans together with the Commitments (if applicable) in a corresponding amount.

(ii)    Mandatory prepayments pursuant to Section 2.10(b), (c), (d) or (e), shall be applied first to reduce the principal amount of the then outstanding New Money Loans

34

AmericasActive:14673966.12

together with the Commitments in a corresponding amount until paid in full in cash, and second to the principal amount of the Roll-Up Loans and any accrued but unpaid interest thereon.

(g)    Notice of Prepayment.  Administrative Borrower shall notify the Administrative Agent in writing of any prepayment hereunder (i) in the case of any mandatory prepayment, before or concurrently with such prepayment, and (ii) in the case of voluntary prepayment, not later than 1:00 p.m., New York City time, one Business Day before the date of prepayment.  Each such notice shall be irrevocable.  Each such notice shall specify the prepayment date, the principal amount of the Loans to be prepaid and, in the case of a mandatory prepayment, a reasonably detailed calculation of the amount of such prepayment.  Promptly following receipt of any such notice, the Administrative Agent shall advise the Lenders of the contents thereof.  Each prepayment of the Loans shall be applied ratably to the applicable Loans and otherwise in accordance with this Section 2.10.  Prepayments shall be accompanied by accrued interest to the extent required by Section 2.06.

SECTION 2.11  [Reserved].

SECTION 2.12  Yield Protection.

(a)    Increased Costs Generally. If any Change in Law shall:

(i)    impose, modify or deem applicable any reserve, special deposit, compulsory loan, insurance charge or similar requirement against assets of, deposits with or for the account of, or credit extended or participated in, by any Lender;

(ii)    subject any Lender to any Tax of any kind whatsoever with respect to this Agreement, its Commitments or other obligations hereunder, or its deposits, reserves, other liabilities or capital attributable thereto, or change the basis of taxation of payments to such Lender in respect thereof (except for Indemnified Taxes or Other Taxes covered by Section 2.15 and the imposition of, or any change in the rate of, any Excluded Tax payable by such Lender); or

(iii)    impose on any Lender any other condition, cost or expense affecting this Agreement made by such Lender or participation therein;

and the result of any of the foregoing shall be to reduce the amount of any sum received or receivable by such Lender (whether of principal, interest or any other amount), then, upon request of such Lender, Borrowers will pay to such Lender such additional amount or amounts as will compensate such Lender for such additional costs incurred or reduction suffered.

(b)    Capital Requirements.  If any Lender determines (in good faith, but in its sole absolute discretion) that any Change in Law affecting such Lender or any lending office of such Lender or such Lender's holding company, if any, regarding capital or liquidity requirements has or would have the effect of reducing the rate of return on such Lender's capital or on the capital of such Lender's holding company, if any, as a consequence of this Agreement, the Commitments of such Lender or the Loans made by such Lender, to a level below that which such Lender or such Lender's holding company could have achieved but for such Change in Law (taking into consideration such Lender's policies and the policies of such Lender's holding company with respect to capital adequacy), then from time to time Borrowers will pay to such Lender such additional amount or amounts as will compensate such Lender or such Lender's holding company for any such reduction suffered.

(c)    Certificates for Reimbursement.  A certificate of a Lender setting forth the

35

amount or amounts necessary to compensate such Lender or its holding company, as the case may be, as specified in paragraph (a) or (b) of this Section 2.12 and delivered to Administrative Borrower shall be conclusive absent manifest error. Borrowers shall pay such Lender the amount shown as due on any such certificate within 10 Business Days after receipt thereof.

(d)    Delay in Requests.    Failure or delay on the part of any Lender to demand compensation pursuant to this Section 2.12 shall not constitute a waiver of such Lender's right to demand such compensation; *provided* that Borrowers shall not be required to compensate a Lender pursuant to this Section for any increased costs incurred or reductions suffered more than nine months prior to the date that such Lender, as the case may be, notifies Administrative Borrower of the Change in Law giving rise to such increased costs or reductions and of such Lender's intention to claim compensation therefor (except that, if the Change in Law giving rise to such increased costs or reductions is retroactive, then the nine-month period referred to above shall be extended to include the period of retroactive effect thereof) .

(e)    Illegality.    If it becomes unlawful in any applicable jurisdiction for a Lender to perform any of its obligations as contemplated by this Agreement or to fund, issue or maintain its participation in any Borrowing, (i) such Lender shall promptly notify the Administrative Agent upon becoming aware of that event, (ii) upon the Administrative Agent notifying Administrative Borrower, the Commitment of such Lender will be immediately cancelled, and (iii) solely if it has become unlawful for such Lender to maintain its participation in any Borrowing, Borrowers shall repay without premium, fee or penalty such Lender's participation in any such Borrowing made to Borrowers on the date specified by the Lender in the notice delivered to the Administrative Agent (being no earlier than the last day of any applicable grace period permitted by law).

SECTION 2.13 [Reserved].

SECTION 2.14 Payments Generally; Pro Rata Treatment; Sharing of Setoffs.

(a)    Payments Generally.    Borrowers shall make each payment required to be made by it hereunder or under any other Loan Document (whether of principal, interest, fees or of amounts payable under Section 2.12, 2.15 or 10.03, or otherwise) on or before the time expressly required hereunder or under such other Loan Document for such payment (or, if no such time is expressly required, prior to 2:00 p.m., New York City time), on the date when due, in immediately available funds, without setoff, deduction or counterclaim. Any amounts received after such time on any date may, in the discretion of the Administrative Agent, be deemed to have been received on the next succeeding Business Day for purposes of calculating interest thereon. All such payments shall be made to the Administrative Agent at its offices at the Funding and Payment Office, except that payments pursuant to Sections 2.12, 2.15 and 10.03 shall be made directly to the Persons entitled thereto and payments pursuant to other Loan Documents shall be made to the Persons specified therein. The Administrative Agent shall distribute any such payments received by it for the account of any other Person to the appropriate recipient promptly following receipt thereof. If any payment under any Loan Document shall be due on a day that is not a Business Day, unless specified otherwise, the date for payment shall be extended to the next succeeding Business Day, and, in the case of any payment accruing interest, interest thereon shall be payable for the period of such extension.

(b)    Pro Rata Treatment.

36

(i)      Each payment by Borrowers of interest in respect of the applicable Loans shall be applied to the obligations owing to the Lenders, *pro rata* according to the respective amounts then due and owing to the Lenders.

(ii)     Each payment by Borrowers on account of principal of the applicable Loans shall be allocated among the Lenders *pro rata* based on the principal amount of the applicable Loans held by the Lenders.

(c)      <u>Insufficient Funds</u>. If at any time insufficient funds are received by and available to the Administrative Agent to pay fully all amounts of principal, interest and fees then due hereunder, such funds shall be applied (i) *first*, toward payment of interest and fees then due hereunder, ratably among the parties entitled thereto in accordance with the amounts of interest and fees then due to such parties, and (ii) *second*, toward payment of principal then due hereunder, ratably among the parties entitled thereto in accordance with the amounts of principal then due to such parties.

(d)      <u>Sharing of Set-Off</u>. If any Lender shall, by exercising any right of setoff or counterclaim or otherwise, obtain payment in respect of any principal of or interest on any of its Loans or other Obligations resulting in such Lender's receiving payment of a proportion of the aggregate amount of its Loans and accrued interest thereon or other Obligations greater than its *pro rata* share thereof as provided herein, then the Lender receiving such greater proportion shall (a) notify the Administrative Agent of such fact, and (b) purchase (for cash at face value) participations in the Loans and such other obligations of the other Lenders, or make such other adjustments as shall be equitable, so that the benefit of all such payments shall be shared by the Lenders ratably in accordance with the aggregate amount of principal of and accrued interest on their respective Loans and other amounts owing them, *provided* that:

(i)      if any such participations are purchased and all or any portion of the payment giving rise thereto is recovered, such participations shall be rescinded and the purchase price restored to the extent of such recovery, without interest; and

(ii)     the provisions of this paragraph shall not be construed to apply to (x) any payment made by Borrowers pursuant to and in accordance with the express terms of this Agreement (as modified from time to time) or (y) any payment obtained by a Lender as consideration for the assignment of or sale of a participation in any of its Loans to any assignee or participant, other than to Holdings or any Subsidiary thereof (as to which the provisions of this paragraph shall apply).

Each Borrower consents to the foregoing and agrees, to the extent it may effectively do so under applicable Requirements of Law, that any Lender acquiring a participation pursuant to the foregoing arrangements may exercise against such Borrower rights of setoff and counterclaim with respect to such participation as fully as if such Lender were a direct creditor of such Borrower in the amount of such participation, but in any event without duplication of any claims or rights of the Lender(s) from which it acquired such participation. If under applicable bankruptcy, insolvency or any similar law any Secured Party receives a secured claim in lieu of a setoff or counterclaim to which this <u>Section 2.14(d)</u> applies, such Secured Party shall to the extent practicable, exercise its rights in respect of such secured claim in a manner consistent with the rights to which the Secured Party is entitled under this <u>Section 2.14(d)</u> to share in the benefits of the recovery of such secured claim.

(e)      <u>Borrower Default</u>. Unless the Administrative Agent shall have received notice from Administrative Borrower prior to the date on which any payment is due to the Administrative Agent

37

for the account of the Lenders hereunder that Borrowers will not make such payment, the Administrative Agent may assume that Borrowers have made such payment on such date in accordance herewith and may, in reliance upon such assumption, distribute to the Lenders the amount due.  In such event, if no Borrower has in fact made such payment, then each of the Lenders severally agrees to repay to the Administrative Agent forthwith on demand the amount so distributed to such Lender with interest thereon, for each day from and including the date such amount is distributed to it to but excluding the date of payment to the Administrative Agent, at the greater of the Federal Funds Effective Rate and a rate determined by the Administrative Agent in accordance with banking industry rules on interbank compensation.

SECTION 2.15  Taxes.

(a)    Payments Free of Taxes.  Any and all payments by or on account of any obligation of Borrowers hereunder or under any other Loan Document shall be made free and clear of and without reduction or withholding for any Taxes, except as required by applicable Requirements of Law. If applicable Requirements of Law (as determined in the good faith discretion of the applicable withholding agent) require the deduction or withholding of any Tax from any such payments by the withholding agent, then the applicable withholding agent shall make such deductions and shall timely pay the full amount deducted to the relevant Governmental Authority in accordance with applicable Requirements of Law and, if such Tax is an Indemnified Tax, then the sum payable by Borrowers shall be increased as necessary so that after such deduction or withholding has been made (including such deductions and withholdings applicable to additional sums payable under this Section) the Administrative Agent or Lender, as the case may be, receives an amount equal to the sum it would have received had no such deduction or withholding been made.

(b)    Payment of Other Taxes by Borrowers.  Without limiting the provisions of paragraph (a) above, Borrowers shall timely pay any Other Taxes to the relevant Governmental Authority in accordance with applicable Requirements of Law.

(c)    Indemnification by Borrowers.  Borrowers shall indemnify the Administrative Agent and each Lender, within 10 Business Days after written demand therefor, for the full amount of any Indemnified Taxes or Other Taxes (including Indemnified Taxes or Other Taxes imposed or asserted on or attributable to amounts payable under this Section) payable by the Administrative Agent or such Lender, as the case may be, and any reasonable expenses arising therefrom or with respect thereto, whether or not such Indemnified Taxes or Other Taxes were correctly or legally imposed or asserted by the relevant Governmental Authority.  A certificate as to the amount of such payment or liability delivered to Administrative Borrower by a Lender (with a copy to the Administrative Agent), or by the Administrative Agent on its own behalf or on behalf of a Lender, shall be conclusive absent manifest error.  Notwithstanding anything in this Section 2.15 to the contrary, Borrowers shall have no obligation to a Lender or the Administrative Agent with respect to an Indemnified Tax, Other Tax or other indemnity payment to the extent arising from the willful misconduct or gross negligence (as determined by a final non-appealable judgment of a court of competent jurisdiction) of the Lender or the Administrative Agent, as applicable.

(d)    Evidence of Payments.  As soon as practicable after any payment of Indemnified Taxes or Other Taxes by a Borrower to a Governmental Authority, Administrative Borrower shall deliver to the Administrative Agent the original or a certified copy of a receipt issued by such Governmental Authority evidencing such payment, a copy of the return reporting such payment or other evidence of such payment reasonably satisfactory to the Administrative Agent.

38

(e)    <u>Status of Lenders</u>. Any Foreign Lender that is entitled to an exemption from or reduction of any withholding tax under the law of the jurisdiction in which a Borrower is resident for tax purposes, or any treaty to which such jurisdiction is a party, with respect to any payments hereunder or under any other Loan Document shall, to the extent it may lawfully do so, deliver to Administrative Borrower and to the Administrative Agent, at the time or times prescribed by applicable law and at the time or times reasonably requested by Administrative Borrower or the Administrative Agent, such properly completed and executed documentation prescribed by applicable Requirements of Law as will permit such payments to be made without withholding or at a reduced rate of withholding. In addition, any Lender, if requested by Administrative Borrower or the Administrative Agent, shall deliver such other documentation prescribed by applicable Requirements of Law or reasonably requested by Administrative Borrower or the Administrative Agent as will enable Administrative Borrower or the Administrative Agent to determine whether or not such Lender is subject to backup withholding or information reporting requirements. Notwithstanding anything to the contrary in the above two sentences, in the case of any Taxes that are not U.S. federal withholding taxes, the completion, execution and submission of non-U.S. federal forms shall not be required if in the Lender's judgment such completion, execution or submission would subject such Lender to any material unreimbursed cost or expense or would be otherwise materially disadvantageous to such Lender in any material respect.

Without limiting the generality of the foregoing, in the event that a Borrower is a US Person, any Foreign Lender shall, to the extent it may lawfully do so, deliver to Administrative Borrower and the Administrative Agent (in such number of copies as shall be requested by the recipient) on or prior to the date on which such Foreign Lender becomes a Lender under this Agreement (and from time to time thereafter as prescribed by applicable law or upon the request of Administrative Borrower or the Administrative Agent, but only if such Foreign Lender is legally entitled to do so), whichever of the following is applicable:

(i)    duly completed copies of Internal Revenue Service Form W-8BEN or W-8BEN-E, as applicable (or any successor forms) claiming eligibility for benefits of an income tax treaty to which the United States of America is a party,

(ii)    duly completed copies of Internal Revenue Service Form W-8ECI (or any successor forms),

(iii)    in the case of a Foreign Lender claiming the benefits of the exemption for portfolio interest under Section 881(c) of the Code, (x) a certificate, in substantially the form of <u>Exhibit M-1</u>, <u>M-2</u>, <u>M-3</u> or <u>M-4</u>, as applicable, or any other form approved by the Administrative Agent, to the effect that such Foreign Lender is not (A) a "bank" within the meaning of Section 881(c)(3)(A) of the Code, (B) a "10 percent shareholder" of Borrowers within the meaning of Section 881(c)(3)(B) of the Code, or (C) a "controlled foreign corporation" described in Section 881(c)(3)(C) of the Code, and that no payments in connection with the Loan Documents are effectively connected with such Foreign Lender's conduct of a U.S. trade or business and (y) duly completed copies of  Internal Revenue Service Form W-8BEN or W-8BEN-E, as applicable (or any successor forms),

(iv)    to the extent a Foreign Lender is not the beneficial owner (for example, where the Foreign Lender is a partnership or participating Lender granting a typical participation), an Internal Revenue Service Form W-8IMY, accompanied by a Form W-8ECI, W-8BEN or W-8BEN-E, as applicable, a certificate in substantially the form of <u>Exhibit M-1</u>, <u>M-2</u>, <u>M-3</u> or <u>M-4</u>, as applicable, Form W-9, and/or other certification documents from each beneficial owner, as

39

applicable; *provided* that, if the Foreign Lender is a partnership (and not a participating Lender) and one or more beneficial owners of such Foreign Lender are claiming the portfolio interest exemption, such Foreign Lender may provide a certificate, in substantially the form of <u>Exhibit M-1</u>, <u>M-2</u>, <u>M-3</u> or <u>M-4</u>, as applicable, on behalf of such beneficial owner(s), or

        (v)      any other form prescribed by applicable Requirements of Law as a basis for claiming exemption from or a reduction in United States federal withholding tax duly completed together with such supplementary documentation as may be prescribed by applicable Requirements of Law to permit Administrative Borrower and the Administrative Agent to determine the withholding or deduction required to be made.

        If a payment made to a Lender under any Loan Document would be subject to U.S. federal withholding tax imposed by FATCA if such Lender were to fail to comply with the applicable reporting requirements of FATCA (including those contained in Section 1471(b) or 1472(b) of the Code, as applicable), such Lender shall deliver to Administrative Borrower and the Administrative Agent at the time or times prescribed by applicable law and at such time or times reasonably requested by Administrative Borrower or the Administrative Agent such documentation prescribed by applicable law (including as prescribed by Section 1471(b)(3)(C)(i) of the Code) and such additional documentation reasonably requested by Administrative Borrower or the Administrative Agent as may be necessary for Borrowers and the Administrative Agent to comply with their obligations under FATCA and to determine that such Lender has complied with its obligations under FATCA or to determine the amount to deduct and withhold from such payment. Solely for purposes of this paragraph, "FATCA" shall include any amendments made to FATCA after the date of this Agreement.

        Any Lender that is not a Foreign Lender shall deliver to Administrative Borrower and the Administrative Agent on or prior to the date on which such Lender becomes a Lender under this Agreement (and from time to time thereafter as prescribed by applicable law or upon the request of Administrative Borrower or the Administrative Agent), duly executed and properly completed copies of Internal Revenue Service Form W-9 certifying that it is not subject to backup withholding.

        Each Lender shall, from time to time after the initial delivery by such Lender of the forms described above, whenever a lapse in time or change in such Lender's circumstances renders such forms, certificates or other evidence so delivered obsolete or inaccurate, promptly (1) deliver to Administrative Borrower and the Administrative Agent (in such number of copies as shall be requested by the recipient) renewals, amendments or additional or successor forms, properly completed and duly executed by such Lender, together with any other certificate or statement of exemption required in order to confirm or establish such Lender's status or that such Lender is entitled to an exemption from or reduction in U.S. federal withholding tax  or backup withholding or (2) notify Administrative Agent and Administrative Borrower of its inability to deliver any such forms, certificates or other evidence.

        (f)      <u>Treatment of Certain Refunds</u>.  If the Administrative Agent or a Lender determines, in its sole discretion (exercised in good faith), that it has received a refund of any Indemnified Taxes or Other Taxes as to which it has been indemnified by a Borrower or with respect to which a Borrower has paid additional amounts pursuant to this Section, it shall pay to the applicable Borrower an amount equal to such refund (but only to the extent of indemnity payments made, or additional amounts paid, by such Borrower under this Section with respect to the Indemnified Taxes or Other Taxes giving rise to such refund), net of all reasonable out-of-pocket expenses of the Administrative Agent or such Lender, as the case may be, and without interest (other than any interest paid by the relevant Governmental Authority with respect to such refund); *provided* that such Borrower, upon the request of

the Administrative Agent or such Lender, agrees to repay the amount paid over to such Borrower (plus any penalties, interest or other charges imposed by the relevant Governmental Authority) to the Administrative Agent or such Lender or in the event the Administrative Agent or such Lender is required to repay such refund to such Governmental Authority. This paragraph shall not be construed to require the Administrative Agent or any Lender to make available its tax returns (or any other information relating to its taxes that it deems confidential) to Borrowers or any other Person. Notwithstanding anything to the contrary, in no event will the Administrative Agent or any Lender be required to pay any amount to a Borrower the payment of which would place the Administrative Agent or such Lender in a less favorable net after-tax position than the Administrative Agent or such Lender would have been in if the Indemnified Taxes or Other Taxes giving rise to such refund had never been imposed in the first instance.

SECTION 2.16 <u>Mitigation Obligations; Replacement of Lenders.</u>

(a)    <u>Designation of a Different Lending Office</u>. If any Lender requests compensation under <u>Section 2.12</u>, or requires Borrowers to pay Indemnified Taxes or any additional amount to any Lender or any Governmental Authority for the account of any Lender pursuant to <u>Section 2.15</u>, then such Lender shall use reasonable efforts to designate a different lending office for funding or booking its Loans hereunder or to assign its rights and obligations hereunder to another of its offices, branches or affiliates, if, in the reasonable judgment of such Lender, such designation or assignment (i) would eliminate or reduce amounts payable pursuant to <u>Section 2.12</u> or <u>2.15</u>, as the case may be, in the future and (ii) would not subject such Lender to any unreimbursed cost or expense and would not otherwise be disadvantageous to such Lender. Each Borrower, jointly and severally, hereby agrees to pay all reasonable costs and expenses incurred by any Lender in connection with any such designation or assignment. A certificate setting forth such costs and expenses submitted by such Lender to Administrative Borrower shall be conclusive absent manifest error.

(b)    <u>Replacement of Lenders</u>. If any Lender requests compensation under <u>Section 2.12</u>, or if it has become unlawful for any Lender to perform its obligations under this Agreement as described in <u>Section 2.12(e)</u>, or if a Borrower is required to pay Indemnified Taxes or any additional amount to any Lender or any Governmental Authority for the account of any Lender pursuant to <u>Section 2.15</u>, then Administrative Borrower may, at its sole expense and effort, upon notice to such Lender and the Administrative Agent, and with the consent of the Required Lenders, require such Lender to assign and delegate, without recourse (in accordance with and subject to the restrictions contained in, and consents required by, <u>Section 10.04</u>), all of its interests, rights and obligations under this Agreement and the other Loan Documents to an Eligible Assignee that shall assume such obligations (which assignee may be another Lender, if a Lender accepts such assignment); *provided* that:

(i)    Borrowers shall have paid to the Administrative Agent the processing and recordation fee specified in <u>Section 10.04(b)</u>;

(ii)    such Lender shall have received payment of an amount equal to the outstanding principal of its Loans, accrued interest thereon, accrued fees and all other amounts payable to it hereunder and under the other Loan Documents, from the assignee (to the extent of such outstanding principal and accrued interest and fees) or Borrowers (in the case of all other amounts);

(iii)    in the case of any such assignment resulting from a claim for compensation under <u>Section 2.12</u> or payments required to be made pursuant to <u>Section 2.15</u>, such

41

assignment will result in a reduction in such compensation or payments thereafter; and

      (iv)    such assignment does not conflict with applicable Requirements of Law.

