**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

|  |  |
|---|---|
| *In re:*<br><br>**RAVN AIR GROUP, Inc.,** *et al.,*<br><br>Debtors.[1] | Chapter 11<br><br>Case No.: 20-10755 (BLS)<br><br>(Jointly Administered)<br><br>Objection Deadline: April 22, 2020 at 4:00 p.m. (ET)<br>Hearing Date: April 29, 2020 at 11:00 a.m. (ET)<br>Ref. Docket No. 13 and 49 |

**LIMITED OBJECTION OF PENAIR REALTY HOLDINGS, LLC TO DEBTORS' MOTION FOR ENTRY OF INTERIM AND FINAL ORDERS PURSUANT TO 11 U.S.C. SECTIONS 105, 361, 362, 363, 364, AND 507 AND BANKRUPTCY RULES 2002, 4001, AND 6004 (I) AUTHORIZING THE DEBTORS TO OBTAIN POSTPETITION SENIOR SECURED SUPERPRIORITY FINANCING, (II) AUTHORIZING THE DEBTORS' LIMITED USE OF CASH COLLATERAL, (III) GRANTING ADEQUATE PROTECTION TO THE PREPETITION SECURED PARTIES, (IV) SCHEDULING A FINAL HEARING, AND (V) GRANTING RELATED RELIEF**

PenAir Realty Holdings, LLC (the "Landlord"), by and through its undersigned counsel, Dawson Law Group, LLC and Young Conaway Stargatt & Taylor, LLP, hereby files this limited objection (the "Objection") to the *Motion of the Debtors for Entry of Interim and Final Orders Pursuant to 11 U.S.C. Sections 105, 361, 362, 363, 364, and 507 and Bankruptcy Rules 2002, 4001, and 6004 (I) Authorizing the Debtors to Obtain Postpetition Senior Secured Superpriority Financing, (II) Authorizing the Debtors' Limited Use of Cash Collateral, (III) Granting Adequate Protection to the Prepetition Secured Parties, (IV)*

---

[1] The Debtors in these chapter 11 cases and the last four digits of each Debtor's U.S. tax identification number are as follows: RAVN Air Group, Inc. (3047), Ravn Air Group Holdings, LLC (5356), JJM, Inc. (4858), HoTH, Inc. (9957), Peninsula Aviation Services, Inc. (6859), Corvus Airlines, Inc. (7666), Frontier Flying Service, Inc. (8091), and Hageland Aviation Services, Inc. (2754). The notice address for all of the Debtors is 4700 Old International Airport Road, Anchorage, AK 99502.

*Scheduling a Final Hearing, and (V) Granting Related Relief* [D.I. 13] (the "Financing Motion"),[2] and respectfully represents as follows:

## BACKGROUND FACTS

1. RAVN Air Group, Inc. and its debtor affiliates in the above-captioned chapter 11 cases (collectively, the "Debtors") filed their voluntary petitions for relief under Chapter 11 of Title 11 of the United States Code on April 5, 2020 (the "Petition Date"). The Debtors continue to operate their businesses and manage their properties as debtors-in-possession pursuant to 11 U.S.C. §§ 1107(a) and 1108.[3] On April 20, 2020, the Office of the United States Trustee for the District of Delaware (the "U.S. Trustee") appointed an official committee of unsecured creditors (the "Committee") in these chapter 11 cases [D.I. 84].

2. The Debtors lease hangar, warehousing, office, and facilities for aircraft maintenance and repair (the "Premises") from the Landlord pursuant to two unexpired triple net leases of nonresidential real property (individually, a "Lease" and collectively, the "Leases") located at the Anchorage International Airport in Anchorage, Alaska, on parcels identified as Block 27, Lot 5C AIA and Block 27, Lot 5B AIA. The Leases contain a host of obligations, which include base rent owed to the Landlord (the "Base Rent"), which totals approximately $81,229.89, plus (ii) rent payments owed to the State of Alaska, pursuant to Paragraph 8(b) of the Leases, which obligates the Debtors to pay the Landlord's obligations under that certain Land Lease Agreement ADA-30562, effective as of January 6, 1994, as amended and supplemented from time to time, (the "Ground Lease"), which total approximately $4,679.81 (the "Ground Lease Rent"), as well as utilities, taxes, and maintenance costs of the Premises. The Base Rent and the Ground Lease Rent are

---

[2] Capitalized terms used but not otherwise defined here shall have the meanings ascribed to them in the Financing Motion and accompanying documents.

