# AMENDED AND RESTATED AIRCRAFT
# LEASE AGREEMENT 020 (2018)

between

## JAH2015AN680PA, LLC
Lessor,

and

## PENINSULA AVIATION SERVICES, INC. ,
Lessee,

**December 21, 2018**

**SAAB-SCANIA 2000, S/N 2000-020**

**Registration: N680PA**

AMENDED AND RESTATED LEASE AGREEMENT 020
JAH2015AN680PA, LLC - PENINSULA AVIATION SERVICES, INC.

EXHIBIT A

## TABLE OF CONTENTS

SECTION 1.    DEFINITIONS ............................................................................ 1
SECTION 2.    AGREEMENT AND CONDITIONS TO LEASE .................................. 9
SECTION 3.    DELIVERY AND ACCEPTANCE; EFFECTIVE DATE; TERM ...... 11
SECTION 4.    RENT .................................................................................... 12
SECTION 5.    REPRESENTATIONS AND WARRANTIES ............................... 13
SECTION 6.    POSSESSION, USE AND OPERATIONS .................................... 17
SECTION 7.    MAINTENANCE ...................................................................... 20
SECTION 8.    COVENANTS OF LESSEE ......................................................... 21
SECTION 9.    REPLACEMENT OF PARTS; ALTERATIONS; MODIFICATIONS
                      AND ADDITIONS ..................................................................... 23
SECTION 10.    GENERAL TAX INDEMNITY .................................................... 25
SECTION 11.    CASUALTY OCCURRENCES ..................................................... 27
SECTION 12.    INSURANCE ............................................................................ 28
SECTION 13.    INDEMNIFICATION ................................................................. 31
SECTION 14.    LIENS ................................................................................... 33
SECTION 15.    PERFECTION OF TITLE AND FURTHER ASSURANCES ............ 33
SECTION 16.    RETURN OF AIRCRAFT AND RECORDS ................................... 36
SECTION 17.    EVENTS OF DEFAULT ............................................................ 38
SECTION 18.    REMEDIES ............................................................................ 41
SECTION 19.    ALIENATION .......................................................................... 44
SECTION 20.    MISCELLANEOUS .................................................................. 44
SECTION 21.    OPTION TO RENEW……………………………………..…...47
SECTION 22.    LESSEE'S RIGHT OF FIRST OFFER……………………...…47

EXHIBIT A        AIRCRAFT SPECIFICATIONS
EXHIBIT B        AIRCRAFT DOCUMENT SUMMARY
EXHIBIT C        CERTAIN DEFINITIONS, VALUES AND CONTRACTUAL PROCEDURES
EXHIBIT D        LEASE SUPPLEMENT NO. 1
EXHIBIT E        DELIVERY CONDITIONS
EXHIBIT F        RETURN CONDITIONS
EXHIBIT G        MAINTENANCE RECORDING REQUIREMENTS
EXHIBIT H        LIFE LIMITED PARTS
EXHIBIT I        MAINTENANCE RESERVES

## AMENDED AND RESTATED LEASE AGREEMENT 020 (2018)
### Saab-Scania 2000, N680PA, S/N 2000-020

THIS **AMENDED AND RESTATED LEASE AGREEMENT 020** (2018) (this "Lease"), dated as of December 21, 2018 is by and between **JAH2015AN680PA, LLC**, a Delaware limited liability company ("Lessor"), and **PENINSULA AVIATION SERVICES, INC.**, a Delaware corporation ("Lessee").

### WITNESSETH

WHEREAS, Lessor and Lessee's predecessor Peninsula Airways, Inc. ("Pen Air") entered into an Aircraft Lease Agreement 020 dated March 13, 2015, recorded by the Federal Aviation Administration on February 18, 2016, as Conveyance No. DT014336 ("Existing Lease").

WHEREAS, Pen Air filed for Chapter 11 bankruptcy protection on August 6, 2017.

WHEREAS, as part of the bankruptcy proceeding, Lessee purchased certain assets of Pen Air including certain contractual rights and obligations.

WHEREAS, as part of the bankruptcy proceeding, the Trustee assumed the Existing Lease and assigned the Existing Lease to Lessee on or about December 21, 2018.

WHEREAS, Lessor and Lessee desire to amend and restate the Existing Lease upon the terms and subject to the conditions hereinafter set forth.

NOW THEREFORE, for and in consideration of the mutual promises and covenants set forth herein and other good and valuable consideration, the receipt and sufficiency of which is hereby conclusively, Lessor and Lessee hereby agree as follows:

## SECTION 1.  DEFINITIONS

Unless the context otherwise requires, the following terms shall have the following respective meanings for all purposes of this Lease and shall be equally applicable to both the singular and the plural forms of the terms herein defined:

"Aircraft" shall mean the Airframe, together with (a) the two (2) Engines and the two (2) Propellers, whether or not installed on the Aircraft identified in **Exhibit A**; (b) all Parts and all components thereof; (c) all ancillary equipment or devices furnished with the Airframe, Engines, Propellers or Parts under this Lease; (d) all Aircraft Documents; and (e) all substitutions, replacements and renewals of any and all thereof.

"Aircraft Documents" shall mean (a) the maintenance and inspection records and all other current and historical records, manuals, and documentation pertaining to the Aircraft identified in **Exhibit B,** in hard copy, in digital format or via subscription, as the Lessor keeps them, all aircraft documents associated with the Aircraft, including without limitation a current and valid United States Standard Airworthiness Certificate, all Airframe, Engines, APU and engine log

RECORDED BY
Federal Aviation Administration
Civil Aviation Registry
Date 3-15-2019  Time 1:50
Conveyance Number NJ016534

United States Standard Airworthiness Certificate, all Airframe, Engines, APU and engine log books, and all flight, and maintenance manuals, data, and inspection, modification, maintenance and overhaul records, all weight and balance records, all maintenance contracts, computerized maintenance programs and warranty contracts; all wiring and engineering diagrams, drawings and data; all issued FAA Form 337's (or non-U.S. equivalents); any Supplemental Type Certificates and any and all other records relating or required to be maintained with respect to the Aircraft, all of the foregoing of which shall be original, complete, correct, continuous, in English and up-to-date, and (b) the maintenance and inspection records generated and maintained by Lessee during the Term under Applicable Law, including the records required as set forth in **Exhibit G**.

"Airframe" shall mean: (a) the certain Saab 2000 aircraft (excluding Engines or engines and Propellers or propellers from time to time installed thereon) identified as to manufacturer, type, manufacturer serial number and registration number in **Exhibit A**; and (b) any and all Parts which are from time to time incorporated or installed on or attached thereto or which have been removed therefrom so long as title thereto remains vested in Lessor in accordance herewith, including the terms of Section 9.

"Airworthiness Directives" or "ADs" shall mean all airworthiness directives of the Aviation Authority applicable to the Aircraft.

"Applicable Law" shall mean: (a) any law, statute, decree, constitution, regulation, order, judgment, rule, license, permit, injunction or other directive of any Governmental Entity; (b) any treaty, pact, compact or other agreement to which any Governmental Entity is a signatory or party (including, without limitation, the Cape Town Convention); (c) any judicial interpretation with binding characteristics or application of those specified in (a) or (b) above; (d) any administrative interpretation with binding characteristics or application of those specified in (a) or (b) above; and (e) any amendment or revision of any of those specified in (a), (b), (c) or (d) above, and in each case, which is applicable to the Aircraft and its use and operation, Lessee, or the transactions contemplated by this Lease.

"Approved Insurance Broker" shall mean Arthur J. Gallagher & Co., or another insurance broker of internationally recognized responsibility and standing specializing in aircraft insurance as is reasonably acceptable to and approved by Lessor and any Lessor Lender.

"Approved Insurer" shall mean an insurer of internationally recognized responsibility and standing specializing in aircraft insurance, as is reasonably acceptable to and approved by Lessor and any Lessor Lender.

"Approved Maintenance Provider" shall mean: (a) with respect to any scheduled maintenance, modification, or alteration to the Aircraft, any Person (including, to the extent applicable, the Lessee) which is a maintenance facility approved by the Aviation Authority and which is reasonably acceptable to Lessor; and (b) with respect to any other required maintenance hereunder, any other Person which is a maintenance facility approved by the Aviation Authority.

"Aviation Authority" shall mean the Federal Aviation Administration of the United States Department of Transportation or any successor thereto.

"Basic Rent" shall mean the rent for the Aircraft specified on **Exhibit C** and payable throughout the Term for the Aircraft pursuant to Section 4.1.

"Basic Rent Payment Date" shall mean each day for payment of Basic Rent determined in accordance with **Exhibit C**.

"Business Day" shall mean any day other than a Saturday, Sunday or other day on which banking institutions in Miami, Florida and Anchorage, Alaska are authorized or required by law to be closed.

"Cape Town Convention" shall mean, collectively, (i) the official English language text of the Convention on International Interests in Mobile Equipment adopted on November 16, 2001 at a diplomatic conference held in Cape Town, South Africa, as the same may be amended or modified from time to time, and (ii) the Protocol.

"Casualty Value" shall mean the amount specified as such in **Exhibit C** and payable by Lessee to Lessor upon a Casualty Occurrence to the Airframe as set forth in Section 11.1.

"Casualty Occurrence" shall mean any of the following events with respect to the Aircraft, Airframe or any Engine: (a) loss of such property or its use due to theft or disappearance (including hijacking) for a period in excess of ninety (90) consecutive days or the remainder of the Term, or destruction, damage beyond economic repair, or rendition of such property permanently unfit for normal use by Lessee for any reason whatsoever; (b) any damage to such property which results in an insurance settlement with respect to such property on the basis of a total loss or on the basis of a compromised or constructive total loss, or which otherwise renders such property permanently unfit for normal use; or, (c) the condemnation, confiscation, appropriation or seizure of, or requisition of title to, such property which shall have resulted in the loss of possession by the Lessee for a period in excess of ninety (90) consecutive days. A Casualty Occurrence with respect to the Airframe shall constitute a Casualty Occurrence with respect to the Aircraft.

"C-Check" shall mean the heavy maintenance check on the Airframe performed every 4,000 Flight Hours of the Airframe's operation and any other maintenance and inspection tasks that are a part of such checks under Lessee's Maintenance Program, including corrosion prevention and control inspections and any aging aircraft inspections as applicable, all in accordance with the Manufacturer's Maintenance Program.

"Commencement Date" shall mean the date when the Lease Supplement is executed and delivered by Lessee evidencing Lessee's final acceptance of the Aircraft and establishing the commencement of the Term.

"Contract of Sale" shall have meaning given to such term in the Cape Town Convention.

"Cycle" shall mean (a) with respect to the Airframe and the Landing Gear, any combination of a take off and the next subsequent landing of the Airframe, or (b) with respect to any Engine, any combination of a take off and the next subsequent landing of any airframe on which such Engine is installed.

"Default" shall mean an event which would constitute an Event of Default but for the lapse of time or the giving of notice or both.

"Delivery Condition" shall mean the condition that the Aircraft is to be in when delivered by Lessor to Lessee under this Lease as specified in **Exhibit E**.

"Delivery Date" shall mean December 21, 2018. "Delivery Location" shall mean the location where Lessee has accepted the Aircraft.

