IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

|  |  |  |
|---|---|---|
| In re: | ) ) | Chapter 11 |
| RAVN AIR GROUP, INC., *et al.*,[1] | ) ) | Case No. 20-10755 (BLS) |
| Debtors. | ) ) ) | (Jointly Administered) |

**OBJECTION OF THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS TO THE DEBTORS' MOTION SEEKING AUTHORITY TO OBTAIN DEBTOR IN POSSESSION FINANCING AND RELATED RELIEF**

The Official Committee of Unsecured Creditors (the "**Committee**") of the above captioned debtors and debtors in possession (the "**Debtors**"), by and through its undersigned proposed counsel, Brown Rudnick LLP, files this objection (the "**Objection**") to the *Motion of the Debtors for Entry of Interim and Final Orders Pursuant to 11 U.S.C. Sections 105, 361, 362, 363, 364 and 507 and Bankruptcy Rules 2002, 4001, and 6004 (I) Authorizing the Debtors to Obtain Postpetition Senior Secured Superpriority Financing, (II) Authorizing the Debtors' Limited Use of Cash Collateral, (III) Granting Adequate Protection to the Prepetition Secured Parties, (IV) Scheduling a Final Hearing, and (V) Granting Related Relief* [D.I. 13] (the "**DIP Motion**").[2]  In support of this Objection, the Committee respectfully states as follows:

---

[1] The Debtors in these chapter 11 cases and the last four digits of each Debtor's U.S. tax identification number are as follows: Ravn Air Group, Inc. (3047), Ravn Air Group Holdings, LLC (5356), JJM, Inc. (4858), HoTH, Inc. (9957), Peninsula Aviation Services, Inc. (6859), Corvus Airlines, Inc. (7666), Frontier Flying Service, Inc. (8091), and Hageland Aviation Services, Inc. (2754). The notice address for all of the Debtors is 4700 Old International Airport Road, Anchorage, AK 99502.

[2] Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to such terms in the DIP Motion.

**PRELIMINARY STATEMENT**

1. The extraordinary COVID-19 crisis and the unprecedented recession that it triggered tipped these Debtors into the Chapter 11 Cases during the time that ordinarily would have been their most revenue-generating business cycle. As the largest carrier in Alaska, the Debtors provided the only practical means of travel, supply of goods, and receipt of mail to more than 20 of its destinations and well over 100 isolated Alaskan communities. Unfortunately, the Company faced a nearly 90% decrease in its revenue due to the local and state quarantine bans as 72 of its planes were grounded and its workforce shrunk from 1,300 employees to 39. Given the pervasive uncertainty over the length of the crisis and timing of any forthcoming government relief, the Debtors have found themselves and their ability to continue providing essential services entirely at the mercy of their Prepetition (and now DIP) Lenders. The Prepetition Lenders, however, chose to ignore the fact that the Debtors could have continued operating and providing critical services to many communities in this dire time of need and instead, took advantage of the predicament to enhance their investment and priority position through the Chapter 11 process at the expense of other creditors.

2. The DIP Facility has but one purpose – jam through the restructuring at lightning speed by imposing egregious milestones to get the Prepetition Lenders paid in full in cash in a matter of days, while providing them with additional returns through multiple fees and generous interest rates under the DIP Facility. These fees and rates are especially onerous given that nearly a third of the Prepetition Lenders' loans are being rolled up into postpetition debt, two dollars to one. The $24 million roll-up component is actually four times the amount irrevocably committed by the DIP Lenders: while the DIP Facility provides for a possibility of an additional $6 million delayed draw on top of the approved $6 million interim borrowing, that amount would only be available after the entry of the Final Order and the filing of an "Acceptable Plan," that is, a chapter

11 plan that either pays the DIP and Prepetition Lenders in full in cash or is otherwise completely acceptable to them in all respects.  The delayed draw is also subject to satisfaction of other unspecified terms and conditions acceptable to the DIP Agent and the Requisite DIP Lenders. While the Interim Order provides for an additional $2 million incremental facility after the entry of the Final Order, that amount is only available in the sole and absolute discretion of the DIP Lenders.  (Interim Order, § 7(b)).  In sum, the Debtors got a very expensive $6 million advance (less than a quarter of the full DIP amount) that does not provide sufficient runway for a restructuring.  It is difficult to understand what the DIP Facility achieves, beyond providing the Prepetition Lenders with enhancements unavailable through a state foreclosure process.

