**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re: | Chapter 11 |
| RAVN AIR GROUP, INC. *et al.*,[1] | Case No. 20-10755 (BLS) |
| Debtors. | (Jointly Administered) |
| | **Hearing Date: April 29, 2020 at 11:00 a.m. (ET)** |
| | **Re: Dkt. Nos. 13, 49, 88, 90, 98** |

**DEBTORS' OMNIBUS REPLY IN SUPPORT OF THE DEBTORS FOR MOTION FOR ENTRY OF A FINAL ORDER PURSUANT TO 11 U.S.C. SECTIONS 105, 361, 362, 363, 364 AND 507 AND BANKRUPTCY RULES 2002, 4001, AND 6004 (I) AUTHORIZING THE DEBTORS TO OBTAIN POSTPETITION SENIOR SECURED SUPERPRIORITY FINANCING, (II) AUTHORIZING THE DEBTORS' LIMITED USE OF CASH COLLATERAL, (III) GRANTING ADEQUATE PROTECTION TO THE PREPETITION SECURED PARTIES, AND (IV) GRANTING RELATED RELIEF**

The debtors and debtors in possession (the "Debtors") in the above-captioned chapter 11 cases (the "Chapter 11 Cases") hereby submit this omnibus reply (the "Reply") in further support of their motion (the "Motion"),[2] pursuant to sections 105, 361, 362, 363, 364 and 507 of title 11 of the Bankruptcy Code, Rules 2002, 4001, and 6004 of the Bankruptcy Rules, and Local Rule 4001-2, for entry of an order: (i) authorizing the Debtors to obtain postpetition financing (the "DIP Financing") pursuant to the Senior Secured, Super-Priority Debtor-In-Possession Credit Agreement substantially in the form attached as Exhibit A to the interim order granting the Motion [Dkt. No. 49] (such interim order, the "Interim Order", and such agreement, as amended from time

---

[1]      The Debtors in these Chapter 11 Cases and the last four digits of each Debtor's U.S. tax identification number are as follows:  Ravn Air Group, Inc. (3047), Ravn Air Group Holdings, LLC (5356), JJM, Inc. (4858), HoTH, Inc. (9957), Peninsula Aviation Services, Inc. (6859), Corvus Airlines, Inc. (7666), Frontier Flying Service, Inc. (8091), and Hageland Aviation Services, Inc. (2754).  The notice address for all of the Debtors is 4700 Old International Airport Road, Anchorage, AK 99502.

[2]      Capitalized terms not otherwise defined in this Reply shall have the meanings ascribed to such terms in the Motion.

to time, the "DIP Credit Agreement") together with the DIP Credit Documents and the DIP Budget; (ii) granting DIP Superpriority Claims to the DIP Secured Parties, (iii) authorizing the Debtors to use Cash Collateral and affording adequate protection; and (iv) granting related relief, and in response to the objections filed thereto by the Official Committee of Unsecured Creditors [Dkt. No. 98] (the "Objection"); PenAir Realty Holdings, LLC [Dkt. No. 90] (the "PenAir Realty Objection"); and GCI Communication Corp. [Dkt. No. 88] (the "GCI Objection"). For the reasons discussed below, the Debtors respectfully request that the Court overrule these objections and enter a final order substantially in the form attached hereto as **Exhibit A** (the "Final Order").[3]

## SUMMARY OF ARGUMENT

1.      The Governor of Alaska announced the first case of COVID-19 on March 12, 2020. By the end of the month, passenger revenue was down 80-90%. The Debtors acted quickly to reduce expenses – most notably by laying off substantially all of its workforce of over 1,300 people – and immediately went to their Prepetition Secured Parties and others to find some source of liquidity that would allow them to preserve their businesses. Their entreaties to the United States Government, the State of Alaska, and private lenders, investors, and others continue to this day.

2.      The Prepetition Secured Parties were the only group that timely offered up liquidity to the Debtors. In order to induce members of their group to participate as DIP Lenders, the Prepetition Secured Parties offered attractive terms on the DIP Loan. Because the value of the Debtors' assets is worth less than the total of its obligations to the Prepetition Secured Parties, the economic entities most affected by the DIP Loan terms were nonparticipating Prepetition Secured Parties.

3.      The Official Committee of Unsecured Creditors (the "Creditors' Committee"), which was formed on April 20, 2020, sought and obtained an extension from the Debtors to respond to the

---

[3]      Attached hereto as Exhibit B is a redline showing proposed changes from the Interim Order.

