**EXHIBIT 1**

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

|  |  |
|---|---|
| | Chapter 11 |
| In re: | Case No. 20-10755 (BLS) |
| RAVN AIR GROUP, INC., *et al.*,[1] | (Jointly Administered) |
| Debtors. | **Re: Docket No. 197** |

**OBJECTION OF THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS TO
DEBTORS' MOTION FOR ORDERS (I)(A) AUTHORIZING AND APPROVING THE
BIDDING PROCEDURES, (B) APPROVING PROCEDURES RELATED TO THE
ASSUMPTION OF CERTAIN EXECUTORY CONTRACTS AND UNEXPIRED
LEASES, (C) APPROVING THE NOTICE PROCEDURES, (D) AUTHORIZING ENTRY
INTO ONE OR MORE STALKING HORSE AGREEMENTS, AND (E) SETTING A
DATE FOR THE SALE HEARING; AND (II) AUTHORIZING AND APPROVING (A)
THE SALE OF CERTAIN ASSETS FREE AND CLEAR OF ALL LIENS, CLAIMS,
ENCUMBRANCES AND INTERESTS, (B) THE ASSUMPTION AND ASSIGNMENT OF
CERTAIN CONTRACTS, AND (C) PAYMENT OF BID PROTECTIONS, IF
APPLICABLE**

The Official Committee of Unsecured Creditors (the "Committee") of the above

captioned debtors and debtors in possession (the "Debtors") files this objection (the "Objection")

to the *Debtors' Motion For Orders (II)(A) Authorizing And Approving The Bidding Procedures,*

*(B) Approving Procedures Related To The Assumption Of Certain Executory Contracts And*

*Unexpired Leases, (C) Approving The Notice Procedures, (D) Authorizing Entry Into One Or*

*More Stalking Horse Agreements, And (E) Setting A Date For The Sale Hearing; And (II)*

---

[1] The Debtors in these chapter 11 cases and the last four digits of each Debtor's U.S. tax identification number are as follows: Ravn Air Group, Inc. (3047), Ravn Air Group Holdings, LLC (5356), JJM, Inc. (4858), HoTH, Inc. (9957), Peninsula Aviation Services, Inc. (6859), Corvus Airlines, Inc. (7666), Frontier Flying Service, Inc. (8091), and Hageland Aviation Services, Inc. (2754). The notice address for all of the Debtors is 4700 Old International Airport Road, Anchorage, AK 99502.

*Authorizing And Approving (A) The Sale Of Certain Assets Free And Clear Of All Liens, Claims, Encumbrances And Interests, (B) The Assumption And Assignment Of Certain Contracts, And (C) Payment Of Bid Protections, If Applicable* [Dkt. No. 197] (the "Bidding Procedures Motion").[2]  In support of this Objection, the Committee submits the *Declaration of Richard Newman in Support of Debtors' Motion For Orders (II)(A) Authorizing And Approving The Bidding Procedures, (B) Approving Procedures Related To The Assumption Of Certain Executory Contracts And Unexpired Leases, (C) Approving The Notice Procedures, (D) Authorizing Entry Into One Or More Stalking Horse Agreements, And (E) Setting A Date For The Sale Hearing; And (II) Authorizing And Approving (A) The Sale Of Certain Assets Free And Clear Of All Liens, Claims, Encumbrances And Interests, (B) The Assumption And Assignment Of Certain Contracts, And (C) Payment Of Bid Protections, If Applicable,* attached hereto as **Exhibit A** (the "Newman Declaration"), and respectfully states as follows:

## PRELIMINARY STATEMENT

1.      The Debtors have recently announced that they have been conditionally approved for government payroll funding in the amount of $30 million.  This development is instrumental in paving the way for a potential going concern sale of the Debtors' assets.  In fact, the Debtors have already received and have been evaluating several indications of interest with respect to a sale of all or substantially all assets.  The Debtors now need additional time to evaluate the incoming offers and run a proper marketing process in order to attract other interested bidders to maximize the value of the Debtors' estates.  The Debtors do not disagree - as they stated at the second day hearing:

---

[2] Capitalized terms used herein but not otherwise defined shall have the meanings ascribed to them in the Bidding Procedures Motion.

- [W]e would be delighted to have more time.
- Every option, by definition, is more valuable if you have more time to exercise it.
- [O]ur special restructuring committee is absolutely committed to trying to find another alternative to the orderly liquidation that's laid out in [the Plan].

