# EXHIBIT A

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

|  |  |
|---|---|
| In re: | Chapter 11 |
| RAVN AIR GROUP, INC., *et al.*,[1] | Case No. 20-10755 (BLS) |
| Debtors. | (Jointly Administered) |

**DECLARATION OF RICHARD NEWMAN IN SUPPORT OF OBJECTION OF THE**
**OFFICIAL COMMITTEE OF UNSECURED CREDITORS TO DEBTORS'**
**MOTION FOR ORDERS (I)(A) AUTHORIZING AND APPROVING THE**
**BIDDING PROCEDURES, (B) APPROVING PROCEDURES RELATED**
**TO THE ASSUMPTION OF CERTAIN EXECUTORY CONTRACTS**
**AND UNEXPIRED LEASES, (C) APPROVING THE NOTICE PROCEDURES,**
**(D) AUTHORIZING ENTRY INTO ONE OR MORE STALKING HORSE**
**AGREEMENTS, AND (E) SETTING A DATE FOR THE SALE HEARING; AND**
**(II) AUTHORIZING AND APPROVING (A) THE SALE OF CERTAIN ASSETS**
**FREE AND CLEAR OF ALL LIENS, CLAIMS, ENCUMBRANCES AND**
**INTERESTS, (B) THE ASSUMPTION AND ASSIGNMENT OF CERTAIN**
**CONTRACTS, AND (C) PAYMENT OF BID PROTECTIONS, IF APPLICABLE**

I, Richard Newman, declare under penalty of perjury:

1.      I am a Managing Director with Alvarez & Marsal North America, LLC ("A&M").

The Official Committee of Unsecured Creditors (the "Committee") of the above-captioned

debtors and debtors-in-possession (the "Debtors") has selected A&M as its financial advisor, and

I am authorized to make this declaration (this "Declaration") on behalf of the Committee in

support of the Committee's objection (the "Objection")[2] to the *Debtors' Motion For Orders*

---

[1] The Debtors in these chapter 11 cases and the last four digits of each Debtor's U.S. tax identification number are as follows: Ravn Air Group, Inc. (3047), Ravn Air Group Holdings, LLC (5356), JJM, Inc. (4858), HoTH, Inc. (9957), Peninsula Aviation Services, Inc. (6859), Corvus Airlines, Inc. (7666), Frontier Flying Service, Inc. (8091), and Hageland Aviation Services, Inc. (2754). The notice address for all of the Debtors is 4700 Old International Airport Road, Anchorage, AK 99502.

[2] Capitalized terms not otherwise defined in this Declaration shall have the meaning set forth in the Objection.

*(II)(A) Authorizing And Approving The Bidding Procedures, (B) Approving Procedures Related To The Assumption Of Certain Executory Contracts And Unexpired Leases, (C) Approving The Notice Procedures, (D) Authorizing Entry Into One Or More Stalking Horse Agreements, And (E) Setting A Date For The Sale Hearing; And (II) Authorizing And Approving (A) The Sale Of Certain Assets Free And Clear Of All Liens, Claims, Encumbrances And Interests, (B) The Assumption And Assignment Of Certain Contracts, And (C) Payment Of Bid Protections, If Applicable* [Docket No. 197] (the "<u>Motion</u>").

2.      Except as otherwise noted,[3] all facts set forth in this Declaration are based upon (a) my personal knowledge of the Debtors' current operations and financial performance, (b) information learned from my review of relevant documents, and (c) information I have received from the Debtors' professionals. If I were called upon to testify, I could and would testify competently to the facts set forth herein.

## QUALIFICATIONS

3.      A&M is a global professional services firm that offers a wide variety of services to private and public clients, including financial turnaround and restructuring advisory services. My responsibilities at A&M primarily involve business plan review, liquidity management, budget planning, cash flow forecasting, and bankruptcy sales. In this capacity, I have advised clients in numerous chapter 11 cases, including those of: Avaya Inc.; Boomerang Tube, LLC; Communications Corporation of America, Inc.; Chesapeake Corporation; Endeavour Operating Corp.; Dresser, Inc.; Freedom Communications, Inc.; Getty Petroleum Marking Inc.; Keywell LLC; Kimball Hill, Inc.; Eastman Kodak Corporation; NewPage Corporation; Orchids Paper Products Company; Reader's Digest Association Inc.; SunEdison Inc.; TK Holdings Inc.; Tronox

---

[3] Certain of the disclosures herein relate to matters within the personal knowledge of other professionals at A&M and are based on information provided by them.

Inc.; Union Carbide Corporation; and Visteon Corp.

4.     During my approximately fifteen (15) years as a restructuring and turnaround management professional, I have been involved in analyses of sales under section 363(b) of the Bankruptcy Code and corresponding bid procedures, marketing efforts, and sale processes in numerous chapter 11 cases, including, among others, Bayou Steel BD Holdings LLC.; Freds, Inc.; Freedom Communications, Inc.; Hollander Sleep Products, LLC.; HRI Holding Corp. ("Houlihans") Keywell LLC; LifeCare Holdings, Inc.; NORPAC Foods Inc.; Orchids Paper Products Company; Synergy Pharmaceuticals, Inc.; and TK Holdings Inc.

