# **EXHIBIT B**

 1  there's simply not enough time to do the things that Ravn needs
 2  to do and that Ravn needs additional time.
 3          We filed in our reply a fairly comprehensive response
 4  on that.  I think it is fair to summarize it as we would be
 5  delighted to have more time.  Every option, by definition, is
 6  more valuable if you have more time to exercise it.  But the
 7  deal that we got and the optionality that it has provided us,
 8  both in terms of allowing us to pay immediately some priority
 9  claims and also because of the plan format, auguring the
10  payment of all administrative and priority claims, was one
11  extraordinary benefit over one of the other alternatives, which
12  would've been a Chapter 7 filing at the outset.
13          The other is, as we've tried to make clear, our
14  special restructuring committee is absolutely committed to
15  trying to find another alternative to the orderly liquidation
16  that's laid out in the former plan that was filed on Monday.
17  As Your Honor so frequently hears, we take the best deal we can
18  negotiate, not the best one that exists in an idyllic world.
19          And frankly, I think that this is a fair deal and has
20  given us lots of opportunities to pursue the CARES Act
21  opportunities.  There are other opportunities and I don't
22  think, given our papers, I need to belabor the point.  I would
23  simply rest on that point.  And then there are the technical
24  issues around 552 and avoidance actions and the like.  I
25  propose to come back to that but stop at this point and let Mr.

1           THE COURT:  Okay.
2           MR. STARK:  I remember in grade school that Alaska is
3   a very big state.  But it is useful to see how big it is, when
4   compared against the contiguous United States.  And then,
5   looking below that, the map of connections -- the map of
6   connectivity, what Ravn does throughout the State of -- or did,
7   up until a few weeks ago, did throughout the State of Alaska.
8           At the top it says, air travel is key to life in
9   Alaska.  This is very different than living in the Northeast.
10  Vast distances and terrain necessitate air travel.  Over eighty
11  percent of Alaskan communities are not connected by road or
12  rail.  Many communities are not able to offer medical or dental
13  services, requiring residents to travel by air for care.
14          I walk across the street.  I take a cab, and I have
15  fifty different options.  These people can take an airplane --
16          THE COURT:  Let me ask you a question, because I want
17  to be clear.  On a lot of this, I think you're pushing an open
18  door, all right?  It was not lost upon me that this is not a
19  typical case and I don't have any problem with you quoting me
20  back from the first day transcript because I think, in many
21  ways, I repeated that when we started today's hearing with my
22  frank disappointment that we're in a situation where there was
23  not necessarily a rescue structure available.
24          So the importance of the services provided by this
25  company is not lost upon me.  But bankruptcy is a place of hard

1  for government funding that emerges because of these deadlines,
2  we'll be back in front of Your Honor, I suspect, very quickly
3  on that.
4          We just don't think, based on what we've heard, and
5  we've been working on this since mid-March, as have the
6  debtors, we don't think it's going to come to fruition, based
7  on what we've been told.  We've all made strenuous efforts.
8  We've all called our political connections.  It has not
9  resulted in anything yet, and we've been told it won't result
10 in anything, which is the news that Mr. Keller was talking
11 about earlier and that they submitted a -- and the debtor
12 submitted a supplemental declaration about.
13         Unless Your Honor has any questions, I'm going to move
14 on from the time element.
15         THE COURT:  So I want to be clear, because I think, to
16 be blunt, Mr. Stark's comments are that the lenders are either
17 simply taking the company or perhaps, giving up on the company.
18 Either one.  And so the question would be -- play this string
19 out for me, all right, because we're in a very fuzzy area.  So
20 say I give you your timeline, okay, and you're going to make
21 all the arguments that you're funding the professionals, and
22 you're funding the process, and you're paying the freight, and
23 you're doing what you're supposed to be doing.  And you're even
24 confirming a plan rather than moving forward with a credit bid
25 that leaves everybody hanging, right?

and just saying, you know something? We're in. We're going to liquidate. It is a heavy lift on the 10th of June, before confirmation, to unwind that process. And I'm confident that they may try, but how do I have confidence that the optionality that Mr. Stark is hoping to keep and maintain will, in fact, be there?

And again, you tell me it'll be the committee, the debtor, and you folks all in a line cheerleading a government entity. And I think I'd like to know how I can know that that's going to be what happens in June. Right now, that would be great. If the phone rang today, I have little doubt that everybody would jump on that and say you know something? We're going to pivot. Mr. Keller, please revise your plan, or we'll come up with a different deal, but it'll put planes back in the air and service the people of Alaska. I don't have any doubt that that happens if that phone call comes in today. That seems to me, again, pretty rational.

How does this train get stopped in June if that's, again, when prospects arise? I don't know if I've been clear on my suggestion, but that's --

MR. NEIER: I think you are, Your Honor. Obviously the debtor and the committee could always raise the issue to you. But I think what you're really asking is whether there's something irrevocable about what's going to happen going forward between now and June.

1         I think, Your Honor, if you hear from Mr. Keller and
2    you read the plan that was submitted on Monday, you'll see that
3    what's happening is the DIP is not going to be paid off in this
4    case.  It's going to roll to an exit, okay?  And all the claims
5    are going to go into a liquidating trust, to be liquidated over
6    three years.  Over three years.  So nothing's going to happen
7    immediately.
8         And if, in June, there is somebody who wants to buy
9    all the planes and resume operations, my guess is that
10   everybody will be on board with that strategy, and there's
11   nothing that will happen between now and June in terms of
12   liquidation of collateral.  There are some small deals, and I
13   think the debtors are planning on some de minimis asset sales
14   during the case, just to raise money to pay the freights and
15   pay down the DIP and so forth.
16        But we've been told by the debtors' airplane expert
17   that it'll take as much as, I think, thirty-three months to
18   liquidate the collateral.  And as Mr. Stark pointed out, these
19   planes are not worth very much today.  They're worth very
20   little today.  So delay may actually help the price of the
21   planes to recover.  And if these planes are liquidated, by the
22   way, what we've been told is they won't be liquidated in
23   Alaska.  They'll have to be flown to the U.S., and they're
24   likely going to be liquidated internationally.  It's a very
25   complicated job, and it's not going to result in a lot of

1  the fact is that, to the extent that that white knight or that
2  opportunity, a meaningful opportunity, arises and we've
3  described different possibilities of state action, or public
4  agencies, or other players, I want to be -- I will not hesitate
5  to exercise the power that I have over the process of a Chapter
6  11 case in order to afford the debtor a meaningful opportunity
7  to pursue a path that's superior to liquidation.
8           And again, I appreciate Mr. Neier's candor in saying,
9  look, a three-year liquidation of a lot of planes in the market
10 that we're in, is not the lender's first best hope.  I get
11 that.  But I think it's helpful to me -- to the parties, that I
12 can at least share with you that I think that this is a plan --
13 is a superior result, in many ways, to lots of different 363
14 transactions here, that might not come with some of the
15 benefits associated with a plan, and I'm cognizant of that.
16 But again, if opportunity arises, I would expect to be
17 contacted by the parties very promptly, and I can't predict
18 what those options or opportunities will be, but we are in a
19 very unusual situation.
20          So with that, I'm going to actually -- I think what
21 I'm going to do, is terminate the call.  We will reconvene at
22 2:30 Eastern.  If it is easier or more helpful that I get off
23 and the parties can at least confer about who's going to call
24 who, that's actually -- that might be the best way to do this,
25 rather than having you all go scramble through your cell