**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re: | Chapter 11 |
| RAVN AIR GROUP, INC., <u>et al.</u>, | Case No. 20-10755 (BLS) |
| Debtors. | (Jointly Administered)[1] |

**PROPOSED DISCLOSURE STATEMENT FOR THE
CHAPTER 11 PLAN OF LIQUIDATION
OF RAVN AIR GROUP, INC. AND ITS AFFILIATED DEBTORS**

<div style="border:1px solid black">

**THIS IS NOT A SOLICITATION OF ACCEPTANCE OR REJECTION OF THE CHAPTER 11 PLAN OF LIQUIDATION OF RAVN AIR GROUP, INC. AND ITS AFFILIATED DEBTORS. ACCEPTANCES OR REJECTIONS MAY NOT BE SOLICITED UNTIL A DISCLOSURE STATEMENT HAS BEEN APPROVED BY THE BANKRUPTCY COURT. THIS PROPOSED DISCLOSURE STATEMENT IS BEING SUBMITTED FOR APPROVAL BUT HAS NOT BEEN APPROVED BY THE BANKRUPTCY COURT.**

</div>

Dated: Wilmington, Delaware
May 26, 2020

**BLANK ROME LLP**

Victoria A. Guilfoyle (No. 5183)
Stanley B. Tarr (No. 5535)
Jose F. Bibiloni (No. 6261)
1201 N. Market Street, Suite 800
Wilmington, Delaware 19801
Telephone: (302) 425-6400
Facsimile: (302) 425-6464
Email: guilfoyle@blankrome.com
    tarr@blankrome.com
    jbibiloni@blankrome.com

**KELLER BENVENUTTI KIM LLP**

Tobias S. Keller (*pro hac vice*)
Jane Kim (*pro hac vice*)
Thomas B. Rupp (*pro hac vice*)
650 California Street, Suite 1900
San Francisco, California 94108
Telephone: (415) 496-6723
Facsimile: (650) 636-9251
Email: tkeller@kbkllp.com
    jkim@kbkllp.com
    trupp@kbkllp.com

*Counsel to the Debtors and Debtors in Possession*

---

[1] The Debtors in these Chapter 11 Cases and the last four digits of each Debtor's U.S. tax identification number are as follows: Ravn Air Group, Inc. (3047), Ravn Air Group Holdings, LLC (5356), JJM, Inc. (4858), HoTH, Inc. (9957), Peninsula Aviation Services, Inc. (6859), Corvus Airlines, Inc. (7666), Frontier Flying Service, Inc. (8091), and Hageland Aviation Services, Inc. (2754). The notice address for all of the Debtors is 4700 Old International Airport Road, Anchorage, AK 99502.

**<u>DISCLAIMER</u>**

THIS PROPOSED DISCLOSURE STATEMENT PROVIDES INFORMATION REGARDING THE *CHAPTER 11 PLAN OF LIQUIDATION OF RAVN AIR GROUP, INC. AND ITS AFFILIATED DEBTORS*, WHICH BANKRUPTCY PLAN THE DEBTORS ARE SEEKING TO HAVE CONFIRMED BY THE BANKRUPTCY COURT. THE INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT IS INCLUDED FOR PURPOSES OF SOLICITING ACCEPTANCES TO, AND CONFIRMATION OF, THE PLAN AND MAY NOT BE RELIED ON FOR ANY OTHER PURPOSE. APPROVAL OF THIS DISCLOSURE STATEMENT DOES NOT CONSTITUTE A DETERMINATION OR RECOMMENDATION BY THE BANKRUPTCY COURT REGARDING THE FAIRNESS OR THE MERITS OF THE PLAN.

THIS DISCLOSURE STATEMENT CONTAINS SUMMARIES OF CERTAIN PROVISIONS OF THE PLAN, CERTAIN STATUTORY PROVISIONS, AND CERTAIN DOCUMENTS RELATING TO THE PLAN. IN THE EVENT OF ANY CONFLICT, INCONSISTENCY, OR DISCREPANCY BETWEEN THE TERMS AND PROVISIONS IN THE PLAN AND THIS DISCLOSURE STATEMENT, THE PLAN SHALL GOVERN FOR ALL PURPOSES. ALL HOLDERS OF CLAIMS SHOULD READ THIS DISCLOSURE STATEMENT AND THE PLAN IN THEIR ENTIRETY BEFORE VOTING ON THE PLAN.

THE STATEMENTS CONTAINED HEREIN HAVE BEEN MADE AS OF THE DATE HEREOF UNLESS OTHERWISE SPECIFIED. HOLDERS OF CLAIMS AND EQUITY INTERESTS REVIEWING THIS DISCLOSURE STATEMENT SHOULD NOT INFER AT THE TIME OF SUCH REVIEW THAT THERE HAVE BEEN NO CHANGES IN THE FACTS SET FORTH HEREIN. ALTHOUGH THE DEBTORS HAVE MADE AN EFFORT TO DISCLOSE WHERE CHANGES IN PRESENT CIRCUMSTANCES COULD REASONABLY BE EXPECTED TO AFFECT MATERIALLY THE RECOVERIES UNDER THE PLAN, THIS DISCLOSURE STATEMENT IS QUALIFIED TO THE EXTENT CERTAIN EVENTS DO OR DO NOT OCCUR.

THIS DISCLOSURE STATEMENT HAS BEEN PREPARED IN ACCORDANCE WITH SECTION 1125 OF THE BANKRUPTCY CODE AND NOT NECESSARILY IN ACCORDANCE WITH FEDERAL OR STATE SECURITIES LAWS OR ANY OTHER NON-BANKRUPTCY LAW. THIS DISCLOSURE STATEMENT HAS NOT BEEN APPROVED OR DISAPPROVED BY THE UNITED STATES SECURITIES AND EXCHANGE COMMISSION (THE "<u>SEC</u>") OR ANY FEDERAL, STATE, LOCAL, OR FOREIGN REGULATORY AGENCY, NOR HAS THE SEC OR ANY OTHER SUCH AGENCY PASSED UPON THE ACCURACY OR ADEQUACY OF THE STATEMENTS CONTAINED IN THIS DISCLOSURE STATEMENT. ALL PERSONS OR ENTITIES SHOULD EVALUATE THIS DISCLOSURE STATEMENT AND THE PLAN IN LIGHT OF THE SPECIFIC PURPOSE FOR WHICH THE DOCUMENTS WERE PREPARED.

THE DEBTORS MAKE STATEMENTS IN THIS DISCLOSURE STATEMENT THAT MAY BE CONSIDERED FORWARD-LOOKING STATEMENTS UNDER THE FEDERAL SECURITIES LAWS. STATEMENTS CONCERNING THESE AND OTHER MATTERS ARE NOT GUARANTEES AND REPRESENT THE DEBTORS' ESTIMATES AND ASSUMPTIONS ONLY AS OF THE DATE SUCH STATEMENTS WERE MADE AND INVOLVE KNOWN AND UNKNOWN RISKS, UNCERTAINTIES, AND OTHER UNKNOWN FACTORS THAT COULD IMPACT THE DEBTORS' PLAN OR DISTRIBUTIONS THEREUNDER. IN ADDITION TO STATEMENTS THAT EXPLICITLY DESCRIBE SUCH RISKS AND UNCERTAINTIES, READERS ARE URGED TO CONSIDER STATEMENTS LABELED WITH THE TERMS "BELIEVES," "BELIEF," "EXPECTS," "INTENDS," "ANTICIPATES," "PLANS," OR SIMILAR TERMS TO BE UNCERTAIN AND FORWARD-LOOKING. CREDITORS AND OTHER INTERESTED PARTIES SHOULD ALSO REVIEW THE SECTION OF THIS DISCLOSURE STATEMENT ENTITLED "RISK FACTORS" FOR A DISCUSSION OF CERTAIN FACTORS THAT MAY AFFECT THE PLAN AND DISTRIBUTIONS THEREUNDER.

# TABLE OF CONTENTS

                                                                                                  **Page**

I.      INTRODUCTION .............................................................................................................3

        A.      Overview of the Plan .........................................................................................4

                1.      General Structure of the Plan .................................................................4
                2.      Material Terms of the Plan .....................................................................5
                3.      Summary of Treatment of Claims and Equity Interests Under the Plan ...........6

        B.      Plan Voting Instructions and Procedures ..........................................................7

                1.      Voting Rights ..........................................................................................7
                2.      Solicitation Materials .............................................................................8
                3.      Voting Instructions and Procedures .......................................................9
                4.      Confirmation Hearing and Deadline for Objections to Confirmation ...........11

II.     BACKGROUND REGARDING RAVN ........................................................................11

        A.      General Background. .......................................................................................11
        B.      The Debtors' Capital Structure .......................................................................13
        C.      Events Leading Up to the Chapter 11 Cases ...................................................14

                1.      Seasonal Cash Flow and the COVID-19 Crisis ...................................14
                2.      Pursuit of Financing and Decision to File Chapter 11 Cases ................15

III.    THE CHAPTER 11 CASES ...........................................................................................16

        A.      First Day Orders and Initial Employment Applications ..................................16
        B.      Motion to Pay Certain Employee Obligations .................................................16
        C.      DIP Financing Motion .....................................................................................17
        D.      Appointment of the Unsecured Creditors' Committee .....................................18
        E.      United States Trustee .......................................................................................18
        F.      Meeting of Creditors ........................................................................................18
        G.      Schedules, Statements of Financial Affairs, Claims Bar Dates, and Filed Claims ......18
        H.      Bidding Procedures Motion .............................................................................19
        I.      Other Events During the Chapter 11 Cases .....................................................19

IV.     SUMMARY OF THE JOINT CHAPTER 11 PLAN .....................................................19

        A.      Purpose and Effect of the Plan ........................................................................20
        B.      Substantive Consolidation and Its Relationship to the Plan Treatment of Claims ......20
        C.      The Liquidation Trust and the Liquidation Analysis .......................................22

                1.      Liquidation Analysis and Summary Thereof ........................................23

        D.      Treatment of Claims and Equity Interests........................................................23

                1.      Unclassified Claims ..............................................................................23

                        (a)     Administrative Claims ...............................................................23
                        (b)     Professional Fee Claims.............................................................24
                        (c)     Priority Tax Claims ....................................................................24

(d)    DIP Claims ................................................................................ 24

2.    Class 1: Prepetition Secured Creditor Claims ................................ 24
3.    Class 2: Other Secured Claims ...................................................... 25
4.    Class 3: Priority Claims ................................................................ 25
5.    Class 4: General Unsecured Claims ............................................... 26
6.    Class 5: Subordinated Claims ....................................................... 26
7.    Class 6: Equity Interests ............................................................... 26
8.    Special Provisions Regarding Insured Claims ............................... 26
9.    Settlement of Claims and Controversies ....................................... 27

(a)    Generally ...................................................................... 27
(b)    Implementing Settlement Elements .............................. 27

E.    Acceptance or Rejection of Plan ............................................................. 28

1.    Impaired Class of Claims Entitled to Vote ................................... 28
2.    Acceptance by an Impaired Class .................................................. 28
3.    Presumed Acceptances by Unimpaired Classes ............................ 28
4.    Impaired Classes Deemed to Reject Plan ..................................... 28
5.    Modifications of Votes ................................................................. 28
6.    Confirmation Pursuant to Bankruptcy Code Section 1129(b) ....... 28
7.    Elimination of Vacant Classes ...................................................... 29
8.    Severability of Joint Plan ............................................................. 29

F.    Implementation of the Plan ..................................................................... 29

1.    Implementation of the Plan ........................................................... 29
2.    Streamlining of the Debtors' Corporate Affairs ............................ 29

(a)    Debtors' Existing Directors, Officers, and Managers ..... 29
(b)    Dissolution of the Debtors ............................................ 29
(c)    Corporate Documents and Corporate Authority ............. 30

3.    Liquidation Trust ......................................................................... 30

(a)    Appointments ............................................................... 30
(b)    Creation and Governance of the Liquidation Trust ......... 30
(c)    Vesting of Liquidation Trust Assets .............................. 31
(d)    Purpose of the Liquidation Trust ................................... 31
(e)    Authority ...................................................................... 31
(f)    Limitation of Liability ................................................... 33
(g)    Indemnification ............................................................ 33
(h)    Insurance ...................................................................... 33
(i)    Tax Reporting ............................................................... 34
(j)    Distributions to Liquidation Trust Beneficiaries ............ 34
(k)    Other Plan Distributions ............................................... 35
(l)    Cash Investments .......................................................... 35
(m)    Registration and Transfer of the Liquidation Trust Interests ............. 35
(n)    Exemption .................................................................... 35
(o)    Pursuit and Resolution of Liquidation Trust Actions ...... 36
(p)    Termination of the Liquidation Trust ............................. 36
(q)    Control Provision ......................................................... 36

|   |   |   |   |
|---|---|---|---|
|   | 4. | Preservation of Privileges and Defenses | 36 |
|   | 5. | Preservation of Rights of Action | 37 |
|   |   | (a) Maintenance of Avoidance Actions and Causes of Action | 37 |
|   |   | (b) Preservation of All Liquidation Trust Actions Not Expressly Settled or Released | 37 |
|   | 6. | Cancellation of Instruments | 38 |
|   | 7. | Substantive Consolidation | 38 |
|   | 8. | Asset Sale at Confirmation. | 39 |
| G. | Executory Contracts and Unexpired Leases | | 39 |
|   | 1. | Assumption of Certain Executory Contracts and Unexpired Leases | 39 |
|   |   | (a) Assumption of Agreements | 39 |
|   |   | (b) Cure Payments | 39 |
|   |   | (c) Objections to Assumption/Cure Payment Amounts | 40 |
|   |   | (d) Resolution of Claims Relating to Assumed Contracts and Leases | 40 |
|   | 2. | Rejection of Executory Contracts and Unexpired Leases | 40 |
|   |   | (a) Rejected Agreements | 40 |
|   |   | (b) Rejection Claims Bar Date | 41 |
| H. | Conditions Precedent to the Effective Date | | 41 |
|   | 1. | Conditions to the Effective Date | 41 |
|   | 2. | Waiver of Conditions to the Effective Date | 41 |
|   | 3. | Effect of Non-Occurrence of Conditions to the Effective Date | 42 |
|   | 4. | Notice of the Effective Date | 42 |
| I. | Certain Miscellaneous Provisions | | 42 |
|   | 1. | Administrative Claims | 42 |
|   | 2. | Professional Fee Claims | 42 |
|   | 3. | Payment of Statutory Fees | 43 |
|   | 4. | Post-Effective Date Reporting | 43 |
|   | 5. | Dissolution of the Creditors' Committee | 44 |
|   | 6. | Modifications and Amendments | 44 |
|   | 7. | Severability of Plan Provisions | 45 |
|   | 8. | Compromises and Settlements | 45 |
|   | 9. | Binding Effect of Plan | 45 |
|   | 10. | Non-Discharge of the Debtors; Injunction | 45 |
|   | 11. | Releases and Related Matters | 46 |
|   | 12. | Exculpation and Limitation of Liability | 46 |
|   | 13. | Term of Injunctions or Stays | 47 |
|   | 14. | Revocation, Withdrawal, or Non-Consummation | 47 |
|   | 15. | Exemption from Transfer Taxes | 47 |
|   | 16. | Good Faith | 47 |
|   | 17. | Conflicts | 48 |
| V. | RISK FACTORS | | 48 |

|   | A. | Parties May Object to the Plan's Classification of Claims and Equity Interests | 48 |
|   | B. | The Debtors May Not Be Able to Obtain Confirmation of the Plan | 48 |
|   | C. | The Conditions Precedent to the Effective Date of the Plan May Not Occur | 48 |
|   | D. | Claims Estimation and Allowance of Claims | 49 |
|   | E. | Potential Pursuit of Liquidation Trust Actions Against Creditors and Others | 49 |
|   | F. | Risks Regarding Liquidation Trust Assets | 50 |
|   | G. | Tax Considerations | 50 |
| VI. | | CONFIRMATION OF THE PLAN | 50 |
|   | A. | The Confirmation Hearing | 50 |
|   | B. | Requirements for Confirmation of the Plan | 51 |
|   | C. | Best Interests of Creditors | 52 |
|   | D. | Feasibility | 53 |
|   | E. | Acceptance by Impaired Classes | 53 |
|   | F. | Confirmation Without Acceptance by All Impaired Classes | 54 |
|   |   | 1. No Unfair Discrimination | 54 |
|   |   | 2. Fair and Equitable Test | 54 |
|   | G. | Alternatives to Confirmation and Consummation of the Plan | 54 |
| VII. | | CERTAIN SECURITIES LAW CONSEQUENCES OF THE PLAN | 55 |
|   | A. | General | 55 |
|   |   | 1. Status as Securities | 55 |
|   |   | 2. Transfer Restrictions on Beneficial Interests | 55 |
|   | B. | Exemption from Offer and Sale of Securities Act and Blue Sky Laws | 55 |
|   |   | 1. Issuance of Beneficial Interests under Plan | 55 |
|   |   | 2. Resale of Beneficial Interests After Plan Effective Date | 56 |
|   | C. | Exchange Act and other securities law compliance | 57 |
| VIII. | | CERTAIN UNITED STATES FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN | 57 |
|   | A. | Certain U.S. Federal Income Tax Consequences of the Liquidation Trust | 59 |
|   | B. | Consequences to Holders of Claims Generally | 60 |
|   | C. | Consequences to Liquidation Trust Beneficiaries | 61 |
|   | D. | Withholding on Distributions, and Information Reporting | 62 |
| IX. | | RECOMMENDATION | 63 |

## EXHIBITS & SCHEDULES

EXHIBIT A          First Joint Chapter 11 Plan of Liquidation

EXHIBIT B          Liquidation Analysis

| |
|---|
| **THE EXHIBITS AND SCHEDULES ATTACHED TO THIS DISCLOSURE STATEMENT ARE INCORPORATED BY REFERENCE AS THOUGH FULLY SET FORTH HEREIN** |

**THE DEBTORS RESERVE THE RIGHT TO AMEND OR SUPPLEMENT THIS PROPOSED DISCLOSURE STATEMENT AT OR BEFORE THE CONFIRMATION HEARING**

### GENERAL OVERVIEW AND SUMMARY

This proposed disclosure statement (the "Disclosure Statement") describes in detail the historical background that led to the bankruptcy cases of Ravn Air Group, Inc. and its affiliated debtors and debtors in possession (collectively, "Ravn" or the "Debtors"), explains what has happened in the Debtors' bankruptcy cases, and sets forth the treatment of creditors in the Debtors' proposed plan of liquidation (the "Plan"). This overview and summary section highlights the main points discussed in the Disclosure Statement and should be read in conjunction with the remainder of the Disclosure Statement. This general overview and summary section is qualified by the express terms of the Plan.

### 1.    Background

The Debtors are a combination of five Alaskan air transportation businesses, which together constitute the largest regional air carrier and network in the state. The Debtors own and, until the COVID-19-related disruptions, operated 72 aircraft, at 21 hub airports and 73 facilities, serving 115 destinations in Alaska with up to 400 daily flights. Until the COVID-19-related disruptions, the Debtors had over 1,300 employees (non-union), and they carried over 740,000 passengers on an annual basis. The Debtors provided air transportation and logistics services to the passenger, mail, charter, and freight markets in Alaska, pursuant to U.S. Department of Transportation approval as three separate certificated air carriers. The Debtors' revenue was diversified across several service offerings essential to a state that has few roads and highways, and is separated by vast mountain ranges, rivers, oceans, glaciers, and frozen tundra. Passenger service provides the largest revenue stream, generating 54% of the Debtors' total revenue, followed by mail and bypass mail (23%), charter (12%), freight (5%), and other (6%).

Because of Alaska's harsh winter climate, the Debtors' businesses are highly seasonal. Their operations tend to consume cash during the last and first quarters of each year, when they must cover capital costs and costs associated with the maintenance of their extensive route network and aircraft fleets. On March 12, 2020, the Governor of Alaska announced the first case of coronavirus in Alaska on live television. Prior to that point, travel restrictions had already been instituted around the world and in the United States, which caused airlines across the country to experience substantial revenue losses as a result of decreased sales and canceled flights. These same effects hit Alaska on March 12. It was at that time that airline bookings dropped dramatically, in which the Debtors experienced an 80-90% decrease in passenger revenue at all three of its airlines, as compared to the Debtors' historical results for the same period. In addition, in mid-March, the Debtors, along with other Alaska carriers, began receiving demands from rural hubs and villages around Alaska not to fly passengers to or from their communities. Finally, on March 20, 2020, the State of Alaska published Health Alert 9.2, issuing a strong advisory to all Alaskans to cease any non-essential in-state long distance personal, business, or medical travel. In total, this caused an unprecedented drop in passenger traffic and passenger revenue placing the Debtors in a significant negative cash flow situation.

1

By mid-March 2020, the Debtors faced a liquidity crisis.  On March 23rd and 27th, 2020, the Debtors announced two rounds of drastic flight schedule and route reductions, temporary layoffs, as well as pay cuts.  Such cost-saving measures helped to conserve the Debtors' cash, but they were not enough to put the Debtors in a cash flow positive or neutral situation given the magnitude of the decline in passenger revenue relative to the cost to continue operating as a safe and compliant air carrier.  As a result, the Debtors very quickly found themselves in a situation where they needed additional financing to generate liquidity needed to continue operating.  By the end of March 2020, the Debtors did not have sufficient cash to fund operations, including their payroll obligations due and payable after April 5, 2020, and they were unable to secure additional financing given the dramatic COVID-19-related reduction in passenger demand and general uncertainty about when demand would normalize in the future.

## 2.    The Debtors' Bankruptcy Cases

The Debtors commenced these cases on April 5, 2020.  Among the "First Day" motions that the Debtors brought and for which relief was granted was a motion to obtain debtor-in-possession financing to, among other things, pay outstanding payroll and support the Debtors through these Chapter 11 Cases.  Further information about the first day motions and the commencement of the Chapter 11 Cases is provided below.

The DIP Loan (as hereafter defined) included among its conditions that the Plan be filed on or before April 27, 2020 (the first business day that is twenty days after the Petition Date), and that such Plan either "(a) pays the DIP Obligations, Roll-Up Obligations, and Prepetition Obligations in full in cash, or (b) is otherwise acceptable in form or substance to" various secured lender parties.  These parties advised the Debtor that, in the absence of substantial CARES Act funding or other commitments that materially improved the Debtors' recovery prospects, an "acceptable" plan would require the establishment of a liquidating trust and various of the provisions contained in the Plan.  After further consultation on the Plan's terms, the Debtors timely filed the Plan.  The Debtors believe that the Plan is acceptable in form and substance as required under the DIP Orders.

The Debtors have applied for loans and grants under the CARES Act.  On May 14, 2020, the United States Department of Treasury informed the Debtors that it was prepared to move forward with their Payroll Support Program applications, subject to certain requirements, including that the funds from the PSP grants be used exclusively for the payment of wages, salaries, and benefits to employees, and that the Debtors maintain the level of scheduled air transportation service served by the Debtors before March 1, 2020.  The Debtors are also required to provide a plan of reorganization that would demonstrates the Debtors' ability to satisfy the requirements under the PSP agreement.

## 3.    Debtors' Proposed Bankruptcy Plan

The Plan provides for the creation of a Liquidation Trust, which will own the Debtors' assets (including the Debtors' interests in aircraft and related properties) and will sell those assets to generate cash, and will distribute that (and other) cash to Holders of Liquidation Trust Interests. The Liquidation Trust will also own litigation claims against third parties and may generate cash through prosecution or settlement of those claims. However, the estimated recoveries to creditors

set forth below and in the Disclosure Statement do not take into account potential proceeds of these litigation claims because they are unpredictable and highly contingent. The Plan also provides that the Debtors may seek approval of an Asset Sale at Confirmation, in the event that the Debtors conclude that an Asset Sale at Confirmation will yield a higher or better return to the Estates than a sale by the Liquidation Trust, as described further herein.

