**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

|  |  |
|---|---|
| In re: | Chapter 11 |
|  | Case No.  19-11626 (KG) |
| RAVN AIR GROUP, INC., *et al.*, | Jointly Administered |
| Debtors.[1] | **Objection Deadline: June 22, 2020** |
|  | **Hearing Date: June 25, 2020** |
|  | **Re: D.I. 112** |

**OBJECTION OF THE OFFICIAL COMMITTEE OF UNSECURED**
**CREDITORS TO CONFIRMATION OF CHAPTER 11 PLAN OF**
**RAVN AIR GROUP, INC.  AND ITS AFFILIATED DEBTORS**
**AND CROSS-MOTION FOR CONVERSION TO CHAPTER 7**

The Official Committee of Unsecured Creditors (the "Committee"), appointed in the

Chapter 11 cases of the above-captioned debtors (collectively, the "Debtors"), by and through its

undersigned counsel, respectfully submits this: (i) objection ("Objection") to the *[Proposed]*

*Chapter 11 Plan of Liquidation of Ravn Air Group, Inc. and Its Affiliated Debtors*, dated May

26, 2020 [D.I.  112] (as may be modified and amended, the "Plan");[2] and (ii) cross-motion to

convert the cases to a Chapter 7 case (the "Cross-Motion").  In support of its Objection and

Cross-Motion, the Committee submits the *Declaration of Richard Newman in Support of*

*Objection of the Official Committee of Unsecured Creditors to Confirmation of Chapter 11 Plan*

*of Ravn Air Group, Inc. and its Affiliated Debtors and Cross-Motion for Conversion to Chapter*

---

[1]     The Debtors in these Chapter 11 Cases and the last four digits of each Debtor's U.S. tax identification number are as follows: Ravn Air Group, Inc. (3047), Ravn Air Group Holdings, LLC (5356), JJM, Inc. (4858), HoTH, Inc. (9957), Peninsula Aviation Services, Inc. (6859), Corvus Airlines, Inc. (7666), Frontier Flying Service, Inc. (8091), and Hageland Aviation Services, Inc. (2754). The notice address for all of the Debtors is 4700 Old International Airport Road, Anchorage, AK 99502.

[2]     Capitalized terms used in this Objection but not otherwise defined shall have the meanings ascribed to such terms in the Plan.   Also incorporated in this Objection is the *Proposed Disclosure Statement for the Chapter 11 Plan of Ravn Air Group, Inc. and Its Affiliated Debtors* [D.I. 256] (the "Disclosure Statement").

*7*, attached hereto as **Exhibit A** (the "Newman Declaration").  In furtherance of its Objection and Cross-Motion, the Committee respectfully states as follows:

## PRELIMINARY STATEMENT

1.     Throughout this case, the Committee has been consistently fighting for the Debtors to have a breathing chance to rehabilitate or otherwise continue as a going concern.  The secured lenders, on the other hand, have persisted with their "foreclosure" efforts at every step of the case, notwithstanding the fact that, but for the COVID-19 pandemic, Ravn Air Group (if re-started) would continue to serve a vital community function in Alaska, provide thousands of jobs and maintain its business purpose.  The fact that several interested going concern bidders have emerged and the CARES Act funding was approved[3] seems to make no difference to the secured lenders, who have predetermined that "[t]here is nothing [here] other than a liquidation that can be foreseen and is acceptable."  Transcript of Hr'g May 27, 2020, 48:14-15.

2.     As discussed herein and the Newman Declaration, general unsecured creditors would be better served and maintain more rights in chapter 7 than under the Plan. Notwithstanding the secured lenders' imposed liquidation path, the Committee had remained cautiously optimistic that the Debtors would be willing to propose a plan that provided unsecured creditors with both fair value and a viable business partner for the future.  Despite these efforts,

---

[3]     On June 17, the Debtors announced that they have "been approved by the U.S. Treasury to receive $31.6 million in airline support payroll grants under the [CARES Act] Payroll Support Program (PSP) subject to Bankruptcy Court approval, which would be available to Treasury-approved bidders seeking to buy the entire Air Group in an upcoming Chapter 11 sale process." In their press release, the Debtors commented:  "Given this news, and the fact that we now have a number of interested, enterprise-wide bidders who want to buy the entire Air Group and its three airlines, we remain optimistic that we will be able to maximize creditor recoveries, exit Chapter 11 protection, and ensure that Alaska's largest and most vital regional airline can resume operations later this summer." *See* https://www.flyravn.com/ravn-news/ravn-air-group-approved-to-receive-31-6-million-in-cares-act-payroll-support-program-psp-grants/.

the Plan fails to accomplish these Chapter 11 goals, and therefore, fails to satisfy the Bankruptcy Code's requirements for confirmation.

3.      The Debtors bear the burden of demonstrating that the value propositions set forth in the Plan with respect to all stakeholders are fair, appropriate and proposed in good faith. Satisfaction of the good faith requirement pursuant to Section 1129(a)(3) is one of the key requirements to the finality of the bankruptcy court's order confirming a plan.  The Plan, however, cannot satisfy this and other requirements of Section 1129 because the secured lenders have abused the provisions and goals of Chapter 11 in most fundamental ways.

4.      One of the hallmarks of Chapter 11, and bankruptcy jurisprudence in general, is the fundamental right of a debtor, creditors and other stakeholders to have a meaningful voice in the case.  Chapter 11 is, after all, supposed to be an adversary process.  The Debtors' case, however, has been nothing more but an orchestrated "puppet-master" regime with the Debtors and, at least by intention, the Committee, being treated as "puppets" by the secured lenders.  .

- From the outset, the secured lenders' DIP financing became a means, through the aggressive case milestones (and obligation to file an "Acceptable Plan"), to disrupt the traditional life cycle of a Chapter 11 case and dictate a plan that would only cement the secured lenders' foreclosure goals, regardless of any positive case developments that could open the Debtors up for business and provide other creditors with fair value.

- The Debtors' Plan solicitation process did not provide adequate information to unsecured creditors to make an informed vote on the Plan.  As discussed below, the Debtors simply thought that providing any valuation data—a cornerstone of any plan—was unnecessary.  The Debtors also failed to disclose existence of valuable unencumbered assets and Avoidance Actions that should have been part of the Debtors' Liquidation Analysis.  Neither the Disclosure Statement nor the subsequently filed Plan Supplement provided any information on the Debtors' going concern sale process (which is still ongoing) or the Debtors' approval for the CARES Act funding.

- The Plan confirmation process is being conducted **before** the secured lenders would allow market-based valuation data to emerge.  In fact, as of the date of this Objection, the Debtors' marketing process (as informal as it has been) is fully ongoing, with several bidders submitting bids for either an "all asset" transaction

or a substantial portion thereof.  The Committee, however, is forced to object to the Plan confirmation during this time, before the bidding process has concluded, since qualified bids are not due until after the filing deadline, with confirmation hearing scheduled a mere 24 hours later.  The sale process is structured to be "optional" to the secured lenders.

- The secured lenders have usurped and eliminated the traditional Chapter 11 framework of procedures for all creditors to participate in the plan-formulation and confirmation process. .  Even when the Committee succeeded at extending the case timeline by two weeks, the secured lenders fought hard to revert back to an unworkable schedule that would not allow for a proper Chapter 11 process to take place.  There has not been, in fact, a single communication between the Debtors and the Committee or the secured lenders and the Committee regarding the unsecured creditors' treatment – let alone any negotiations regarding same.

5.    The Plan fails to provide general unsecured creditors with any value or at a minimum, show that the unsecured creditors' recoveries under the Plan would satisfy the "best interests" test and would not be less than in a chapter 7 liquidation.  In an extraordinary departure from well-accepted bankruptcy practice, the Debtors' advisors have not presented any analysis of value of their assets under the Plan or the total enterprise value of the Debtors, which renders the Plan unconfirmable.  The "paper valuation" prepared at the request of the secured lenders, which the Debtors are relying upon, but which is untested by any formal marketing or sale process, cannot serve as a credible proxy for an independent analysis conducted by the estates' fiduciaries.  In addition, given the current bifurcation of the Plan and sale process, the Debtors are not even allowing a true "market test" to unfold in order to determine value on a going concern basis.

6.    The Plan fails the "best interests" test by allocating less value to unsecured creditors than they would receive in Chapter 7.  Through its investigation, the Committee has identified a number of significant assets that are not encumbered by either the Prepetition Secured Parties' or the DIP Lenders' liens.  Most critically, the Debtors' long-term ground leases with the State of Alaska—assets that have been determined to have substantial value—are

4

wholly unencumbered.  Even at a fraction of their prepetition value, these unencumbered assets would provide greater returns to unsecured creditors than the $250,000 (or approximately 0.5% of the unsecured claim) nuisance distribution currently proposed under the Plan for the unsecured creditors.  A proper liquidation analysis, taking into account valuable assets like Avoidance Actions and properly accounting for the unencumbered assets, establishes that unsecured creditors will do far better in chapter 7—with projected recoveries ranging from approximately 2 to 6 percent—than under the Plan.  Newman Declaration at ¶ 9.  Rather than provide unsecured creditors fair value, the Plan shifts this value to the Debtors' secured lenders.

7.      In a further attempt to disenfranchise unsecured creditors, the Plan proposes to transfer all Avoidance Actions and Causes of Action held by the Debtors or their Estates (along with all unencumbered assets) to the Liquidation Trust for the sole benefit of the secured lenders. Avoidance Actions are not assets of the Estates that a plan can allocate to their secured lenders. Such actions have largely remained unencumbered throughout these Chapter 11 cases and are considered to belong to unsecured creditors, not the Debtors' secured lenders.  The Avoidance Actions and Causes of Action could result in significant additional value to satisfy unsecured claims.  The Debtors cannot justify the adequacy of these transfers, which are inappropriate, inequitable and not proposed in good faith.

