# IN THE UNITED STATES BANKRUPTCY COURT
# FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re:<br><br>RAVN AIR GROUP, INC. *et al.*,[1]<br><br>Debtors. | Chapter 11<br><br>Case No. 20-10755 (BLS)<br><br>(Jointly Administered)<br><br>Hearing Date: June 25, 2020 at 11:00 a.m. (ET)<br><br>Re: Docket Nos. 356, 381 |

### PROPOSED PROFFER AND DECLARATION OF JOHN T. YOUNG, JR. IN SUPPORT OF CONFIRMATION OF FIRST AMENDED CHAPTER 11 PLAN OF LIQUIDATION OF RAVN AIR GROUP, INC. AND ITS AFFILIATED DEBTORS AND IN RESPONSE TO PLAN CONFIRMATION OBJECTIONS

I, John T. Young, Jr., do hereby declare as follows:

1. I am a Senior Managing Director at Conway MacKenzie, LLC ("Conway MacKenzie"), financial advisor to the above-captioned debtors (collectively, the "Debtors") in these cases (the "Chapter 11 Cases") filed under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code"). I am authorized to make this Proposed Proffer on behalf of the Debtors in support of confirmation of the *First Amended Chapter 11 Plan of Liquidation of Ravn Air Group, Inc. and Its Affiliated Debtors* [D.I. 381] (as may be amended, the "Plan"), in response to the objection [D.I. 356] (the "Objection") to confirmation of the Plan filed by the Official Committee of Unsecured Creditors appointed in these Chapter 11 Cases (the "Creditors Committee"), and in support of the Memorandum of Law filed by the Debtors in support of

---

[1] The Debtors in these chapter 11 cases and the last four digits of each Debtor's U.S. tax identification number are as follows:  Ravn Air Group, Inc. (3047), Ravn Air Group Holdings, LLC (5356), JJM, Inc. (4858), HoTH, Inc. (9957), Peninsula Aviation Services, Inc. (6859), Corvus Airlines, Inc. (7666), Frontier Flying Service, Inc. (8091), and Hageland Aviation Services, Inc. (2754).  The notice address for all of the Debtors is 4700 Old International Airport Road, Anchorage, AK 99502.

146484.01601/123463538v.3

confirmation of the Plan concurrently herewith (the "Memorandum").[2] Unless otherwise stated, I have personal knowledge of the facts stated herein. If called upon to testify, I would testify as follows:

2. I have reviewed the Objection and the Declaration of Richard Newman (the "Newman Declaration") filed by the Committee in support of the Objection.

3. Conway MacKenzie is a restructuring advisory firm specializing in corporate restructurings, operations improvement, dispute resolution and valuation. Conway MacKenzie has extensive experience working with and for distressed companies in complex financial and operational restructurings, both out-of-court and in chapter 11 proceedings throughout the United States. Conway MacKenzie professionals have advised debtors, creditors and equity constituents in numerous reorganizations, which advisory services have included financial analysis and budgeting, forecasting, cash management, operational assessments and improvements, dispute and litigation advisory and interim management services. Conway MacKenzie has been involved in numerous energy industry bankruptcies in capacities including advisor to official committees of creditors, advisor to official equity committees, advisor to secured and unsecured holders of debt, debtor advisory, and serving as a Chief Restructuring Officer.

4. I have over 20 years of experience as a restructuring professional and have been qualified to provide expert testimony on financial restructuring matters in many bankruptcy matters. A copy of my curriculum vitae, which includes additional information about my qualifications and professional experience, is attached hereto as **Exhibit A**.

---

[2] Capitalized terms used but not defined herein have the meanings ascribed to them in the Memorandum.

Best Interests Test

5.      I disagree with Mr. Newman that a valuation analysis under the Plan would be appropriate in these cases.  Because of the current economic circumstances, the Debtors' financial condition, and the substantial working capital needed to restart the Debtors' operations, the Debtors have no prospect of generating positive cash flow before 2021 at the earliest.  In the interim, the Debtors would operate at a loss of tens of millions of dollars.  As such, a discounted cash flow valuation would be meaningless to demonstrate that the Plan is in the best interests of creditors.