A Lender shall not be required to make any such assignment or delegation if, prior thereto, as a result of a waiver by such Lender or otherwise, the circumstances entitling Borrowers to require such assignment and delegation cease to apply.

      Each Lender agrees that, if Administrative Borrower elects to replace such Lender in accordance with this Section 2.16(b), subject to the satisfaction of clause (i) through (iv), as applicable, it shall promptly execute and deliver to the Administrative Agent an Assignment and Assumption to evidence the assignment and shall deliver to the Administrative Agent any Note (if Notes have been issued in respect of such Lender's Loans) subject to such Assignment and Assumption; *provided* that the failure of any such Lender to execute an Assignment and Assumption shall not render such assignment invalid and such assignment shall nonetheless be recorded in the Register.

      SECTION 2.17  [Reserved].

      SECTION 2.18  [Reserved].

      SECTION 2.19  Defaulting Lenders.

      Notwithstanding any provision of this Agreement to the contrary, if any Lender is a Defaulting Lender, then the following provisions shall apply for so long as such Lender is a Defaulting Lender:

      (a)    the Commitment Fee shall cease to accrue on the Commitment of such Lender so long as it is a Defaulting Lender; and

      (b)    any amount payable to such Defaulting Lender hereunder (whether on account of principal, interest, fees or otherwise and including any amount that would otherwise be payable to such Defaulting Lender pursuant to Section 2.14(d) but excluding Section 2.16(b)) may, in lieu of being distributed to such Defaulting Lender, be retained by the Administrative Agent in a segregated non-interest bearing account and, subject to any applicable Requirements of Law, be applied at such time or times as may be determined by the Administrative Agent (i) first, to the payment of any amounts owing by such Defaulting Lender to the Administrative Agent hereunder, (ii) second, to the funding of any Loan in respect of which such Defaulting Lender has failed to fund its portion thereof as required by this Agreement, as determined by the Administrative Agent, (iv) third, if so determined by the Administrative Agent and Administrative Borrower, held in such account as cash collateral for future funding obligations of the Defaulting Lender under this Agreement, (v) fourth, pro rata, to the payment of any amounts owing to Borrowers or the Lenders as a result of any judgment of a court of competent jurisdiction obtained by a Borrower or any Lender against such Defaulting Lender as a result of such Defaulting Lender's breach of its obligations under this Agreement and (vi) fifth, to such Defaulting Lender or as otherwise directed by a court of competent jurisdiction; *provided* that if such payment is (x) a prepayment of the principal amount of any Loans and (y) made at a time when the conditions set forth in Section 4.02 are satisfied, such payment shall be applied solely to prepay the Loans of all non-Defaulting Lenders pro rata prior to being applied to the prepayment of any Loans owed to any Defaulting Lender.

AmericasActive:14673966.12

The rights and remedies against a Defaulting Lender under this Section 2.19 are in addition to other rights and remedies that Borrowers, the Administrative Agent and the non-Defaulting Lenders may have against such Defaulting Lender. The arrangements permitted or required by this Section 2.19 shall be permitted under this Agreement, notwithstanding any limitation on Liens or the pro rata sharing provisions or otherwise.

SECTION 2.20 Joint and Several Liability.

(a)    All Loans, upon funding, shall be deemed to be jointly funded to and received by Borrowers. Each Borrower is jointly and severally liable under this Agreement for all Obligations, regardless of the manner or amount in which proceeds of Loans are used, allocated, shared or disbursed by or among Borrowers themselves, or the manner in which the Administrative Agent and/or any Lender accounts for such Loans on its books and records. Each Borrower shall be liable for all amounts due to the Administrative Agent and/or any Lender from Borrowers under this Agreement, regardless of which Borrower actually receives Loans hereunder or the amount of such Loans received or the manner in which such Agent and/or such Lender accounts for such Loans on its books and records.

(b)    Each Borrower's Obligations with respect to Loans made to it, and such Borrower's Obligations arising as a result of the joint and several liability of such Borrower hereunder with respect to Loans made to the other Borrowers hereunder shall be separate and distinct obligations, but all such Obligations shall be primary obligations of such Borrower. Borrowers acknowledge and expressly agree with the Administrative Agent and each Lender that the joint and several liability of each Borrower is required solely as a condition to, and is given solely as inducement for and in consideration of, credit or accommodations extended or to be extended under the Loan Documents to any or all of the other Borrowers and is not required or given as a condition of Loans to such Borrower.

(c)    Each Borrower's Obligations under this Agreement shall, to the fullest extent permitted by law, be unconditional irrespective of (i) the release of any other Borrower or the validity or enforceability, avoidance, or subordination of the Obligations of any other Borrower or of any promissory note or other document evidencing all or any part of the Obligations of any other Borrower, (ii) the absence of any attempt to collect the Obligations from any other Borrower, or any other security therefor, or the absence of any other action to enforce the same, (iii) the waiver, consent, extension, forbearance, or granting of any indulgence by the Administrative Agent and/or any Lender with respect to any provision of any instrument evidencing the Obligations of any other Borrower, or any part thereof, or any other agreement now or hereafter executed by any other Borrower and delivered to the Administrative Agent and/or any Lender, (iv) the failure by the Administrative Agent and/or any Lender to take any steps to perfect and maintain its security interest in, or to preserve its rights to, any security or collateral for the Obligations of any other Borrower, (v) the Administrative Agent's and/or any Lender's election, in any proceeding instituted under the Bankruptcy Code, of the application of Section 1111(b)(2) of the Bankruptcy Code, (vi) any borrowing or grant of a security interest by any other Borrower, as debtor-in-possession under Section 364 of the Bankruptcy Code, (vii) the disallowance of all or any portion of the Administrative Agent's and/or any Lender's claim(s) for the repayment of the Obligations of any other Borrower under Section 502 of the Bankruptcy Code, or (viii) any other circumstances which might constitute a legal or equitable discharge or defense of a guarantor or of any other Borrower.

(d)    With respect to any Borrower's Obligations arising as a result of the joint and several liability of Borrowers hereunder with respect to Loans made to any of the other Borrowers hereunder, such Borrower waives, until the Obligations shall have been indefeasibly paid in full in cash and this Agreement shall have been terminated, any right to enforce any right of subrogation or any

43

remedy which the Administrative Agent and/or any Lender now has or may hereafter have against any other Borrower, any endorser or any guarantor of all or any part of the Obligations, and any benefit of, and any right to participate in, any security or collateral given to the Administrative Agent and/or any Lender to secure payment of the Obligations or any other liability of any Borrower to the Administrative Agent and/or any Lender.

        (e)     Upon any Event of Default, to the extent otherwise permitted under the DIP Orders, the Administrative Agent may proceed directly and at once, without notice, against any Borrower to collect and recover the full amount, or any portion of the Obligations, without first proceeding against any other Borrower or any other Person, or against any security or collateral for the Obligations. Each Borrower consents and agrees that the Administrative Agent shall be under no obligation to marshal any assets in favor of any Borrower or against or in payment of any or all of the Obligations.

        SECTION 2.21 No Discharge; Survival of Claims.

        Each of Borrowers agrees that (a) the Obligations shall not be discharged by the entry of a Final Order confirming a Plan of Reorganization unless such Plan of Reorganization provides for the termination of the Commitments and the indefeasible payment in full in cash of the Obligations under the Loan Documents (other than contingent indemnification obligations as to which no claim has been asserted) on the Consummation Date of such Plan of Reorganization (and each of Borrowers, pursuant to Section 1141(d)(4) of the Bankruptcy Code, hereby waives any such discharge) and (b) the Superpriority Claim granted to the Agents and the Lenders pursuant to the DIP Orders and the Liens granted to the Agents and the Lenders pursuant to the DIP Orders shall not be affected in any manner by the entry of a Final Order confirming a Plan of Reorganization.

### ARTICLE III

### REPRESENTATIONS AND WARRANTIES

        Each Borrower represents and warrants to the Administrative Agent and each of the Lenders that:

        SECTION 3.01 Organization; Powers.

        Each Borrower (a) is duly organized and validly existing under the laws of the jurisdiction of its organization, (b) has all requisite power and authority to carry on its business as now conducted and to own and lease its property and (c) except for the filing of bankruptcy petitions, is qualified and in good standing  (in each case solely to the extent such concept is applicable in the applicable jurisdiction) to do business in every jurisdiction where such qualification is required, except in such jurisdictions where the failure to so qualify or be in good standing, individually or in the aggregate, could not reasonably be expected to result in a Material Adverse Effect.

        SECTION 3.02 Authorization; Enforceability.

        The Transactions to be entered into by each Borrower are within such Borrower's powers and have been duly authorized by all necessary action on the part of such Borrower.  This Agreement has been duly executed and delivered by each Borrower and constitutes, and each other Loan Document to which any Borrower is to be a party, when executed and delivered by such Borrower, will constitute, a legal, valid and binding obligation of such Borrower, enforceable in accordance with its terms, subject to

44

applicable bankruptcy, insolvency, reorganization, moratorium or other laws affecting creditors' rights generally and subject to general principles of equity, regardless of whether considered in a proceeding in equity or at law.

SECTION 3.03 No Conflicts.

The Transactions (a) do not require any consent or approval of, registration or filing with, or any other action by, any Governmental Authority, except (i) such as have been obtained or made and are in full force and effect, (ii) filings necessary to perfect, or maintain the perfection of, Liens created by the Loan Documents and (iii) consents, approvals, registrations, filings, permits or actions the failure to obtain or perform which could not reasonably be expected to result in a Material Adverse Effect, (b) will not violate the Organizational Documents of any Borrower, (c) will not violate any Requirement of Law (except as could not reasonably be expected to result in a Material Adverse Effect), (d) will not violate or result in a default or require any consent or approval (that has not been obtained) under any indenture, agreement or other instrument binding upon any Borrower, or give rise to a right thereunder to require any payment to be made by any Borrower, except for violations, defaults or failures to obtain consents or approvals that, in each case, could not reasonably be expected to result in a Material Adverse Effect, and (e) will not result in the creation or imposition of any Lien on any property of any Borrower, except Permitted Liens.

SECTION 3.04 [Reserved].

SECTION 3.05 Properties.

(a)     Generally.  Each Borrower has good title to, or valid leasehold interests in, all its property material to its business, free and clear of all Liens except for Permitted Liens and minor irregularities or deficiencies in title that, individually or in the aggregate, do not materially interfere with its ability to conduct its business as currently conducted or to utilize such property for its intended purpose.  The property of Borrowers, taken as a whole, (i) is, except as could not reasonably be expected to result in a Material Adverse Effect, in good operating order, condition and repair (ordinary wear and tear excepted) and (ii) constitutes all the property which is required for the business and operations of Borrowers as presently conducted in all respects, except as could not reasonably be expected to result in a Material Adverse Effect.

(b)     Real Property.  Schedule 3.05(b) contains, as of the Closing Date, a true and complete list of each material interest in Real Property (i) owned by any Borrower as of the date hereof and (ii) leased, subleased or otherwise occupied or utilized by any Borrower, as lessee, sublessee, franchisee or licensee, as of the date hereof and describes the type of interest therein held by such Borrower.

(c)     No Casualty Event.  No Borrower has received any notice of, nor has any knowledge of, the occurrence or pendency or contemplation of any Casualty Event affecting all or any material portion of its property (it being agreed that assets with an aggregate value in excess of $1,000,000 (or such other amount as the Required Lenders shall agree) shall be deemed material for purposes of this Section 3.05(c)).

(d)     Flood Insurance.  No Real Property Mortgage encumbers improved Real Property in the United States that is located in an area that has been identified by the Secretary of Housing and Urban Development as an area having special flood hazards within the meaning of the National Flood

45

Insurance Act of 1968 unless flood insurance available under such Act has been obtained in accordance with <u>Section 5.04</u>.

(e)     <u>Collateral</u>.  Except with respect to Intellectual Property, each Borrower owns or has rights to use all of the Collateral and all rights with respect to any of the foregoing used in, necessary for or material to each Borrower's business as currently conducted.  Except with respect to Intellectual Property, the use by each Borrower of such Collateral and all such rights with respect to the foregoing do not infringe on the rights of any Person other than such infringement which could not, individually or in the aggregate, reasonably be expected to result in a Material Adverse Effect.  Except with respect to Intellectual Property, no claim has been made and remains outstanding that any Borrower's use of any Collateral does or may violate the rights of any third party that could, individually or in the aggregate, reasonably be expected to result in a Material Adverse Effect.

SECTION 3.06 <u>Intellectual Property</u>.

(a)     <u>Ownership/No Claims</u>.  Subject to Permitted Liens, each Borrower owns, or is licensed to use, all patents, patent applications, trademarks, trade names, service marks, copyrights, technology, trade secrets, proprietary information, domain names, know-how, processes and other intellectual property necessary for the conduct of its business as currently conducted (the "**Intellectual Property**"), except for those the failure to own or license which, individually or in the aggregate, could not reasonably be expected to result in a Material Adverse Effect.  To the knowledge of each Borrower, no claim has been asserted and is pending by any Person challenging or questioning the use of any such Intellectual Property or the validity or effectiveness of any such Intellectual Property except as could not reasonably be expected to result in a Material Adverse Effect.  To the knowledge of each Borrower, use of such Intellectual Property by each Borrower does not infringe the rights of any Person, except for such claims and infringements that, individually or in the aggregate, could not reasonably be expected to result in a Material Adverse Effect.

(b)     <u>Registrations</u>.  Except pursuant to licenses and other user agreements entered into in the ordinary course of business (i) each Borrower owns and possesses the right to use each material copyright, patent and trademark (as such terms are defined in the Security Agreement) listed in Schedule 8(a) or 8(b) to the Perfection Certificate and (ii) except as could not reasonably be expected to result in a Material Adverse Effect, all registrations listed in Schedule 8(a) or 8(b) to the Perfection Certificate are in full force and effect.

(c)     <u>No Violations or Proceedings</u>.  To each Borrower's knowledge, there is no material infringement or other violation by others of any Intellectual Property rights of such Borrower except as could not be reasonably expected to result in a Material Adverse Effect.

SECTION 3.07 <u>Equity Interests and Subsidiaries</u>.

(a)     <u>Equity Interests</u>.  Schedule 3.07(a) sets forth a list of (i) all the Subsidiaries of Holdings and their jurisdictions of organization as of the Closing Date and (ii) the number of each class of its Equity Interests authorized, and the number outstanding, on the Closing Date and the number of shares covered by all outstanding options, warrants, rights of conversion or purchase and similar rights at the Closing Date.  All Equity Interests of each Borrower are duly and validly issued and are fully paid and non-assessable (to the extent such concepts are applicable).  All Equity Interests of each other Borrower are owned directly or indirectly by Holdings.  Except as set forth on <u>Schedule 3.07(a)</u>, each Borrower is the record and Beneficial Owner of, and has good and marketable title to, the Equity Interests pledged by

46

it under the Pledge and Security Agreement, free of any and all Liens, rights or claims of other Persons, except the security interest created by the Pledge and Security Agreement, and there are no outstanding warrants, options or other rights to purchase, or shareholder, voting trust or similar agreements outstanding with respect to, or property that is convertible into, or that requires the issuance or sale of, any such Equity Interests.

(b)    No Consent of Third Parties Required.  No consent of any Person including any other general or limited partner, any other member of a limited liability company, any other shareholder or any other trust beneficiary is necessary in connection with the creation, perfection or first priority status of the security interest of the Administrative Agent in any Equity Interests pledged to the Administrative Agent for the benefit of the Secured Parties under the Pledge and Security Agreement or the exercise by the Administrative Agent of the voting or other rights provided for in the Pledge and Security Agreement or the exercise of remedies in respect thereof, except for those already obtained.

SECTION 3.08 Litigation; Compliance with Laws.

There are no actions, suits or proceedings at law or in equity by or before any Governmental Authority pending or, to the knowledge of any Borrower, threatened in writing against any Borrower (i) that involve any Loan Document or any of the Transactions or (ii) as to which there is a reasonable possibility of an adverse determination and that, if adversely determined, could reasonably be expected, individually or in the aggregate, to result in a Material Adverse Effect.  No Borrower or any of its property is in violation of, nor will the continued operation of its property as currently conducted violate, any Requirements of Law (including any zoning or building ordinance, code or approval or any building permits) or any restrictions of record or agreements affecting any Borrower's Real Property or is in default with respect to any Requirement of Law, where such violation or default, individually or in the aggregate, could reasonably be expected to result in a Material Adverse Effect.

SECTION 3.09 Agreements.

No Borrower is in default in any manner under any provision of any indenture or other agreement or instrument evidencing Indebtedness, or any other agreement or instrument to which it is a party or by which it or any of its property is or may be bound, where such default could reasonably be expected to result in a Material Adverse Effect, and to each Borrower's knowledge, no condition exists which, with the giving of notice or the lapse of time or both, would constitute such a default.

SECTION 3.10 Federal Reserve Regulations.

No Borrower is engaged principally, or as one of its important activities, in the business of extending credit for the purpose of buying or carrying Margin Stock.  No part of the proceeds of any Loan will be used, whether directly or indirectly, and whether immediately, incidentally or ultimately, for any purpose that entails a violation of, or that is inconsistent with, the provisions of the regulations of the Board, including Regulation T, U or X.  The pledge of the Securities Collateral pursuant to the Pledge and Security Agreement does not violate such regulations.

SECTION 3.11 Investment Company Act.

No Borrower is an "investment company" or a company "controlled" by an "investment company," as defined in, or subject to regulation under, the Investment Company Act of 1940, as amended.

47

SECTION 3.12 [Reserved].

SECTION 3.13 Taxes.

Each Borrower has (a) timely filed or caused to be timely filed all federal Tax Returns and all state, local and foreign Tax Returns required to have been filed by it and all such Tax Returns are true and correct in all respects, (b) duly and timely paid, collected or remitted or caused to be duly and timely paid, collected or remitted all Taxes (whether or not shown on any Tax Return) due and payable, collectible or remittable by it and all assessments received by it (except Taxes that are being contested in good faith by appropriate proceedings and for which such Borrower has set aside on its books reserves in accordance with GAAP) and (c) satisfied all of its withholding tax obligations, in each case except for failures that could not be reasonably expected to, individually or in the aggregate, result in a Material Adverse Effect. No Borrower is aware of any proposed or pending tax assessments, deficiencies or audits that could be reasonably expected to, individually or in the aggregate, result in a Material Adverse Effect. Except as could not be reasonably expected to, individually or in the aggregate, result in a Material Adverse Effect, no Borrower has ever "participated" in a "listed transaction" within the meaning of Treasury Regulation Section 1.6011-4.

SECTION 3.14 No Material Misstatements.

No information, report, financial statement, certificate, exhibit or schedule furnished in writing by or on behalf of any Borrower to the Administrative Agent or any Lender in connection with the negotiation of any Loan Document or included therein or delivered pursuant thereto, taken as a whole, subject to any limitations or exceptions set forth therein, contained or contains any material misstatement of fact or omitted or omits to state any material fact necessary to make the statements therein, in the light of the circumstances under which they were or are made, not misleading in any material respect as of the date such information is dated or certified; *provided* that to the extent any such information, report, financial statement, exhibit or schedule was based upon or constitutes an estimate, forecast or projection, each Borrower represents only that it acted in good faith and utilized assumptions believed by it to be reasonable in the preparation of such information, report, financial statement, exhibit or schedule, it being understood that actual results may vary from such estimates, forecasts and projections and that such variations may be material. As of the Closing Date, the information included in the Beneficial Ownership Certification is true and correct in all respects.

SECTION 3.15 Labor Matters.

There are no strikes, lockouts, slowdowns or unfair labor practice charges against any Borrower pending or, to the knowledge of any Borrower, threatened in writing. The hours worked by and payments made to employees of any Borrower have not been in violation of the Fair Labor Standards Act of 1938, as amended, or any similar state or local law and each Borrower is in compliance with all applicable laws respecting employment and employment practices, including, without limitation, all laws respecting terms and conditions of employment, health and safety, wages and hours, child labor, immigration, employment discrimination, disability rights or benefits, equal opportunity, plant closures and layoffs, affirmative action, workers' compensation, labor relations, employee leave issues and unemployment insurance, in each case, except where the failure to do so could not reasonably be expected to result in a Material Adverse Effect. All payments due from any Borrower, or for which any claim may be made against any Borrower, on account of wages and employee health and welfare insurance and other benefits, have been paid or accrued as a liability on the books of such Borrower except where the failure to do so could not reasonably be expected to result in a Material Adverse Effect.

48

SECTION 3.16 [Reserved].

SECTION 3.17 Employee Benefit Plans.