[3] Unless otherwise specified, all statutory references to "Section" are to 11 U.S.C. §§ 101 et seq. (the "Bankruptcy Code").

2

due on the first day of each month and total approximately $85,909.70 (the "Rent"). The Debtors did not pay the Rent due under the Leases on April 1, 2020, and the next payment of Rent and other charges is due on May 1, 2020.

3. On the Petition Date, the Debtors filed the Financing Motion. On April 7, 2020, the Court entered an interim order approving the relief requested in the Financing Motion on an interim basis (the "Interim Order") [D.I. 49]. The Interim Order did not include customary language limiting liens on leases and language with respect to access rights to the Premises in the event of default (the "Landlord Protections"). *See* Interim Order, ¶ 15 at pp. 21-22; ¶ 27 at pp. 38-39. Consequently, as set forth in greater detail below, the proposed language provided in Sections II and III must also be included in any Final Order so as to adequately protect the Landlord. The hearing to consider the Financing Motion on a final basis is scheduled for April 29, 2020 at 11:00 a.m. (prevailing Eastern Time).

4. A proposed final order approving the Financing Motion (the "Proposed Final Order") has not been filed.

5. The Financing Motion seeks to secure postpetition financing from the Debtors' prepetition revolving secured lenders (the "DIP Lenders") in the form of a $12 million senior secured superpriority term loan facility (the "DIP Facility") and the use of cash collateral. The financing provides for a partial roll-up of 200% of the prepetition obligations owed to each of the Prepetition Lenders that participate in the DIP Facility and allows the Debtors to, among other things, fund the Debtors' working capital requirements, operating expenses, capital expenditures related to aircraft maintenance and other line items in order to accomplish a restructuring, or in the alternative, an orderly wind-down of the Debtors' business and a liquidation of the Debtors' assets.

6. In exchange for this post-petition financing and use of cash collateral, the Debtors and the DIP Secured Parties agreed to a Budget in connection with the Interim

Order (the "DIP Budget"), which, upon information and belief, does not provide for the payment of the rent owed to the Landlord for use of their property from April 6, 2020 through April 30, 2020 (the "Stub Rent"). The Stub Rent owed to the Landlord is approximately $68,727.76. Nor have the Debtors provided any indication that the budget prepared in connection with the Proposed Final Order will include the payment of Stub Rent, making Stub Rent the only post-petition administrative expense of these chapter 11 estates not being provided for. As explained more fully in the First Day Declaration, the Debtors are no longer maintaining operations at full capacity. *See* First Day Dec., ¶¶ 28-31 at pp. 11-13. Nevertheless, the Debtors and the DIP Lenders are continuing to use the Premises for their post-petition benefit outside of the ordinary course of business. Consequently, the Landlord has been forced to become an administrative claimant that will not be paid in full on its administrative claims and thus unfairly bear the full risk of failure in these cases.

7.   Despite failing to provide for the payment of Stub Rent in the DIP Budget, the Debtors seek to waive the protections set forth in sections 506(c) and 552(b) of the Bankruptcy Code. These provisions were enacted to prevent secured creditors from forcing unsecured creditors to pay for the liquidation of the secured creditors' collateral.

8.   The Landlord recognizes that the COVID-19 health crisis is extraordinary and unprecedented and it may be appropriate for the Bankruptcy Court to fashion certain relief to assist the Debtors in weathering the storm, but any such relief must balance the interests of all parties-in-interest in the Debtors' bankruptcy cases and the very real threat of administrative insolvency in these cases. As proposed, the relief sought by the Debtors fails to do so and vitiates Landlord's rights under the Leases and the Bankruptcy Code. The present climate is fraught with uncertainty, and it is unclear whether the Debtors will be able to resume their operations, and, to the extent that they can and elect to do so, whether they will have the ability to actually pay both their current and any deferred

4

administrative claims at that time.

9. The Court should require the Debtors to pay Stub Rent under their Leases with the Landlord. The Court should not allow the Debtors to conduct their businesses outside of the ordinary course of business, for the direct benefit of the DIP Lenders, without also requiring the Debtors to timely pay Stub Rent. Anything less than full and immediate payment of all Stub Rent deprives the Landlord of its adequate protection rights and is unfair to the Landlord. The practical effect of this is that the DIP Lenders are using the bankruptcy process to gain the rent-free use of the Premises for non-ordinary course use for their direct benefit, relegating the Landlord to the position of an involuntary, unsecured, interest-free lender to these estates. The Court should not permit the DIP Lenders and the Debtors to force the Landlord to fund the Debtors' operations.