"Demonstration Flight" shall mean the demonstration flight specified in Section 16.6.2.

"Discrepancy" or "Discrepancies" means any discrepancies in relation to the Aircraft solely related to the Delivery Condition set forth in Exhibit E or the Return Condition as set forth in

Section 16, as reasonably determined by (i) the Lessee in connection with the Delivery of the Aircraft in accordance with Exhibit E, or (ii) the Lessor in connection with the return of the Aircraft in accordance with Section 16, and which is noted in writing as a Discrepancy.

"Dollars or $" shall mean lawful currency of the United States of America.

"DOT" shall mean the United States Department of Transportation or any successor thereto.

"Engine" shall mean each of the engines identified as to manufacturer, type and manufacturer serial number in **Exhibit A**, together with any and all Parts incorporated or installed in or attached thereto and any and all Parts removed therefrom so long as title thereto remains vested in Lessor in accordance with the terms of Section 9 after removal from such Engine. "Engine" shall include any Substitute Engine which may from time to time be substituted therefor pursuant to and in accordance with the terms of this Lease, including, without limitation, Section 11. Except as otherwise set forth herein, at such time as a Substitute Engine shall be so substituted, such replaced Engine shall cease to be an Engine hereunder. The term "Engines" shall mean, as of any date of determination, all Engines then leased hereunder.

"Engine Manufacturer" shall mean the manufacturer of the Engines specified as such in **Exhibit C**.

"Lessee Event of Default" shall mean the occurrence of any of the events specified in Section 17.1.

"Lessor Event of Default" shall mean the occurrence of any of the events specified in Section 17.2.

"Expiration Date" shall mean the date specified as such in **Exhibit C** or such earlier date as this Lease may be terminated in accordance with the terms hereof.

"FAR" shall mean the Federal Aviation Regulations promulgated under the Federal Aviation Act, as amended and supplemented from time to time.

"Federal Aviation Act" shall mean 49 U.S.C. §40101 et. seq., as amended and as in effect on the date of this Lease, or any successor or substituted U.S. legislation at the time in effect and applicable.

"Final Inspection" shall mean the inspection of the Aircraft and Engines specified in Section 16.6.3.

"Flight Hour" shall mean (a) with respect to the Airframe, any hour or any fraction of an hour measured from the time the wheels of the Airframe leave the ground until the wheels next touch the ground, (b) with respect to any Engine, any hour or any fraction of an hour measured from the time the wheels of any airframe on which such Engine is installed leave the ground until the wheels next touch the ground and (c) with respect to any Propeller, any hour or any fraction of an hour measured from the time the wheels of any airframe on which the related Engine is installed leave the ground until the wheels next touch the ground.

"Governmental Entity" shall mean and include: (a) the Aviation Authority; (b) any national, state, or local government (whether domestic or foreign) and any political subdivision thereof or local jurisdiction therein; (c) any board, commission, department, division, organ, instrumentality, court or agency of any entity specified in (a) or (b) above, however constituted; and (d) any association, organization or institution of which any entity specified in (b) or (c) above is a member or to whose jurisdiction any such entity is subject or in whose activities any such entity is a participant, but in each case (except for purposes of defining "Applicable

Law" above) only to the extent that any entity specified in (a) through (d) above has jurisdiction over this Lease or the Aircraft and its operations.

"Habitual Base" shall mean Anchorage, Alaska.

"IDERA" shall mean an irrevocable de registration and export request authorization substantially in the form annexed to the Cape Town Convention.

"Indemnitees" shall mean Lessor and its respective officers, directors, shareholders, controlling persons, agents, affiliates and employees, and their respective successors and assigns.

"Inspection Report" means the written report by Lessee setting forth any Discrepancies found during the Pre-Delivery Inspection in accordance with **Exhibit E** hereof.

"Interest Rate" shall mean the interest rate set forth as such in **Exhibit C**.

"International Interest" shall have the meaning given to such term in the Cape Town Convention.

"International Registry" shall mean the registry established pursuant to the Cape Town Convention.

"Jetstream" shall mean Jetstream Aviation Capital, LLC., an authorized representative of Lessor.

"Landing Gear" shall mean (a) all of the landing gear which is installed on the Airframe on the Delivery Date and which is listed in the Lease Supplement, whether or not from time to time installed on the Airframe or installed on any other airframe; (b) any and all Parts, so long as such Parts are incorporated in, installed on, attached to or appurtenant to such landing gear or so long as title to such Parts is vested in Lessor in accordance with the terms of Section 9 after removal from such landing gear, and (c) insofar as the same belong to Lessor, all substitutions, replacements or renewals from time to time made in or to such landing gear or to any of the items referred to in clauses (a) or (b) above or to any part of such items as required or permitted under this Lease.

"Late Fee" with respect to any late payment of Rent shall mean an amount equal to the sum of (a) 1% of such unpaid Rent plus (b) interest on such unpaid Rent at the rate of 12% per annum from the date such Rent was due to and including the date such Rent was paid.

"Lease Agreement," "this Lease Agreement," "this Lease," "this Agreement," "herein," "hereunder" or other like words shall mean this Lease and all Exhibits, the Lease Supplement and all amendments or modifications hereto or thereto from time to time entered into.

"Lease Identification" shall mean a placard in the form set forth in **Exhibit C**.

"Lease Supplement" shall mean the Lease Supplement substantially in the form of **Exhibit D** to be entered into between Lessor and Lessee on the Delivery Date of the Aircraft for the purpose of leasing the Aircraft under and pursuant to the terms of this Lease Agreement and any subsequent Lease Supplement entered into in accordance with the terms hereof.

"Lessee's Maintenance Program" shall mean Lessee's maintenance program for Saab 2000 aircraft, as amended from time to time, which is and shall at all times during the Term of this Lease remain approved by the Aviation Authority.

"Lessee's Operations Specifications" shall mean Lessee's FAR Part 121 Operations Specifications.

"Lessor's Interest" shall mean all estate, right, title and interest of Lessor in and to the Aircraft, the Lease, the Lease Supplement, any bill of sale, any warranty with respect to the Airframe or

the Engines, and all amounts of Basic Rent and Supplemental Rent, including, without limitation, insurance proceeds and requisition, indemnity or other payments of any kind for or with respect to the Aircraft.

"Lessor's Liens" shall mean Liens on the Aircraft or Lessor's Interest (a) arising as a result of claims against Lessor or Lessor's Interest not related to the transactions contemplated by this Lease, (b) arising as a result of acts or omissions of Lessor which are either not related to transactions contemplated by, or permitted under, this Lease, or prohibited under this Lease Agreement; (c) granted by Lessor to any Lessor Lender (d) arising as a result of claims against Lessor with respect to any loss, damage, or claim against which Lessee is not required to indemnify Lessor pursuant to this Lease Agreement; or (e) claims against Lessor arising out of any transfer by Lessor of all or any portion of Lessor's Interest, including without limitation as security for indebtedness, other than the transfer of the Aircraft pursuant to Sections 11 and 12 hereof or pursuant to the exercise of remedies set forth in Section 18.

"Lien" shall mean any mortgage, pledge, lien, charge, encumbrance, hypothecation, lease, exercise of rights, security interest, International Interest, Prospective International Interest, Non-consensual Right or Interest or claim (including any imposed with respect to any Taxes or any airport or landing fees or related charges).

"Life" of an LLP shall mean the time/cycles between scheduled overhaul or replacement of such LLP determined by reference to the Manufacturer's Maintenance Program.

"Life Remaining" of an LLP at any given time shall mean the time/cycles remaining until the next scheduled overhaul or replacement of such LLP determined by reference to the Manufacturer's Maintenance Program.

"LLP" shall mean life-limited Part.

"Maintenance Contribution" shall have the meaning set forth in **Exhibit C**.

"Maintenance Contribution Request" shall have the meaning set forth in **Exhibit C**.

"Maintenance Credits" shall have the meaning set forth in **Exhibit C**.

"Maintenance Event" shall have the meaning set forth in **Exhibit C**.

"Maintenance Provider" shall have the meaning set forth in **Exhibit C**.

"Maintenance Reserves" shall have the meaning set forth in **Exhibit C**.

"Major Damage" shall mean any damage to the Aircraft or any part thereof (a) which required, requires or would have required (if the Aircraft had been registered on the FAA registry) an FAA Form 337 to be completed in respect of the repair if completed by a repair station other than the manufacturer; (b) where the repair of which requires any deviation from the original approved manufacturer aircraft build specification or standard production configuration; (c) which requires recurring inspections after repair of the damage, or (d) which would constitute a major repair or alteration as defined by 14 C.F.R. Part 43, Appendix A.

"Manufacturer" shall mean the manufacturer of the Airframe specified as such in **Exhibit C**.

"Manufacturer's Maintenance Program" shall mean Manufacturer's maintenance program for Saab 2000, as amended from time to time, which is and shall at all times during the Term of this Lease remain approved by the Aviation Authority.

"Material Adverse Event" means any change, effect or circumstance that, in the reasonable opinion of the Lessor, is, or would reasonably be expected to be, materially adverse to (a) the

business, assets, financial condition or results of operations of the Lessee and its subsidiaries, taken as a whole, (b) the ability of the Lessee or its subsidiaries to perform their respective obligations under the Related Leases; provided, however, that none of the following will be deemed to constitute a Material Adverse Event or be considered in determining whether a Material Adverse Event has occurred or will occur: any event, circumstance, condition, development, change or occurrence arising out of, resulting from or relating to (i) the economy or the airline industry or scheduled services business (including, without limitation, changes in commodity prices, fuel prices, general market prices and regulatory changes) that do not have a disproportionate effect on the Lessee, taken as a whole [for the avoidance of doubt and not by way of limitation, in the event that the above events have a negative impact of the major U.S. Part 121 air carriers, but no such impact on Lessee, then such would not be a Material Adverse Event] or (ii) the announcement or consummation of this Lease and the Related Leases.

"Non-consensual Right or Interest" shall have the meaning given to such term in the Cape Town Convention.

"Operational Control" shall mean, with respect to a flight, the exercise of authority over initiating, conducting or terminating the flight.

"Parts" shall mean all appliances, components, parts, instruments, appurtenances, avionics, accessories, furnishings, propeller gear boxes and other equipment of whatever nature (other than complete Engines or engines but including Propellers and Landing Gear), which may now or from time to time be incorporated or installed in or attached to the Airframe or any Engine. Except as otherwise set forth herein, only at such time as a replacement part shall be substituted for a Part in accordance with Section 9 shall the Part so replaced cease to be a Part hereunder.

"Payment Location" shall mean the account specified as such in **Exhibit C** or such other account as specified in writing by Lessor to Lessee from time to time.

"Permitted Lien" shall mean: (a) any Lessor Lien and (b) any of the following Liens as long as the continued existence of such Lien does not involve any danger of the sale, forfeiture or loss of the Aircraft or any other part of Lessor's Interest or of criminal liability on the part of Lessor: (i) any Lien for Taxes which are either not assessed or, if assessed, are not yet due and payable or are being contested in good faith by appropriate proceedings ; or (ii) any undetermined or inchoate Lien of materialmen, mechanics, workmen, repairers, carriers, hangarkeepers, material suppliers or other similar Lien arising in the ordinary course of Lessee's business (including those arising under maintenance agreements entered into in the ordinary course of business) in respect of obligations which are not overdue or which have been adequately bonded or are being contested in good faith by appropriate proceedings; or (iii) any Lien with respect to which Lessee shall have provided an adequate bond or adequate reserves.