   3. In addition to enhancing their collateral position through the roll-up to the detriment of unsecured creditors, the Prepetition/DIP Lenders have also imposed "prepackaged" plan-type milestones in these Chapter 11 Cases that are guaranteed to push the Debtors towards a fire sale or disorderly liquidation.  Specifically, the proposed milestones require the Debtors to file the disclosure statement and Acceptable Plan on April 25, before the second day hearing in these Chapter 11 Cases; obtain approval of the disclosure statement within 48 days; and confirm the Acceptable Plan within 76 days of the Petition Date.  The Debtors will simply not have enough time to consider any restructuring alternatives (other than the Acceptable Plan that pays the Prepetition/DIP Lenders in full in cash) and all available sources of exit financing by April 25. Such a compressed artificial timeline will not allow the Debtors to fully explore and receive government aid or other funding in order to implement a value-maximizing restructuring.  Even in the case of a sale, there will not be sufficient time to market the Company, to understand the appropriate type of purchaser, and ensure that the sale will bring on appropriate equity value for the assets.  Moreover, these milestones completely disable the Committee functions and prevent and discourage any input, investigation or objections by any party in interest.  The DIP Facility

should assist the Debtors in building a bridge to emergence, not, as it does here, limit due process and circumvent the protections of the Bankruptcy Code for the sole interest of the Prepetition Lenders.

4. Given the Company's significant footprint in Alaska and in light of potentially forthcoming government relief that would enable it to resume operations and re-hire its 1,300 employees, the Debtors simply need more time to put a proper plan in place. Unfortunately, through this DIP Facility, the Debtors have ceded control of these Chapter 11 Cases to their Prepetition Lenders. If approved as proposed, the DIP Facility will have the effect of foreclosing any objection or investigation by the Committee or any other party to an "Acceptable Plan." Such a process runs afoul of the bankruptcy protections for disclosure and confirmation. Furthermore, it is not in the best interest of creditors (aside from the Prepetition Lenders) to force a fait accompli process in a quickly changing environment with significant impacts on Alaskan communities, 1,300 employees, and all other creditors and contract parties.

5. The Prepetition Lenders could have exercised their state law rights and remedies and foreclosed on their collateral, but instead elected to take advantage of the bankruptcy process. They must "pay the freight" of that choice. This Court should not allow the Prepetition/DIP Lenders to use the Chapter 11 process to enrich themselves, while Ravn's communities are sorting through immediate, serious problems such as not being able to reach hospitals and other critical help, as they wait for the Company to resume services.

## RELEVANT BACKGROUND

6. On April 5, 2020 (the "**Petition Date**"), the Debtors commenced voluntary cases under chapter 11 of the Bankruptcy Code. The Debtors continue to operate their businesses and manage their properties as debtors-in-possession pursuant to sections 1107(a) and 1008 of the Bankruptcy Code.

7. On April 7, 2020, the Court entered an interim order approving the relief requested in the DIP Motion on an interim basis (the "**Interim Order**") [D.I. 49].

8. On April 20, 2020, the United States Trustee for the District of Delaware appointed the Committee in these Chapter 11 Cases pursuant to Bankruptcy Code section 1102. No trustee or examiner has been appointed.

9. A hearing to approve the DIP Facility on a final basis is scheduled for April 29, 2020 at 11:00 a.m. (EST) (the "**Final DIP Hearing**"). The Committee obtained an extension of time to file this Objection through April 24, 2020. A proposed Final Order approving the DIP Motion has not been filed.