Motion and timely filed its objection (the "Objection") to the Motion on April 24, 2020.  The Objection laments the collapse of the Debtors' business and its impact on their employees, their unsecured creditors, and their community.

4.      Unfortunately, while recognizing the unprecedented impact of the COVID-19 pandemic, the Objection focuses its ire on the Prepetition Secured Parties and the DIP Lenders that have agreed to provide the Debtors with the liquidity to pay over $6 million of unsecured but priority employee claims and a brief runway to attempt to restart its business while concurrently driving toward an "Acceptable Plan" – *i.e.*, an orderly liquidation.

5.      The Debtors, through Ravn Air Group, Inc.'s Special Restructuring Committee, continue to seek means of partially or wholly restarting the Debtors' businesses.  While the results to date have been disappointing, especially with respect to the CARES Applications, the Debtors continue to look for ways to maximize recoveries to all parties and help protect the Debtors' many stakeholders.

## SUPPLEMENTAL FACTS

6.      As required by the Interim Order, the Debtors soon will be filing a proposed form of plan and disclosure statement.  The proposed plan anticipates the creation of a Liquidation Trust that will pay the DIP Claims and Prepetition Secured Parties' Claims (as both are defined in the plan) over time, but does not anticipate that the Prepetition Secured Parties will be paid in full.  All priority and administrative claims other than the DIP claims will be paid in full on or soon after the effective date of the plan, and there is a set-aside for the claims of unsecured creditors.  The Debtors believe that the proposed plan, if confirmed, will be an "Acceptable Plan" to the DIP Lenders as required under the Interim Order and the proposed final order sought by this Reply.

3

7.      The Debtors' operational downsizing was determined without direction from the Prepetition Secured Creditors but was, instead, a response to the circumstances set forth more fully in the *Declaration of John Mannion in Support of First Day Motions* filed on the Petition Date [Dkt. No. 5] and the *Supplemental Declaration of John Mannion in Support of First Day Motions* filed on April 7, 2020 [Dkt. No. 36] (the "First Day Declarations").  Prior to the downsizing and the March 12 announcement of the first COVID-19 case in Alaska, the Debtors employed in excess of 1,300 people and ran up to 400 daily flights.

8.      The downsizing occurred as follows:

a.      The Debtors laid off their first group of employees on March 23, 2020, when 134 employees were issued notices, and the Debtors reduced scheduled flying by approximately thirty percent.

b.      On March 27, 2020, the Debtors issued temporary layoff notices to 167 employees, and the Debtors reduced scheduled flying by approximately fifty percent.

c.      On April 5, 2020, immediately before the Chapter 11 Cases were commenced, the Debtors grounded all aircraft, stopped all operations, and reduced staffing to approximately 39 employees.

9.      Had the Debtors not made the reductions in force and other operational changes described above, their operating expenses would have continued to run at a rate in excess of $3 million per week.  Its operating receipts would have been a small fraction of that sum.

10.     The Debtors initially contacted the Prepetition Secured Parties to discuss the possibility of a shutdown and the need for emergency financing the week of March 22, 2020.  In connection with their discussions, the Debtors obtained a preliminary valuation of the Debtors' assets pursuant to which they determined that the value of those assets collectively was substantially less than the amount of

4

their obligations to the Prepetition Secured Parties.[4]  The Debtors are informed and believe that the Prepetition Secured Parties share this understanding.

11.     The Debtors have appointed and empowered a Special Restructuring Committee that exercises plenary power over the Debtors' decisions in these Chapter 11 Cases.  Two of the three members of the Special Restructuring Committee are independent directors who have extensive experience in distressed investing and transactions.  The third is the Debtors' Chief Executive Officer.

12.     The Special Restructuring Committee explored, and continues to explore, alternative transactions.  Its members have been in direct communications with representatives of the United States Treasury and have advocated for CARES Act funding to support an alternative to the currently-proposed plan.  The information available to the Special Restructuring Committee on the status of the Debtors' CARES Applications is that the funding requested will not be granted in the amounts requested or in amounts that would have supported alternatives previously under consideration by the Special Restructuring Committee.

13.     The Special Restructuring Committee continues to explore alternative transactions, including alternative transactions that would not pay the Prepetition Secured Parties in full.

14.     In the meantime, the Debtors have continued to work to reduce expenses and limit the impact of their downsizing by, among other things, subletting their facilities and ground service equipment to be used by other airline operators in remote areas and working with Alaska's boroughs and municipalities to assure essential services to their communities.