*See* Ex. B, Hearing Tr., Apr. 30, 2020 (the "Second Day Hearing Tr."), p. 26;4-6, 14-16.

2.      This Court also expressed "frank disappointment that [at the time of the second day hearing] . . . there was not necessarily a rescue structure available." Second Day Hearing Tr., p. 33;21-23. But the Court made clear that "to the extent that [ ] white knight or that opportunity, a meaningful opportunity, arises and we've been described different possibilities of state action, or public agencies, or other players, [ ] I will not hesitate to exercise the power that I have over the process of a Chapter 11 case in order to afford the debtor a meaningful opportunity to pursue a path that's superior to liquidation." Second Day Hearing Tr., p. 83;2-7.

3.      We are now at that critical inflection point when the Debtors have the green light from the Department of Treasury and received a few going concern offers. The Debtors need to be afforded that "meaningful" opportunity for a better outcome than simply handing the keys over to their secured lenders. While the secured lenders were convinced at the second day hearing that it was not going to happen,[3] they conceded that "if . . . there is somebody who wants to buy all the planes and resume operations . . . everybody will be on board with that strategy." Second Day Hearing Tr., p. 62; 8-10. That strategy is possible now. The government funding and the going concern sale prospects are materializing and there is a real need for more time to effectuate a fair sale process, without the disabling DIP milestones.

4.      The need for more time is justified because the Debtors have not fostered

---

[3] The secured lenders' counsel stated at the second day hearing, "we don't think it's going to come to fruition . . . [i]t has not resulted in anything yet, and we've been told it won't result in anything." [Second Day Hearing Tr., p. 59;6, 8-10].

competitive bidding to ensure a robust sale process in order to maximize the value of their estates for all constituents.  Prior to filing the Bidding Procedures Motion, the Debtors did not conduct a formal marketing process as the secured lenders made clear at the outset that they wanted to proceed with a liquidation and did not want time or resources diverted to a sale process.  *See* Ex. C, Joint Stipulation of Facts by Debtors and Committee, § 3.  The Debtors could not even hire an investment banker as they were handicapped by the constraints of the DIP budget.  *Id.*  The Debtors nonetheless filed the Bidding Procedures Motion to set up a structure for piecemeal liquidation in the event any buyer emerged and to ensure compliance with the DIP milestones. Appeasement of the secured creditors, however, through an *ad hoc* sale process, is not a sound business reason for conducting a sale.

5.    Section 363 sale procedures under the Bankruptcy Code were specifically designed to enable a fair and even-handed process that maximizes the value of a debtor's estate. To that end, the quality of the marketing process that a debtor-in-possession runs has significant influence on the success of the sale and maximization of the debtor's assets.  The Debtors' proposed bidding procedures have not been accompanied by the marketing process customary in the airline industry and chapter 11 practice to maximize the value of the estates for the benefit of creditors.

- The Debtors did not compile or reach out to an extensive list of potential aviation or airline investors to attempt to sell the business as a going concern.
- The Debtors did not create a teaser to send to potential interested parties
- The Debtors did not create a typical detailed and extensive Confidential Information Memorandum ("CIM") or similar marketing materials to assist in the marketing of the Debtors' assets.
- The Debtors have not conducted a valuation of the Debtors' assets as a going concern.
- The Debtors were not able to run a formal marketing process or otherwise attempt to sell the Debtors as a going concern prior to filing the Bidding Procedures Motion.

Joint Stipulation of Facts by Debtors and Committee, §§ 3-7.

6.       While the Debtors' special committee has made some outreach efforts, which resulted in generating a few meaningful indications of interest, more needs to be done to ensure that the value of the Debtors' assets is maximized for all constituents.  As explained herein, the Bidding Procedures Motion, which contemplates a sale on a compressed timeline of less than a month, simply does not foster a competitive process and will not optimize the value of the Debtors' estates.  Economic uncertainty and the peculiar facts and geography of these cases are not sufficient bases to abandon the standards of fair play and due process developed over the past several decades to protect stakeholders of troubled companies.