5.     A copy of my biography, which includes additional details regarding my professional experience, is attached hereto as **Exhibit 1**.

**ANALYSIS**

6.     The Committee asked A&M to evaluate the Motion and the Debtors' marketing process both prior to the Petition Date and postpetition efforts to sell the Debtors' assets as a going concern.  To conduct this analysis, I, and other members of the A&M team, familiarized ourselves with the Debtors' operations and unique challenges, as well as the Debtors' current and prior efforts to market the Debtors' assets.  I analyzed how many weeks the sale process might be extended based upon the Debtors' cash flow budget and results to date.

**A.     The Debtors' Marketing Efforts**

7.     In my discussions with the Debtors' professionals and members of the Debtors' Special Restructuring Committee and a review of the Debtors' marketing materials, I have determined that the Debtors' marketing efforts to sell the Debtors assets as a going concern are less than adequate and do not meet the standards typically set forth in other chapter 11 cases.

8.     The Debtors have no formal plan for marketing the assets.  In fact, my

3

conversations with the Debtors' professionals and members of the Special Restructuring Committee establish that the approach to identifying or soliciting potential bidders has been *ad hoc*. The Special Restructuring Committee has reached out to over a dozen of various parties already known, either directly or indirectly to members of the Special Restructuring Committee. All other interest in the Debtors' assets has resulted from inbound inquiries after the bankruptcy filing based on public reporting. Between the Special Restructuring Committee outreach and inbound inquiries, six parties so far have signed confidentiality agreements in connection with potential interest in a purchase of the Debtors' business as a going concern. Beyond the fixed universe of directly or indirectly known parties who may have interest in the Debtors' assets and reliance on inbound inquiries, the Debtors marketing outreach has been limited. The Debtors have not hired an investment banker or similar financial advisor in connection with the potential sale of the Debtors' assets as a going concern. Nor have the Debtors done a valuation of their assets as a going concern. Instead, their rushed and ad hoc efforts have been forced by the Lenders' pre-baked desire to liquidate the Debtors' assets as quickly as possible.

9.　　　In addition to the limited marketing outreach, the marketing materials the Debtors have provided are likewise inadequate. To my understanding, the most comprehensive (if not only) marketing material provided by the Debtors to potentially interested parties is the presentation attached to this Declaration as **Exhibit 2**. As compared to a more traditional CIM, the Debtors' marketing materials fail to provide necessary information required by potential buyers as part of the marketing process. Though not exhaustive, I have identified fifteen (15) metrics typically found in a CIM. I could identify only three (3) in the Debtors' marketing presentation. A chart I prepared with the assistance of other professionals at A&M addressing each of these metrics is attached to this Declaration as **Exhibit 3**.

**B.**      **Need for Additional Time and an Investment Banker to Market the Debtors'
Assets**

10.      Now that the Treasury Department has expressed willingness to approve the
Debtors' application for as much as $30 million, the Debtors should be given, in my opinion,
more time to properly market the Debtors' business as a going concern and to run a true sale
process that will maximize value.  The interest in purchasing the Debtors' as a going concern
garnered even from the Debtors' *ad hoc* and inadequate marketing efforts thus far suggests that a
proper effort would be justified and potentially fruitful. The current timeline sought through the
Motion has been predetermined through the DIP Milestones.  According to the Debtors'
professionals and the Special Restructuring Committee, the DIP Lenders have expressed no
interest or willingness to extend DIP Milestones in order to extend the sale timeline.

11.      In my opinion, based on where the marketing efforts by the Debtors currently
stand and the level of interest currently expressed by potential bidders, the sale process could
benefit from an extension of a month. That would push the proposed confirmation hearing date
from June 24, 2020 to on or about July 24, 2020.  Based on my review of the Debtors' financials
and budget, the Debtors would exceed the DIP budget by approximately $686,000 due to a
three-week extension.  However, the Debtors could stay in compliance with the current DIP
budget through July 24 if the last two weeks of professional fees were delayed and paid from
sale proceeds.

12.      The Debtors may also benefit from hiring an investment banker to complete the
sale process.  While, even with a one-month extension, an investment banker may have limited
time to market the Debtors' assets to additional parties, any additional interest in the Debtors'
assets will only serve to maximize value.  Additionally, investment bankers are individually
suited to work with already-interested potential bidders to guide them through the bidding

process and work to drive value within the existing process itself in addition to looking externally for additional value-drivers.

13.     Currently, the traditionally investment banking activities of reviewing current indications of interest fall primarily to the Special Restructuring Committee, with input from SPI, which was engaged by the Debtors at the request of the Lenders.  Based on my review of SPI website, SPI is well-credentialed for repossession and liquidation of aircraft, which is the goal of the Lenders.  However, SPI lacks the proper expertise to market, analyze, or drive value of going-concern interest and potential bids.  It will be in the best interests of the Debtors' estates and the DIP Lenders to attempt to retain an investment banker that can maximize value of the Debtors' assets and generate the greatest return.