Cash will be distributed by the Liquidation Trust to Holders of Liquidation Trust Interests over time (as it sells assets). The beneficiaries of the Liquidation Trust who will be Holders of Liquidation Trust Interests are Holders of DIP Claims and Holders of Prepetition Secured Creditor Claims. Holders of Administrative Claims, Priority Claims, Professional Fee Claims, and General Unsecured Claims are not beneficiaries of the Liquidation Trust and initially will receive cash distributions at or soon after the Effective Date in accordance with the Plan and as described further herein.

Further, the Plan provides for "substantive consolidation" of all of the Debtors into one entity. Thus, if Entity A holds $100 of assets and owes $0 of liabilities, and Entity B holds $0 of assets and owes $100 of liabilities, and if those two entities are substantively consolidated, the resulting entity will hold $100 of assets and owe $100 of liabilities.

The Debtors estimate the following recoveries for Holders of Liquidation Trust Interests and General Unsecured Claims under the Plan:

| Unclassified | DIP Claims | 100% of Allowed Amounts |
|---|---|---|
| Class 1 | Prepetition Secured Creditor Claims | 0 to 8% of Allowed Amounts |
| Class 4 | General Unsecured Claims | 0.4 to 0.6% of Allowed Amounts |

## I.    **INTRODUCTION**

Ravn Air Group, Inc. and the other Debtors in the above-captioned chapter 11 cases (the "Chapter 11 Cases") hereby submit this disclosure statement (the "Disclosure Statement") pursuant to sections 1125 and 1126(b) of title 11 of the United States Code (the "Bankruptcy Code"), in connection with the solicitation of votes on the *Chapter 11 Plan of Liquidation of Ravn Air Group, Inc. and Its Affiliated Debtors*, dated as of May [26], 2020 (as amended, modified, or supplemented from time to time pursuant to its terms, the "Plan"). A copy of the Plan is attached hereto as **Exhibit A**.[2]

---

[2]    All capitalized terms used but not defined herein shall have the meanings provided to such terms in the Plan. The summary of the Plan provided herein is qualified in its entirety by reference to the Plan. In the case of any inconsistency between the summary herein and the Plan, the Plan shall govern.

The purpose of this Disclosure Statement is to enable Creditors whose Claims are Impaired under the Plan and who are entitled to vote on the Plan to make an informed decision when exercising their right to accept or reject the Plan. This Disclosure Statement sets forth certain information regarding the Debtors' prepetition operating and financial history, their reasons for seeking protection under chapter 11 of the Bankruptcy Code, the course of these Chapter 11 Cases, and the anticipated orderly liquidation of the Estate Assets. This Disclosure Statement also describes certain terms and provisions of the Plan, certain effects of Confirmation of the Plan, certain risk factors associated with the Plan, and the manner in which Distributions will be made under the Plan. In addition, this Disclosure Statement discusses the confirmation process and the voting and election procedures that Creditors entitled to vote under the Plan must follow for their votes to be counted.

A.        **Overview of the Plan**

1.        **General Structure of the Plan**

A bankruptcy plan is a vehicle for satisfying the rights of holders of claims against and equity interests in a debtor. Consummation of a plan is the overriding purpose of a chapter 11 case. Upon confirmation and effectiveness, a plan becomes binding on the debtor and all of its creditors and equity interest holders.

In these Chapter 11 Cases, the Plan contemplates a liquidation of each of the Debtors and is therefore referred to as a "plan of liquidation." The Debtors' assets largely consist of aircraft and related assets, Cash, and the Liquidation Trust Actions under the Plan. The Liquidation Trust Actions include, but are not limited to, causes of action, claims, remedies, or rights that may be brought by or on behalf of the Debtors or the Estates under chapter 5 of the Bankruptcy Code and related statutes or common law, as well as any other claims, rights, or causes of action held by the Debtors' Estates. The estimated recoveries to creditors set forth in this Disclosure Statement do not take into account potential proceeds of the Liquidation Trust Actions because they are unpredictable and highly contingent. Among other things, although the Debtors believe that such litigation claims may exist, the ability to collect any judgment on those claims remains unknown at this time.

The Plan provides for the creation of a Liquidation Trust, as well as the appointment of a Liquidation Trustee, who will administer and liquidate all remaining property of the Debtors and their Estates, subject to the supervision and oversight of the Liquidation Trust Supervisory Board and the Liquidation Trustee, respectively, all as described more fully in Section IV.F of this Disclosure Statement. The Plan also provides that the Debtors may seek approval of an Asset Sale at Confirmation in the event that the Debtors conclude that an Asset Sale at Confirmation will yield a higher or better return to the Estates than a sale by the Liquidation Trust; *provided* that no Asset Sale shall be considered at the Confirmation Hearing or at Confirmation absent the consent of the DIP Lenders. The Plan also provides for Distributions to be made to certain Holders of Administrative Claims, Professional Fee Claims, Priority Tax Claims, DIP Claims, Prepetition Secured Creditor Claims, Other Secured Claims, Priority Claims, and General Unsecured Claims, and for the funding of the Liquidation Trust. The Plan also provides for substantive consolidation as of the Effective Date of the Debtors into Ravn Air Group, Inc.  Finally, the Plan provides for the cancellation of all Equity Interests in the Debtors, the dissolution and wind up of the affairs of

4

the Debtors, and the administration of any remaining assets of the Debtors' Estates by the Liquidation Trustee.

**THE DEBTORS BELIEVE THAT THE PLAN IS FAIR AND EQUITABLE, WILL MAXIMIZE RECOVERIES TO CREDITORS, AND IS IN THE BEST INTERESTS OF THE DEBTORS AND THEIR CONSTITUENTS. FOR THESE REASONS, THE DEBTORS URGE HOLDERS OF CLAIMS WHO ARE ENTITLED TO VOTE TO TIMELY RETURN THEIR BALLOTS AND TO VOTE TO <u>ACCEPT</u> THE PLAN.**

### 2.    Material Terms of the Plan

The following is a general overview of certain material terms of the Plan:

- All Allowed Administrative Claims, Allowed Professional Fee Claims, Allowed Priority Tax Claims, Allowed Other Secured Claims, and Allowed Priority Claims will be paid or otherwise satisfied in full as required by the Bankruptcy Code, unless otherwise agreed to by the Holders of such Claims and the Liquidation Trustee.

- Holders of Allowed DIP Claims will receive Class A Liquidation Trust Interests in full satisfaction of their Claims against the Debtors and their estates. Holders of DIP Claims will be deemed to have waived their rights to Distributions from the Creditors' Fund in respect of their deficiency General Unsecured Claims.

- Holders of Allowed Prepetition Secured Claims will receive Class B Liquidation Trust Interests in full satisfaction of their Claims against the Debtors and their estates. Holders of Prepetition Secured Claims will be deemed to have waived their rights to Distributions from the Creditors' Fund in respect of their deficiency General Unsecured Claims.

- Holders of Allowed General Unsecured Claims (which will not include any deficiency Claims of Holders of DIP Claims or Holders of Prepetition Secured Claims) will receive a Pro Rata share of the Creditors' Fund in satisfaction of their Claims against the Debtors and their estates.  The Creditors' Fund will be funded in the amount of $250,000.

- Holders of Allowed Subordinated Claims, if any, shall not be entitled to, and shall not receive or retain any property or interest in property under the Plan on account of such Allowed Subordinated Claims.

- All Equity Interests in the Debtors shall be deemed void, cancelled, and of no further force and effect. On and after the Effective Date, Holders of Equity Interests shall not be entitled to, and shall not receive or retain any property or interest in property under the Plan on account of such Equity Interests.

- In accordance with Section 5.06 of the Plan, subject to the rights of Allowed Other Secured Claims and the reservations set forth in such Section 5.06, the Debtors will be substantively consolidated into Ravn Air Group, Inc.

- Any Intercompany Claims that could be asserted by one Debtor against another Debtor will

be extinguished immediately before the Effective Date with no separate recovery on account of any such Claims, and any Intercompany Liens that could be asserted by one Debtor regarding any Estate Assets owned by another Debtor will be deemed released and discharged on the Effective Date; *provided, however*, that solely with respect to any Secured Claim of a non-debtor as to which the associated Lien would be junior to any Intercompany Lien, so as to retain the relative priority and seniority of such Intercompany Claim and associated Intercompany Lien, the otherwise released Intercompany Claim and associated Intercompany Lien will be preserved for the benefit of, and may be asserted by the Liquidation Trust.

- The Liquidation Trust will be created to (a) sell, liquidate, transfer, or otherwise dispose of the Liquidation Trust Assets, (b) most effectively and efficiently pursue the Liquidation Trust Actions for the collective benefit of all the Liquidation Trust Beneficiaries, and (c) pay Distributions, in accordance with the Plan.

### 3.    Summary of Treatment of Claims and Equity Interests Under the Plan

The table below summarizes the classification and treatment of Claims and Equity Interests under the Plan.

**THE PROJECTED RECOVERIES FOR PREPETITION SECURED CREDITOR CLAIMS AND GENERAL UNSECURED CLAIMS SET FORTH IN THE TABLE BELOW ARE ESTIMATES ONLY AND ACTUAL RECOVERIES MAY DIFFER. FOR A COMPLETE DESCRIPTION OF THE DEBTORS' CLASSIFICATION AND TREATMENT OF CLAIMS AND EQUITY INTERESTS, REFERENCE SHOULD BE MADE TO THE PLAN.**

| CLASS | DESCRIPTION | IMPAIRED/ UNIMPAIRED | PROJECTED RECOVERY |
|-------|-------------|----------------------|--------------------|
| None | Administrative Claims | Unimpaired | 100% |
| None | Professional Fee Claims | Unimpaired | 100% |
| None | Priority Tax Claims | Unimpaired | 100% |
| None | DIP Claims | Impaired | 100% |
| Class 1 | Prepetition Secured Creditor Claims | Impaired | 0 to 8% |
| Class 2 | Other Secured Claims | Unimpaired | 100% |
| Class 3 | Priority Claims | Unimpaired | 100% |
| Class 4 | General Unsecured Claims | Impaired | 0.4 to 0.6% |

146484.01601/123194608v.3

| Class 5 | Subordinated Claims | Impaired (deemed to reject) | 0% |
| Class 6 | Equity Interests | Impaired (deemed to reject) | 0% |

**THE DEBTORS BELIEVE THAT THE PLAN PROVIDES THE BEST RECOVERIES POSSIBLE FOR HOLDERS OF CLAIMS AGAINST THE DEBTORS AND THUS STRONGLY RECOMMEND THAT YOU VOTE TO <u>ACCEPT</u> THE PLAN.**

### B.  Plan Voting Instructions and Procedures

#### 1.  Voting Rights

a.  <u>Unclassified Claims (DIP Claims)</u>.  Unclassified Claims are entitled to be paid in full unless each Holder of such a Claim agrees otherwise and are not entitled to vote on the Plan.  This notwithstanding, the Debtors intend to solicit acceptances of the Plan from each Holder of a DIP Claim in order to establish that all Holders of DIP Claims accept the proposed treatment for Holders of DIP Claims under the Plan in lieu of payment on the Effective Date.

b.  <u>Classified Claims (Classes 1 and 4)</u>.  Under the Bankruptcy Code, only classes of claims or interests that are "impaired" and that are not deemed as a matter of law to have rejected a plan under Bankruptcy Code section 1126 are entitled to vote to accept or reject such plan. Any class that is "unimpaired" is not entitled to vote to accept or reject a plan and is conclusively presumed to have accepted such plan. As set forth in Bankruptcy Code section 1124, a class is "impaired" if the legal, equitable, or contractual rights attaching to the claims or equity interests of that class are modified or altered by the proposed plan. Holders of claims or interests within an impaired class are entitled to vote to accept or reject a plan if such claims or interests are "allowed" under Bankruptcy Code section 502.

Under the Bankruptcy Code, acceptance of a plan by a class of claims is determined by calculating the number and the dollar amount of allowed claims voting to accept such plan. Acceptance by a class of claims requires more than one-half of the number of total allowed claims voting in the class to vote in favor of the plan and at least two-thirds in dollar amount of the total allowed claims voting in the class to vote in favor of the plan; only those non-insider holders that actually vote to accept or reject the plan are counted for purposes of determining whether these dollar and number thresholds are met. Thus, a Class of Claims will have voted to accept the Plan only if two-thirds in amount and a majority in number that actually vote cast their Ballots in favor of acceptance.

Pursuant to the Plan, Claims in Class 1 and Class 4 are Impaired by, and entitled to receive a Distribution under, the Plan, and only the Holders of Claims in those Classes that are Allowed Claims or have been deemed allowed for voting purposes are entitled to vote to accept or reject the Plan. Only Holders of Claims in Class 1 and Class 4 as of the dates specified in the Disclosure Statement Order (the "<u>Voting Record Date</u>") may vote to accept or reject the Plan.

Pursuant to the Plan, Claims in Class 2 and Class 3 are Unimpaired by the Plan, and such Holders are deemed to have accepted the Plan and are therefore not entitled to vote on the Plan.

7

The Debtors will not solicit the votes of Holders of any Subordinated Claims in Class 5 because such Holders are deemed to have rejected the Plan; therefore, such Holders are not entitled to vote on the Plan. Pursuant to the Plan, Equity Interests in Class 6 will not receive or retain any property under the Plan on account of such Equity Interests, and are therefore deemed to reject the Plan and are not entitled to vote on the Plan.

## 2.    Solicitation Materials

The Debtors, with the approval of the Bankruptcy Court, have engaged Bankruptcy Management Systems, Inc. dba Stretto (the "Voting Agent") to serve as the voting agent to process and tabulate Ballots and to generally oversee the voting process. The following materials constitute the solicitation package (the "Solicitation Package"):

- This Disclosure Statement, including the Plan and all other Exhibits and Schedules thereto;

- The Bankruptcy Court order approving this Disclosure Statement (the "Disclosure Statement Order") (excluding exhibits);

- The notice of, among other things, (i) the date, time, and place of the hearing to consider Confirmation of the Plan and related matters and (ii) the deadline for filing objections to Confirmation of the Plan (the "Confirmation Hearing Notice");

- One or more Ballots, to be used in voting to accept or to reject the Plan and applicable instructions with respect thereto (the "Voting Instructions");

- A pre-addressed, postage pre-paid return envelope; and

- Such other materials as the Bankruptcy Court may direct or approve.

The Debtors, through the Voting Agent, will distribute the Solicitation Package in accordance with the Disclosure Statement Order. The Solicitation Package is also available without charge at the Debtors' restructuring website at https://cases.stretto.com/ravnair.

On or before June [10], 2020, the Debtors will File a Plan Supplement. As the Plan Supplement is updated or otherwise modified, it will be made available without charge at the Debtors' restructuring website at https://cases.stretto.com/ravnair.

If you are the Holder of a Claim and believe that you are entitled to vote on the Plan, but you did not receive a Ballot or your Ballot is damaged or illegible, or if you have any questions concerning voting procedures, you should contact the Voting Agent by writing to:

Ravn Air Group, Inc., et al. Ballot Processing
c/o Stretto
8269 E. 23rd Avenue, Suite 275
Denver, CO 80238
Email:  TeamRavnAir@Stretto.com
Phone:  855.749.4543

If your Claim is subject to a pending claim objection and you wish to vote on the Plan, you must File a motion pursuant to Bankruptcy Rule 3018 with the Bankruptcy Court for the temporary allowance of your Claim for voting purposes and your Claim or portion thereof, as applicable, must be temporarily allowed by the Bankruptcy Court for voting purposes by the Voting Deadline or you will not be entitled to vote to accept or reject the Plan.

**THE DEBTORS AND THE LIQUIDATION TRUST, AS APPLICABLE, RESERVE THE RIGHT, THROUGH THE CLAIM OBJECTION PROCESS, TO OBJECT TO OR SEEK TO DISALLOW OR SUBORDINATE ANY CLAIM FOR DISTRIBUTION PURPOSES, EXCEPT AS MAY BE EXPRESSLY PROVIDED OTHERWISE IN THE PLAN OR CONFIRMATION ORDER.**

### 3.    Voting Instructions and Procedures

As set forth in the Disclosure Statement Order, all votes to accept or reject the Plan must be cast by using the Ballots enclosed with the Solicitation Packages or otherwise provided by the Debtors or the Voting Agent. No votes other than ones using such Ballots will be counted, except to the extent the Bankruptcy Court orders otherwise. The Bankruptcy Court has fixed the Voting Record Date for the determination of the Holders of Claims who are entitled to (a) receive a copy of this Disclosure Statement and all of the related materials and (b) vote to accept or reject the Plan.

After carefully reviewing the Plan, this Disclosure Statement, and the detailed instructions accompanying your Ballot, you are asked to indicate your acceptance or rejection of the Plan by voting in favor of or against the Plan on the accompanying Ballot.

**The deadline to vote on the Plan is June [17], 2020 at 4:00 p.m. (prevailing Eastern Time) (the "Voting Deadline").** In order for your vote to be counted, your Ballot must be properly completed in accordance with the Voting Instructions on the Ballot, and actually received no later than the Voting Deadline, either by (i) submitting an electronic ballot through the case website at https://cases.stretto.com/ravnair or (ii) by mailing your Ballot so it is received no later than the Voting Deadline at the following address:

> Ravn Air Group, Inc., et al. Ballot Processing
> c/o Stretto
> 8269 E. 23rd Avenue, Suite 275
> Denver, CO 80238
> Email:  TeamRavnAir@Stretto.com
> Phone:  855.749.4543

Only the Holders of Allowed DIP Claims, or Allowed Claims or Claims that are deemed allowed for purposes of voting on the Plan in Class 1 or Class 4 as of the Voting Record Date are entitled to vote to accept or reject the Plan, and they may do so by completing the appropriate Ballots and returning those Ballots in the envelope provided to the Voting Agent so as to be actually received by the Voting Agent by the Voting Deadline. Each Holder of a Claim must vote

9

its entire Claim either to accept or to reject the Plan and may not split such vote. The Ballots will clearly indicate the appropriate return address. It is important to follow the specific Voting Instructions provided on each Ballot.

Unless otherwise provided in the Voting Instructions accompanying the Ballots, the following Ballots will not be counted in determining whether the Plan has been accepted or rejected:

- Any Ballot that fails to clearly indicate an acceptance or rejection, or that indicates both an acceptance and a rejection, of the Plan;

- Any Ballot received after the Voting Deadline, except if the Debtors have granted an extension of the Voting Deadline with respect to such Ballot in writing, or by order of the Bankruptcy Court;

- Any Ballot containing a vote that the Bankruptcy Court determines was not solicited or procured in good faith or in accordance with the applicable provisions of the Bankruptcy Code;

- Any Ballot that is illegible or contains insufficient information to permit the identification of the Claim Holder;

- Any Ballot cast by a Person that does not hold a Claim in the voting Class; and

- Any Ballot that is not signed or does not contain an original signature.

Any party who has previously submitted to the Voting Agent prior to the Voting Deadline a properly completed Ballot may revoke such Ballot and change its vote or elections by submitting to the Voting Agent prior to the Voting Deadline a subsequent properly completed Ballot for acceptance or rejection of the Plan. In the case where multiple Ballots are received from the same Holder with respect to the same Claim prior to the Voting Deadline, the last timely received, properly executed Ballot will be deemed to reflect that voter's intent and will supersede and revoke any prior Ballot. Any party who has delivered a properly completed Ballot for the acceptance or rejection of the Plan that wishes to withdraw such acceptance or rejection rather than changing its vote may withdraw such acceptance or rejection by delivering a written notice of withdrawal to the Voting Agent at any time prior to the Voting Deadline. To be valid, a notice of withdrawal must (i) contain the description of the Claims to which it relates and the aggregate principal amount represented by such Claims, (ii) be signed by the withdrawing party in the same manner as the Ballot being withdrawn, (iii) contain a certification that the withdrawing party owns the Claims and possesses the right to withdraw the vote sought to be withdrawn, and (iv) be actually received by the Voting Agent prior to the Voting Deadline.

**ALL BALLOTS ARE ACCOMPANIED BY VOTING INSTRUCTIONS. IT IS IMPORTANT THAT THE HOLDER OF A CLAIM ENTITLED TO VOTE FOLLOW THE SPECIFIC INSTRUCTIONS PROVIDED WITH EACH BALLOT.**

146484.01601/123194608v.3

If you have any questions about (a) the procedure for voting your Claim or making elections on your Ballot, (b) the Solicitation Package that you have received, or (c) the amount of your Claim, or if you wish to obtain, at your own expense (unless otherwise specifically required by Bankruptcy Rule 3017(d)), an additional copy of the Plan, this Disclosure Statement, or any appendices, schedules, or exhibits to such documents, please contact the Voting Agent at the address specified above. Copies of the Plan, Disclosure Statement, and other documents Filed in these Chapter 11 Cases may be obtained free of charge at the Debtors' restructuring website at https://cases.stretto.com/ravnair. Documents Filed in these Chapter 11 Cases may also be examined between the hours of 8:00 a.m. and 4:00 p.m., prevailing Eastern Time, Monday through Friday, at the Office of the Clerk of the Bankruptcy Court, 824 North Market Street, 3rd Floor, Wilmington, Delaware 19801.

The Voting Agent will process and tabulate Ballots for the Classes entitled to vote to accept or reject the Plan and will File a voting report (the "Voting Report") on or before October 19, 2018. The Voting Report will, among other things, describe every Ballot that does not conform to the Voting Instructions or that contains any form of irregularity, including, but not limited to, those Ballots that are late, illegible (in whole or in material part), unidentifiable, lacking signatures, lacking necessary information, or damaged.

**THE DEBTORS URGE HOLDERS OF CLAIMS WHO ARE ENTITLED TO VOTE TO TIMELY RETURN THEIR BALLOTS AND TO VOTE TO <u>ACCEPT</u> THE PLAN BY THE VOTING DEADLINE.**

### 4.    Confirmation Hearing and Deadline for Objections to Confirmation

Objections to Confirmation of the Plan must be Filed and served on the Debtors and certain other entities, all in accordance with the Confirmation Hearing Notice, so that such objections are actually received by no later than **June [17], 2020 at 4:00 p.m.** (prevailing Eastern Time). Unless objections to Confirmation of the Plan are timely served and Filed in compliance with the Disclosure Statement Order, they may not be considered by the Bankruptcy Court. For further information, refer to Section VI of this Disclosure Statement, "Confirmation of the Plan."

## II.    <u>BACKGROUND REGARDING RAVN</u>

### A.    General Background.

The Ravn group of airlines was formed through the combination of five well known and long-tenured Alaskan air transportation businesses, creating the largest regional air carrier and network in the state.  The Debtors own and, until the COVID-19-related disruptions, operated 72 aircraft, at 21 hub airports and 73 facilities, serving 115 destinations in Alaska with up to 400 daily flights. Until the COVID-19-related disruptions, the Debtors had over 1,300 employees (non-union), and they carried over 740,000 passengers on an annual basis.  The Debtors provided air transportation and logistics services to the passenger, mail, charter, and freight markets in Alaska, pursuant to U.S. Department of Transportation approval as three separate certificated air carriers. Two of the carriers (RavnAir ALASKA and PenAir) operate under Federal Aviation Administration ("FAA") Part 121 certificates and the other (RavnAir CONNECT) operates under an FAA Part 135 certificate.  In addition to carrying passengers, many of whom fly on Medicaid-

11

subsidized tickets, other key customers include companies in the oil & gas industry, the seafood industry, the mining industry, and the travel and tourism industries.  A corporate structure chart follows:



Before the Petition Date, the Debtors operated under three primary brands, RavnAir ALASKA, PenAir, and RavnAir CONNECT:

--    RavnAir ALASKA:  RavnAir ALASKA (FAA certificate name "Corvus Airlines") was founded in 1948 (f/k/a Era Aviation), and currently has a fleet of ten 37-seat De Havilland Canada DHC-8 aircraft.  RavnAir ALASKA operated as a scheduled Part 121 passenger and charter carrier, while also operating passenger flights in partnership with Alaska Airlines through codeshare, interline, and frequent flyer agreements. The airline also has interline agreements with other major international and domestic carriers including United, American, and Delta Air Lines.