8.      Further depriving unsecured creditors of fair value, the Plan gives total control over to the secured lenders by providing impermissibly broad and vastly overreaching releases, exculpation and injunction that inure largely to the benefit of the secured lenders and the equity sponsors, without the benefit of reciprocal consideration being offered to the Debtors' Estates in exchange.  The Debtors also cannot meet their burden for proposed substantive consolidation of the Debtors' Estates and, as such, the Plan cannot be confirmed.

5

9.      Chapter 11 was not intended as a self-serving vehicle for secured lenders to divert value to themselves from the unsecured creditors in violation of the Bankruptcy Code's priority scheme.  "The purpose of Chapter 11 reorganization is to assist financially distressed business enterprises by providing them with breathing space in which to return to a viable state . . . .  [I]f there is not a potentially viable business in place worthy of protection and rehabilitation, Chapter 11 has lost its *raison d'ĕtre*."[4]  This entire Chapter 11 case has been a Chapter 7 case in disguise, where secured lenders are using the DIP and now the Plan process as a means to control the assets and recovery.  This is contrary to how a Chapter 11 process should work.  The Debtors are supposed to be an adversary in a Chapter 11 case and in Chapter 7, the trustee may be selected with input from general unsecured creditors.  The secured lenders have attempted to justify their use of Chapter 11 by offering to pay the administrative and priority claims.  However, such claims are not significant (as compared to the unencumbered value of the Estates) and are largely attributable to expenses of the Debtors' liquidation process—a Section 506(c) surcharge expense. The secured lenders are, in reality, only paying for control of this case.  The Court should not countenance a chapter 11 process that provides no value to any parties other than the Debtors' professionals and secured lenders.  Accordingly, Chapter 7 conversion is the outcome demanded by the facts of the case.

10.     For these reasons, the Debtors are unable to satisfy the strict requirements of section 1129 of the Bankruptcy Code and confirmation of the Plan must be denied.

---

4       *In re Winshall Settlor's Trust*, 758 F.2d 1136, 1137 (6th Cir. 1985).

## FACTUAL BACKGROUND

### I.   General Case Background

11.     On April 5, 2020 (the "Petition Date"), the Debtors commenced voluntary cases under chapter 11 of the Bankruptcy Code.  The Debtors continue to operate their businesses and manage their properties as debtors-in-possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.  On April 20, 2020, the United States Trustee appointed the Committee in these cases pursuant to Bankruptcy Code section 1102.

12.     The Debtors are majority-owned by investment affiliates of private equity firms J.F. Lehman & Company and W Capital Partners through Ravn Air Group Holdings, LLC and certain other holding companies.  Persons affiliated with these investors make up a majority of the members of the board of Ravn Air Group, Inc.  The Debtors have appointed a special restructuring committee to oversee decisions related to the management of the Debtors' cases, consisting of two independent directors and the Debtors' Chief Executive Officer.

13.     The Debtors found themselves in their current economic position as a result of the COVID-19 virus as the State of Alaska issued a strong advisory to all Alaskans to cease any non-essential in-state long distance personal, business, or medical travel.  Nearly overnight, the Debtors' passenger traffic plummeted 80 to 90 percent.  The shutdown came at the worst possible time for Alaska, and for the Debtors, who receive a substantial portion of their annual revenue during the Alaskan fishing and tourism season running from May through September.

14.     In the weeks leading up to their chapter 11 cases, the Debtors sought financing from their existing lenders and investors and applied for loans and grants under the CARES Act. However, prior to the Petition Date, the Debtors were unsuccessful in their efforts to procure federal or state financing in amounts needed to continue operation of the business.

15.     The Debtors continued to have discussions with representatives of and advisors to the Department of Treasury in their Chapter 11 cases in anticipation that, if a purchaser emerges that is willing and able to purchase the Debtors' assets and business as a going concern, up to $30 million of CARES Act funding may be available as a PSP assistance grant, as well as $5 million in the form of a loan under the CARES Act.

16.     On June 17, 2020, the Debtors announced that they have "been approved by the U.S.  Treasury to receive $31.6 million in airline support payroll grants under the [CARES Act] Payroll Support Program (PSP) subject to Bankruptcy Court approval, which would be available to Treasury-approved bidders seeking to buy the entire Air Group in an upcoming Chapter 11 sale process."[5]

## II.     The Debtors' Prepetition Credit Agreement

17.     On July 31, 2015, Ravn Air Group, Inc., as borrower, certain of the other Debtors, as guarantors, and the Prepetition Secured Parties entered into that certain Credit Agreement (as amended, restated, supplemented, or otherwise modified from time to time, the "Prepetition Credit Agreement").  The Prepetition Credit Agreement included a term loan of up to $95 million and revolving loans in the aggregate amount of up to $15 million.  As of March 31, 2020, a total of approximately $90,907,954.51, exclusive of interest and fees payable under the Prepetition Credit Agreement, was owing to the Prepetition Secured Parties.

18.     Concurrent with the execution and delivery of the Prepetition Credit Agreement, the Debtors and the Prepetition Secured Parties entered into that certain Security Agreement dated July 31, 2015 (as amended, restated, supplemented, or otherwise modified from time to time, the "Security Agreement"), granting the Prepetition Collateral Agent, for the benefit of the

---

5       See footnote 3, *infra*.

Prepetition Secured Parties, security interests in certain pledged collateral (the "Prepetition Pledged Collateral"), as set forth in the Security Agreement.  Security Agreement at § 2.1.

19.     The Debtors further executed and delivered to U.S.  Bank, National Association, as security trustee (the "Prepetition Security Trustee") for the benefit of the Prepetition Secured Parties, security interests in certain assets (collectively with the Prepetition Pledged Collateral, the "Prepetition Collateral"), pursuant to the terms of that certain Aircraft and Engine Mortgage and Aircraft Lease Agreement, dated as of August 4, 2015 (the "Pledge and Security Agreement," and collectively with the Prepetition Credit Agreement, Security Agreement, and related documents, the "Prepetition Loan Documents").  Pledge and Security Agreement at § 2.1.

## III.     The DIP Facility and Milestones

20.     On the Petition Date, the Debtors filed the *Motion of the Debtors for Entry of Interim and Final Orders Pursuant to 11 U.S.C.  Sections 105, 361, 362, 363, 364, and 507 and Bankruptcy Rules 2002, 4001, and 6004 (I) Authorizing the Debtors to Obtain Postpetition Senior Secured Superpriority Financing, (II) Authorizing the Debtors' Limited Use of Cash Collateral, (III) Granting Adequate Protection of the Prepetition Secured Parties, (VI) Scheduling a Final Hearing, and (V) Granting Related Relief* [Docket No.  13] (the "DIP Motion").  The DIP Motion sought use of a postpetition lending facility (the "DIP Facility") provided by certain of the Debtors' Prepetition Secured Parties.  The DIP Facility consists of $12 million in new money financing and a roll-up of $24 million in outstanding prepetition obligations owed to the Prepetition Secured Parties.

21.     As set forth in the DIP Credit Agreement, certain Prepetition Secured Parties acted as lenders under the DIP Facility, with BNP Paribas serving as agent under the DIP Facility (the "DIP Agent" and together with the DIP Lenders, the "DIP Secured Parties").  The DIP Credit Agreement purports to provide liens (the "DIP Liens") on substantially all assets of

the Debtors (the "DIP Collateral"), including a schedule of tracts of land of real property owned by the State of Alaska and leased to the Debtors (the "Ground Leases") through a Real Property Mortgage. *See* DIP Credit Agreement at § 5.12, Schedule 3.05(b).

22.     On April 30, 2020, the Court issued a *Final Order Pursuant To 11 U.S.C. §§ 105, 361, 362, 363, 364 And 507, And Bankruptcy Rules 2002, 4001, And 6004 (i) Authorizing The Debtors To Obtain Postpetition Senior Secured Superpriority Financing, (ii) Authorizing The Debtors' Limited Use Of Cash Collateral, (iii) Granting Adequate Protection To The Prepetition Secured Parties, And (iv) Granting Related Relief* [D.I. 148] (the "DIP Order"). The DIP Order authorizes the Debtors use of the DIP Facility.

23.     The DIP Order contains fast-track milestones (the "DIP Milestones") imposed by the DIP Lenders under the DIP Facility as follows:

- **April 25, 2020** – The Debtors must file a plan and disclosure statement in a form acceptable to the secured creditors;
- **May 23, 2020** – The Debtors must obtain approval from the Court of a disclosure statement of a plan acceptable to the secured creditors; and
- **June 20, 2020** – The Debtors must obtain (subject to the Court's availability) confirmation of a plan acceptable to the secured creditors.[6]

DIP Order at ¶ 10.

24.     The DIP Order grants the DIP Liens for the benefit of the DIP Secured Parties with certain conditions, among others, in "*to the extent not expressly prohibited by law or contract*, all of those items and types of collateral not governed by Article 9 of the Uniform Commercial Code, including, without limitation, licenses issued by any federal or state regulatory authority, any leasehold or other real property interests, and commercial tort claims of the Debtors . . . ." DIP Order at ¶ 15 (emphasis added).

---

6     A confirmation hearing for the Plan is scheduled for June 25, 2020.

25.     In addition to the DIP Liens, the DIP Secured Parties are provided superpriority administrative claims against the Debtors for the value of any property not subject to the DIP Liens.  However, the DIP superpriority claims are expressly subordinate to the DIP Liens.  DIP Order at ¶ 14(a).  The Debtors have provided no indication that the DIP Liens may not be satisfied from proceeds of the DIP Collateral; the Committee's analysis suggests that the DIP Liens and DIP Obligations may be fully satisfied from the DIP Collateral.  *See* Newman Declaration at ¶ 9.

26.     The DIP Order provides the Committee with a fixed period (the "Challenge Period") to challenge the Prepetition Secured Parties' liens.  *See* DIP Order at ¶ 20.  The Challenge Period was set to expire on June 19, 2020, but the Committee and the Prepetition Collateral Agent agreed to extend the Challenge Period until the earlier of (i) the entry of the order confirming the Plan, and (ii) July 17, 2020.