6.      Notwithstanding the meaningful constraints imposed on the Debtors because of the compressed Plan Milestones and the logistical challenges of arranging for due diligence during the pandemic, the Debtors have been able to test the market with respect to their assets. The Debtors have engaged with over eighty prospective asset purchasers – not including those parties whom the Debtors approached who indicated that they were not interested in the assets. The prospective asset purchasers include over a dozen parties interested in purchasing or investing in the Debtors as a going concern.  The parties interested in a going concern transaction include numerous experienced airline operators and airline investors.  Based on the indications of interest and offers received, I believe that any offers to purchase the Debtors' assets and business as a going concern would be unlikely to substantially exceed $36 million, the amount of the DIP Obligations.

7.      I have reviewed the Committee Liquidation Analysis, as defined in the Newman Declaration.  I have identified a number of issues with the Committee Liquidation Analysis and do not agree with Mr. Newman's conclusion that general unsecured creditors would receive greater recoveries in a chapter 7 liquidation than under the Plan.

3

Distributions on Prepetition Secured Creditor Claims

8.      The Committee Liquidation Analysis shows estimates of $39.3 to $53.7 million of net proceeds available for distribution to creditors, but does not provide for any amounts to be used to pay the $68.3 million of secured claims held by the Prepetition Secured Parties in Class 1. It appears that the Committee Liquidation Analysis marshals the proceeds of the liquidation of aircraft to pay the DIP Lenders' claims first, pay costs of asset liquidation, and then satisfy the Chapter 11 Administrative Claims. It also appears that, because the Committee alleges that the real property is unencumbered by the Prepetition Secured Lenders, the Committee Liquidation Analysis marshals the proceeds of the real property (labeled "Other Property and Equipment") – estimated by Mr. Newman to yield gross recoveries of $12 million to $18 million – to pay remaining Chapter 11 Administrative Claims, Class 3 Priority Claims, and provide distributions to Class 4 General Unsecured Claims.

9.      Even if the Committee were correct that the Prepetition Secured Lenders are not entitled to the proceeds of the real property, I disagree with Mr. Newman's conclusion that general unsecured creditors would receive any recoveries in a chapter 7 liquidation because it is based on two significant errors: (a) he did not apply any discount to the net orderly liquidation values of the aircraft and other flight equipment, which is not a reasonable assumption in a chapter 7 scenario, and (b) he relied on a purported valuation summary of real property that has incorrect and outdated information, provides no information about the methodology or assumptions used, and does not reflect current market conditions in Alaska. If those two errors were corrected in the Committee Liquidation Analysis and the remainder of Mr. Newman's calculations and assumptions were accepted, Class 4 General Unsecured Claims would not receive any recoveries in a chapter 7 liquidation under the Committee Liquidation Analysis.

Aircraft and Other Flight Equipment

10. The Committee Liquidation Analysis assumes that a chapter 7 trustee would be able to recover the full orderly liquidation value of the Debtors' aircraft and related assets ($44.9 million gross or $36.1 million net orderly liquidation value) set forth in the desktop valuation report (the "SPI Report") prepared for the Debtors by sage-popovich, inc. ("SPI") would be available in a chapter 7. *See* Committee Liquidation Analysis, p. 6, line (4). I disagree. The SPI Report assumes the orderly liquidation of the aircraft and related assets over a three-year period by SPI, experienced liquidators of aircraft and other flight equipment. The Plan contemplates a process by which the aircraft and related assets will be transferred to a Liquidation Trust, and SPI would maintain, market, and sell the assets. These costs, which include, but are not limited to, insurance to replace the Debtors' current policy that expires on July 11, storage, security, maintenance, and advertising, must be borne before the realization of proceeds from the liquidation of the aircraft. The Plan contemplates that the costs of funding that process will be financed through the Exit Financing.