Each Plan is in compliance with the applicable provisions of ERISA and the Code and the regulations and published interpretations thereunder except as could not reasonably be expected, alone or together with any other ERISA Event, result in liability of Borrowers or any of their ERISA Affiliates in an aggregate amount that would constitute an Event of Default under Section 8.01(h) or the imposition of a Lien. No ERISA Event that, alone or together with any other ERISA Event could reasonably be expected to result in liability of Borrowers or any of their ERISA Affiliates in an aggregate amount that would constitute an Event of Default under Section 8.01(h) or the imposition of a Lien has occurred or, to the knowledge of Borrowers or their ERISA Affiliates, could reasonably be expected to occur. The present value of all accumulated benefit obligations of all underfunded Plans (based on the assumptions used for purposes of Statement of Financial Accounting Standards No. 158) did not, as of the date of the most recent financial statements reflecting such amounts, exceed by a material amount the fair market value of the property of all such underfunded Plans. Using actuarial assumptions and computation methods consistent with subpart I of subtitle E of Title IV of ERISA, the aggregate liabilities of each Borrower or its ERISA Affiliates to all Multiemployer Plans in the event of a complete withdrawal therefrom, as of the close of the most recent fiscal year of each such Multiemployer Plan, could not reasonably be expected, alone or together with any other ERISA Event, to result in liability of Borrowers or any of their ERISA Affiliates in an aggregate amount that would constitute an Event of Default under Section 8.01(h) or the imposition of a Lien.

SECTION 3.18 Environmental Matters.

(a)    Except as could not reasonably be expected to result in a Material Adverse Effect:

(i)    Borrowers and their businesses, operations, and Real Property are and have been in material compliance with, and Borrowers have no material liability under, any applicable Environmental Law; and under the currently effective business plan of Borrowers, no material expenditures or operational adjustments are reasonably expected to be required in order to comply with applicable Environmental Laws during the next five years;

(ii)    Borrowers have obtained all Environmental Permits required for the conduct of their businesses and operations, and the ownership, operation and use of their property, under Environmental Law, all such Environmental Permits are valid and in good standing and, under the business plan of Borrowers as of the Closing Date, no material expenditures or operational adjustments are reasonably expected to be required in order to renew or modify such Environmental Permits during the next five years;

(iii)    There has been no Release or to the knowledge of Borrowers threatened Release of Hazardous Material on, at, under or from any Real Property or facility presently or formerly owned, leased or operated by Borrowers or their predecessors in interest that could result in liability by Borrowers under any applicable Environmental Law;

(iv)    There is no Environmental Claim pending or, to the knowledge of Borrowers, threatened in writing against Borrowers, or relating to the Real Property currently or, to the knowledge of Borrowers, formerly owned, leased or operated by Borrowers or their predecessors in interest or relating to the operations of Borrowers, and to the knowledge of

49

Borrowers there are no actions, activities, circumstances, conditions, events or incidents that could reasonably be expected to form the basis of such an Environmental Claim; and

      (v)     To the knowledge of Borrowers, no Person with an indemnity or contribution obligation to Borrowers relating to compliance with or liability under Environmental Law is in default with respect to such obligation.

    (b)     To Borrowers' knowledge, except as would not reasonably be expected to result in a Material Adverse Effect:

      (i)     No Borrower is obligated to perform any action or otherwise incur any material expense under Environmental Law pursuant to any order, decree, judgment or agreement by which it is bound or has assumed by contract, agreement or operation of law, and no Borrower is conducting or financing any Response pursuant to any Environmental Law with respect to any Real Property or any other location;

      (ii)    No Real Property or facility owned, operated or leased by Borrowers and, to the knowledge of Borrowers, no Real Property or facility formerly owned, operated or leased by Borrowers or any of their predecessors in interest is (i) listed or proposed for listing on the National Priorities List promulgated pursuant to CERCLA or (ii) listed on the Comprehensive Environmental Response, Compensation and Liability Information System promulgated pursuant to CERCLA or (iii) included on any similar list maintained by any Governmental Authority including any such list relating to petroleum;

      (iii)   No Lien has been recorded or, to the knowledge of any Borrower, threatened in writing under any Environmental Law with respect to any Real Property or other assets of Borrowers; and

      (iv)   The execution, delivery and performance of this Agreement and the consummation of the transactions contemplated hereby will not require any notification, registration, filing, reporting, disclosure, investigation, remediation or cleanup pursuant to any Governmental Real Property Disclosure Requirements or any other applicable Environmental Law.

SECTION 3.19  Insurance.

    Schedule 3.19 sets forth a true, complete and correct description of all material insurance maintained by each Borrower as of the Closing Date. All insurance material to Borrowers' business as required pursuant to Section 5.04 is in full force and effect (after giving effect to any replacements thereof), all premiums have been or will be (in accordance with the terms of the applicable policy) duly paid, and there exists no material default under any Insurance Requirement. Each Borrower has insurance in at least such amounts and covering at least such risks and liabilities as are customary for companies of a similar size engaged in similar businesses in similar locations.

SECTION 3.20  Security Documents; Superpriority Claims.

    (a)     Upon the entry of the Interim Borrowing Order or the Final Borrowing Order, as applicable, the Obligations under the Loan Documents:

(i)      in accordance with section 364(c)(1) of the Bankruptcy Code, shall constitute allowed senior administrative expense claims against Borrowers' estates (the "**Superpriority Claims**") with priority in payment over any and all administrative expenses at any time existing or arising, of any kind or nature whatsoever, including, without limitation, the kinds specified or ordered pursuant to any provision of the Bankruptcy Code, including, but not limited to, Sections 105, 326, 328, 330, 331, 503(b), 506(c) (subject to the entry of the Final Borrowing Order with respect to Section 506(c) only), 507(a), 507(b), 726, 1113 and 1114 of the Bankruptcy Code or otherwise, whether or not such expenses or claims may become secured by a judgment lien or other non-consensual lien, levy or attachment; provided, however, that the Superpriority Claims shall be subject to and subordinate to only the Carve-Out; and

(ii)      shall be secured by valid, enforceable, non-avoidable and perfected priming liens on and security interests in favor of the Secured Parties on all Collateral in which any Borrower has any right, title or interest.

(b)      The Superpriority Claims referred to in this Section 3.20 shall be senior in priority to (i) all claims against any Borrower in the Chapter 11 Cases; and (ii) all other Liens on the Collateral as and to the extent described in Section 3.20(a)(i).

(c)      Upon the entry of the Interim Borrowing Order or the Final Borrowing Order, as applicable, each of the Security Documents is effective to create in favor of the Administrative Agent, for the benefit of the Secured Parties, legal, valid and enforceable Liens on, and security interests in, all of Borrowers' right, title and interest in and to the Collateral thereunder, in each case subject to no Liens other than Permitted Liens.

SECTION 3.21  [Reserved].

SECTION 3.22  Anti-Terrorism Laws.

No Borrower and, to the knowledge of each Borrower, none of its controlled or controlling Affiliates and none of the respective officers, directors, brokers or agents of such Borrower, such Subsidiary or controlled or controlling Affiliate (in each such person's capacity as such) has violated or is in violation of applicable Anti-Terrorism Laws.

SECTION 3.23  AML Laws; Anti-Corruption Laws and Sanctions.

(a)      Each Borrower has implemented and maintains in effect policies and procedures intended to ensure compliance by Borrowers and their respective directors, officers, employees and agents (in each such person's capacity as such) with Anti-Corruption Laws, applicable AML Laws and applicable Sanctions.

(b)      None of (i) Borrowers or any of their respective directors or officers, or, to the knowledge of any Borrower, any of their respective employees or Affiliates, (in each case in such person's capacity as such), or (ii) to the knowledge of any Borrower, any agent of any Borrower or other Affiliate (in each such person's capacity as such) that will act in any capacity in connection with or benefit from the credit facilities established hereby, (A) is a Sanctioned Person, or (B) is in violation of AML Laws, Anti-Corruption Laws, or Sanctions.

(c)      No Loan, use of proceeds thereof or other transaction contemplated by this Agreement will cause a violation of AML Laws, Anti-Corruption Laws or applicable Sanctions by any

51

Person participating in the transactions contemplated by this Agreement, whether as lender, borrower, guarantor, agent, or otherwise. Each Borrower represents that, no Borrower, or, to the knowledge of any Borrower, any other controlled or controlling Affiliate, has engaged in or intends to engage in any dealings or transactions with, or for the benefit of, any Sanctioned Person or with or in any Sanctioned Country.

SECTION 3.24 Holding Companies.

Holdings has not engaged in any activities or business or incurred any Indebtedness or other liabilities except in connection with its formation and the Loan Documents.

SECTION 3.25 Aircraft Matters.

(a)     Schedule 14(a) to the Perfection Certificate sets forth a true and correct list of all airframes, engines (other than parts) and propellers owned or leased by Owner Trust, each Borrower (setting forth, with respect to each such airframe, engine and propeller the manufacturer, model, manufacturer's serial number ("MSN"), the owner or lessor thereof, the secured party thereof (if any) and whether such airframe, engine or propeller is subject to a mortgage (other than an Aircraft Mortgage) or a lease and a description thereof; with respect to each engine, the rated horsepower thereof and the airframe to which it is installed or, if not installed, an indication thereof; and, with respect to each airframe, the jurisdiction of registration and the registration number).

(b)     Schedule 14(b) to the Perfection Certificate sets forth as of the date of the most recent Perfection Certificate Supplement delivered to the Administrative Agent, the location of the base for each Aircraft owned or leased by Owner Trust and any Borrower and each Aircraft Lease to which each Aircraft Operating Party is party.

(c)     Owner Trust is a Citizen of the United States and each Aircraft Operating Party is an Air Carrier and a Citizen of the United States and, at any time after the Closing Date (assuming compliance with and effectiveness of Section 7(l) of the Security Trustee Agreement), each Aircraft Operating Party that is an Air Carrier is a Citizen of the United States.

(d)     Except as set forth on Schedule 3.25, no Aircraft Operating Party nor any of its Aircraft is in breach or violation of any Aircraft Lease to which it is a party or any Aircraft Regulation that, individually or in the aggregate, could reasonably be expected to result in a Material Adverse Effect.

(e)     Each Aircraft Operating Party has an Air Carrier Certificate that is in full force and effect and all Aircraft Permits are in full force and effect, and there are no proceedings of any Governmental Authority pending, or to the knowledge of any Borrower, threatened in writing that challenge the right of any Aircraft Operating Party to operate under its Air Carrier Certificate or any Aircraft Permit, except for any failure of any Air Carrier Certificate or Aircraft Permits to be in full force and effect, or any such challenge thereto, that, individually or in the aggregate, could not reasonably be expected to result in a Material Adverse Effect.

AmericasActive:14673966.12

SECTION 3.26 <u>Approved Budget</u>. The Approved Budget reasonably presents the projected financial operations and disbursements of the Borrowers for the period specified therein and such projections are reasonably achievable based upon reasonable assumptions and other information available to the Borrowers as of the first day of such period.

## ARTICLE IV

### CONDITIONS TO LOANS

SECTION 4.01 <u>Conditions to Initial New Money Loans</u>.

The obligation of each Lender to fund a New Money Loan requested to be made by it on the Closing Date shall be subject to the prior or concurrent satisfaction of each of the conditions precedent set forth in this <u>Section 4.01</u>.

(a)     <u>Loan Documents</u>. There shall have been delivered to the Administrative Agent an executed counterpart of each of this Agreement, a Borrowing Notice, and, if requested by any Lender, a Note to each such Lender.

(b)     <u>Corporate Documents</u>. The Administrative Agent shall have received:

(i)     a certificate of the secretary, director or assistant secretary (or other officer reasonably acceptable to the Administrative Agent) of each Borrower dated the Closing Date, certifying (A) that attached thereto is a true and complete copy of each Organizational Document (or its equivalent) of such Borrower certified (to the extent applicable and available) as of a recent date by the Secretary of State of the state of its organization, (B) that attached thereto is a true and complete copy of resolutions duly adopted by the Governing Body of such Borrower or equivalent body or Person of such Borrower authorizing the execution, delivery and performance of the Loan Documents to which such Person is a party and the Borrowings hereunder, and that such resolutions have not been modified, rescinded, supplemented, or amended and are in full force and effect and (C) as to the incumbency and specimen signature of each officer executing any Loan Document or any other document delivered in connection herewith on behalf of such Borrower (together with a certificate of another officer as to the incumbency and specimen signature of the secretary or assistant secretary or other officer executing the certificate in this clause (i)); and

(ii)     to the extent available, a certificate as to the good standing of each Borrower (in so-called "long-form" if available) as of a recent date, from such Secretary of State (or other applicable Governmental Authority to the extent available).

(c)     <u>Officer's Certificate</u>. The Administrative Agent shall have received a certificate dated the Closing Date and signed by a Financial Officer of Administrative Borrower (or other Responsible Officer reasonably acceptable to the Administrative Agent), stating that on the date of the initial Loan (1) no Default or Event of Default has occurred and is continuing and (2) the representations and warranties contained in Article III are (x) with respect to any representations or warranties that contain a materiality qualifier, true and correct in all respects as of such date, except to the extent any such representation or warranty is stated to relate solely to an earlier date, in which case such representation or warranty shall have been true and correct in all respects on and as of such earlier date and (y) with respect to any representations or warranties that do not contain a materiality qualifier, true

53

and correct in all material respects as of such date, except to the extent any such representation or warranty is stated to relate solely to an earlier date, in which case such representation or warranty shall have been true and correct in all material respects on and as of such earlier date.

(d)    <u>Litigation</u>.    There shall be no litigation, public or private, or administrative proceedings, governmental investigation or other legal or regulatory developments, actual or, to the knowledge of any Borrower, threatened, that, singly or in the aggregate, could reasonably be expected to result in a Material Adverse Effect, or could reasonably be expected to materially and adversely affect the ability of Borrowers to consummate the financings contemplated hereby or the other Transactions.

(e)    <u>Fees</u>.    The Administrative Agent shall have (i) for the account of each Lender hereto, an upfront fee in an amount equal to 3.00% of the Commitment of such Lender (whether drawn or undrawn), and (ii) received all other Fees and other amounts due and payable on or prior to the Closing Date (or shall have received assurances of payment thereof satisfactory to the Administrative Agent), including, to the extent invoiced prior to the Closing Date, reimbursement or payment of all out-of-pocket expenses (including the legal fees and expenses of Winston & Strawn LLP, special counsel to the Administrative Agent and the Lenders, Paul Hastings LLP, special counsel to certain Lenders, and the fees and expenses of any local counsel, appraisers, consultants and other advisors) required to be reimbursed or paid by Borrowers hereunder or under any other Loan Document, subject only to the terms of the DIP Order.

(f)    <u>USA PATRIOT Act</u>.    The Lenders and the Administrative Agent shall have (i) timely received the information required under <u>Section 10.13</u> to the extent requested by the Administrative Agent at least five (5) days prior to the Closing Date and (ii) received, if any Borrower qualifies as a "legal entity customer" under the Beneficial Ownership Regulation, a Beneficial Ownership Certification with respect to such Borrower at least five (5) days prior to the Closing Date.

(g)    <u>Evidence of Insurance</u>.    The Administrative Agent shall have received a certificate from Borrowers' insurance broker or other evidence satisfactory to it that all insurance required to be maintained pursuant to Section 5.04 is in full force and effect and that either the Security Trustee or Administrative Agent, as applicable, but in either case for the benefit of the Secured Parties, has been named as additional insured or loss payee thereunder to the extent required under Section 5.04.

(h)    <u>Motions</u>.    The Administrative Agent and the Lenders shall have received and reviewed all material so-called "first day" motions, declarations, and other pleadings to be filed in the Chapter 11 Cases, each of which shall be in form and substance reasonably satisfactory to Administrative Borrower, the Administrative Agent and the Required Lenders.

(i)    <u>Approved Budget</u>. The Administrative Agent and the Lenders shall have received and reviewed the Approved Budget, which shall be in form and substance satisfactory to the Administrative Agent and the Lenders, which shall be attached to the DIP Orders.

(j)    <u>Interim Borrowing Order</u>. All motions and other documents to be filed with and submitted to the Bankruptcy Court in connection with the DIP Orders shall be, prior to such filing and submittal, (x) received by the Administrative Agent and the Lenders reasonably in advance of filing and (y) in form and substance satisfactory to Administrative Borrower, the Administrative Agent and the Lenders. The Interim Borrowing Order shall have been entered, shall be in full force and effect, and neither shall have been reversed, vacated or stayed, or modified without the prior written consent of Administrative Borrower, the Administrative Agent and the Lenders, and all other necessary consents and

54

approvals to the transactions contemplated hereby shall have been obtained and shall be satisfactory to the Administrative Agent and Lenders.

SECTION 4.02 <u>Conditions to All New Money Loans.</u>

The obligation of each Lender to make any New Money Loan shall be subject to the satisfaction of each of the conditions precedent set forth below.

(a)    <u>Notice</u>.  The Administrative Agent shall have received a Borrowing Request as required by <u>Section 2.03</u>.

(b)    <u>No Default</u>.  At the time of and immediately after giving effect to such Loan and the application of the proceeds thereof, no Default or Event of Default shall have occurred and be continuing on such date.

(c)    <u>Representations and Warranties</u>.  On the date of any Loan, each of the representations and warranties made by any Borrower set forth in <u>Article III</u> or in any other Loan Document shall be true and correct in all material respects (except that any representation and warranty that is qualified as to "materiality" or "Material Adverse Effect" shall be true and correct in all respects) on and as of the date of such Loan with the same effect as though made on and as of such date, except to the extent such representations and warranties expressly relate to an earlier date, in which case, such representations and warranties shall have been true and correct as of such earlier date.

(d)    <u>No Legal Bar</u>.  No order, judgment or decree of any Governmental Authority shall purport to restrain such Lender from making any Loans to be made by it.

(e)    <u>Second Loan Draw - Final Borrowing Order</u>.  With respect to the second draw of the New Money Loans pursuant to Section 2.02(a)(ii), the Final Borrowing Order shall have been entered and be in full force and effect and shall not have been reversed, vacated or stayed, or modified without the prior written consent of Administrative Borrower, the Administrative Agent and the Required Lenders, and an Acceptable Plan of Reorganization shall have been filed with the Bankruptcy Court.

(f)    <u>Third Loan Draw – Incremental Commitments</u>.  With respect to the third draw of New Money Loans pursuant to Section 2.02(a)(iii), Lenders shall have provided Incremental Commitments at their discretion in accordance with Section 2.02(d).

Each of the delivery of a Borrowing Request for a Loan and the acceptance by any Borrower of the proceeds of such Loan shall constitute a representation and warranty by each Borrower that on the date of such Loan (both immediately before and after giving effect thereto and the application of the proceeds thereof) the conditions contained in (i) with respect to the initial Loan on the Closing Date, <u>Section 4.01(c)</u> or (ii) with respect to any Loan made on any date other than the Closing Date, <u>Sections 4.02(b)</u> and <u>(c)</u>, have been satisfied.  Each Borrower shall provide such information as the Administrative Agent may reasonably request to confirm that such conditions have been satisfied.

**ARTICLE V**

<u>AFFIRMATIVE COVENANTS</u>

Each Borrower covenants and agrees with each Lender that so long as this Agreement shall remain in effect and until the Commitments have been terminated and the principal of and interest

AmericasActive:14673966.12

on each Loan, all Fees and all other expenses or amounts payable under any Loan Document (other than with respect to contingent obligations under indemnification provisions as to which no claim is pending) shall have been indefeasibly paid in full in cash, each Borrower will:

SECTION 5.01 Financial Statements, Reports, etc.

Furnish to the Administrative Agent and the Administrative Agent shall deliver to the Lenders:

(a)    Monthly Approved Budget Updates. Beginning with the Fiscal Month ended on April 30, 2020, within 10 Business Days after the end of each Fiscal Month, an updated proposed budget to supplement or replace the Approved Budget, and if Administrative Agent and Required Lenders in their sole discretion shall approve such updated proposed budget, it shall supplement or replace and supersede the then existing Approved Budget. The Administrative Agent shall notify Administrative Borrower whether such updated proposed budget is acceptable no later than five (5) Business Days after receipt thereof; provided that if no such notice is provided, then the Approved Budget most recently in effect shall remain in effect until the Administrative Agent notifies Administrative Borrower as to its and the Required Lenders' acceptance of the proposed budget.

(b)    Weekly Reports. Beginning with the calendar week ended on April 12, 2020, within four (4) Business Days after the end of each calendar week, (A) a report showing actual cash receipts and disbursements of Borrowers covered by the Approved Budget for such calendar week, (B) a Variance Report for the period ended with such calendar week, (C) a Liquidity Report with respect to such calendar week, and (D) a schedule of professional fees billed since inception and a schedule of professional fees paid since the Petition Date, in each case certified in writing by a Responsible Officer of Administrative Borrower as being true and accurate;

(c)    Court Filings.    Substantially concurrently with the filing thereof with the Bankruptcy Court, copies of the monthly operating reports required to be filed with the Bankruptcy Court. Prior to the filing thereof, copies of all material pleadings, motions and applications to be filed by or on behalf of the Borrowers with the Bankruptcy Court or provided to the U.S. Trustee (or any monitor or interim receiver, if any, appointed in the Chapter 11 Cases) or the Creditors' Committee, or if it is not practicable to provide copies of the same in advance of filing, then advance notice of all such material pleadings, motions and applications and copies of all such documents promptly after each such document is filed with the Bankruptcy Court or to the U.S. Trustee (or any monitor or interim receiver, if any, appointed in the Chapter 11 Cases) or the Creditors' Committee.    Nothing contained herein shall constitute a waiver of, or agreement or waive, Borrowers' attorney-client work product or other applicable privileges.

(d)    Compliance Certificate.    Concurrently with the delivery of budget updates or reports under Section 5.01(a) and 5.01(b), a certificate of a Responsible Officer of Administrative Borrower (A) certifying that no Default has occurred or, if such a Default has occurred, specifying the nature and extent thereof and any corrective action taken or proposed to be taken with respect thereto, and (B) Borrowers' weekly compliance with Section 6.22 for the applicable period then ended;

(e)    Perfection Certificate Supplement.    Concurrently with the certificate under Section 5.01(d), an executed Perfection Certificate Supplement or a certificate of a Responsible Officer confirming that there has been no material change in such information since the date of the latest Perfection Certificate Supplement or, if none to date, the Perfection Certificate;

56

(f)      Other Information.   Promptly, from time to time, such other information regarding the operations, business affairs and financial condition of any Borrower, or compliance with the terms of any Loan Document, as the Administrative Agent or the Required Lenders (through the Administrative Agent) may reasonably request.