10. Accordingly, the Landlord requests that the Court require that any proposed Final Order include (i) confirmation that the provision for "Rent" in the thirteen-week DIP Budget is intended to encompass and satisfy all amounts owed to the Landlord under the Leases during the relevant time period, (ii) a carve-out for DIP and Adequate Protection Liens to ensure the Leases are not encumbered beyond what is currently permitted thereunder, (iii) language limiting the remedies of the DIP Lenders in an Event of Default under the terms of the DIP Facility, and (iv) the payment of the post-petition Stub Rent and denial of any waiver of the Debtors' protections under Section 506(c) and 552 until the Landlord receives such payment of Stub Rent.

26366849.4

**ARGUMENT**

I. **THE DIP BUDGET ATTACHED TO THE INTERIM ORDER PROVIDES INSUFFICIENT LEASE PAYMENTS PER MONTH TO FULLY COMPENSATE THE LANDLORD.**

11. The DIP Budget provides for payment of "Rent" in the amount of $360,000 for the thirteen-week period spanning April 6, 2020 to June 19, 2020. Amounts due and owing for Rent in the period covered by the DIP Budget total $85,909.70 per month or $240,547.16 in the period covered by the DIP Budget, plus additional amounts in respect of utilities, taxes, and maintenance costs. It is unclear from the DIP Budget provided what line items this "Rent" category is intended to pay. Further, it is unlikely that this line item for "Rent" will be able to fully satisfy the Debtors' Rent obligations and those due and owing to the dozens of other landlords identified in Schedule 3.05(b) to the Financing Motion.

12. The Landlord is owed full compensation for this period in keeping with the terms of the Leases. Therefore any Final Order must provide confirmation that the outstanding amounts due and owing to the Landlord under the Leases are encompassed by this provision for "Rent" or some other form of adequate protection that is acceptable to the Landlord.

II. **THE PROPOSED FINAL ORDER MUST PROVIDE A CARVE-OUT FOR DIP AND ADEQUATE PROTECTION LIENS.**

13. Paragraph 15 of the Interim Order provides that DIP Collateral includes liens on leaseholds. The Landlord objects to this attempt by the Debtors and the DIP Lenders to encumber the Leases in direct violation thereof. If the Debtors are agreeing to grant a lien on leasehold interests, any such lien must be limited to the proceeds arising from the sale, assignment, termination, or other disposition of the Leases and not the Leases themselves.

14. In this case, the Leases expressly prohibit the Tenant from

encumbering the Leases as the Debtors are attempting to do here. *See* Leases, ¶ 11(g). The Landlord does not consent to any leasehold mortgage proposed to be granted to the DIP Lenders. The Landlord's opposition to any such leasehold mortgage is not unreasonable under the circumstances and uncertainties present in these chapter 11 cases. Furthermore, upon information and belief, the Debtors have not requested the Landlord's prior written consent to any such leasehold mortgage.

15. The Court must deny the direct grant of liens on the Leases. The Leases expressly restrict or prohibit such liens. Lease provisions which restrict the ability to encumber a leasehold interest are both unenforceable under applicable non-bankruptcy law and critical to the Landlord's ability to (i) control its interest in the Premises, (ii) preserve clear title, (iii) comply with its own financing and investment requirements and (iv) market its property effectively. An enforceable lease provision under applicable state law remains enforceable in a bankruptcy case. Indeed, section 365(d)(3) expressly mandates that the Debtors comply with their post-petition lease obligations. The DIP liens on leaseholds granted in the Interim Order constitute post-petition defaults under the Leases. *See* Leases, ¶ 11(g). In contrast, a lien on the proceeds arising from any subsequent disposition of the Leases would not violate the Leases while also providing the DIP Lenders with the economic protections they seek as lenders without trampling upon the Landlord's statutory and contractual rights and protections.