"Person" shall mean and include any individual, corporation, company, limited liability company, partnership, firm, joint stock company, joint venture, trust, estate, unincorporated organization, association or Governmental Entity.

"Propeller" shall mean each of the propellers being identified as to manufacturer, type and manufacturer serial number in **Exhibit A**, including any Substitute Propeller which may from time to time be substituted therefor pursuant to and in accordance with the terms of this Lease, including, without limitation, Section 11; together in each case with any and all Parts incorporated or installed in or attached thereto and any and all Parts removed therefrom so long as title thereto remains vested in Lessor in accordance with the terms of Section 9 after removal from such propeller. Except as otherwise set forth herein, at such time as a Substitute Propeller

shall be so substituted, such replaced Propeller shall cease to be a Propeller hereunder. The term "Propellers" shall mean, as of any date of determination, all Propellers then leased hereunder.

"Prospective International Interest" shall have the meaning given to such term in the Cape Town Convention.

"Protocol" shall mean the official English language text of the Protocol to the Convention on International Interests in Mobile Equipment on matters specific to Aircraft Equipment, adopted on November 16, 2001 at a diplomatic conference held in Cape Town, South Africa, as the same may be amended or modified from time to time, which is sometimes also referred to as the "Aircraft Equipment Protocol."

"Redelivery Receipt" shall mean the redelivery receipt specified in Section 16.6.5.

"Related Aircraft" shall mean those certain Saab 2000 listed on **Exhibit C** attached hereto.

"Related Leases" shall mean the certain Aircraft Lease Agreements between the Lessee and the Related Lessors with respect to the Related Aircraft.

"Related Lessors" means JAH2015AN681PA, LLC, JAH2015AN682PA, LLC, Wells Fargo Trust Company, National Association, not in its individual capacity but solely as Owner Trustee under the Trust Agreement (N687PA), and Wells Fargo Trust Company, National Association, not in its individual capacity but solely as Owner Trustee under the Trust Agreement (N686PA).

"Registerable Interests" shall mean all existing and prospective international interests and other interests, rights and/or notices, sales and prospective sales, assignments, subordinations and discharges, in each case, susceptible to being registered at the International Registry pursuant to the Cape Town Convention.

"Renewal Option" shall have the meaning set forth in Section 21.

"Renewal Term" shall have the meaning set forth in Section 21.

"Rent" shall mean Basic Rent.

"Return Location" shall mean an airport selected by Lessor in Canada or the U.S.A.

"Return Occasion" shall mean any return of possession of the Aircraft to Lessor upon the Expiration Date or Lessor's taking possession of the Aircraft pursuant to Section 18.

"Rolls Royce Agreement" shall mean the Total Care Agreement between Lessee and Rolls Royce with respect to the Engines which shall be entered into as soon as reasonably possible following the execution of this Lease Agreement.

"Security Deposit" shall mean the amount specified as such in **Exhibit C**.

"State of Registration" shall mean country specified as such in **Exhibit C**.

"Substitute Engine" shall mean an engine of the same manufacturer and model and having the same or better value, utility, modification status and remaining useful life (including with respect to LLP's) as the Engine it is intended to replace hereunder as specified in Section 11.2.

"Substitute Propeller" shall mean a propeller of the same manufacturer and model and having the same or better value, utility, modification status and remaining useful life (including with respect to LLP's) as the Propeller it is intended to replace hereunder as specified in Section 11.2.

"Supplemental Rent" shall mean any and all amounts, liabilities and obligations (other than Basic Rent and Maintenance Reserves) which Lessee assumes or agrees to pay hereunder to

Lessor or any Lessor Lender, including without limitation: (a) any payment of Casualty Value; (b) any payment of indemnity required by Section 10 or Section 13; and (c) to the extent permitted by Applicable Law, the Late Fee for any installment of Basic Rent not paid on the due date thereof and for any Supplemental Rent not paid when due hereunder, until the same is paid.

"Taxes" shall mean any and all sales, use, business, gross income, personal property, transfer, fuel, leasing, occupational, value added, excess profits, excise, gross receipts, franchise, stamp, ad valorem, income, levies, imposts, customs, import and export, withholdings, goods and services, or other taxes, excises, or duties of any nature whatsoever, together with any penalties, fines, charges or interest thereon.

"Term" shall mean the term of this Lease which shall commence on the Commencement Date and which shall end on the Expiration Date.

## SECTION 2.  AGREEMENT AND CONDITIONS TO LEASE

2.1     Agreement to Lease.  Lessor hereby agrees to lease the Aircraft to Lessee, and Lessee hereby agrees to lease the Aircraft from Lessor, subject to and in accordance with the terms hereof, as supplemented by the Lease Supplement. At all times during the Term of this Lease, the Aircraft shall be under the exclusive care, custody and control of Lessee, and Lessee will be responsible for the condition, maintenance, use, operation and airworthiness of the Aircraft. Lessee acknowledges that, subject to Lessor's rights under this Lease, including, without limitation, as provided in Sections 3.3, 16 and 18, Lessor shall have no responsibility for maintenance, management, operations, care, custody or control of the Aircraft (including, without limitation, provision of pilots or crew or provision of insurance as required herein), all of which shall be Lessee's sole responsibility.

2.2     Lessor Conditions to Lease.  Lessor's obligation to lease the Aircraft to Lessee shall be subject to and conditioned upon the satisfaction of all of the following conditions on or before the Commencement Date, all of which shall be delivered and reasonably satisfactory to Lessor in form and substance:

2.2.1    duly executed originals of this Lease and the Lease Supplement,

2.2.2    the Security Deposit;

2.2.3    the first installment of Basic Rent;

2.2.4    a copy of Lessee's articles of organization containing all amendments and additions, a certificate of good standing issued by the State of Lessee's incorporation, as well as an officer's certificate evidencing due authority of Lessee for the execution, delivery and performance of this Lease and all other documents related thereto to which it is a party;

2.2.5    a copy of Lessee's Operating Certificate and Lessee's Operations Specifications and any other documentation or authority pursuant to which the Aircraft will be operated, together with evidence that the same is valid and in compliance with the requirements of the Aviation Authority;

2.2.6    a certificate signed by a duly authorized officer of Lessee, dated as of the Commencement Date, stating that: (i) the representations and warranties contained in Section 5.3 are true and accurate on and as of such date as though made on and as of such time, and (ii) no event has occurred and is continuing, or would result from the execution,

delivery and performance by Lessee of this Lease which constitutes a Lessee Event of Default;

2.2.7  an opinion or report, dated the Commencement Date, signed by an Approved Insurance Broker as to the due compliance with the insurance provisions of Section 12 with respect to the Aircraft in form and substance reasonably satisfactory to Lessor and any Lessor Lender;

2.2.7  certificates of an Approved Insurance Broker evidencing the insurance as required by Section 12 in form and substance reasonably satisfactory to Lessor and any Lessor Lender;

2.2.8  a legal opinion from Crowe and Dunlevy, or another mutually agreeable FAA counsel, as to all required filings under Applicable Law with Governmental Entities, recordation and registration of the Lease with the FAA, and such other matters as may reasonably be requested by Lessor, in form and substance reasonably satisfactory to Lessor and any Lessor Lender;

2.2.9  all of the representations and warranties of the Lessee set forth in this Lease and in any other document or agreement executed and/or delivered in connection herewith shall be true and correct in all respects;

2.2.11  Lessee and the Related Lessor shall have entered into the Related Leases, and no Lessee Event of Default (as each such term is defined in the Related Leases) shall have occurred and be continuing thereunder;

Lessee acknowledges and agrees that (i) any action (other than an express, written waiver) by Lessor prior to the satisfaction of all of the preceding conditions shall not constitute a waiver by Lessor of any such condition, and (ii) Lessee shall be irrevocably obligated to satisfy all of such conditions prior to the Commencement Date, subject to the other terms and conditions hereof or as otherwise mutually agreed by the Parties.

In the event that all of the Lessee Conditions to Lease set forth in Section 2.3 of this Agreement have been satisfied with respect to the Aircraft, but Lessee fails to accept delivery of the Aircraft, for reasons unrelated to a breach or default by Lessor, Lessee will cause the return the Aircraft to an airport and facility designated by Lessor in the continental U.S. at Lessee's sole cost.

2.3  Lessee Conditions to Lease.  Lessee shall accept the Aircraft hereunder from Lessor upon the receipt by Lessee of the following items on or before the Commencement Date, all of which shall be reasonably delivered and satisfactory to Lessee in form and substance, and duly authorized and executed:

2.3.1  this Lease and the Lease Supplement;

2.3.2  tender of the Aircraft and the Aircraft Documents for delivery in the condition required by this Lease;

2.3.3  a certificate of good standing issued by the state of Lessor's incorporation;

2.3.4  a certificate from an authorized officer of Lessor evidencing due authority of Lessor for the execution, delivery and performance of this Lease and all other documents related thereto;

2.3.5  all of the representations and warranties of the Lessor set forth in this Lease and in any other document or agreement executed and/or delivered in connection herewith shall be true and correct in all respects;

2.3.6   Lessee shall have conducted a Pre-Delivery Inspection of the Aircraft and the Aircraft Documents, and the Aircraft and Aircraft Documents are reasonably satisfactory to the Lessee

2.3.7   Lessee and the Related Lessor shall have entered into the Related Leases and no Lessor default shall have occurred and be continuing thereunder.

Lessor acknowledges and agrees that (i) any action (other than an express, written waiver) by Lessee prior to the satisfaction of all of the preceding conditions shall not constitute a waiver by Lessee of any such condition, and (ii) Lessor shall be irrevocably obligated to satisfy all of such conditions prior to the Commencement Date, subject to the other terms and conditions hereof or as otherwise mutually agreed by the Parties.

## SECTION 3.  DELIVERY AND ACCEPTANCE; EFFECTIVE DATE; TERM

3.1   Delivery.   The Lessor will make the Aircraft available for delivery on or about the Delivery Date in compliance with the Delivery Condition set forth in **Exhibit E**.

3.2   Place of Delivery and Acceptance.   The Aircraft shall be delivered to and accepted by Lessee at the Delivery Location. If Lessee fails to be present on the date scheduled for delivery of the Aircraft or fails to deliver to Lessor the Lease Supplement duly signed by Lessee within three (3) Business Day following tender of the Aircraft by Lessor to Lessee in compliance with the Delivery Condition set forth in **Exhibit E**, such failure shall be an Lessee Event of Default and, in addition to any other rights and remedies available to Lessor (each of which is hereby expressly reserved), Lessor will retain the Security Deposit.