**OBJECTION**

10. The Committee is mindful of the Debtors' need for postpetition financing for the runway and capital necessary to reorganize. The proposed DIP Facility, however, incorporates a number of provisions that (i) outright prejudice the rights and powers that the Bankruptcy Code confers on the Court, the Debtors and the Committee, (ii) unjustifiably benefit the DIP Lenders (who are also the Prepetition Lenders) at the expense of the Debtors' estates and their unsecured creditors, (iii) foreclose the Committee's ability to fulfill its statutory and fiduciary mandate; and (iv) cede the DIP Lenders undue control over these Chapter 11 Cases. The Committee respectfully submits that the DIP Facility should not be approved absent the modifications requested herein.

**A.     The Proposed Case Milestones are Inappropriate and Should Be Extended**

10. The DIP Lenders' efforts to leverage their prepetition debt position to force the Debtors to surrender control and propose a plan at breakneck speed need not, and should not, be approved by the Court. *See In re Defender Drug Stores, Inc.*, 145 B.R. 312, 317 (9th Cir. BAP 1992) ("[B]ankruptcy courts do not allow terms in financing arrangements that convert the bankruptcy process from one designed to benefit all creditors to one designed for the unwarranted

benefit of the postpetition lender."); *In re Grand Valley Sport & Marine, Inc.*, 143 B.R. 840, 852 (Bankr. W.D. Mich. 1992) (refusing to "authorize postpetition financing pursuant to § 364 where a creditor leverages a debtor in possession into making a concession unauthorized by, or in conflict with, the Bankruptcy Code as a condition for the requested credit").

11. More specifically, a lender cannot extend DIP financing to "seize control of the reins of reorganization." *In re Tenney Vill. Co., Inc.*, 104 B.R. 562, 567–570 (Bankr. D.N.H. 1989) (finding an onerous and one-sided financing arrangement violated debtor's fiduciary duties to the estate and its creditors); *In re FCX, Inc.*, 54 B.R. 833, 838 (Bankr. E.D.N.C. 1985) ("[T]he court should not ignore the basic injustice of an agreement in which the debtor, acting out of desperation, has compromised the rights of unsecured creditors.").

12. To that end, courts examining proposed DIP financings must consider whether "the proposed terms would prejudice the powers and rights that the Code confers for the benefit of all creditors and leverage the Chapter 11 process by granting the lender excessive control over the debtor or its assets as to unduly prejudice the rights of other parties in interest." *In re Mid-State Raceway, Inc.*, 323 B.R. 40, 59 (Bankr. N.D.N.Y. 2005). DIP financings also cannot dictate the terms of a Chapter 11 plan. Indeed, "[t]he bankruptcy court cannot, under the guise of section 364, approve financing arrangements that amount to a plan of reorganization but evade confirmation requirements." *Id.*

13. Instead of permitting the Debtors to pursue a proper chapter 11 process for the benefit of all stakeholders, the proposed DIP Facility mandates such aggressive milestones that it fully forecloses the Committee from exercising its statutory duties. Even more importantly, it pre-determines the terms of the Debtors' restructuring and does not give the Debtors sufficient time to obtain relief from the State and federal government, including through the CARES Act.

Specifically, the DIP Facility requires the chapter 11 process to progress along the following unrealistic and unnecessary milestones:

- **April 25, 2020 (20 Days from the Petition Date)** – Filing of the disclosure statement and "Acceptable Plan" (that is a Chapter 11 plan that indefeasibly either (a) pays the DIP Obligations, Roll-Up Obligations, and Prepetition Obligations in full in cash, or (b) that is otherwise acceptable in form and substance to the DIP Agent, Requisite DIP Lenders, Prepetition Agent and Prepetition Required Lenders);

- **May 23, 2020 (48 Days from the Petition Date)** – Approval of the disclosure statement for an Acceptable Plan satisfactory in form and substance to the DIP Agent and the Requisite DIP Lenders;

- **June 20, 2020 (76 Days from the Petition Date)** – Confirmation of an Acceptable Plan (Interim Order, §10).