---

[4]     Such valuation is confidential but will be shared with the Creditors' Committee upon execution of an acceptable form of confidentiality agreement.

## **RESPONSE TO THE CREDITORS' COMMITTEE OBJECTION**

The Deal with the DIP Lenders Is Fair to the Debtors and Their Estates

15.     The main thrust of the Objection is that the DIP Lenders, as proxy for the Prepetition Secured Parties, are taking advantage of the Debtors to enrich themselves at the cost of the Debtors, the unsecured creditors, and the communities served by the Debtors.    In fact, the Debtors' circumstances are dire and the options made available through the DIP Financing give the Debtors the best opportunity to survive the COVID-19 crisis while providing reasonable protection to its secured creditors, priority creditors, and affected communities.

16.     First, the severity of the downturn meant that the Debtors were caught with over a thousand employees that had to be laid off with no material notice.    Worse yet, for reasons explained in the First Day Declarations, when their passenger revenues dropped precipitously, the Debtors' cash flow was seasonally stretched.    The DIP Financing provided cash to pay well over $6 million in priority claims for which cash would not have been otherwise available.    It also left the Debtors with a core group of employees that has been able to work with other air carriers and communities throughout Alaska to help assure that essential air services continue through, among other things, the sublease and continuing usage of the Debtors' properties in remote rural communities.

17.     Second, the DIP Lenders negotiated for a plan process that gave the Debtors nearly three months to find an alternative to a controlled liquidation.    This obviated the need to find a distressed buyer and negotiate a "quick sale" that likely would have been concluded in half the time without providing – as any chapter 11 plan must – any assurance that administrative and priority claims would be paid.

146484.01601/123192960v.1

18. Third, the foregoing process has in fact given the Special Restructuring Committee the ability to press the Debtors' CARES Applications with the United States Treasury while engaging with private equity sponsors, other governmental agencies, and prospective purchasers that have shown an interest in the Debtors' businesses and assets. The foregoing activities have proceeded with the full knowledge and consent of the DIP Lenders.

19. Fourth, the reality of the Debtors' circumstances is that there is no scenario in which the Debtors (or a chapter 7 trustee) would have been able to timely pay all of their priority employee obligations, explore other plan and sale options, or pay anything to unsecured creditors.

20. Finally, in light of the foregoing, the terms upon which the DIP Lenders have agreed to advance funds reflect not an economic transfer of value from unsecured creditors – as portrayed by the Creditors' Committee – but instead a potential redistribution between the Prepetition Secured Parties that have elected to participate in the DIP Financing and the Prepetition Secured Parties that have elected not to do so. Stated directly, the only parties with an economic interest in changing the financial terms of the DIP Financing are the Prepetition Secured Parties that have elected not to participate in that financing.

The Specific Objections Raised by the Creditors' Committee Should Be Overruled.

21. Timelines. The Debtors and the Special Restructuring Committee would welcome the additional flexibility that extended timelines would provide, but they are entirely reliant on the DIP Lenders to provide the financing both for the plan and for the Debtors' operations pending confirmation. Absent a compelling economic justification for additional financing (which the Special Restructuring Committee continues to explore), the Debtors cannot continue even their very limited operations. Accordingly, the deadlines set forth in the DIP Credit Agreement are necessary and appropriate in the absence of any alternative source of financing.

146484.01601/123192960v.1

22.    <u>Roll Up Loans and Fees</u>.  In light of the COVID-19 crisis, the Roll Up Loans and DIP Fees were necessary to persuade the Prepetition Secured Parties to advance additional funds to the Debtors.  In light of the fact that the value of the Debtors' assets is inadequate to pay the Prepetition Secured Parties' Claims in full[5], the Debtors submit that the quantum of fees or treatment of Roll Up Loans is an issue best left to be debated among the Prepetition Secured Parties.

23.    <u>Carve-Out and Investigation Budget and Timing</u>.  With respect to the Carve-Out, the Debtors and the DIP Agent have agreed to a reformulated Carve-Out that provides up to $600,000 over ten weeks, *i.e.*, the budgeted amount prior to a Carve-Out Trigger Event – for the Creditors' Committee's professionals as well as an expanded Carve-Out for the Debtors' professionals.  That change is reflected in the proposed Final Order attached hereto.  *Cf.* Objection, ¶23.  With regard to the investigation budget and timing, the Debtors believe that the periods proposed by the DIP Agent are adequate to allow the Creditors' Committee to make the necessary inquiries and perform the evaluation required of the Committee.