7.       In light of recent positive developments, the proposed sale process and the accompanying Plan confirmation deadline should be extended to allow the Debtors to properly market and evaluate the going concern offers in pursuit of effectuating a successful sale. Extending the timeline by a mere month (the Bid Deadline to July 17, 2020, the Auction to July 22, 2020 and the Sale Hearing to July 24, 2020) would not burden the Debtors estates and would allow motivated buyers to properly conduct diligence.  Newman Declaration, ¶ 11.  The additional time also would not prejudice the secured lenders, who stand to directly benefit from the Debtors' efforts to maximize the value of their assets.  *Id.*      Accordingly, the Bidding Procedures Motion should not be approved unless modified to accommodate the extended timeline.

**BACKGROUND**

A.      **The Debtors' Chapter 11 Proceedings**

8.       On April 5, 2020 (the "<u>Petition Date</u>"), the Debtors commenced voluntary cases under chapter 11 of the Bankruptcy Code.  The Debtors continue to operate their businesses and

5

manage their properties as debtors-in-possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code. On April 20, 2020, the United States Trustee appointed the Committee in these Chapter 11 Cases pursuant to Bankruptcy Code section 1102.

9.      On April 30, 2020, the Court issued a *Final Order Pursuant To 11 U.S.C. §§ 105, 361, 362, 363, 364 And 507, And Bankruptcy Rules 2002, 4001, And 6004 (i) Authorizing The Debtors To Obtain Postpetition Senior Secured Superpriority Financing, (ii) Authorizing The Debtors' Limited Use Of Cash Collateral, (iii) Granting Adequate Protection To The Prepetition Secured Parties, And (iv) Granting Related Relief* [D.I. 148] (the "DIP Order"). The DIP Order authorizes the Debtors use of the DIP budget to accomplish an orderly wind-down of the Debtors' operations and a liquidation of the Debtors assets.

10.     The key requirement of the financing under the DIP Facility was the establishment of aggressive milestones (the "DIP Milestones"), which the Debtors must satisfy or be in default under the DIP Facility. The DIP Milestones require the Debtors to obtain approval of the disclosure statement for a plan acceptable to their secured creditors by May 23, 2020 and have such plan confirmed by June 20, 2020.[4]  Final DIP Order § 10.

11.     The Debtors have filed a plan of liquidation [Dkt. No. 112] (the "Plan") at the behest of their secured lenders that provides for a liquidation trust with the secured lenders as the only trust beneficiaries. The Plan presupposes that the secured lenders will select the liquidation trustee and the oversight board to oversee the administration of the liquidation trust. Although the Plan provides for a "Creditors' Fund" for general unsecured creditors, the unsecured creditors stand to receive essentially nothing under the Plan.

12.     In acknowledging the short timeline imposed by the secured lenders, at the second

---

[4] Due to scheduling availability of the Court, the hearing to approve the Disclosure Statement is scheduled for May 27, 2020 and the hearing to confirm the Plan is tentatively scheduled for June 24, 2020.

day hearing, the Court expressed skepticism whether the proverbial "train" could be stopped if the Debtors were approached with the prospect of reorganization as a going concern, noting "[i]t is a heavy lift on the 10th of June, before confirmation, to unwind that process." Second Day Hearing Tr., p. 61;2-3, 18-19. However, the Court stressed its preference that the Debtors maintain "optionality" such that a going concern prospect may be preserved notwithstanding the Debtors' stated intention to liquidate. *See id.*

**B.**     <u>**Efforts to Obtain and Progress on Government Funding**</u>

13.     The Debtors found themselves in their current precarious economic position as a result of the COVID-19 virus. On March 20, 2020, the State of Alaska published Health Alert 9.2, a strong advisory to all Alaskans to cease any non-essential in-state long distance personal, business, or medical travel. Nearly overnight, the Debtors' passenger traffic plummeted 80-90%.

14.     In the weeks leading up to the Petition Date, the Debtors sought much needed financing from both the State of Alaska and the federal government. Specifically, the Debtors applied for relief under the federal Coronavirus Aid, Relief, and Economic Security Act (the "<u>CARES Act</u>").

15.     On May 20, 2020, the Debtors announced that they have been conditionally approved by the U.S. Treasury to seek payroll grants under the CARES Act Payroll Support Program. The press release notes that this assistance will "help pave the way for buyers who are seeking to purchase the entire Air Group, maximize creditor recoveries, and enable a successful exit from Chapter 11 that will preserve Alaska's largest and most vital regional air carrier and the many jobs and essential air service it provides."[5] This conditional relief makes the Debtors

---

[5] *See* Ravn Air Group Conditionally Approved To Move Forward For CARES Act Grants, Files Motion For Sale Process at https://www.flyravn.com/.

significantly more attractive to a potential buyer looking to purchase them as a going concern.