14.     For the foregoing reasons, in my opinion, the (a) Debtors' marketing efforts do not meet the standard for an adequate sale of assets in chapter 11, (b) the Debtors should have at least another month to market the Debtors' assets and maximize value for those potential bidders that already expressed interest in the Debtors' assets as a going concern, and (c) hiring of an investment bank will be in the best interest of the Debtors and the DIP Lenders as further means to maximize value.

    Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge and belief.

Dated: Wilmington, DE
    May 25, 2020                              /s/ *Richard Newman*
                                              Richard Newman

## **EXHIBIT 1**

# Rich Newman

## Managing Director – Co-Leader of UCC Practice



- Co-leads Alvarez & Marsal's Unsecured Creditors' Committee practice. Managing Director with Alvarez & Marsal Creditor Advisory in Chicago where he provides financial advisory services to creditors and focuses on representing official committees of unsecured creditors in bankruptcy proceedings. Specializes in 363 sales, liquidity management, business plan review, solvency, formulation of reorganization plans and litigation support

- With more than fifteen years of restructuring experience, Mr. Newman has advised unsecured creditor committees, healthy and distressed companies in leveraged recapitalizations, mergers and acquisitions, and support of interim management roles.

- Unsecured Creditor Committee assignments: Avaya, Boomerang Tube, Buccaneer Energy, Constar, Endeavour, Getty Petroleum, Global Aviation, Hollander Sleep Products, Keywell LLC, Kodak, LifeCare, NewPage, Orchids Paper, NORPAC Foods, Inc., Ryckman Creek Resources, LLC, SunEdison, Synergy Pharmaceuticals, Takata, Tintri, and Westinghouse

**Phone: (+1) 312 288 4056**

**E-mail Address:**
**rnewman@alvarezandmarsal.com**

- Debtor financial advisory, bank advisory, or out-of-court deals: Appleton Coated, Chesapeake Corporation, Detroit Public Schools, Dresser, Inc., Kimball Hill Homes, Severstal North America, Inc., Tronox Inc., Union Carbide and Visteon Corp.

- Testimony experience includes (i) Orchids Paper Products Company Case No. 19-10729, (ii) TK Holdings Inc. (f/k/a Takata) Case No. 17-11375 (November 2017), and (iii) Deposition re: SGK Ventures, LLC (f/k/a Keywell, LLC) Case No. 13-37603 (August 2014), among others

- B.S. in economics from George Washington University and a master's degree in business administration from The University of Texas. I have passed all three levels of the CIRA exam and received the Kroll Zolfo Cooper / Randy Waits Award for excellence on the CIRA exam

**ALVAREZ & MARSAL**

## <u>EXHIBIT 2</u>

**(REDACTED IN ITS ENTIRETY)**

## **EXHIBIT 3**

Comparison of Sale Materials
Comparison of Ravn April 2020 Presentation to Standard Confidential Information Memorandum ("CIM")

| # | Topic | Raven April 2020 Doc. | Market CIM | Commentary |
|---|---|---|---|---|
| 1 | Investment Highlights | X | X | |
| 2 | Industry Overview / Where Does Company Fit? | X | X | Could be improved, no meaningful analysis comparing Ravn to competition, historical or projected |
| 3 | Customer Overview | | X | Not satisfactory - no in depth discussion or analytics in presentation |
| 4 | Competition and Competitive Summary | | X | Not satisfactory -Couple pages and source of ranking against competition is not given. No detailed competitive summary by business (passenger, freight, etc.) |
| 5 | Management Team | X | X | |
| 6 | Historical Financials | | X | Not satisfactory - only 2019, and no costs by business unit |
| 7 | Projected Financials | | X | Not satisfactory - only one page, would expect at least 5-10 pages of assumptions. For example, how will you optimize fleet to properly address declines in passenger volumes |
| 8 | Historical and Projected Financials by Business | | X | Not satisfactory - not included |
| 9 | Summary of Key Assets | | X | Not satisfactory - Number of planes given but no information on age, condition and owned or leased. No detail for engines, hangars and property |
| 10 | Calendar - Deadline for NDAs, Bids Due, Auction, etc. | | X | Not satisfactory - not included |
| 11 | Overview of Cares Funding[1] | | X | Not satisfactory - not included. Only reference is company needs CARES funding |
| 12 | COVID-19 Mitigation Plans[1] | | X | Not satisfactory - not included |
| 13 | ORG Chart | | X | Not satisfactory - not included |
| 14 | Contact Information - Investment Banker / Management | | X | Not satisfactory - not included |
| 15 | Cost Detail - Corp. Overhead and SG&A | | X | Not satisfactory - not included.  Bidders ask for info as usually a good spot to save cash to offset investment requirement |

1. CIMs in today's environment mention COVID-19 mitigation and CARES funding if applicable to Debtor