--    PenAir:  In December 2018, HoTH, Inc., through a subsidiary, purchased certain assets of PenAir (FAA certificate name "Peninsula Aviation Services, Inc.") through a section 363 sale in the chapter 11 case of Peninsula Airways Inc., Case No. 17-00282-GS, in the United States Bankruptcy Court for the District of Alaska.  PenAir also operated as a Part 121 carrier flying five Saab 2000 45-seat aircraft in passenger and charter service, and operated in partnership with Alaska Airlines through a capacity purchase agreement to serve the City of Unalaska in the Aleutian Islands, as well as codeshare, interline, and frequent flyer agreements.

146484.01601/123194608v.3

-- RavnAir CONNECT:  RavnAir CONNECT is comprised of two Part 135 carriers, Hageland Aviation Services Alaska and Frontier Flying Services (this latter certificate is currently dormant).  RavnAir Connect/Hageland operated with a combined fleet of 57 aircraft – Beechcraft 1900s, Cessna 208s, PA-31 Piper Navajos, and Cessna 207s. RavnAir CONNECT is one of the largest Part 135 carriers in the U.S., and it connected the Debtors' passenger route network to over 110 smaller, rural Alaskan and Alaskan native communities.  It also provided vital charter, mail, bypass mail (food and medicine), and freight delivery services to these destinations.

The Debtors' revenue was diversified across several service offerings essential to a state that has few roads and highways, and is separated by vast mountain ranges, rivers, oceans, glaciers, and frozen tundra.  Passenger service provided the largest revenue stream, generating 54% of the Debtors' total revenue, followed by mail and bypass mail (23%), charter (12%), freight (5%), and other (6%).

### B.    The Debtors' Capital Structure

The Debtors' assets are comprised primarily of approximately seventy aircraft, including nine DeHavilland Dash-8 passenger aircraft and an assortment of smaller passenger and cargo aircraft made by manufacturers including Cessna, Piper, and Beech.  The Debtors believe that these aircraft, along with related personal property including spare parts, tools, and equipment, comprise the vast majority of the value of their assets.  In addition, the Debtors lease several parcels of real estate, some of which have improvements; the Debtors are in the process of evaluating the value of the leases and related improvements.  The Debtors believe that certain of the real estate-related assets may not be subject to priority, non-avoidable liens or mortgages, as discussed below.  While their evaluation is ongoing, the Debtors are not aware of any Causes of Action against third parties that have material value, including Causes of Action against Released Parties under the Plan.

The Debtors have significant liabilities.  Ravn Air Group, Inc. is the borrower under that certain Credit Agreement dated as of July 31, 2015 (as amended, the "Credit Agreement"), with certain lenders (collectively, the "Prepetition Secured Lenders") and BNP Paribas, as administrative agent (the "Prepetition Administrative Agent," and, together with the Prepetition Secured Lenders, the "Prepetition Secured Parties"), with respect to a term loan of up to $95 million and revolving loans in the aggregate amount of up to $15 million.  As of March 31, 2020, a total of approximately $90,907,954.51 exclusive of interest and fees payable under the Credit Agreement was owing to the Prepetition Secured Parties.

Debtor Ravn Air Group Holdings, LLC and the Debtors other than Ravn Air Group, Inc. are guarantors to the Credit Agreement.  Each of the Debtors have pledged substantially all of their assets to the Prepetition Secured Parties, including assets pledged to U.S. Bank, N.A., as security trustee (the "Prepetition Security Trustee") for the benefit of the Prepetition Secured Parties, pursuant to the terms of that certain Aircraft and Engine Mortgage and Aircraft Lease Agreement dated as of August 4, 2015 (all such collateral, the "Prepetition Collateral").

In addition to the Debtors' secured debt, as of the Petition Date the Debtors had approximately $30 million of trade indebtedness outstanding and accrued employee obligations of

13

approximately $6.5 million.  In accordance with the relief granted in response to the First Day Motions, the Debtors paid down substantially all of their priority claims payable to employees soon after the Chapter 11 Cases were commenced.  The Debtors anticipate that rejection claims relating to certain leased aircraft and real estate leased by the Debtors will increase the total of its unsecured debt substantially.  Finally, because the value of the Prepetition Collateral is not sufficient to pay the Claims of the Prepetition Secured Parties in full, pursuant to section 506(a) of the Bankruptcy, their Claims would normally be partially secured and partially unsecured.

The Debtors are majority-owned by investment affiliates of private equity firms J.F. Lehman & Company and W Capital Partners through Ravn Air Group Holdings, LLC and certain other holding companies.  Although persons affiliated with these investors make up a majority of the members of the board of Ravn Air Group, Inc., substantially all decisions relating to the management of the Debtors' cases (including decisions relating to financing, asset sales, and plan negotiations) have been fully invested in Ravn Air Group, Inc.'s Special Restructuring Committee, which is comprised of two independent directors, James Decker and Richard Nevins, and the Chief Executive Officer, David H. Pflieger, Jr.  Neither of the independent directors who are members of the Special Restructuring Committee is associated with the Debtors' equity investors; Mr. Pflieger holds a small equity interest in Ravn Air Group Holdings, LLC.

## C.    Events Leading Up to the Chapter 11 Cases

### 1.    Seasonal Cash Flow and the COVID-19 Crisis

Because of Alaska's harsh winter climate, the Debtors' businesses are highly seasonal. Their operations tend to consume cash during the last and first quarters of each year, when they must cover capital costs and costs associated with the maintenance of their extensive route network and aircraft fleets.  The business model relies heavily on cash flow received during the summer tourism season in the second and third quarters of the year, when passenger revenues are highest. Indeed, given the capital-intensive nature of the Debtors' business, strong financial results in the summer and fall months are essential to the Debtors' survival.

On March 12, 2020, after several months of increasing outbreaks around the world, and the World Health Organization declaring COVID-19 to be a pandemic, the Governor of Alaska announced the first case of coronavirus in Alaska on live television.  Prior to that point, travel restrictions had already been instituted around the world and in the United States, which caused airlines across the country to experience substantial revenue losses as a result of decreased sales and canceled flights.

These same effects hit Alaska on March 12.  It was at that time that airline bookings dropped dramatically, with the Debtors experiencing an 80-90% decrease in passenger revenue at all three of its airlines, as compared to the Debtors' historical results for the same period.  In addition, in mid-March, the Debtors, along with other Alaska carriers, began receiving demands from rural hubs and villages around Alaska not to fly passengers to or from their communities. Finally, on March 20, 2020, the State of Alaska published Health Alert 9.2, issuing a strong advisory to all Alaskans to cease any non-essential in-state long distance personal, business, or medical travel.  In total, this caused an unprecedented drop in passenger traffic and passenger revenue placing the Debtors in a significant negative cash flow situation.

By mid-March 2020, the Debtors faced a liquidity crisis.  On March 23rd and 27th, 2020, the Debtors announced two rounds of drastic flight schedule and route reductions, temporary layoffs, as well as pay cuts.  Such cost-saving measures helped to conserve the Debtors' cash, but they were not enough to put the Debtors in a cash flow positive or neutral situation given the magnitude of the decline in passenger revenue relative to the cost to continue operating as a safe and compliant air carrier.  As a result, the Debtors very quickly found themselves in a situation where they needed additional financing to generate liquidity needed to continue operating.  By the end of March 2020, the Debtors did not have sufficient cash to fund operations, including payroll obligations due and payable after April 5, 2020, and they were unable to secure additional financing given the dramatic COVID-19-related reduction in passenger demand and general uncertainty about when demand would normalize in the future.

### 2.    Pursuit of Financing and Decision to File Chapter 11 Cases

In the weeks leading up to these chapter 11 filings, the Debtors sought much-needed financing from two sources:  (1) their existing lenders and investors, and (2) State of Alaska and federal government relief packages in the form of grants, loans, or equity investments, particularly under the federal Coronavirus Aid, Relief, and Economic Security Act (the "CARES Act").  First, the Debtors engaged in extensive negotiations with its existing lenders and investors about the Debtors' liquidity situation.  In addition, the Debtors also sought to identify new sources of capital.

Through the month of March, the Debtors engaged in extensive negotiations with the Prepetition Secured Parties regarding the future of the Debtors and their operations, their ability to weather the COVID-19 pandemic with or without assistance (including grants and loans under the CARES Act), and the willingness of the Prepetition Secured Parties to provide bridge financing in light of the foregoing.  These negotiations (as well as the discussions with government officials described below) were made all the more difficult because of the inherent uncertainty regarding how long and the extent to which the current COVID-19 operating environment will last, as well as the fact that they were conducted telephonically, rather than in-person, as a result of COVID-19.

Separately, the Debtors also spoke with high-ranking representatives of the State of Alaska and the federal government.  Unfortunately, by the end of March 2020, it became clear that any state or federal government financial assistance or other relief was not going to be available before the Debtors ran out of cash and had to suspend operations.

On April 3, 2020, the Debtors submitted applications for grants under the CARES Act.  It is uncertain whether such applications will be granted or the timing of any such funding; however, the Debtors believe that any such government relief will be a key factor to enable the Debtors to resume operations and re-hire the employees the Debtors laid off as a result of the COVID-19-related business disruptions.  The Debtors also filed applications for up to $75 million in loans under the CARES Act later in the month (together with the grant applications, the "CARES Applications"), after the Petition Date.

On April 5, 2020, prior to the filing of these Chapter 11 Cases, the Debtors laid off almost all of their remaining workforce, other than a very small number of employees necessary to the administration of these Chapter 11 Cases.

15

Certain of the Prepetition Secured Parties (BNP Paribas, as administrative agent (in such capacity, the "DIP Agent") for itself and certain other financial institutions (collectively, in their capacities as such, the "DIP Lenders" and together with the DIP Agent, collectively, the "DIP Secured Parties") agreed to extend credit, as further described below (the "DIP Loan"), which financing has been funding the administration of these Chapter 11 Cases and allowed the Debtors to pay essential expenses, including the payroll and other employee expenses described in the Employee Wages Motion (as defined below), as well as other payments for which the Debtors sought and received authority in the other First Day Motions.

The Debtors were unable to identify an investor or lender that would provide the financing necessary for the Debtors to continue operations, either as a chapter 11 debtor-in-possession or outside of bankruptcy, other than the DIP Secured Parties and the DIP Financing.

## III.    THE CHAPTER 11 CASES

On April 5, 2020 (the "Petition Date"), the Debtors commenced voluntary cases under chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the District of Delaware. The Chapter 11 Cases are being jointly administered under the case caption *In re Ravn Air Group, Inc., et al.*, Case No. 20-10755 (BLS) (Bankr. D. Del.). An immediate effect of commencement of the Chapter 11 Cases was the imposition of the automatic stay under Bankruptcy Code section 362(a), which, with limited exceptions, enjoins the commencement or continuation of all collection efforts by Creditors, the enforcement of liens against property of the Debtors, and the continuation of litigation against the Debtors during the pendency of the Chapter 11 Cases. The automatic stay will remain in effect, unless modified by the Bankruptcy Court, until the Effective Date.

### A.    First Day Orders and Initial Employment Applications

On or about Petition Date, the Debtors Filed certain "first day" motions and applications with the Bankruptcy Court (the "First Day Motions") seeking certain immediate relief to aid in the efficient administration of these Chapter 11 Cases and to facilitate the Debtors' transition to debtor-in- possession status. The Bankruptcy Court held a hearing on these first-day motions on April 7, 2020, with a subsequent hearing held on April 29, 2020, with respect to certain of the First Day Motions. In connection with these hearings, the Bankruptcy Court entered a series of customary "first day" and "second day" orders. *See* Docket Nos. 42 through 49.

On or about April 29, 2020, the Debtors filed applications to employ Keller Benvenutti Kim LLP and Blank Rome LLP as bankruptcy co-counsel. *See* Docket Nos. 136 & 137.  On that date the Debtors also filed an application to employ Conway Mackenzie as financial advisors. *See* Docket Nos. 135. On May 6, 2020, the Debtors filed an application to employ sage-popovich as liquidation advisor. *See* Docket No. 175. The Bankruptcy Court entered orders for each of the applications. *See* Docket Nos. 226, 227, 228, [_].

### B.    Motion to Pay Certain Employee Obligations

As described above, in the weeks leading up to the Petition Date, the Debtors implemented several workforce reductions, the most recent of which was completed shortly before the filing of

the petitions. The Debtors reduced their workforce to 39 employees, who were and remain are necessary to work on administration of these chapter 11 cases, in the areas of accounting and finance, human resources, information technology support, and mechanics to maintain assets. But for the filing of these Chapter 11 Cases and the reductions in force, the Debtors' employees were scheduled to receive their next paychecks shortly after the Petition Date to cover work performed from March 16, 2020 to March 31, 2020. As set forth more fully in one of their First Day Motions, the Debtors sought authority to pay current and terminated employees their compensation. The First Day Motion also sought authority to make and disburse prepetition deductions, honor paid time off benefits, reimburse business expenses, and pay for certain accrued benefits. These obligations, in the aggregate, were estimated to be approximately $6.5 million.

The Bankruptcy Court granted the Debtors' motion to pay these employee obligations with respect to the relief requested at the hearing on an interim basis on April 7, 2020, and on a final basis on April 28, 2020. *See* Docket Nos. 48 & 123.

### C.    DIP Financing Motion

On the Petition Date, the Debtors Filed a motion (the "DIP Motion") seeking interim and final orders authorizing the Debtors to, among other things, (i) borrow the DIP Loan of up to $14 million (with $6 million to be available on an interim basis) in postpetition financing from the "DIP Lenders"; (ii) grant priming liens and security interests to the DIP Lenders to secure the applicable Debtors' obligations under the DIP Loan; (iii) subject to the terms and conditions set forth in the DIP Motion, use the DIP Lenders' cash collateral; and (iv) provide adequate protection to the holders of alleged prepetition liens. *See* Docket No. 13.

On April 7, 2020, the Bankruptcy Court entered its first interim order on the DIP Motion, authorizing the Debtors to, among other things, borrow up to $6 million for the period from the Petition Date through the date of the further interim hearing set for April 29, 2020. *See* Docket No. 49. On April 30, 2020, the Bankruptcy Court entered its final order on the DIP Motion, which, among other things, increased the borrowing limit to the full $14 million (exclusive of the Roll Up Loans, as defined therein, in the aggregate amount of $24 million). *See* Docket No. 148 (the "Final DIP Order"). The Final DIP Order entered by the Bankruptcy Court contains various important features, including:

- Authorization for the Debtors to borrow up to $14 million from the DIP Lenders, plus assume an additional $24 million in Roll Up Loans;

- Approval of the DIP Loan Documents between the Debtors and the DIP Lenders;

- The grant of a priming security interest and lien on the Prepetition Secured Creditors' collateral, including certain aircraft and related assets;

- Authorization for the Debtors to use the DIP Lenders' Cash Collateral (as defined in the Final DIP Order), subject to the conditions set forth in the Final DIP Order;

- Carve-outs providing for the payment of certain expenses incurred during the Chapter 11 Cases, including amounts that may be payable to professionals retained by the Debtors and the Creditors' Committee;

17

- Certain Events of Default provisions setting forth the DIP Lenders' rights upon the occurrence thereof; and

- Standard waivers of certain provisions of the Bankruptcy Code, including under Bankruptcy Code section 552, as well as adequate protection liens granted to the DIP Lenders on certain Estate Assets.

### D.    Appointment of the Unsecured Creditors' Committee

On April 20, 2020, the U.S. Trustee appointed the Creditors' Committee in these Chapter 11 Cases. *See* Docket No. 84. The members of the Creditors' Committee are Crowley Fuels, STS Repair and Modification, PetroStar, Inc., Frosty Fuels, and Airport Enterprises. Counsel to the Creditors' Committee is Brown Rudnick LLP.

### E.    United States Trustee

Timothy J. Fox, Esq. is the trial attorney for the Office of the United States Trustee in connection with these Chapter 11 Cases. The Debtors and the Creditors' Committee have worked cooperatively to address concerns and comments from the U.S. Trustee's office during these Chapter 11 Cases.

### F.    Meeting of Creditors

The initial meeting of creditors under Bankruptcy Code section 341(a) was held on May 14, 2020. At the initial meeting of creditors, the U.S. Trustee and creditors asked questions of a representative of the Debtors.

### G.    Schedules, Statements of Financial Affairs, Claims Bar Dates, and Filed Claims

On May 11 and 12, 2020, the Debtors Filed their Schedules and Statement of Financial Affairs. *See* Docket Nos. No. 8 in Case No. 10755 and Docket No. 6 in each of Case Nos. 20-10756, 20-10757, 20-10758, 20-10759, 20-10760, 20-10761, and 20-10762. A Creditor whose Claim is set forth in the Schedules and not identified as contingent, unliquidated, or disputed may, but need not, file a proof of claim to be entitled to participate in the Chapter 11 Cases or to receive a Distribution under the Plan.

The Bankruptcy Court established (i) June 15, 2020 at 11:59 p.m. (prevailing Eastern Time) as the deadline (or "bar date") for Creditors (other than governmental units) to File proofs of claim against the Debtors (including Claims arising under section 503(b)(9) of the Bankruptcy Code); and (ii) as to each Debtor, October 2, 2020 at 11:59 p.m. (prevailing Eastern Time) as the deadline for any governmental unit (as such term is defined in Bankruptcy Code section 101(27)) to File proofs of claim against the Debtors. *See* Docket No. 221.

The Debtors have not completed claim reconciliation work and do not anticipate doing so before the Effective Date of the Plan.

### H.    Bidding Procedures Motion

On May 14, 2020, the Debtors Filed a motion (the "Bidding Procedures Motion") seeking, among other things, approval of bidding procedures that the Debtors intend to use to offer the sale of all, substantially all, or a substantial part of their assets. [The Court approved the bidding procedures portion of the Bidding Procedures Motion on May 27, 2020. *See* Docket No. [___].] If the Debtors are able to find one or more acceptable purchasers of the Debtors' assets, to which the DIP Lenders consent, the Debtors will seek approval of such sale or sales at a sale hearing to be heard in connection with or on the same date as the Confirmation Hearing.  Proceeds from the Sale will be transferred to the Liquidation Trust pursuant to the Plan.

### I.    Other Events During the Chapter 11 Cases

On May 14, 2020, the United States Department of Treasury ("Treasury") informed the Debtors that it was prepared to move forward with their Payroll Support Program ("PSP") applications pursuant to the CARES Act, subject to certain requirements, including that the funds from the PSP grants be used exclusively for the payment of wages, salaries, and benefits to employees, and that the Debtors maintain the level of scheduled air transportation service served by the Debtors before March 1, 2020.  The Debtors are also required to provide a plan of reorganization that would demonstrates the Debtors' ability to satisfy the requirements under the PSP agreement.  In the event that, pursuant to the procedures contemplated in the Bidding Procedures Motion, the Debtors find a purchaser to purchase the Debtors' assets as a going concern, the Debtors will seek that Treasury permit such a purchaser to use the PSP grants.

## IV.    <u>SUMMARY OF THE JOINT CHAPTER 11 PLAN</u>

This section provides a summary of the structure and means for implementation of the Plan and the classification and treatment of Claims and Equity Interests under the Plan and is qualified in its entirety by reference to the Plan (as well as the exhibits thereto and definitions therein).

The statements contained in this Disclosure Statement do not purport to be precise or complete statements of all the terms and provisions of the Plan or documents referred to therein, and reference is made to the Plan and to such documents for the full and complete statement of such terms and provisions.

The Plan itself and the documents referred to therein control the actual treatment of Claims against and Equity Interests in the Debtors under the Plan and will, upon the occurrence of the Effective Date, be binding on all Holders of Claims against and Equity Interests in the Debtors, the Debtors' Estates, all parties receiving property under the Plan, and other parties in interest. In the event of any conflict, inconsistency, or discrepancy between this Disclosure Statement and the Plan, the Confirmation Order, the Plan Supplement, or any other operative document, the terms of the Plan, Confirmation Order, Plan Supplement, or such other operative document, as applicable, shall govern and control; *provided* that, in any event, the terms of (1) the Confirmation Order and then (2) the Plan, inclusive of any Plan Supplement, in that order, shall govern and control over all other related documents.

19

### A.    Purpose and Effect of the Plan

Chapter 11 is the chapter of the Bankruptcy Code primarily used for business reorganization. Under chapter 11, a debtor is authorized to reorganize its business for the benefit of its constituents. Chapter 11 also specifically allows a debtor to formulate and consummate a plan of liquidation. *See* 11 U.S.C. § 1129(a)(11). A plan of liquidation sets forth the means for satisfying claims against and equity interests in a debtor. Confirmation of a plan of liquidation by a bankruptcy court makes that plan binding on the debtor and any creditor of or interest holder in the debtor, whether or not such creditor or interest holder (i) is impaired under or has accepted the plan or (ii) receives or retains any property under the plan.

The Plan provides for the distribution of the proceeds of the liquidation of all Estate Assets to various Creditors as contemplated under the Plan and for the wind up of the Debtors' corporate affairs. More specifically, the Plan provides for the creation and funding of a Liquidation Trust to administer and liquidate all remaining property of the Debtors, including (i) any aircraft and related assets owned by the Debtors immediately prior to the Effective Date and (ii) the Liquidation Trust Actions.

Under the Plan, Claims against, and Equity Interests in, the Debtors are divided into Classes according to their relative seniority and other criteria. If the Plan is confirmed by the Bankruptcy Court and consummated, the Claims and Equity Interests of the various Classes will be treated in accordance with the provisions in the Plan for each such Class, and the Liquidation Trust will make Distributions as provided in the Plan. A general description of the Classes of Claims and Equity Interests created under the Plan, the treatment of those Classes under the Plan, and the property to be distributed under the Plan are described below.

### B.    Substantive Consolidation and Its Relationship to the Plan Treatment of Claims

Although the Plan contemplates a substantive consolidation of all the Debtors into Ravn Air Group, Inc., the ultimate Distributions that will be made pursuant to the Plan will be paid by the Liquidation Trust. The Liquidation Trust has been structured to generally be a successor to the Debtors by acting as the estate representative and administrator for all the Liquidation Trust Assets, which largely consist of the Liquidation Trust Actions, aircraft and related assets, and Cash owned by the Debtors.  The Liquidation Trust will ultimately distribute to the Holders of Liquidation Trust Interests (*i.e.*, Holders of DIP Claims and Class 1 Prepetition Secured Creditor Claims) the proceeds of the Estate Assets and Liquidation Trust Actions and certain Cash on hand at the Liquidation Trust, net of payments to Holders of certain Administrative Claims, Professional Fee Claims, Priority Tax Claims, Other Secured Claims and Priority Claims, as well as the funding of the Creditors' Fund. This structure gives effect to the substantive consolidation contemplated by the Plan but also continues to reflect the economic reality as among the Creditors.

Consistent with the substantive consolidation contemplated by the Plan, and in order to reduce administrative costs, on the Effective Date, each of the Debtors other than the Remaining Debtor will be dissolved automatically without the need for any corporate action or approval, without the need for any corporate filings, and without the need for any other or further actions to be taken on behalf of such dissolving Debtor or any other Person or any payments to be made in

20

connection therewith, and the Chapter 11 Cases for all Debtors other than the Remaining Debtor will be deemed closed and no further fees in respect of such closed cases will thereafter accrue or be payable to any Person. Notwithstanding such substantive consolidation, however, fees payable pursuant to 28 U.S.C. § 1930 shall be due and payable by each individual Debtor through the Effective Date.