## IV.     Committee Diligence, Investigation, and Challenge

27.     The Committee and its professionals commenced an investigation of, among other things, the validity, enforceability, priority and extent of the Prepetition Credit Agreement, the liens on and security interests in the Debtors' assets purportedly securing the Prepetition Credit Agreement facility, and potential claims and causes of action against the Prepetition Secured Parties.  Through review of the public records, documents from the Prepetition Secured Parties and the DIP Lenders, and the Debtors' files, the Committee has learned that the Prepetition Secured Parties and the DIP Lenders either do not hold a security interest in, or had not properly filed documents to perfect their liens in several instances.

28.     Based on the Committee's review of the Prepetition Loan Documents, there was no attempt by the Prepetition Secured Parties to attach liens on the Ground Leases under the Security Agreement or the Pledge and Security Agreement.  Moreover, the Committee was not

provided, nor could it locate, any mortgage pledging interest in the Ground Leases to the Prepetition Secured Parties.

29.     Further, a review of the Ground Leases makes clear that the State of Alaska, as the lessor thereunder, will not allow liens on the Ground Leases, but may allow assignment of the Ground Leases for security purposes, *only with the lessor's express consent*.  The Committee is informed that the Debtors did not request nor did the Debtors receive permission from the lessor to assign the Ground Leases for security purposes to any party, including the DIP Secured Parties in anticipation of these Chapter 11 Cases.

30.     On or about May 16, 2019, Peninsula Aviation Services, Inc.  ("PASI") became a party to the Prepetition Credit Agreement and certain other Prepetition Loan Documents. However, based on the Committee's review of public records, neither the Prepetition Secured Parties nor the DIP Secured Parties timely filed a UCC-1 financing statement against PASI. Under the Prepetition Loan Documents and applicable law, for a lien to be perfected against a bona fide purchaser for value without notice, the Prepetition Secured Parties were required to file a UCC-1 financing statement in the applicable filing office.[7]

31.     Furthermore, the Security Agreement omits the necessary identifying descriptions for the commercial tort claims (the "Commercial Tort Claims").  The Security Agreement lists as Prepetition Pledged Collateral "the Commercial Tort Clams described on Schedule 9 to the applicable Perfection Certificate, if any."  *See* Security Agreement at § 2.1.  A review of the Security Agreement reveals that no Commercial Tort Claims were listed under "Schedule 9" and no supplements to the section have been provided to the Committee.

---

[7]     The security interest of the DIP Secured Parties in certain Ground Leases in which PASI is the lessee is explicitly addressed in the Final DIP Order.  *See* DIP Order at ¶ 39.  The validity of the DIP Liens on those specific Ground Leases is not at issue.

32.     Also under the Security Agreement, the Prepetition Secured Parties were granted a security interest in the Debtors' deposit accounts, except to the extent that such deposit accounts constitute Excluded Property (as defined in the Security Agreement).  *See* Security Agreement at § 2.1.  Based on the Committee's review of the Prepetition Loan Documents, the Debtors maintain Deposit Accounts with First National Bank of Alaska, Wells Fargo, and US Bank.  To perfect its security interest over the Debtors' deposit accounts, the Prepetition Secured Parties were required to maintain control over the Debtors' deposit accounts.  For example, certain of the Debtors and Prepetition Secured Parties entered into that certain Deposit and Securities Account Control Agreement dated as of November 24, 2015 with the Prepetition Collateral Agent and First National Bank Alaska, as depositary.  However, no similar agreement exists with respect to the Debtors' Wells Fargo and US Bank deposit accounts.

33.     Finally, under the Prepetition Loan Documents, if requested by the Prepetition Collateral Agent, each Debtor was required to deliver to the Prepetition Collateral Agent originals of the certificates of title or ownership for the motor vehicles (and any other equipment covered by the certificates of title or ownership) owned by it, with the Prepetition Collateral Agent listed as lienholder therein.  From the Committee's review of the Prepetition Loan Documents, such request was not made and certificates of title or ownership were not delivered to the Prepetition Collateral Agent.

34.     As a result of findings from its investigation, contemporaneously with this Objection, the Committee instituted a challenge under the DIP Order and filed a complaint (the "Complaint"), seeking to avoid certain liens held by the Prepetition Secured Parties that were not properly perfected and declaratory judgment that no Prepetition Liens ever attached to certain

assets of the Debtors, including the Ground Leases.   Additionally, the Complaint seeks a declaratory judgement that the DIP Liens do not attach to the Ground Leases.[8]

## V.    The Debtors' Liquidation Efforts to Date

35.    Despite touting their desire to reorganize, the Debtors have been moving in a concerted fast-paced effort with their secured lenders towards liquidation, as evidenced by the Debtors' actions described below and in the *Objection of the Official Committee of Unsecured Creditors to Debtors' Disclosure Statement for the Chapter 11 Plan of Liquidation of Ravn Air Group, Inc. and Its Affiliated Debtors* [Docket No.  242] (the "Disclosure Statement Objection"), which is incorporated herein by reference.

36.    Following a hearing on May 27, 2020, the Court approved a dual-track process by which the Debtors were permitted to sell their assets subject to a competitive auction.   The Committee noted in various filings and on the record at the hearing that the timeline to the requested sale was insufficient to permit reasonable diligence, particularly given travel and other logistical restrictions on prospective buyers due to the COVID-19 pandemic but also because the Debtors had failed to engage an investment banker and conduct a true sale process as customary for a chapter 11 proceeding of this size.

37.    As of the date of this Objection, the deadline for parties to submit qualified bids to purchase the Debtors as a going concern had not passed.   Accordingly, the Committee reserves the right to amend and/or supplement this Objection as warranted by any developments post-filing.

---

8       Any allegations set forth in the Complaint that are not explicitly set forth in this Objection are incorporated herein by reference.

## VI.    The Debtors' Plan and Disclosure Statement

38.    On April 27, 2020, the Debtors filed their Plan and Disclosure Statement.  The Plan was an empty shell, and the Disclosure Statement told stakeholders virtually nothing.  The documents did not identify or incorporate the results of any sale, and provided vague assurances of a "Creditors' Fund" for unsecured creditors.  The Plan provides that all Avoidance Actions and Causes of Action of the Estates would become property of the Liquidation Trust (whose sole beneficiaries are secured lenders) after confirmation.  With the entirety of its recovery coming from the $250,000 Creditors' Fund, general unsecured creditors would not see the benefit from any recovery by the Liquidation Trust from Avoidance Actions or any other potentially unencumbered assets of the Debtors.  The benefit from the Liquidation Trust will go entirely to the secured lenders.  *See* Plan at §§ 3.02, 3.03.

39.    Under the terms of the Plan, certain Allowed DIP Claims "inclusive of any Roll-Up Loans" will be converted to exit financing with the Liquidation Trust as borrower.[9]  *See id.* at § 3.03.  The treatment limits Allowed DIP Claims to "the full amount due and owing under the DIP Facility as of the Effective Date, if any."  *Id.*  The Plan defines DIP Facility as "[t]hat certain $14 million senior secured super priority debtor-in-possession financing facility provided by the DIP Lenders on the terms of, and subject to the conditions set forth in, the DIP Loan Agreement and the DIP Orders."  *Id.* at § 1.01.  As a result, Allowed DIP Claims are allowed in an amount not greater than $14 million.  Even so, the Exit Financing envisions loan commitments of not less than $32 million.  *See* Plan Supplement, Ex. A.

40.    Additionally, certain other Allowed DIP Claims and Allowed Prepetition Secured Creditor Claims will receive beneficial interests in the Liquidation Trust in exchange for the

---

9    On June 12, 202, the Debtors filed their Plan Supplement [D.I. 337], which includes the Exit Financing Credit Agreement.

amount of their claims. *See* Plan at §§ 3.02, 3.03. Importantly, the DIP Lenders and Prepetition Secured Parties agreed to treatment that allows their claims only to the extent they are secured. Any unsecured portions of their claims are waived. *See id.* However, as stated above, unencumbered assets identified by the Committee and all Avoidance Actions and Causes of Action of the Estates will be transferred to the Liquidation Trust for the sole benefit of the DIP Secured Parties and the Prepetition Secured Parties, rather than general unsecured creditors.

41.     The Plan further relies on the Debtors' so-called "Liquidation Analysis," which was not filed until shortly before the Disclosure Statement hearing. The Liquidation Analysis was not an analysis at all. It asserted, without much substantive rationale, that creditors will do better than a Chapter 7 proceeding because the Debtors say so, *ipse dixit*. The Liquidation Analysis did not even acknowledge the existence of the unencumbered assets or the Avoidance Actions and the value that they would provide for general unsecured creditors. *See* Newman Declaration at ¶ 9.

42.     On June 7, 2020, the Court entered an order establishing solicitation and voting on the Plan [D.I. 318] (the "Solicitation Order"). The Committee reserved all rights to object to the sufficiency of disclosure for plan confirmation purposes.

43.     At the time the Solicitation Order was entered, among other reasons due to the accelerated timeline of these cases, the Debtors were continuing to update both their internal and sale-related data rooms with new documents. Many such documents, including those related to the Ground Leases, were provided only recently, for the purposes of both promoting the sale of the Debtors' assets as well as the Committee's diligence related to Challenge rights under the DIP Order and also related to the Plan itself.

44.     Thus, at the time the Solicitation Order was entered and ballots solicited, no party had disclosed to the Court the critical fact that (a) the Debtors' Ground Leases prohibit encumbrance, (b) the Debtors had failed to obtain consents to assignment and encumbrance of the Ground Leases, and thus, (c) the DIP Liens do not extend to the value of the Ground Leases. As such, the Disclosure Statement did not disclose that significant unencumbered assets were being diverted to secured creditors without consideration and in excess of the value of their claims.