11. In a chapter 7 liquidation, a chapter 7 trustee would not have Exit Financing available and therefore would not have the funds available to support the three-year orderly liquidation process that will be necessary to realize the values set forth in the SPI Report, and the Committee Liquidation Analysis does not identify a source of funding. For that reason, the Debtors' Liquidation Analysis applied a 40% (on the low end) and 20% (on the high end) discount on recoveries from a forced liquidation of the aircraft and related assets in the event of a chapter 7 liquidation.

Real Property

12. The Committee Liquidation Analysis estimates that proceeds of $12 million to $18 million could be realized from the monetization of the ground leases. *See* Committee Liquidation Analysis, p. 6, line (5). I disagree with this estimate for a number of reasons.

13. First, the Committee Liquidation Analysis purports to rely on a real estate valuation summary from 2015, which is appended to the Committee Liquidation Analysis as Appendix 2 (the "2015 Summary"). The 2015 Summary does not have any of the characteristics of a report that would lead me to believe that it is reliable, and I believe that it is not reasonable to rely on the 2015 Summary for purposes of estimating value or potential recoveries by a chapter 7 trustee. The 2015 Summary does not identify the author and does not provide information about the assumptions used or the methodology for making the valuations. It appears to have been written in 2015 and does not include any updates to account for intervening market conditions in Alaska over the past five years. In particular, it does not account for the substantial drop in oil and gas prices as well as the COVID-19 pandemic, both of which have had significant negative impacts on real property values in Alaska. Moreover, it does not reflect the depreciation of the buildings and other structures from five years of aging. Finally, it is not an accurate list of the real property held by the Debtors at this time.

14. I believe that, in the event of a chapter 7 liquidation, a chapter 7 trustee would not be able to realize anything close to the recoveries estimated in the Committee Liquidation Analysis from the sale of real property. In reaching this conclusion, I relied on the report prepared by Bond Filipenko Commercial Properties, LLC ("Filipenko"), which is attached hereto as **Exhibit B** (the "Filipenko Report"). During the chapter 11 cases, the Debtors retained Filipenko as their real estate advisor. As part of its employment, Filipenko performed a

valuation of the Debtors' real estate assets, which was completed on June 18, 2020. The Filipenko Report describes the source of information relied on by Filipenko, including evaluation of proposals and indications of interest received, information provided by Conway Mackenzie, the State of Alaska, and other sources, and interviews with market participants and stakeholders. The Filipenko Report further provides information about current market conditions in Alaska and their impact on the real property and reflects the current age and condition of the real property.

15. I believe that the Filipenko Report is reliable, based on my review of the Filipenko Report and based on my own personal observations. I personally traveled to Alaska last week and toured several of the Debtors' facilities. My observations were that the costs to maintain the Debtors' facilities – which are scattered throughout the State of Alaska in remote locations – would impose a far more expensive and constant burden on a chapter 7 trustee than I believe a chapter 7 trustee would be willing to bear in the absence of a known buyer for the properties. The annual carrying costs on the properties, without taking into account unexpected maintenance costs, are at least $2 million per year. It is my understanding that even a short-term monetization of real property would require a chapter 7 trustee to hold the property for at least six to nine months. The Committee Liquidation Analysis does not identify a source for funding the carrying costs for the real property during that period.

16. It is my belief that a chapter 7 trustee would not expose him or herself to the risk and expense of maintaining the properties indefinitely, given the potential limited standalone value of the real property. For that reason, the Debtors' Liquidation Analysis as filed did not estimate any recoveries from sales of real property in the event of a chapter 7 liquidation.