SECTION 5.02 Litigation and Other Notices.

Furnish to the Administrative Agent (and the Administrative Agent shall deliver to the Lenders) written notice of the following promptly after obtaining knowledge thereof:

(a)      any Default or Event of Default, specifying the nature and extent thereof and the corrective action (if any) taken or proposed to be taken with respect thereto;

(b)      the filing or commencement of, or any written threat or notice of intention of any Person to file or commence, any action, suit, litigation or proceeding or any governmental investigation, whether at law or in equity by or before any Governmental Authority, (i) against any Borrower that could reasonably be expected to result in a Material Adverse Effect or (ii) with respect to any Loan Document;

(c)      any development that has resulted in, or could reasonably be expected to result in a Material Adverse Effect;

(d)      the occurrence of a material Casualty Event; and

(e)      any change in the information provided in the Beneficial Ownership Certification that would result in a change to the list of beneficial owners identified in part (c) or (d) of such certification.

SECTION 5.03 Existence; Compliance with Laws; Businesses and Properties.

(a)      Do or cause to be done all things necessary to preserve, renew and maintain in full force and effect its legal existence, except as otherwise expressly permitted under Section 6.05 or Section 6.06.

(b)      Do or cause to be done all things necessary to obtain, preserve, renew, extend and keep in full force and effect the rights, licenses, permits, privileges, franchises, authorizations, patents, copyrights, trademarks, trade names and other intellectual property material to the conduct of its business, except where the failure to do so could not reasonably be expected to result in a Material Adverse Effect; comply with all applicable Requirements of Law (including FAA and US DOT regulations and any and all zoning, building, Environmental Law, ordinance, code or approval or any building permits or any restrictions of record or agreements affecting the Real Property) and decrees and orders of any Governmental Authority, whether now in effect or hereafter enacted, except where the failure to comply, individually or in the aggregate, could not reasonably be expected to result in a Material Adverse Effect; pay and perform its obligations under all Leases except where the failure to do so could not reasonably be expected to result in a Material Adverse Effect; and at all times maintain, preserve and protect all property material to the conduct of such business (including material Aircraft Collateral) and keep such property in good repair, working order and condition (other than wear and tear occurring in the ordinary course of business) and from time to time make, or cause to be made, all needful and proper repairs, filings, renewals, additions, improvements and replacements thereto necessary in order that the business carried on in connection therewith may be properly conducted at all times; *provided* that nothing in this Section 5.03(b) shall prevent (i) sales or other dispositions of property, consolidations or mergers by or

57

involving any Borrower in accordance with Section 6.05 or Section 6.06; (ii) the withdrawal by any Borrower of its qualification as a foreign corporation in any jurisdiction where such withdrawal, individually or in the aggregate, could not reasonably be expected to result in a Material Adverse Effect; or (iii) the abandonment by any Borrower of any rights, licenses, permits, privileges, franchises, authorizations, trademarks, trade names, copyrights, patents or other Intellectual Property or other aspects of the business that such Person reasonably determines are not useful to its business or no longer commercially desirable.

(c)      Maintain in effect and enforce policies and procedures designed to ensure compliance by Borrowers and their respective directors, officers, employees and agents with Anti-Corruption Laws, applicable AML Laws and applicable Sanctions.

SECTION 5.04 Insurance.

(a)      Generally.  Maintain or cause to be maintained such insurance, to such extent and against such risks as is customary with companies in the same or similar businesses operating in the same or similar locations, including insurance with respect to the Aircraft Collateral, Mortgaged Properties and other properties material to the business of Borrowers against such casualties and contingencies and of such types and in such amounts with such deductibles as is customary in the case of similar businesses operating in the same or similar locations (recognizing that, for the avoidance of doubt, product liability insurance shall not be considered customary), including (i) physical hazard insurance on an "all risk" basis, (ii) commercial general liability against claims for bodily injury, death or property damage covering any and all insurable claims, (iii) worker's compensation insurance and such other insurance as may be required by any Requirement of Law, (iv) all-risk hull insurance and liability insurance applicable to aircraft and the other Aircraft Collateral and (v) such other insurance against risks as the Administrative Agent may from time to time reasonably require (such policies to be in such form and amounts and having such coverage as may be reasonably satisfactory to the Administrative Agent); *provided* that during the continuance of an Event of Default, with respect to physical hazard insurance, (i) no Borrower shall agree to the material adjustment of any material claim thereunder without the consent of the Administrative Agent and (ii) the Administrative Agent may agree to any such adjustment with the consent of any Borrower (not to be unreasonably withheld, conditioned or delayed).

(b)      Requirements of Insurance.  All such property and general liability insurance of Borrowers or the Owner Trust, as applicable, other than insurance carried for the benefit of a landlord pursuant to a triple net lease, shall name the Administrative Agent as mortgagee (in the case of property insurance) or additional insured on behalf of the Secured Parties (in the case of general liability insurance) or 'lender' loss payee (in the case of property insurance) or the Administrative Agent or Security Trustee as loss payee or (in the case of aircraft hull insurance and liability insurance) as additional insured, as applicable, in each case solely with respect to such insurance as is customarily treated in such a manner in respect of syndicated loan transactions of the type contemplated by this Agreement.  A DIP Order provision effecting the foregoing shall adequately fulfill the requirements of this subsection.

(c)      Flood Insurance.  With respect to each Mortgaged Property in the United States, obtain flood insurance in such total amount as the Administrative Agent or the Required Lenders may from time to time reasonably require (but, at a minimum, as required by the Flood Disaster Protection Act of 1973, as amended from time to time (the "**Act**")), if at any time the area in which any improvements located on any Mortgaged Property is designated a "flood hazard area" in any Flood Insurance Rate Map published by the Federal Emergency Management Agency (or any successor agency), and otherwise comply with the National Flood Insurance Program as set forth in the Act.

58

(d)    Broker's Report.  Deliver to the Administrative Agent a report of a reputable insurance broker with respect to such insurance and such supplemental reports with respect thereto as the Administrative Agent may from time to time reasonably request.

SECTION 5.05  Obligations and Taxes.

(a)    Payment of Obligations.  Pay and discharge promptly when due all material Taxes, assessments and governmental charges or levies imposed upon it or upon its income or profits or in respect of its property, before the same shall become delinquent or in default, as well as all lawful and material claims for labor, services, materials and supplies or otherwise that, if unpaid, would reasonably be expected to give rise to a Lien other than a Permitted Lien upon such properties or any part thereof; *provided* that such payment and discharge shall not be required with respect to any such Tax, assessment, charge, levy or claim so long as (i) the validity or amount thereof shall be contested in good faith by appropriate proceedings timely instituted and diligently conducted and the applicable Borrower shall have set aside on its books adequate reserves or other appropriate provisions with respect thereto in accordance with GAAP, and (ii) in the case of any Tax, assessment, charge, levy or claim that has or may become a Lien against any of the Collateral, such proceedings operate to stay the sale of any portion of the Collateral to satisfy such Tax, assessment, charge, levy or claim, in each case consistent with the Approved Budget.

(b)    Filing of Returns.  Timely and correctly file all material Tax Returns required to be filed by it.  Withhold or collect and remit all material Taxes that it is required to withhold or collect and remit.

(c)    Tax Shelter Reporting.  No Borrower intends to treat the Loans as being a "reportable transaction" within the meaning of Treasury Regulation Section 1.6011-4.  If any Borrower determines to take any action inconsistent with such intention, it will promptly notify the Administrative Agent thereof.

SECTION 5.06  Employee Benefits.

(a)    Cause each Plan to comply in all material respects with the applicable provisions of ERISA and the Code.

(b)    Furnish to the Administrative Agent (x) promptly, and in any event within 10 calendar days, after any Responsible Officer of any Borrower or any ERISA Affiliates of any Borrower knows or has reason to know that any ERISA Event that, alone or together with any other ERISA Event, could reasonably be expected to result in liability of Borrowers or any of their ERISA Affiliates in an aggregate amount that would constitute an Event of Default under Section 8.01(h) or the imposition of a Lien, a statement of a Responsible Officer of Administrative Borrower setting forth details as to such ERISA Event and the action, if any, that Borrowers propose to take with respect thereto; (y) upon request by the Administrative Agent, copies of (i) each Schedule B, MB or SB (Actuarial Information) to the annual report (Form 5500 Series) filed by any Borrower or any ERISA Affiliate with the Internal Revenue Service with respect to each Plan; (ii) the most recent actuarial valuation report for each Plan; (iii) all notices received by any Borrower or any ERISA Affiliate from a Multiemployer Plan sponsor or any governmental agency concerning an ERISA Event; and (iv) such other documents or governmental reports or filings relating to any Plan (or employee benefit plan sponsored or contributed to by any Borrower) as the Administrative Agent shall reasonably request, and (z) promptly following any request therefor by the Administrative Agent, on and after the effectiveness of the Pension Protection Act of 2006,

59

copies of (i) any documents described in Section 101(k) of ERISA with respect to any Multiemployer Plan and (ii) any notices described in Section 101(l) of ERISA with respect to any Multiemployer Plan.

SECTION 5.07 Maintaining Records; Access to Properties and Inspections; Lender Meetings.

(a)    Keep proper books of record and account in which full, true and correct entries in conformity with Requirements of Law are made of all dealings and transactions in relation to its business and activities.  Keep proper manuals and records relating to the Aircraft Collateral in conformity with all Requirements of Law, including aircraft maintenance records.    Each Borrower will permit any representatives designated by the Administrative Agent or any Lender to visit and inspect the financial records, Aircraft Collateral records and the property (including aircraft) of such Borrower at reasonable times, all at the reasonable expense of Borrowers to make extracts from and copies of such financial records and Aircraft Collateral records, and permit any representatives designated by the Administrative Agent or any Lender to discuss the affairs, finances, accounts and condition of any Borrower with the officers and employees thereof and advisors therefor (including independent accountants).

(b)    Weekly, at the request of the Administrative Agent or the Required Lenders, hold a meeting by conference call at a mutually agreeable time with the Administrative Agent (and all Lenders who choose to attend such meeting).

SECTION 5.08 Use of Proceeds.

Use the proceeds of the Loans only in accordance with the Approved Budget and the DIP Orders, and each withdrawal of funds from the Designated Deposit Account shall be deemed a representation by each Borrower that such funds are or will be used solely for payment of expenses identified in the Approved Budget and payable at the times or for the periods therein specified.

SECTION 5.09 Compliance with Environmental Laws; Environmental Reports.

(a)    Comply, and use commercially reasonable efforts to cause all lessees and charterers of Real Property owned or leased by any Borrower to comply, in all material respects with all Environmental Laws and Environmental Permits applicable to its operations and Real Property, obtain and renew all material Environmental Permits required for its operations and Real Property, and conduct all Responses required by, and in accordance with, Environmental Laws, except in each case as would not reasonably be expected to result in a Material Adverse Effect; *provided* that no Borrower shall be required to undertake any Response to the extent that its obligation to do so is being contested in good faith and by proper proceedings and appropriate reserves are being maintained with respect to such circumstances in accordance with GAAP.

(b)    Furnish to the Administrative Agent written notice of any Release or discovered environmental condition that constitutes a violation of Environmental Laws by a Borrower in a manner that could reasonably be expect to expose any Borrower to any material liability that is not covered by insurance or third party indemnification within 30 days after obtaining knowledge thereof.

AmericasActive:14673966.12

SECTION 5.10 [Reserved].

SECTION 5.11 [Reserved].

SECTION 5.12 Security Interests; Further Assurances.

Promptly, upon the reasonable request of the Administrative Agent, at Borrowers' expense, execute, acknowledge and deliver, or cause the execution, acknowledgment and delivery of, and thereafter register, file or record, or cause to be registered, filed or recorded, in an appropriate governmental office, any document or instrument supplemental to or confirmatory of the Security Documents or otherwise deemed by the Administrative Agent reasonably necessary or desirable for the continued validity, perfection and priority of the Liens on the Collateral covered thereby subject to no other Liens except Permitted Liens and use commercially reasonable efforts to obtain any consents or waivers reasonably requested by the Administrative Agent as may be necessary or appropriate in connection therewith. Deliver or cause to be delivered to the Administrative Agent or the Security Trustee, as applicable, from time to time such other documentation, consents, authorizations, approvals and orders in form and substance reasonably satisfactory to the Administrative Agent as the Administrative Agent shall reasonably deem necessary to perfect or maintain the Liens on the Collateral pursuant to the Security Documents. Upon the exercise by the Administrative Agent or the Security Trustee of any power, right, privilege or remedy pursuant to any Loan Document which requires any consent, approval, registration, qualification or authorization of any Governmental Authority execute and deliver all applications, certifications, instruments and other documents and papers that the Administrative Agent or the Security Trustee may reasonably require and as are commercially reasonable. If the Administrative Agent or the Required Lenders reasonably determines that they are required by a Requirement of Law to have appraisals prepared in respect of the Real Property of any Borrower constituting Collateral, Borrowers shall provide to the Administrative Agent appraisals that satisfy the applicable requirements of the Real Estate Appraisal Reform Amendments of FIRREA and are otherwise in form and substance reasonably satisfactory to the Administrative Agent.

SECTION 5.13 Post-Closing Matters.

Execute and deliver the documents and complete the tasks set forth on Schedule 5.13, in each case within the time limits specified on such schedule.

SECTION 5.14 Advisors.

Retain on or before the Petition Date, and continue to retain during the Chapter 11 Cases and thereafter until such time as the Administrative Agent and the Required Lenders shall agree, (i) the Financial Adviser and (ii) Sage-Popovich, Inc., as asset liquidation specialists, in each case on terms consistent with the Approved Budget, and (B) retain such advisers (including a financial adviser to the Administrative Agent and the Lenders) as the Administrative Agent may request from time to time.

SECTION 5.15 Aircraft Matters.

(a)    Each Mortgaged Aircraft will, unless not yet delivered to a Borrower or the Owner Trust, leased, out for repair or refurbishment, or in transit, be principally hangared at any time only at a location identified on Schedule 14(b) to the Perfection Certificate, as updated from time to time by Administrative Borrower to the Administrative Agent, or as otherwise notified by Administrative Borrower to the Administrative Agent.

61

(b)     Each Aircraft Operating Party shall remain an Air Carrier, except as would not reasonably be expected to result in a Material Adverse Effect, and while an Air Carrier shall remain a Citizen of the United States.

(c)     Each Aircraft Operating Party will comply with the requirements of all applicable Aircraft Regulations, other than Aircraft Regulations the non-compliance with which, individually or in the aggregate, could not reasonably be expected to result in a Material Adverse Effect.

(d)     Each Aircraft Operating Party shall maintain its Air Carrier Certificate and all Aircraft Permits applicable to it and its Aircraft except where the failure to do so, individually or in aggregate, could not reasonably be expected to result in a Material Adverse Effect.

(e)     Each Aircraft Operating Party shall perform its obligations and comply with the provisions of any Aircraft Lease to which it is party except where the failure to do so, individually or in the aggregate, could not reasonably be expected to result in a Material Adverse Effect. Each Aircraft Operating Party will notify the Administrative Agent (i) upon receipt of any notice of termination of any Aircraft Lease to which it is party and (ii) prior to giving any notice of termination of any Aircraft Lease to which it is a party, in either case, where such termination could reasonably be expected to result in a Material Adverse Effect.

## ARTICLE VI

### NEGATIVE COVENANTS

Each Borrower covenants and agrees with each Lender that, so long as this Agreement shall remain in effect and until the Commitments have been terminated and the principal of and interest on each Loan, all Fees and all other expenses or amounts payable under any Loan Document (other than with respect to contingent obligations under indemnification provisions as to which no claim is pending) have been indefeasibly paid in full in cash, no Borrower will:

SECTION 6.01 Indebtedness.

Incur, create, assume or permit to exist, directly or indirectly, any Indebtedness, except

(a)     Indebtedness incurred under this Agreement and the other Loan Documents;

(b)     Indebtedness arising from the honoring by a bank or other financial institution of a check, draft or similar instrument inadvertently (except in the case of daylight overdrafts) drawn against insufficient funds in the ordinary course of business;

(c)     Indebtedness arising in connection with endorsement of instruments for deposit in the ordinary course of business;

(d)     Indebtedness outstanding on the date hereof and listed on Schedule 6.01; and

(e)     Indebtedness constituting Prepetition Secured Indebtedness; provided that no principal, interest or other amounts payable under the Prepetition Credit Agreement may be paid except as (i) adequate protection in accordance with the terms of the DIP Orders or (ii) otherwise contemplated by an Acceptable Plan of Reorganization approved by a Final Order.

AmericasActive:14673966.12

SECTION 6.02 <u>Liens.</u>

Create, incur, assume or permit to exist, directly or indirectly, any Lien on any property now owned or hereafter acquired by it or on any income or revenues or rights in respect of any thereof, except the following (collectively, the "**Permitted Liens**"):

(a)    Liens securing the Obligations;

(b)    Liens for taxes, assessments or governmental charges or levies either (i) not yet overdue for more than 30 days or not yet payable or (ii) which are being contested in good faith by appropriate proceedings, for which adequate reserves have been established in accordance with GAAP;

(c)    Liens in respect of property of any Borrower imposed by Requirements of Law, which were incurred in the ordinary course of business and do not secure Indebtedness for borrowed money, such as carriers', warehousemen's, materialmen's, landlords', workmen's, suppliers', repairmen's and mechanics' Liens and other similar Liens arising in the ordinary course of business, and (i) which do not in the aggregate materially detract from the value of the property of Borrowers, taken as a whole, and do not materially impair the use thereof in the operation of the business of Borrowers, taken as a whole, and (ii) which, if they secure obligations that are more than 60 days past due, are being contested in good faith by appropriate proceedings for which adequate reserves have been established in accordance with GAAP;

(d)    easements, rights-of-way, restrictions (including zoning restrictions), covenants, licenses, encroachments, protrusions and other similar charges or encumbrances, and minor title deficiencies on or with respect to any Real Property, in each case whether now or hereafter in existence, not (i) securing Indebtedness for borrowed money or (ii) individually or in the aggregate materially interfering with the ordinary conduct of the business of Borrowers at such Real Property;

(e)    Liens arising out of judgments, attachments or awards not resulting in an Event of Default;

(f)    Liens (other than any Lien imposed by ERISA) (x) imposed by Requirements of Law or pledges or deposits made in connection therewith in the ordinary course of business in connection with workers' compensation, unemployment insurance and other types of social security legislation, (y) incurred in the ordinary course of business to secure the performance of tenders, statutory obligations (other than excise taxes), contracts (other than for borrowed money), surety, stay, customs and appeal bonds, statutory bonds, bids, leases, government contracts, trade contracts, performance and return of money bonds and other similar obligations (exclusive of obligations for the payment of borrowed money) or (z) arising by virtue of deposits made in the ordinary course of business to secure liability for premiums to insurance carriers;

(g)    any interest or title of a licensor or lessor in the property covered by any license or lease agreement of any Borrower entered into in the ordinary course of business;

(h)    Liens arising out of conditional sale, title retention, consignment or similar arrangements for the sale of goods entered into by any Borrower in the ordinary course of business in accordance with the past practices of such Borrower;

(i)    ordinary course bankers' Liens, rights of setoff and other similar Liens existing solely with respect to accounts maintained by any Borrower, in each case granted in the ordinary course

63

of business in favor of the bank or banks with which such accounts are maintained, securing amounts owing to such bank with respect to cash management and operating account arrangements, including those involving pooled accounts and netting arrangements; *provided* that, unless such Liens are non-consensual and arise by operation of law, in no case shall any such Liens secure (either directly or indirectly) the repayment of any Indebtedness other than Indebtedness permitted under Section 6.01(b);

(j)     Liens granted or deemed granted pursuant to the Security Documents and the DIP Orders and other Liens expressly permitted by a Security Document on property subject thereto;

(k)     licenses of Intellectual Property granted by any Borrower in the ordinary course of business and not interfering in any material respect with the ordinary conduct of business of Borrowers;

(l)     the filing of UCC financing statements solely as a precautionary measure in connection with operating leases or consignment of goods and any International Interest or Prospective International Interest (each as defined in the Cape Town Convention) of a lessor to any Borrower or otherwise in connection with the purchase, sale or other transfer of any Aircraft (which purchase, sale or other transfer is otherwise permitted hereunder);

(m)     Liens in favor of customs and revenue authorities arising as a matter of law to secure payment of customs duties in connection with the importation of goods;

(n)     Liens described on Schedule 6.02;

(o)     Liens imposed by applicable law on the assets of any Borrower or the Owner Trust located at an airport for the benefit of any nation or government or national or governmental authority of any nation, state, province or other political subdivision thereof, and any agency, department, regulatory, airport authority, air navigation authority or other entity exercising executive, legislative, judicial, regulatory or administrative functions of or pertaining to government in respect of the regulation of commercial aviation or the registration, airworthiness or operation of civil aircraft and having jurisdiction over any Borrower including, without limitation, the FAA or DOT;

(p)     salvage or similar rights of insurers;

(q)     leases or subleases of any Aircraft;

(r)     any extension, renewal or replacement (or successive extensions, renewals or replacements), in whole or in part, of any Lien referred to in the foregoing clauses of this Section 6.02; and

(s)     Liens securing Prepetition Secured Indebtedness.

*provided, however,* that no consensual Liens shall be permitted to exist, directly or indirectly, on any Securities Collateral, other than Liens granted pursuant to the Security Documents.

SECTION 6.03 Sale and Leaseback Transactions.