16. The burden to demonstrate that bankruptcy law overrides applicable state law falls to the Debtors. *See Raleigh v. Ill. Dep't of Revenue,* 530 U.S. 15, 25 (2000); *Butner v. United States*, 440 U.S. 48, 55 (1979). The Debtors cite no authority to rewrite the terms of the Leases—nor is there any. The Uniform Commercial Code's provisions regarding assignment prohibitions apply only to personal property leases and contracts, not leases of real property. *See e.g.,* UCC §§ 2A-103(j); 2A-501; 9-109; 9-407. Nothing in the

Bankruptcy Code overrides state real property law or the terms of the Lease in the financing context. To the contrary, Bankruptcy Code section 365(d)(3) expressly mandates that the Debtors "shall timely perform all the obligations . . . under any unexpired lease of nonresidential real property, until such lease is assumed or rejected." 11 U.S.C. § 365(d)(3). As such, the Debtors must continue to perform in accordance with the terms of the Leases until they assume or reject them, and cannot pick and choose which terms to disregard or violate. The Debtors and the DIP Lenders cannot use debtor in possession financing to end-run their post-petition obligations under the Leases.

17. Furthermore, a grant of liens on the Leases would provide a back-door means for the DIP Lenders to step into the Debtors' shoes under the Leases upon the occurrence of an Event of Default under the DIP Facility or to assign the Leases to third parties pursuant to a foreclosure, thereby evading the statutory requirements for assumption and assignment memorialized in Bankruptcy Code section 365.

18. The Bankruptcy Code makes clear that in order for a debtor to assume and assign its interests in an unexpired lease of nonresidential real property, the debtor must cure defaults and demonstrate adequate assurance of the assignee's ability to perform under the lease on an ongoing basis. 11 U.S.C. §§ 365(b), (f). If the sweeping remedies granted to the DIP Lenders upon the occurrence of an Event of Default under the Interim Order are approved by the Court in a Final Order, a *de facto* assignment of the Leases will result. The Debtors and the DIP Lenders should not be permitted to circumvent Bankruptcy Code section 365 in the context of a financing motion.

19. Consequently, the following language is proposed for inclusion in the Final Order, clarifying that liens will only be placed on the disposition of the leaseholds, not the Leases themselves: "provided however, with respect to the Debtors' non-residential real property leases, no liens or encumbrances shall be granted or extend to such leases

8

themselves under this Final Order, except as permitted in the applicable lease, but rather any liens granted shall extend only to the proceeds realized upon the sale, assignment, termination, or other disposition of such leases, books and records related to the foregoing, accessions and proceeds of the foregoing, wherever located, including insurance or other proceeds."

### III. THE PROPOSED FINAL ORDER MUST CONTAIN LANGUAGE LIMITING THE REMEDIES OF THE LENDERS IN AN EVENT OF DEFAULT UNDER THE TERMS OF THE DIP FACILITY.

20. Any final order of the Financing Motion must make clear that the DIP Lenders do not have unrestricted rights of access to use and occupy Debtors' leased premises following a default under the terms of the DIP Facility. There is no basis for a bankruptcy court to grant a non-debtor party rights to use and occupy real property leased by a debtor outside the parameters of Section 365. *See e.g., In re Antwerp Diamond, Inc.*, 138 B.R. 865, 866-69 (Bankr. N.D. Ohio 1992). Paragraph 27 of the Interim Order does not limit entry by the DIP Secured Parties after an Event of Default.

21. Consequently, the following language is proposed for inclusion in any Final Order approving the Financing Motion: "Notwithstanding anything to the contrary herein, the DIP Agent and the other DIP Secured Parties may enter upon a leased premises of the Debtors after an Event of Default in accordance with (i) a separate written agreement among the DIP Agent, the other DIP Secured Parties, and the applicable landlord for the leased premises, (ii) pre-existing rights of the DIP Agent or the other DIP Secured Parties under applicable non-bankruptcy law, (iii) written consent of the applicable landlord for the leased premises, or (iv) entry of an order by this Court approving such access to the leased premises after notice and an opportunity to be heard for the applicable landlord for the leased premises."

## IV. THE COURT SHOULD ORDER THE PAYMENT OF STUB RENT FOR THE POST-PETITION USE AND OCCUPANCY OF THE PREMISES AS PART OF ANY PROPOSED FINAL ORDER.

22. The Bankruptcy Code is not served by allowing the Debtors and the DIP Lenders to avail themselves of the protections of the Bankruptcy Code without paying for post-petition use of the Premises. Depriving landlords of post-petition rent payments that the Bankruptcy Code was intended to protect ignores clear legislative intent.