3.3   Casualty to the Aircraft Preceding Delivery; Force Majeure.   In the event of a Casualty Occurrence with respect to the Aircraft prior to its delivery, the obligation of Lessor to make the Aircraft available to Lessee, the obligation of Lessee to lease the Aircraft from Lessor and this Lease, including all obligations set forth herein, shall terminate.   In such event, Lessor shall promptly notify Lessee in writing of the Casualty Occurrence and promptly return to Lessee any monies paid by Lessee to Lessor hereunder, including, without limitation, the Security Deposit. Notwithstanding anything to the contrary contained in this Lease, neither party shall be liable to the other for any delay in performance, including in delivery of the Aircraft, or failure to deliver the Aircraft, caused by a Force Majeure (including, without limitation, an act of God, a labor disturbance and fire, flood, hurricane, earthquake or other natural disaster) or caused by an act of any Governmental Entity, provided however, that the failure of the Aircraft to meet FAA requirements to enable Lessee to operate the Aircraft in regularly scheduled operations under Part 121 shall not been considered a Force Majeure excusing Lessor's obligations to deliver the Aircraft to Lessee in compliance with the Delivery Conditions set forth in **Exhibit E**.

3.4   Acceptance of Aircraft.   The Aircraft to be leased hereunder shall be delivered to Lessee as specified in this Lease and otherwise "AS IS, WHERE IS" and SUBJECT TO EACH AND EVERY DISCLAIMER OF WARRANTY AND REPRESENTATION AS SET FORTH IN SECTION 5.1.   Upon tender of delivery of the Aircraft by Lessor to Lessee in full compliance with Lessor's obligations pursuant to this Lease, including but not limited to the Delivery Condition set forth in **Exhibit E,** Lessee shall immediately accept the Aircraft, and shall indicate and confirm its acceptance of the Aircraft by executing and delivering to Lessor the Lease Supplement.

3.5   Effective Date and Term of Lease.   The effective date of this Lease shall be the Commencement Date and the Term shall continue until the Expiration Date; provided that this

Lease may be earlier terminated by Lessor pursuant to the provisions of Section 3.3 or Section 18.

## SECTION 4.  RENT

4.1     Rent. Lessee covenants and agrees to pay to Lessor, or its permitted assigns or whoever shall be entitled thereto, the following as Rent:

     4.1.1    all Basic Rent and Maintenance Reserves as set forth in **Exhibit C**; and

     4.1.2    any and all Supplemental Rent as the same becomes due.

4.2     Place and Method of Payment. All Basic Rent, Maintenance Reserves and Supplemental Rent payable under this Lease shall be paid in U.S. Dollars by wire transfer of immediately available funds at the Payment Location. If any payment hereunder is due on a day that is not a Business Day, such payment may be made on the next Business Day thereafter.

4.3     Net Lease, Prohibition Against Setoff, Counterclaim, Etc. This Lease is a net lease. Lessee's obligation to pay all Rent hereunder shall be absolute and unconditional and shall not be affected or reduced by any circumstances or contingencies whatsoever, including, without limitation: (a) any setoff, offset, counterclaim, recoupment, defense or other right which Lessee may have against Lessor, the Manufacturer, any seller of or Person providing services with respect to the Aircraft or any other Person, for any reason whatsoever; (b) any defect in the airworthiness or registration under Applicable Law, or any condition, design, operation, merchantability or fitness for use of, or any damage to or loss or destruction of, the Aircraft, or any interruption, unavailability or cessation in the use or possession thereof by Lessee for any reason whatsoever, whether arising out of or related to an act or omission of Lessee, or any other Person; (c) any Liens, Lessor Liens, or Permitted Liens with respect to the Aircraft; (d) the invalidity or unenforceability or lack of due authorization or other infirmity of this Lease or any absence of right, power or authority of Lessee to enter into this Lease; (e) any insolvency, bankruptcy, reorganization or similar proceedings by or against Lessor, Lessee or any other Person; (f) any other circumstance or happening of any nature whatsoever, whether or not similar to any of the foregoing; or (g) any Taxes (with respect to which Lessee's obligations shall be as set forth in Section 10); it being the express intention of Lessor and Lessee that all Rent payable hereunder shall be payable in all events, unless the obligation to pay the same shall be terminated pursuant to the express provisions of this Lease. Nothing in this Section shall be construed (1) to preclude Lessee from bringing any suit at law or in equity which it would otherwise be entitled to bring for breach by Lessor of any representation, warranty, or covenant hereunder, or (2) as a waiver of or consent to any act or failure to act by any person except as otherwise expressly provided in this Lease.

4.4     Security Deposit.

     4.4.1    Upon the execution of this Agreement, Lessee shall deliver to Lessor a Security Deposit (the "Security Deposit") in the amount of One Hundred Fifty Thousand ($150,000) Dollars. The Security Deposit shall be held by Lessor as security for the timely and faithful performance by Lessee of all of Lessee's obligations under the Lease. Lessee hereby grants Lessor a continuing security interest therein. Lessee agrees to execute and file with the appropriate Governmental Authorities any and all documents necessary or reasonably requested by Lessor to evidence and perfect such security interest in favor of Lessor.

4.4.2   If Lessee fails to pay Rent hereunder or to pay any other sums due or to perform any of the other terms and provisions of this Lease or a Lessee Event of Default has otherwise occurred and is continuing hereunder, in addition to all other rights Lessor shall have hereunder and under the any applicable Law (each of which is hereby expressly reserved), Lessor may use, apply or retain all or any portion of the Security Deposit in full or partial payment for sums due to Lessor by Lessee under the terms and conditions of this Lease.  If Lessor uses or applies all or any portion of such Security Deposit, such application shall not be deemed a cure of any Default, and Lessee shall within five (5) Business Days after written demand therefor to deposit with Lessor in immediately available funds an amount sufficient to fully restore the Security Deposit to its original sum and the failure of Lessee to do so shall be a material breach of this Lease by Lessee.

4.4.3   Provided no Lessee Event of Default has occurred and is continuing under this Lease and Lessee has otherwise complied with all of its obligations under this Lease (including, without limitation, the return of the Aircraft in the condition required by Section 16), the Security Deposit shall be returned to Lessee upon Lessee's return of the Aircraft in compliance with Section 16.

4.4.4   In the event this Lease Agreement is terminated pursuant to Section 3.3 by reasons of a Casualty Occurrence with respect to the Aircraft, the Security Deposit shall be returned to Lessee within five (5) Business Days of such termination.

4.4.5   Lessor need not maintain the Security Deposit in a segregated account and may commingle the Security Deposit with Lessor's other funds.

4.4.6   Interest, if any, accruing on the Security Deposit shall be for Lessor's account.

4.4.7   Provided no Lessee Event of Default has occurred and is continuing under this Lease and Lessee has otherwise complied with all of its obligations under this Lease in the first twelve (12) months of operation under the Lease, Lessor shall credit one (1) month of deposit ($50,000) toward the thirteenth (13th) month base rent or a subsequent month at Lessee's option.

## SECTION 5.  REPRESENTATIONS AND WARRANTIES

5.1   LESSOR REPRESENTATIONS AND WARRANTIES

5.1.1   DISCLAIMER AND WAIVER.  UPON DELIVERY AND ACCEPTANCE OF THE AIRCRAFT, LESSOR HAS NOT MADE AND SHALL NOT BE DEEMED TO HAVE MADE (WHETHER BY VIRTUE OF HAVING LEASED THE AIRCRAFT UNDER THIS LEASE, OR HAVING ACQUIRED THE AIRCRAFT, OR HAVING DONE OR FAILED TO DO ANY ACT, OR HAVING ACQUIRED OR FAILED TO ACQUIRE ANY STATUS UNDER OR IN RELATION TO THIS LEASE OR OTHERWISE), AND LESSOR HEREBY SPECIFICALLY DISCLAIMS, ANY REPRESENTATION OR WARRANTY, EXPRESS OR IMPLIED (EXCEPT AS HEREIN BELOW PROVIDED IN THIS SECTION 5.1), AS TO AIRWORTHINESS, CONDITION, DESIGN, OPERATION, MERCHANTABILITY, FREEDOM FROM CLAIMS OF INFRINGEMENT OR THE LIKE, OR FITNESS FOR USE FOR A PARTICULAR PURPOSE, OF THE AIRCRAFT, OR AS TO THE QUALITY OF THE MATERIAL OR WORKMANSHIP OF THE AIRCRAFT, THE ABSENCE THEREFROM OF LATENT OR OTHER DEFECTS, WHETHER OR NOT DISCOVERABLE, OR AS TO ANY OTHER REPRESENTATION OR WARRANTY WHATSOEVER, EXPRESS OR IMPLIED (INCLUDING ANY IMPLIED WARRANTY ARISING FROM A COURSE OF PERFORMANCE OR DEALING OR USAGE OF TRADE), WITH RESPECT TO THE AIRCRAFT.

(INITIALS OF LESSEE: N|a ) LESSEE HEREBY WAIVES, RELEASES, RENOUNCES AND DISCLAIMS EXPECTATION OF OR RELIANCE UPON ANY SUCH WARRANTY OR WARRANTIES. LESSOR SHALL NOT HAVE ANY RESPONSIBILITY OR LIABILITY WHATSOEVER TO LESSEE OR ANY OTHER PERSON, WHETHER ARISING IN CONTRACT OR TORT, OUT OF ANY NEGLIGENCE OR STRICT LIABILITY OF LESSOR OR OTHERWISE, FOR: (a) ANY LIABILITY, LOSS OR DAMAGE CAUSED OR ALLEGED TO BE CAUSED, DIRECTLY OR INDIRECTLY, BY THE AIRCRAFT OR ANY ENGINE OR BY ANY INADEQUACY THEREOF OR DEFICIENCY OR DEFECT THEREIN OR BY ANY OTHER CIRCUMSTANCE IN CONNECTION THEREWITH; (b) THE USE, OPERATION OR PERFORMANCE OF THE AIRCRAFT OR ANY ENGINE OR ANY RISKS RELATING THERETO; (c) ANY INTERRUPTION OF SERVICE, LOSS OF BUSINESS, ANY ANTICIPATED PROFITS, ANY INCIDENTAL DAMAGES, ANY CONSEQUENTIAL DAMAGES OR ANY PUNITIVE DAMAGES; OR (d) THE DELIVERY, OPERATION, SERVICING, MAINTENANCE, REPAIR, IMPROVEMENT OR REPLACEMENT OF THE AIRCRAFT.