14. These milestones are modeled on typical prepackaged plan milestones. However, these Chapter 11 Cases are not prepackaged and an expedited chapter 11 plan process that compresses the disclosure statement and plan filing without time for investigation and input from the Committee is not acceptable. Not only does the compressed timeframe impede the Debtors' and Committee's ability to maximize recoveries for all of their constituents and deprives parties in interest of due process, but it also puts the Debtors on a path to liquidation for the benefit of their Prepetition Lenders. *See In re Energy Future Holdings Corp.*, (Bankr. D. Del. Nov. 4, 2014) (Case No. 14-10979) (CSS) Tr. At 20:16-20 (holding that "the proposed timelines must be stretched . . . to allow for sufficient time for any interested party to develop an alternative transaction . . . and the . . . committee to. . . get up to speed.").

15. The Debtors must be given a chance to survive so that they can continue providing critical services for the residential and business communities in Alaska. Equally important, about 1,300 people can get their jobs back if only the Debtors are given the opportunity to properly restructure. In order for that to happen, the milestones must be extended.

16. Accordingly, the Committee requests that the confirmation milestone be extended by at least 120 days (with accompanying plan filing deadline extended to 45 days following the Petition Date and the disclosure statement approval extended to 75 days), in order for the Debtors to properly develop their Chapter 11 plan and for the Committee to exercise its statutory duties.

B.   **The Roll-Up and Excessive DIP Fees Are Unwarranted**

16. The DIP Facility roll-up significantly improves the position of the Prepetition Lenders and rolls up $24 million of prepetition secured debt into postpetition administrative expense debt at the rate of two dollars to one. In fact, given the contingencies surrounding any delayed draw availability, almost 90% of the DIP Facility will repay the Debtors' prepetition debt, at an elevated priority and with grants of additional security interests in unencumbered collateral and Avoidance Action proceeds. This material enhancement of the Prepetition Lenders' position to the detriment of unsecured creditors is not permitted and certainly not justified given the minuscule amount of the new money component. *In re Kaib*, 448 B.R. 373, 376 n.2 (Bankr. W.D. Pa. 2011).

17. The roll-up is particularly troublesome here given that some of the Prepetition Lenders' liens may be invalid and avoidable. In a rare occurrence for a typical case before this Court, the Debtors actually disclose in footnote 4 of the DIP Motion that they have "identified certain collateral for which the security interests and/or mortgages of the Prepetition Secured Parties may be subject to avoidance." (DIP Motion, §22, n. 4). Given this disclosure, there may be substantial infirmities with respect to the Prepetition Lenders' collateral. Accordingly, the roll-up will likely need to be unwound by the Court and should not be approved at this time.

18. In addition to improving their collateral and priority position, the Prepetition Lenders are also getting greater returns under the DIP Facility (which they would have not gotten through a state foreclosure process) in the form of (a) an upfront fee of 300 basis points, a fee of

200 points for any unused commitment, and an Agent Fee, (b) payment of DIP Lenders' expenses, including, without limitation, various professional fees, and (c) an interest rate at the Debtors' Alternate Base Rate (as defined in the Prepetition Credit Agreement) plus 800 basis points per annum on the outstanding principal amount of the DIP Facility plus 200 basis points default interest rate.  (DIP Credit Agreement §§ 2.05 and 2.06).  In the context of these Chapter 11 Cases, the proposed fees and interest rates (including payment of 200 basis points default interest when it has not been determined that the Lenders are oversecured) are plainly excessive and should be adjusted downward to avoid a windfall to the Prepetition/DIP Lenders at the expense of unsecured creditors.

### C.      The Limitations on the Committee's Ability to Investigate and Pursue Claims against the Prepetition Lenders Are Unacceptable

19.     The Debtors' proposed stipulations and releases of the Prepetition Lenders together with the limitations on the use of cash collateral by the Committee handcuff the Committee's ability to properly perform its functions.