24.    <u>Avoidance Actions, Marshalling, and Related Provisions</u>.  The issues raised at paragraphs 28 through 31 of the Objection reflect the laundry list of standard disputes between secured creditors and unsecured committees and, as in most cases, the Debtors submit that they were able to negotiate a package of rights and obligations that they believe is fair on balance. (Debtors typically also state that they have no objection to revised DIP facility provisions that would improve the terms from the estates' perspective.)  Here, however, the Debtors are compelled to note the unusual circumstances that apply to these Chapter 11 Cases:  Well over $6 million of

---

[5]     As noted in paragraph 17 of the Objection, the Debtors have identified limited instances in which the Prepetition Secured Creditors may not have perfected or unavoidable interests in their assets (and will identify those circumstances to the Creditors' Committee).  They do not believe that the value of such assets is substantial relative to the total value of the Prepetition Secured Creditors' collateral.

146484.01601/123192960v.1

priority claims – *i.e.*, claims that are junior to the Prepetition Secured Parties' claims but senior to the claims represented by the Creditors' Committee – were paid on a first-day basis exclusively out of DIP Loan proceeds and the Prepetition Secured Parties' collateral *with their consent*.  It is one thing to assert that one's secured creditors should "bear the costs of freight" when they use a chapter 11 case as the vehicle for their recovery; this case presents a somewhat different circumstance, in which the Prepetition Secured Parties have paid the majority of the "freight" in advance and are committing to pay the balance through an Acceptable Plan.

25.    <u>Information Rights</u>.  The Debtors have no objection to sharing reports provided to the DIP Agent with the Creditors' Committee upon execution of a confidentiality agreement.

<b><u>RESPONSE TO THE PENAIR REALTY OBJECTION</u></b>

26.    PenAir Realty Holdings, LLC ("<u>PenAir Realty</u>") raises two sets of issues.  The first raise technical issues surrounding the DIP Lenders' legal interests in its leases and are addressed in the form of the proposed Final Order attached hereto at paragraph 27, which specifically addresses a landlord's rights in the context of the DIP Lenders' exercise of remedies.  Notwithstanding the assertions contained in the PenAir Realty Objection, nothing contained therein or elsewhere purports to allow the lenders to assume or take an assignment of the PenAir Realty leases (or any other lease) and acknowledges the landlord's right to compensation in the event that the DIP Lenders seek to exercise their remedies on the DIP collateral located on the landlord's property.  As discussed below, given the imminence of the rejection of the PenAir Realty leases, the PenAir Realty concerns regarding preservation of its legal rights do not require or merit the detailed revisions to the proposed form of Final Order contained in the PenAir Realty Objection.

27.    The balance of the PenAir Realty objection, though styled an objection to the Motion, is essentially a request for payment of an administrative claim for "stub rent."  PenAir

9

Realty has not noticed a motion for payment of such stub rent, nor has it made an evidentiary showing for such payment.  In the crush of activities that have consumed the Debtors during the first two weeks of their Chapter 11 Cases, they have not been in a position to examine the PenAir Realty demand for stub rent or determine whether they have defenses or setoffs.  Accordingly, PenAir Realty should file an appropriate motion with evidentiary support and allow the Debtors to respond to such motion.  Moreover, even if there were no defenses to the PenAir Realty stub rent claim, the Debtors should not be required to pay the claim at this time. *See, e.g.*, *In re DVI, Inc.*, 308 B.R. 703, 708 (Bankr. D. Del. 2004) (allowing a landlord an administrative expense claim for stub rent and post-rejection use but denying the landlord's request for immediate payment of such administrative expense claim and observing that, "[u]nlike section 365(d)(3) which requires immediate payment, an administrative claim under section 503(b) need not be paid immediately but can be paid as late as the confirmation date."); *In re HQ Global Holdings, Inc.*, 282 B.R. 169, 175 (Bankr. D. Del. 2002) (denying landlords' motions seeking immediate determination of the amount and payment of stub rent until the debtors had determined whether to assume or reject the leases and observing that "[w]e cannot conclude that the Landlords should have greater rights than other section 503(b) claimants."); *see also In re ADI Liquidation, Inc. (f/k/a AWI Delaware, Inc.)*, No. 14-12092 (KJC) (Bankr. D. Del. Oct. 6, 2014) [D.I. 279] (overruling 503(b)(9) claimants' objection to entry of a final DIP order that did not provide for payment of 503(b)(9) claims without prejudice to the claimants' right to raise payment of 503(b)(9) claims in connection with the sale); *In re Global Home Prods., LLC*, 2006 Bankr. LEXIS 3608, at *12-13 (Bankr. D. Del. Dec. 21, 2006) (denying claimant's motion seeking immediate payment of 503(b)(9) claim where, *inter alia*, immediately paying all administrative claims would jeopardize the debtors' ongoing

10

restructuring efforts).  PenAir Realty has cited no reason why the equities here favor immediate payment.