**C.    The Proposed Bidding Procedures Motion**

16.    In an effort to generate some buyer interest, on May 14, 2020, the Debtors filed the Bidding Procedures Motion.  The Bidding Procedures Motion contemplates a Bid Deadline of June 17, 2020, an Auction (if any) of some or all of the Debtors assets on June 22, 2020 and a Sale Hearing to coincide with the Plan confirmation hearing on June 24, 2020.

17.    The Bidding Procedures Motion facially preserves optionality by creating the means for an interested buyer to make a bid to purchase the Debtors, as a going concern.  However, the sale process advocated by the Debtors on the current compressed timeline dictated by their secured lenders will not realize optimal value for the estates.

18.    The Bidding Procedures Motion contemplates an auction for some or all of the Debtors' assets subject to the submission of Qualified Bids by potential bidders.  If the Debtors do not receive any Qualified Bids, the auction will be cancelled and the Debtors will seek confirmation of the Plan without the sale of the assets.  If one Qualified Bid is submitted, the Debtors shall, after consultation with advisors for the DIP Lenders and the Committee, promptly proceed to seek entry of the appropriate order approving the transaction with such bidder.  Finally, in the event that there is a competitive market for the Debtors' assets that results in receipt of more than one Qualified Bid, the Debtors shall conduct an auction on June 22, 2020.

19.    As the Debtors filed their Bidding Procedures Motion to comply with the compressed DIP milestones, the Debtors actually have not conducted a formal marketing process customary either within their industry or in chapter 11 practice.  Specifically, the Debtors:

> a.  have no formal plan for marketing or otherwise attempting to sell Debtors as a going concern in a 363 sale or otherwise;
>
> b.  have not engaged an investment banker in connection with the potential sale of Debtors as a going concern in a 363 sale or otherwise as the secured lenders

made clear to the Debtors that they would not want them diverting time or
resources to pursue a going concern sale in lieu of a liquidating plan;

c.  have not compiled or reached out to an extensive list of potential aviation and
    airline investors or other airline owners for purposes of marketing or
    otherwise attempting to sell their assets as a going concern or otherwise;

d.  have not created a customary CIM or other similar marketing materials for
    potential buyers in order to assist in the marketing for a potential sale as a
    going concern; and

e.  have not conducted a valuation of their assets as a going concern.

Joint Stipulation of Facts by Debtors and Committee, §§ 3-7.

20.    In fact, the Debtors approach to identifying or soliciting potential bidders has
been *ad hoc*.  Of the handful of potential bidders identified thus far, several have approached the
Debtors after the bankruptcy filing based on public reporting.  Others were parties known by the
Debtors' executives, who the Debtors' executives thought might have an interest in the Debtors'
assets.  *See* Newman Declaration at ¶ 8.

21.    The Debtors' special restructuring committee has reached out to over a dozen of
various parties and between such outreach and inbound inquiries, six parties so far have signed
confidentiality agreements in connection with potential interest in a purchase of the Debtors'
business as a going concern. Joint Stipulation of Facts by Debtors and Committee, § 2.   While
the Debtors are making good progress in evaluating the current indications of interest, the DIP
Milestones artificially shorten the Debtors sale process with a proposed bid deadline of June 17,
2020, a mere three weeks from when the Debtors are seeking approval of the Bidding Procedures
Motion.  As set forth in the Newman Declaration, an additional month, at least, is needed to
ensure a fair and well-rounded process to maximize the value of the Debtors' assets.  Newman
Declaration at ¶ 11.

22.    There are also limited marketing materials available for potential bidders.  Unlike
most asset sales in chapter 11 (or any going concern sales involving substantially all assets),

there is no traditional CIM and the marketing materials that the Debtors are using provide far less than what is typically found in a traditional CIM.  Newman Declaration at ¶  9.  It is of no surprise that the Debtors' information is so limited since they never hired an investment banker to properly market their assets.