The substantive consolidation effected pursuant to the Plan shall not affect, without limitation, (i) the Debtors' or the Liquidation Trust's defenses to any Claim or Cause of Action, including the ability to assert any counterclaim; (ii) the Debtors' or the Liquidation Trust's setoff or recoupment rights; (iii) requirements for any third party to establish mutuality prior to substantive consolidation in order to assert a right of setoff against the Debtors or the Liquidation Trust; or (iv) distributions to the Debtors, the Estates, or the Liquidation Trust out of any insurance policies or proceeds of such policies.

The Disclosure Statement and the Plan shall be deemed to be a motion requesting that the Bankruptcy Court approve the substantive consolidation contemplated by the Plan. Unless an objection to the proposed substantive consolidation is made in writing by any Creditor purportedly affected by such substantive consolidation on or before the deadline to object to confirmation of the Plan, or such other date as may be fixed by the Bankruptcy Court, the substantive consolidation contemplated by the Plan may be approved by the Bankruptcy Court at the Confirmation Hearing. In the event any such objections are timely filed, a hearing with respect thereto shall be scheduled by the Bankruptcy Court, which hearing may, but need not, be the Confirmation Hearing.

If substantive consolidation is challenged, the Debtors intend to present evidence that substantive consolidation is appropriate under the circumstances of the Chapter 11 Cases. That evidence would include the following: All of the Debtors' assets are subject to the DIP Claims in the amount of $36 million; notwithstanding the Debtors' attempts to do so, the operations and books of the Debtors do not fully reflect a proper allocation of assets and liabilities among the Debtors, and income received by and expenses charged against any particular Debtor may need to be reallocated in a way that would involve an extremely expensive forensic accounting exercise that may not yield an accurate picture of the assets and liabilities of any particular Debtor; Impaired Classes under the Plan have either voted to accept the Plan or, by virtue of their treatment, are likely to receive more under the Plan than had the Debtors not been substantively consolidated; and, except as described below, all of the Debtors' assets are and were collateral of the Prepetition Secured Creditors.

The Debtors believe that the Estates have strong arguments that two groups of collateral are not subject to perfected, non-avoidable security interests in favor of the Prepetition Secured Creditors: (a) the assets of Peninsula Airways, Inc.; and (b) leasehold improvements on property for which various of the Debtors have ground leases throughout the State of Alaska. The Debtors' investigation is continuing, but it believes that the aggregate value of these assets is less than $10 million. Even if that amount could be recovered, however, the Debtors do not believe that such value would yield a better outcome for General Unsecured Creditors because Holders of DIP Claims are not required to marshal their assets; because the adequate protection liens of the Prepetition Secured Creditors would absorb substantially all of the value of such assets; the Plan's terms, which provide for payment in full of all priority and administrative claims as well as funding of the Creditors' Fund, are superior to the recovery a Holder of a General Unsecured Claim would

21

receive if substantive consolidation were not granted; and the Prepetition Secured Creditors' waiver of distributions from Class 4 materially increases the recovery available to Holders of General Unsecured Claims.

If the Bankruptcy Court determines that substantive consolidation of any given Debtors in the manner requested is not appropriate, then the Debtors may request that the Bankruptcy Court otherwise confirm the Plan and approve the treatment of and Distributions to the different Classes under the Plan on an adjusted basis (including on a Debtor-by-Debtor basis), in the Debtors' reasonable discretion, after consultation with the Creditors' Committee. Furthermore, the Debtors reserve their rights (i) to seek confirmation of the Plan without implementing  substantive consolidation of any given Debtor, and, in the Debtors' reasonable discretion after consultation with the Creditors' Committee, to request that the Bankruptcy Court approve the treatment of and Distributions to any given Class under the Plan on an adjusted, Debtor-by-Debtor basis; and (ii) after consultation with the Creditors' Committee, to seek to substantively consolidate all Debtors into Ravn Air Group, Inc. if all Impaired Classes entitled to vote on the Plan vote to accept the Plan.

### C.    The Liquidation Trust and the Liquidation Analysis

The Plan contemplates the creation of a Liquidation Trust. All Liquidation Trust Assets will vest in the Liquidation Trust. The United States of America has taken the position that FAA operating certificates cannot be transferred to another party. Accordingly, to the extent that the Debtors cannot or are prohibited from transferring any asset or asset to the Liquidation Trust, the Plan provides that the Liquidation Trust will have a perfected, first priority claim on each such asset or its proceeds as permitted under applicable law. The Liquidation Trust will be administered by the Liquidation Trustee, subject to the supervision and oversight of the Liquidation Trust Supervisory Board. The initial members of the Liquidation Trust Supervisory Board will be identified at or before the Confirmation Hearing and will be selected as follows: one (1) individual nominated by the Administrative Agent for the Exit Financing, two (2) individuals nominated by the Holders of the Exit Financing; one (1) individual nominated by the Holders of Class A Liquidation Trust Interests; and one (1) individual nominated by Holders of Class B Liquidation Trust Interests. The initial Liquidation Trustee will be identified in the Plan Supplement. Following the Effective Date, the Liquidation Trust will own and administer the Liquidation Trust Assets in accordance with the Plan and the Liquidation Trust Agreement. The realization of proceeds from the Liquidation Trust will be for the ultimate benefit of the Liquidation Trust Beneficiaries. The Liquidation Trustee will proceed to liquidate the Estate Assets, which consist primarily of the aircraft and related assets owned by the Debtors, in an orderly fashion. The Liquidation Trust will also pursue, as appropriate, the Liquidation Trust Actions, consistent with the terms of the Plan and the Liquidation Trust Agreement. In addition to the proceeds of the Liquidation Trust Assets, the Liquidation Trust also will be funded with certain other Cash for Creditors, the Liquidation Trust Seed Funding, and any Cash it may generate by prosecuting the Liquidation Trust Actions. The Liquidation Trust will make Distributions of Cash to Creditors, including an initial Distribution of Available Cash pursuant to the Plan and, thereafter, the Liquidation Trust Interest Waterfall. Thereafter, the Liquidation Trust also may make, in its discretion, periodic Distributions of additional Available Cash to the Liquidation Trust Beneficiaries at any time following the Effective Date.

146484.01601/123194608v.3

## 1.    Liquidation Analysis and Summary Thereof

The liquidation process will be administered by the Liquidation Trust. The net proceeds of this liquidation process have been estimated in the liquidation analysis attached hereto as **Exhibit B** (the "Liquidation Analysis"). As set forth in the current Liquidation Analysis:

- On or soon after the Effective Date, Cash of $9,650,000-$10,650,000 will be used to (a) fund the Administrative Claims Reserve, which will be used to pay Allowed Administrative Claims; (b) fund the Professional Fee Claim Reserve, which will be used to pay all Allowed Professional Fee Claims, (c) pay Allowed Priority Claims and Allowed Priority Tax Claims, and (d) fund the Creditors' Fund.

- The Debtors estimate an ultimate range of aggregate recoveries from sales of aircraft and related Liquidation Trust Assets in the range of $27.2 million to $41.3 million, net of operating and other expenses through the end of the Liquidation Analysis projection period.

- The Debtors have not ascribed any value to recoveries that may be realized by the Liquidation Trust in respect of any Liquidation Trust Actions, and the Debtors are not aware of any Liquidation Trust Actions that may have material value, but it is possible that the Liquidation Trust Actions may generate significant value.

It is important to emphasize that the Liquidation Analysis relies on various assumptions and is subject to material modifications from time to time. If the Liquidation Analysis is revised by the Debtors prior to the Confirmation Hearing, any such revision will be included in the Plan Supplement.

### D.    Treatment of Claims and Equity Interests

#### 1.    Unclassified Claims

##### (a)    Administrative Claims

As part of their agreement to provide funding embodied in the Plan, pursuant to Bankruptcy Rule 9019, Holders of DIP Claims have established the Administrative Claims Reserve to pay all Allowed Administrative Claims.  Allowed Administrative Claims shall be paid solely from the Administrative Claims Reserve.  Except as otherwise provided for herein, and subject to the requirements of the Plan, on or as soon as reasonably practicable after the later of (i) the Effective Date and (ii) thirty (30) days following the date on which an Administrative Claim becomes an Allowed Administrative Claim, the Holder of such Allowed Administrative Claim shall receive, in full satisfaction, settlement, and release of and in exchange for such Allowed Administrative Claim from the Administrative Claims Reserve, (a) Cash equal to the unpaid portion of such Allowed Administrative Claim or (b) such other less favorable treatment as to which such Holder and the Liquidation Trust shall have agreed upon in writing.  Any excess funds in the Administrative Claims Reserve shall be released to the Liquidation Trust to be used for other purposes consistent with the Plan.

146484.01601/123194608v.3

**(b)    Professional Fee Claims**

As part of their agreement to provide funding embodied in the Plan, pursuant to Bankruptcy Rule 9019, Holders of DIP Claims have established the Professional Fee Claim Reserve to pay all Allowed Professional Fee Claims.  Professional Fee Claims shall be paid as set forth in **Error! Reference source not found.** of the Plan.

**(c)    Priority Tax Claims**

In full satisfaction, settlement, and release of and in exchange for such Claims, Allowed Priority Tax Claims shall be paid, at the Liquidation Trust's option, as follows: (a) Cash equal to the unpaid portion of such Allowed Priority Tax Claim on the later of the Effective Date and thirty (30) calendar days following the date on which such Priority Tax Claim becomes an Allowed Priority Tax Claim; (b) in regular installment payments in Cash over a period not exceeding five (5) years after the Petition Date, plus interest on the unpaid portion thereof at the rate determined under applicable nonbankruptcy law as of the calendar month in which the Effective Date occurs (*provided* that such election shall be without prejudice to the right to prepay any such Allowed Priority Tax Claim in full or in part without penalty); or (c) such other treatment as to which the Holder of an Allowed Priority Tax Claim and the Liquidation Trust shall have agreed upon in writing.

**(d)    DIP Claims**

Subject to the DIP Orders, on the Effective Date, the DIP Claims shall be deemed to be Allowed in the full amount due and owing under the DIP Facility as of the Effective Date, if any. On the Effective Date, each Holder of an outstanding DIP Claim (inclusive of certain Roll-Up Loans as defined in the DIP Loan Agreement) shall be issued (a) a Pro Rata Share of the Exit Financing by converting such DIP Claims (inclusive of the Roll-Up Loans as defined in the DIP Loan Agreement) on a dollar-for-dollar basis into loans under the Exit Financing, and (b) One Class A Liquidation Trust Interest in exchange for every Thousand Dollars ($1,000) of such Holder's DIP Claim consisting of certain Roll-Up Loans that are not converted as specified in clause (a), and the Debtors obligations under the DIP Facility shall be transferred to the Liquidation Trust and any rights under the DIP Facility shall be cancelled. Notwithstanding Section 506(a) of the Bankruptcy Code, Holders of DIP Claims shall be deemed to have waived the unsecured portion of their DIP Claims, if any, and will have no right to recover anything from the Creditors' Fund with respect to any deficiency Claims.

**2.    Class 1: Prepetition Secured Creditor Claims**

Class 1 consists of Prepetition Secured Creditor Claims. Class 1 is Impaired under the Plan.

On the Effective Date, each Holder of an outstanding Prepetition Secured Creditor Claim shall be issued One Class B Liquidation Trust Interest in exchange for every Thousand Dollars ($1,000) of such Holder's Class 1 Claim. Notwithstanding Section 506(a) of the Bankruptcy Code, Notwithstanding Section 506(a) of the Bankruptcy Code, Holders of Allowed Claims in Class 1 shall be deemed to have waived the unsecured portion of their Claims, if any, and will have no right to recover anything from the Creditors' Fund. Notwithstanding Section 506(a) of the

24

Bankruptcy Code, Holders of Claims in Class 1 shall be deemed to have waived the unsecured portion of their Class 1 Claims, if any, and will have no right to recover anything from the Creditors' Fund with respect to any deficiency Claims.

### 3.    Class 2: Other Secured Claims

Class 2 consists of all Other Secured Claims. Class 2 is Unimpaired under the Plan.

The legal, equitable, and contractual rights of Holders of Allowed Class 2 Claims are unaltered by the Plan, and, notwithstanding substantive consolidation of the Debtors and vesting of the Liquidation Trust Assets in the Liquidation Trust, the Liens of the Holders of Allowed Class 2 Claims will continue to attach to their respective Collateral, provided that all such Claims shall remain subject to any and all defenses, counterclaims, and setoff or recoupment rights with respect thereto. Unless the Holder of an Allowed Class 2 Claim agrees to other treatment, on or as soon as is reasonably practicable after the Effective Date, each Holder of an Allowed Class 2 Claim shall receive, at the Liquidation Trust's option: (i) Cash in the Allowed amount of such Holder's Allowed Class 2 Claim;  or (ii) the return of the Collateral securing such Allowed Class 2 Claim, without representation or warranty by any Person (and without recourse against any Person regarding such Other Secured Claim); or (iii) (A) the cure of any default, other than a default of the kind specified in Bankruptcy Code section 365(b)(2), that Bankruptcy Code section 1124(2) requires to be cured, with respect to such Holder's Allowed Class 2 Claim, without recognition of any default rate of interest or similar penalty or charge, and upon such cure, no default shall exist; (B) the reinstatement of the maturity of such Allowed Class 2 Claim as the maturity existed before any default, without recognition of any default rate of interest or similar penalty or charge; and (C) retention of its unaltered legal, equitable, and contractual rights with respect to such Allowed Class 2 Claim, including through the retention of any associated Lien on the Collateral securing such Allowed Class 2 Claim.

The Bankruptcy Court shall retain jurisdiction and power to determine the amount necessary to satisfy any Allowed Class 2 Claim for which treatment is elected under clause (i) or clause (iii) of the immediately foregoing paragraph. With respect to any Allowed Class 2 Claim for which treatment is elected under clause (i), any Holder of such Allowed Class 2 Claim shall release (and by the Confirmation Order shall be deemed to release) all Liens against any Estate Assets.

### 4.    Class 3: Priority Claims

Class 3 consists of all Priority Claims. Class 3 is Unimpaired under the Plan.

On, or as soon as reasonably practicable after, the later of (i) the Effective Date  and (ii) the date on which a Priority Claim becomes payable pursuant to and as specified by an order of the Bankruptcy Court, the Holder of such Allowed Priority Claim shall receive, in full satisfaction, settlement, and release of and in exchange for such Allowed Priority Claim, either (a) Cash equal to the unpaid portion of such Allowed Priority Claim or (b) such other less favorable treatment from the Liquidation Trust to which such Holder and the Liquidation Trust shall have agreed upon in writing.

25

5.       **Class 4: General Unsecured Claims**

Class 4 consists of all General Unsecured Claims. Class 4 is Impaired under the Plan.

On, or as soon as reasonably practicable after, the later of (i) the Effective Date and (ii) the date on which a General Unsecured Claim becomes payable pursuant to and as specified by an order of the Bankruptcy Court, the Holder of such Allowed General Unsecured Claim shall receive, in full satisfaction, settlement, and release of and in exchange for such Allowed General Unsecured Claim, its Pro Rata share of the Creditors' Fund. As part of their agreement to fund the Administrative Claims Reserve, the Professional Fees Reserve and the Creditors' Fund, pursuant to Bankruptcy Rule 9019, Holders of DIP Claims and Class 1 Claims shall be deemed to have waived their rights to Distributions in respect of their deficiency General Unsecured Claims. Allowed General Unsecured Claims will be paid solely from the Creditors' Fund.

6.       **Class 5: Subordinated Claims**

Class 5 consists of all Subordinated Claims. Class 5 is Impaired under the Plan.

Holders of Class 5 Claims shall not receive any property or interest in property under the Plan on account of such Subordinated Claims. Class 5 is deemed to have rejected the Plan and, therefore, Holders of Class 5 Claims are not entitled to vote on the Plan.

7.       **Class 6: Equity Interests**

Class 6 consists of all Equity Interests. Class 6 is Impaired under the Plan.

As of the Effective Date, all Equity Interests shall be deemed void, cancelled, and of no further force and effect. On and after the Effective Date, Holders of Equity Interests shall not be entitled to, and shall not receive or retain any property or interest in property under the Plan on account of such Equity Interests. Class 6 is deemed to have rejected the Plan and, therefore, Holders of Equity Interests are not entitled to vote on the Plan.

8.       **Special Provisions Regarding Insured Claims**

(a)      Any Allowed General Unsecured Claim with respect to an Insured Claim shall be limited to the Uninsured Portion of such Claim, provided such Claims have been timely Filed by the applicable Claims Bar Date.

(b)      If there is insurance purchased by or otherwise applicable to the Debtors, any Person with rights against or under the applicable insurance policy, including the Liquidation Trust and Holders of Insured Claims, may pursue such rights.

(c)      Nothing in this Section IV.D.8. shall constitute a waiver of any Causes of Action the Debtors, the Estates, or the Liquidation Trust may hold against any Person, including the Debtors' insurance carriers; and nothing in this Section IV.D.8. is intended to, shall, or shall be deemed to preclude any Holder of an Insured Claim from seeking or obtaining a distribution or other recovery from any insurer of the Debtors in addition to (but not in duplication of) any

26

Distribution such Holder may receive under the Plan; *provided, however*, that the Debtors and the Liquidation Trust do not waive, and expressly reserve their rights to assert that any insurance coverage is property of the Estates to which they are entitled.

### 9.   Settlement of Claims and Controversies

#### (a)   Generally

Pursuant to Bankruptcy Code sections 1123(a)(5), 1123(b)(3), and 1123(b)(6), as well as Bankruptcy Rule 9019, and in consideration for the Distributions and other benefits provided under the Plan, the provisions of the Plan will constitute a good faith compromise and settlement of all claims and controversies set forth in the Plan or in the Plan Supplement with respect to any Claim, Equity Interest, or any Distribution on account thereof, as well as of all potential Intercompany Claims and Causes of Action against any Debtor. The entry of the Confirmation Order will constitute the Bankruptcy Court's approval, as of the Effective Date, of the compromise or settlement of all such claims or controversies and the Bankruptcy Court's finding that all such compromises or settlements are (i) in the best interest of the Debtors, the Estates, and their respective property and stakeholders; and (ii) fair, equitable, and reasonable. This comprehensive compromise and settlement is a critical component of the Plan and is designed to provide a resolution of myriad disputed intercompany and intercreditor Claims, Liens, and Causes of Action that otherwise could take years to resolve, which would delay and undoubtedly reduce the Distributions that ultimately would be available for all Creditors.

#### (b)   Implementing Settlement Elements

Pursuant to the comprehensive resolution set forth herein, the Plan effectuates, among other things, the following:

(i)   In accordance with Section 5.06 of the Plan, subject to the rights of Allowed Other Secured Claims, the Debtors will be substantively consolidated into Ravn Air Group, Inc.;

(ii)   The Holders of Allowed Claims in Class 1 (Prepetition Secured Creditor Claims) and Class 4 (General Unsecured Claims) will receive the treatment provided for such Holders under the Plan;

(iii)   The Liquidation Trust will be created to most effectively and efficiently pursue the Liquidation Trust Actions for the collective benefit of all the Liquidation Trust Beneficiaries; and

(iv)   Any Intercompany Claims that could be asserted by one Debtor against another Debtor will be extinguished immediately before the Effective Date with no separate recovery on account of any such Claims that could be asserted by one Debtor regarding any Estate Assets owned by another Debtor will be deemed released and discharged on the Effective Date.

146484.01601/123194608v.3

### E.    Acceptance or Rejection of Plan

#### 1.    Impaired Class of Claims Entitled to Vote

Only the votes of Holders of Allowed Claims in Class 1 and Class 4  shall be solicited with respect to the Plan. The unanimous consent of Holders of DIP Claims, which class of Claims is unclassified, is also being sought.

#### 2.    Acceptance by an Impaired Class

In accordance with Bankruptcy Code section 1126(c), and except as provided in Bankruptcy Code section 1126(e), the Holders of Claims in any Class entitled to vote on the Plan shall have accepted the Plan if the Plan is accepted by the Holders of at least two-thirds (⅔) in dollar amount and more than one-half (½) in number of the Allowed Claims in such Class that have timely and properly voted to accept or reject the Plan.

#### 3.    Presumed Acceptances by Unimpaired Classes

Class 2 and Class 3 are Unimpaired under the Plan. Under Bankruptcy Code section 1126(f), the Holders of Claims in such Unimpaired Classes are conclusively presumed to have accepted the Plan, and, therefore, the votes of such Holders shall not be solicited.

#### 4.    Impaired Classes Deemed to Reject Plan

The Debtors have determined not to solicit the votes of Holders of any Claims in Class 5, and such Holders shall be deemed to have rejected the Plan and, therefore, such Holders are not entitled to vote on the Plan. Holders of Equity Interests in Class 6 are not entitled to receive or retain any property or interests in property under the Plan. Under Bankruptcy Code section 1126(g), such Holders are deemed to have rejected the Plan, and, therefore, the votes of such Holders shall not be solicited.

#### 5.    Modifications of Votes

Following the Voting Deadline, no Creditors entitled to vote on the Plan will be able to change their votes cast on the Plan or any attendant elections or preferences without the written consent of the Debtors, which consent may be given or withheld in the Debtors' reasonable discretion.

#### 6.    Confirmation Pursuant to Bankruptcy Code Section 1129(b)

Because at least one Impaired Class is deemed to have rejected the Plan, the Debtors will and hereby request confirmation of the Plan under Bankruptcy Code section 1129(b). The Debtors reserve the right to alter, amend, modify, revoke, or withdraw the Plan, the Plan Supplement, or any schedule or exhibit, including to amend or modify it to satisfy the requirements of Bankruptcy Code section 1129(b), if necessary.

146484.01601/123194608v.3

### 7.    Elimination of Vacant Classes

Any Class of Claims or Equity Interests that does not contain, as of the date of the commencement of the Confirmation Hearing, a Holder of an Allowed Claim, or a Holder of a Claim temporarily allowed under Bankruptcy Rule 3018, shall be deemed deleted from the Plan for purposes of determining acceptance of the Plan by such Class under Bankruptcy Code section 1129(a)(8).

### 8.    Severability of Joint Plan

The Plan represents a joint plan comprised of individual plans for each of the Debtors. As further discussed in **Error! Reference source not found.** of the Plan, the Debtors may alter, amend, or modify the Plan at or before the Confirmation Hearing, including to remove one or more Debtors from the Plan, in the Debtors' reasonable discretion.

## F.    Implementation of the Plan

### 1.    Implementation of the Plan

The Plan will be implemented by various acts and transactions as set forth in the Plan, including, among other things, the establishment of the Liquidation Trust, the appointment of the Liquidation Trustee, and the making of Distributions by the Liquidation Trust.

### 2.    Streamlining of the Debtors' Corporate Affairs

#### (a)    Debtors' Existing Directors, Officers, and Managers

On the Effective Date, each of the Debtors' existing directors, officers, and managers shall be terminated automatically without the need for any Corporate Action and without the need for any corporate or limited liability company filings, and shall have no ongoing rights against or obligations to the Debtors or the Estates, including under any applicable prepetition agreements (all of which will be deemed terminated). On the Effective Date, the Liquidation Trustee shall succeed to all such powers as would have been applicable to the Debtors' officers and managers in respect of all Liquidation Trust Assets; *provided, however*, that the Liquidation Trustee may continue to consult with or employ the Debtors' former directors, officers, employees, and managers to the extent required to comply with applicable law or contractual provisions regarding the Debtors.