45.     The Committee reserves all rights to amend and/or supplement this Objection as warranted by events post-filing.

## OBJECTION

### I.      The Plan Should Not Be Confirmed Because the Debtors Cannot Carry Their Heavy Burden of Proof and Persuasion Under the Bankruptcy Code

46.     The Debtors, as Plan proponents, bear the burden of proof and persuasion with respect to all confirmation requirements. *See, e.g.*, *In re Armstrong World Indus., Inc.*, 348 B.R. 111, 122 (D. Del. 2006); *In re Exide Techs.*, 303 B.R. 48, 58 (Bankr. D. Del. 2003). These are "heavy" burdens, requiring careful consideration of each inquiry under Section 1129. *See In re Vita Corp.*, 380 B.R. 525, 528 (C.D. Ill. 2008); *In re Sacred Heart Hosp. of Norristown*, 182 B.R. 413, 423-24 (Bankr. E.D. Pa. 1995). This is especially so where, as here, a debtor acts as the plan proponent. *See, e.g., Everett v. Perez (In re Perez)*, 30 F.3d 1209, 1214 n.5 (9th Cir. 1994) ("The burden of proposing a plan that satisfies the requirements of the Code always falls on the party proposing it, but it falls particularly heavily on the debtor-in-possession or trustee since they stand in a fiduciary relationship to the estate's creditors.").

47.     The Debtors fail to carry this burden because the Plan (a) has not been proposed in good faith as required by Section 1129(a)(3) of the Bankruptcy Code; (b) lacks a valuation

analysis and fails to allocate appropriate value to general unsecured creditors; (c) does not satisfy

the "best interests" of creditors test as required by Section 1129(a)(7) and "fair and equitable"

requirement of Section 1129(b); (d) improperly provides enhanced treatment to secured lenders

(while stripping value from unsecured creditors) in the form of broad releases, exculpation and

injunction provisions, and transfer of unencumbered assets, all Avoidance Actions and Causes of

Action of the Estates to the Liquidation Trust; and (e) does not satisfy the standards for

substantive consolidation of the Debtors' Estates.

### A.  <u>The Plan Is Unconfirmable As It Is Not Proposed in Good Faith</u>

48.     Section 1129(a)(3) of the Bankruptcy Code requires that a plan be proposed in

good faith.  Although "good faith" is not defined in the Bankruptcy Code, in construing this

phrase, courts have borrowed from traditional equitable principles.  Generally, good faith under

Section 1129(a)(3) is assessed by considering whether the totality of circumstances suggest that a

"plan is proposed with the legitimate and honest purpose to reorganize and has a reasonable hope

of success."  *In re Century Glove, Inc.*, 1993 WL 239489, at \*4 (D. Del. Feb. 10, 1993).  *See also*

*In re SGL Carbon Corp.*, 200 F.3d 154, 165 (3d Cir. 1999) (finding good faith requires "some

relation" between the chapter 11 plan and the "reorganization-related purposes" of chapter 11).

49.     A court shall confirm a plan only if it has been proposed in good faith and not by

any means forbidden by law, and it is feasible.  *In re Am. Capital Equip., LLC*, 688 F.3d 145,

155 (3d Cir. 2012).  *See also In re Quigley Co., Inc.*, 437 B.R. 102 (Bankr. S.D.N.Y. 2010) (plan

process benefitting certain preferred creditors to the detriment of others not proposed in "good

faith").  It is generally understood that, in determining whether the plan has been proposed in

good faith, the court must decide whether there has been an abuse of the provisions or the goals

of Chapter 11.  *See, e.g., In re Zenith*, 241 B.R. 92, 107-11 (Bankr. D. Del. 1999).  The

objectives of chapter 11 are:  (1) to permit successful rehabilitation of the debtor and (2) to

maximize the value of the bankruptcy estate. *See In re Amaravathi L.P.*, 416 B.R. 618, 624 (Bankr. S.D. Tex. 2009) (*quoting Toibb v. Radloff*, 501 U.S. 157, 160 (1991)). *See also In re Capital West Investors*, 186 B.R. 497, 499 (N.D. Cal. 1995).

**(i)     The Secured Lenders' Misuse of the Chapter 11 Process to Realize a Higher Recovery at the Expense of all Other Creditors Defies Most Fundamental Notions of Chapter 11**

50.     The Debtors' Plan ignores the objectives of maximizing value for the Estates, and thus, for all creditors.  The Plan serves to benefit but one constituency—the Debtors' secured lenders.  At every step of the case, from the DIP financing to solicitation and plan confirmation process, the secured lenders defied the most fundamental notions of Chapter 11.

51.     First, the aggressive DIP milestones ensured that the Debtors would not be able to properly conduct a sale process or propose a plan that would be fair and equitable to other creditors.  Second, the Plan solicitation process was not conducted in good faith as the general unsecured creditors were not provided with adequate information to make an informed vote on the Plan.  As discussed in detail below, the Disclosure Statement, among other things, (a) lacked an independent valuation analysis by the Estates' fiduciaries, (b) failed to disclose unencumbered assets or provide detail with respect to Avoidance Actions or why such actions were being transferred to secured lenders, and (c) failed to disclose any information on the Debtors' going concern sale efforts and the CARES Act funding approval.  Third, the entire plan confirmation process is deficient as the Committee is forced to file this Objection before the bidding process has even concluded.

52.     The Debtors' secured lenders have held a firm grip on these Chapter 11 cases since the Petition Date.  This has been particularly evident given their unwillingness to entertain any going concern transaction for the Debtors despite several interested bidders submitting bids for an "all asset" sale and receipt of the CARES Act approval for a $32 million PSP grant.  Even

after the Court agreed to extend the case timeline by two weeks at the May 27 hearing, the

secured lenders went out of their way to get the Court to reconsider that ruling in an emergency

motion based on the insufficiency of the DIP budget to support the mere two week-extension.

Transcript of Hr'g June 5, 2020, 39:18-20.[10]  The DIP budget, however, has no utility other than

to aid the secured lenders through the chapter 11 process.  Specifically:

- 42% of the $12 million DIP financing is allocated towards professional fees, most of which facilitates the secured lenders' goal of obtaining the benefits of the chapter 11 process; approximately 18% of the DIP financing funds the secured lenders through (i) $1.275 million allocated to lender professional fees, and (ii) $830,000 allocated for DIP interest;

- the DIP budget provides for professional fees and expenses of three different law firms for the DIP Lenders, as compared to one counsel and one Delaware counsel for every other constituency in these cases;

- the DIP budget allocates funds for the liquidation advisor, Sage-Popovich, Inc., rather than an investment banker, as early as April 2020, demonstrating that a going concern was never a real option;

- the DIP budget allocates a mere $250,000 for general unsecured creditors, which likely amounts to less than a penny in recoveries on a pro rata basis; and

- the DIP budget, even without the United States Postal Services' receivable, continues to outperform, including because of a $580,000 tax refund the Debtors have received from the IRS in mid-June; excluding the timing of payment of professional fees, the Debtors have outperformed the DIP budget by approximately $1.3 million through June 12, 2020 - cash that could have been used to hire an investment banker to run a proper going concern sale process.

*See* Newman Declaration at ¶ 10.

53. The secured lenders' misuse of the Chapter 11 process at the expense of all other

creditors renders the Plan unconfirmable.

---

10    Statement of DIP Lenders' counsel: "But the lenders can't be forced to, frankly, support a process that we thought from the very beginning was going to be unrealistic."

### (ii)    The Plan Impermissibly Shifts
Significant Unencumbered Value That Belongs
to Unsecured Creditors to the Debtors' Secured Lenders

54.     Most egregiously, the Plan allocates to the secured lenders <u>all</u> of the value from unencumbered assets, most notably the Ground Leases and Avoidance Actions.  Secured lenders do not have secured claims for the value of unencumbered assets, and, given that they waived their unsecured claims,[11] have no grounds to assert any claim against the unencumbered assets. *See* 11 U.S.C. § 506(a)(1).  However, if approved, the Plan would disburse all of the Debtors' assets, including unencumbered assets, to them, while leaving the unsecured creditors with nothing.  The Court cannot confirm a plan that allocates to any class of creditors value in violation of the Bankruptcy Code's claims allowance requirements, prohibition on discrimination against classes of claimants, and the chapter 11 priority scheme.  11 U.S.C. § 1129(a)(7), (b); *Czyzewki v. Jevic Holding Corp.*, 137 S. Ct. 973, 979 (2017).

55.     Furthermore, notwithstanding that the DIP Secured Parties agreed to waive any unsecured portion of their claim, including any superprirority claim, and otherwise limit the size of their claim to $14 million, the DIP Secured Parties now seek loan commitments under the Exit Facility (which was never solicited to creditors) of not less than $32 million.  It is also not clear why the Exit Financing is even necessary for the Liquidation Trust.[12]  It is not necessary for the operation of the Liquidation Trust and appears as a thinly veiled means to continue to receive high fees and interest, as they have been under  the DIP Facility.  A more appropriate course of

---

[11]     Because the Holders of Allowed DIP Claims agreed to waive the entire unsecured portion of their claims, that includes any superpriority claim granted under the DIP Order.

[12]     To the extent the DIP Lenders advance additional funds to the Liquidation Trust for the purpose of funding the trust to liquidate the Estates' assets, the Committee recognizes the need and legitimacy of the Exit Financing only to the extent new money is advanced to the Liquidation Trust.

action is to provide a beneficial interest in the Liquidation Trust to all outstanding DIP Claims (within the limitations set forth in the Plan) as of the Effective Date.

56.     Under the Plan, the secured lenders would not only receive all unencumbered assets, Avoidance Actions and Causes of Action of the Estates and continued fees and interest through full control of the Liquidation Trust, but the Committee—the only estate fiduciary incentivized to oversee and contest their actions—would be dissolved.  There is no good or legitimate reason to allow the secured lenders to use the chapter 11 process to liquidate the Debtors' assets and improperly encumber assets and Avoidance Actions that belong to unsecured creditors.  The unsecured creditors would be better served in chapter 7, where unencumbered assets (indeed, all assets) can be liquidated more cheaply and in harmony with the Bankruptcy Code's priority scheme.