17. Since the preparation and filing of the original Debtors' Liquidation Analysis, as a result of the Debtors' bid process, the Debtors received several offers to purchase the real

property with respect to a few of the ground leases.  The purchase prices set forth in these offers total approximately $3 million in the aggregate.  A revised liquidation analysis of the Debtors is attached hereto as **Exhibit C** (the "Debtors' Revised Liquidation Analysis").  The Debtors' Revised Liquidation Analysis reflects $4 to $7 million in recoveries on the ground leases in the event of a chapter 7 liquidation.  Given the fact that the Debtors' chapter 11 cases are highly publicized, I believe any serious potential buyer of airline real estate in Alaska would be aware of the opportunity to bid and would have expressed interest by the bid deadline.  Relying on the information in the Filipenko Report and my personal observations, I conclude that a chapter 7 trustee would not attempt to monetize the ground leases absent a known buyer, but rather would reject any ground leases for which there was not a known buyer at the commencement of the chapter 7 case to avoid the carrying costs.  Therefore, in the event of a chapter 7 liquidation, I do not believe that there would be recoveries in monetizing any ground leases other than the few for which offers or indications of interest have been received.

Preference Actions

18.    The Committee Liquidation Analysis estimates a recovery of $700,000 to $2.5 million for actions relating to the avoidance of preferences during the 90-day period prior to the petition date.  *See* Committee Liquidation Analysis, p. 6, line (7-A).  Neither the Newman Declaration nor the Committee Liquidation Analysis identifies any particular potential preference action.

19.    Conway Mackenzie has not undertaken a detailed analysis of preference actions, but based on its initial review, Conway Mackenzie has not identified any meaningful transfers made during the preference period that may be outside of the ordinary course and subject to avoidance.

20. In addition, Conway Mackenzie performed a review of insider transactions and concluded that transfers to the Debtors' equity sponsors during the five years before the Petition Date were immaterial and did not appear to be avoidable fraudulent conveyances.

Intangible Assets

21. The Committee Liquidation Analysis estimates that $1 to $3 million can be recovered from the transfer of Federal Aviation Administration ("FAA") certificates in the event of a chapter 7 liquidation.

22. It is my understanding that the requirements that the FAA and the United States Department of Transportation will impose on any prospective transferee of a certificate are strenuous, and that it would be difficult and costly for a chapter 7 trustee to monetize the certificates. For example, I understand that the transfer of certificates would require a chapter 7 trustee to maintain the Debtors' informational technology suite, manuals, processes, and employees such as mechanics and pilots, in order to maintain the viability of the certificates.

23. It is my belief that a chapter 7 trustee would not undertake the burden and expense of preserving the certificates for an indefinite period of time while trying to find a buyer. For that reason, the Debtors' Liquidation Analysis does not estimate any recoveries from transfers of FAA certificates in the event of a chapter 7 liquidation.

DIP Budget

24. Finally, Mr. Newman states that the Debtors' DIP Budget "continues to outperform the projections," and cites a $580,000 payroll tax refund from the IRS as an example. Newman Declaration at ¶ 12.f. Mr. Newman is wrong. The $580,000 payroll tax refund was a circular transaction based on an administrative error. The "refund" was received from the IRS because the Debtors had referenced the wrong pay period in their payment of payroll taxes.

Promptly after receiving the $580,000 "refund," the Debtors returned the same amount to the IRS with respect to the corrected pay period.

25.     The Debtors have not "outperformed" the DIP Budget projections. The cash basis variance that Mr. Newman reviewed does not account for the accrual of unpaid administrative costs. It is unclear whether the Debtors will be able to pay accrued administrative expenses, in part because of the unknown amount of accrued professional fees. As such, at this time, the Debtors do not have sufficient funds available to support a sale process that would extend the effective date of the Plan beyond July 9 (14 days after the date of the Confirmation Hearing). However, based on the interest received from bidders, I am confident that the payments required under the Plan can be made and the Liquidation Trust can be funded as set forth under the Plan if a few asset sales can be consummated and the Plan goes effective, on or around July 9.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. Executed in Houston, Texas on June 24, 2020.

*/s/ John T. Young, Jr.*
John T. Young, Jr.