Enter into any arrangement, directly or indirectly, with any Person whereby it shall sell or transfer any property, real or personal, used or useful in its business, whether now owned or hereafter acquired, and thereafter rent or lease such property or other property which it intends to use for substantially the same purpose or purposes as the property being sold or transferred (a "**Sale and**

64

**Leaseback Transaction"**).

SECTION 6.04 <u>Investment, Loan, Advances.</u>

Directly or indirectly, lend money or credit (by way of guarantee or otherwise) or make advances to any Person, or purchase or acquire any Equity Interests, bonds, notes, debentures or other obligations or securities of, or any other interest in, or make any capital contribution to, any other Person, or purchase or own a futures contract or otherwise become liable for the purchase or sale of currency or other commodities at a future date in the nature of a futures contract, or purchase or acquire (in one transaction or a series of related transactions) all or substantially all of the property (whether tangible or intangible) of any Person, or the property constituting a business unit, line of business, or division of any Person, or form any new Person (all of the foregoing, collectively, "**Investments**"), except that the following shall be permitted:

(a)     Investments outstanding on the Closing Date and identified on <u>Schedule 6.04</u>;

(b)     Borrowers may (i) acquire and hold accounts receivables owing to any of them if created or acquired in the ordinary course of business and payable or dischargeable in accordance with customary terms, (ii) invest in, acquire and hold cash and Cash Equivalents, (iii) endorse negotiable instruments held for collection in the ordinary course of business, (iv) make contract, lease, utility and other similar deposits and prepayments in the ordinary course of business and (v) make extensions of trade credit in the ordinary course of business, in each case, to the extent permitted under the Approved Budget;

(c)     Investments by a Borrower in any other Borrower;

(d)     purchases and other acquisitions of inventory, materials, equipment and other property in the ordinary course of business and to the extent permitted under the Approved Budget;

(e)     Capital Expenditures by Borrowers to the extent permitted under the Approved Budget;

(f)     leases, licenses and sublicenses of real or personal property in the ordinary course of business to the extent permitted under the Approved Budget; and

(g)     Contingent Obligations of any Borrower in respect of obligations of another Borrower to the extent such obligations are permitted hereunder.

An Investment shall be deemed to be outstanding to the extent not returned in the same form as the original Investment (or as cash) to any Borrower.

SECTION 6.05 <u>Mergers and Consolidations.</u>

Wind up, liquidate or dissolve its affairs or enter into any transaction of merger or consolidation, except into a trust or other entity that is the assignee or successor to Borrowers pursuant to the Acceptable Plan of Reorganization on terms acceptable to the Administrative Agent and the Required Lenders.

AmericasActive:14673966.12

SECTION 6.06 <u>Asset Sales.</u>

Effect any Asset Sale, except that the following shall be permitted:

(a)    Dispositions in accordance with an Acceptable Plan of Reorganization as approved by the Bankruptcy Court by Final Order;

(b)    Leases, licenses or sublicenses of real or personal property;

(c)    dispositions, settlements and write-offs of accounts receivable in connection with the collection or compromise thereof in the ordinary course of business; and

(d)    the sale, contribution or transfer of any Aircraft (and any acquisition rights in respect thereof or related thereto) by any Borrower to the Owner Trust (or any other owner trust of which the sole beneficiaries are one or more Borrowers), in each case in the ordinary course of business and on terms reasonably acceptable to the Administrative Agent and the Required Lenders and approved by the Bankruptcy Court.

SECTION 6.07 <u>Dividends.</u>

Declare or pay, directly or indirectly, any Dividends with respect to any Borrower, except that the following shall be permitted:

(a)    subject to the approval of the Bankruptcy Court, Dividends by any Borrower to another Borrower; and

(b)    Permitted Tax Distributions in accordance with the Approved Budget.

SECTION 6.08 <u>Transactions with Affiliates.</u>

Enter into, directly or indirectly, any transaction or series of related transactions, whether or not in the ordinary course of business, with any Affiliate of any Borrower (other than transactions between or among Borrowers, to the extent otherwise permitted by this Agreement) except that the following shall be permitted:

(a)    Dividends permitted by <u>Section 6.07;</u>

(b)    reasonable and customary manager, director (or member of similar governing or advisory body), officer and employee compensation (including bonuses), business expense reimbursement and other benefits (including retirement, health, stock option and other benefit plans) and indemnification arrangements, and payments under "key employee" or "employee retention" plans approved by the Bankruptcy Court, in each case to the extent consistent with the Approved Budget;

(c)    transactions with customers, clients, suppliers, joint venture partners or purchasers or sellers of goods and services, in each case in the ordinary course of business and to the extent consistent with the Approved Budget; and

(d)    Investments and Assets Sales permitted by Sections 6.04 and 6.06, and leases of Aircraft, subject, where applicable, to the approval of the Bankruptcy Court.

AmericasActive:14673966.12

SECTION 6.09 [Reserved].

SECTION 6.10 <u>Prepayments of Other Indebtedness; Modifications of Organizational Documents and Other Documents, etc.</u>

Directly or indirectly:

(a)    make any voluntary or optional payment or prepayment of principal on or redemption or acquisition for value of, or any prepayment or redemption as a result of any asset sale, change of control or similar event of, any Indebtedness outstanding under any Junior Financing; or

(b)    amend or modify any of its Organizational Documents or any agreement to which it is a party with respect to its Equity Interests (including any stockholders' agreement), or enter into any new agreement with respect to its Equity Interests, other than any such amendments or modifications or such new agreements which are not, or could not be reasonably expected to be, adverse to the interests of the Lenders.

SECTION 6.11 <u>Limitation on Certain Restrictions on Subsidiaries.</u>

Directly or indirectly, create or otherwise cause or suffer to exist or become effective any consensual encumbrance or restriction on the ability of any Subsidiary to (a) pay dividends or make any other distributions on its capital stock or any other interest or participation in its profits owned by any Borrower or any Subsidiary, or pay any Indebtedness owed to a Borrower or a Subsidiary, (b) make loans or advances to any Borrower or any Subsidiary or (c) transfer any of its properties to any Borrower or any Subsidiary, except for such encumbrances or restrictions existing under or by reason of (i) applicable Requirements of Law; (ii) this Agreement and the other Loan Documents; (iii) customary provisions restricting subletting or assignment of any lease governing a leasehold interest of a Subsidiary; (iv) customary provisions restricting assignment of any agreement entered into by a Subsidiary in the ordinary course of business; (v) any holder of a Lien permitted by <u>Section 6.02</u> restricting the transfer of the property subject thereto; (vi) customary restrictions and conditions contained in any agreement relating to the sale of any property permitted under <u>Section 6.06</u> pending the consummation of such sale (including asset sale and stock sale agreements and other similar agreements); (vii) any agreement in effect at the time such Subsidiary becomes a Subsidiary, so long as such agreement was not entered into in connection with or in contemplation of such Person becoming a Subsidiary; (viii) customary provisions in partnership agreements, limited liability company organizational governance documents, asset sale and stock sale agreements and other similar agreements entered into in the ordinary course of business that restrict the transfer of ownership interests in such partnership, limited liability company or similar Person in each case, in existence on the Closing Date; (ix) restrictions on cash or other deposits or net worth imposed by suppliers or landlords under contracts entered into in the ordinary course of business; (x) in the case of any joint venture which is not a Borrower, restrictions in such Person's Organizational Documents or pursuant to any joint venture agreement or stockholders agreements solely to the extent of the Equity Interests of or property held in the subject joint venture or other entity; or (xi) any encumbrances or restrictions imposed by any amendments or refinancings that are otherwise permitted by the Loan Documents or the contracts, instruments or obligations referred to in clauses (iii), (vii) or (viii) above; *provided* that such amendments or refinancings are, taken as a whole, no more materially restrictive with respect to such encumbrances and restrictions than those prior to such amendment or refinancing.

67

SECTION 6.12 <u>Limitation on Issuance of Capital Stock.</u>

Issue any Equity Interest (including by way of sales of treasury stock) or any options or warrants to purchase, or securities convertible into, any Equity Interest.

SECTION 6.13 <u>Business.</u>

Engage (directly or indirectly) in any business other than those businesses in which Borrowers are engaged on the Closing Date.

SECTION 6.14 <u>[Reserved].</u>

SECTION 6.15 <u>[Reserved].</u>

SECTION 6.16 <u>No Further Negative Pledge.</u>

Enter into any agreement, instrument, deed or lease which prohibits or limits the ability of any Borrower to create, incur, assume or suffer to exist any Lien upon any of their respective properties or revenues, whether now owned or hereafter acquired, or which requires the grant of any security for an obligation if security is granted for another obligation, except the following: (1) this Agreement and the other Loan Documents; (2) covenants in documents creating Liens permitted by <u>Section 6.02</u> prohibiting further Liens on the properties encumbered thereby; (3) any other agreement that does not restrict in any manner (directly or indirectly) Liens created pursuant to the Loan Documents on any Collateral securing the Obligations and does not require the direct or indirect granting of any Lien securing any Indebtedness or other obligation by virtue of the granting of Liens on or pledge of property of any Borrower to secure the Obligations; and (4) any prohibition or limitation that (a) exists pursuant to applicable Requirements of Law, (b) consists of customary restrictions and conditions contained in any agreement relating to the sale of any property permitted under <u>Section 6.06</u> pending the consummation of such sale, (c) restricts pledging, subletting or assignment of any leasehold interest contained in any lease governing a leasehold interest of a Borrower, (d) exists in any agreement in effect at the time such Person becomes a Subsidiary, so long as such agreement was not entered into in contemplation of such Person becoming a Subsidiary or (e) is imposed by any amendments or refinancings that are otherwise permitted by the Loan Documents of the contracts, instruments or obligations referred to in clause (4)(d); *provided* that such amendments and refinancings are no more materially restrictive, taken as a whole, with respect to such prohibitions and limitations than those prior to such amendment or refinancing.

SECTION 6.17 <u>Compliance with Anti-Terrorism Laws.</u>

(a)    Fail to comply with any Anti-Terrorism Laws applicable thereto.

(b)    Request any Borrowing, or use (and each Borrower shall procure that Borrowers and its or their respective directors, officers, employees, Affiliates and agents not use), directly or indirectly, the proceeds of any Borrowing, or lend, contribute or otherwise make available such proceeds to any Borrower, other Affiliate, joint venture partner or other Person, (i) in furtherance of an offer, payment, promise to pay, or authorization of the payment or giving of money, or anything else of value, to any Person in violation in any material respect of any Anti-Corruption Laws or AML Laws, (ii) for the purpose of funding, financing or facilitating any activities, business or transaction of or with any Sanctioned Person, or in any Sanctioned Country, or involving any goods originating in or with a Sanctioned Person or Sanctioned Country in each case in violation of Sanctions, or (iii) in any manner that would result in the violation of any Sanctions by any Person (including any Person participating in

68

the transactions contemplated hereunder, whether as underwriter, advisor lender, investor or otherwise).

SECTION 6.18 <u>Accounts.</u> (i) Open or maintain any Account other than the Designated Deposit Account, the Accounts disclosed on <u>Schedule 6.18</u> in effect on the Closing Date or as otherwise approved by the Administrative, or (ii) take any action or permit any action to be taken to close, terminate or otherwise abandon the Designated Deposit Account or to terminate the Designated Deposit Account Control Agreement.

SECTION 6.19 <u>Information Regarding Collateral.</u>

Effect any change (i) in any Borrower's legal name, (ii) in the location of any Borrower's chief executive office, (iii) in any Borrower's identity or form of organization, (iv) in any Borrower's Federal Taxpayer Identification Number or organizational identification number, if any, or (v) in any Borrower's jurisdiction of organization (in each case, including by merging with or into any other entity, reorganizing or organizing in any other jurisdiction), until (A) it shall have given the Administrative Agent not less than 30 days' prior written notice (in the form of an Officers' Certificate), or such lesser notice period agreed to by the Administrative Agent, of its intention so to do, clearly describing such change and providing such other information in connection therewith as the Administrative Agent may reasonably request and (B) it shall have taken all action reasonably required by the Administrative Agent to maintain the perfection and priority of the security interest of the Administrative Agent for the benefit of the Secured Parties in the Collateral, if applicable. Each Borrower agrees to promptly provide the Administrative Agent at its request with certified Organizational Documents reflecting any of the changes described in the preceding sentence.

SECTION 6.20 <u>Owner Trust.</u>

Notwithstanding anything to the contrary contained herein, no Borrower will cause or permit the Owner Trust to (i) incur, directly or indirectly, any Indebtedness or any other material obligation or liability whatsoever other than any obligation under any Loan Document or in connection with any lease described below, (ii) create or suffer to exist any Lien upon any property or assets now owned or hereafter acquired by it other than as permitted pursuant to any Loan Document, (iii) terminate or consolidate with or merge with or into, or convey, transfer or lease all or substantially all its assets to, any Person except for the lease of Aircraft (x) to an Aircraft Operating Party and (y) to any unaffiliated third party, and/or (iv) engage in any business or activity inconsistent with its obligations under any Loan Document. Administrative Borrower and/or JJM, Inc. shall remain, either together or individually, as the sole beneficiary or beneficiaries of the Owner Trust and the Owner Trust shall remain a Citizen of the United States.

SECTION 6.21 <u>Certain Bankruptcy Matters.</u>

(a)    Without the prior written consent of the Administrative Agent and the Required Lenders, (i) assume, assume and assign, or reject executory contracts or unexpired leases or (ii) make any payments on account of any creditor's claims incurred prior to the Petition Date, other than (A) "critical vendor" payments approved by the Bankruptcy Court (so long as such payments are included and approved in the DIP Budget) and (B) adequate protection payments with respect to the Prepetition Credit Agreement in accordance with the terms of the DIP Orders (so long as such payments are included and approved in the DIP Budget).

(b)    Consent to or permit to exist any of the following:

(i)     any order which authorizes the rejection or assumption of any executory contracts or unexpired leases of such Borrower without the prior written consent of the Administrative Agent and the Required Lenders;

(ii)     any modification, stay, vacation or amendment to the DIP Orders to which the Administrative Agent and the Required Lenders have not consented in writing;

(iii)     a priority claim or administrative expense or unsecured claim against such Borrower (now existing or hereafter arising or any kind or nature whatsoever, including, without limitation, any administrative expense of the kind specified in sections 105, 326, 328, 330, 331, 364(c), 503(a), 503(b), 506(c), 507(a), 507(b), 546(c), 546(d), 726 or 1114 of the Bankruptcy Code) equal or superior to the priority claim of the Administrative Agent in respect of the Obligations or to any priority claim with respect to Permitted Prior Senior Liens (as defined in the DIP Orders), except in each case with respect to the Professional Fee Carve Out;

(iv)     any Lien on any Collateral having a priority equal or superior to the Lien securing the Obligations, other than with respect to the Professional Fee Carve Out Permitted Prior Senior Liens (as defined in the DIP Orders);

(v)     any order which authorizes the return of any of any Borrower's property pursuant to section 546(h) of the Bankruptcy Code;

(vi)     any order which authorizes the payment of any Indebtedness (other than Indebtedness reflected in the Approved Budget, and other Indebtedness approved by the Administrative Agent and the Required Lenders, in each case incurred prior to the Petition Date or the grant of "adequate protection" (whether payment in cash or transfer of property) with respect to any such Indebtedness which is secured by a Lien other than as set forth in the DIP Orders); or

(vii)     any order seeking authority to take any action that is prohibited by the terms of this Agreement or the other Loan Documents or refrain from taking any action that is required to be taken by the terms of this Agreement or any of the other Loan Documents.

SECTION 6.22. <u>Budgeted Expenses and Net Cash Flow</u>.

(a)     Pay any expenses other than those set forth in the Approved Budget;

(b)     On a cumulative basis from and after the Petition Date, permit actual aggregate expenses incurred and disbursements made to exceed 115% of those projected in the Approved Budget; and

(c)     Permit "Net Cash Flow" (as defined in the Approved Budget) for any rolling period of four consecutive weeks (beginning with such four week period ended on the last day of the fourth full week following the Petition Date) on a cumulative basis (x) if negative, to be more than 110% of the projected cumulative Net Cash Flow as set forth in the Approved Budget for such period, and (y) if positive, to be less than 80% of the projected cumulative Net Cash Flow as set forth in the Approved Budget for such period.

**ARTICLE VII**

70

[RESERVED]

## ARTICLE VIII

EVENTS OF DEFAULT

SECTION 8.01 <u>Events of Default.</u>

Upon the occurrence and during the continuance of the following events ("**Events of Default**"):

(a)    default shall be made in the payment of any principal of any Loan when and as the same shall become due and payable, whether at the due date thereof or at a date fixed for prepayment (whether voluntary or mandatory) thereof or by acceleration thereof or otherwise;

(b)    default shall be made in the payment of any interest on any Loan or any Fee or any other amount (other than an amount referred to in paragraph (a) above) due under any Loan Document, when and as the same shall become due and payable, and such default shall continue unremedied for one day;

(c)    any representation or warranty made or deemed made by any Borrower in this Agreement, or any representation or warranty or statement in any certificate furnished by a Borrower pursuant to this Agreement shall be false in any material respect (or, to the extent such representation and warranty contains qualifications as to materiality, it shall prove to be false in any respect) as of the date made or deemed made;

(d)    default shall be made in the due observance or performance by any Borrower of any covenant, condition or agreement contained in Section <u>5.01</u>, <u>5.02</u>, <u>5.03(a)</u>, <u>5.07</u>, <u>5.08</u>, <u>5.13</u> or <u>5.14</u>, or in <u>Article VI</u>;

(e)    default shall be made in the due observance or performance by any Borrower or the Owner Trust of any covenant, condition or agreement contained in any Loan Document (other than those specified in paragraphs (a), (b) or (d) immediately above) and such default shall continue unremedied or shall not be waived for a period of five days after the earlier of (x) any Borrower becoming aware of such default, and (y) written notice thereof from the Administrative Agent to Administrative Borrower;

(f)    any Borrower shall (i) fail to pay any principal or interest due in respect of any Material Indebtedness (other than the Obligations and the Prepetition Secured Obligations), when and as the same shall become due and payable beyond any applicable grace period, or (ii) fail to observe or perform any other term, covenant, condition or agreement contained in any agreement or instrument evidencing or governing any Material Indebtedness (other than the Obligations and the Prepetition Secured Obligations) if the effect of any failure referred to in this clause (ii) is to cause, or to permit the holder or holders of such Material Indebtedness or a trustee or other representative on its or their behalf (with or without the giving of notice, the lapse of time or both) to cause, such Material Indebtedness to become due prior to its stated maturity or become subject to a mandatory offer purchase by the obligor;

(g)    one or more judgments, orders or decrees for the payment of money in an aggregate amount in excess of $1,000,000 in excess of applicable insurance or indemnity coverage shall be rendered against any Borrower or any combination thereof and the same shall remain undischarged,

71

unvacated or unbonded for a period of 45 consecutive days during which execution shall not be effectively stayed, or any action shall be legally taken by a judgment creditor to levy upon properties of any Borrower to enforce any such judgment;

(h)    one or more ERISA Events shall have occurred that, when taken together with all other such ERISA Events that have occurred, either alone or in the aggregate, could reasonably be expected to result in liability of any Borrower or any of its ERISA Affiliates, such liability in an aggregate amount exceeding $500,000;

(i)    any security interest and Lien purported to be created by any Security Document shall cease to be in full force and effect, or shall cease to give the Administrative Agent or Security Trustee, as applicable, for the benefit of the Secured Parties, a perfected first priority (subject to Permitted Liens and to the extent required in the applicable Security Document) security interest in and Lien on any material portion of the Collateral thereunder (except as otherwise expressly provided in this Agreement or such Security Document), or shall be asserted by any Borrower not to be, a valid, perfected, first priority (except with respect to Permitted Liens or as otherwise expressly provided in this Agreement or such Security Document) security interest in or Lien on any material portion of the Collateral covered thereby;

(j)    any Loan Document or any material provisions thereof shall at any time and for any reason be declared by a court of competent jurisdiction to be null and void, or a proceeding shall be commenced by any Borrower or any other Person, or by any Governmental Authority, seeking to establish the invalidity or unenforceability thereof (exclusive of questions of interpretation of any provision thereof), or any Borrower shall repudiate or deny any portion of its liability or obligation for the Obligations;

(k)    [Reserved];

(l)    the entry of an order in any of the Chapter 11 Cases which stays, modifies or reverses any DIP Order or which otherwise materially adversely affects the effectiveness of any DIP Order without the express written consent of the Administrative Agent and the Required Lenders, or the filing of any pleading by any Borrower or any Affiliate thereof seeking the entry of such an order;

(m)    either (i) the appointment in any of the Chapter 11 Cases of a trustee or of any examiner having expanded powers to operate all or any part of the business of any Borrower, or (ii) the conversion of any of the Chapter 11 Cases to a case under chapter 7 of the Bankruptcy Code;

(n)    the entry of any order without the prior written consent of the Administrative Agent and the Required Lenders which provides relief from the automatic stay otherwise imposed pursuant to section 362 of the Bankruptcy Code which permits any creditor to realize upon, or to exercise any right or remedy with respect to, any asset of a Borrower or to terminate any license, franchise, or similar agreement;

(o)    the filing of any application by a Borrower without the express prior written consent of the Administrative Agent and the Required Lenders for the approval of any super-priority claim in any of the Chapter 11 Cases which is pari passu with or senior to the priority of the claims of the Administrative Agent and the Lenders for the Obligations or the Prepetition Secured Obligations, or there shall arise any such super-priority claim under the Bankruptcy Code, except in each instance the Professional Fee Carve Out;

(p)    the payment or other discharge by a Borrower of any Indebtedness or any other "claim" (as defined in the Bankruptcy Code) incurred prior to the Petition Date, except the Prepetition Secured Obligations or otherwise as expressly permitted hereunder or the payment of which the Administrative Agent and the Required Lenders have provided their written consent;