23. The Debtors are using the Premises as an aircraft and passenger terminal facility, office space, warehouse for goods and parts, and facility for the repair and continued maintenance of aircraft. The continuing use and occupancy of the Premises is critical to these operations and the preservation of value of the DIP Collateral. Therefore, the use and occupancy of the Premises provides an actual, necessary, and continuing benefit to the Debtors, and the Court should require the Debtors to pay the Landlord the Stub Rent. Permitting Debtors (for the direct benefit of the DIP Lenders) to continue to enjoy the post-petition use of the Premises without paying the Stub Rent is contrary to congressional intent, inequitable, and is not required or even suggested by applicable law.

24. As explained more fully in the *Declaration of John Mannion In Support of Chapter 11 Petitions and First Day Motions* (the "First Day Declaration") [D.I. 5], the Debtors have been experiencing a liquidity crisis since mid-March, 2020 occasioned by a variety of factors, including the dramatic COVID-19 related reduction in passenger demand and general uncertainty about when demand would normalize in the future. *See* First Day Dec., ¶ 15 at p. 7. As of the date of filing of this Objection, significant liquidity concerns remain and demand for the Debtors' services has not yet normalized. Accordingly, the path forward for the Debtors is uncertain at best, and there is a real likelihood that these estates may already be administratively insolvent leaving any payment on account of the Stub Rent at considerable risk. The Landlord is effectively providing an involuntary,

unsecured, post-petition, interest-free loan to the Debtors in the amount of Stub Rent. Importantly, other parties and creditor are not being put in such a position as the DIP Budget provides for all other post-petition administrative expenses of these estates, including professional fees. While the Landlord will not likely fully recover the pre-petition rent that the Debtors failed to pay, this Court should not permit the Debtors to also avoid paying for their post-petition use and occupancy of the Premises, while availing themselves of the benefits of the Bankruptcy Code. There is ample support for the payment of Stub Rent in the Bankruptcy Code.

*i. Stub Rent should be paid for Lease Premises.*

25.     The Debtors and the DIP Lenders asked this Court to approve milestones pursuant to a plan of reorganization in the Financing Motion and will be pursuing a sale or liquidation if reorganization proves unsuccessful. *See* Interim Order, ¶ 10 at p. 15. The Debtors state that the continuation of maintenance and repair operations on the Debtors' Collateral—operations which are performed at the Landlord's Premises—is critical to the Debtors' restructuring strategy and hope of resuming operations. See First Day Dec., ¶¶ 28-31 at pp. 11-13. The DIP Lenders are receiving the benefit of the hangar, office space, and repair facilities at the Premises, while risking no exposure or risk of loss post-petition. The Landlord has been put in the position of being an involuntary, unsecured, interest-free lender for at least the month of April 2020, which interest-free loan inures to the direct benefit of the DIP Lenders. The Landlord should not bear the risk of administrative insolvency while other parties-in-interest benefit, and the Court should direct that the Landlord receive payment of the Stub Rent for the use of its property for the direct benefit of the DIP Lenders. *See e.g., In re ZB Co., Inc.*, 302 B.R. 316, 320 (Bankr. D. Del. 2003) (holding that rent should be paid to landlords on a per diem basis during the pre-rejection period in order to

avoid the potential that the landlord could be left with an allowed administrative claim against an administratively insolvent estate).

> ii. Based on the potential administrative insolvency of these cases, the Court should require the payment of Stub Rent as adequate protection under Section 363(e).

26. The payment of Stub Rent is warranted as adequate protection as a condition of a sale that involves the use of the Premises under Section 363(e), which provides:

> Notwithstanding any other provision of this section, at any time, on request of an entity that has an interest in property used, sold, or leased, or proposed to be used, sold, or leased, by the trustee, *the court, with or without a hearing, shall prohibit or condition such use, sale, or lease as is necessary to provide adequate protection of such interest* . . . . (emphasis added).

11 U.S.C. § 363(e).

27. Section 363(e) provides a basis to grant adequate protection to real property lessors. *See e.g., Matter of Cont'l Airlines, Inc.*, 154 B.R. 176, 180 (Bankr. D. Del. 1993) (finding that adequate protection is available under § 363(e) for a decrease in value due to the use, sale, or *lease* of an entity's interest in property) (emphasis added); *In re P.J. Clarke's Rest. Corp.*, 265 B.R. 392, 404 (Bankr. S.D.N.Y. 2001) (providing that a "landlord's right to adequate protection seems to follow clearly from the language of Section 363(e)"); *In re Ernst Home Ctr., Inc.*, 209 B.R. 955, 966-67 (Bankr. W.D. Wash. 1997) (finding that adequate protection is available to real property lessors under Section 363(e)); *In re RB Furniture, Inc.*, 141 B.R. 706, 713-14 (Bankr. C.D. Cal. 1992) (adequate protection under Section 363(e) may be even broader than the rights encompassed under Section 365(d)(3), given that it "is a fluid concept that reflects all the circumstances surrounding a debtor's use of property").