THE WARRANTIES AND REPRESENTATIONS SET FORTH IN THIS SECTION 5.1 ARE EXCLUSIVE AND IN LIEU OF ALL OTHER REPRESENTATIONS OR WARRANTIES WHATSOEVER, EXPRESS OR IMPLIED, AND LESSOR SHALL NOT BE DEEMED TO HAVE MADE ANY OTHER WARRANTIES, EXCEPT THAT LESSOR REPRESENTS AND WARRANTS THAT:

5.1.2   Lessor is a limited liability company  duly organized and validly existing under the laws of the State of Delaware, is duly qualified in each jurisdiction in which failure to so qualify may have a material adverse effect of its financial condition or its ability to perform its obligations under this Lease and has the full power and authority to carry on its business as presently conducted and to perform its obligations under this Lease;

5.1.3   this Lease has been duly authorized by all necessary action on the part of Lessor and does not require any approval of the members of owners of Lessor, and neither the execution and delivery hereof nor the consummation of the transactions contemplated hereby nor compliance by Lessor with any of the terms and provisions hereof will contravene any Applicable Law or result in any breach of, or constitute any default under or result in the creation of any Lien upon any property of Lessor under, Lessor's articles of organization or bylaws or any credit agreement or instrument or other agreement or instrument to which Lessor is a party or by which Lessor or its properties or assets are bound or affected;

5.1.4   no consent, approval or authorization of, or notice to, any Governmental Entity having jurisdiction with respect to the execution, delivery or performance by Lessor of this Lease (including all monetary and other obligations hereunder) is required for Lessor to execute and deliver this Lease and to perform the transactions contemplated hereby;

5.1.5   this Lease has been duly executed and delivered by Lessor, and this Lease and the Lease Supplement, when executed and delivered by Lessor, constitute legal, valid and binding obligations of Lessor, enforceable in accordance with their respective terms, except as may be limited by bankruptcy, insolvency, reorganization, moratorium or other similar laws affecting the enforcement of creditors' rights generally, and, to the extent that certain remedies require or may require enforcement by a court of equity, by such principles of equity (regardless of whether such enforceability is considered in a proceeding in equity or at law) as a court having jurisdiction may impose and by laws which may affect some of such remedies;

5.1.6   there are no suits or proceedings pending or, to the knowledge of Lessor, threatened in any court or before any Governmental Entity against or affecting Lessor or

the Aircraft which would, if adversely determined, have a materially adverse effect on the Lessor's ability to perform its obligations under any of this Lease;

5.1.7    except for (i) the registration on the aircraft registry maintained by the Aviation Authority, (ii) the placing on the Aircraft and on each Engine of the plates containing the legends referred to in Section 6.6, (iii) the filing of this Lease for recordation with the Aviation Authority and the International Registry and (iv) the execution and filing of any precautionary filings as are requested by Lessor, no further filing or recording of this Lease or of any other document and no further action is necessary under the Laws of any Governmental Entity in order to fully protect and establish Lessor's title to the Aircraft as against Lessee or any third party;

5.1.8    The Lessor has performed in all material respects all obligations and agreements, and complied in all material respects with each of the covenants and conditions, contained in the Related Leases to be performed or complied with by it prior to or on the date hereof.

5.1.9    The representations and warranties of Lessor herein shall survive the execution of this Lease.  The representations and warranties of Lessor herein will be deemed to be repeated by Lessor on Delivery with reference to the facts and circumstances then existing.

5.2    Assignment of Manufacturers' Warranties.  So long no Lessee Event of Default has occurred and is continuing and Lessor has not terminated this Lease, Lessor hereby assigns to Lessee, for the Term of this Lease, such rights as Lessor may have under any warranty, express or implied, with respect to the Aircraft and the Engines made by the Manufacturer, the Engine Manufacturer or any other Person (including Rolls Royce and any Approved Maintenance Provider) to the extent that the same exist and may be assigned by Lessor or otherwise made available to Lessee.  Any monies recovered by Lessee pursuant to such warranties shall be applied to correct or cure the related defect or deficiency of the Aircraft; the balance, if any, of such monies shall be applied to reimburse Lessee for any amounts paid by it to correct or cure such related defect or deficiency; and the final balance, if any, of such monies shall be paid to Lessor.  If a Lessee Event of Default has occurred and is continuing, all such rights shall immediately revert to, and all such monies shall be paid over to, Lessor including all claims thereunder, whether or not perfected. Upon the cure of any such Lessee Event of Default, and provided that Lessor is not then pursuing any other remedies in respect thereof, then such rights shall once again revert to Lessee.

5.3    Lessee's Representations and Warranties.  Lessee hereby represents and warrants the following, each of which shall survive the execution and delivery of this Lease, and the delivery by Lessor and acceptance by Lessee of the Aircraft:

5.3.1    Lessee is a corporation duly incorporated and validly existing under the laws of the State of Delaware, is duly qualified in each jurisdiction in which failure to so qualify may have a material adverse effect of its financial condition or its ability to perform its obligations under this Lease and has the full power and authority to carry on its business as presently conducted and to perform its obligations under this Lease;

5.3.2    this Lease has been duly authorized by all necessary action on the part of Lessee and does not require any approval of stockholders of Lessee, and neither the execution and delivery hereof nor the consummation of the transactions contemplated hereby nor compliance by Lessee with any of the terms and provisions hereof will contravene any

Applicable Law or result in any breach of, or constitute any default under or result in the creation of any Lien upon any property of Lessee under, Lessee's articles of incorporation or bylaws or any credit agreement or instrument or other agreement or instrument to which Lessee is a party or by which Lessee or its properties or assets are bound or affected;

5.3.3    no consent, approval or authorization of, or notice to, any Governmental Entity having jurisdiction with respect to the execution, delivery or performance by Lessee of this Lease (including all monetary and other obligations hereunder) is required for Lessee to execute and deliver this Lease and to perform the transactions contemplated hereby;

5.3.4    this Lease has been duly executed and delivered by Lessee, and this Lease and the Lease Supplement, when executed and delivered by Lessee, constitute legal, valid and binding obligations of Lessee, enforceable in accordance with their respective terms, except as may be limited by bankruptcy, insolvency, reorganization, moratorium or other similar laws affecting the enforcement of creditors' rights generally, and, to the extent that certain remedies require or may require enforcement by a court of equity, by such principles of equity (regardless of whether such enforceability is considered in a proceeding in equity or at law) as a court having jurisdiction may impose and by laws which may affect some of such remedies;

5.3.5    there are no suits or proceedings pending or, to the knowledge of Lessee, threatened in any court or before any Governmental Entity against or affecting Lessee or the Aircraft which would, if adversely determined, have a materially adverse effect on the current business or financial condition of Lessee or Lessee's ability to perform its obligations under any of this Lease;

5.3.6    except for (i) the registration on the aircraft registry maintained by the Aviation Authority, (ii) the placing on the Aircraft and on each Engine of the plates containing the legends referred to in Section 6.6, (iii) the filing of this Lease for recordation with the Aviation Authority and the International Registry and (iv) the execution and filing of any precautionary filings as are requested by Lessor, no further filing or recording of this Lease or of any other document and no further action is necessary under the Laws of any Governmental Entity in order to fully protect and establish Lessor's title to the Aircraft as against Lessee or any third party;

5.3.7    except for the rights of Lessee conferred by this Lease, Lessee shall not have, or claim to have, any other interest in the Aircraft or make any demands against Lessor in respect thereof;

5.3.8    the Lessee's Maintenance Program complies with all requirements of the Aviation Authority;

5.3.9    Lessee is a duly authorized and certified air carrier in good standing under Applicable Law, has satisfied all of the requirements of and is in good standing with the Aviation Authority, and has complied with and satisfied all requirements of the Aviation Authority, as applicable, so as to enable it to fulfill its obligations hereunder, and to otherwise lawfully operate, possess, use and maintain the Aircraft;

5.3.10    Lessee holds a Part 121 air carrier certificate, and is authorized to act as an On Demand and Scheduled Air Carrier in accordance with DOT and FARs, and in connection with such authority, has satisfied all of the requirements of and is in good standing with the Aviation Authority and the DOT, and has complied with and satisfied

all requirements of the Aviation Authority and/or DOT, as applicable, so as to enable it to fulfill its obligations hereunder, and, subject to Lessor having delivered the Aircraft in full compliance with the Delivery Conditions set forth in **Exhibit E** and to the Aircraft being added to Lessee's Part 121 operations specifications, to otherwise lawfully operate, possess, use and maintain the Aircraft;

5.3.11  Lessee currently possesses and during the Term will continue to obtain and maintain all required and necessary economic and technical competency authority from all Governmental Entities having authority over those jurisdictions to which Lessee is presently operating aircraft and (subject to Lessor having delivered the Aircraft in full compliance with the Delivery Conditions set forth in **Exhibit E**) to which Lessee will operate the Aircraft;

5.3.12  Lessee shall make all payments and take all actions necessary to cause the Lease Agreement and the Rolls Royce Agreement to be in full force and effect during the Term;

5.3.13  There has been no Material Adverse Event related to the Lessee since the execution of this Lease Agreement; and

5.3.14  The Lessee has performed in all material respects all obligations and agreements, and complied in all material respects with each of the covenants and conditions, contained in the Related Leases to be performed or complied with by it prior to or on the date hereof.

5.3.15  The representations and warranties of Lessee herein shall survive the execution of this Lease.  The representations and warranties of Lessee herein will be deemed to be repeated by Lessee on Delivery and on each Basic Rent payment date with reference to the facts and circumstances then existing.

## SECTION 6.  POSSESSION, USE AND OPERATION

6.1    Possession.

6.1.1    Sublease, Assignment and Transfer. Lessee may, without the prior written consent of Lessor, sublease  the Aircraft  to any subsidiary or affiliate directly owned or controlled by Lessee, including Ravn Alaska or any affiliated or related entity of Ravn Alaska; *provided, however*, in the event the Owner Trustee does not provide timely consent of the sublease contemplated above, Lessor agrees to replace the Owner Trustee in a timely manner to support the Lessee's operations.  In all cases of any sublease, Lessee shall remain obligated to comply with all terms and conditions of the Lease, including, but not limited to, all financial obligations set forth herein. Otherwise, Lessee hereby covenants and agrees that, without the prior written consent of Lessor and all Lessor Lenders (which consent Lessor or any Lessor Lender may withhold in its sole discretion), Lessee will not, and hereby acknowledges and confirms that it has no right to, assign this Lease or sublease or transfer or part with possession, and shall not transfer or part with possession, of the Aircraft, Airframe, any Engine or any Propeller, or install any Engine or permit any Engine to be installed on any airframe other than the Airframe, or install any Propeller or permit any Propeller to be installed on any engine other than an Engine, *provided, however*, that so long as no Lessee Event of Default shall have occurred and be continuing and so long as the action to be taken shall not affect the registration of, Lessor's title to the Aircraft and so long as all necessary approvals of each Governmental Entity having jurisdiction over Lessee, and its operations, have been obtained, then Lessee may, without the prior written consent of Lessor or Lessor Lenders:

6.1.1    deliver possession of the Aircraft, the Airframe, any Engines, any Propeller or any Part thereof to the manufacturer thereof for testing or other similar purposes or to any Approved Maintenance Provider for inspection, service, repair, maintenance, testing or overhaul work thereon to the extent required or permitted by the terms of Section 7.1 and Section 9;

6.1.2    install an Engine on a Related Aircraft or install a Propeller on an engine installed on a Related Aircraft;

6.1.3    install an engine from a Related Aircraft or install a propeller from an engine installed on a Related Aircraft; and

6.1.4    install an engine (other than an Engine) on the Airframe, or a propeller (other than a Propeller) on an engine or an Engine, or a part (other than a Part) on the Aircraft, provided that such installation does not create, or permit to exist, any Liens on the Aircraft except those of the type permitted under Section 14 and those which apply only to such engine, propeller or part which has been installed on the Aircraft.

6.2    <u>Certain Limitations on Transfers</u>.  With respect to any transfer pursuant to Section 6.1:

6.2.1    the rights of any transferee that received possession by reason of a transfer permitted by this Section 6.1 shall be subject and subordinate to all of the terms of this Lease;

6.2.2    Lessee shall remain primarily liable hereunder for the performance of all terms of this Lease to the same extent as if such transfer had not occurred;

6.2.3    no relinquishment of possession of the Aircraft, the Airframe or any Engine pursuant to the terms of this Section 6.1 shall in any way discharge or diminish any of Lessee's obligations to Lessor hereunder; and

6.2.4    if any of the actions permitted under Section 6.1(a) shall result in the divestiture of Lessor's title in and to such Aircraft, Airframe, Engine, Propeller or Part, then Lessee shall comply with Section 11 in respect thereof.