20.     Specifically, the Debtors stipulated to the validity of the claims and liens of the Prepetition Lenders, and the release of the Prepetition Lenders and related parties from all claims relating to the Prepetition Credit Documents and the Prepetition Obligations (Interim Order, § 19).  These stipulations and releases became effective as to the Debtors upon entry of the Interim Order.  They will bind all other parties in interest unless they are challenged by the Committee by June 19, 2020 (within 60 days of its appointment or 75 days from the Petition Date).  (Interim Order, § 20(a)).

21.     These provisions prevent the Debtors from challenging any of the claims or liens of the Prepetition Lenders and deny the Committee and other parties in interest adequate time and resources to evaluate or challenge the liens or claims of the Prepetition Lenders or otherwise challenge the restructuring.  Moreover, the grant of liens to the Prepetition Lenders on the proceeds

of Avoidance Actions is entirely inappropriate where such actions may provide a material source of recovery for general unsecured creditors and may include actions against the Prepetition Lenders.

22. In addition, the Interim Order provides that "no portion or proceeds of the DIP Facility, the DIP Collateral, the Prepetition Collateral, the Cash Collateral, or the Carve-Out" shall be used for "objecting, contesting or raising any defense to validity, perfection, priority, or enforceability of, or any amount due under" the Prepetition Credit Documents or asserting any Challenges against the Prepetition Secured Parties. (Interim Order, § 21). The Interim Order then provides a $15,000 investigation budget. The combination of below-market budget and fee restrictions effectively precludes investigation of the validity of the claims and liens of the Prepetition Lenders—inappropriate under any circumstances; even more so in light of the Debtors' own admission that the liens may be avoidable.

23. Pursuant to the Interim Order, the Carve-Out for the Debtors, the Committee and their respective professionals (both counsel and financial advisor) is collectively limited to $250,000. To put this amount in perspective, the DIP budget shows professional fees budgeted for $5.0 million through the same period. Committee advisor fees are only about 5% of the professional fee budget. The Committee professional budget itself is unreasonable. But to state the parties' budget allocations on a percentage basis is to refute any argument that the Debtors and the Prepetition/DIP Lenders intend to pay the freight for unsecured creditors' substantive involvement in these chapter 11 proceedings.

24. Together, the Challenge Period and the investigation and professional fees budgets ensure that the claims of the Prepetition Lenders will be allowed in the amounts stipulated by the Debtors, without any opportunity for the Committee or other parties in interest to undertake a meaningful investigation or objection. *See In re Channel Master Holdings, Inc.*, No. 03-13004,

2004 Bankr. LEXIS 576, at *8-9 (Bankr. D. Del. Apr. 26, 2004) (refusing to enforce a $75,000 cap on committee's professional fees under a postpetition financing facility and finding such cap unreasonable in light of much larger caps on other professionals in the case).

25. The Committee was formed only days ago, and in accordance with its statutory duties, hired counsel and began working diligently to get up to speed on the various first day filings. To date, however, the Committee has no information regarding the validity of the claims and liens of the Prepetition Lenders other than the Debtors' disclosure in the DIP Motion that certain liens of the Prepetition Lenders may be invalid and avoidable. Under normal circumstances, courts provide statutory committees with a reasonable period of time and a sufficient budget to investigate the validity of the liens and claims of secured creditors. And section 1103 of the Bankruptcy Code provides that a statutory committee may "investigate the acts, conduct, assets, liabilities, and financial condition of the debtor[s]" and "participate in the formulation of a plan." 11 U.S.C. §1103(c)(2) and (3). The Prepetition Lenders are clearly trying to blockade these statutory powers of the Committee.