28.     As noted in the PenAir Realty Objection, the Debtors' post-petition contractual rent payment to PenAir Realty first comes due in May.  PenAir Realty Objection, ¶2.  As PenAir Realty well knows, the Debtors are in the process of removing their property from the PenAir Realty premises and expect to have vacated the leaseholds before May 1 (and to have brought a motion to reject the PenAir Realty leases), in which case no rent will be payable.[6]  Based on the foregoing, it is neither necessary nor appropriate for obligations to PenAir Realty to be budgeted for or provided special treatment.

## RESPONSE TO RESERVED RIGHTS

29.     GCI Communications Corp. ("GCI") has asked that the DIP Budget be increased to cover its obligations, which, prepetition, averaged over $70,000 per month.

30.     The GCI contract was entered into when the Debtors were fully operational and had in excess of 1,300 employees.  Today, they have no flight operations whatsoever and fewer than forty employees.  Accordingly, their need for GCI's internet, telecommunications, and related services are very small relative to the historical usage, as is the case with most of their utilities.

31.     In light of the foregoing, the Debtors have negotiated in principle a reduced payment obligation with GCI's business team, as a result of which the $70,442 monthly obligation will be reduced to less than $28,000.  In addition to this reduction and similar reductions that are being negotiated across the Debtors' utility providers, the Debtors expect that their payment obligations to utility providers that bill on a by-usage basis (as opposed to GCI's flat monthly rate)

---

[6]     Counsel for PenAir Realty had been advised of the Debtors' intention to vacate its properties in writing prior to the filing of the PenAir Realty Objection.

will be substantially lower post-petition than they were historically during the Debtors' normal business operations.  Moreover, as described above, the Debtors have been subletting certain of their facilities and ground service equipment to be used by other airline operators, and, in connection with such arrangements, the subtenants have agreed to pay the associated utilities.  As such, the Debtors submit that the line item for utilities in the DIP Budget is proper and sufficient.

32.     Like GCI, the Chugach Electric Association ("CEA") has questioned whether the Debtors have adequately provided for usage of CEA's services.  The CEA concerns are to be managed under the *Interim Order Granting Motion for Continuation of Utility Service and Approval of Adequate Assurance of Payment to Utility Company Under Section 366(b)* [Dkt. No. 47] and any final order that issues thereafter.  Should it become appropriate, the proposed Final Order, at paragraph 4(a), provides the Debtors with flexibility to adjust the DIP Budget at that time.

146484.01601/123192960v.1

## CONCLUSION

WHEREFORE, for the reasons set forth herein, the Debtors respectfully request entry of a final order granting the relief requested in the Motion, substantially in the form attached hereto as Exhibit A, and such other and further relief as may be deemed just and appropriate.

Dated: April 26, 2020
       Wilmington, Delaware

**BLANK ROME LLP**

*/s/ Victoria Guilfoyle*
Victoria A. Guilfoyle (No. 5183)
Stanley B. Tarr (No. 5535)
Jose F. Bibiloni (No. 6261)
1201 N. Market Street, Suite 800
Wilmington, Delaware 19801
Telephone: (302) 425-6400
Facsimile: (302) 425-6464
Email: guilfoyle@blankrome.com
      tarr@blankrome.com
      jbibiloni@blankrome.com

    -and-

**KELLER BENVENUTTI KIM LLP**
Tobias S. Keller (*pro hac vice*)
Jane Kim (*pro hac vice*)
Thomas B. Rupp (*pro hac vice*)
650 California Street, Suite 1900
San Francisco, California 94108
Tel:  (415) 496-6723
Fax:  (650) 636-9251
Email: tkeller@kbkllp.com
      jkim@kbkllp.com
      trupp@kbkllp.com

*Proposed Attorneys for Debtors*
*and Debtors-in-Possession*

146484.01601/123192960v.1