23.    Rather than hire a qualified investment banker, at the request of their secured lenders, the Debtors have engaged Sage-Popovich, Inc. ("SPI"), a firm specializing in repossession of aircraft fleet, to prepare for and advise the Debtors on the potential liquidation. *See* Joint Stipulation of Facts by Debtors and Committee, §§ 8-10.  SPI has conducted an appraisal of the Debtors' assets for purposes of a potential liquidation, but has not performed any valuation of the Debtors' business as a going concern.  As set forth in the Committee's objection to SPI retention application [Dkt. No. 241], the retention of SPI is premature at this stage and the Debtors should not be using SPI to evaluate incoming going concern offers when there is a clear conflict of interest given the secured lenders' mandate to liquidate and the Debtors' fiduciary duties to maximize the value of their assets through a going concern sale.

## ARGUMENT

### A.    The Debtors' Proposed Sale Process on the Current Timeline Will Not Realize Optimal Value For The Debtors' Assets.

24.    The paramount goal in any 363 sale is to realize optimal value for the estates. *Simantob v. Claims Prosecutor, LLC (In re Lahijani)*, 325 B.R. 282, 288-89 (B.A.P. 9th Cir. 2005) ("The court's obligation in § 363(b) sales is to assure that optimal value is realized by the estate under the circumstances…."); *In re Mushroom Transp. Co., Inc.*, 382 F.3d 325, 339 (3d Cir. 2004) (discussing trustee's duty to maximize value of the estate); *In re Edwards*, 228 B.R. 552, 561 (Bankr. E.D. Pa. 1998).

25.    Accordingly, a proper 363 sale process is one that fosters robust, competitive

10

bidding.  *See Calpine Corp. v. O'Brien Envtl. Energy, Inc. (In re O'Brien Envtl. Energy, Inc.)*, 181 F.3d 527, 535-37 (3d Cir. 1999) (recognizing that more competitive bidding will bring better benefit to the estate); *In re Edwards*, 228 B.R. 552, 561 (Bankr. E.D. Pa. 1998) (noting judges should encourage "fervent bidding" that "redounds to the benefit" of the bankruptcy estate).

26.     Rather obviously, the higher the demand for the Debtors' assets, the more likely the Debtors will be to realize optimal value of their assets.   The "best way to determine value is exposure to a market.'' *Bank of America Nat. Trust and Sav. Ass'n v. 203 North LaSalle Street Partnership*, 526 U.S. 434 (1999).  Consequently, an auction involving more than one potential bidder is more likely to realize optimal value of the Debtors' assets than a situation in which the Debtors receive one or zero Qualified Bids and forgo an auction process.  Furthermore, more Qualified Bids will result in higher auction participation by potential bidders and an increased likelihood in realizing optimal value of the Debtors' assets.  Therefore, the goal is to create as much demand as possible for the Debtors' assets such that there is a competitive auction that results in a maximized price.

27.     It stands to reason that the easiest and, indeed, most basic way for the Debtors to create a market for these assets is to properly market the assets to potential buyers.  While the Debtors have done an informal outreach to certain interested parties and in fact, a few indications of interest have been received by the Debtors, there is no time to sit back and continue to wait for the market to come to them.  Passive marketing efforts are contrary to the ultimate goal of maximizing the return to the Debtors' estates and would limit potential buyers to only those who are following these Chapter 11 cases.  An otherwise would-be buyer who is unaware of these Chapter 11 cases has no ability to (i) purchase these assets and (ii) create further market demand, thereby pushing up the price of these assets.  Without a concerted effort to actively market these

assets, the Debtors proposed sale process cannot be said to realize the optimal value.

28.     Given the recent announcement of the conditional government funding approval, combined with existing indications of interest, the Debtors need more time to use those positive developments to gain momentum for the proper sale process.  The Debtors need to ramp up, not slow down and sit back, on their marketing efforts.  As set forth in the Newman Declaration, the Debtors as well as their secured lenders could greatly benefit from the hiring of a qualified investment banker.  *See* Newman Declaration at ¶¶ 12-13.  Use of unqualified professionals, like SPI, will not provide the necessary impact on the sales process, like a qualified investment banker, to maximize value.  *Id.*

29.     Without the investment banking expertise to manage the marketing of the Debtors' assets and the sales process, the Committee, other parties in interest, and perhaps most importantly, any potential bidders, have no in-depth information on the Debtors' assets and other critical data points.  As the Debtors acknowledge, they have not created a typical detailed and extensive CIM or similar materials to attract interested buyers to the Debtors' business.  *See* Joint Stipulation of Facts by Debtors and Committee, § 6.  The marketing materials provided by the Debtors only contain three of the multiple metrics typically found in a traditional CIM.  *See* Newman Declaration Ex. C.  Additionally, there is inadequate discussion of relief the Debtors are seeking and have already received or intend to receive under the CARES Act.  *Id.*