#### (b)    Dissolution of the Debtors

On the Effective Date, each of the Debtors will be dissolved automatically without the need for any further Corporate Action, without the need for any corporate or limited liability company filings, and without the need for any other or further actions to be taken by or on behalf of such dissolving Debtor or any other Person or any payments to be made in connection therewith; *provided, however*, that the Liquidation Trust may in its discretion file any certificates of cancellation as may be appropriate in connection with dissolution of any Debtors.

146484.01601/123194608v.3

### (c)    Corporate Documents and Corporate Authority

On the Effective Date, the certificates of incorporation, bylaws, operating agreements, and articles of organization, as applicable, of all the Debtors shall be deemed amended to the extent necessary to carry out the provisions of the Plan. The entry of the Confirmation Order shall constitute authorization for the Debtors and the Liquidation Trustee, as applicable, to take or cause to be taken all actions (including, if applicable, Corporate Actions) necessary or appropriate to implement all provisions of, and to consummate, the Plan prior to, on, and after the Effective Date and all such actions taken or caused to be taken shall be deemed to have been authorized and approved by the Bankruptcy Court without further approval, act, or action under any applicable law, order, rule, or regulation.

### 3.    Liquidation Trust

### (a)    Appointments

(i)    On and after the Effective Date, the initial Liquidation Trustee shall become and serve as Liquidation Trustee. The Liquidation Trustee will receive compensation and reimbursement of reasonable expenses, as shall be specifically set forth in the Liquidation Trust Agreement.

(ii)    On and after the Effective Date, the initial Liquidation Trust Supervisory Board shall begin to serve without further action. Any compensation and reimbursement of reasonable expenses shall be specifically set forth in the Liquidation Trust Agreement.

### (b)    Creation and Governance of the Liquidation Trust

On the Effective Date, the Liquidation Trustee shall execute the Liquidation Trust Agreement and shall take any other steps necessary to establish the Liquidation Trust in accordance with the Plan and the beneficial interests therein.

For U.S. federal income tax purposes, the transfer of the assets to the Liquidation Trust will be treated as a sale or other disposition of assets by the Remaining Debtor (except for the assets transferred to the Disputed Ownership Fund as provided in Section 7.10 of the Plan) to the Liquidation Trust Beneficiaries in exchange for their claims in the Chapter 11 Cases. Any income or loss from the transfer of assets to the Liquidation Trust shall flow through to the Remaining Debtor, on whose behalf the Liquidation Trust will be responsible to pay the tax liability, if any. For U.S. federal income tax purposes, the Liquidation Trust is intended to be treated as a "liquidating trust", which is a type of "grantor trust".  Assuming such treatment is respected, the Liquidation Trust Beneficiaries shall be treated as the grantors of the Liquidation Trust and deemed to be the owners of the Liquidation Trust Assets. The transfer of the Liquidation Trust Assets to the Liquidation Trust shall be deemed a transfer to the Liquidation Trust Beneficiaries by the Remaining Debtor, followed by a deemed transfer by such Liquidation Trust Beneficiaries to the Liquidation Trust.

The Debtors, the Liquidation Trust Beneficiaries, and the Liquidation Trust will consistently report the valuation of the assets transferred to the Liquidation Trust. Such consistent

30

valuations and revised reporting will be used for all U.S. federal income tax purposes. Income deductions, gain, or loss from the Liquidation Trust shall be reported to the beneficiaries of the Liquidation Trust in conjunction with the filing of the Liquidation Trust's income tax returns. Each Liquidation Trust Beneficiary shall report income, deductions, gain, or loss on such Liquidation Trust Beneficiary's income tax returns. The Liquidation Trust shall be governed by the Liquidation Trust Agreement and administered by the Liquidation Trustee. The powers, rights, and responsibilities of the Liquidation Trustee shall be specified in the Liquidation Trust Agreement. After an objection to a Disputed Claim is resolved or a Contingent Claim or Unliquidated Claim has been determined in whole or in part by a Final Order or by agreement, the Liquidation Trust Interests and/or Cash held in the Disputed Ownership Fund shall be transferred as described in **Error! Reference source not found.** of the Plan.

### (c)    Vesting of Liquidation Trust Assets

On the Effective Date, the Liquidation Trust will be automatically vested with all of the Debtors' and the Estates' respective rights, title, and interest in and to all Liquidation Trust Assets; *provided* that, to the extent that the Debtors cannot or are prohibited from transferring any asset or assets to the Liquidation Trust, the Liquidation Trust shall have a perfected, first priority claim on each such asset or its proceeds, as permitted under applicable law. Except with respect to liens granted in connection with the Exit Financing or as otherwise provided in the Plan or the Confirmation Order, the Liquidation Trust Assets shall automatically vest in the Liquidation Trust free and clear of all Claims, Liens, or interests subject only to the Liquidation Trust Interests and the Liquidation Trust Expenses, as provided for in the Liquidation Trust Agreement, and such vesting shall be exempt from any stamp, real estate transfer, other transfer, mortgage reporting, sales, use, or other similar tax. The Liquidation Trustee shall be the exclusive trustee of the Liquidation Trust Assets for purposes of 31 U.S.C. § 3713(b) and 26 U.S.C. § 6012(b)(3), as well as the representative of the Estates appointed pursuant to Bankruptcy Code section 1123(b)(3) regarding all Liquidation Trust Assets. The Liquidation Trust shall hold and distribute the Liquidation Trust Assets in accordance with the provisions of the Plan and the Liquidation Trust Agreement.

### (d)    Purpose of the Liquidation Trust

The Liquidation Trust shall be established for the purpose of pursuing or liquidating the Liquidation Trust Assets and making Distributions to the Liquidation Trust Beneficiaries in accordance with Treasury Regulation section 301.7701- 4(d), with no objective to continue or engage in the conduct of a trade or business.

### (e)    Authority

Subject to the supervision of the Liquidation Trust Supervisory Board, the Liquidation Trustee shall have the authority and right on behalf of the Debtors and the Estates and without the need for Bankruptcy Court approval (in each case, unless otherwise provided in the Plan) to carry out and implement all applicable provisions of the Plan, including to:

146484.01601/123194608v.3

(i)      review, reconcile, compromise, settle, or object to Claims and resolve such objections as set forth in the Plan, free of any restrictions of the Bankruptcy Code or the Bankruptcy Rules;

(ii)      calculate and make Distributions and calculate and establish reserves under and in accordance with the Plan;

(iii)      pay, negotiate, restructure, and discharge obligations relating to the Exit Financing;

(iv)      retain, compensate, and employ professionals and other Persons to represent the Liquidation Trustee with respect to and in connection with its rights and responsibilities;

(v)      establish, maintain, and administer documents and accounts (including the Creditors' Fund) as appropriate, which shall be segregated to the extent appropriate in accordance with the Plan;

(vi)      maintain, conserve, collect, settle, and protect the Liquidation Trust Assets (subject to the limitations described in the Plan);

(vii)      sell, liquidate, transfer, assign, distribute, abandon, or otherwise dispose of the Liquidation Trust Assets or any part thereof or interest therein upon such terms as the Liquidation Trustee determines to be necessary, appropriate, or desirable;

(viii)      negotiate, incur, and pay the Liquidation Trust Expenses;

(ix)      prepare and file any and all informational returns, reports, statements, returns, and other documents or disclosures relating to the Debtors that are required under the Plan, by any governmental unit, or by applicable law;

(x)      compile and maintain the official claims register, including for purposes of making initial and subsequent Distributions under the Plan;

(xi)      take such actions as are necessary or appropriate to wind down the Remaining Debtor;

(xii)      comply with the Plan, exercise the Liquidation Trustee's rights, and perform the Liquidation Trustee's obligations; and

(xiii)      exercise such other powers as deemed by the Liquidation Trustee to be necessary and proper to implement the Plan.

To the extent necessary to give full effect to its administrative rights and duties under the Plan, the Liquidation Trustee shall be deemed to be vested with all rights, powers, privileges, and authorities of (i) an appropriate corporate or limited liability company officer or manager of each of the Debtors under any applicable nonbankruptcy law and (ii) a "trustee" of each of the Debtors under Bankruptcy Code sections 704 and 1106. The Liquidation Trust Supervisory Board will have all rights and powers of a corporate board appointed under Delaware law.

32

**(f)**    **Limitation of Liability**

The Liquidation Trustee shall enjoy all of the rights, powers, immunities, and privileges applicable to a Bankruptcy Code chapter 7 trustee with respect to limitations of liability. The Liquidation Trustee may, in connection with the performance of its functions, in its sole and absolute discretion, consult with its attorneys, accountants, advisors, and agents, and shall not be liable for any act taken, or omitted to be taken, or suggested to be done in accordance with advice or opinions rendered by such Persons, regardless of whether such advice or opinions were in writing. Notwithstanding such authority, the Liquidation Trustee shall be under no obligation to consult with any such attorneys, accountants, advisors, or agents, and its determination not to do so shall not result in the imposition of liability on the Liquidation Trustee unless such determination is based on willful misconduct or gross negligence. Persons dealing with the Liquidation Trustee shall look only to the Liquidation Trust Assets to satisfy any liability incurred by the Liquidation Trustee to such Person in carrying out the terms of the Plan or the Liquidation Trust Agreement, and the Liquidation Trustee shall have no personal obligation to satisfy such liability.

**(g)**    **Indemnification**

The Liquidation Trust shall indemnify the Liquidation Trust Indemnified Parties for, and shall defend and hold them harmless against, any loss, liability, damage, judgment, fine, penalty, claim, demand, settlement, cost, or expense (including the reasonable fees and expenses of their respective professionals) incurred without gross negligence or willful misconduct on the part of the Liquidation Trust Indemnified Parties (which gross negligence or willful misconduct, if any, must be determined by a final, non-appealable order of a court of competent jurisdiction) for any action taken, suffered, or omitted to be taken by the Liquidation Trust Indemnified Parties in connection with the acceptance, administration, exercise, and performance of their duties under the Plan or the Liquidation Trust Agreement, as applicable. An act or omission taken with the approval of the Bankruptcy Court, and not inconsistent therewith, will be conclusively deemed not to constitute gross negligence or willful misconduct. In addition, the Liquidation Trust shall, to the fullest extent permitted by law, indemnify, defend, and hold harmless the Liquidation Trust Indemnified Parties, from and against and with respect to any and all liabilities, losses, damages, claims, costs, and expenses, including attorneys' fees arising out of or due to their actions or omissions, or consequences of such actions or omissions, with respect to the Liquidation Trust, the Remaining Debtor, or the implementation or administration of the Plan if the Liquidation Trust Indemnified Party acted in good faith and in a manner reasonably believed to be in, or not opposed to, the best interest of the Liquidation Trust or the Remaining Debtor. To the extent the Liquidation Trust indemnifies, defends, and holds harmless any Liquidation Trust Indemnified Parties as provided above, the legal fees and related costs incurred by counsel to the Liquidation Trustee in monitoring or participating in the defense of such claims giving rise to the right of indemnification shall be paid as Liquidation Trust Expenses. The costs and expenses incurred in enforcing the right of indemnification in **Error! Reference source not found.Error! Reference source not found.** of the Plan shall be paid by the Liquidation Trust.

33

**(h)    Insurance**

The Liquidation Trustee shall be authorized, but not required, to obtain any insurance coverages deemed to be reasonably necessary, at the Liquidation Trust's sole expense, for itself and its respective agents, including coverage with respect to the liabilities, duties, and obligations of the Liquidation Trustee, which insurance coverage may, at the sole discretion of the Liquidation Trustee, be extended for a reasonable period after the termination of the Liquidation Trust.

**(i)    Tax Reporting**

(i)    The Liquidation Trust shall timely file tax returns for the Liquidation Trust treating the Liquidation Trust as a grantor trust pursuant to Treasury Regulation section 1.671- 4(a).

(ii)    The Liquidation Trust shall be responsible for timely payment of all taxes (if any) imposed on and payable by the Liquidation Trust or the Remaining Debtor, or any taxes payable in respect of the Liquidation Trust Assets.

(iii)    The Liquidation Trust shall distribute such tax-related notices, beneficiary statements, and information returns, as applicable, to the applicable Holders of Allowed Claims as are required by applicable law or that the Liquidation Trustee determines are otherwise necessary or desirable.

(iv)    The Liquidation Trust is authorized to file a request for expedited determination under Bankruptcy Code section 505(b) for any tax returns filed with respect to the Debtors.

**(j)    Distributions to Liquidation Trust Beneficiaries**

(i)    The Liquidation Trust may make Distributions from the Administrative Claims Reserve to Holders of Allowed Administrative Claims and from Available Cash to Holders of Priority Tax Claims, Priority Claims, and to the Liquidation Trust Beneficiaries at any time following the Effective Date, provided that such Distributions are otherwise permitted under, and not inconsistent with, the other terms of the Plan, the Liquidation Trust Agreement, and applicable law.

(ii)    The Liquidation Trust shall, prior to making any Distributions to Liquidation Trust Beneficiaries, pay Available Cash to the Exit Financing Administrative Agent to satisfy all obligations under the Exit Financing in accordance with the terms of the Exit Financing until such obligations are indefeasibly paid in full in cash.

(iii)    No later than (i) the first Business Day that is at least 180 calendar days after the Effective Date and (ii) the last Business Day of each subsequent 180-calendar-day period after the Effective Date until the Closing Date, the Liquidation Trustee shall calculate the Distributions that could potentially be made to the Liquidation Trust Beneficiaries based on the amount of then-Available Cash and, based on such calculation, promptly thereafter may make Distributions, if any, of the amount so determined.

(iv)    On each Distribution Date, the Liquidation Trust shall distribute its Available Cash to Liquidation Trust Beneficiaries (the "<u>Liquidation Trust Interests Waterfall</u>") as follows:

34

(A)    The Liquidation Trust shall distribute Available Cash to each Holder of Class A Liquidation Trust Interests Pro Rata based on such Holder's number of Class A Liquidation Trust Interests until the aggregate amount of all Distributions made indefeasibly pays the Roll-Up Loans converted to Class A Liquidation Trust Interests in full in cash; and

(B)    The Liquidation Trust shall distribute Available Cash to each Holder of Class B Liquidation Trust Interests Pro Rata based on such Holder's number of Class B Liquidation Trust Interests until the aggregate amount of all Distributions made indefeasibly pays the Prepetition Obligations in full in cash.

**(k)    Other Plan Distributions**

(i)    The Liquidation Trustee may make Distributions from the Creditors' Fund to Holders of Allowed General Unsecured Claims as required by the Plan, provided that such Distributions are otherwise permitted under, and not inconsistent with, the other terms of the Plan and applicable law.

(ii)    No later than (i) the first Business Day that is at least 180 calendar days after the Effective Date and (ii) the last Business Day of each subsequent 180-calendar-day period after the Effective Date until the Closing Date, the Liquidation Trustee shall calculate the Distributions that could potentially be made to Holders of Allowed General Unsecured Claims based on the amount remaining in the Creditors' Fund and, based on such calculation, promptly thereafter may make Distributions, if any, of the amount so determined.

**(l)    Cash Investments**

The Liquidation Trustee may invest Cash of the Liquidation Trust, including any earnings thereon or proceeds therefrom, any Cash realized from the liquidation of the Liquidation Trust Assets, or any Cash that is otherwise remitted to the Liquidation Trust, which investments, for the avoidance of doubt, will not be required to comply with Bankruptcy Code section 345(b); *provided, however*, that such investments must be investments that are permitted to be made by a "liquidating trust" within the meaning of Treasury Regulation section 301.7701-4(d), as reflected therein, or under applicable guidelines, rulings, or other controlling authorities.

**(m)    Registration and Transfer of the Liquidation Trust Interests**

(i)    The record holders of the Liquidation Trust Interests shall be recorded and set forth in a registry maintained by, or at the direction of, the Liquidation Trustee expressly for such purpose. Such obligation may be satisfied by the Liquidation Trust's retention of an institutional transfer agent for the maintenance of such registry.

(ii)    Upon their issuance as of the Effective Date, the Liquidation Trust Interests will be subject to restrictions on transfer under the Liquidation Trust Agreement, which restrictions shall prohibit the Liquidation Trust Interests from being certificated or transferable except by operation of law or by will or the laws of descent and distribution, in each case following written notice to the Liquidation Trust, or as otherwise provided therein.

146484.01601/123194608v.3

**(n)    Exemption**

To the extent the Liquidation Trust Interests are deemed to be "securities," the issuance of such interests under the Plan are exempt, pursuant to Bankruptcy Code section 1145, from registration under the Securities Act and any applicable state and local laws requiring registration of securities.

**(o)    Pursuit and Resolution of Liquidation Trust Actions**

The Liquidation Trust, as a successor in interest to the Debtors and the Estates, may, and will have the exclusive right, power, and interest on behalf of itself, the Debtors and the Estates to institute, commence, file, pursue, prosecute, enforce, abandon, settle, compromise, release, waive, dismiss, or withdraw any and all Liquidation Trust Actions without any further order of the Bankruptcy Court, except as otherwise provided in the Liquidation Trust Agreement. From and after the Effective Date, the Liquidation Trust, in accordance with Bankruptcy Code section 1123(b)(3), shall serve as a representative of the Estates with respect to any and all Liquidation Trust Actions that were Estate Assets and shall retain and possess the right to institute, commence, file, pursue, prosecute, enforce, abandon, settle, compromise, release, waive, dismiss, or withdraw, as appropriate, any and all Liquidation Trust Actions in any court or other tribunal.

**(p)    Termination of the Liquidation Trust**

The Liquidation Trustee and the Liquidation Trust shall be discharged or terminated, as the case may be, at such time as: (a) the Liquidation Trustee determines that the pursuit of additional Liquidation Trust Actions is not likely to yield sufficient additional proceeds to justify further pursuit of such Liquidation Trust Actions; and (b) all Distributions required to be made by the Liquidation Trust to the Holders of Allowed Claims and to the Liquidation Trust Beneficiaries under the Plan and the Liquidation Trust Agreement have been made, but in no event shall the Liquidation Trust be terminated later than five (5) years from the Effective Date unless the Bankruptcy Court, upon motion made at least six (6) months before such fifth anniversary (and, in the event of further extension, by order of the Bankruptcy Court, upon motion made at least six (6) months before the end of the preceding extension), determines that a fixed period extension (not to exceed three (3) years, together with any prior extensions, unless the Liquidation Trust receives a favorable letter ruling from the Internal Revenue Service (the "IRS") that any further extension would not adversely affect the status of the Liquidation Trust as a liquidating trust for U.S. federal income tax purposes) is necessary to facilitate or complete the recovery on, and liquidation of, the Liquidation Trust Assets. Upon termination of the Liquidation Trust, any remaining Liquidation Trust Assets that exceed the amounts required to be paid under the Plan may be transferred by the Liquidation Trustee to the American Bankruptcy Institute Endowment Fund.

**(q)    Control Provision**

To the extent there is any inconsistency between the Plan as it relates to the Liquidation Trust and the Liquidation Trust Agreement, the Plan shall control.

####     4.        Preservation of Privileges and Defenses

The actions taken by the Debtors, the Liquidation Trust, or any of their respective Related Parties in connection with the Plan shall not be (or be deemed to be) a waiver of any privilege or defense of the Debtors, or the Liquidation Trust, as applicable, including any attorney-client privilege or work-product doctrine. Notwithstanding any Debtors providing any privileged information related to any Liquidation Trust Actions to the Liquidation Trustee, the Liquidation Trust, or any Person associated with any of the foregoing, such privileged information shall be without waiver in recognition of the joint, common, or successor interest in prosecuting the Liquidation Trust Actions and shall remain privileged. The Liquidation Trust each shall retain the right to waive its own privileges. Only the Liquidation Trustee shall have the right to waive the attorney-client privilege, work-product doctrine, or other protections as to the Debtors, the Remaining Debtor, and the Liquidation Trust.

####     5.        Preservation of Rights of Action

#####     (a)        Maintenance of Avoidance Actions and Causes of Action

Except as otherwise provided in the Plan or the Confirmation Order, from and after the Effective Date, the Liquidation Trust will retain all rights to institute, commence, file, pursue, prosecute, enforce, abandon, settle, compromise, release, waive, dismiss, or withdraw, as appropriate, any and all of the Debtors' or Estates' Causes of Action (whether existing as of the Petition Date or thereafter arising), and all Avoidance Actions, all as Liquidation Trust Actions, in each case in any court or other tribunal, including in an adversary proceeding Filed in the Chapter 11 Cases. The Liquidation Trust, as a successor in interest to the Debtors and the Estates, may, and will have the exclusive right, power, and interest on behalf of itself, the Debtors and the Estates, to enforce, sue on, settle, compromise, transfer, or assign (or decline to do any of the foregoing) any or all of the Liquidation Trust Actions without notice to or approval from the Bankruptcy Court. In accordance with the Plan, and pursuant to Bankruptcy Code section 363 and Bankruptcy Rule 9019, without any further notice to or action, order, or approval of the Bankruptcy Court, from and after the Effective Date, the Liquidation Trust may compromise and settle Liquidation Trust Actions.

#####     (b)        Preservation of All Liquidation Trust Actions Not Expressly Settled or Released

The failure to specifically identify in the Disclosure Statement or the Plan any potential or existing Avoidance Actions or Causes of Action as a Liquidation Trust Action is not intended to and shall not limit the rights of the Liquidation Trust to pursue (i) any such Avoidance Actions or Causes of Action or (ii) a Preserved Claim (which is a Cause of Action specifically identified as such in the Plan Supplement). Unless a Liquidation Trust Action is expressly waived, relinquished, released, compromised, or settled in the Plan or any Final Order (including the Confirmation Order), which the Debtors expressly reserve such Liquidation Trust Action for later resolution by the Liquidation Trust (including any Avoidance Actions or Causes of Action not specifically identified or of which the Debtors may presently be unaware or that may arise or exist by reason of additional facts or circumstances unknown to the Debtors at this time or facts or circumstances that may change or be different from those the Debtors now believe to exist). As such, no

37

preclusion doctrine, including the doctrines of *res judicata*, collateral estoppel, issue preclusion, claim preclusion, waiver, estoppel (judicial, equitable, or otherwise), or laches will apply to any such Avoidance Actions or Causes of Action upon or after Confirmation of the Plan based on the Disclosure Statement, the Plan, or the Confirmation Order, except when such Avoidance Actions or Causes of Action have been expressly released. In addition, the right to pursue or adopt any claims alleged in any lawsuit in which any Debtor or the Liquidation Trust is a plaintiff, defendant, or an interested party is fully reserved as against any Person that is not a Released Party, including the plaintiffs or co-defendants in such lawsuits. For the avoidance of doubt, notwithstanding any release or exculpation provision contained herein, the Liquidation Trust may assert Causes of Action against Released Parties if such Causes of Action are Preserved Claims.

### 6.    Cancellation of Instruments

Except with respect to any executory contracts and unexpired leases that are assumed and assigned to the Liquidation Trust under the Plan or otherwise assumed and assigned pursuant to a Final Order, any agreement, bond, certificate, contract, indenture, lease, note, security, warrant, or other instrument or document evidencing or creating any indebtedness or obligation of the Debtors shall be deemed cancelled on the Effective Date, and all Liens, mortgages, pledges, grants, trusts, and other interests relating thereto shall be automatically cancelled, and all obligations of the Debtors thereunder or in any way related thereto shall be discharged.

### 7.    Substantive Consolidation

(a)    Entry of the Confirmation Order shall constitute the approval, pursuant to Bankruptcy Code sections 105(a), 541, 1123, and 1129, of the substantive consolidation of the Debtors. Notwithstanding such substantive consolidation, however, fees payable pursuant to 28 U.S.C. § 1930 shall be due and payable by each individual Debtor through the Effective Date.

(b)    In connection with the substantive consolidation of the Debtors, all assets of the Debtors shall be consolidated in and shall be held by the Liquidation Trust.