### (iii)     **The Plan Was Improperly Solicited**

57.     The Plan was not properly solicited as the Disclosure Statement completely lacked any information about unencumbered assets, the Avoidance Actions, and the Debtors' going concern transaction prospects in order for general unsecured creditors to make an informed decision on the Plan.

58.     Bankruptcy Code Section 1125(b) requires that a disclosure statement contain "adequate information" regarding a proposed plan for holders of impaired claims and interests entitled to vote on such plan.  11 U.S.C. § 1125(b).  The Third Circuit has emphasized the importance of adequate disclosure, stating that, given the reliance creditors and bankruptcy courts place on disclosure statements, "we cannot overemphasize the debtor's obligation to provide sufficient data to satisfy the Code standard of adequate information."  *In re Oneida Motor Freight.  Inc.*, 848 F.2d 414, 417 (3d Cir. 1988).  "In short, a proper disclosure statement must clearly and succinctly inform the average unsecured creditor what it is going to get, when it

is going to get it, and what contingencies there are to getting its distribution."  *See In re Ferretti*,

128 B.R. 16, 19 (Bankr. D.N.H. 1991).

59.     Here, the Disclosure Statement clearly failed to provide adequate information and

did not have the necessary information required under the Bankruptcy Code to make an informed

vote on the Plan.  As noted above and by reference to the Disclosure Statement Objection,

particularly in light of recent disclosures to the Committee, the Debtors' Disclosure Statement or

the Plan Supplement did not provide sufficient information to unsecured creditors.  Moreover,

the Disclosure Statement necessarily could not have provided information as to the Debtors'

efforts, post-solicitation, to attract a buyer for their assets as a going concern or otherwise, given

the compressed case timeline dictated by the secured lenders.

60.     The Committee has material concerns as to the propriety (and implications for

confirmation) of both (a) the Debtors' plan solicitation process, which has concluded, with no

information discussed herein made available to general unsecured creditors, and (b) the sale

process, which is still ongoing, given that qualified bids are not due until June 24, 2020.

Accordingly, the Committee reserves all rights in light of these circumstances and the filing of

this Objection.

**B.  The Plan Cannot be Confirmed Because It Lacks a Valuation Analysis**

61.     One of the most fundamental deficiencies in the Debtors' Plan is lack of any

valuation analysis prepared by the Debtors.  Here, more than in most other chapter 11 cases, a

valuation is critical because the Debtors' plan process has been "backwards." Generally, Chapter

11 practice follows a series of steps: (1) the value of estate assets is first ascertained, at least by

way of estimates, which creates a factual foundation for negotiations; (2) the stakeholders next

convene to discuss an appropriate allocation of estate value, considering each party's ability to

challenge any contemplated deal structure; (3) agreement is, hopefully, reached thereafter;

(4) the parties, as a final step, incorporate their agreement into a plan and, after Court approval, send it out to creditors to vote.  The Debtors worked in reverse order.

62.     As previewed during proceedings held before the Court, the Debtors simply did not see a "need for a comprehensive valuation" when they already proposed a "small tip to unsecured creditors" in a liquidation plan.  Transcript of Hr'g May 27, 2020, 73:18-19, 24-25.  The Debtors acknowledged that there was no valuation analysis and that the content of their Disclosure Statement was "light" but posited that it was appropriate since this was not a "debt for equity exchange" plan.  Transcript of Hr'g May 27, 2020, 74:10-12.  In other words, the Debtors have determined that performing a valuation analysis simply was not necessary.

63.     Contrary to the Debtors' assertions, valuation is a vital component of any plan, particularly of any plan that is not consensual.  Indeed, the Bankruptcy Code's drafters recognized that "a valuation of the debtor's business . . . will almost always be required under Section 1129(b) in order to determine the consideration to be distributed under the plan."  H.R. Rep. No. 95-595, at 414, as reprinted in 1978 U.S.C.C.A.N. 5963, 6370.  A valuation is necessary to enable the Court to determine whether dissenting creditors are receiving fair and equitable treatment—particularly when they are to receive a mere "tip," while the secured lenders stand to capture value of unencumbered assets and Avoidance Actions that rightly belong to such dissenting unsecured creditors.  *See In re Exide Techs.*, 303 B.R. 48, 60-61 (Bankr. D. Del. 2003) ("A determination of the Debtor's value directly impacts the issues of whether the proposed plan is 'fair and equitable,' as required by 11 U.S.C. § 1129(b)."); *In re Copy Crafters Quickprint, Inc.*, 92 B.R. 973, 981 (Bankr. N.D.N.Y. 1988) (refusing to approve a debtor's disclosure statement "[a]bsent a more recent valuation of the property by a qualified individual" and finding that the valuation in the disclosure statement was "unsupported" and "self-serving").

64.     Generally, courts prefer valuation methodologies that focus on a debtor's earning capacity.  *See Consol. Rock Prods. Co. v. Du Bois*, 312 U.S. 510, 526 (1941) ("The criterion of earning capacity is the essential one if the enterprise is to be freed from the heavy hand of past errors, miscalculations or disaster, and if the allocation of securities among the various claimants is to be fair and equitable."); *In re Exide Techs.*, 303 B.R. at 65-66 ("Collier's notes that 'modern finance has caught up with' Supreme Court's directions in *Consolidated Rock* by providing courts with valuation methodologies that focus upon earning capacity, such as the comparable company analysis and the discounted cash flow analysis used in this case." (quoting 7 Collier on Bankruptcy § 1129.06[2][a], at 1129-156 (15th ed. rev. 2003))).  Following *Consolidated Rock* jurisprudence, courts have looked to the debtor's anticipated cash flows for a determination of enterprise value.

65.     Where a cash flow analysis may not be available, a "market-based approach" that "determines value on a going concern basis by analyzing the price that could be realized for a debtor's assets in a realistic framework, assuming a willing seller and a willing buyer," may be appropriate in limited circumstances.  *In re Exide Techs.*, 303 B.R. at 59 (*citing Travellers Int'l AG v. Trans World Airlines, Inc.  (In re Trans World Airlines, Inc.)*, 134 F.3d 188, 193-94 (3d Cir. 1998)).  *See also* Hon. Christopher Sontchi, *Valuation Methodologies: A Judge's View*, 20 Am.  Bankr. Inst. L. Rev. 1, 1 (2012) (acknowledging that "[e]ven when there is a market it may not fairly estimate the potential sale price of an asset if the market is inefficient, disrupted or dysfunctional").   The jurisprudence of *LaSalle* and its progeny supports the concept of "competing bids" and "exposure to a market" but requires a true "market test."  *Bank of America National Trust and Savings Assoc. v. 203 North LaSalle Street Partnership*, 526 U.S.  434, 119 S.Ct. 1411 (1999) (embracing the concept of competitive choice as a normative interpretative

guide in construing the provisions of Chapter 11 by concluding that "[i]n the interests of statutory coherence, a like disfavor for decisions untested by competitive choice ought to extend to valuations in administering subsection (b)(2)(B)(ii) when some form of market valuation may be available to test the adequacy of an old equity holder's proposed contribution."). *See also In re CGE Shattuck LLC*, 1999 WL 33457789, at \*6 (Bankr.  D.N.H.) (inviting the debtor to amend the plan "to provide for a competitive market determination of the value of the new equity which satisfies the standards enunciated in *LaSalle*"); *In re Minkoff*, 1999 WL 1424987 (Bankr. D. Kan.) (finding that the debtors' plan failed to satisfy Section 1129(b)(2)(B)(ii), but allowing the debtors to amend the plan to provide for bid procedures).

66.     Given that the Debtors currently do not generate cash flows to perform an accurate valuation analysis using one of the preferred valuation methodologies, a "market-based" approach would be a more reliable valuation method that should be used by the Debtors. Unfortunately, the Debtors and the secured lenders are not allowing a true "market test" to unfold.  The Debtors have not hired an investment banker to run a formal marketing process and have cut their sale and plan confirmation process short.  As of the date of this Objection, the Debtors have received several going concern bids that could serve as a proxy for market value. The Debtors are likely to receive additional bids ahead of the June 24 bid deadline as the Debtors' marketing process is ongoing.   The secured lenders, however, are preventing this process from going forward by insisting on having a Plan confirmation the very next day after the bids are due.  The lack of any valuation analysis, even through a "market-based approach" pursuant to a sale process, deprives creditors of the ability to assess the true earning capacity and going concern prospects of these Debtors that would have informed creditors' vote on the Plan.

67.     Valuation is also driven by the time and expense necessary to dispose of the Debtors' assets.  One major advantage of a going-concern sale to the drawn-out liquidation proposed by the secured lenders is the reduced costs to preserve and dispose of the secured lenders' collateral.   Should a long-term liquidation occur, costs could be significant. Additionally, the secured lenders are seeking the Exit Financing and preserving their liens on the collateral in the Liquidation Trust proposed under the Plan.  Should the Exit Financing be permitted, the ability to surcharge the collateral pursuant to section 506(c) of the Bankruptcy Code should be preserved in the Liquidation Trust as well, as it has been throughout these Chapter 11 cases.  Moreover, an independent fiduciary should be appointed for the Liquidation Trust (that would otherwise be under the control of the secured lenders) so that such surcharge rights will be asserted when and if they are necessary.[13]

## C.  General Unsecured Creditors Would Be Better Served In Chapter 7

68.     Section 1129(a)(7) of the Bankruptcy Code requires that each holder of an impaired class either accepts the plan or receives under the plan property of a value, as of the effective date of the plan, of not less than the amount the holder would receive if the debtor were liquidated under chapter 7.  Known as the "best interests" test, every creditor is entitled to plan treatment at least equal to what it might expect in a Chapter 7 liquidation.  *See In re W.R. Grace & Co.*, 475 B.R. 134, 141 (D. Del. 2012).  To make this value determination, the Debtors must prove what unsecured creditors distributions are likely to be under (i) the Plan and (ii) a

---

[13]     The DIP Order contains a Section 552 "equities of the case" surcharge wavier but since the DIP Order approval, there have been several key changes in the Debtors' Chapter 11 cases that may necessitate re-determination of continuing applicability of such waver.  These changes include, among others, the easing of Alaska quarantine requirements with respect to out-of-state visitors that allows for going concern bidders to conduct onsite inspections, the Debtors ongoing marketing and sale processes that are generating bids, the receipt of approval for CARES Act PSP funding, and the submission of several going concern bids to the Debtors, which may yield value far in excess of the proposed liquidation value under the Plan.  Because the Committee was required to file this Objection before the bid deadline, the Committee reserves all rights to challenge the applicability of Section 552 waiver on, among other grounds, Rule 60(b) of the Federal Rules of Civil Procedure.

hypothetical Chapter 7 proceeding. *Id.* (*citing In re Affiliated Foods, Inc.*, 249 B.R. 770, 787 (Bankr. W.D. Mo. 2000)). "In order to show that a payment under a plan is equal to the value that a creditor would receive if the debtor were liquidated, there must be a liquidation analysis of some type that is based on evidence and not mere assumptions or assertions." *In re Adelphia Commc'ns Corp.*, 361 B.R. 337, 366-67 (S.D.N.Y. 2007) (citations omitted). The court then makes an "independent finding, based on the evidence and arguments presented, whether creditors will receive as much under the plan as they would" in a liquidation. *In re W.R. Grace & Co.*, 475 B.R. 134, 142-43.