(q)    the entry of any order in any of the Chapter 11 Cases which provides adequate protection (other than as provided in the DIP Orders), or the granting by a Borrower of similar relief in favor of any one or more of their pre-petition creditors, contrary to the terms and conditions of any DIP Order;

(r)    the failure of a Borrower (i) to comply with each and all of the terms and conditions of any DIP Order, or (ii) to materially comply with any other order entered in any of the Chapter 11 Cases if such failure would result in a Material Adverse Effect;

(s)    the filing of any motion by a Borrower or the entry of any order in any of the Chapter 11 Cases: (i) (A) permitting working capital or other financing (other than ordinary course trade credit or unsecured debt) for any Borrower from any Person other than the Lenders (unless the proceeds of such financing are used to indefeasibly pay in full in cash all Prepetition Secured Obligations and all Obligations), (B) granting a Lien on, or security interest in any of the Collateral, other than with respect to this Agreement or as otherwise permitted herein (unless such Liens are granted in connection with a financing, the proceeds of which are applied to the indefeasible payment in full in cash of all Prepetition Secured Obligations and all Obligations), (C) except as permitted by this Agreement, permitting the use of any of the Collateral pursuant to section 363(c) of the Bankruptcy Code without the prior written consent of the Administrative Agent and the Required Lenders, (D) permitting recovery from any portion of the Collateral any costs or expenses of preserving or disposing of such Collateral under section 506(c) of the Bankruptcy Code, or (E) dismissing any of the Chapter 11 Cases or (ii) the filing of any motion by a Borrower (or by any party in interest or any Creditors' Committee appointed in any of the Chapter 11 Cases) seeking any of the matters specified in the foregoing clause (i) that is not dismissed or denied within thirty (30) days of the date of the filing of such motion (or such later date agreed to in writing by the Administrative Agent);

(t)    the filing of a motion by a Borrower seeking approval of a disclosure statement and a Plan of Reorganization, or the entry of an order confirming a Plan of Reorganization, that is not an Acceptable Plan of Reorganization, or confirmation of an Acceptable Plan of Reorganization is denied by the Bankruptcy Court;

(u)    any Loan Document (as defined in the Prepetition Credit Agreement) or any material provisions thereof shall at any time and for any reason be declared by a court of competent jurisdiction to be null and void, or a proceeding shall be commenced by any Borrower or any other Person, or by any Governmental Authority, seeking to establish the invalidity or unenforceability thereof (exclusive of questions of interpretation of any provision thereof), or any Borrower shall repudiate or deny any portion of its liability or obligation for the Prepetition Secured Obligations; or

(v)    Borrowers shall have not (A) within 20 days after the Petition Date, filed with the Bankruptcy Court a proposed Plan of Reorganization (which shall be an Acceptable Plan of Reorganization) and a disclosure statement that is acceptable in form and substance to the Administrative Agent and the Required Lenders; (B) within 48 days after the Petition Date, obtained approval of the Bankruptcy of said disclosure statement; and (C) within 76 days after the Petition Date, obtained approval

73

of the Bankruptcy Court of the Plan of Reorganization (which shall be an Acceptable Plan of Reorganization).

then, and in every such event and notwithstanding section 362 of the Bankruptcy Code and without further order of the Bankruptcy Court or any other court (but subject to any notice period provided in the applicable DIP Order) or the initiation of any further proceeding with any Borrower, and at any time thereafter during the continuance of such event, the Administrative Agent may, and at the request of the Required Lenders shall, by notice to Administrative Borrower, take any of the following actions, at the same or different times: (i) terminate forthwith the Commitments, (ii) declare the Loans then outstanding to be forthwith due and payable in whole or in part, whereupon the principal of the Loans so declared to be due and payable, together with accrued interest thereon and any unpaid accrued Fees and all other Obligations of Borrowers accrued hereunder and under any other Loan Document, shall become forthwith due and payable, without presentment, demand, protest or any other notice of any kind, all of which are hereby expressly waived by Borrowers, anything contained herein or in any other Loan Document to the contrary notwithstanding, and (iii) exercise all rights and remedies under the Loan Documents and enforce all other rights and remedies under applicable law to the extent provided in the DIP Orders.

SECTION 8.02 [Reserved].

SECTION 8.03 Application of Proceeds.

After the exercise of remedies provided for in Section 8.01, any amounts received by the Administrative Agent on account of the Obligations shall be applied by the Administrative Agent in the following order:

(i)      *First*, to the payment of all reasonable costs and expenses, fees, commissions and taxes of such sale, collection or other realization including compensation to the Administrative Agent, the Security Trustee, the Lenders and their agents and counsel, and all expenses, liabilities and advances made or incurred by the Administrative Agent and the Security Trustee in connection therewith, and all amounts for which the Administrative Agent and the Security Trustee are entitled to indemnification or reimbursement pursuant to the provisions of any Loan Document, together with interest on each such amount at the highest rate then in effect under this Agreement from and after the date such amount is due, owing or unpaid until paid in full in cash;

(ii)      *Second*, without duplication of amounts applied pursuant to clause (i) above, to the indefeasible payment in full in cash of interest and other amounts constituting Obligations in respect of the New Money Loans (other than principal), in each case equally and ratably in accordance with the respective amounts thereof then due and owing;

(iii)      *Third*, to the indefeasible payment in full in cash, *pro rata*, of the principal amount of the Obligations in respect of the New Money Loans; and

(iv)      *Fourth*, without duplication of amounts applied pursuant to clause (i) above, to the indefeasible payment in full in cash of interest and other amounts constituting Obligations in respect of the Roll-Up Loans (other than principal), in each case equally and ratably in accordance with the respective amounts thereof then due and owing;

74

(v)    *Fifth*, to the indefeasible payment in full in cash, *pro rata*, of the principal amount of the Obligations in respect of the Roll-Up Loans; and

(vi)    *Sixth*, the balance, if any, to the Person lawfully entitled thereto (including the applicable Borrower or its successors or assigns) or as a court of competent jurisdiction may direct.

If any such proceeds are insufficient to pay in full the items described in clauses (i) through (v) of this Section 8.03, Borrowers shall remain liable for any deficiency.

## ARTICLE IX

## THE ADMINISTRATIVE AGENT

SECTION 9.01 Appointment and Authority.

Each of the Lenders hereby irrevocably appoints BNP Paribas to act on its behalf as the Administrative Agent hereunder and under the other Loan Documents and authorizes such the Administrative Agent to take such actions on its behalf and to exercise such powers as are delegated to the Administrative Agent by the terms hereof or thereof, together with such actions and powers as are reasonably incidental thereto.  The provisions of this Article are solely for the benefit of the Administrative Agent and the Lenders Banks, and no Borrower shall have rights as a third party beneficiary of any of such provisions.  Each of the Lenders hereby irrevocably authorizes the Administrative Agent to appoint the Security Trustee as security trustee with respect to the Aircraft Collateral and any other Collateral related thereto, and to execute and deliver the Security Trustee Agreement in such form as may be reasonably satisfactory to the Administrative.

SECTION 9.02 Rights as a Lender.

The Person serving as the Administrative Agent hereunder shall have the same rights and powers in its capacity as a Lender as any other Lender and may exercise the same as though it were not the Administrative Agent and the term "Lender" or "Lenders" shall, unless otherwise expressly indicated or unless the context otherwise requires, include the Person serving as the Administrative Agent hereunder in its individual capacity.  Such Person and its Affiliates may accept deposits from, lend money to, act as the financial advisor or in any other advisory capacity for and generally engage in any kind of business with any Borrower or other Affiliate thereof as if such Person were not the Administrative Agent hereunder and without any duty to account therefor to the Lenders.

SECTION 9.03 Exculpatory Provisions.

The Administrative Agent shall not have any duties or obligations except those expressly set forth herein and in the other Loan Documents.  Without limiting the generality of the foregoing, the Administrative Agent:

(i)    shall not be subject to any fiduciary or other implied duties, regardless of whether a Default has occurred and is continuing;

(ii)    shall not have any duty to take any discretionary action or exercise any discretionary powers, except discretionary rights and powers expressly contemplated hereby or by the other Loan Documents that the Administrative Agent is required to exercise as directed in

75

writing by the Required Lenders (or such other number or percentage of the Lenders as shall be expressly provided for herein or in the other Loan Documents); *provided* that the Administrative Agent shall not be required to take any action that, in its judgment or the judgment of its counsel, may expose the Administrative Agent to liability or that is contrary to any Loan Document or applicable Requirements of Law; and

   (iii) shall not, except as expressly set forth herein and in the other Loan Documents, have any duty to disclose, and shall not be liable for the failure to disclose, any information relating to any Borrower or any of its Affiliates that is communicated to or obtained by the Person serving as the Administrative Agent or any of its Affiliates in any capacity.

   The Administrative Agent shall not be liable to any Lender for any action taken or not taken by it (x) with the consent or at the request of the Required Lenders (or such other number or percentage of the Lenders as shall be necessary, or as the Administrative Agent shall believe in good faith shall be necessary, under the circumstances as provided in <u>Section 10.02</u>) or (y) in the absence of its own gross negligence or willful misconduct. The Administrative Agent shall not be deemed to have knowledge of any Default unless and until notice describing such Default is given to the Administrative Agent by a Borrower or a Lender.

   The Administrative Agent shall not be responsible for or have any duty to ascertain or inquire into (i) any statement, warranty or representation made in or in connection with this Agreement or any other Loan Document, (ii) the contents of any certificate, report or other document delivered hereunder or thereunder or in connection herewith or therewith, (iii) the performance or observance of any of the covenants, agreements or other terms or conditions set forth herein or therein or the occurrence of any Default, (iv) the validity, enforceability, effectiveness or genuineness of this Agreement, any other Loan Document or any other agreement, instrument or document or (v) the satisfaction of any condition set forth in <u>Article IV</u> or elsewhere herein, other than to confirm receipt of items expressly required to be delivered to the Administrative Agent. Without limiting the generality of the foregoing, the use of the term "agent" in this Agreement with reference to the Administrative Agent is not intended to connote any fiduciary or other implied (or express) obligations arising under agency doctrine of any applicable law. Instead, such term is used merely as a matter of market custom and is intended to create or reflect only an administrative relationship between independent contracting parties.

   Each party to this Agreement acknowledges and agrees that the Administrative Agent may use an outside service provider for the tracking of all UCC financing statements required to be filed pursuant to the Loan Documents and notification to the Administrative Agent, of, among other things, the upcoming lapse or expiration thereof, and that any such service provider will be deemed to be acting at the request and on behalf of Borrowers. The Administrative Agent shall not be liable for any action taken or not taken by any such service provider.

SECTION 9.04 <u>Reliance by Administrative Agent.</u>

   The Administrative Agent shall be entitled to rely upon, and shall not incur any liability for relying upon, any notice, request, certificate, consent, statement, instrument, document or other writing (including any electronic message, Internet or intranet website posting or other distribution) believed by it to be genuine and to have been signed, sent or otherwise authenticated by the proper Person. The Administrative Agent also may rely upon any statement made to it orally or by telephone and believed by it to have been made by the proper Person, and shall not incur any liability for relying thereon. In determining compliance with any condition hereunder to the making of a Loan that by its terms must

AmericasActive:14673966.12

be fulfilled to the satisfaction of a Lender, the Administrative Agent may presume that such condition is satisfactory to such Lender unless the Administrative Agent shall have received notice to the contrary from such Lender prior to the making of such Loan. The Administrative Agent may consult with legal counsel (who may be counsel for Borrowers), independent accountants and other experts selected by it, and shall be entitled to rely upon the advice of any such counsel, accountants or experts and shall not be liable for any action taken or not taken by it in accordance with such advice.

SECTION 9.05 Delegation of Duties.

The Administrative Agent may perform any and all of its duties and exercise its rights and powers hereunder or under any other Loan Document by or through, or delegate any and all such rights and powers to, any one or more sub agents appointed by the Administrative Agent, including a sub-agent which is a non-U.S. affiliate of the Administrative Agent. The Administrative Agent and any such sub agent may perform any and all of its duties and exercise its rights and powers by or through their respective Related Parties. The exculpatory provisions of this Article shall apply to any such sub agent and to the Related Parties of the Administrative Agent and any such sub agent, and shall apply to their respective activities in connection with the syndication of the credit facilities provided for herein as well as activities as the Administrative Agent.

SECTION 9.06 Resignation of Administrative Agent.

The Administrative Agent may at any time give notice of its resignation to the Lenders and Borrowers. If the Administrative Agent is a Defaulting Lender, the Required Lenders may, to the extent permitted by applicable law, by notice in writing to Administrative Borrower and the Administrative Agent remove the Administrative Agent. If the Administrative Agent that is a Defaulting Lender receives a notice of removal in accordance with the preceding sentence, the Administrative Agent shall be deemed to have given a notice of resignation for all purposes of this Agreement (which may not be revoked by such Administrative Agent, and for such purposes references to a "notice" or "notice of resignation" in this Section 9.06 shall be deemed to refer to such notice of removal). Upon receipt of any such notice of resignation, the Required Lenders shall have the right, in consultation with and, absent the occurrence and continuance of an Event of Default, with the approval of Administrative Borrower, to appoint a successor, which shall be a bank with an office in the United States, or an Affiliate of any such bank with an office in the United States. If no such successor shall have been so appointed by the Required Lenders and shall have accepted such appointment within 30 days after the retiring Administrative Agent gives notice of its resignation, then the retiring Administrative Agent may on behalf of the Lenders, in consultation with and, absent the occurrence and continuance of an Event of Default, the approval of Administrative Borrower, appoint a successor Administrative Agent meeting the qualifications set forth above; *provided* that if the Administrative Agent shall notify Administrative Borrower and the Lenders that no qualifying Person has accepted such appointment, then such resignation shall nonetheless become effective in accordance with such notice and (1) the retiring Administrative Agent shall be discharged from its duties and obligations hereunder and under the other Loan Documents (except that in the case of any collateral security held by the Administrative Agent on behalf of the Lenders under any of the Loan Documents, the retiring Administrative Agent shall continue to hold such collateral security as nominee until such time as a successor Administrative Agent is appointed) and all necessary steps to transfer such collateral security have been taken and (2) all payments, communications and determinations provided to be made by, to or through the Administrative Agent shall instead be made by or to each Lender directly, until such time as the Required Lenders appoint a successor Administrative Agent as provided for above in this paragraph. Upon the acceptance of a successor's appointment as Administrative Agent hereunder, such successor shall succeed to and become vested with all of the rights, powers, privileges and duties of the retiring (or

77

retired) Administrative Agent, and the retiring Administrative Agent shall be discharged from all of its duties and obligations hereunder or under the other Loan Documents (if not already discharged therefrom as provided above in this paragraph). The fees payable by Borrowers to a successor Administrative Agent shall be the same as those payable to its predecessor unless otherwise agreed between Administrative Borrower and such successor. After the retiring Administrative Agent's resignation hereunder and under the other Loan Documents, the provisions of this Article IX and Section 10.03 shall continue in effect for the benefit of such retiring Administrative Agent, its sub-agents and their respective Related Parties in respect of any actions taken or omitted to be taken by any of them while the retiring Administrative Agent was acting as Administrative Agent.

SECTION 9.07 Non-Reliance on Administrative Agent and Other Lenders.

Each Lender acknowledges that it has, independently and without reliance upon the Administrative Agent or any other Lender and based on such documents and information as it has deemed appropriate, made its own credit analysis and decision to enter into this Agreement. Each Lender further represents and warrants that it has had the opportunity to review each document made available to it on the Platform in connection with this Agreement and has acknowledged and accepted the terms and conditions applicable to the recipients thereof. Each Lender also acknowledges that it will, independently and without reliance upon the Administrative Agent or any other Lender and based on such documents and information as it shall from time to time deem appropriate, continue to make its own decisions in taking or not taking action under or based upon this Agreement, any other Loan Document or any related agreement or any document furnished hereunder or thereunder.

SECTION 9.08 Withholding Tax.

To the extent required by any applicable law, the Administrative Agent may withhold from any payment to any Lender an amount equivalent to any applicable withholding tax. Without limiting the provisions of Section 2.15(a) or (c), each Lender shall, and does hereby, indemnify the Administrative Agent, and shall make payable in respect thereof within 30 days after demand therefor, against any and all Taxes and any and all related losses, claims, liabilities and expenses (including fees, charges and disbursements of any counsel for the Administrative Agent) incurred by or asserted against the Administrative Agent by the Internal Revenue Service or any other Governmental Authority as a result of the failure of the Administrative Agent to properly withhold Tax from amounts paid to or for the account of any Lender for any reason (including, without limitation, because the appropriate form was not delivered or not property executed, or because such Lender failed to notify the Administrative Agent of a change in circumstance that rendered the exemption from, or reduction of withholding tax ineffective). A certificate as to the amount of such payment or liability delivered to any Lender by the Administrative Agent shall be conclusive absent manifest error. Each Lender hereby authorizes the Administrative Agent to set off and apply any and all amounts at any time owing to such Lender under this Agreement or any other Loan Document against any amount due the Administrative Agent under this Section 9.08. The agreements in this Section 9.08 shall survive the resignation and/or replacement of the Administrative Agent, any assignment of rights by, or the replacement of, a Lender, the termination of the Commitments and the repayment, satisfaction or discharge of all other Obligations.

SECTION 9.09 No Other Duties, etc.

Anything herein to the contrary notwithstanding, the Lead Arranger and Bookrunner listed on the cover page hereof shall not have any powers, duties or responsibilities under this Agreement or any of the other Loan Documents, except in its capacity as a Lender or in any other capacity assumed

78

hereunder.

SECTION 9.10 <u>Enforcement.</u>

Notwithstanding anything to the contrary contained herein or in any other Loan Document, the authority to enforce rights and remedies hereunder and under the other Loan Documents against Borrowers or any of them shall be vested exclusively in, and all actions and proceedings at law in connection with such enforcement shall be instituted and maintained exclusively by, the Administrative Agent, or as the Required Lenders may require or otherwise direct, for the benefit of all the Lenders; *provided, however,* that the foregoing shall not prohibit (a) the Administrative Agent from exercising on its own behalf the rights and remedies that inure to its benefit (solely in its capacity as Administrative Agent) hereunder and under the other Loan Documents, (b) any Lender from exercising setoff rights in accordance with, and subject to, the terms of this Agreement, or (c) any Lender from filing proofs of claim or appearing and filing pleadings on its own behalf during the pendency of a proceeding relative to any Borrower under any bankruptcy or insolvency law.

SECTION 9.11 <u>Credit Bidding.</u>

Borrowers and the Lenders hereby irrevocably authorize the Administrative Agent, based upon the written instruction of the Required Lenders, to (a) consent to, credit bid or purchase (either directly or through one or more acquisition vehicles) all or any portion of the Collateral at any sale thereof conducted under the provisions of the Bankruptcy Code, including, without limitation, under Section 363 of the Bankruptcy Code or in connection with a Plan of Reorganization, (b) credit bid or purchase (either directly or through one or more acquisition vehicles) all or any portion of the Collateral at any sale, transfer or other disposition thereof conducted under the provisions of the UCC, including pursuant to Sections 9- 610 or 9-620 of the UCC, or (c) credit bid or purchase (either directly or through one or more acquisition vehicles) all or any portion of the Collateral at any other sale or foreclosure conducted by the Administrative Agent (whether by judicial action or otherwise) in accordance with applicable law. In connection with any such credit bid or purchase, (i) the Obligations owed to the Lenders shall be entitled to be, and shall be, credit bid on a ratable basis (with Obligations with respect to contingent or unliquidated claims being estimated for such purpose if the fixing or liquidation thereof would not unduly delay the ability of the Administrative Agent to credit bid or purchase at such disposition of the Collateral and, if such claims cannot be estimated without unduly delaying the ability of the Administrative Agent to credit bid, then such claims shall be disregarded, not credit bid, and not entitled to any interest in the asset or assets purchased by means of such credit bid) and the Lenders whose Obligations are credit bid shall be entitled to receive interests (ratably based upon the proportion of their Obligations credit bid in relation to the aggregate amount of Obligations so credit bid) in the asset or assets so purchased (or in the Equity Interests of the acquisition vehicle or vehicles that are used to consummate such purchase), and (ii) the Administrative Agent, based upon the written instruction of the Required Lenders, may accept non-cash consideration, including debt and equity securities issued by such acquisition vehicle or vehicles, and in connection therewith the Administrative Agent may reduce the Obligations owed to the Lenders (ratably based upon the proportion of their Obligations credit bid in relation to the aggregate amount of Obligations so credit bid) based upon the value of such non-cash consideration.

**ARTICLE X**

<u>MISCELLANEOUS</u>

79

SECTION 10.01    <u>Notices.</u>

(a)    <u>Generally</u>.  Except in the case of notices and other communications expressly permitted to be given by telephone (and except as provided in paragraph (b) below), all notices and other communications provided for herein shall be in writing and shall be delivered by hand or overnight courier service, mailed by certified or registered mail or sent by telecopier as follows:

(i)    if to any Borrower, to Administrative Borrower at:

Ravn Air Group, Inc.
4700 Old International Airport Road
Anchorage, AK 99502
Attention: John Mannion
Email: jmannion@ravnairgroup.com
Telecopier No:  (907) 266-8431

*with a copy to:*
Keller Benvenutti Kim LLP
650 California Street, Suite 1900
San Francisco, CA 94108
Attention:  Tobias S. Keller
Email: tkeller@kbkllp.com
Facsimile: (650) 636-9251

(ii)    if to the Administrative Agent, to it at:

BNP Paribas
787 Seventh Avenue
New York, NY 10019
Attention: Guillaume Charrier
E-mail: guillaume.a.charrier@us.bnpparibas.com

*for Borrowing Requests*:

BNP Paribas, as Administrative Agent
Attention: Dina Wilson / Veronica Burke
Facsimile: (212) 850-4020
Telephone: (212) 471-6807 /6760
Email: agency.ls.support@americas.bnpparibas.com

*with a copy (other than Borrowing Requests) to*:

Winston & Strawn LLP
200 Park Avenue
New York, New York 10166-4193
Attention: David Neier
Email:  Dneier@winston.com

80

Telecopier No.: 212-294-4700

(iii)     if to a Lender, to it at its address (or telecopier number) set forth in its Administrative Questionnaire.