28. In such circumstances, it is appropriate for adequate protection to take

the form of immediate cash payments for post-petition use of the Premises. *See* 11 U.S.C. § 361; *In re Kellstrom Indus., Inc.*, 282 B.R. 787, 794 (Bankr. D. Del. 2002). Where there is a possibility of administrative insolvency, as here, simply allowing an administrative expense claim for Stub Rent will not adequately protect the Landlord. *See* 11 U.S.C. § 361(3). The Debtors continue to operate at the Premises for the direct benefit of themselves and the DIP Lenders. Unlike other creditors, the Landlord has no choice but to allow the Debtors continuing use and occupancy of its Premises. This Court has seen many cases where Debtors and their professionals have said that there will be money to pay administrative claims after a sale process, only to later admit administrative insolvency. The Landlord is a forced participant in these cases, and unlike other creditors, the Landlord has no recourse to prevent the use of its property. As a result, the Landlord should not bear the risk of administrative insolvency, and the Court should require the Debtors to pay Stub Rent as adequate protection for the continued use of the Premises.

> *iii. The Court may require payment of Stub Rent as a surcharge under Section 506(c).*

29.     The Court may also require payment of Stub Rent under Section 506(c), which provides that a trustee or debtor in possession may recover from property securing an allowed secured claim the "reasonable, necessary costs and expenses of preserving or disposing of, such property to the extent of any benefit to the holder of such claim. . . ." 11 U.S.C. § 506(c); *See Precision Steel Shearing, Inc. v. Fremont Fin. Corp. (In re Visual Indus., Inc.)*, 57 F.3d 321, 325 (3d Cir. 1995).[4] The premise underlying Section 506(c) is that the unsecured creditors should not be required to bear the costs of preserving a secured creditor's collateral. *See In re Evanston Beauty Supply Inc.*, 136 B.R. 171, 175 (Bankr. N.D. Ill. 1992). "Ample case authority exists which permits lessors to recover under

---

[4] Any waiver of Section 506(c) claims as part of a final post-petition financing order should be conditioned upon the payment of Stub Rent.

13

Section 506(c) provided that the standards for recovery are met." *In re World Wines, Ltd.*, 77 B.R. 653, 658 (Bankr. N.D. Ill. 1987). Standards for recovery are that the services were necessary and beneficial to the lender. *Visual Indus., Inc.*, 57 F.3d at 325. The Debtors are the primary beneficiaries of the post-petition use of the Premises, and there is no legitimate reason that they should not pay for that benefit.

30. Courts may surcharge lenders for post-petition rents and storage charges owed to them for storing lender's collateral, as necessary and directly beneficial to the lender. *In re Scopetta-Senra P'ship III*, 129 B.R. 700 (Bankr. S.D. Fla. 1991) (determining that landlord who provided post-petition lease space provided benefit to the secured creditor by storing its collateral, and ensuring the debtor's continued operations; *In re World Wines, Ltd.*, 77 B.R. at 658 (finding that landlord was entitled to be paid by the bank for the use and occupancy of its premises for storage of wine to Section 506(c)); *In re Proto-Specialties, Inc.*, 43 B.R. 81 (Bankr. D. Ariz. 1984).

31. The Debtors have been using the Premises to store, maintain, and repair the Debtors' Collateral since the Petition Date. The Stub Rent owing to the Landlord, therefore, is a reasonable and necessary cost for the preservation and maintenance of the Debtors' Collateral, and provides the Debtors and the DIP Lenders with a direct benefit. Without the ability to use the Premises, the Debtors and the DIP Lenders would have to find another location to store and service the airplanes and pay costs associated with removing the planes and finding another suitable location. Moreover, allowing the DIP Lenders access to the Premises at no cost would "result in a windfall benefit to the secured creditor to the detriment of a third party." *In re So Good S. Potato Chip Co.*, 116 B.R. 144, 146 (Bankr. E.D. Mo. 1990). Based on the above, the Court should require the payment of Stub Rent for the storage and maintenance of the DIP Lenders' Collateral under Section 506(c).