6.3    <u>Operation of the Aircraft Generally</u>. Lessee shall:

6.3.1    comply in all material respects with all Applicable Law for the time being in force in any country or jurisdiction in which the Aircraft is being operated which is applicable to the Aircraft or the use and operation of the Aircraft;

6.3.2    not use the Aircraft in any manner contrary to any recommendation of the Aviation Authority or any applicable Manufacturer, contrary to any rule or regulation of the Aviation Authority or for any purpose for which the Aircraft is not designed or reasonably suitable;

6.3.3    use the Aircraft solely in commercial or other operations for which Lessee is duly authorized by the Aviation Authority and Applicable Law;

6.3.4    except as expressly permitted by Lessee's operational specifications and by the Aviation Authority and Applicable Law, not use the Aircraft for the carriage of:

6.3.4.1 any other goods, materials or items of cargo which could reasonably be expected to cause damage to the Aircraft and which would not be adequately covered by the Insurances; or

6.3.4.2 any illegal item or substance;

6.3.5   not utilize the Aircraft for purposes of training, qualifying or re-confirming the status of cockpit personnel except for the benefit of Lessee's cockpit personnel, and then only if the use of the Aircraft and the Related Aircraft for such purpose is not disproportionate to the use for such purpose of other aircraft of the same type operated by Lessee;

6.3.6   not (other than for bona fide safety reasons) cause or permit the Aircraft to proceed to, or remain at, any location which is for the time being the subject of a prohibition order (or any similar order or directive) by:

6.3.6.1 any U.S. Governmental Entity; or

6.3.6.2 any Governmental Entity having jurisdiction over Lessor, Lessee or the Aircraft;

6.3.7   not change the location of the Habitual Base of the Aircraft; and

6.3.8   not operate the Aircraft to, from or in any country that is the subject of sanctions under United Nations Security Council directives that prohibit use of the Aircraft.

6.4   <u>Lawful Insured Operations</u>.  Throughout the Term, Lessee shall ensure that the Aircraft is maintained, used and operated at all times in accordance with Applicable Law, including, without limitation, those relating to intoxicating liquors, narcotics or controlled substances, and in accordance with Lessee's Operations Specifications.  Lessee will not permit the Aircraft to be maintained, used or operated in violation of any airworthiness certificate, or license or registration issued by any Governmental Entity or contrary to the Manufacturer's operating manuals or instructions for the Aircraft. Lessee shall have Operational Control of the Aircraft under the applicable FAR's at all times during the term of the Lease. Lessee will add the Aircraft to, ensure that the Aircraft remains currently listed in, and operate the Aircraft only as authorized by, Lessee's Operations Specifications. Subject to Section 9.3, if any Applicable Law or Manufacturer's mandatory service bulletin requires alteration of the Aircraft, Lessee shall comply therewith at its sole cost and expense.

6.5   <u>Insured Operations</u>.  Lessee agrees not to operate the Aircraft, or permit the Aircraft to be operated: (a) unless the Aircraft is covered by insurance as required by the provisions hereof, or (b) contrary to the terms of such insurance.  The Aircraft will be operated at all times only by Lessee's currently certified flight crew having the minimum qualifications required by, and will be used only for the purposes and in the manner set forth in, the insurance policies issued pursuant to the requirements of this Lease.  Furthermore, Lessee agrees not to operate or locate the Aircraft or suffer or permit the Aircraft to be operated or located in any area excluded from coverage by any insurance policy issued pursuant to the requirements of this Lease.

6.6   <u>Registration and Licenses</u>.  At all times during the Term, Lessee shall cause the Aircraft to remain registered with the Aviation Authority in accordance with Applicable Law reflecting to that Lessor is the owner and lessor hereunder, and accomplish all such other filings as are required by Lessor, the Aviation Authority and Applicable Law.  Lessee will maintain in full force and effect during the Term a current operating certificate, air transport license and a current certificate of airworthiness for the type of operations conducted by Lessee, in accordance with Applicable Law and the requirements of the Aviation Authority.

6.7   <u>Lease Identification</u>.  Upon delivery of the Aircraft, Lessee shall cause the Lease Identification on a metal plate to be placed in the cockpit in a location reasonably adjacent to, and not less prominent than, the airworthiness certificate for the Aircraft and place the Lease Identification on a metal plate on each Engine.  Lessee agrees to make such changes to the Lease

Identification as Lessor may reasonably request in writing from time to time. Lessee shall not place or permit to be placed in or on the Airframe or any Engine or Part any other nameplates dealing with the rights of any Person other than Lessor Lender, but Lessee may cause Lessee's and/or Lessee's mainline carrier codeshare partner's tradename, colors and insignia to be placed on the Airframe and Engines.

## SECTION 7.  MAINTENANCE

7.1     Maintenance.  Lessee, at its own cost and expense, shall:

7.1.1   perform or cause an Approved Maintenance Provider to perform all inspections, repair, maintenance, overhaul and testing: (i) in compliance with all applicable rules and regulations of the Aviation Authority (including, without limitation, any airworthiness directives and mandatory service bulletins); (ii) in compliance with the Lessee's Maintenance Program, (iii) in compliance with the Manufacturer's and Engine Manufacturer's recommended maintenance programs and mandatory service bulletins where mandated by the Aviation Authority, including ageing aircraft, structural inspection and corrosion control programs; (iv) in the same manner and with the same care as is the case with similar aircraft and engines owned by or operated on behalf of Lessee without discrimination and otherwise in accordance with industry standards, and (v) so as to keep the Aircraft in as good operating condition as when delivered to Lessee, ordinary wear and tear excepted, with all systems in good operating condition;

7.1.2   keep the Aircraft in such condition to enable the airworthiness certification of the Aircraft to be maintained at all times under applicable regulations of the Aviation Authority and any other Applicable Law as is necessary to enable all certificates, licenses, permits and authorizations required for the use and operation of the Aircraft, Engines and Parts, (except when all aircraft of the same type and series as the Aircraft powered by engines of the same type and series as the Engines have been grounded by the Aviation Authority), including, without limitation, making any equipment modifications or installations required by the Aviation Authority required for commercial operations;

7.2.2   maintain, in the English language, all records, logs and other materials required by, and in accordance with, the requirements of **Exhibit G** and in a manner acceptable to the Aviation Authority and any other Governmental Entity having jurisdiction over the Aircraft and its operation;

7.2.3   maintain the Engines in a current and qualified status under the Rolls Royce Agreement, and, in accordance with the Saab 2000 program, perform all normal routine and non-routine line maintenance which can be performed while an Engine is mounted "on-wing," perform any other maintenance, inspection, repair or overhaul necessitated by foreign object damage or abuse or misuse and perform all non-routine maintenance work needed in order to maintain the Engines in as good operating condition as when delivered, reasonable wear and tear excepted; and

7.2.4   subject to the terms of this Lease, promptly procure the replacement of any Engine or Part which has become time, cycle or calendar expired, lost, stolen, seized, confiscated, destroyed, damaged beyond repair, unserviceable or permanently rendered unfit for use, with an engine or part complying with the conditions set forth in this Lease.

7.2     Maintenance of Engines; Rolls Royce Agreement.  Notwithstanding the provisions of Section 7.1 to the contrary, Lessee shall maintain the Rolls Royce Agreement in full force and

effect during the Term.  All maintenance and repairs required to maintain the Engines as required shall be performed by a duly qualified and licensed repair facility (including, to the extent applicable, the Lessee) at Lessee's expense. For avoidance of doubt, Lessee shall be responsible for and shall perform (or cause to be performed by a duly qualified and licensed repair facility) and pay for the removal, delivery, and reinstallation of any Engine sent for maintenance under the Rolls Royce  Agreement and for the cost of all Engine maintenance and repairs for which coverage is refused, denied, excluded or withheld pursuant to the Rolls Royce Agreement for any reason whatsoever, including without limitation foreign object damage, damage or loss to the Engine resulting from ingestion, operator induced failure or other negligence and any other Engine risks which are excluded from coverage under the Rolls Royce Agreement. Notwithstanding the foregoing, if an Engine requires a major shop visit during the Term, Lessee shall deliver to Lessor a copy of the proposed workscope at least thirty (30) calendar days in advance of the commencement of work for Lessor's approval, and Lessor shall have the opportunity to review and consult with Lessee and propose any modifications regarding the same.

7.3    Inspection by Lessor:   Lessee shall permit Lessor or a designee of either, at any reasonable time during normal business hours and without interfering with the normal commercial operation of the Aircraft but on five (5) Business Days' prior written notice, provided the Aircraft is not previously scheduled for a flight, to visit and inspect the Aircraft, its condition, use and operation, and Lessee's maintenance procedures and the books, records and logs maintained and relating to the Aircraft, its flights and Lessee's maintenance procedures.

Lessee shall provide Lessor with forty-five (45) days' prior written notice of each "C/4,000 Hr" check, 8-Year check, 20K/12K Cycle check, or other major structural inspection or such annual notification of the scheduled major structural inspections to be performed, and Lessor shall have the right (but not the obligation) to observe any such check or inspection. Lessee shall deliver to Lessor a copy of the proposed check workscope at least thirty (30) calendar days in advance of the commencement of work for Lessor's approval, and Lessor shall have the opportunity to review and consult with Lessee and propose any modifications regarding the same. Lessor shall not have any duty to make any such inspection and shall not incur any liability or obligation by reason of not making any such inspection. Lessor's failure to object to any condition or procedure observed or observable in the course of an inspection hereunder shall not be deemed to waive or modify any of the terms of this Lease with respect to such condition or procedure.

7.4    No Discrimination.   Lessee shall not discriminate, and shall not amend or modify the Lessee's Maintenance Program in any manner that would result in adverse discrimination, in its maintenance and care with respect to the Aircraft as between it and the other Saab aircraft operated by Lessee.

## SECTION 8.  COVENANTS OF LESSEE

In addition to and not in limitation of Lessee's other representations, warranties, covenants and agreements set forth elsewhere in this Lease, Lessee covenants and agrees that:

8.1    Maintenance of Company Existence.   During the Term, Lessee will preserve and maintain its company existence and such of its rights, privileges, licenses and franchises in any jurisdiction where failure to obtain such licensing or qualification may have a material adverse effect upon Lessee and its business, taken as a whole, and its ability to perform hereunder.

8.2     Maintenance of Status.   Lessee is, and shall remain so long as Lessee shall be Lessee under this Lease, duly qualified to operate and maintain the Aircraft under Applicable Law and in accordance with the requirements of this Lease.

8.3     Payment of Taxes.   Lessee will promptly pay or cause to be paid any and all Taxes due and owing during the Term as provided in Section 10. On reasonable demand from time to time, Lessee shall provide written evidence to Lessor that it has paid, or has adequate resources to pay, any such Taxes.