26. The Committee respectfully requests that it be granted additional time to conduct a proper investigation of the Prepetition Lenders' liens and claims. As a matter of fundamental fairness and due process, the Committee should have a reasonable opportunity to investigate the claims and defenses of the Debtors before they are released, especially in light of the Debtors' disclosures regarding perfection issues with respect to Prepetition Lenders' collateral.

27. In light of the foregoing, the Committee requests that the Final Order be revised such that: (i) the Committee is granted automatic standing to commence a Challenge; (ii) the Challenge Period is 90 days from the Committee's formation, with a $75,000 investigation cap (by comparison, less than the professional retainers advanced to DIP Agent counsel and Debtors' counsel in these Chapter 11 Cases); (iii) professional fee budget is increased commensurate with

the substantial work to be done in these Chapter 11 Cases by the Committee; and (iv) the chapter 11 plan confirmation process be extended to a 120-day period after the Petition Date. Without these measures, the Final Order will effectively cede control of the plan and restructuring process in these Chapter 11 Cases to the Prepetition Lenders.

### D.   Liens on Avoidance Action Proceeds Should Not Be Permitted

28.   The DIP Credit Agreement and the Interim Order provide that the DIP Lenders will receive liens on Avoidance Action proceeds and that the Prepetition Lenders' will receive Avoidance Action proceeds as part of their Adequate Protection package. (DIP Credit Agreement, def'n of "Collateral"; Interim Order §§ 14(c) and 22). If approved, these provisions would deprive unsecured creditors of the benefit of a valuable source of recovery and, ironically, result in the proceeds of claims against Prepetition Lenders potentially being paid back to them.

29.   Avoidance powers are intended to allow a debtor-in-possession or trustee to recover certain payments for the benefit of unsecured creditors. *Buncher Co. v. Official Comm. of Unsecured Creditors of GenFarm Ltd. P'ship IV*, 229 F.3d 245, 250 (3d Cir. 2000) (stating that "[w]hen recovery is sought under section 544(b) of the Bankruptcy Code, any recovery is for the benefit of all unsecured creditors"). They are not property of the Debtors' estate that can be offered as security for a secured creditor to bury valuable claims against itself. *See In re Cybergenics Corp.*, 226 F.3d 237, 243-44 (3d Cir 2000), re'vd en banc, 330 F.3d 548 (3d Cir. 2003) (avoidance actions are not property of the estate and are not transferred to the debtor-in-possession, but are rights held by the estate for the benefit of all creditors).

30.   Because the Avoidance Actions are not the Debtors' property, allowing DIP Liens and Adequate Protection Liens on the proceeds of Avoidance Actions would be inconsistent with the intent behind avoidance and the scope of a debtor-in-possession's avoidance powers.

**E.      The DIP Facility Requires Additional Key Modifications**

31.      In addition to the foregoing, the Committee also objects to various other terms of the DIP Facility, including, without limitation, the provisions referenced below and requests that the Final Order be amended accordingly.

(a) <u>The Waivers in the DIP Facility are Premature and Overbroad</u>.  The DIP Facility would prematurely waive important statutory and common law rights of unsecured creditors for the duration of the Chapter 11 Cases (regardless of its trajectory), including (i) the right to surcharge collateral pursuant to section 506(c) of the Bankruptcy Code; (ii) the protections of the "equities of the case" exception of section 552(b) of the Bankruptcy Code; and (iii) the marshalling doctrine.  (Interim Order §§ 17, 38).