30.     Even if a potential bidder is following these Chapter 11 cases and has a real interest in submitting a bid, that bidder is nonetheless unlikely to do so as it lacks basic diligence information to form a ***qualified*** bid.  This lack of information is likely to deter many potential bidders from participating, thereby reducing the demand for the Debtors' assets and resulting in a

process that fails to realize the optimal return for the assets.[6]

31.    The Debtors currently cannot carry their burden that the proposed sale process will realize optimal value for the estates.  The Debtors need more time to enhance and improve their marketing process and sale efforts.  The Court should not approve the Bidding Procedures Motion absent the additional time for the Debtors to run a proper marketing and sale processes.

**B.    The Fast-Track Sale of the Debtors' Assets to Comply with**
**DIP Milestones Lacks A Sound Business Justification.**

32.    Numerous courts have found that a sale outside the ordinary course pursuant to Bankruptcy Code section 363(b) requires sound business justification.  *In re Abbotts Dairies of Pa., Inc.*, 788 F.2d 143, 149-50 (3d Cir. 1986); *In re Montgomery Ward Holding Corp.*, 242 B.R. 147 (D. Del. 1999); see also *Committee of Equity Security Holders v. The Lionel Corp. (In re Lionel Corp.)*, 722 F.2d 1063, 1070 (2d Cir. 1983).  A sound business justification for a sale outside the ordinary course requires a showing of good faith.  *See In re Phoenix Steel Corp.*, 82 B.R. 334, 335-36 ("Those elements [of a 363 sale] are that the proposed sale is fair and equitable, that there is a good business reason for completing the sale and the transaction is in good faith"); *In re Country Manor of Kenton, Inc.*, 172 B.R. 217, 220 (Bankr. N.D. Ohio 1994) ("The sound business purpose test has 4 requirements: (i) sound business reason; (ii) accurate and reasonable notice; (iii) adequate price; and (iv) good faith").  The Third Circuit has instructed that under the Bankruptcy Code provisions governing the sale of assets, the requirement of good faith is paramount in ensuring that section 363 will not be employed to circumvent the usual creditor protections of Chapter 11.  *See In re Abbots Dairies of Pa., Inc.*,

---

[6] The Debtors also need to re-assure prospective bidders that they are conducting proper maintenance and complying with all the regulatory requirements with respect to their grounded aircraft fleet to encourage any buyer to resume commercial operations of any of the Debtors' prior routes.  Aircraft, equipment and hangar spaces require maintenance to satisfy safety standards and obtain regulatory approvals.  Absent regular use and maintenance, assets depreciate rapidly and expense to resume operations increases.

788 F.2d 143 at 150.

33.     In the seminal opinion *In re Lionel*, the Second Circuit held that, in order for a pre-confirmation sale outside the ordinary course of business to pass muster, "there must be some articulated business justification, other than appeasement of major creditors, for using, selling or leasing property out of the ordinary course of business . . . ." *In re Lionel Corp.*, 722 F.2d at 1071 ("The rule we adopt requires that a judge determining a § 363(b) application expressly find from the evidence presented before him at the hearing a good business reason to grant such an application."); *see also Stephens Indus., Inc. v. McClung*, 789 F.2d 386, 390 (6th Cir. 1986) (adopting Second Circuit's reasoning in *In re Lionel Corp.*, and holding that a Section 363 sale must be predicated on a "sound business purpose").

34.     The *Lionel* court cautioned that, in considering a proposed Section 363 sale, courts  "must not blindly follow the hue and cry of the most vocal special interest groups; rather, [courts] should consider all salient factors pertaining to the proceeding and, accordingly, act to further the diverse interests of the debtor, creditors and equity holders, alike." *In re Lionel Corp.*, 722 F.2d at 1071 (emphasis added); *see also In re Culp*, 545 B.R. 827, 844 (Bankr. D. Del. 2016) (same); *In re Montgomery Ward Holding Corp.*, 242 B.R. 147 at 153-54 (same); *In re Delaware & Hudson Ry. Co.*, 124 B.R. 169, 176 (Bankr. D. Del. 1991) (same).