(c)    The substantive consolidation effected pursuant to the Plan shall not affect, without limitation, (i) the Debtors' or the Liquidation Trust's defenses to any Claim or Cause of Action, including the ability to assert any counterclaim; (ii) the Debtors' or the Liquidation Trust's setoff or recoupment rights; (iii) requirements for any third party to establish mutuality with respect to a particular Debtor prior to substantive consolidation in order to assert a right of setoff against the Debtors or the Liquidation Trust; or (iv) distributions to the Debtors, the Estates, or the Liquidation Trust out of any insurance policies or proceeds of such policies.

(d)    The Disclosure Statement and the Plan shall be deemed to be a motion requesting that the Bankruptcy Court approve the substantive consolidation contemplated by the Plan. Unless an objection to the proposed substantive consolidation is made in writing by any Creditor purportedly affected by such substantive consolidation on or before the deadline to object to confirmation of the Plan, or such other date as may be fixed by the Bankruptcy Court, the substantive consolidation contemplated by the Plan may be approved by the Bankruptcy Court at the Confirmation Hearing. In the event any such objections are timely filed, a hearing with respect thereto shall be scheduled by the Bankruptcy Court, which hearing may, but need not, be the

Confirmation Hearing.

(e)     If the Bankruptcy Court determines that substantive consolidation of any given Debtors is not appropriate, then the Debtors may request that the Bankruptcy Court otherwise confirm the Plan and approve the treatment of and Distributions to the different Classes under the Plan on an adjusted, Debtor-by-Debtor basis. Furthermore, the Debtors reserve their rights (i) to seek confirmation of the Plan without implementing substantive consolidation of any given Debtor, and, in the Debtors' reasonable discretion, to request that the Bankruptcy Court approve the treatment of and Distributions to any given Class under the Plan on an adjusted, Debtor-by-Debtor basis; and (ii) to seek to substantively consolidate all Debtors into Ravn Air Group, Inc. if all Impaired Classes entitled to vote on the Plan vote to accept the Plan.

## 8.     Asset Sale at Confirmation.

To the extent that the Debtors conclude that an Asset Sale at Confirmation will yield a higher or better return to the Estates than a sale by the Liquidation Trust, they may seek approval of an Asset Sale at Confirmation; *provided* that no Asset Sale shall be considered at the Confirmation Hearing or at Confirmation without adequate notice prior to the Confirmation Hearing and absent the consent of the DIP Lenders. Proceeds of an Asset Sale, if any, shall constitute Available Cash and shall be administered as set forth herein.

## G.     Executory Contracts and Unexpired Leases

### 1.     Assumption of Certain Executory Contracts and Unexpired Leases

#### (a)     Assumption of Agreements

On the Effective Date, the Debtors shall assume all executory contracts and unexpired leases that are listed on the Schedule of Assumed Agreements and shall assign such contracts and leases to the Liquidation Trust.

The Debtors reserve the right to amend the Schedule of Assumed Agreements at any time prior to the Effective Date, in the Debtors' reasonable discretion (i) to delete any executory contract or unexpired lease and provide for its rejection under the Plan or otherwise, or (ii) to add any executory contract or unexpired lease and provide for its assumption and assignment under the Plan. The Debtors will provide notice of any amendment to the Schedule of Assumed Agreements to the party or parties to those agreements affected by the amendment.

Unless otherwise specified on the Schedule of Assumed Agreements, each executory contract and unexpired lease listed or to be listed therein shall include any and all modifications, amendments, supplements, restatements, or other agreements made directly or indirectly by any agreement, instrument, or other document that in any manner affects such executory contract or unexpired lease, without regard to whether such agreement, instrument, or other document is also listed on the Schedule of Assumed Agreements.

146484.01601/123194608v.3

The Confirmation Order will constitute a Bankruptcy Court order approving the assumption and assignment, on the Effective Date, of all executory contracts and unexpired leases identified on the Schedule of Assumed Agreements.

### (b)    Cure Payments

Any amount that must be paid under Bankruptcy Code section 365(b)(1) to cure a default under and compensate the non-debtor party to an executory contract or unexpired lease to be assumed under the Plan is identified as the "Cure Payment" on the Schedule of Assumed Agreements. Unless the parties mutually agree to a different date, such payment shall be made in Cash within ten (10) Business Days following the later of: (i) the Effective Date and (ii) entry of a Final Order resolving any disputes regarding (A) the amount of any Cure Payment, (B) the ability of the Liquidation Trust to provide "adequate assurance of future performance" within the meaning of Bankruptcy Code section 365 with respect to a contract or lease to be assumed, to the extent required, or (C) any other matter pertaining to assumption and assignment.

Pending the Bankruptcy Court's ruling on any such dispute, if the Effective Date shall have passed, the Liquidation Trust shall have standing to seek to compel the assumption of the executory contract or unexpired lease at issue, as successor in interest to the Debtors.

### (c)    Objections to Assumption/Cure Payment Amounts

Any Person that is a party to an executory contract or unexpired lease that will be assumed and assigned under the Plan and that objects to such assumption or assignment (including the proposed Cure Payment) must File with the Bankruptcy Court and serve on parties entitled to notice a written statement and, if applicable, a supporting declaration stating the basis for its objection. This statement and, if applicable, declaration must be Filed and served on or before the deadline established by the Disclosure Statement Order. Any Person that fails to timely File and serve such a statement and, if applicable, a declaration shall be deemed to waive any and all objections to the proposed assumption and assignment (including the proposed Cure Payment) of its contract or lease.

In the absence of a timely objection by a Person that is a party to an executory contract or unexpired lease, the Confirmation Order shall constitute a conclusive determination regarding the amount of any cure and compensation due under the applicable executory contract or unexpired lease, as well as a conclusive finding that the Liquidation Trust has demonstrated adequate assurance of future performance with respect to such executory contract or unexpired lease, to the extent required.

### (d)    Resolution of Claims Relating to Assumed Contracts and Leases

Payment of the Cure Payment established under the Plan, by the Confirmation Order, or by any other order of the Bankruptcy Court, with respect to an assumed and assigned executory contract or unexpired lease, shall be deemed to satisfy, in full, any prepetition or postpetition arrearage or other Claim (including any Claim asserted in a Filed proof of claim or listed on the Schedules) with respect to such contract or lease (irrespective of whether the Cure Payment is less than the amount set forth in such proof of claim or the Schedules). Upon the tendering of the Cure

146484.01601/123194608v.3

Payment, any such Filed or Scheduled Claim shall be disallowed with prejudice, without further order of the Bankruptcy Court or action by any Person.

## 2. Rejection of Executory Contracts and Unexpired Leases

### (a) Rejected Agreements

On the Effective Date all executory contracts and unexpired leases of the Debtors shall be rejected except for (i) executory contracts and unexpired leases that have been previously assumed or rejected by the Debtors, (ii) executory contracts and unexpired leases that are set forth in the Schedule of Assumed Agreements, and (iii) any agreement, obligation, security interest, transaction, or similar undertaking that the Debtors believe is not executory or a lease, but that is later determined by the Bankruptcy Court to be an executory contract or unexpired lease that is subject to assumption or rejection under Bankruptcy Code section 365. The Confirmation Order will constitute a Bankruptcy Court order approving the rejection, on the Effective Date, of the executory contracts and unexpired leases to be rejected under the Plan.

### (b) Rejection Claims Bar Date

Any Rejection Claim or other Claim for damages arising from the rejection under the Plan of an executory contract or unexpired lease must be Filed and served no later than the Rejection Claims Bar Date. Any such Rejection Claims that are not timely Filed and served will be forever disallowed, barred, and unenforceable, and Persons holding such Claims will not receive and will be barred from receiving any Distributions on account of such untimely Claims. If one or more Rejection Claims are timely Filed, the Liquidation Trust may object to any Rejection Claim on or prior to the Claim Objection Deadline. For the avoidance of doubt, the Rejection Claims Bar Date established by the Plan does not alter any rejection claims bar date established by a prior order of the Bankruptcy Court with respect to any executory contract or unexpired leases that was previously rejected in these Chapter 11 Cases.

## H. Conditions Precedent to the Effective Date

### 1. Conditions to the Effective Date

The occurrence of the Effective Date shall not occur and the Plan shall not be consummated unless and until each of the following conditions has been satisfied or duly waived pursuant to Section 9.2 of the Plan:

(a)    the Bankruptcy Court shall have entered the Confirmation Order;

(b)    the Confirmation Order shall not be subject to any stay;

(c)    all governmental and material third-party approvals and consents necessary in connection with the transactions contemplated by the Plan, if any, shall have been obtained and be in full force and effect;

(d)    all actions and all agreements, instruments, or other documents necessary to

41

implement the terms and provisions of the Plan are effected or executed and delivered, as applicable; and

(e)    the Professional Fee Reserve and Administrative Claims is funded pursuant to **Error! Reference source not found.** of the Plan.

### 2.    Waiver of Conditions to the Effective Date

The conditions to the Effective Date set forth in clauses (c) and (d) of the Plan may be waived in writing by the Debtors, in the Debtors' reasonable discretion.

### 3.    Effect of Non-Occurrence of Conditions to the Effective Date

If each of the conditions to the Effective Date is not satisfied or duly waived in accordance with **Error! Reference source not found.** and **Error! Reference source not found.** of the Plan, upon notification Filed by the Debtors with the Bankruptcy Court, (i) the Confirmation Order shall be vacated; (ii) no Distributions shall be made; (iii) the Debtors, the Estates, and all Creditors shall be restored to the *status quo* as of the day immediately preceding the Confirmation Hearing as though the Confirmation Order was not entered; and (iv) all of the Debtors' and the Estates' obligations with respect to Claims shall remain unchanged and nothing contained in the Plan shall constitute a waiver or release of any Causes of Action by or against the Debtors, the Estates, or any other Person or prejudice in any manner the rights, claims, or defenses of the Debtors, the Estates, or any other Person.

### 4.    Notice of the Effective Date

Promptly after the occurrence of the Effective Date, the Liquidation Trust or its agents shall mail or cause to be mailed to all Creditors a notice that informs such Creditors of (i) entry of the Confirmation Order and the resulting confirmation of the Plan; (ii) the occurrence of the Effective Date; (iii) the assumption, assignment, and rejection of executory contracts and unexpired leases pursuant to the Plan, as well as the deadline for the filing of resulting Rejection Claims; (iv) the deadline established under the Plan for the filing of Administrative Claims; and (v) such other matters as the Liquidation Trustee finds appropriate.

## I.    Certain Miscellaneous Provisions

### 1.    Administrative Claims

Subject to the last sentence of **Error! Reference source not found.** of the Plan, all requests for payment of an Administrative Claim must be Filed with the Bankruptcy Court no later than the Administrative Claims Bar Date. In the event of an objection to Allowance of an Administrative Claim, the Bankruptcy Court shall determine the Allowed amount of such Administrative Claim. **THE FAILURE TO FILE A MOTION REQUESTING ALLOWANCE OF AN ADMINISTRATIVE CLAIM ON OR BEFORE THE ADMINISTRATIVE CLAIMS BAR DATE, OR THE FAILURE TO SERVE SUCH MOTION TIMELY AND PROPERLY, SHALL RESULT IN THE ADMINISTRATIVE CLAIM BEING FOREVER BARRED AND DISALLOWED WITHOUT FURTHER ORDER OF THE BANKRUPTCY COURT.**

**IF FOR ANY REASON ANY SUCH ADMINISTRATIVE CLAIM IS INCAPABLE OF BEING FOREVER BARRED AND DISALLOWED, THEN THE HOLDER OF SUCH CLAIM SHALL IN NO EVENT HAVE RECOURSE TO ANY PROPERTY TO BE DISTRIBUTED PURSUANT TO THE PLAN.** Postpetition statutory tax claims shall not be subject to any Administrative Claims Bar Date.

## 2.    Professional Fee Claims

As part of their agreement to provide funding embodied in the Plan, pursuant to Bankruptcy Rule 9019, Holders of DIP Claims have established the Professional Fee Reserve to pay all Allowed Professional Fee Claims. Professional Fee Claims shall be paid initially from the Professional Fee Reserve. All final requests for payment of Professional Fee Claims pursuant to Bankruptcy Code sections 327, 328, 330, 331, 363, 503(b), or 1103 must be made by application Filed with the Bankruptcy Court and served on counsel to the Liquidation Trust and counsel to the U.S. Trustee no later than forty-five (45) calendar days after the Effective Date, unless otherwise ordered by the Bankruptcy Court. Objections to such applications must be Filed and served on counsel to the Liquidation Trust, counsel to the U.S. Trustee, and the requesting Professional on or before the date that is twenty-one (21) calendar days after the date on which the applicable application was served (or such longer period as may be allowed by order of the Bankruptcy Court or by agreement with the requesting Professional). All Professional Fee Claims shall be paid by the Liquidation Trust to the extent approved by order of the Bankruptcy Court within five (5) Business Days after entry of such order. On the Effective Date, the Liquidation Trust shall establish the Professional Fee Reserve. The Professional Fee Reserve shall vest in the Liquidation Trust and shall be maintained by the Liquidation Trust in accordance with the Plan. The Liquidation Trust shall fully fund the Professional Fee Reserve on the Effective Date in an amount that is fixed by the Debtors and that approximates the total projected amount of unpaid Professional Fee Claims on the Effective Date. If a dispute regarding the amount of the Professional Fee Reserve arises, then any beneficiary thereof may submit the issue to the Bankruptcy Court, which, following notice and a hearing, shall fix the amount of the required funding. All Professional Fee Claims that have not previously been paid, otherwise satisfied, or withdrawn shall be paid from the Professional Fee Reserve. Any excess funds in the Professional Fee Reserve shall be released to the Liquidation Trust to be used for other purposes consistent with the Plan. For the avoidance of doubt, the Professional Fee Reserve is an estimate and shall not be construed as a cap on the Liquidation Trust's obligation to pay in full Allowed Professional Fee Claims.

## 3.    Payment of Statutory Fees

All fees payable pursuant to 28 U.S.C. § 1930, as determined by the Bankruptcy Court at the Confirmation Hearing, shall be paid by the Debtors on or before the Effective Date. All such fees that arise after the Effective Date shall be paid by the Liquidation Trust. Notwithstanding the foregoing: (i) for the Remaining Debtor, quarterly fees for the quarter in which the Effective Date occurs will be calculated on the basis of all Estate Assets distributed to the Liquidation Trust on the Effective Date in the Chapter 11 Case of the Remaining Debtor; (ii) for all other Debtors, quarterly fees for the quarter in which the Effective Date occurs will be calculated on the basis of disbursements (if any) made by such Debtors prior to the Effective Date; and (iii) quarterly fees for each quarter after the quarter in which the Effective Date occurs will be $325.00 for the Remaining Debtor through the entry of the Final Decree for the Remaining Debtor or the dismissal

or conversion of the Chapter 11 Case regarding the Remaining Debtor. Notwithstanding anything to the contrary in the Plan, the U.S. Trustee shall not be required to file any proofs of claim with respect to quarterly fees payable pursuant to 28 U.S.C. § 1930.

### 4.    Post-Effective Date Reporting

(a)    Beginning the first full quarter-end following the Effective Date and continuing on each quarter-end thereafter until the Closing Date, within thirty (30) calendar days after the end of such period, the Liquidation Trust shall File quarterly reports with the Bankruptcy Court. Each quarterly report shall contain a cash flow statement which shall show Distributions by Class during the prior quarter, an unaudited balance sheet, the terms of any settlement of an individual Claim in an amount greater than $100,000, the terms of any litigation settlement where the Cause of Action or the Liquidation Trust Action was greater than $100,000 or the settlement is for more than $100,000, the terms of any sale of Estate Assets where the proceeds of such sale are $100,000 or greater, and such other information as the Liquidation Trust determines is material.

(b)    The Liquidation Trust shall, as soon as practicable after the end of each calendar year and upon termination of the Liquidation Trust, provide or make available a written report and account to the Holders of Liquidation Trust Interests, which report and account sets forth (i) the assets and liabilities of the Liquidation Trust at the end of such calendar year or upon termination and the receipts and disbursements of the Liquidation Trust for such calendar year or period, and (ii) changes in the Liquidation Trust Assets and actions taken by the Liquidation Trustee in the performance of its duties under the Plan or the Liquidation Trust Agreement that the Liquidation Trustee determines in its discretion may be relevant to Holders of Liquidation Trust Interests, such as material changes or actions that, in the opinion of the Liquidation Trustee, may have a material effect on the Liquidation Trust Assets that were not previously reported. The Liquidation Trust may provide or make available to Holders of Liquidation Trust Interests similar reports for such interim periods during the calendar year as the Liquidation Trustee deems advisable. Such reports may be provided or made available to the Holders of Liquidation Trust Interests, in the discretion of the Liquidation Trustee, by any reasonable means, including U.S. mail, electronic transmission, display on IntraLinks or a similar virtual data room to which Holders shall have access, or publication to a publicly-available website or by press release distributed via a generally recognized business news service.

### 5.    Dissolution of the Creditors' Committee

The Creditors' Committee shall be automatically dissolved on the Effective Date and, on the Effective Date, each member of the Creditors' Committee and each Professional retained by the Creditors' Committee shall be released and discharged from all rights, duties, responsibilities, and obligations arising from, or related to, the Debtors, their membership on the Creditors' Committee, the Plan, or the Chapter 11 Cases, except with respect to any matters concerning any Professional Fee Claims held or asserted by any Professional retained by the Creditors' Committee.

### 6.    Modifications and Amendments

(a)    In the Debtors' reasonable discretion, the Debtors may alter, amend, or modify the

44

Plan under Bankruptcy Code section 1127(a) at any time at or prior to the conclusion of the Confirmation Hearing. All alterations, amendments, or modifications to the Plan must comply with Bankruptcy Code section 1127. The Debtors shall provide parties in interest with notice of such amendments or modifications as may be required by the Bankruptcy Rules or order of the Bankruptcy Court. A Creditor that has accepted the Plan shall be deemed to have accepted the Plan, as altered, amended, modified, or clarified, if the proposed alteration, amendment, modification, or clarification does not materially and adversely change the treatment of the Claim of such Creditor.

(b)       After entry of the Confirmation Order and prior to substantial consummation (as defined in Bankruptcy Code section 1101(2)) of the Plan, the Debtors or the Liquidation Trust, as applicable, may, under Bankruptcy Code section 1127(b), institute proceedings in the Bankruptcy Court to remedy any defect or omission or to reconcile any inconsistencies in the Plan, the Disclosure Statement approved with respect to the Plan, or the Confirmation Order, and such matters as may be necessary to carry out the purpose and effect of the Plan so long as such proceedings do not adversely affect the treatment of Holders of Claims under the Plan. Such proceedings must comply with Bankruptcy Code section 1127. To the extent required, prior notice of such proceedings shall be served in accordance with the Bankruptcy Rules or an order of the Bankruptcy Court. A Creditor that has accepted the Plan shall be deemed to have accepted the Plan, as altered, amended, modified, or clarified, if the proposed alteration, amendment, modification, or clarification does not materially and adversely change the treatment of the Claim of such Creditor.

### 7.       Severability of Plan Provisions

If, at or before the Confirmation Hearing, the Bankruptcy Court holds that any Plan term or provision is invalid, void, or unenforceable, the Bankruptcy Court may alter or interpret that term or provision so that it is valid and enforceable to the maximum extent possible consistent with the original purpose of that term or provision. That term or provision will then be applicable as altered or interpreted. Notwithstanding any such holding, alteration, or interpretation, the Plan's remaining terms and provisions will remain in full force and effect and will in no way be affected, impaired, or invalidated. The Confirmation Order will constitute a judicial determination providing that each Plan term and provision, as it may have been altered or interpreted in accordance with Section 11.07 of the Plan, is valid and enforceable under its terms.

### 8.       Compromises and Settlements

From and after the Effective Date, the Liquidation Trust may compromise and settle disputes about any Claims or about any Liquidation Trust Actions, without any further approval by the Bankruptcy Court. Until the Effective Date, the Debtors expressly reserve the right to compromise and settle (subject to the approval of the Bankruptcy Court) Claims against them or any Avoidance Actions and Causes of Action belonging to the Estates.

### 9.       Binding Effect of Plan

Upon the Effective Date, Bankruptcy Code section 1141 shall become applicable with respect to the Plan and the Plan shall be binding on all Persons to the fullest extent permitted by

Bankruptcy Code section 1141(a). Confirmation of the Plan binds each Holder of a Claim or Equity Interest to all the terms and conditions of the Plan, whether or not such Holder's Claim or Equity Interest is Allowed, whether or not such Holder holds a Claim or Equity Interest that is in a Class that is Impaired under the Plan, and whether or not such Holder has accepted the Plan.

### 10.    Non-Discharge of the Debtors; Injunction

**In accordance with Bankruptcy Code section 1141(d)(3)(A), the Plan does not discharge the Debtors. Bankruptcy Code section 1141(c) nevertheless provides, among other things, that the property dealt with by the Plan is free and clear of all Claims and Equity Interests against the Debtors. As such, no Person holding a Claim or an Equity Interest may receive any payment from, or seek recourse against, any assets that are to be distributed under the Plan other than assets required to be distributed to that Person under the Plan. As of the Effective Date, all Persons are precluded and barred from asserting against any property to be distributed under the Plan any Claims, rights, Causes of Action, liabilities, Equity Interests, or other action or remedy based on any act, omission, transaction, or other activity that occurred before the Effective Date except as expressly provided in the Plan or the Confirmation Order.**

### 11.    Releases and Related Matters

**(a)**    On the Effective Date, for good and valuable consideration, the adequacy of which is hereby confirmed, each of the Releasing Parties shall be deemed to have forever released, waived, and discharged each of the Released Parties from any and all claims, obligations, suits, judgments, damages, demands, debts, rights, Causes of Action, and liabilities whatsoever, whether known or unknown, whether foreseen or unforeseen, whether liquidated or unliquidated, whether fixed or contingent, whether matured or unmatured, existing or hereafter arising, at law, in equity, or otherwise, that are based in whole or in part on any act, omission, transaction, event, or other occurrence taking place on or prior to the Effective Date in any way relating to the Debtors, the conduct of the Debtors' business, the Chapter 11 Cases, or the Plan, except for acts or omissions that are determined in a Final Order to have constituted actual fraud or willful misconduct; *provided, however*, that nothing in **Error! Reference source not found.** of the Plan shall release or otherwise affect any Person's rights under the Plan or the Confirmation Order.  Nothing contained in Section 11.11 shall constitute a release of a Debtor or any of them.

**(b)**    **Entry of the Confirmation Order shall constitute (i) the Bankruptcy Court's approval, pursuant to Bankruptcy Rule 9019, of the releases set forth in Section 11.11 of the Plan; and (ii) the Bankruptcy Court's findings that such releases are (1) in exchange for good and valuable consideration provided by the Released Parties (including performance of the terms of the Plan), and a good-faith settlement and compromise of the released claims, (2) in the best interests of the Debtors, the Estates, and any Holders of Claims that are Releasing Parties, (3) fair, equitable, and reasonable, (4) given and made after due notice and opportunity for hearing, and (5) a bar to any of the Releasing Parties asserting any released claim against any of the Released Parties.**

46

### 12.    Exculpation and Limitation of Liability

**On the Effective Date, for good and valuable consideration, the adequacy of which is hereby confirmed, to the maximum extent permitted by law, none of the Exculpated Parties shall have or incur any liability to any Person, including to any Holder of a Claim or an Equity Interest, for any prepetition or postpetition act or omission in connection with, relating to, or arising out of the Chapter 11 Cases, the formulation, negotiation, preparation, dissemination, solicitation of acceptances, implementation, confirmation, or consummation of the Plan, the Disclosure Statement, or any contract, instrument, release, or other agreement or document created, executed, or contemplated in connection with the Plan, or the administration of the Plan or the property to be distributed under the Plan; *provided, however*, that nothing in Section 11.12 of the Plan shall release or otherwise affect any Person's rights under the Plan or the Confirmation Order; and *provided, further*, that the exculpation provisions of Section 11.11 of the Plan shall not apply to acts or omissions constituting actual fraud or willful misconduct by such Exculpated Party as determined by a Final Order. For purposes of the foregoing, it is expressly understood that any act or omission effected with the approval of the Bankruptcy Court conclusively will be deemed not to constitute actual fraud or willful misconduct unless the approval of the Bankruptcy Court was obtained by fraud or intentional misrepresentation, and in all respects, the Exculpated Parties shall be entitled to rely on the written advice of counsel with respect to their duties and responsibilities under, or in connection with, the Chapter 11 Cases, the Plan, and administration thereof. The Confirmation Order shall serve as a permanent injunction against any Person seeking to enforce any Causes of Action against the Exculpated Parties that are encompassed by the exculpation provided by Section 11.12 of the Plan.**

### 13.    Term of Injunctions or Stays

Unless otherwise provided herein or in the Confirmation Order, all injunctions or stays in the Chapter 11 Cases under Bankruptcy Code sections 105 or 362 or otherwise, and extant as of the Confirmation Hearing (excluding any injunctions or stays contained in or arising from the Plan or the Confirmation Order), shall remain in full force and effect through and inclusive of the Effective Date..