69.     Pursuant to the Plan, the proposed distribution to unsecured creditors is $250,000. This amount is substantially deficient, failing to take into account the substantial unencumbered value in these Estates. The Debtors have failed to provide any rational for how such distributions satisfy the "best interests" test. Even without the unencumbered assets, the approximately 0.5% distribution allocated to general unsecured creditors from the Creditors' Fund is insufficient to justify a chapter 11 process that exists solely to resolve secured lenders' claims. Because there would be no benefit to these Estates other than to liquidate, general unsecured creditors would be better served and maintain more rights in chapter 7. As shown in the Newman Declaration, unsecured creditors would actually stand to receive distributions ranging from nearly 2% in the low-end to 6% in the high-end scenario based on a properly performed liquidation analysis. *See* Newman Declaration at ¶ 9. There are several faulty assumptions in the Debtors' Liquidation Analysis, including that:

> i.     the Debtors do not account for, or under-estimate, the liquidation value of a number of assets, including accounts receivable, aircraft, Ground Leases, intangible assets, and Avoidance Actions;
>
> ii.    the Debtors do not account for the lack of encumbrance of Ground Leases or subordination of the DIP Lenders' superpriority claims; and

28

> iii.    the Debtors overstate the wind down costs of a chapter 7 trustee and professionals.

*See* Newman Declaration at ¶ 10.

70.     The allocation of the value of Ground Leases to secured lenders, however, renders the Plan truly offensive to established law generally, and the "best interests" test in particular. The Supreme Court's decision in *Jevic* is instructive here.  *See Jevic*, 137 S. Ct. 973.  Although the Supreme Court's opinion was in the context of a structured dismissal, the overarching theme of the opinion was the potentially serious consequences of the priority scheme enacted by Congress.   *Id*. at 986-87 (discussing Congress's carefully constructed priority scheme). Ultimately, the Supreme Court found that a structured dismissal cannot violate the priority scheme enacted by Congress.  *Id.* at 987.  Section 1129(b) requires that a bankruptcy court "cannot confirm a plan that contains priority-violating distributions over the objection of an impaired creditor class."  *Id.* at 976 (citing 11 U.S.C. §§ 1129 (a)(7), (b)).  Here, the statutory priority scheme should likewise be preserved.

71.     The Debtors' Ground Leases have material value.  The Debtors' DIP Lenders and Prepetition Secured Parties are not entitled to secured claims on account of such value.  *See* 11 U.S.C. §§ 506, 724.  Under the plain terms of the Plan, the Prepetition Secured Parties and DIP Lenders have waived any unsecured portion of their claims and only have allowed claims to the extent they are secured.  Despite that, they stand to benefit from the transfer of all unencumbered assets into the Liquidation Trust for their sole benefit, providing them with far greater returns than they are entitled to, while discriminating against general unsecured creditors.  Accordingly, the value should proceed down the Code-mandated priority scheme to general unsecured

creditors—resulting in distributions far in excess of the paltry $250,000 promised through the Creditors' Fund under the Plan.[14]  *See* Newman Declaration.

72.     There are also additional assets in chapter 7 that the Debtors did not include in their Liquidation Analysis, such as proceeds from unencumbered Avoidance Actions against secured lenders and preference transferees.  *See In re Washington Mut., Inc.*, 442 B.R. 314, 359-60 (Bankr. D. Del. 2011) ("In a case where claims are being released under the chapter 11 plan but would be available for recovery in a chapter 7 case, the released claims must be considered as part of the analysis in deciding whether creditors fare at least as well under chapter 11 plan as they would in a chapter 7 liquidation.").  Outside of bankruptcy, avoidance claims belong to a debtor's creditors, not the debtor itself; as a result, in bankruptcy, similar claims are considered to belong to unsecured creditors, with the debtor acting as a fiduciary.  *See Buncher Co. v. Official Comm. of Unsecured Creditors of GenFarm Ltd. Partnership IV*, 229 F.3d 245, 250 (3d Cir. 2000) ("when recovery is sought under section 544(b) of the Bankruptcy Code, any recovery is for the benefit of all unsecured creditors"); *Fogel v. Zell*, 221 F.3d 955, 966 (7th Cir. 2000) ("The trustee 'owns' the claims of the unsecured creditors only in the sense that he controls their prosecution.  He is not the beneficial owner, but rather is the fiduciary of the creditors.") (*citing Weintraub*, 471 U.S. at 354-55; *In re Martin*, 91 F.3d 389, 394 (3d Cir. 1996)).  *See also In re Pursuit Capital Management, LLC*, 595 B.R. 631, 658 (Bankr. D. Del. 2018) (discussing requirement that transfers of avoidance claims benefit all creditors).  The Debtors' Liquidation Analysis, without basis, ascribes no value to Avoidance Actions and Causes of Action, and attempts to use that as an excuse to gift all such claims to secured lenders

---

[14]     Even if the secured lenders' deficiency claims were allowed, general unsecured creditors would still receive a greater recovery, when accounting for the proper value of all unencumbered assets, than what is currently provided in the Creditors' Fund. *See* Newman Declaration at ¶¶ 9-10.

under the Plan for no consideration.  The Committee's liquidation analysis establishes, after accounting for the Debtors' faulty assumptions, a better recovery in chapter 7.  *See* Newman Declaration at ¶ 11.

73.    Moreover, in contrast to lender-controlled Liquidation Trust, chapter 7 provides important procedural safeguards for general unsecured creditors, while accomplishing the same ultimate goals—wind-down and liquidation of the Debtors' estates.  Most notably, chapter 7 provides a specific priority scheme that the Debtors and secured lenders could not alter.  *See* 11 U.S.C. §§ 724, 726.  Moreover, in chapter 7, general unsecured creditors, not the Debtors or their secured lenders, may select a chapter 7 trustee.  *See* 11 U.S.C. § 702(a).  Given how active the Committee has been in these Chapter 11 cases, they will indubitably continue to remain active to elect a chapter 7 trustee to serve the Estates' best interest.  Once elected, the chapter 7 trustee may work to maximize value of the Debtors' remaining assets in the best interests of creditors, including prosecution of Avoidance Actions and liquidation of unencumbered assets.

74.    Accordingly, in order to preserve the priority scheme enacted by Congress and due to the Debtors' inability to satisfy the "best interests" test of Section 1129(a)(7) and the "fair and equitable" requirement of Section 1129(b), confirmation of the Plan should be denied.

### D.    The Plan Releases Further Deprive Unsecured Creditors Of Value

75.    Rather than provide unsecured creditors appropriate value or allow the Committee to pursue claims for the benefit of such creditors, the Debtors propose broad third-party releases for the Debtors' insiders and their secured lenders.  Such releases are not supported by binding Third Circuit case law and the Debtors have not provided evidence to the contrary.

76.    To determine whether a debtor's release of a third party is appropriate under a plan, the Third Circuit applies the non-exhaustive, five-factor test set forth in *Master Mortgage*. *See In re Master Mortgage Inv. Fund, Inc.*, 168 B.R. 930, 937 (Bankr. W.D. Mo. 1994); *In re*

*Abeinsa Holding, Inc.*, 562 B.R. 265, 282-83 (Bankr. D. Del. 2016) (applying the five-factor *Master Mortgage* test to debtors' proposed release of third parties).  Although no single factor is dispositive, courts in this district have focused the analysis on whether the parties to be released have provided a substantial contribution to the plan.  *See In re Washington Mutual, Inc.*, 442 B.R. 314, 349-50 (Bankr. D. Del. 2011) (approving releases of parties that had waived significant claims against the debtors' assets and the estates but concluding that "there is no basis whatsoever for the Debtors to grant a release to directors and officers of any professionals . . . current or former . . . [because] there has been no evidence presented of any 'substantial contribution' made to the case by the directors, officers, or professionals, justifying releases for those parties.").  Courts do not grant third-party releases lightly, and the plan proponent bears the burden of establishing the appropriateness of the non-debtor releases*.  See In re Zenith Elecs. Corp.*, 241 B.R. 92, 110 (Bankr. D. Del. 1999).

77.     The Debtors have not articulated, and the Committee is unaware of, any contribution by the Debtors' insiders during these cases warranting a release.  None of the Debtors' equity sponsors are providing cash, assets, or anything of value under the Plan and have not performed any extraordinary services that would constitute a contribution.  Furthermore, as previously discussed, the secured lenders' alleged contribution in these Chapter 11 cases, including the $250,000 "tip" to general unsecured creditors, cannot be found to be fair or substantial consideration to justify a non-consensual release.

78.     The Debtors are also transferring all Avoidance Actions and Causes of Action under the Plan to their secured lenders that would otherwise be available to the Debtors' Estates in chapter 7 for the benefit of unsecured creditors.  Avoidance Actions and Causes of Action of

the Estates should not be handed over to the secured lenders but should be pursued for the benefit of all unsecured creditors.