Notices sent by hand or overnight courier service, or mailed by certified or registered mail, shall be deemed to have been given when received; notices sent by telecopier shall be deemed to have been given when sent (except that, if not given during normal business hours for the recipient, shall be deemed to have been given at the opening of business on the next business day for the recipient).  Notices delivered through electronic communications to the extent provided in paragraph (b) below, shall be effective as provided in said paragraph (b).  Any party hereto may change its address or telecopier number for notices and other communications hereunder by written notice to Administrative Borrower and the Administrative Agent.

(b)     Electronic Communications.  Notices and other communications to the Lenders hereunder may (subject to the provisions of this Section 10.01) be delivered or furnished by electronic communication (including e-mail and Internet or intranet websites) pursuant to procedures approved by the Administrative Agent; provided that the foregoing shall not apply to notices to any Lender pursuant to Article II if such Lender has notified the Administrative Agent that it is incapable of receiving notices under such Article by electronic communication.  The Administrative Agent or Administrative Borrower may, in its discretion, agree to accept notices and other communications to it hereunder by electronic communications pursuant to procedures approved by it (including pursuant to the provisions of this Section 10.01); provided that approval of such procedures may be limited to particular notices or communications.

Each Borrower hereby agrees that it will at the request of the Administrative Agent provide to the Administrative Agent any information, documents and other materials that it is obligated to furnish to the Administrative Agent or the Lenders pursuant to this Agreement and any other Loan Document, including all notices, requests, financial statements, financial and other reports, certificates and other information materials (the "Communications"), by transmitting them in an electronic medium in a format reasonably acceptable to the Administrative Agent at e-mail address(es) provided to Administrative Borrower from time to time or in such other form as the Administrative Agent shall require.  In addition, each Borrower agrees to continue to provide the Communications to the Administrative Agent in the manner specified in this Agreement or any other Loan Document or in such other form as the Administrative Agent shall reasonably require.  Nothing in this Section 10.01 shall prejudice the right of the Administrative Agent, any Lender or any Borrower to give any notice or other communication pursuant to this Agreement or any other Loan Document in any other manner specified in this Agreement or any other Loan Document.

Unless the Administrative Agent otherwise prescribes, (i) notices and other communications sent to an e-mail address shall be deemed received upon the sender's receipt of an acknowledgement from the intended recipient (such as by the "return receipt requested" function, as available, return e-mail or other written acknowledgement); provided that if such notice or other communication is not sent during the normal business hours of the recipient, such notice or communication shall be deemed to have been sent at the opening of business on the next business day for the recipient, and (ii) notices or communications posted to an Internet or intranet website shall be deemed received upon the deemed receipt by the intended recipient at its e-mail address as described in the foregoing clause (i) of notification that such notice or communication is available and identifying the website address therefor.

81

The Administrative Agent agrees that receipt of the Communications (other than, unless the Administrative Agent otherwise agrees in writing, any such Communication that (i) relates to a request for a new, or a conversion of an existing, Borrowing or other extension of credit (including any election of an interest rate or interest period relating thereto), (ii) relates to the payment of any principal or other amount due under this Agreement prior to the scheduled date therefor, (iii) provides notice of any Default under this Agreement or (iv) is required to be delivered to satisfy any condition precedent to the effectiveness of this Agreement and/or any borrowing or other extension of credit hereunder) by the Administrative Agent at its e-mail address(es) set forth above shall constitute effective delivery of the Communications to the Administrative Agent for purposes of the Loan Documents.

(c)     Platform. Each Borrower further agrees that the Administrative Agent may make the Communications available to the Lenders by posting the Communications on SyndTrak, DebtDomain or a substantially similar secure electronic transmission system (the "**Platform**"). The Platform is provided "as is" and "as available." The Administrative Agent do not warrant the accuracy or completeness of the Communications, or the adequacy of the Platform and expressly disclaim liability for errors or omissions in the communications. No warranty of any kind, express, implied or statutory, including, without limitation, any warranty of merchantability, fitness for a particular purpose, non-infringement of third party rights or freedom from viruses or other code defects, is made by the Administrative Agent in connection with the Communications or the Platform. In no event shall the Administrative Agent or any of its Related Parties have any liability to Borrowers, any Lender or any other Person for damages of any kind, including direct or indirect, special, incidental or consequential damages, losses or expenses (whether in tort, contract or otherwise) arising out of any Borrower's or the Administrative Agent's transmission of communications through the Internet, except to the extent the liability of such Person is found in a final non-appealable judgment by a court of competent jurisdiction to have resulted from such Person's gross negligence or willful misconduct.

SECTION 10.02     Waivers; Amendment.

(a)     Generally. No failure or delay by the Administrative Agent or any Lender in exercising any right or power hereunder or under any other Loan Document shall operate as a waiver thereof, nor shall any single or partial exercise of any such right or power, or any abandonment or discontinuance of steps to enforce such a right or power, preclude any other or further exercise thereof or the exercise of any other right or power. The rights and remedies of the Administrative Agent and the Lenders hereunder and under the other Loan Documents are cumulative and are not exclusive of any rights or remedies that they would otherwise have. No waiver of any provision of any Loan Document or consent to any departure by any Borrower therefrom shall in any event be effective unless the same shall be permitted by this Section 10.02, and then such waiver or consent shall be effective only in the specific instance and for the purpose for which given. Without limiting the generality of the foregoing, the making of a Loan shall not be construed as a waiver of any Default, regardless of whether the Administrative Agent or any Lender may have had notice or knowledge of such Default at the time. No notice or demand on any Borrower in any case shall entitle any Borrower to any other or further notice or demand in similar or other circumstances.

(b)     Required Consents. Subject to Sections 10.02(c) and (d), neither this Agreement nor any other Loan Document nor any provision hereof or thereof may be waived, amended, supplemented or modified except, in the case of this Agreement, pursuant to an agreement or agreements in writing entered into by Borrowers and the Administrative Agent or, in the case of any other Loan Document, pursuant to an agreement or agreements in writing entered into by the Administrative Agent and Borrower or Borrowers that are party thereto, in each case with the written consent of the Required

82

Lenders (it being agreed, subject to the following proviso, that the Administrative Agent's consent is not required if any such waiver, amendment, supplement or modification is executed by Required Lenders); *provided* that no such agreement shall be effective if the effect thereof would:

(i)     increase the Commitment of any Lender without the written consent of such Lender (it being understood that no amendment, modification, termination, waiver or consent with respect to any condition precedent, covenant or Default shall constitute an increase in the Commitment of any Lender);

(ii)     reduce the principal amount or premium, if any, of any Loan (except in connection with a payment contemplated by clause (vii) below) or reduce the rate of interest thereon including any provision establishing a minimum rate (other than interest pursuant to Section 2.06(b)), or reduce any Fees payable hereunder, or change the form or currency of payment of any Obligation, without the written consent of each Lender directly affected thereby (it being understood that any amendment or modification to the financial definitions in this Agreement shall not constitute a reduction in the rate of interest for purposes of this clause (ii));

(iii)     (A) change the scheduled final maturity of any Loan, (B) postpone the date for payment of any interest, premium, if any, or fees payable hereunder, (C) reduce the amount of, waive or excuse any such payment (other than waiver of any increase in the interest rate pursuant to Section 2.06(b)), or (D) postpone the scheduled date of expiration of any Commitment beyond the Commitment Termination Date, in any case, without the written consent of each Lender directly affected thereby;

(iv)     permit the assignment or delegation by any Borrower of any of its rights or obligations under any Loan Document, without the written consent of each Lender;

(v)     release all or a substantial portion of the Collateral from the Liens of the Security Documents (except in accordance with Section 9.11 or Section 10.17) or alter the relative priorities of the Obligations entitled to the Liens of the Security Documents, in each case without the written consent of each Lender;

(vi)     change Section 2.14(b), (c) or (d) in a manner that would alter the *pro rata* sharing of payments or setoffs required thereby or any other provision in each of the foregoing cases in a manner that would alter the *pro rata* allocation among the Lenders of Loan disbursements, including the requirements of Sections 2.02(a), without the written consent of each Lender directly affected thereby;

(vii)     change any provision of this Section 10.02(b) or Section 10.02(c), without the written consent of each Lender directly affected thereby;

(viii)     change the percentage set forth in the definition of "Required Lenders" or any other provision of any Loan Document (including this Section) specifying the number or percentage of Lenders required to waive, amend or modify any rights thereunder or make any determination or grant any consent thereunder, without the written consent of each Lender, other than to increase such percentage or number or to give any additional Lender or group of Lenders such right to waive, amend or modify or make any such determination or grant any such consent;

83

(ix)    subordinate the Obligations to any other obligation, without the written consent of each Lender;

(x)    change or waive any provision of <u>Article X</u> as the same applies to the Administrative Agent, or any other provision hereof as the same applies to the rights or obligations of the Administrative Agent, in each case without the written consent of the Administrative Agent; or

(xi)    change any provision of <u>Section 10.03(a)</u> without the written consent of the Administrative Agent (such consent not to be unreasonably withheld).

Notwithstanding anything to the contrary herein:

(I)    no Defaulting Lender shall have any right to approve or disapprove any amendment, waiver or consent hereunder, except to the extent the consent of such Lender would be required under clause (i), (ii) or (iii) in the proviso to the first sentence of this <u>Section 10.02(b)</u>; and

(II)    any Loan Document may be waived, amended, supplemented or modified pursuant to an agreement or agreements in writing entered into by Borrowers and the Administrative Agent (without the consent of any Lender) solely to cure a defect or error, or to grant a new Lien for the benefit of the Secured Parties or extend an existing Lien over additional property.

(c)    <u>Collateral</u>. Without the consent of any other Person, the applicable Borrower or Parties and the Administrative Agent may (in its or their respective sole discretion, or shall, to the extent required by any Loan Document) enter into any amendment or waiver of any Loan Document, or enter into any new agreement or instrument, to effect the granting, perfection, protection, expansion or enhancement of any security interest in any Collateral or additional property to become Collateral for the benefit of the Secured Parties, or as required by local law to give effect to, or protect any security interest for the benefit of the Secured Parties, in any property or so that the security interests therein comply with applicable Requirements of Law.

SECTION 10.03    <u>Expenses; Indemnity; Damage Waiver.</u>

(a)    <u>Costs and Expenses</u>. Borrower shall pay promptly upon demand therefor (i) all reasonable out-of-pocket expenses incurred by the Administrative Agent, the Lenders and their Affiliates (in the case of counsel, limited to the reasonable fees, charges and disbursements of Winston & Strawn LLP, as counsel for the Administrative Agent and the Lenders and, if necessary or appropriate, one local counsel in each relevant jurisdiction and, notwithstanding the foregoing, the reasonable fees, charges and disbursements of Paul Hastings LLP in an amount not to exceed $75,000) in connection with the preparation, negotiation, execution, delivery and administration of this Agreement and the other Loan Documents or any amendment, amendment and restatement, modification or waiver of the provisions hereof or thereof (whether or not the transactions contemplated hereby or thereby shall be consummated), including in connection with post-closing searches to confirm that security filings and recordations have been properly made and including any costs and expenses of the service provider referred to in <u>Section 9.03</u> and in connection with the preparation for, monitoring of, and participation in the Chapter 11 Cases, including the protection or enforcement of any rights or remedies of the Administrative Agent or any Lender in the Chapter 11 Cases, and (ii) all out-of-pocket expenses incurred by the Administrative Agent,

84

the Collateral Agent and any Lender (in the case of counsel, limited to Winston & Strawn LLP, as counsel for the Administrative Agent and the Lenders and, if necessary or appropriate, of one local counsel in each relevant jurisdiction) during the occurrence and continuance of an Event of Default in connection with the enforcement or protection of rights under the Loan Documents.

(b)    <u>Indemnification by Borrowers</u>.  Borrowers shall, jointly and severally, indemnify the Administrative Agent (and any sub-agent thereof, including the Security Trustee), each Lender, and each Related Party of any of the foregoing Persons (each such Person being called an "**Indemnitee**") against, and hold each Indemnitee harmless from, any and all reasonable losses, claims, damages, liabilities and related expenses (including the reasonable fees, charges and disbursements of one common counsel for all Indemnitees and, solely in the case of a conflict of interest, one additional counsel to all affected Indemnitees and, if reasonably necessary, one local counsel in each relevant material jurisdiction to all Indemnitees) incurred by any Indemnitee or asserted against any Indemnitee by any party hereto or any third party to the extent arising out of, in connection with, or as a result of (i) the execution or delivery of this Agreement, any other Loan Document, or any amendment, amendment and restatement, modification or waiver of the provisions hereof or thereof, or any agreement or instrument contemplated hereby or thereby, the performance by the parties hereto of their respective obligations hereunder or thereunder or the consummation of the transactions contemplated hereby or thereby, (ii) any Loan or the use or proposed use of the proceeds therefrom, (iii) any actual or alleged presence or Release or threatened Release of Hazardous Materials on, at, under or from any property owned, leased or operated by any Borrower at any time, or any Environmental Claim related in any way to any Borrower, or (iv) any actual or prospective claim, litigation, investigation or proceeding relating to any of the foregoing, whether based on contract, tort or any other theory, whether brought by a third party or by a Borrower, and regardless of whether any Indemnitee is a party thereto; *provided* that such indemnity shall not, as to any Indemnitee, be available to the extent that such losses, claims, damages, liabilities or related expenses (x) are determined by a court of competent jurisdiction by final and nonappealable judgment to have resulted from the gross negligence or willful misconduct of such Indemnitee or (y) result from a claim brought by a Borrower against an Indemnitee for breach of such Indemnitee's obligations hereunder or under any other Loan Document, if such Borrower has obtained a final and nonappealable judgment in its favor on such claim as determined by a court of competent jurisdiction.  This <u>Section 10.03(b)</u> shall not apply with respect to Taxes.

(c)    <u>Reimbursement by Lenders</u>.  To the extent that a Borrower for any reason fails to indefeasibly pay any amount required under paragraph (a) or (b) of this <u>Section 10.03</u> to be paid by it to the Administrative Agent (or any sub-agent thereof, including the Security Trustee) or any Related Party of any of the foregoing, each Lender severally agrees to pay to the Administrative Agent (or any sub-agent thereof, including the Security Trustee) or such Related Party, as the case may be, such Lender's *pro rata* share (determined as of the time that the applicable unreimbursed expense or indemnity payment is sought) of such unpaid amount (such indemnity shall be effective whether or not the related losses, claims, damages, liabilities and related expenses are incurred or asserted by any party hereto or any third party); *provided* that the unreimbursed expense or indemnified loss, claim, damage, liability or related expense, as the case may be, was incurred by or asserted against the Administrative Agent (or any sub-agent thereof, including the Security Trustee) in its capacity as such, or against any Related Party of any of the foregoing acting for the Administrative Agent (or any such sub-agent thereof, including the Security Trustee) in connection with such capacity.  The obligations of the Lenders under this paragraph (c) are subject to the provisions of <u>Section 2.14</u>.  For purposes hereof, a Lender's *"pro rata* share" shall be determined based upon its share of the sum of the total outstanding Loans and unused Commitments at the time.

(d)    <u>Waiver of Consequential Damages, Etc.</u>  To the fullest extent permitted by applicable Requirements of Law, no Borrower shall assert, and each Borrower hereby waives, any claim against any Indemnitee, on any theory of liability, for special, indirect, consequential (including lost profits) or punitive damages (as opposed to direct or actual damages) arising out of, in connection with, or as a result of, this Agreement, any other Loan Document or any agreement or instrument contemplated hereby, the transactions contemplated hereby or thereby, any Loan or the use of the proceeds thereof. Absent gross negligence or willful misconduct, no Indemnitee referred to in paragraph (b) above shall be liable for any damages arising from the use by unintended recipients of any information or other materials distributed by it through telecommunications, electronic or other information transmission systems in connection with this Agreement or the other Loan Documents or the transactions contemplated hereby or thereby.

(e)    <u>Payments.</u>  All amounts due under this Section shall be payable not later than ten Business Days after written demand therefore and provision of reasonably detailed supporting invoices or other backup documentation.

SECTION 10.04    <u>Successors and Assigns.</u>

(a)    <u>Successors and Assigns Generally.</u>  The provisions of this Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective successors and assigns permitted hereby, except that no Borrower may assign or otherwise transfer any of its rights or obligations hereunder without the prior written consent of the Administrative Agent, and each Lender and no Lender may assign or otherwise transfer any of its rights or obligations hereunder except (i) to an Eligible Assignee in accordance with the provisions of paragraph <u>(b)</u> of this <u>Section 10.04</u>, (ii) by way of participation in accordance with the provisions of paragraph <u>(d)</u> of this <u>Section 10.04</u> or (iii) by way of pledge or assignment of a security interest subject to the restrictions of paragraph <u>(f)</u> of this Section (and any other attempted assignment or transfer by any Borrower or any Lender shall be null and void). Nothing in this Agreement, expressed or implied, shall be construed to confer upon any Person (other than the parties hereto, their respective successors and assigns permitted hereby, Participants to the extent provided in paragraph <u>(d)</u> of this Section and, to the extent expressly contemplated hereby, the other Indemnitees) any legal or equitable right, remedy or claim under or by reason of this Agreement.

(b)    <u>Assignments by Lenders.</u>

(i)    Subject to the conditions set forth in paragraph (b)(ii) below, any Lender may at any time assign to one or more assignees all, and not less than all (unless to an Affiliate of such Lender or an Approved Fund with respect to such Lender), of its rights and obligations under this Agreement (including all or a portion of its Commitment and the Loans at the time owing to it) with the prior written consent (such consent not to be unreasonably withheld or delayed) of the Administrative Agent; *provided* that:

(A)    no consent of the Administrative Agent shall be required for an assignment of (x) any Commitment or Loan to a Lender holding a commitment or Loan prior to such assignment, or (y) an Affiliate of a Lender or an Approved Fund;

(B)    other than in respect to an assignment to an Affiliate of the assigning Lender or an Approved Fund thereof, the assigning Lender shall give notice to the Administrative Agent of such assigning Lender's intention to assign its rights and obligations under this Agreement (the "**Assigned Interest**"), and the Administrative Agent shall promptly

86

notify, and in any event within five Business Days after having received notice thereof, each other Lender of the assigning Lender's intent, and each such other Lender may elect or decline, in its sole discretion, to purchase all (but not less than all) of the Assigned Interest by promptly notifying Administrative Agent thereof, which the Administrative Agent shall promptly notify to the assigning Lender, and if more than one Lender shall have notified the Administrative Agent of such intent to purchase the Assigned Interest, the assigning Lender shall sell the Assigned Interest to such Lenders, ratably based on their respective Obligations; provided, any such Lender shall be deemed to have declined to purchase the Assigned Interest unless it shall have elected to purchase such Assigned Interest by written notice to the Administrative Agent within five Business Days after having received notice thereof; and

(C)     for the avoidance of doubt, any sale, assignment or transfer of any Lender's Loans to any assignee shall be all of such Lender's DIP Loans and Roll-Up Loans to such assignee, and DIP Loans and Roll-Up Loans may not be sold, transferred or assigned separately, unless, in each case, to an Affiliate of such Lender or an Approved Fund with respect to such Lender.

(ii)     Assignments shall be subject to the following additional conditions:

(A)     other than in respect of an assignment to an Affiliate of the assigning Lender or an Approved Fund thereof, each assignment shall be of the entire amount of the assigning Lender's Commitment and the Loans at the time owing to it; and

(B)     the parties to each assignment shall execute and deliver to the Administrative Agent an Assignment and Assumption, together with a processing and recordation fee of $3,500 and any applicable tax forms or documentation specified in Section 2.15(e), and the Eligible Assignee, if it shall not be a Lender, shall deliver to the Administrative Agent an Administrative Questionnaire.

Subject to acceptance and recording thereof in the Register (as described below) by the Administrative Agent pursuant to paragraph (c) of this Section 10.04, from and after the effective date specified in each Assignment and Assumption, the Eligible Assignee thereunder shall be a party to this Agreement and, to the extent of the interest assigned by such Assignment and Assumption, have the rights and obligations of a Lender under this Agreement, and the assigning Lender thereunder shall, to the extent of the interest assigned by such Assignment and Assumption, be released from its obligations under this Agreement (and, in the case of an Assignment and Assumption covering all of the assigning Lender's rights and obligations under this Agreement, such Lender shall cease to be a party hereto) but shall continue to be entitled to the benefits of Sections 2.12, 2.15 (subject to the requirements of Section 2.15) and 10.03 with respect to facts and circumstances occurring prior to the effective date of such assignment. Any assignment or transfer by a Lender of rights or obligations under this Agreement that does not comply with this paragraph shall be treated for purposes of this Agreement as a sale by such Lender of a participation in such rights and obligations in accordance with Section 10.04(d).

(c)     Register.  The Administrative Agent, acting solely for this purpose as an agent of Borrowers, shall maintain at one of its offices in New York a copy of each Assignment and Assumption delivered to it and a register for the recordation of the names and addresses of the Lenders, and the Commitments of, and principal amounts (and stated interest) of the Loans owing to, each Lender pursuant to the terms hereof from time to time (the "**Register**").  The entries in the Register shall be conclusive absent manifest error, and Borrowers, the Administrative Agent and the Lenders shall treat each Person

87

whose name is recorded in the Register pursuant to the terms hereof as a Lender hereunder for all purposes of this Agreement, notwithstanding notice to the contrary. The Register shall be available for inspection by Borrowers and any Lender (but in respect of any Lender, only as to the Loans and Commitment of such Lender (but no other Lender)), at any reasonable time and from time to time upon reasonable prior notice.