      *iv.*    *The Court may authorize the immediate payment of Stub Rent under Section 503(b).*

32.    The Court may allow the Stub Rent as an administrative expense of the Debtors under Section 503(b)(1), and order its immediate payment, even if such payment is not ordered under Section 365(d)(3).[5] Section 503(b)(1) provides for an administrative expense claim for "the actual, necessary costs and expenses of preserving the estate." *See* 11 U.S.C. § 503(b)(1). Section 365(d)(3) does not preclude the Court from ruling that Stub Rent is an administrative expense under Section 503(b)(1). *See In re Goody's Fam. Clothing Inc.*, 610 F.3d 812, 816-19 (3d Cir. 2010); *In re Garden Ridge Corp.*, 323 B.R. 136, 142-43 (Bankr. D. Del. 2005) (citing *ZB Co. Inc.*, 302 B.R. at 319 (landlords entitled to prorated rent from the Petition Date—despite the fact that the billing date occurred the day before the petition date)). A landlord's administrative claim under Section 503(b)(1) is equal to the lease contract rate. *See ZB Co.*, 302 B.R. at 319 (contract rate is presumed to be the fair rental value).

33.    Courts have discretion to determine the timing of the administrative

---

[5] *Centerpoint Props. v. Montgomery Ward Holding Corp. (In re Montgomery Ward Holding Corp.)*, 268 F.3d 205, 212 (3d Cir. 2001) is used as the basis for application of the "billing date" model in this Circuit to avoid payment of rent that accrues post-petition during the month of this bankruptcy filing. In *Goody's Fam. Clothing Inc. v. Mountaineer Prop. Co. II, LLC (In re Goody's Fam. Clothing Inc.)*, 401 B.R. 656, 664 (D. Del. 2009), *aff'd* 610 F.3d 812 (3d Cir. 2010); however, the District Court noted its disapproval of applying the billing date approach to stub rent under Section 365(d)(3). The Court pointed out that Congress' intent is contrary to the "perverse result that debtor-tenants should use § 365(d)(3) offensively to avoid timely rent payments." *Id.* at 664 n. 8. This is especially true since it is debtors that control the timing of a bankruptcy filing, as evidenced in the present case where the Debtors filed their petitions on April 5, 2020. The Court posited that applying *Montgomery Ward* to rent payments is problematic, contrary to the purpose of Section 365(d)(3), and that it produces confounding consequences. *Id.* The District Court was not asked to address the applicability of Section 365(d)(3) to stub rent, and yet raised this issue *sua sponte*. The Court pointed out that had it had been asked to address the applicability of Section 365(d)(3), "it might have read *Montgomery Ward* more narrowly than did the Bankruptcy Court." *Id.* at 664. The legislative history surrounding Section 365(d)(3) provides that Section 365(d)(3) is intended to relieve the burden placed on Landlords during the period between a bankruptcy filing and assumption or rejection of a lease. *Omni Partners, L.P. v. Pudgie's Dev. of N.Y., Inc. (In re Pudgie's Dev. of N.Y. Inc.)*, 239 B.R. 688, 692 (S.D.N.Y. 1999) (*quoting* 130 Cong. Rec. S8894-95 (daily ed. June 29, 1994) (statement of Sen. Hatch)). Requiring Landlords to provide rent-free use of the Premises post-petition is inconsistent with the policy behind Section 365. The legislative history relating to Section 365(d)(3) demonstrates that its purpose is to ensure that landlords are paid for lease obligations and to prevent the injustice of landlords providing forced and uncompensated services to debtors. *See Montgomery Ward*, 268 F.3d at 210-12. Congress specifically intended that Section 365(d)(3) alleviate –not exacerbate—this injustice. Using Section 365(d)(3) to the detriment of Landlords ignores clear legislative intent and should not be endorsed by this Court.

payments, and may direct immediate payment of prorated, post-petition rent. *See e.g., Garden Ridge Corp.*, 323 B.R. at 143 (*citing HQ Glob. Holdings, Inc.*, 282 B.R. 169, 173 (Bankr. D. Del. 2002) (entering interim orders directing the full contract rent for February 2004 to each landlord); *ZB Co.*, 302 B.R. at 320. "In determining the time of payment, courts consider prejudice to the debtor, hardship to the claimant, and potential detriment to other creditors." *See Garden Ridge Corp.,* 323 B.R. at 143; *see also HQ Glob.*, 282 B.R. at 173.