8.4     Place of Business.   Lessee will provide to Lessor and any Lessor Lender at least thirty (30) days' prior written notice of any change in its principal place of business or chief executive office if there is more than one place of business.

8.5     Notice of Default.   Immediately after Lessee or any of its corporate officers obtains knowledge of a Default or a Lessee Event of Default hereunder, Lessee shall notify Lessor in writing of such Default or Lessee Event of Default.  In addition, Lessee shall provide immediate notice to Lessor if the police or any other Governmental Entity or authority seizes or impounds the Aircraft.

8.6     Governmental Consents.   Lessee, at its sole cost and expense, shall maintain in full force and effect (i) all governmental consents, licenses, authorizations, approvals, declarations, filings and registrations obtained or effected in connection with this Lease or required by any Applicable Law from time to time during the Term, and (ii) every document or instrument contemplated hereby or thereby, and Lessee shall take all such additional action as may be proper in connection herewith or therewith.

8.7     No Liens.   Lessee, at its sole cost and expense, shall at all times keep the Aircraft free and clear of Liens except as expressly permitted under Section 14.

8.8     No IDERA.  Lessee shall not execute any IDERA with respect to the Aircraft or permit any IDERA with respect to the Aircraft to be recorded with the Aviation Authority.

8.9     Reports.   During the Term, Lessee agrees to furnish to Lessor and any Lessor Lender the following:

8.9.1   intentionally not used;

8.9.2   within sixty (60) days after the end of the first three calendar quarters of each calendar year, a copy of the Lessee's internally prepared consolidated financial statements as of the last day of such quarter, as they are  prepared by Lessee in the ordinary course of business, including a consolidated profit and loss statement and a consolidated balance sheet of Lessee;

8.9.3   within one-hundred twenty (120) days after the end of each fiscal year, a copy of the annual audited consolidated profit and loss account and balance sheet of Lessee, as they are prepared by Lessee in the ordinary course of business;

8.9.5   on or before the 45th day of each calendar quarter, a report detailing the Flight Hours or Cycles, as applicable, operated for the Airframe and for each Engine and Propeller (noting the location of each Engine and Propeller) for the previous calendar quarter;

8.9.6   on or before March 1 of each calendar year, a list of those mandatory service bulletins, airworthiness directives and engineering modifications incorporated on the

Aircraft during the preceding calendar year and those requiring compliance in the next calendar year;

8.9.7 upon Lessor's written request but not more frequently than twice per year, written summaries of changes to Lessee's maintenance programs relating to the Aircraft;

8.9.8 within five (5) Business Days of the occurrence thereof, written notice of any damage to the Airframe, any Engine or any Propeller, including a detailed description of the incident causing such damage and the steps being taken by Lessee to repair such damage; 8.9.9 from time to time such information concerning the location, condition, use and operation of the Aircraft as Lessor or any Lessor Lender may reasonably request; and

8.9.10 timely written notice of any known or anticipated potential Material Adverse Event.

## SECTION 9.  REPLACEMENT OF PARTS; ALTERATIONS; MODIFICATIONS AND ADDITIONS

9.1    Replacement of Parts.  Lessee, at its own cost and expense, will promptly replace or cause to be replaced by an Approved Maintenance Provider, or applicable vendor of the same, all Parts which may from time to time become worn out, lost, stolen, destroyed, seized, confiscated, damaged beyond repair or permanently rendered unfit for use for any reason whatsoever. In addition, in the ordinary course of maintenance, service, repair, overhaul or testing, Lessee may, at its own cost and expense, cause to be removed any Parts, whether or not worn out, destroyed, damaged beyond repair or permanently rendered unfit for use, provided that Lessee shall immediately replace such Parts, at its own cost and expense. All replacement Parts (a) shall be free and clear of all Liens, other than Liens permitted by Section 14, (b) shall be in at least the same modification status and service bulletin accomplishment status, (c) shall be interchangeable as to form, fit and function, (d) shall have been overhauled, repaired and inspected by an agency approved by the Aviation Authority and shall bear all tags and/or airworthiness release certificates acceptable to or required by the Aviation Authority, and (e) shall be in as good an operating condition as, and have a value, utility and remaining useful life at least equal to, or greater than, the Parts replaced. All historical records relating to such replacement Parts shall be maintained by Lessee in English, and in compliance with the requirements of the Aviation Authority.

All Parts which are at any time removed from the Aircraft shall remain the property of Lessor and subject to this Lease, no matter where located, until such time as such Parts shall be replaced by Parts which have been incorporated or installed in or attached to the Aircraft and which meet the requirements for replacement Parts specified above. Immediately upon any replacement Part becoming incorporated or installed in or attached to the Aircraft as above provided, (i) title to the removed Part shall thereupon vest in Lessee, free and clear of all rights of Lessor and shall no longer be deemed a Part hereunder, (ii) title to such replacement Part shall thereupon vest solely in Lessor, free and clear of any and all Liens (other than Liens permitted by Section 14) and (iii) such replacement Part shall become subject to this Lease and be deemed a Part for all purposes hereof to the same extent as the Part which it has replaced.

9.2    Alterations, Modifications and Additions.  Subject to Section 9.3, Lessee, at its own cost and expense, shall make or cause to be made such alterations and modifications in and additions to the Aircraft, Engines or Parts as may be required from time to time to meet the applicable standards of the Aviation Authority, or to comply with any Applicable Law, rule, directive, bulletin, regulation or order of any other Governmental Entity or in connection with any

emergency repair. In addition, Lessee, at its own cost and expense, may from time to time make alterations and modifications in and additions to the Aircraft, provided no such alteration, modification or addition diminishes the remaining warranty, value or utility, or impairs the condition or airworthiness, of the Aircraft, and no such alteration, modification or additions costing in excess of One-Hundred Thousand United States Dollars (US$100,000.00), shall be made without Lessor's prior written consent, which consent shall not be unreasonably withheld. Title to all Parts incorporated or installed in or attached or added to the Aircraft as the result of such alteration, modification or addition shall vest immediately in Lessor and shall become subject to this Lease, without the necessity for any further act or transfer, document or notice, *provided, however*, that Lessee may remove such Parts prior to return of the Aircraft to Lessor on the Expiration Date if such removal does not damage or otherwise result in any diminution in value of the Aircraft, and provided further, however, that Lessee replaces and restores any Parts originally installed on the Aircraft as of the Commencement Date and which were removed by Lessee in connection with any such alteration, modification or addition. In no event shall Lessor bear any liability or cost as a result of any alteration, modification or addition to, or for any grounding or suspension of certification of, the Aircraft or for any loss of revenue arising therefrom.

9.3    New Mandatory FAR, MRB, Airworthiness Directive and Service Bulletin Cost Sharing. Notwithstanding any language in the Lease Agreement to the contrary but provided no uncured Lessee Event of Default has occurred and is continuing, Lessor will reimburse Lessee for a portion of the actual cost (inclusive of all third party costs, including third party labor costs (but exclusive of Lessee's internal labor costs), if necessitated only due to regulatory limitations on Lessee's internal capabilities) of Lessee's compliance with any mandatory FAR, mandatory MRB, mandatory Airworthiness Directives ("AD") or mandatory Service Bulletins ("SB") applicable to the Aircraft which are issued and become effective after the Delivery Date of each Aircraft (the "Qualified FAR/MRB/AD/SB Costs") as follows:

Lessee shall be responsible for and shall pay the first USD $25,000 of all Qualified FAR/MRB/AD/SB Costs for each FAR, MRB, AD or SB completed by Lessee during the Lease Term.   Costs in excess of that amount ("Excess Costs") shall be allocated between Lessor ("Lessor's Portion") and Lessee ("Lessee's Portion").   Lessee's Portion shall be determined by multiplying the Excess Costs by a fraction, the numerator of which shall be the number of complete months remaining in the Lease Term from the date each individual FAR, MRB, AD or SB was completed and the denominator of which is the number of months comprising the Lease Term for the Aircraft. Lessor's Portion shall be the amount of Excess Costs in excess of Lessee's Portion.

For the avoidance of ambiguity, this Section 9.3 shall only apply to mandatory FAR, MRB, Airworthiness Directives and Service Bulletins which are issued and become effective after the Delivery Date of each Aircraft. It shall not apply to any non-mandatory items or items issued or effective prior to the Delivery Date of each Aircraft or the Automatic Dependent Surveillance Broadcast (ADS-B) compliance requirements as further set forth on **Exhibit E** .

9.4    Upon return of the Aircraft at expiration of the Lease Term or termination by Lessee in accordance with the Lease Agreement, Lessor will reimburse Lessee for Lessor's portion of each FAR, MRB, AD and SB completed and paid for by Lessee during the Lease Term as part of the Equivalency Settlement (as hereinafter defined in **Exhibit F**).

**SECTION 10.**          **GENERAL TAX INDEMNITY**

10.1    Indemnity.  Lessee shall pay when due and indemnify and hold each Indemnitee harmless from and against any and all Taxes imposed against any such Indemnitee, Lessee, the Aircraft or any interest therein or use thereof, as well as any and all Taxes arising out of this Lease or based on or measured by, the payments of Rent and other amounts due hereunder, the terms, covenants and conditions hereof, or the use, operation, maintenance, possession, condition, control, occupancy, servicing, installation, transportation, storage, substitution, recording, documentation, import or export of the Aircraft by Lessee in connection with its use and operation thereof, rental, lease, landing, registration, modification, location, repair, abandonment, replacement, delivery, registration, repossession, improvement, subleasing, manufacture, rental, settlement of any insurance claim, return or other disposition of the Aircraft or any Part thereof or interest therein regardless of the method of calculation; *provided, however*, that Lessee shall have no obligation to pay, indemnify and hold harmless any Taxes: (i) assessed against or imposed on an Indemnitee which are based upon or measured by such Indemnitee's gross or net annual income, profit (including excess profits), gain, capital or net worth, doing business or franchise and interest, additions to tax, penalties, or other charges in respect thereof, or in lieu of any such Taxes; or (ii) attributable to the period following the Expiration Date; or (iii) attributable to any Indemnitee's gross negligence or willful misconduct; or (iv) imposed as a result of Lessor's voluntary or involuntary transfer or other disposition of the Aircraft, the Airframe, any Engine or any Propeller, or any Part thereof or interest therein, except a transfer or sale to Lessee or resulting directly or indirectly from the exercise of remedies while a Lessee Event of Default shall have occurred and be continuing; or (v) imposed solely as a result of (and unrelated to and not arising from or as a result of Lessee's lease, use, operation or maintenance of the Aircraft during the Term hereof) the location of Lessor's principal place of business, or Lessor's local business activities other than the leasing of the Aircraft hereunder; or (vi) any Tax imposed on or with respect to an assignee or successor of the interest of an Indemnitee to the extent that such Tax would not have been imposed on or with respect to the assignor Indemnitee; or (vii) any Tax resulting from a Lessor Lien; or (viii) any event or occurrence for which Lessee is obligated under this Lease to make a payment of Casualty Value or an amount determined by reference to the Casualty Value.