- The effect of the section 506(c) waiver is inappropriate, as it closes the door to a further avenue of recovery for the benefit of the Debtors' estate by the Debtors agreeing to pay for any and all expenses associated with the preservation and disposition of the DIP Lenders' and Prepetition Lenders' collateral, without due regard for the principal purpose of section 506(c) of the Bankruptcy Code.  Section 506(c) ensures that the cost of liquidating a secured lender's collateral is not paid from unsecured recoveries.  *See e.g., Precisions Steel Shearing v. Fremon Fin. Corp. (In re Visual Indus., Inc.)*, 57 F. 3d 321, 325 (3d Cir. 1995) ("section 506(c) is designed to prevent a windfall to the secured creditor").  A 506(c) waiver is wholly inappropriate absent the payment of all administrative expenses.  *See, e.g., In re The Sports Authority, Inc., et al.*, Case No. 16-10527 (MFW) (Bankr. D. Del. May 3, 2016) (D.I. 1699) (preserving 506(c) rights for the Debtors or any party with requisite standing in the final DIP financing order); *In re Motor Coach Indus. Intl, Inc.*, Case No. 08-12136 (BLS) (Bankr. D. Del. Oct. 22, 2008) (D. I. 244) (removing a section 506(c) waiver from the final postpetition financing order after the creditors' committee objection); *In re NEC Holdings Corp.*, Case No. 10-11890 (PJW) Hearing Transcript (D.I. 224) (Bankr. D. Del. July 13, 2010) (requiring that secured creditors pay the "freight" of the bankruptcy by ensuring an administratively solvent estate).

- This Court is also not in a position to determine at this stage what the "equities of the case" may be or assess the impact of the elimination of such a remedy.  "The purpose of the equity exception is to prevent a secured creditor from reaping benefits from collateral that has appreciated in value as a result of the trustees/debtor-in-possession's use of other assets of the estate (which normally would go to general creditors) to cause the appreciated value."  *In re Muma Servs.*, 322 B.R. 541, 558-59 (Bankr. D. Del. 2005).  A prospective finding that the

13

"equities of the case" exception contained in section 552(b) is waived is wholly inappropriate and should be stricken.

- The Debtors should also not waive any rights with respect to the marshalling doctrine in the Final Order. Such rights should be preserved for the Committee. Marshalling "prevent[s] the arbitrary action of a senior lienor from destroying the rights of a junior lienor or a creditor having less security." *Meyer v. United States*, 375 U.S. 233, 237 (1963). The DIP and Prepetition Lenders should be required to exhaust all other collateral before seeking satisfaction from unencumbered assets (which as noted above should exclude Avoidance Action proceeds), the value of which would otherwise be available for the benefit of unsecured creditors.

(b) <u>Adequate Protection</u>. The Debtors seek to grant a generous adequate protection package to the Prepetition Lenders consisting of (i) automatically perfected replacement liens on and security interests in the DIP Collateral; (ii) allowed superpriority administrative expense claims against the estates; and (ii) the payment of uncapped professional fees for Prepetition Agent's counsel and up to $75,000 of fees for counsel to certain Prepetition Lenders and DIP Lenders. (Interim Order § 23). The Debtors propose to provide the Prepetition Lenders the Adequate Protection Liens to "secure the Prepetition Obligations against, without duplication, the aggregate diminution, if any subsequent to the Petition Date, in the value of the Prepetition Collateral" resulting from, among other things, "depreciation, use, sale, loss, decline in market price or otherwise of the Prepetition Collateral as a consequence of the use, sale or lease of the Prepetition Collateral by the Debtors or as a result of the imposition of the automatic stay." (Interim Order §23 (a)). The Committee objects to the Adequate Protection package, which should be limited as follows, especially if the Court approves the roll-up: (i) if the Prepetition Lenders are determined to be undersecured, then any adequate protection payments and reimbursement of professional fees made to such party shall be applied towards repayment of principal; (ii) the proposed adequate protection liens and superpriority claims should not encumber or be satisfied from the proceeds of Avoidance Actions, and (iii) any and all Adequate Protection Liens should be limited to the diminution in value of Prepetition Collateral resulting from the "use, sale or lease" of such collateral.

(c) <u>Exercise of Remedies</u>. The Interim Order provides that the automatic stay is modified to allow the DIP Lenders to exercise remedies against DIP Collateral five days after providing notice to various parties that a default has occurred. (Interim Order §26). This effectively gives the Committee only five days, not even business days, to obtain an injunction from the Court to prevent the irreparable harm that could befall the estate if the DIP Lenders are allowed to exercise remedies without oversight. The Final Order should provide the Committee with ten business days to object on any grounds (with a hearing to be held on an expedited basis), and the DIP

        Lenders should only be able to exercise remedies once objections have been resolved.

    (d)    <u>Reports and Budget</u>. The Debtors are required to provide various financial reports and notices to the DIP Lenders and the Prepetition Lenders, as well as budgets, and provide them with certain access. The Debtors should be required to provide the Committee with the same access rights and all such reports and notices at the same time as they are provided to the DIP Lenders, and the Committee should have consultation rights over the budget.

    (e)    <u>Credit Bidding</u>. The Prepetition Lenders should not be permitted to credit bid unless (i) the Committee's lien challenge rights and ability to prosecute a Challenge are expressly preserved; and (ii) if a credit bid is for a pool of assets that includes unencumbered assets, the party making such credit bid must pay cash for any such unencumbered assets. (Interim Order § 37).

    (f)    <u>Indemnification</u>. The DIP Facility also includes broad indemnification provisions that obligate the Debtors to indemnify the DIP Lenders for losses and/or fees incurred in connection with the DIP Facility, the Chapter 11 Cases or any transactions in connection therewith. (Interim Order § 24). The broad language of the indemnity encompasses prepetition period which would create a situation in which estate professional could not be reimbursed for investigating or pursuing claims against the Prepetition Lenders and the Debtors would be required to reimburse the DIP Lenders' costs in defending against any such claims. This provision circumvents the Committee's Challenge rights and should not be approved in its current form.

32.    In sum, there is a strong public interest in reorganizing these Debtors with maximum transparency and a fair process. Before its operations came to a halt, the Company transported 740,000 passengers a year, many subsidized by Medicaid to travel for critical medical procedures. As the largest Alaskan carrier, it facilitated passenger travel, communications, and cargo transport for Alaska's oil and gas, mining, seafood, travel and tourism industries. Now, these travel and supply lines have been put in peril unless the Company is given time to receive government aid or other funding. The proposed DIP Facility forecloses any chance of that happening at the outset of these Chapter 11 Cases and should not be approved absent proposed modifications. Surely, there has to be a way for Ravn to rehire the Alaskan employees and serve Alaskans who most need their services during this national crisis.

## RESERVATION OF RIGHTS

The Committee and its professionals, who were engaged only about a few days ago, reserve the right to further object, supplement and amend this Objection, including by filing a declaration in support thereof, to introduce evidence at any hearing relating to this Objection and the DIP Motion and to further object to the DIP Motion or any other relief that the Debtors may seek in these Chapter 11 Cases.

[*Remainder of page intentionally left blank.*]

WHEREFORE, the Committee respectfully requests that the Court (a) deny the relief requested in the DIP Motion unless the objections raised herein are addressed and incorporated into a proposed Final Order that is satisfactory to the Committee, including, without limitation, (i) extending the currently proposed plan confirmation milestone to 120 days, the plan filing deadline to 45 days, and the disclosure statement approval to 75 days from the Petition Date; (ii) removing the roll-up component of the DIP Facility and adjusting downward the DIP fees and interest rates under the DIP Facility; (iii) granting the Committee a Challenge Period of 90 days (with automatic standing) and a $75,000 investigation budget as well as increasing the professional fee budget; (iv) removing Avoidance Action proceeds from the DIP Lenders' collateral and the Prepetition Lenders' Adequate Protection liens; (v) removing the 506(c), 552(b) and marshalling waivers and making other changes as discussed above; and (vi) granting such other relief as the Court determines is just and proper.

Dated: April 24, 2020
Wilmington, Delaware

BROWN RUDNICK LLP
Robert Stark, Esq.
Oksana Lashko, Esq.
Seven Times Square
New York, NY  10036
Telephone:  (212) 209-4800
Facsimile:  (212) 938-2862

*Proposed Counsel to the Committee*