35.     Courts in this District have applied the *Lionel* "sound business justification" (or "sound business purpose") standard to Section 363 sales outside the ordinary course of business. *See, e.g.*, *In re Montgomery Ward Holding Corp.*, 242 B.R. 147, at 153 ("In determining whether to authorize the use, sale or lease of property of the estate under this section, courts require the debtor to show that a sound business purpose justifies such actions."); *In re Culp*, 545 B.R. 827 at 844 (transactions under Section 363 must be based on "sound business purpose" justifying the

14

sale); *In re Pursuit Capital Mgmt., LLC*, 2016 WL 5402735, Case No. 15-801, at n.10 (D. Del. Sept. 26, 2016) (Andrews, J.) ("The sale of assets which is not in the debtor's ordinary course of business requires proof that: (1) there was a sound business purpose for the sale; (2) the proposed sale price was fair; (3) the trustee had provided adequate and reasonable notice; and (4) the buyer has acted in good faith."). Thus, in considering a proposed sale transaction, the Court must conduct an independent and meaningful review of the merits of the proposed transaction and the Debtors' purported business justification, and must ensure that the proposed sale adheres to the substantive and procedural safeguards embedded within the Bankruptcy Code. *See In re Lionel Corp.*, 722 F.2d 1063 at 1071; *In re Montgomery Ward Holding Corp.*, 242 B.R. 147 at 155.

36.     While not defined in the Bankruptcy Code, courts have consistently found a lack of good faith, and therefore an absence of a sound business justification, where a Debtor has failed to market its assets prior to a contemplated sale outside of the ordinary course. At its most basic level, a good faith effort to conduct a 363 sale requires competitive bidding. Where no marketing has been done, a proffered sale process cannot be said to have been contemplated in good faith. *See In re Country Manor*, 172 B.R. 217, 221; *see also In re Mangia Pizza Investments, LP,* 480 B.R. 669, 693 (Bankr. W.D. Tex. 2012) (finding that the debtor's failure to conduct a "definitive marketing and sale process" demonstrated a lack of good faith by failing to maximize the value of the estate and violated the best interest of creditors test); *In re Nicole Energy Services, Inc.,* 385 B.R. 201, 234-35 (Bankr. S.D. Ohio 2008) ("[T]he Court has given careful and heightened scrutiny to this transaction and concludes that the assets were adequately marketed, and the purchase agreement between the trustee and [buyer] will yield the highest and best price").

37.     In *Country Manor*, the debtors received one offer to purchase its assets and

15

moved for authority to sell substantially all of its assets pursuant to section 363. The Court found that the debtor's proposed sale of its business under section 363 failed the sound business purpose test for lack of good faith. *See In re Country Manor*, 172 B.R. 217 at 221. Specifically, the Court was "most concerned" with the debtor's lack of effort in soliciting other offers as the assets were never advertised. *See id.* Therefore, the Court concluded, the sale was not in good faith. *See id.*

38.    Closely tied to the concept of good faith is the accepted principle that courts approve only those bid procedures that will foster competitive bidding and ensure a robust sale process, not procedures designed to chill or undermine competitive bidding. *See In re Dura Auto. Sys., Inc.*, 2007 WL 7728109, Case No. 06-11202, at *90 (Bankr. D. Del. 2007) (bid procedures should "allow the Debtors to conduct the Auction in a controlled, fair and open fashion that will encourage participation by financially capable bidders who demonstrate the ability to close a transaction, thereby increasing the likelihood that the Debtors will receive the best possible consideration for the Sale Assets by helping ensure a competitive and fair bidding process."); *In re President Casinos, Inc.*, 314 B. R. 784, 786 (Bankr. E.D. Mo. 2004) ("Structured bid procedures should provide a vehicle to enhance the bid process and should not be a mechanism to chill prospective bidders' interests"). Accordingly, courts will not approve bidding procedures that "undermine principles of fair play," because "unless the bidding process remains fair and equitable, competitors will refrain from the type of full participation that is needed to assure bids for the highest reasonable value." *In re Jon J. Peterson, Inc.*, 411 B.R. 131, 137 (Bankr. W.D.N.Y. 2009).

39.    Because the Debtors are forced to move through these cases on an expedited timeline, they have filed their Bidding Procedures Motion for a sale process to coincide with the

DIP Milestone for Plan confirmation, without having conducted a proper marketing process. However, the secured lenders' pressure tactics are not a substitute for sound business judgment. The Debtors are making progress on attracting interested buyers on the heels of the conditional government funding approval and this progress should not be dismantled due to extremely short timeline.

40.     The proposed fast-track sale of the Debtors' assets short-circuits the actual process preventing the Debtors from properly identifying the most qualified going concern buyer for their business. As set forth in the Newman Declaration, the Debtors could have an additional month to market their assets and provide proper diligence to potential bidders with limited effect on the DIP budget. Newman Declaration at ¶ 11. The Debtors desperately need this additional time to properly run the marketing process and identify the most qualified bidder to maximize the value of their assets. Even if the additional time may exceed the DIP budget by a limited amount, it is in the best interests of all parties in interest, including the DIP Lenders, to ensure that the Debtors maximize the value of their assets and properly perform their fiduciary duties. *See Ford Motor Credit Co. v. Weaver,* 680 F.2d 451, 461 (6th Cir. 1982) ("a debtor in possession has the duty to protect and conserve the property in his possession for the benefit of creditors"); *In re Roblin Industries, Inc.*, 52 B.R. 241, 243 (Bankr. W.D.N.Y. 1985) ("a debtor in possession, like a trustee, is a fiduciary of each creditor of the estate"); *In re Tenney Village Co., Inc.*, 104 B.R. 562, 568 (Bankr. D. N.H. 1989) (finding that the proposed DIP financing agreement would "disarm the debtor of all weapons usable against it for the bankruptcy estate's benefit, place the debtor in bondage working for the [lender], seize control of the reins of reorganization, and steal a march on other creditors in numerous ways").

41.     The DIP Lenders' sole objective is to maximize their own returns and wrap this

17

case up as quickly as possible.  It only makes sense that the DIP Lenders allow the Debtors to run a proper sale process that includes the requisite marketing efforts and the time to run it.  With the right conditions, the opportunity of a successful sale process is available given the promise of government funding and indications of interest from several going concern bidders (even before any real marketing efforts have taken place).  A forced sale of the Debtors' assets on the DIP Lenders' timeline without the proper procedural and substantive safeguards would be solely for the benefit of the secured lenders and lacks good faith.  The Debtors, along with the Committee must be granted an opportunity to evaluate potential offers and transactions that make the most business sense for the Debtors' estates and all of their creditors.  For these reasons, the Debtors' Bidding Procedures Motion should not be approved on the currently contemplated timeline.

## RESERVATION OF RIGHTS

42.    The Committee reserves all rights with respect to the Debtors' proposed sale process and bidding procedures, including without limitation, the Committee's rights to supplement or amend this Objection in advance of, or in conjunction with, the hearing to approve the Bidding Procedures Motion, any sale of the Debtors' assets or the consideration provided in connection therewith.

## CONCLUSION

**WHEREFORE**, for the foregoing reasons, the Committee respectfully requests that (a)
the Court deny entry of an Order granting the relief requested in the Bidding Procedures Motion,
unless the timeline for approval of the bidding procedures is extended to (i) July 17, 2020 for the
Bid Deadline, (ii) July 22, 2020 for the Auction, and (iii) July 24, 2020 for the Sale Hearing and
the accompanying Plan confirmation hearing; and (b) grant such other and further relief as the
Court deems just and proper.

Dated: May 25, 2020                           Respectfully submitted,
     Wilmington, Delaware

**POLSINELLI PC**

*/s/ Christopher A. Ward*
Christopher A. Ward (Del. Bar No. 3877)
Shanti M. Katona (Del. Bar No. 5352)
Brenna A. Dolphin (Del. Bar No. 5604)
222 Delaware Avenue, Suite 1101
Wilmington, Delaware 19801
Telephone: (302) 252-0920
Facsimile: (302) 252-0921
cward@polsinelli.com
skatona@polsnielli.com
bdolphin@polsinelli.com

-and-

**BROWN RUDNICK LLP**
Robert J. Stark (pro hac vice)
Oksana P. Lashko (pro hac vice)
Max D. Schlan (pro hac vice)
Seven Times Square
New York, New York 10036
Telephone: (212) 209-4800
Facsimile: (212) 209-4801
rstark@brownrudnick.com
olashko@brownrudnick.com
mschlan@brownrudnick.com

*Proposed Counsel to the Official Committee of
Unsecured Creditors*

63775396 v6

19