### 14.    Revocation, Withdrawal, or Non-Consummation

The Debtors reserve the right to revoke or withdraw the Plan at any time prior to the Confirmation Hearing and to File subsequent plans. If the Debtors revoke or withdraw the Plan prior to the Confirmation Hearing, or if the Effective Date does not occur, then (a) the Plan shall be null and void in all respects; and (b) nothing contained in the Plan, and no acts taken in preparation for consummation of the Plan, shall (i) constitute or be deemed to constitute a waiver or release of any Claims against, or any Equity Interests in, any Debtor, or any Causes of Action by or against any Debtor or any other Person, (ii) prejudice in any manner the rights of any Debtor or any other Person in any further proceedings involving a Debtor, or (iii) constitute an admission of any sort by any Debtor or any other Person.

146484.01601/123194608v.3

### 15.    Exemption from Transfer Taxes

Pursuant to Bankruptcy Code section 1146, the vesting of the Liquidation Trust Assets in the Liquidation Trust, the vesting of the Estate Assets in the Liquidation Trust, the issuance, transfer, or exchange of notes or equity securities under the Plan, the creation of any mortgage, deed of trust, lien, pledge, or other security interest, or the making or assignment of any lease or sublease, or making or delivery of any deed or other instrument of transfer under, in furtherance of, or in connection with the Plan, shall not be subject to any stamp, real estate transfer, mortgage recording, or other similar tax.

### 16.    Good Faith

Confirmation of the Plan shall constitute a conclusive determination that: (a) the Plan, and all the transactions and settlements contemplated thereby, have been proposed in good faith and in compliance with all applicable provisions of the Bankruptcy Code and the Bankruptcy Rules; and (b) the solicitation of acceptances or rejections of the Plan has been in good faith and in compliance with all applicable provisions of the Bankruptcy Code, and the Bankruptcy Rules, and, in each case, that the Debtors and all Related Parties have acted in good faith in connection therewith.

### 17.    Conflicts

In the event and to the extent that any provision of the Plan is inconsistent with the provisions of the Disclosure Statement, any other order entered in the Chapter 11 Cases, or any other agreement to be executed by any Person pursuant to the Plan, the provisions of the Plan shall control and take precedence; provided, however, that the Confirmation Order shall control and take precedence in the event of any inconsistency between the Confirmation Order, any provision of the Plan, and any of the foregoing documents.

## V.    RISK FACTORS

Prior to voting on the Plan, each Holder of a Claim entitled to vote should consider carefully the risk factors described below, as well as all other information contained in this Disclosure Statement, including the exhibits hereto. These risk factors should not be regarded as the only risks involved in connection with the Plan and its implementation.

### A.    Parties May Object to the Plan's Classification of Claims and Equity Interests

Bankruptcy Code section 1122 provides that a plan may place a claim or an interest in a particular class only if such claim or interest is substantially similar to the other claims or interests in such class. The Debtors believe that the classification of the Claims and Equity Interests under the Plan complies with this requirement. Nevertheless, there can be no assurance that the Bankruptcy Court will reach the same conclusion.

### B.    The Debtors May Not Be Able to Obtain Confirmation of the Plan

With regard to any proposed plan, the Debtors may not receive the requisite acceptances to confirm a plan. In the event that votes with respect to Claims in the Classes entitled to vote are

146484.01601/123194608v.3

received in number and amount sufficient to enable the Bankruptcy Court to confirm the Plan, the Debtors intend to seek Confirmation of the Plan by the Bankruptcy Court. If the requisite acceptances are not received, the Debtors may not be able to obtain Confirmation of the Plan. Even if the requisite acceptances of a proposed plan are received, the Bankruptcy Court still might not confirm the Plan as proposed if the Bankruptcy Court finds that any of the statutory requirements for confirmation under Bankruptcy Code section 1129 have not been met.

## C.    The Conditions Precedent to the Effective Date of the Plan May Not Occur

As more fully set forth herein and in the Plan, the Effective Date is subject to several conditions precedent. There can be no assurance that any or all of such conditions will be satisfied or waived. If such conditions precedent are not met or waived, the Effective Date will not occur. Accordingly, even if the Plan is confirmed by the Bankruptcy Court, there can be no assurance that the Effective Date will occur.

## D.    Claims Estimation and Allowance of Claims

There can be no assurance that the estimated Claim amounts set forth in this Disclosure Statement are correct, and the actual amount of Allowed Claims may differ significantly from the estimates. The estimated amounts are subject to certain risks, uncertainties, and assumptions. Should one or more of these risks or uncertainties materialize, or should underlying assumptions prove incorrect, the actual amount of Allowed Claims may vary from those estimated herein.

Distributions to Holders of Allowed Class 1 and Class 4 Claims will be affected by the pool of Allowed Claims in each respective Class. Upon completion of further analysis of Filed Claims, which will likely lead to Claims objection litigation and related matters, the total amount of Claims that ultimately become Allowed Claims in each of the foregoing Classes may differ from the Debtors' estimates, which are reflected in this Disclosure Statement, and such difference could be material. As a result, the amount of Distributions that may be received by a particular Holder of an Allowed Claim may be either adversely or favorably affected by the aggregate amount Class 4 Claims ultimately Allowed.

## E.    Potential Pursuit of Liquidation Trust Actions Against Creditors and Others

In accordance with Bankruptcy Code section 1123(b), after the Effective Date, the Liquidation Trustee shall have and retain and may enforce any Liquidation Trust Actions. Accordingly, a Holder of a Claim may be subject to one or more such Liquidation Trust Actions being asserted against it.

The failure to specifically identify in the Disclosure Statement or the Plan any potential or existing Avoidance Actions or Causes of Action as a Liquidation Trust Action is not intended to and shall not limit the rights of the Liquidation Trust to pursue any such Avoidance Actions or Causes of Action. The Debtors expressly reserve all Avoidance Actions and Causes of Action, other than those Avoidance Actions and Causes of Action that are expressly waived, relinquished, released, compromised, or settled in the Plan, pursuant to the Confirmation Order, or pursuant to any other order of the Bankruptcy Court, as Liquidation Trust Actions for later adjudication, and no preclusion doctrine (including the doctrines of res judicata, collateral estoppel, judicial estoppel,

49

equitable estoppel, issue preclusion, claim preclusion, and laches) shall apply to such Avoidance Actions or Causes of Action as Liquidation Trust Actions on or after the Effective Date.

Moreover, no Person may rely on the absence of a specific reference in the Plan, the Confirmation Order, the Liquidation Trust Agreement, or the Disclosure Statement to any Avoidance Action or Cause of Action against such Person as any indication that the Liquidation Trust will not pursue any and all available Avoidance Actions and Causes of Action against such Person. The objection to the Allowance of any Claims will not in any way limit the ability or the right of the Liquidation Trust to assert, commence, or prosecute any Avoidance Actions or Causes of Action. Nothing contained in the Plan, the Confirmation Order, the Liquidation Trust Agreement, or the Disclosure Statement will be deemed to be a waiver, release, or relinquishment of any Avoidance Actions or Causes of Action which the Debtors or their Estates had immediately prior to the Effective Date. The Liquidation Trust shall have, retain, reserve, and be entitled to assert all Avoidance Actions and Causes of Action fully as if the Avoidance Actions and Causes of Action had not been contributed to the Liquidation Trust in accordance with the Plan and the Liquidation Trust Agreement.

Without limiting the generality of the preceding two paragraphs and associated reservations, the Debtors note that all parties in interest should review the Plan Supplement, which will contain a non-exclusive analysis of the Liquidation Trust Actions that are being preserved under the Plan.

F.    **Risks Regarding Liquidation Trust Assets**

The Plan relies, in large part, on the Liquidation Trust generating proceeds from aircraft and related asset sales to produce Cash for remittance to the Liquidation Trust for distribution to creditors. In the event that sales are delayed, costs incurred with respect to aircraft and related assets prior to sale exceed estimates, or markets decline due to economic conditions or other constraints, payments may be correspondingly delayed.

The Liquidation Trust's ability to monetize the Estate Assets is subject to certain risks associated with the aviation industry in general, including: local, national, and international economic conditions; the supply and demand for aircraft and related asset sales, particularly assets properties of the sort owned by the Debtors; the impact of COVID-19 and pandemics on commercial air traffic and services; changes in interest rates; changes in environmental laws or regulations, planning laws and other governmental roles and fiscal and monetary policies; negative developments in the economy that depress travel and retail activity; uninsured casualties; force majeure acts, terrorist events, under-insured or uninsurable losses; and other factors that are beyond the reasonable control of the Liquidation Trust. In addition, aviation assets are subject to long-term cyclical trends that can give rise to significant volatility in values. Also, a variety of work is projected to be undertaken with respect to the aircraft and related asset sales to be sold, the cost of which is not susceptible to precise determination. Unexpected conditions, weather, labor issues and a variety of other variables may affect the actual cost of the projected work being undertaken and thus affect, potentially adversely, the net proceeds of the sales of the real estate.

### G.    Tax Considerations

There are several material income tax considerations, risks, and uncertainties associated with consummation of the Plan. Holders of Claims, Holders of Equity Interests, and other interested parties should read carefully the discussion set forth in Article VIII for a discussion of certain U.S. federal income tax consequences of the transactions contemplated under the Plan.

## VI.    CONFIRMATION OF THE PLAN

### A.    The Confirmation Hearing

Bankruptcy Code section 1128(a) requires the Bankruptcy Court, after notice, to hold a hearing regarding Confirmation of the Plan. Bankruptcy Code section 1128(b) provides that any party in interest may object to Confirmation of the Plan.

The Bankruptcy Court has scheduled the Confirmation Hearing to commence on **June [24], 2020, at 11:00 a.m.** (prevailing Eastern Time), before the Honorable Brendan L. Shannon, United States Bankruptcy Judge, in the United States Bankruptcy Court for the District of Delaware, 824 North Market Street, Wilmington, Delaware 19801.   The Confirmation Hearing Notice, which sets forth the time and date of the Confirmation Hearing, has been included along with this Disclosure Statement. The Confirmation Hearing may be adjourned from time to time without further notice except for an announcement of the adjourned date made at the Confirmation Hearing or any adjournment thereof.

Objections to Confirmation of the Plan must be Filed and served so that they are actually received by no later than **June [17], 2020, at 4:00 p.m.** (prevailing Eastern Time). **Unless objections to Confirmation of the Plan are timely served and Filed in compliance with the Disclosure Statement Order, they may not be considered by the Bankruptcy Court**.

### B.    Requirements for Confirmation of the Plan

Among the requirements for the Confirmation of the Plan is that the Plan (i) is accepted by all Impaired Classes of Claims, or, if rejected by an Impaired Class of Claims, that the Plan "does not discriminate unfairly" and is "fair and equitable" as to such Impaired Class of Claims; (ii) is feasible; and (iii) is in the "best interests" of Holders of Claims.

At the Confirmation Hearing, the Bankruptcy Court will determine whether the Plan satisfies the requirements of Bankruptcy Code section 1129. The Debtors believe that: (i) the Plan satisfies or will satisfy all of the necessary statutory requirements of chapter 11 of the Bankruptcy Code; (ii) the Debtors have complied or will have complied with all of the necessary requirements of chapter 11 of the Bankruptcy Code; and (iii) the Plan has been proposed in good faith. More specifically, the Debtors believe that the Plan satisfies or will satisfy the following applicable Confirmation requirements of Bankruptcy Code section 1129:

•    The Plan complies with the applicable provisions of the Bankruptcy Code.

•    The Debtors have complied with the applicable provisions of the Bankruptcy Code.

- The Plan has been proposed in good faith and not by any means forbidden by law.

- Any payment made or promised under the Plan for services or for costs and expenses in, or in connection with, the Chapter 11 Cases, or in connection with the Plan and incident to the Chapter 11 Cases, has been disclosed to the Bankruptcy Court, and any such payment: (1) made before the Confirmation of the Plan is reasonable; or (2) is subject to the approval of the Bankruptcy Court as reasonable, if it is to be fixed after Confirmation of the Plan.

- Either each Holder of a Claim in an Impaired Class of Claims has accepted the Plan, or each such Holder will receive or retain under the Plan on account of such Claim property of a value, as of the Effective Date of the Plan, that is not less than the amount that such Holder would receive or retain if the Debtors were liquidated on the Effective Date of the Plan under chapter 7 of the Bankruptcy Code.

- The Classes of Claims that are entitled to vote on the Plan will have accepted the Plan, or at least one Class of Impaired Claims will have accepted the Plan, determined without including any acceptance of the Plan by any insider holding a Claim in that Class, and the plan does not "discriminate unfairly" and is "fair and equitable" with respect to each Class of Claims that is impaired under, and has not accepted, the Plan.

- Except to the extent a different treatment is agreed to, the Plan provides that all Allowed Administrative Claims and Allowed Priority Claims will be paid in full on the Effective Date, or as soon thereafter as is reasonably practicable.

- All accrued and unpaid fees of the type described in 28 U.S.C. § 1930, including the fees of the U.S. Trustee, will be paid through the Effective Date.

### C.    Best Interests of Creditors

Often called the "best interests of creditors" test, Bankruptcy Code section 1129(a)(7) requires that a bankruptcy court find, as a condition to confirmation of a chapter 11 plan, that the plan provides, with respect to each impaired class, that each holder of a claim or an interest in such class either (i) has accepted the plan or (ii) will receive or retain under the plan property of a value that is not less than the amount that such holder would receive or retain if the debtor liquidated under chapter 7 on the effective date of the plan. Accordingly, if an impaired class does not unanimously accept the Plan, the best interests test requires the Bankruptcy Court to find, before confirming the Plan, that the Plan provides to each member of such Impaired Class a recovery on account of the Class member's Claim that has a value, as of the Effective Date, at least equal to the value of the distribution that each such Class member would receive if the Debtor were liquidated under chapter 7 of the Bankruptcy Code on the Effective Date.

The Plan is a plan of liquidation. The costs of liquidation under chapter 7 of the Bankruptcy Code would include the fees payable to a chapter 7 trustee, and the fees that would be payable to additional attorneys and other professionals that such a trustee may engage.

146484.01601/123194608v.3

Conversion to chapter 7 of the Bankruptcy Code would mean the establishment of a new claims bar date, which could result in new General Unsecured Claims being asserted against the Estates, thereby diluting the recoveries of other Holders of Allowed Claims.

In addition, a chapter 7 trustee likely would act quickly to sell or otherwise monetize the Estate Assets, including because (i) a chapter 7 trustee probably would not have adequate staffing or funding to dispose of the Debtors' real property over an extended period of time, and (ii) a chapter 7 trustee would need to seek authorization to operate the Debtors' remaining business, which is relief that should be granted only "for a limited period" in any event, *see* 11 U.S.C. § 721. In light of, among other things, the limited universe of potential buyers for aircraft and related assets, such a forced sale by a chapter 7 trustee would likely ultimately result in significantly lower recoveries from the sale of the Estate Assets, as set forth in the Liquidation Analysis.

On balance, the Debtors believe that a chapter 7 trustee would be less likely to maximize the value available from all the Estate Assets and would be unable to obtain the benefits of the compromises and settlements available under the Plan. Therefore, the Debtors believe that confirmation of the Plan will provide each Holder of a DIP Claim, a Prepetition Secured Creditor Claim, or a General Unsecured Claim with an equal or greater recovery than such Holder would receive pursuant to the liquidation of the Debtors under chapter 7 of the Bankruptcy Code.

The Debtors believe that the Plan satisfies the best interests test because, if the Plan were not confirmed and, instead, the Chapter 11 Cases were converted to a chapter 7 liquidation proceeding, the value of the Debtors' estates would diminish because (i) the estates would need to pay fees and other costs to any chapter 7 trustee, and (ii) the estates would incur increased professional fee costs associated with supporting the chapter 7 proceeding and associated litigation costs and claims.  In addition, the Debtors' ability to realize value from their assets could be impaired in a chapter 7 liquidation.

If the Plan is not confirmed by the Bankruptcy Court, there can be no assurance that any alternative plan would be on terms as favorable to any Holders of Claims as the terms of the Plan. In addition, there can be no assurance that the Debtors will be able to successfully develop, prosecute, confirm, and consummate an alternative plan that is acceptable to the Bankruptcy Court and the Debtors' creditors.

### D.    Feasibility

Bankruptcy Code section 1129(a)(11) requires that confirmation of the plan is not likely to be followed by the liquidation, or the need for further financial reorganization of the Debtors, or any successor to the Debtors (unless such liquidation or reorganization is proposed in the plan). This requirement is satisfied as the Plan specifically proposes a liquidation and the Debtors believe the Debtors' Cash and any additional proceeds from the Liquidation Trust Assets will be sufficient to allow the Liquidation Trustee to make all payments required to be made under the Plan. Accordingly, the Debtors believe that the Plan is feasible.

### E.    Acceptance by Impaired Classes

The Bankruptcy Code requires, as a condition to confirmation, that, except as described in the following section, each class of claims or interests that is impaired under a plan accept the plan. A class that is not "impaired" under a plan is deemed to have accepted the plan and, therefore, solicitation of acceptances with respect to such class is not required.

A class is "impaired" unless a plan: (a) leaves unaltered the legal, equitable, and contractual rights to which the claim or the interest entitles the holder of such claim or interest; or (b) cures any default, reinstates the original terms of such obligation, compensates the holder for certain damages or losses, as applicable, and does not otherwise alter the legal, equitable, or contractual rights to which such claim or interest entitles the holder of such claim or interest.

Bankruptcy Code section 1126(c) defines acceptance of a plan by a class of impaired claims as acceptance by holders of at least two-thirds in dollar amount and more than one-half in number of allowed claims in that class, counting only those claims held by creditors that actually voted to accept or reject the plan. Thus, a Class of Impaired Claims will have voted to accept the Plan only if two-thirds in amount and a majority in number actually voting cast their Ballots in favor of acceptance.

### F.    Confirmation Without Acceptance by All Impaired Classes

Bankruptcy Code section 1129(b) allows a bankruptcy court to confirm a plan even if all impaired classes have not accepted that plan, *provided* that the plan has been accepted by at least one impaired class of claims, determined without including the acceptance of the plan by any insider. Notwithstanding an impaired class's rejection or deemed rejection of the plan, such plan will be confirmed, at the plan proponent's request, in a procedure commonly known as "cramdown," so long as the plan does not "discriminate unfairly" and is "fair and equitable" with respect to each class of claims or interests that is impaired under, and has not accepted, the plan.

To the extent that any Impaired Class rejects the Plan or is deemed to have rejected the Plan, the Debtors will request Confirmation of the Plan under Bankruptcy Code section 1129(b). The Debtors reserve the right to alter, amend, modify, revoke, or withdraw the Plan, the Plan Supplement, or any schedule or exhibit, including to amend or modify it to satisfy the requirements of Bankruptcy Code section 1129(b), if necessary.

### 1.    No Unfair Discrimination

The "unfair discrimination" test applies to classes of claims or interests that reject or are deemed to have rejected a plan and that are of equal priority with another class of claims or interests that is receiving different treatment under such plan. The test does not require that the treatment of such classes of claims or interests be the same or equivalent, but that such treatment be "fair" under the circumstances. In general, bankruptcy courts consider whether a plan discriminates unfairly in its treatment of classes of claims of equal rank (*e.g.*, classes of the same legal character). Bankruptcy courts will take into account various factors in determining whether a plan discriminates unfairly, and, accordingly, a plan could treat two classes of unsecured creditors

54

differently without unfairly discriminating against either class. The Debtors submit that if the Debtors are required to "cramdown" the Plan pursuant to Bankruptcy Code section 1129(b), the Plan is structured such that it does not "discriminate unfairly" against any rejecting Class.

### 2.    Fair and Equitable Test

The "fair and equitable" test applies to classes that reject or are deemed to have rejected a plan and are of different priority and status vis-à-vis another class (*e.g.*, secured versus unsecured claims, or unsecured claims versus equity interests), and includes the general requirement that no class of claims receive more than 100% of the amount of the allowed claims in such class, including interest. As to the rejecting class, the test sets different standards depending on the type of claims or interests in such rejecting class. The Debtors submit that if the Debtors are required to "cram down" the Plan pursuant to Bankruptcy Code section 1129(b), the Plan is structured such that the applicable "fair and equitable" standards are met.

### G.    Alternatives to Confirmation and Consummation of the Plan

The Debtors believe that the Plan affords Holders of Claims the potential for a materially better realization on the Estate Assets than a chapter 7 liquidation, and, therefore, is in the best interests of all such Holders. If, however, the requisite acceptances of the voting Classes of Claims are not received, or no Plan is confirmed and consummated, the theoretical alternatives include: (a) formulation of an alternative chapter 11 plan or plans, or (b) liquidation of the Debtors under chapter 7 of the Bankruptcy Code.

If the requisite acceptances are not received or if the Plan is not confirmed, the Debtors or another party in interest could attempt to formulate and propose a different plan or plans. The Debtors believe that the Plan enables Creditors to realize the greatest possible value under the circumstances, and, as compared to any alternative plan, has the greatest chance to be confirmed and consummated.

The Chapter 11 Cases may also be converted to cases under chapter 7 of the Bankruptcy Code, pursuant to which a statutory trustee would be elected or appointed to complete the liquidation of the Estate Assets for distribution to Creditors in accordance with the priorities established by the Bankruptcy Code. As described above, the Debtors believe that the Plan will provide each Holder of a DIP Claim, a Prepetition Secured Creditor Claim, or a General Unsecured Claim with an equal or greater recovery than it would receive pursuant to liquidation of the Debtors under chapter 7 of the Bankruptcy Code.

## VII.    CERTAIN SECURITIES LAW CONSEQUENCES OF THE PLAN

### A.    General

### 1.    Status as Securities

The Plan provides for the establishment of the Liquidating Trust and for the issuance of beneficial interests therein issued in respect of Allowed DIP Claims and Allowed Class 1 Claims. In general, beneficial interests in trusts may sometimes be subject to regulation under applicable non-bankruptcy law, including federal and state securities laws. As discussed below, the Debtors

55

believe that the beneficial interests in the Liquidation Trust (the "Beneficial Interests") will not constitute "securities."

### 2.    Transfer Restrictions on Beneficial Interests

Under the terms of the Liquidation Trust Agreement, the Beneficial Interests initially will be uncertificated and subject to transfer restrictions set forth in the Liquidation Trust Agreement (the "Transfer Restrictions"). Under the Transfer Restrictions, the Beneficial Interests cannot be assigned or transferred by any holder thereof other than by will or intestate succession upon the death of such holder or otherwise by operation of law. The Transfer Restrictions will be effective upon issuance of the Beneficial Interests on the Effective Date of the Plan and will remain in effect during the initial and any renewal term of the Liquidation Trust unless sooner terminated or modified by the Liquidation Trustee in accordance with the Liquidation Trust Agreement.

### B.    Exemption from Offer and Sale of Securities Act and Blue Sky Laws

### 1.    Issuance of Beneficial Interests under Plan

Unless an exemption is available, the offer and sale of a security generally is subject to registration with the SEC under Section 5 of the Securities Act of 1933, as amended (the "Securities Act").

In the event that the Beneficial Interests are deemed to constitute securities, section 1145(a)(1) of the Bankruptcy Code exempts the offer and sale of securities under a plan of reorganization from registration under the Securities Act and state securities laws and regulations ("Blue Sky Laws") if three principal requirements are satisfied:

1.    the securities are offered and sold under a plan of reorganization and are securities of the debtor, of an affiliate of the debtor participating in a joint plan with the debtor, or of a successor to the debtor under the plan;

2.    the recipients of the securities hold a pre-petition or administrative claim against the debtor or an interest in the debtor; and

3.    the securities are issued entirely in exchange for recipient's claim against or interest in the debtor, or principally in such exchange and partly for cash or property.

If and to the extent that the Beneficial Interests may constitute securities, the Debtors believe that the Beneficial Interests, which are being issued in respect of Allowed DIP Claims and Allowed Class 1 Claims, will qualify as securities "of the debtor . . . or of a successor to the debtor" pursuant to section 1145(a)(1). In addition, the Beneficial Interests will be issued entirely in exchange for such Claims and Interests. Thus, the Debtors believe that the issuance of the Beneficial Interests pursuant to the Plan will satisfy the applicable requirements of section 1145(a)(1) of the Bankruptcy Code, and that such issuance should be exempt from registration under the Securities Act and any applicable Blue Sky Law.

146484.01601/123194608v.3

The Debtors believe that its reliance upon the foregoing exemption in respect of the issuance of the Beneficial Interests is consistent with positions taken by the SEC with respect to similar transactions and arrangements by other debtors in possession. However, the Debtors have not sought any "no-action" letter by the SEC with respect to any such matters, and therefore no assurance can be given regarding the availability of any exemptions from registration with respect to any securities, if any, issued pursuant to the Plan.

### 2.      Resale of Beneficial Interests After Plan Effective Date

As discussed above, during the continuation of the Transfer Restrictions, the Beneficial Interests cannot be assigned or transferred by any holder thereof other than by will or intestate succession upon the death of such holder or otherwise by operation of law. Under the Liquidation Trust Agreement, the Liquidation Trustee will terminate or modify the Transfer Restrictions as necessary following the effectiveness of the registration of the Beneficial Interests under Section 12(g) of the Exchange Act and the acceptance of the Beneficial Interests for quotation on the Over-the-Counter Bulletin Board (OTCBB) or other organized over-the-counter trading market in the United States. If the Transfer Restrictions are so terminated or modified, the Beneficial Interests may become transferable to the extent otherwise permissible under applicable law. However, no assurance can be given that the Liquidation Trustee will be successful in causing the registration of the Beneficial Interests or their acceptance for trading on any such organized trading market. None of the Debtors or the Liquidation Trust will be obliged to, and it is expected that none of them will, seek the listing of any Beneficial Interest on any national stock exchange such as the NYSE, NASDAQ Stock Market, or NASDAQ National Market.

### C.      Exchange Act and other securities law compliance

Section 12(g) of the Exchange Act, and the Exchange Act rules and regulations promulgated thereunder, does not require a company to register a class of equity securities in these circumstances.

## VIII.    CERTAIN UNITED STATES FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN

**THE U.S. FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN ARE COMPLEX. ALL HOLDERS OF CLAIMS AGAINST THE DEBTORS SHOULD CONSULT WITH THEIR OWN TAX ADVISORS AS TO THE PARTICULAR TAX CONSEQUENCES TO THEM OF THE TRANSACTIONS CONTEMPLATED BY THE PLAN, INCLUDING THE APPLICABILITY AND EFFECT OF ANY STATE, LOCAL, OR FOREIGN TAX LAWS AND OF ANY CHANGE IN APPLICABLE TAX LAWS.**

This discussion is provided for informational purposes only, and is based on provisions of the Internal Revenue Code of 1986, as amended (the "IRC"), Treasury Regulations promulgated thereunder, judicial authorities, and current administrative rulings and practice, all as in effect on the date hereof. Due to the complexity of certain aspects of the Plan, the lack of applicable legal precedent, the possibility of changes in the law, the differences in the nature of the Claims (including Claims within the same Class) and Equity Interests, the Holder's status and method of accounting (including Holders within the same Class) and the potential for disputes as to legal and

factual matters with the IRS, the tax consequences described herein are subject to significant uncertainties. No legal opinions have been requested from counsel with respect to any of the tax aspects of the Plan and no rulings have been or will be requested from the IRS with respect to the any of the issues discussed below. Further, legislative, judicial or administrative changes may occur, perhaps with retroactive effect, which could affect the accuracy of the statements and conclusions set forth below as well as the tax consequences to the Holders of Claims and Equity Interests. Any such changes or interpretations may be retroactive and could significantly, and adversely, affect the U.S. federal income tax consequences of the Plan.

The following summary does not address the U.S. federal income tax consequences to the Holders of Claims not entitled to vote to accept or reject the Plan. In addition, to the extent that the following discussion relates to the consequences to Holders of Claims entitled to vote to accept or reject the Plan, it is limited to Holders that are United States persons within the meaning of the IRC. For purposes of the following discussion, a "United States person" is any of the following:

• An individual who is a citizen or resident of the United States;

• A corporation created or organized under the laws of the United States or any state or political subdivision thereof;

• An estate, the income of which is subject to U.S. federal income taxation regardless of its source; or

• A trust that (a) is subject to the primary supervision of a United States court and which has one or more United States fiduciaries who have the authority to control all substantial decisions of the trust, or (b) has a valid election in effect under applicable Treasury Regulations to be treated as a United States person.

This discussion does not address all aspects of U.S. federal income taxation that may be relevant to a particular Holder in light of its particular facts and circumstances, or to certain types of Holders subject to special treatment under the IRC. Examples of Holders subject to special treatment under the IRC are governmental entities and entities exercising governmental authority, foreign companies, persons who are not citizens or residents of the United States, banks and certain other financial institutions, broker-dealers, insurance companies, tax-exempt organizations, real estate investment trusts, small business investment companies, regulated investment companies, persons that have a functional currency other than the U.S. dollar, and persons holding Claims that are a hedge against, or that are hedged against, currency risk or that are part of a straddle, constructive sale, or conversion transaction. This discussion does not address the tax consequences to Holders of Claims who did not acquire such Claims at the issue price on original issue. No aspect of foreign, state, local or estate and gift taxation is addressed.

The U.S. federal income tax treatment of Holders of Claims and the character, amount, and timing of income, gain, or loss recognized as a consequence of the Plan and the Distributions provided for by the Plan may vary, depending upon the following factors, among others: (i) whether the Claim or portion thereof constitutes a Claim for principal or interest; (ii) the type of consideration, if any, received by the Holder in exchange for the Claim, and whether the Holder

58

receives Distributions under the Plan in more than one taxable year; (iii) whether the Holder is a citizen or resident of the United States for tax purposes, is otherwise subject to U.S. federal income tax on a net basis, or falls into any special class of taxpayers, such as those that are excluded from this discussion as noted above; (iv) the manner in which the Holder acquired the Claim; (v) the length of time that the Claim has been held; (vi) whether the Claim was acquired at a discount; (vii) whether the Holder has taken a bad debt deduction or a worthless securities deduction with respect to the Claim or any portion thereof in the current or prior taxable years; (viii) whether the Holder has previously included in gross income accrued but unpaid interest with respect to the Claim; (ix) the method of tax accounting of the Holder; (x) whether the Claim is an installment obligation for U.S. federal income tax purposes; and (xi) whether the "market discount" rules apply to the Holder. Therefore, each Holder should consult such Holder's own tax advisor for tax advice with respect to that Holder's particular situation and circumstances, and the particular tax consequences to such Holder of the transactions contemplated by the Plan.

A significant amount of time may elapse between the date of the Disclosure Statement and the receipt of a final Distribution under the Plan. Events occurring after the date of the Disclosure Statement, such as new or additional tax legislation, court decisions, or administrative changes, could affect the U.S. federal income tax consequences of the Plan and the transactions contemplated thereunder. No representations are being made regarding the particular tax consequences of the confirmation or implementation of the Plan as to any Holder of a Claim. This discussion is not binding upon the IRS or other taxing authorities. No assurance can be given that the IRS or another authority would not assert, or that a court would not sustain, a different position from any discussed herein.

The following discussion generally assumes that the Plan will be treated as a plan of liquidation of the Debtors for U.S. federal income tax purposes, and that all Distributions to Holders of Claims will be taxed accordingly.

**THE FOLLOWING DISCUSSION IS INTENDED ONLY AS A SUMMARY OF CERTAIN U.S. FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN, AND IS NOT A SUBSTITUTE FOR CAREFUL TAX PLANNING WITH A TAX PROFESSIONAL. THE FOLLOWING DISCUSSION IS FOR INFORMATIONAL PURPOSES ONLY AND IS NOT TAX ADVICE. THE TAX CONSEQUENCES ARE IN MANY CASES UNCERTAIN AND MAY VARY DEPENDING ON A HOLDER'S PARTICULAR CIRCUMSTANCES. ACCORDINGLY, EACH HOLDER IS STRONGLY URGED TO CONSULT SUCH HOLDER'S INDEPENDENT TAX ADVISOR REGARDING THE FEDERAL, STATE, LOCAL, AND FOREIGN INCOME TAX CONSEQUENCES OF THE PLAN.**

### A.    Certain U.S. Federal Income Tax Consequences of the Liquidation Trust

Under the terms of the Plan, for U.S. federal income tax purposes the Liquidation Trust Assets will be treated as transferred to the Liquidation Trust Beneficiaries in a taxable disposition, and immediately thereafter contributed into the Liquidation Trust in a non-taxable contribution. Any income or gain from the deemed transfer of assets to the Liquidation Trust Beneficiaries shall flow through to the Remaining Debtor, on whose behalf the Liquidation Trust will be responsible to pay any resulting tax liability. The tax consequences of the Plan, however, are subject to many

59

uncertainties due to the complexity of the Plan and the lack of interpretative authority regarding certain changes in the tax law. Uncertainties with regard to the U.S. federal income tax consequences of the Plan also arise due to the inherent nature of estimates of value that will impact the determination of the amount of income or gain from the deemed transfer of assets to the Liquidation Trust Beneficiaries.

As of the Effective Date, the Liquidation Trust shall be established for the benefit of all Liquidation Trust Beneficiaries. The Liquidation Trustee will make a good faith valuation of the Liquidation Trust Assets. All parties (including, without limitation, the Liquidation Trustee and the Liquidation Trust Beneficiaries) must consistently use such valuation for all U.S. federal income tax purposes. Subject to definitive guidance from the IRS or a court of competent jurisdiction to the contrary (including the receipt by the Liquidation Trustee of an IRS private letter ruling if the Liquidation Trustee so requests one, or the receipt of an adverse determination by the IRS upon audit if not contested by the Liquidation Trustee), the Liquidation Trustee will (a) elect to treat any Liquidation Trust Assets allocable to a Distribution Reserve (a reserve for amounts and Liquidation Trust Interests retained on account of, Contingent Claims, Disputed Claims or Unliquidated Claims) as a "disputed ownership fund" governed by Treasury Regulation section 1.468B-9, and (b) to the extent permitted by applicable law, report consistently with the foregoing for state and local income tax purposes. Accordingly, the Distribution Reserves will be subject to tax annually on a separate entity basis on any net income earned with respect to the Liquidation Trust Assets in such reserves, and all distributions from such reserves will be treated as received by Holders in respect of their Claims as if distributed by the Debtors. All parties (including, without limitation, the Liquidation Trustee and the Liquidation Trust Beneficiaries) will be required to report for tax purposes consistently with the foregoing.

The Liquidation Trust is intended to qualify as a "liquidating trust" for U.S. federal income tax purposes. In general, a liquidating trust is not a separate taxable entity but rather is treated for U.S. federal income tax purposes as a "grantor" trust (i.e., a pass-through entity). The IRS, in Revenue Procedure 94-45, 1994-28 I.R.B. 124, set forth the general criteria for obtaining an IRS ruling as to the grantor trust status of a liquidating trust under a chapter 11 plan. The Liquidation Trust has been structured with the intention of complying with such general criteria. Pursuant to the Plan, and in conformity with Revenue Procedure 94-45, all parties (including the Liquidation Trustee and the Liquidation Trust Beneficiaries) are required to treat for U.S. federal income tax purposes, the Liquidation Trust as a grantor trust of which the Liquidation Trust Beneficiaries are the owners and grantors. Although the following discussion assumes that the Liquidation Trust would be so treated for U.S. federal income tax purposes, no ruling has been requested from the IRS concerning the tax status of the Liquidation Trust as a grantor trust. Accordingly, there can be no assurance that the IRS would not take a contrary position to the classification of the Liquidation Trust as a grantor trust. If the IRS were to challenge successfully such classification, the U.S. federal income tax consequences to the Liquidation Trust and the Liquidation Trust Beneficiaries could vary from those discussed herein, and, thus, there could be less Available Cash than projected, resulting in lower recoveries for Liquidation Trust.

### B.    Consequences to Holders of Claims Generally

In general, each Holder of an Allowed Claim will recognize gain or loss in an amount equal to the difference between (i) the "amount realized" by such Holder in satisfaction of its Claim, and

(ii) such Holder's adjusted tax basis in such Claim (other than basis attributable to accrued but unpaid interest previously included in the Holder's taxable income). The "amount realized" by a Holder of an Allowed Claim in satisfaction of its Claim will equal the sum of cash and the aggregate fair market value of the property received by such Holder in satisfaction of its Claim pursuant to the Plan (such as a Holder's undivided beneficial interest in the assets transferred to the Liquidation Trust). Where gain or loss is recognized by a Holder in respect of its Allowed Claim, the character of such gain or loss (*i.e.*, long-term or short-term capital, or ordinary income) will be determined by a number of factors including the tax status of the Holder, whether the Claim constituted a capital asset in the hands of the Holder and how long it had been held, whether the Claim was originally issued at a discount or acquired at a market discount and whether and to what extent the Holder had previously claimed a bad debt deduction or theft loss in respect of the Claim. It is possible that any loss, or a portion of any gain, realized by a Holder of an Allowed Claim may have to be deferred until all of the Distributions to such Holder are received.

Each Holder of an Allowed Claim should consult its own tax advisor to determine whether gain or loss recognized by such Holder will be long-term capital gain or loss and the specific tax effect thereof on such Holder.

A Holder of an Allowed Claim who receives, in respect of the Holder's Allowed Claim, an amount that is less than that Holder's tax basis in such Allowed Claim may be entitled to a bad debt deduction under IRC section 166(a). The rules governing the character, timing, and amount of a bad debt deduction place considerable emphasis on the facts and circumstances of the holder, the obligor, and the instrument with respect to which a deduction is claimed. Holders of Allowed Claims, therefore, are urged to consult their own tax advisors with respect to the ability to take a bad debt deduction in any particular taxable year. A Holder that has previously recognized a loss or deduction in respect of that Holder's Allowed Claim may be required to include in gross income (as ordinary income) any amounts received under the Plan to the extent such amounts exceed the Holder's adjusted basis in such Allowed Claim.

Holders of Allowed Claims who were not previously required to include any accrued but unpaid interest with respect to an Allowed Claim may be treated as receiving taxable interest income to the extent any consideration they receive under the Plan is allocable to such interest. A Holder previously required to include in gross income any accrued but unpaid interest with respect to an Allowed Claim may be entitled to recognize a deductible loss to the extent such interest is not satisfied under the Plan.

A Holder of an Allowed Claim constituting an installment obligation for U.S. federal income tax purposes may be required to recognize currently any gain remaining with respect to such obligation if, pursuant to the Plan, the obligation is considered to be satisfied at other than at face value or distributed, transmitted, sold or otherwise disposed of within the meaning of IRC section 453B.

Holders of Disallowed Claims will not receive any Distribution as part of the Plan. Accordingly, because such a Holder may receive an amount that is less than that Holder's tax basis in such Claim, such Holder may be entitled to a bad debt deduction under IRC section 166(a). As noted above, the rules governing the character, timing, and amount of a bad debt deduction place considerable emphasis on the facts and circumstances of the holder, the obligor, and the instrument

with respect to which a bad debt deduction is claimed. Holders of Disallowed Claims, therefore, are urged to consult their own tax advisors with respect to the ability to take a bad debt deduction in any particular taxable year.

### C.    Consequences to Liquidation Trust Beneficiaries

After the Effective Date, any amount that a Liquidation Trust Beneficiary (as a Holder of a Liquidation Trust Interest) receives as a distribution from the Liquidation Trust in respect of its beneficial interest in the Liquidation Trust should not be included, for U.S. federal income tax purposes, in the Holder's amount realized in respect of its Allowed Claim but should be separately treated as a distribution received in respect of such Holder's beneficial interest in the Liquidation Trust. In general, a Holder's aggregate tax basis in its undivided beneficial interest in the assets transferred to the Liquidation Trust will equal the fair market value of such undivided beneficial interest as of the Effective Date, and the Holder's holding period in such assets will begin the day following the Effective Date.

Distributions to any Liquidation Trust Beneficiary that also is a Holder of an Allowed Claim in respect of such Allowed Claim will be allocated first to the original principal portion of such Claim as determined for U.S. federal tax purposes, and then, to the extent the consideration exceeds such amount, to the remainder of such Claim. However, there is no assurance that the IRS will respect such allocation for U.S. federal income tax purposes.

For all U.S. federal income tax purposes, all parties (including the Liquidation Trustee and the Liquidation Trust Beneficiaries) shall treat the transfer of the Liquidation Trust Assets to the Liquidation Trust, in accordance with the terms of the Plan, as a transfer of those assets to the Liquidation Trust Beneficiaries by the Remaining Debtor followed by a deemed transfer of such assets by such Liquidation Trust Beneficiaries to the Liquidation Trust. Consistent therewith, all parties shall treat the Liquidation Trust as a grantor trust of which the Liquidation Trust Beneficiaries are to be the owners and grantors. Thus, the Liquidation Trust Beneficiaries shall be treated as the direct owners of an undivided beneficial interest in the Liquidation Trust Assets. Accordingly, each Liquidation Trust Beneficiary will be required to report on its U.S. federal income tax return(s) the Liquidation Trust Beneficiary's allocable share of all income, gain, loss, deduction or credit recognized or incurred by the Liquidation Trust. Allocations of taxable income of the Liquidation Trust (other than taxable income allocable to a Distribution Reserve) among Liquidation Trust Beneficiaries shall be determined by reference to the manner in which an amount of cash equal to such taxable income would be distributed (were such cash permitted to be distributed at such time) if, immediately prior to such deemed distribution, the Liquidation Trust had distributed all of its assets (valued at their tax book value, and other than assets allocable to a Distribution Reserve) to the Liquidation Trust Beneficiaries, adjusted for prior taxable income and loss and taking into account all prior and concurrent distributions from the Liquidation Trust. Similarly, taxable loss of the Liquidation Trust shall be allocated by reference to the manner in which an economic loss would be borne by the Liquidation Trust Beneficiaries if the Liquidating Trust were to distribute in liquidation the remaining Liquidation Trust Assets. The tax book value of the Liquidation Trust Assets for this purpose shall be equal to the fair market value of the Liquidation Trust Assets on the Effective Date, adjusted in accordance with tax accounting principles prescribed by the IRC, applicable Treasury Regulations, and other applicable administrative and judicial authorities and pronouncements.

62

The character of items of income, deduction and credit to any Liquidation Trust Beneficiary and the ability of such Liquidation Trust Beneficiary to benefit from any deductions or losses may depend on the particular situation of such Liquidation Trust Beneficiary. The U.S. federal income tax reporting obligation of a Liquidation Trust Beneficiary is not dependent upon the Liquidation Trust distributing any cash or other proceeds to such Liquidation Trust Beneficiary. Therefore, a Liquidation Trust Beneficiary may incur a U.S. federal income tax liability regardless of the fact that the Liquidation Trust has not made, or will not make, any concurrent or subsequent distributions to the Liquidation Trust Beneficiary. If a Liquidation Trust Beneficiary incurs a U.S. federal tax liability but does not receive distributions commensurate with the taxable income allocated to it in respect of its beneficial interests in the Liquidation Trust, the Liquidation Trust Beneficiary may be allowed a subsequent or offsetting loss.

As noted above, the Liquidation Trustee will file with the IRS returns for the Liquidation Trust as a grantor trust pursuant to Treasury Regulations section 1.671-4(a). The Liquidation Trustee also will send to each Liquidation Trust Beneficiary a separate statement setting forth the Liquidation Trust Beneficiary's share of items of income, gain, loss, deduction or credit and will instruct each Liquidation Trust Beneficiary to report such items on its U.S. federal income tax return.

### D.    Withholding on Distributions, and Information Reporting

All Distributions to Holders of Allowed Claims under the Plan and any Distributions to the Liquidation Trust Beneficiaries are subject to any applicable tax withholding, including employment tax withholding. *See* Plan Section 7.14. Under U.S. federal income tax law, interest, dividends, and other reportable payments may, under certain circumstances, be subject to "backup withholding" at the then applicable withholding rate (currently 24%). Backup withholding generally applies if the payment recipient (i) fails to furnish the recipient's social security number or other taxpayer identification number; (ii) furnishes an incorrect taxpayer identification number; (iii) fails to properly report interest or dividends; or (iv) under certain circumstances, fails to provide a certified statement, signed under penalty of perjury, that the taxpayer's identification number provided is the recipient's correct taxpayer identification number and that such recipient is not subject to backup withholding. Backup withholding is not an additional tax but merely an advance payment, which may be refunded to the extent it results in an overpayment of tax. Certain Persons are exempt from backup withholding, including, in certain circumstances, corporations and financial institutions.

In addition, a Holder of an Allowed Claim that is a not a U.S. entity may be subject to additional withholding, depending on, among other things, the particular type of income and whether the type of income is subject to a lower treaty rate. As to certain Claims, it is possible that withholding may be required with respect to distributions by the Debtor making such Distribution or by the Liquidation Trust, as applicable, even if no withholding would have been required if payment was made prior to the Chapter 11 Cases. A non-U.S. Holder may also be subject to other adverse consequences in connection with the implementation of the Plan. As discussed above, the foregoing discussion of the U.S. federal income tax consequences of the Plan does not generally address the consequences to non-U.S. Holders. Non-U.S. Holders are urged to consult their own tax advisors regarding potential withholding on Distributions under the Plan.

In addition, Treasury Regulations generally require disclosure by a taxpayer on its U.S. federal income tax return of certain types of transactions in which the taxpayer participated, including, among other types of transactions, certain transactions that result in the taxpayer's claiming a loss in excess of specified thresholds. Holders are urged to consult their own tax advisors regarding these Treasury Regulations and whether the transactions contemplated by the Plan would be subject to these Treasury Regulations and require disclosure on the Holder's tax returns.

## IX.    **RECOMMENDATION**

The Debtors believe that confirmation and implementation of the Plan are the best alternative under the circumstances and urge all Impaired Creditors entitled to vote on the Plan to vote in favor of and support confirmation of the Plan.

Dated: May 26, 2020                          Respectfully submitted,


**RAVN AIR GROUP, INC.,** ET AL.


By:    /s/ DRAFT 5.26.2020
          Name: John Mannion
          Title:   Chief Financial Officer

146484.01601/123194608v.3