79.     The Plan's exculpation and injunction provisions also further the impermissible non-consensual releases of claims against non-debtor third parties.  The exculpation provision provides, in relevant part, that the Exculpated Parties (which includes the DIP Secured Parties and the Prepetition Secured Parties and each of their Related Parties) shall not have any liability "for any prepetition or postpetition act or omission in connection with, relating to, or arising out of the Chapter 11 Cases", the Plan or the Disclosure Statement.  Plan at § 11.12.  Thus, the exculpation provision includes releases of any claims by third parties against the Prepetition Secured Parties and the DIP Secured Parties for their prepetition acts, yet it is not limited to those creditors who have accepted the Plan and binds, without their consent, unsecured creditors, who stand to receive nothing under the Plan.

80.     Similar to the exculpation provision, the injunction provision also furthers the non-consensual releases of claims by preventing creditors from bringing any actions against the released parties "based on any act, omission, transaction, or other activity that occurred before the Effective Date."  Plan at § 11.1.  Similar to the release and exculpation provisions of the Plan, there is no evidence that any value has been given to creditors in exchange for the injunction.  Because the exculpation and injunction provisions incorporate all claims purported to be improperly released in the broad release provisions of the Plan, the Plan cannot be confirmed.

### E.  The Debtors Cannot Sustain The Heavy Burden Of Substantive Consolidation

81.     The Plan is predicated upon the substantive consolidation of the Debtors' Estates. There are generally only two circumstances in which substantive consolidation has been found

appropriate:  (a) where creditors dealt with the debtors as a single economic unit and did not rely on their separate identities, or (2) where the affairs of the debtors are so entangled that consolidation will benefit the estates of all of the debtors.  *See In re Genesis Health Ventures, Inc.*, 402 F.3d 416 (3d Cir.  2005); *see also In re Owens Corning*, 419 F.3d 195 (3d Cir.  2005) (overturning confirmation of plan where plan proponents sought to remake substantive consolidation not as a remedy but to strip creditor rights under the Bankruptcy Code, favor certain creditors over others, and trump possible plan objections).

82.     The Debtors have not proffered any evidence that creditors dealt with the Debtors as a single economic unit nor that they did not rely on the Debtors' separate identities.  In fact, the Debtors' Schedules and Statements of Financial Affairs evidence that the Debtors' creditors dealt with the Debtors on an individual basis and not as a single economic unit.  The Debtors also fail to provide evidence that their business affairs were so entangled or that corporate formalities were ignored so as to justify substantive consolidation.

83.     Substantive consolidation is particularly inappropriate in this instance given that the liens on assets from certain Estates are avoidable for the benefit of unsecured creditors, most notably the Ground Leases held by various different Debtors.  Creditors of each Debtor may be entitled to significantly greater returns than creditors of any other Debtor depending on the value of particular Ground Lease held by it.  Accordingly, the Debtors have failed to meet their burden to justify substantive consolidation of any of the Debtors rendering the Plan patently unconfirmable.

## II.     Cross-Motion For Conversion To Chapter 7

84.     The Committee cross-moves to convert these Chapter 11 cases to chapter 7. Section 1112(b) of the Bankruptcy Code, provides that, on request of a party in interest, and after notice and a hearing, "the Court shall convert a case to a case under chapter 7 or dismiss a case

under this chapter, whichever is in the best interests of creditors and the estate, if the movant establishes cause." 11 U.S.C. § 1112(b)(1) (emphasis added). Under section 1112(b), conversion or dismissal is mandatory upon a finding of "cause." *See* 11 U.S.C. § 1112(b)(1); *DCNC North Carolina I, LLC v. Wachovia Bank, N.A.*, Case No. 09-3775, 09-3776, 2009 WL 3209728, \*6 (E.D. Pa. Oct. 5, 2009); *see also In re The Reserves Resort, Spa & Country Club LLC*, Case No. 12-13316 (KG), 2013 WL 3523289, \*2 (Bankr. D. Del. July 12, 2013).

85.     Although "cause" is not defined, Section 1112(b)(4) provides a nonexclusive list of 16 "causes" for conversion. 11 U.S.C. § 1112(b)(4)(A)-(P); *In re Am. Capital Equip., LLC*, 688 F.3d 145, 162 n. 10 (3d Cir. 2012) ("the listed examples of cause are not exhaustive"); *In re Mechanical Maintenance, Inc.*, 128 B.R. 382, 386 (E.D. Pa. 1991). At least two separate and independent grounds under § 1112(b)(4) exist here and demand conversion of these cases. Specifically, there is both: (A) a substantial or continuing loss to or diminution of the estates and the absence of a reasonable likelihood of rehabilitation and (M) an inability to effectuate substantial consummation of a confirmed plan. 11 U.S.C. § 1112(b)(4)(A) and (M).

86.     If the movant establishes "cause", the burden then shifts to the debtor to prove it falls within the section 1112(b)(2) "unusual circumstances" exception to section 1112(b)(1)'s mandatory conversion. However, the Third Circuit instructs that "[c]ourts usually require the debtor do more than manifest unsubstantiated hopes for a successful reorganization." *In re Brown*, 951 F.2d 564, 572 (3d Cir. 1991)) (citing *In re Canal Place Ltd. Partnership*, 921 F.2d 569, 577 (5th Cir. 1991)); *see also In re Woodbrook Assocs.*, 19 F.3d 312, 317 (7th Cir. 1994) ("The very purpose of § 1112(b) is to cut short [the] plan and confirmation process where it is pointless."). If cause to convert or dismiss is present, the Third Circuit has indicated that it then

chooses between conversion and dismissal based on "the best interest of creditors and the estate." *In re Am. Capital Equip.*, LLC, 688 F.3d at 161.

87. Conversion is warranted where, among other things, a debtor is "suffering substantial or continuing losses to or diminution of the estate and there is no reasonable likelihood of rehabilitation." 11 U.S.C. § 1112(b)(4)(A). The inquiry under 1112(b)(4)(A) is twofold. *In re Gateway Access Solutions, Inc.*, 374 B.R. 556, 562 (Bankr. M.D. Pa. 2007). "First, the Court must look at the track record of the debtor to determine if it is suffering losses or making gains. Second, the Court must determine whether rehabilitation is likely given the evidence presented at hearing." *Id.*

### A. The Debtors Are Suffering Continuing Losses

88. The statements of the Debtors and their secured lenders amply demonstrate that the Debtors are suffering losses and unable to remain in Chapter 11 past their requested confirmation and effective date. *See, e.g.*, *Emergency Motion of BNP Paribas, as Agent for the DIP Lenders and Prepetition Lenders, for Reconsideration of the Proposed Order (i) Approving Proposed Disclosure Statement and the Form and Manner of the Notice of the Disclosure Statement Hearing, (ii) Establishing Solicitation and Voting Procedures, (iii) Scheduling a Confirmation Hearing, and (iv) Establishing Notice and Objection Procedures for Confirmation of Debtors' Plan of Liquidation* [Dkt. No. 297] (the "Reconsideration Motion") (seeking reconsideration of scheduling order extending Plan milestones by two weeks). It cannot be disputed that the Debtors are not operating and, beyond some limited hope of collecting on accounts receivable and modest asset liquidations, have no hope or intention to rehabilitate their business or recover any material portion of its value in chapter 11.

89.     Until only days ago, the Debtors and their creditors remained hopeful that their losses might be stemmed by a going-concern sale to a third-party buyer, which would yield sale proceeds sufficient to satisfy administrative expenses and provide a distribution to creditors. Reserving all rights in the event of submission of a qualified bid and consummation of a going concern sale of the Debtors' business after the filing hereof, the Debtors do not, at present, have an ability or prospect to preserve value through such a sale that the secured lenders would actually approve.   Accordingly, all of the Debtors' continuing activities in Chapter 11 cause irreparable loss to the Estates.

### B.  <u>The Plan Cannot Be Confirmed</u>

90.     The Debtors also fail the second prong of the test because they are not seeking to rehabilitate.   Where a Chapter 11 case is motivated by something other than a desire to rehabilitate a financially distressed yet a viable entity or to preserve or maximize asset values for the creditor-beneficiaries of an orderly liquidation, a chapter 11 plan is not proposed in good faith and is not consistent with the purposes of the Bankruptcy Code.

91.     When considering a motion under Bankruptcy Code section 1112(b), "rehabilitation" means an ability to re-establish the debtor-entity on a firm sound financial basis. *See In re BH S&B Holdings, LLC*, 439 B.R. 342, 347 (Bankr. S.D.N.Y. 2010) ("rehabilitation means to put back in good condition and reestablish on a sound basis.").   An intention to "liquidate (rather than rehabilitate), demonstrates that there is no likelihood of rehabilitation." *Id.  See also Loop Corp. v. U.S. Trustee*, 379 F.3d 511 (8th Cir. 2004) (granting U.S. Trustee's motion after last round negotiations with lenders failed, and the debtors were cash flow negative, there were mounting costs to the estate, and the plan of liquidation was evidence of a lack of likelihood of rehabilitation).   The *BH S&B* court discussed that though a liquidation plan is

permissible, courts have converted or dismissed cases on facts similar to *Loop* and *BH S&B*. 439 B.R. at 348 (citing *In re Natrl. Plants & Lands Mgmt. Co., Ltd.*, 68 B.R. 394, 395 (Bankr. S.D.N.Y. 1986) (converting chapter 11 case, in part, because the debtor's proposed liquidating plan conceded that the business would be terminated and the debtor was losing $60,000 per month in chapter 11).

92.     The Debtors entered bankruptcy with the express intent to give their secured lenders a tactical advantage of liquidating through a lender-controlled chapter 11 process. As previously expressed to the Court in connection with the Debtors' motion to approve their auction and sale process, *see* D.I. 197, there is reason to suspect that even their attempts to sell their business were not afforded customary and proper resources. *See* D.I. 251 (redacted version of Committee objection to proposed bidding procedures). Regardless, no going concern buyers have appeared, and reserving all rights to be proved wrong by the submission of bids in the two days following the filing of this Objection, it has been obvious from the outset that a true reorganization was a "hopeless and unrealistic prospect" in these cases. *See In re Economy Cab & Tool Co., Inc.*, 44 B.R. 721, 724 (Bankr. D. Minn. 1984). *See also In re Gateway Access Solutions, Inc.*, 374 B.R. at 567 (lack of purchaser interest in "going concern" purchase proves it is not in the best interests of creditors to remain in Chapter 11). The Debtors' Estates are now paying millions of dollars to professionals to steward an empty ship and propose an unconfirmable Plan. As demonstrated in the Newman Declaration, the remaining duties here can be performed more efficiently and fairly by a disinterested trustee.

93.     Additionally and analogously, conversion is warranted where a debtor presents an "inability to effectuate substantial consummation of a confirmed plan." 11 U.S.C. § 1112(b)(4)(M). A "debtor's ability to effectuate a plan may well turn on practical

considerations, including whether confirmation can be achieved." *In re Babayoff*, 445 B.R. 64, 76 (Bankr. E.D.N.Y. 2011); *see Loop Corp.*, 379 F.3d 511, n.2 (8th Cir. 2004) (discussing bankruptcy court's skepticism about whether any plan would be confirmable as grounds for cause to convert) (citing *In re Fossum*, 764 F.2d 520, 521-22 (8th Cir. 1985) ("A finding that the [debtors] were unable to effectuate any plan which would be confirmable is a proper basis for dismissal of the [debtors'] chapter 11 case."). *See also In re DCNC North Carolina I, LLC*, 407 B.R. 651, 665 (Bankr. E.D. Pa. 2009) (Debtors' inability to effectuate plans of reorganization sufficient cause to convert); *In re Lamar Estates, Inc.*, 6 B.R. 933 (Bankr. E.D.N.Y. 1980) (same).

94.     The evidence presented to the Court in support of the Plan and discussed at length above and in the Newman Declaration demonstrates that liquidation by the Debtors and secured lenders cannot comply with the Bankruptcy Code.  The Debtors cannot confirm a plan in compliance with Section 1129 without, among other things, allocating substantial value for unsecured creditors on account of the Debtors' Ground Leases and other assets, which the Debtors and their secured lenders have not agreed to do.

95.     Even if the Debtors themselves agree to modify the Plan to comply with section 1129 as to value allocation, it appears that they must obtain (1) additional funding for administrative expenses through any extended confirmation date, and (2) sufficient consent of voting classes to the modification.  *See* Reconsideration Motion (describing administrative expense funding limitations); 11 U.S.C. § 1129(a)(8), (b) (requiring consent of impaired class). The evidence before the Court, most prominently the aggressive actions taken by the Debtors and their secured lenders to lock themselves into case milestones under their DIP Order, suggests

that neither sufficient and timely funding nor consent for material Plan amendments will be provided.

96.    Absent the amendments to the Plan as requested herein, the Debtors have no reasonable prospect of rehabilitating or even liquidating in these Chapter 11 Cases.

### C.    Conversion Would Benefit the Debtors And Their Estates

97.    Finally, conversion, rather than dismissal, would benefit the Debtors and their Estates.  A chapter 7 trustee would be able to liquidate the Debtors' assets more efficiently than the Debtors in Chapter 11, *see* Newman Declaration and Part I.C above, and would additionally be able to prosecute and liquidate Avoidance Actions that would not be available for the equitable benefit of all creditors outside Title 11.  Given the complexity of the Debtors' finances and assets, it is unlikely that the Debtors or any party would be capable of providing comparably substantial returns to any stakeholders were the cases to be dismissed.

98.    While the complete exhaustion of the Estates' value for administrative expenses might alleviate certain disputes among secured and unsecured creditors, marching toward a plan that will pay nothing to prepetition creditors is not a legitimate purpose of chapter 11.  As set forth above, general unsecured creditors would be protected by the safeguards of chapter 7, and as the Committee's liquidation analysis in the Newman Declaration establishes, all parties in interest would be better served in chapter 7 under the "best interests" test.  Accordingly, should the Court not deny or defer confirmation of the Plan, the Committee cross-moves for conversion of these Chapter 11 cases to chapter 7.

### III.    Request For Stay Pending Appeal

99.    Should the Court confirm a Plan, the Committee requests that the Court issue a stay pending appeal.  Bankruptcy Rule 8005 contemplates a stay pending an appeal of a Bankruptcy Court's order.  *See* Fed. R. Bankr. P. 8005.  Under Bankruptcy Rule 8005, a stay

pending appeal is appropriate to "maintain the status quo."  *See KOS Pharm., Inc. v. Andrx Corp.*, 369 F.3d 700, 708 (3d Cir. 2004).  In bankruptcy cases, myriad circumstances can occur "that would necessitate the grant of a stay pending appeal in order to preserve a party's position." *In re Highway Truck Drivers & Helpers Local Union # 107*, 888 F.2d 293, 298 (3d Cir.  1989).

100.    In evaluating whether a party is entitled to a stay pending appeal, courts consider (a) the likelihood that the moving party will succeed on the merits; (b) the possibility that the moving party will suffer irreparable harm absent relief; (c) whether the stay will inflict substantial harm on the nonmoving parties; and (d) whether the stay will harm the public interest. *See Republic of Philippines v. Westinghouse Elec. Corp.*, 949 F.2d 653, 658 (3d Cir. 1991) (citing *Hilton v. Braunskill*, 481 U.S. 770, 776 (1987)).

101.    None of these factors is, on its own, outcome determinative.  Rather, a court "must balance all of the factors in order to decide whether or not to grant a stay."  *Haskell v. Goldman, Sachs & Co.  (In re Genesis Health Ventures, Inc.)*, 367 B.R. 516, 519 (Bankr. D. Del. 2007) (finding all four factors weighed in favor of granting motion to stay proceedings pending appeal) (citation omitted); *Meisel v. Armenia Coffee Corp. (In re Hudson's Coffee, Inc.)*, No. 06-1458, 2008 Bankr. LEXIS 2994, at * 4 (Bankr. D.N.J. Oct. 31, 2008) ("[N]o single factor is outcome determinative.  Rather, [a court] must balance all of the elements in order to reach an appropriate determination.").  *See also In re Countrywide Home Loans, Inc.*, 387 B.R. 467, 479 (Bankr. W.D. Pa. 2008) (noting that "a balancing approach is more appropriate than a somewhat mechanical test").  Particularly, the Court should find that the more likely it is that the movant will succeed on appeal, the less strong showing of irreparable harm needs to be, and vice versa. *See BEPCO, L.P. v. 15375 Mem'l Corp. (In re 15357 Mem'l Corp.)*, No. 06-10859-KG, 2009 WL 393948 (D. Del. Feb. 18, 2009).  *See also Hickey v. City of New York (In re World Trade*

*Ctr. Disaster Site Litig.)*, 503 F.3d 167, 170 (2d Cir. 2007) ("[T]he degree to which a factor must be present varies with the strength of the other factors, meaning that more of one [factor] excuses less of the other.") (citations and internal quotations omitted).

102.     The issues raised herein are material and should be heard on appeal should the Plan be confirmed.  These include, but not limited to, legal and evidentiary issues pertaining to: (i) use of a confirmation of a plan of liquidation to frustrate fundamental principles of the Bankruptcy Code following the Supreme Court's decision in *Jevic*; (ii) "good faith" and other Section 1129 requirements, given how the Plan vests exclusive control of critical value and value-allocation issues with the secured lenders, and bestows other lucrative benefits thereon; (iii) improper solicitation of votes on the Plan given lack of valuation and lack of disclosure with respect to unencumbered assets, Avoidance Actions and other critical information; (iv) improper plan confirmation process due to secured lender control of the case that handicapped the Debtors' going concern sale process.  Without the stay, the Debtors may consummate the Plan while an appeal is pending, rendering the appeal "equitably moot" and dissolving the Committee, leaving no fiduciary representative for unsecured creditors.  In the near term, however, as the Plan contemplates liquidation of assets over a period of 18 to 36 months, a stay will not harm the Estates.  Accordingly, should the Court confirm the Plan, a stay should be issued.

## RESERVATION OF RIGHTS

103.     The Committee reserves all rights with respect to the Debtors' proposed Plan and confirmation thereof, including without limitation, the Committee's rights to supplement or amend this Objection and Cross-Motion in advance of, or in conjunction with, the hearing to approve confirmation of the Plan, or any sale of the Debtors' assets.

[*Remainder of page intentionally left blank.*]

42

## CONCLUSION

**WHEREFORE**, the Committee respectfully requests that the Court:  (i) deny confirmation of the Plan, (ii) absent the amendments to the Plan as requested herein, grant the Committee's Cross-Motion and a stay pending appeal, and (iii) grant the Committee such other or further relief as the Court deems just and proper.

Dated: June 22, 2020
      Wilmington, Delaware

Respectfully submitted,

**POLSINELLI PC**

*/s/ Christopher A. Ward*
Christopher A. Ward (Del. Bar No. 3877)
Shanti M. Katona (Del. Bar No. 5352)
Brenna A. Dolphin (Del. Bar No. 5604)
222 Delaware Avenue, Suite 1101
Wilmington, Delaware 19801
Telephone: (302) 252-0920
Facsimile: (302) 252-0921
cward@polsinelli.com
skatona@polsnielli.com
bdolphin@polsinelli.com

-and-

**BROWN RUDNICK LLP**
Robert J. Stark (pro hac vice)
Oksana P. Lashko (pro hac vice)
Max D. Schlan (pro hac vice)
Seven Times Square
New York, New York 10036
Telephone: (212) 209-4800
Facsimile: (212) 209-4801
rstark@brownrudnick.com
olashko@brownrudnick.com
mschlan@brownrudnick.com

*Counsel to the Official Committee of Unsecured Creditors*