(d)    Participations.  Any Lender may at any time, without the consent of, or notice to, Borrowers or the Administrative Agent sell participations to any Person (other than a natural Person or any Borrower or any of its Affiliates) (each, a "**Participant**") in all or a portion of such Lender's rights and/or obligations under this Agreement (including all or a portion of its Commitment and/or the Loans owing to it); *provided* that (i) such Lender's obligations under this Agreement shall remain unchanged, (ii) such Lender shall remain solely responsible to the other parties hereto for the performance of such obligations and (iii) Borrowers, the Administrative Agent and the Lenders shall continue to deal solely and directly with such Lender in connection with such Lender's rights and obligations under this Agreement.

Any agreement or instrument pursuant to which a Lender sells such a participation shall provide that such Lender shall retain the sole right to enforce the Loan Documents and to approve any amendment, modification or waiver of any  provision of the Loan Documents; *provided* that such agreement or instrument may provide that such Lender will not, without the consent of the Participant, agree to any amendment, modification or waiver described in clause (i), (ii) or (iii) of the first proviso to Section 10.02(b) that affects such Participant.  Subject to paragraph (e) of this Section, each Borrower agrees that each Participant shall be entitled to the benefits of Sections 2.12 and 2.15 (subject to the requirements of those Sections) to the same extent as if it were a Lender and had acquired its interest by assignment pursuant to paragraph (b) of this Section.  To the extent permitted by law, each Participant also shall be entitled to the benefits of Section 10.08 as though it were a Lender; *provided* such Participant agrees to be subject to Section 2.14 as though it were a Lender.

Each Lender that sells a participation shall, acting solely for this purpose as an agent of Borrowers, maintain a register on which it enters the name and address of each Participant and the principal amounts (and stated interest) of each participant's interest in the Loans or other obligations under this Agreement (the "**Participant Register**"); *provided* that no Lender shall have any obligation to disclose all or any portion of the Participant Register to Borrowers, the Administrative Agent or any other Person (including the identity of any Participant or any information relating to a Participant's interest in the Commitments, Loans or other Obligations) except to the extent such disclosure is necessary to establish that such Commitments, Loans or other Obligations are in registered form under Section 5f.103-1(c) of the United States Treasury Regulations.  The entries in the Participant Register shall be conclusive absent manifest error, and such Lender shall treat each Person whose name is recorded in the Participant Register as the owner of such participation for all purposes of this Agreement notwithstanding any notice to the contrary.

(e)    Limitations on Participant Rights.  A Participant shall not be entitled to receive any greater payment under Sections 2.12 and 2.15 than the applicable Lender would have been entitled to receive with respect to the participation sold to such Participant, unless the sale of the participation to such Participant is made with Administrative Borrower's prior written consent (not to be unreasonably withheld or delayed).

(f)    Certain Pledges.  Any Lender may at any time pledge or assign a security interest in all or any portion of its rights under this Agreement to secure obligations of such Lender, including any

88

pledge or assignment to secure obligations to a Federal Reserve Bank or other central bank; *provided* that no such pledge or assignment shall release such Lender from any of its obligations hereunder or substitute any such pledgee or assignee for such Lender as a party hereto. In the case of any Lender that is a fund that invests in bank loans, such Lender may, without the consent of Administrative Borrower or the Administrative Agent, collaterally assign or pledge all or any portion of its rights under this Agreement, including the Loans and Notes or any other instrument evidencing its rights as a Lender under this Agreement, to any holder of, trustee for, or any other representative of holders of, obligations owed or securities issued, by such fund, as security for such obligations or securities.

SECTION 10.05    Survival of Agreement.

All covenants, agreements, representations and warranties made by Borrowers in the Loan Documents and in the certificates or other instruments delivered in connection with or pursuant to this Agreement or any other Loan Document shall be considered to have been relied upon by the other parties hereto and shall survive the execution and delivery of the Loan Documents and the making of any Loans, regardless of any investigation made by any such other party or on its behalf and notwithstanding that the Administrative Agent or any Lender may have had notice or knowledge of any Default or incorrect representation or warranty at the time any credit is extended hereunder, and shall continue in full force and effect as long as the principal of or any accrued interest on any Loan or any fee or any other amount payable under this Agreement (other than with respect to contingent obligations under indemnification provisions as to which no claim is pending) is outstanding and so long as the Commitments have not expired or terminated. The provisions of Sections 2.12, 2.14, 2.15 and Article X shall survive and remain in full force and effect regardless of the consummation of the transactions contemplated hereby, the repayment of the Loans, the expiration or termination of the Commitments, the resignation or replacement of the Administrative Agent or any assignment of rights by, or the replacement of, a Lender or the termination of this Agreement or any provision hereof.

SECTION 10.06    Counterparts; Integration; Effectiveness; Electronic Execution.

This Agreement may be executed in counterparts (and by different parties hereto in different counterparts), each of which shall constitute an original, but all of which when taken together shall constitute a single contract. This Agreement and the other Loan Documents, and any separate letter agreements with respect to fees payable to the Administrative Agent, constitute the entire contract among the parties relating to the subject matter hereof and supersede any and all previous agreements and understandings, oral or written, relating to the subject matter hereof. Except as provided in Section 4.01, this Agreement shall become effective when it shall have been executed by the Administrative Agent and when the Administrative Agent shall have received counterparts hereof that, when taken together, bear the signatures of each of the other parties hereto. Delivery of an executed counterpart of a signature page of this Agreement by telecopier or other electronic transmission (i.e., a "pdf" or "tif" document) shall be effective as delivery of a manually executed counterpart of this Agreement.

The words "execution," "signed," "signature," and words of like import in any Loan Document shall be deemed to include electronic signatures or the keeping of records in electronic form, each of which shall be of the same legal effect, validity or enforceability as a manually executed signature or the use of a paper-based recordkeeping system, as the case may be, to the extent and as provided for in any applicable Requirement of Law, including the Federal Electronic Signatures in Global and National Commerce Act, the New York State Electronic Signatures and Records Act, or any other similar state laws based on the Uniform Electronic Transactions Act.

SECTION 10.07     Severability.

Any provision of this Agreement held to be invalid, illegal or unenforceable in any jurisdiction shall, as to such jurisdiction, be ineffective to the extent of such invalidity, illegality or unenforceability without affecting the validity, legality and enforceability of the remaining provisions hereof; and the invalidity of a particular provision in a particular jurisdiction shall not invalidate such provision in any other jurisdiction.

SECTION 10.08     Right of Setoff.

If an Event of Default shall have occurred and be continuing, each Lender and each of its Affiliates is hereby authorized at any time and from time to time, to the fullest extent permitted by applicable Requirements of Law, to set off and apply any and all deposits (general or special, time or demand, provisional or final, in whatever currency) at any time held and other obligations (in whatever currency) at any time owing by such Lender or any such Affiliate to or for the credit or the account of any Borrower against any and all of the obligations of such Borrower now or hereafter existing under this Agreement or any other Loan Document to such Lender Bank, irrespective of whether or not such Lender shall have made any demand under this Agreement or any other Loan Document and although such obligations of such Borrower may be contingent or unmatured or are owed to a branch or office of such Lender different from the branch or office holding such deposit or obligated on such indebtedness. The rights of each Lender and its Affiliates under this Section are in addition to other rights and remedies (including other rights of setoff) that such Lender or its Affiliates may have. Each Lender agrees to notify Administrative Borrower and the Administrative Agent promptly after any such setoff and application; *provided* that the failure to give such notice shall not affect the validity of such setoff and application.

SECTION 10.09     Governing Law; Jurisdiction; Consent to Service of Process.

(a)     Governing Law. This Agreement and the transactions contemplated hereby, and all disputes between the parties under or relating to this Agreement or the facts or circumstances leading to its execution, whether in contract, tort or otherwise, shall be construed in accordance with and governed by the laws (including statutes of limitation) of the State of New York, without regard to conflicts of law principles that would require the application of the laws of another jurisdiction and to the extent applicable, the Bankruptcy Code.

(b)     Submission to Jurisdiction. Each of the parties hereto hereby irrevocably and unconditionally submits, for itself and its property, to the exclusive jurisdiction of the Bankruptcy Court except to the extent the Bankruptcy Court declines to exercise jurisdiction, in which case each of the parties hereto hereby irrevocably and unconditionally submits, for itself and its property, to the nonexclusive jurisdiction of the Supreme Court of the State of New York sitting in New York County and of the United States District Court of the Southern District of New York, and any appellate court from any thereof, in any action or proceeding arising out of or relating to any Loan Document, or for recognition or enforcement of any judgment, and each of the parties hereto hereby irrevocably and unconditionally agrees that all claims in respect of any such action or proceeding may be heard and determined in such New York State court or, to the fullest extent permitted by applicable law, in such Federal court. Each of the parties hereto agrees that a final judgment in any such action or proceeding shall be conclusive and may be enforced in other jurisdictions by suit on the judgment or in any other manner provided by law. Nothing in this Agreement or any other Loan Document shall affect any right that the Administrative Agent or any Lender may otherwise have to bring any action or proceeding relating to this Agreement or any other Loan Document against any Borrower or its properties in the

90

courts of any jurisdiction.

(c)     Venue. Each of the parties hereto hereby irrevocably and unconditionally waives, to the fullest extent permitted by applicable Requirements of Law, any objection which it may now or hereafter have to the laying of venue of any suit, action or proceeding arising out of or relating to this Agreement or any other Loan Document in any court referred to in Section 10.09(b). Each of the parties hereto hereby irrevocably waives, to the fullest extent permitted by applicable Requirements of Law, the defense of an inconvenient forum to the maintenance of such action or proceeding in any such court.

(d)     Service of Process. Each of the parties hereto irrevocably consents to service of process in any action or proceeding arising out of or relating to any Loan Document, in the manner provided for notices (other than telecopier or e-mail) in Section 10.01. Nothing in this Agreement or any other Loan Document will affect the right of any party hereto to serve process in any other manner permitted by applicable Requirements of Law.

SECTION 10.10     Waiver of Jury Trial.

EACH OF THE PARTIES HERETO HEREBY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE REQUIREMENTS OF LAW, ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN ANY LEGAL PROCEEDING DIRECTLY OR INDIRECTLY ARISING OUT OF OR RELATING TO THIS AGREEMENT, ANY OTHER LOAN DOCUMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY (WHETHER BASED ON CONTRACT, TORT OR ANY OTHER THEORY).    EACH OF THE PARTIES HERETO (A) CERTIFIES THAT NO REPRESENTATIVE, AGENT OR ATTORNEY OF ANY OTHER PARTY HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT SUCH OTHER PARTY WOULD NOT, IN THE EVENT OF LITIGATION, SEEK TO ENFORCE THE FOREGOING WAIVER AND (B) ACKNOWLEDGES THAT IT AND THE OTHER PARTIES HERETO HAVE BEEN INDUCED TO ENTER INTO THIS AGREEMENT BY, AMONG OTHER THINGS, THE MUTUAL WAIVERS AND CERTIFICATIONS IN THIS SECTION.

SECTION 10.11     Headings.

Article and Section headings and the Table of Contents used herein are for convenience of reference only, are not part of this Agreement and shall not affect the construction of, or be taken into consideration in interpreting, this Agreement.

SECTION 10.12     Treatment of Certain Information; Confidentiality.

Each of the Administrative Agent and the Lenders agrees to maintain the confidentiality of the Information (as defined below), except that Information may be disclosed (a) to its Affiliates and to its and its Affiliates' respective partners, directors, officers, employees, agents, advisors and other representatives (it being understood that the Persons to whom such disclosure is made will be informed of the confidential nature of such Information and instructed to keep such Information confidential), (b) to the extent requested by any Governmental Authority or regulatory authority (including any self-regulatory authority, such as the National Association of Insurance Commissioners), (c) to the extent required by applicable Requirements of Law or by any subpoena or similar legal process, (d) to any other party hereto, (e) in connection with the exercise of any remedies hereunder or under any other Loan Document or any action or proceeding relating to this Agreement or any other Loan Document or the enforcement of rights hereunder or thereunder, (f) subject to an agreement containing provisions substantially the same as those

91

of this <u>Section 10.12</u> and with respect to which Borrowers are express third party beneficiaries, to (i) any assignee of or Participant in, or any prospective assignee of or Participant in, any of its rights or obligations under this Agreement, (ii) any actual or prospective counterparty (or its advisors) to any swap or derivative transaction relating to any Borrower and its obligations or (iii) any rating agency for the purpose of obtaining a credit rating applicable to any Lender, (g) with the written consent of Administrative Borrower or (h) to the extent such Information (x) becomes publicly available other than as a result of a breach of this Section or (y) becomes available to the Administrative Agent, any Lender or any of their respective Affiliates on a nonconfidential basis from a source other than Sponsor, Parent or any Borrower. For purposes of this Section, "**Information**" means all information received from Sponsor, Parent or any Borrower relating to any Borrower or any of its businesses, other than any such information that is available to the Administrative Agent or any Lender on a nonconfidential basis prior to disclosure by Parent or any Borrower. Any Person required to maintain the confidentiality of Information as provided in this Section shall be considered to have complied with its obligation to do so if such Person has exercised the same degree of care to maintain the confidentiality of such Information as such Person would accord to its own confidential information.

SECTION 10.13        <u>USA PATRIOT Act Notice and Customer Verification.</u>

Each Lender that is subject to the USA PATRIOT Act and the Administrative Agent (for itself and not on behalf of any Lender) hereby notify Borrowers that pursuant to the "know your customer" regulations and the requirements of the USA PATRIOT Act, they are required to obtain, verify and record information that identifies each Borrower, which information includes the name, address and tax identification number (and other identifying information in the event this information is insufficient to complete verification) that will allow such Lender or the Administrative Agent, as applicable, to verify the identity of each Borrower. This information must be delivered to the Lenders and the Administrative Agent no later than five days prior to the Closing Date and thereafter promptly upon request. This notice is given in accordance with the requirements of the USA PATRIOT Act and is effective as to the Lenders and the Administrative Agent.

SECTION 10.14        <u>Interest Rate Limitation.</u>

Notwithstanding anything herein to the contrary, if at any time the interest rate applicable to any Loan, together with all fees, charges and other amounts which are treated as interest on such Loan under applicable Requirements of Law (collectively, the "**Charges**), shall exceed the maximum lawful rate (the "**Maximum Rate**") which may be contracted for, charged, taken, received or reserved by the Lender holding such Loan in accordance with applicable Requirements of Law, the rate of interest payable in respect of such Loan hereunder, together with all Charges payable in respect thereof, shall be limited to the Maximum Rate and, to the extent lawful, the interest and Charges that would have been payable in respect of such Loan but were not payable as a result of the operation of this Section shall be cumulated and the interest and Charges payable to such Lender in respect of other Loans or periods shall be increased (but not above the Maximum Rate therefor) until such cumulated amount, together with interest thereon at the Federal Funds Effective Rate to the date of repayment, shall have been received by such Lender.

SECTION 10.15        [Reserved].

SECTION 10.16        <u>Obligations Absolute.</u>

To the fullest extent permitted by applicable Requirements of Law, all obligations of

92

Borrowers hereunder shall be absolute and unconditional irrespective of:

(a)    any bankruptcy, insolvency, reorganization, arrangement, readjustment, composition, liquidation or the like of any Borrower;

(b)    any lack of validity or enforceability of any Loan Document or any other agreement or instrument relating thereto against any Borrower;

(c)    any change in the time, manner or place of payment of, or in any other term of, all or any of the Obligations, or any other amendment or waiver of or any consent to any departure from any Loan Document or any other agreement or instrument relating thereto;

(d)    any exchange, release or non-perfection of any other Collateral, or any release or amendment or waiver of or consent to any departure from any guarantee, for all or any of the Obligations;

(e)    any exercise or non-exercise, or any waiver of any right, remedy, power or privilege under or in respect hereof or any Loan Document; or

(f)    any other circumstances which might otherwise constitute a defense available to, or a discharge of, Borrowers (other than a defense of cash payment).

SECTION 10.17    <u>Release of Collateral.</u>

Upon the sale of any item of Collateral of any Borrower (including, without limitation, as a result of the sale, in accordance with the terms of the Loan Documents, of a Borrower that owns such Collateral but excluding Asset Sales among Borrowers) in accordance with the terms of the Loan Documents, the Administrative Agent will, at Administrative Borrower's request and expense, execute and deliver to such Borrower or its designee such documents as such Borrower may reasonably request to evidence the release of such item of Collateral from the Liens granted under the Security Documents. Administrative Borrower shall provide the Administrative Agent such certifications or documents as the Administrative Agent shall reasonably request in order to demonstrate compliance of any such sale with the Loan Documents.

After all Commitments have been terminated and the principal of and interest on each Loan, all Fees and all other expenses or amounts payable under any Loan Document (other than with respect to contingent obligations under indemnification provisions as to which no claim is pending) have been indefeasibly paid in full in cash, the Administrative Agent will, at Administrative Borrower's request and expense, execute and deliver such documents as Administrative Borrower may reasonably request to evidence the release the Collateral from the Liens granted under the Security Documents.

SECTION 10.18    <u>Acknowledgment and Consent to Bail-In of Affected Financial Institutions.</u>  Notwithstanding anything to the contrary in any Loan Document or in any other agreement, arrangement or understanding among any such parties, each party hereto acknowledges that any liability of any Affected Financial Institution arising under any Loan Document, to the extent such liability is unsecured, may be subject to the write-down and conversion powers of an applicable Resolution Authority and agrees and consents to, and acknowledges and agrees to be bound by:

(a)    the application of any Write-Down and Conversion Powers by an applicable Resolution Authority to any such liabilities arising hereunder which may be payable to it by any party hereto that is an Affected Financial Institution; and

93

(b)      the effects of any Bail-in Action on any such liability, including, if applicable (i) a reduction in full or in part or cancellation of any such liability, (ii) a conversion of all, or a portion of, such liability into shares or other instruments of ownership in such Affected Financial Institution, its parent undertaking, or a bridge institution that may be issued to it or otherwise conferred on it, and that such shares or other instruments of ownership will be accepted by it in lieu of any rights with respect to any such liability under this Agreement or any other Loan Document or (iii) the variation of the terms of such liability in connection with the exercise of the write-down and conversion powers of any applicable Resolution Authority.

SECTION 10.19      Certain ERISA Matters.

(a)      Each Lender (x) represents and warrants, as of the date such person became a Lender party hereto, to, and (y) covenants, from the date such person became a Lender party hereto to the date such person ceases being a Lender party hereto, for the benefit of, the Administrative Agent and its Affiliates, and not, for the avoidance of doubt, to or for the benefit of any Borrower, that at least one of the following is and will be true:

(i)      such Lender is not using "plan assets" (within the meaning of Section 3(42) of ERISA or otherwise) of one or more Benefit Plans with respect to such Lender's entrance into, participation in, administration of and performance of the Loans, the Commitments or this Agreement,

(ii)      the transaction exemption set forth in one or more PTEs, such as PTE 84-14 (a class exemption for certain transactions determined by independent qualified professional asset managers), PTE 95-60 (a class exemption for certain transactions involving insurance company general accounts), PTE 90-1 (a class exemption for certain transactions involving insurance company pooled separate accounts), PTE 91-38 (a class exemption for certain transactions involving bank collective investment funds) or PTE 96-23 (a class exemption for certain transactions determined by in-house asset managers), is applicable with respect to such Lender's entrance into, participation in, administration of and performance of the Loans, the Commitments and this Agreement,

(iii)      (A) such Lender is an investment fund managed by a "Qualified Professional Asset Manager" (within the meaning of Part VI of PTE 84-14), (B) such Qualified Professional Asset Manager made the investment decision on behalf of such Lender to enter into, participate in, administer and perform the Loans, the Commitments and this Agreement, (C) the entrance into, participation in, administration of and performance of the Loans, the Commitments and this Agreement satisfies the requirements of sub-sections (b) through (g) of Part I of PTE 84-14 and (D) to the best knowledge of such Lender, the requirements of subsection (a) of Part I of PTE 84-14 are satisfied with respect to such Lender's entrance into, participation in, administration of and performance of the Loans, the Commitments and this Agreement, or

(iv)      such other representation, warranty and covenant as may be agreed in writing between the Administrative Agent, in its sole discretion, and such Lender.

(b)      In addition, unless either (1) sub-clause (i) in the immediately preceding clause (a) is true with respect to a Lender or (2) Lender has provided another representation, warranty and covenant in accordance with sub-clause (iv) in the immediately preceding clause (a), such Lender further (x) represents and warrants, as of the date such person became a Lender party hereto, to, and (y) covenants,

94

from the date such person became a Lender party hereto to the date such person ceases being a Lender party hereto, for the benefit of, the Administrative Agent and its Affiliates, and not, for the avoidance of doubt, to or for the benefit of any Borrower, that none of the Administrative Agent or any of its Affiliates is a fiduciary with respect to the assets of such Lender involved in such Lender's entrance into, participation in, administration of and performance of the Loans, the Commitments and this Agreement (including in connection with the reservation or exercise of any rights by the Administrative Agent under this Agreement, any Loan Document or any documents related hereto or thereto).

SECTION   10.21      Relationship with DIP Orders. In the event of any inconsistency between the terms of the DIP Orders and the Loan Documents, the terms of the DIP Orders shall control and the representations, warranties, covenants, agreements or events of default made herein and in the other Loan Documents shall be subject to the terms of the DIP Orders.

[Signature Pages Follow]

95