34. As set forth herein, the hardship to the Landlord outweighs any prejudice to the Debtors or other creditors. Without immediate payment of the Stub Rent, there is a significant risk that Landlords will not receive any payment for the Debtors use and occupancy of the Premises during the month of April, providing the Debtors with the ability to use the hangars for the direct benefit of the DIP Lenders free of charge. No other creditor is required to provide post-petition services to the Debtors without payment, and certain creditors will receive payment for pre-petition charges. Forcing the Landlord to act as an involuntary, post-petition lender is contrary to the Bankruptcy Code, and the Court should order that the Landlord receive payment of the Stub Rent under these circumstances. *See In re Travel 2000, Inc.*, 264 B.R. 444 (Bankr. W.D. Mich. 2001) (finding that Congress and the courts have determined that a landlord should receive the benefit of its bargain to compensate a landlord for being compelled by the Bankruptcy Code to continue providing a debtor with a critical service). Therefore, this Court is within its authority to allow and require immediate payment of the Stub Rent under Section 503(b)(1).[6]

---

[6] Section 105(a) of the Bankruptcy Code also provides a basis for immediate payment of Stub Rent pursuant to its power to "issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title." A prevailing concern in the drafting of Section 365(d)(3) is the fact that: (1) a landlord has no control over the debtor's decision to file for bankruptcy, (2) a landlord thereafter is a hostage to the bankruptcy proceedings; and (3) a landlord remains an unwilling party forced to continue to provide services to the debtor pending a decision to assume or reject the lease. In light of the Debtors' control over the timing of the bankruptcy filing, it is fair and consistent with the intended protections of the Bankruptcy Code and congressional intent to require payment of Stub Rent for the use of the Premises. *See In re Krystal Co.*, 194 B.R. 161, 164 (Bankr. E.D. Tenn. 1996).

*v. The Bankruptcy Code requires Equal Treatment of Administrative Expense Creditors.*

35. The Bankruptcy Code does not allow the Debtors to treat similarly situated administrative claimants differently. *In re Lazar*, 83 F.3d 306, 308-09 (9th Cir. 1996) ("Under the Bankruptcy Code, administrative expense creditors must be treated equally and the court should not set up its own order of priorities."). Through their DIP Budget, the Debtors are establishing different classes of administrative claimants to receive payment, to the exclusion of others (namely, the Landlord), in violation of the Bankruptcy Code. As these estates may already be administrative insolvent, this alone should justify the payment of the Stub Rent.

## V.  RESERVATION OF RIGHTS

36. The Landlord reserves the right to amend and/or supplement this Objection, including, without limitation, adding and supplementing objections to proposed cure amounts, adequate assurance information, and any proposed assignee's ability to perform under the Leases. Further, the Landlord reserves all rights with respect to any proposed reorganization or sale of the Debtors' business or assets.

## VI.  CONCLUSION

The Court should require the immediate payment of Stub Rent as party of any order approving the Financing Motion as set forth above, and it should specifically condition any provisions granting a Section 506(c) waiver, marshaling or application of the proceeds, upon (i) the confirmation that the provision for "Rent" in the thirteen-week DIP Budget is intended to encompass and satisfy all amounts owed to the Landlord under the Leases during the relevant time period, (ii) the addition of  a carve-out for DIP and Adequate Protection Liens, (iii) the addition of language limiting the remedies of the DIP Lenders in an Event of Default under the terms of the DIP Facility, and (iv) payment of  the Stub Rent. The Landlord also

requests that the Court grant such other and further relief as the Court deems proper.

*[Remainder of Page Intentionally Left Blank]*

26366849.4

| | |
|---|---|
| Dated: Wilmington, Delaware<br>April 22, 2020 | **YOUNG CONAWAY STARGATT & TAYLOR, LLP**<br><br>By: */s /Sean M. Beach*<br>Sean M. Beach (No. 4070)<br>Rodney Square<br>1000 North King Street<br>Wilmington, Delaware 19801<br>Telephone: (302) 571-6600<br>Facsimile: (302) 571-1253<br>Email: sbeach@ycst.com<br><br>**DAWSON LAW GROUP, LLC**<br>Wayne G. Dawson<br>P.O. Box 244965<br>Anchorage, Alaska 99524<br>Telephone (907) 277-3995<br>Facsimile: (907) 277-3991<br>Email: wdawson@dawsonlaw-ak.com<br><br>*Counsel to PenAir Realty Holdings, LLC* |