10.2    Tax Returns.  In case any report or return is required to be made with respect to any Taxes which are an obligation of Lessee under this Section 10, Lessee will either make such report or return in such manner as will show the ownership of the Aircraft in Lessor and send a copy of such report or return to Lessor or will notify Lessor of such requirement and make such report or return in such manner as shall be reasonably satisfactory to Lessor. If actual notice is given by any taxing authority to Lessor that a report or return is required to be filed with respect to any Taxes subject to Indemnity pursuant to in this Section 10, Lessor shall promptly notify Lessee of such required report or return. Lessor agrees to respond to any reasonable request of Lessee for information within the control of Lessor with respect to the filing of or need to file any report or return, but Lessee agrees to pay any reasonable costs, fees or other charges of independent counsel or independent accountants incurred in connection with such request.

10.3    Gross Up.  Lessee further agrees that if at any time any Applicable Law or any Governmental Entity requires any deduction or withholding in respect of Taxes from any payment of Rent or other amounts due under this Lease, the sum due from Lessee in respect of such payment shall be increased to the extent necessary to ensure that, after paying such Taxes or making such deductions or withholding, Lessor or other Person entitled to the same receives on

the due date for such payment a net sum equal to the sum which it would have received had no such deduction or withholding been required to be made.

10.4    Tax Savings.  Any payment to Lessor or an Indemnitee under this Section 10 will be made by Lessee, in full, and upon realization of any net savings by Lessor or such Indemnitee by reason of deductions, credits, allocations, or allowances received in respect of the payment or accrual of the Taxes indemnified against, and after accounting for the receipt by Lessor or such Indemnitee of such payment, Lessor or such Indemnitee, as the case may be, shall return an amount equivalent to such net savings not exceeding the amount of indemnity paid. Lessor will furnish to Lessee whatever information Lessee reasonably requests evidencing the net savings in question within ninety (90) days after filing the applicable return.

10.5    Timing of Payment.  Lessee shall pay any amount payable by Lessee pursuant to this Section 10 promptly, and in any case within the earlier of ten (10) Business Days after demand or thirty (30) days prior to the date such Tax is due to the taxing authority.

10.6    Contest.  Notwithstanding anything in this Section 10 to the contrary, so long as (a) a contest of such Taxes does not involve a danger of the sale, forfeiture or loss of, or imposition of a Lien on, the Aircraft or any interest therein, and (b) Lessee has provided Lessor with an opinion of independent tax counsel that a reasonable basis exists for contesting such claim, then Lessor and each Indemnitee will in good faith and with due diligence, at Lessee's written request and at Lessee's expense, contest (or permit Lessee to contest on behalf of Lessee, Lessor or such Indemnitee) the validity, applicability or amount of such Taxes.

10.7    Refunds.  Upon receipt by Lessor or Indemnitee of a refund of all or any part of any Taxes which Lessee has paid, Lessor or Indemnitee, as the case may be, will pay to Lessee the amount of such Taxes refunded, including any interest paid to Lessor or Indemnitee therewith, not exceeding the amount of indemnity paid.

10.8    Settlements.   If in the course of exercising contest rights, an Indemnitee learns that a taxing authority asserting a claim for which indemnity is sought hereunder is willing to agree to a settlement of a claim ("Settlement Proposal"), such Indemnitee shall notify Lessee of such settlement proposal. If the settlement proposal is acceptable to the Lessee, the Lessee shall notify such Indemnitee and the Indemnitee shall notify the taxing authority and agree to the settlement proposal. If the Lessee declines the settlement proposal, Lessee shall notify the Indemnitee in writing of the amount for which Lessee would be willing to settle such claim ("Lessee Settlement Proposal") and Indemnitee will notify the taxing authority of the Lessee Settlement Proposal. If the taxing authority agrees to the Lessee Settlement Proposal the Indemnitee shall agree.  If the taxing authority does not accept Lessee's Settlement Proposal, Lessee shall have the option of assuming full responsibility for the tax claim or accepting the Settlement Proposal.

10.9    Miscellaneous.  Lessee's obligations under this Section 10 shall not be affected by any circumstances, including, without limitation, any set off, counterclaim, recoupment, defense or other right which Lessee may have against Lessor or any other Person for any reason whatsoever. Lessee will pay to an Indemnitee, to the extent permitted by Applicable Law, interest at the Interest Rate on any amount not paid to such Indemnitee when due pursuant to this Section 10 until the same shall be paid in full. All indemnities, obligations, adjustments and payments provided for in this Section 10 shall survive, and remain in full force and effect, notwithstanding the expiration or other termination of this Lease. The obligations of Lessee in respect of all such indemnities, obligations, adjustments and payments are expressly made for the benefit of, and shall be enforceable by, an Indemnitee, without declaring this Lease to be in

default or taking other action thereunder, and notwithstanding any provision to the contrary contained herein.

## SECTION 11.    CASUALTY OCCURRENCES

11.1    Casualty Occurrence with respect to the Airframe.    Immediately after a Casualty Occurrence with respect to the Airframe, Lessee shall give Lessor written notice of such occurrence. Upon receipt of insurance proceeds as a result of such Casualty Occurrence, Lessee shall pay to Lessor the Casualty Value in immediately available funds.  Upon such payment, and the payment of all Rent then due and payable under this Lease and the performance of all obligations of Lessee hereunder: (a) the obligation of Lessee to make further payments of Basic Rent hereunder shall terminate, (b) this Lease shall terminate with respect to the Aircraft, and (c) Lessor will transfer to Lessee, without recourse or warranty, all of Lessor's right, title and interest, in and to the Airframe and Engines (whether or not installed on the Airframe at the time of the Casualty Occurrence) on an "As-Is," "Where-Is" basis. No Casualty Occurrence shall result in any reduction or abatement of Rent until receipt by Lessor of the Casualty Value.

11.2    Casualty Occurrence with respect to an Engine.    Upon a Casualty Occurrence with respect to an Engine, Lessee shall give Lessor written notice thereof promptly and in any case within thirty (30) days thereof, and shall, upon receipt of insurance proceeds as a result of such Casualty Occurrence, convey to Lessor, as replacement for the Engine suffering such Casualty Occurrence, title to a Substitute Engine. At the time of such conveyance to Lessor, each Substitute Engine shall be free of all Liens, shall be the same or better make and model, and shall be in as good an operating condition as the Engine being replaced, assuming the Engine being replaced was in the condition and repair required by the terms hereof immediately prior to the Casualty Occurrence and shall be qualified to become subject to the Rolls Royce Agreement. Prior to or at the time of any such conveyance, Lessee, at its own expense, will promptly: (a) furnish Lessor with a full warranty bill of sale or similar instrument, in such form as will qualify as a "contract of sale" pursuant to Article V of the Protocol and otherwise in form and substance reasonably satisfactory to Lessor, to evidence the vesting in Lessor of good and marketable title to such Substitute Engine, free and clear of any Liens other than Lessor Liens; (b) cause a further supplement to this Lease, in form and substance reasonably satisfactory to Lessor, subjecting such Substitute Engine to this Lease, to be duly executed by Lessee and recorded pursuant to Applicable Law; (c) furnish Lessor with such evidence of title to such Substitute Engine and of compliance with the insurance provisions of Section 12 with respect to such Substitute Engine as Lessor may reasonably request; (d) furnish Lessor with an opinion of Lessee's counsel acceptable to Lessor and any Lessor Lender to the effect that title to such Substitute Engine has been duly conveyed to Lessor, free and clear of all Liens, that such Substitute Engine is duly leased hereunder and that such Substitute Engine is duly subjected to this Lease and the Lien of Lessor Lender's mortgage or security agreement; (e) furnish a certificate signed by a duly authorized financial officer or executive of Lessee certifying that, upon consummation of such replacement, no Lessee Event of Default will exist hereunder; (f) furnish Lessor with such documents as Lessor may reasonably request in connection with the consummation of the transactions contemplated by this Section 11.2, in each case in form and substance satisfactory to Lessor; (g) furnish such financing statement covering the Substitute Engine as may be reasonably requested by Lessor. Upon full compliance by Lessee with the terms of this paragraph, Lessor will transfer to Lessee title to the Engine which suffered the Casualty Occurrence without recourse or warranty on an "As-Is," "Where-Is" basis. For all purposes hereof, each such Substitute Engine shall be deemed part of the property leased hereunder, shall be deemed an "Engine" as defined herein and shall be deemed part of the

Aircraft. No Casualty Occurrence covered by this Section 11.2 shall result in any reduction or abatement in Rent.

11.3    Application of Proceeds and Payments. Any payments received at any time by Lessor or by Lessee from any insurer under insurance (other than liability insurance), or from any Governmental Entity or other Person with respect to a Casualty Occurrence will be applied as follows:

11.3.1 Unless Section 11.3.2 is applicable, so much of such payments as shall not exceed the Casualty Value required to be paid by Lessee pursuant to Section 11.1 of this Lease shall be paid to or as directed by Lessor in reduction of Lessee's obligation to pay such Casualty Value if not already paid by Lessee, or, if already paid by Lessee (unless a Lessee Event of Default shall have occurred and be continuing) shall be applied by Lessor to reimburse Lessee for its payment of such Casualty Value and the balance of such payment, if any, remaining thereafter, if such payment is received with respect to insurance other than liability insurance (unless an Event of Default shall have occurred and be continuing) shall be paid over to, or retained by Lessee; or

11.3.2 If such payments are received as a result of a Casualty Occurrence with respect to an Engine which is being replaced by Lessee with a Substitute Engine pursuant to Section 11.2, unless a Lessee Default shall have occurred and be continuing, all such payments shall be paid over to, or retained by, Lessee if Lessee satisfies Lessor, in Lessor's reasonable discretion, that Lessee has fully performed or, concurrently therewith will fully perform, the terms of Section 11.2 and of Section 16 with respect to the Casualty Occurrence for which such payments are made.

11.4    Requisition for Use by Government with Respect to the Aircraft. In the event of the requisition for use by a Governmental Entity of the Aircraft or any Engine (other than a requisition constituting a Casualty Occurrence), all of Lessee's obligations under this Lease, including without limitation those with respect to the Aircraft or such Engine, shall continue to the same extent as if such requisition had not occurred; *provided, however*, that if it is impossible for Lessee to perform its maintenance obligations with respect to the Aircraft or such Engine because of the possession of the Aircraft or such Engine by such Governmental Entity, promptly upon the return of the Aircraft or such Engine to Lessee, Lessee shall undertake all actions necessary to restore the Aircraft or such Engine to the condition it would have been in had Lessee fully performed such obligations throughout the period of time the Aircraft or such Engine was in the possession of such Governmental Entity. All payments received by Lessor or Lessee from the Governmental Entity for the use of the Aircraft or such Engine during the Term therefor shall, so long as no Lessee Event of Default shall have occurred and be continuing, be paid over to, or retained by, Lessee; and all payments received by Lessor or Lessee from the Governmental Entity for the use of such item after the Term therefor shall be paid over to, or retained by, Lessor.

11.5    Other Applications. Any amounts not payable to or retained by Lessee pursuant to this Section 11 or Section 12 because a Lessee Event of Default shall have occurred and be continuing shall be paid to and retained by Lessor and shall be applied by Lessor against Lessee's obligations hereunder in such manner as Lessor may determine.

## SECTION 12.          INSURANCE.

12.1    Public Liability and Property Damage Insurance. Lessee, at its own cost and expense, will carry and maintain in effect with respect to the Aircraft and with Approved Insurers: