**<u>EXHIBIT A</u>**

**Lot 1 Sale Order**

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| RAVN AIR GROUP, INC., *et al.*,[1] | ) | Case No. 20-10755 (BLS) |
| | ) | |
| Debtors. | ) | (Jointly Administered) |
| | ) | |
| | ) | **Re. Docket Nos. 197 & 295** |

### ORDER APPROVING THE DEBTORS' MOTION FOR THE (A) SALE OF CERTAIN ACQUIRED ASSETS FREE AND CLEAR OF ALL LIENS, CLAIMS, ENCUMBRANCES AND INTERESTS, (B) THE ASSUMPTION AND ASSIGNMENT OF CERTAIN CONTRACTS, AND (C) PAYMENT OF BID PROTECTIONS, IF APPLICABLE, WITH RESPECT TO THE SALE TO WRIGHT AIR SERVICE, INC.

Upon the motion (the "Sale Motion") of the above-captioned debtors and debtors in possession (collectively, the "Debtors") for entry of an order (this "Sale Order") Authorizing and Approving (A) the Sale of Certain Acquired Assets Free and Clear of All Liens, Claims, Encumbrances and Interests, (B) the Assumption and Assignment of Certain Contracts, and (C) Payment of Bid Protections, if Applicable (collectively, the "Transaction"), pursuant to that certain Asset Purchase Agreement (the "APA")[2] attached to this Sale Order as Exhibit 1; and this Court having entered an order on June 3, 2020 [Docket No. 295] (the "Bid Procedures Order") approving, among other things, the proposed form of notice of the Sale Hearing; and the Debtors having determined, that Wright Air Service, Inc. (the "Buyer") has submitted the highest or otherwise best bid for those certain Acquired Assets, as defined in the APA (including, without

---

[1]    The Debtors in these chapter 11 cases and the last four digits of each Debtor's U.S. tax identification number are as follows: Ravn Air Group, Inc. (3047), Ravn Air Group Holdings, LLC (5356), JJM, Inc. (4858), HoTH, Inc. (9957), Peninsula Aviation Services, Inc. (6859), Corvus Airlines, Inc. (7666), Frontier Flying Service, Inc. (8091), and Hageland Aviation Services, Inc. (2754). The notice address for all of the Debtors is 4700 Old International Airport Road, Anchorage, AK 99502.

[2]    Capitalized terms used but not otherwise defined herein have the meanings ascribed to them in the Sale Motion, the APA, or the Bid Procedures Order, as applicable.

limitation, those assets set forth on Exhibit A to the APA); and upon adequate and sufficient notice of the Sale Motion and all other related transactions contemplated thereunder and in this Sale Order; and all interested parties having been afforded an opportunity to be heard with respect to the Sale Motion and all relief related thereto; and the Court having reviewed and considered the Sale Motion and all relief related thereto and any objections thereto; and upon the full record in support of the relief requested by the Debtors in the Sale Motion; and this Court having jurisdiction over this matter; and this Court having determined that it may enter a final order consistent with Article III of the United States Constitution; and this Court having found that venue of this proceeding and the Sale Motion in this district is proper; and it further appearing that the legal and factual bases set forth in the Sale Motion and at the Sale Hearing establish just cause for the relief granted herein; and it appearing that the relief requested in the Sale Motion is in the best interests of the Debtors, their estates, their creditors, and all other parties in interest; and upon the full record of these chapter 11 cases and all other pleadings and proceedings, including the Sale Motion; and after due deliberation thereon, and good and sufficient cause appearing therefor,

**THE COURT HEREBY FINDS THAT:**[3]

**I.      Jurisdiction, Final Order, and Statutory Predicates.**

A.      This Court has jurisdiction to hear and determine the Sale Motion pursuant to 28 U.S.C. §§ 157(b)(l) and 1334(a). Venue is proper in this District and before this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

B.      The statutory predicates for the relief requested in the Sale Motion are sections 105(a), 363, and 365 of the Bankruptcy Code and Bankruptcy Rules 2002(a)(2), 6004, 6006, 9007, and 9014.

---

[3]      All findings of fact and conclusions of law announced by the Court at the Hearing in relation to the Sale Motion are hereby incorporated herein to the extent not inconsistent herewith.

C.      This Sale Order constitutes a final order within the meaning of 28 U.S.C. § 158(a). Notwithstanding Bankruptcy Rules 6004(h) and 6006(d), and to any extent necessary under Bankruptcy Rule 9014 and Rule 54(b) of the Federal Rules of Civil Procedure, as made applicable by Bankruptcy Rule 7054, the Court expressly finds that there is no just reason for delay in the implementation of this Sale Order, waives any stay, and expressly directs entry of judgment as set forth herein.

## II.      Notice of the Sale Motion and Cure Amounts.

D.      Notice of the Sale Hearing was timely, proper, and reasonably calculated to provide interested parties with timely and proper notice of the sale and the Sale Hearing, and no other or further notice of the Sale Motion and the Sale Hearing is, or shall be, required. The requirements of Bankruptcy Rule 6004(a) and the Local Rules are satisfied by such notice.

E.      A reasonable opportunity to object and be heard with respect to the Transaction and the Sale Motion and the relief requested therein has been afforded to all interested persons and entities.

## III.      Good Faith of the Buyer.

F.      The APA was negotiated, proposed, and entered into by the Debtors and the Buyer without collusion, in good faith, and from arms'-length bargaining positions.

G.      Neither the Debtors, nor the Buyer have engaged in any conduct that would cause or permit the Transaction to be avoided under Bankruptcy Code section 363(n). The Buyer is consummating the Transaction in "good faith" within the meaning of section 363(m) of the Bankruptcy Code and is not an "insider" of any Debtor (as defined under section 101(31) of the Bankruptcy Code). Buyer has proceeded in good faith in all respects in connection with the Transaction. Buyer is therefore entitled to all of the protections afforded under section 363(m) of the Bankruptcy Code.

H.     On June 26, 2020, this Court entered its order confirming the Second Amended Chapter 11 Plan of Liquidation of RAVN Air Group, Inc. and its Affiliated Debtors (the "Plan"). The Transaction does not constitute a *sub rosa* chapter 11 plan. The Transaction neither impermissibly restructures the rights of the Debtors' creditors nor impermissibly dictates a chapter 11 plan for any of the Debtors.

## IV.     Highest or Otherwise Best Offer.

I.     The Debtors' marketing process with respect to the Acquired Assets afforded a full, fair, and reasonable opportunity for any person or entity to make a higher or otherwise better offer to purchase the Acquired Assets under the circumstances, as approved in the Bid Procedures Order. The APA constitutes the highest or otherwise best offer for the Acquired Assets, and the Debtors' determination that the APA constitutes the highest or otherwise best offer for the Acquired Assets constitutes a valid and sound exercise of the Debtors' business judgment.

J.     Approval of the Sale Motion and the APA and the consummation of the Transaction is in the best interests of the Debtors' chapter 11 estates, their creditors, and other parties in interest. The Transaction should be approved.

## V.     No Merger.

K.     The Buyer is not a mere continuation of the Debtors or their estates, or any of them, and there is no continuity of enterprise between the Buyer and the Debtors, or any of them. The Buyer is not holding itself out to the public as a continuation of the Debtors. The Buyer is not a successor to the Debtors or their estates by reason of any theory of law or equity, and the Transaction does not amount to a consolidation, merger, or de facto merger of the Buyer and the Debtors, or any of them.

## VI.    Validity of Transfer.

L.    The APA was not entered into for the purpose of hindering, delaying, or defrauding creditors under the Bankruptcy Code or under the laws of the United States, any state, territory, possession, or the District of Columbia. None of the Debtors or the Buyer are entering into the transactions contemplated by the APA fraudulently for the purpose of statutory or common law fraudulent conveyance or fraudulent or voidable transfer claims.

M.    The Debtors are the sole and lawful owners of the Acquired Assets. The Acquired Assets constitute property of the Debtors' estates and title thereto is vested in the Debtors' estates within the meaning of section 541(a) of the Bankruptcy Code. Except as otherwise provided in paragraphs 16, 25, 36 and 37 of this Sale Order, subject to section 363(f) of the Bankruptcy Code, the transfer of each of the Acquired Assets to the Buyer will be, as of the Closing Date, a legal, valid, and effective transfer of the Acquired Assets, which transfer vests or will vest the Buyer with all right, title, and interest of the Debtors to the Acquired Assets free and clear of (a) all liens (including any liens as that term is defined in section 101(37) of the Bankruptcy Code) and encumbrances relating to, accruing, or arising at any time prior to the Closing Date (collectively, the "Liens") and (b) all debts arising under, relating to, or in connection with any act of the Debtors or claims (as that term is defined in section 101(5) of the Bankruptcy Code), liabilities, obligations, demands, guaranties, options in favor of third parties, rights, contractual commitments, restrictions, interests, mortgages, hypothecations, charges, indentures, loan agreement, instruments, collective bargaining agreement, leases, licenses, deeds of trust, security interests, conditional sale or other title retention agreements, pledges, judgments, claims for reimbursement, contribution, indemnity, exoneration, infringement, products liability, alter-ego, and matters of any kind and nature, whether arising prior to or subsequent to the commencement of these cases, and whether imposed by agreement, understanding, law, equity, or otherwise (including, without

limitation, rights with respect to Claims (as defined below) and Liens (A) that purport to give to any party a right of setoff or recoupment against, or a right or option to effect any forfeiture, modification, profit sharing interest, right of first refusal, purchase or repurchase right or option, or termination of, any of the Debtors' or the Buyer's interests in the Acquired Assets, or any similar rights, or (B) in respect of taxes, restrictions, rights of first refusal, charges of interests of any kind or nature, if any, including, without limitation, any restriction of use, voting, transfer, receipt of income or other exercise of any attributes of ownership) (collectively, as defined in this clause (b), "Claims"), relating to, accruing or arising any time prior to entry of this Sale Order, with the exception of any such Liens or Claims that are expressly assumed by the Buyer or otherwise permitted under the APA (the "Permitted Obligations"), including, for the avoidance of doubt, Cure Costs or any other obligations arising under the Assumed Contracts to the extent expressly set forth in the APA.

N.      Subject to the entry of this Sale Order, each Debtor: (i) has full requisite corporate or other organizational power and authority to execute, deliver, and perform its obligations under the APA and all other documents contemplated thereby and (ii) has taken all requisite corporate or other organizational action and formalities necessary to authorize and approve the execution, delivery, and performance of its obligations under the APA and to consummate the Transaction, including as required by their respective organizational documents, and, upon execution thereof, the APA and the related documents were or will be duly and validly executed and delivered by such Debtor and enforceable against such Debtor in accordance with their terms and, assuming due authorization, execution, and delivery thereof by the other parties thereto, constituted or will constitute a valid and binding obligation of such Debtor. No government, regulatory, or other consents or approvals, other than those expressly provided for in the APA, were required for the

execution, delivery, and performance by the Debtors of the APA or the consummation of the Transaction contemplated thereby. No consents or approvals of the Debtors, other than those expressly provided for in the APA or this Sale Order, are required for the Debtors to consummate the Transaction.

## VII.    Transfer of the Acquired Assets Free and Clear.

O.      The conditions of section 363(f) of the Bankruptcy Code have been satisfied in full; therefore, the Debtors may sell the Acquired Assets free and clear of any interest in the property other than the Permitted Obligations or as otherwise set forth in this Sale Order.

P.      The Buyer would not have entered into the APA and would not consummate the Transaction contemplated thereby if the sale and/or transfer of the Acquired Assets to the Buyer was not free and clear of all Liens and Claims, other than Permitted Obligations with respect to the Acquired Assets, or if the Buyer would, or in the future could, be liable for any of such Liens and Claims (other than the Permitted Obligations).

Q.      The Debtors may sell the Acquired Assets free and clear of all Liens and Claims against the Debtors, their estates, or any of the Acquired Assets (except the Permitted Obligations) because, in each case, one or more of the standards set forth in section 363(f)(l)-(5) of the Bankruptcy Code has been satisfied. Those holders of Liens or Claims against the Debtors, their estates, or any of the Acquired Assets who did not object, or who withdrew their objections, to the Transaction or the Sale Motion are deemed to have consented pursuant to section 363(f)(2) of the Bankruptcy Code. All other holders of Liens or Claims (except to the extent that such Liens or Claims are Permitted Obligations) are adequately protected by having their Liens or Claims, if any, in each instance against the Debtors, their estates, or any of the Acquired Assets, attach to the net cash proceeds of the Purchase Price ultimately attributable to the Acquired Assets in which such creditor alleges a Lien or Claim, in the same order of priority, with the same validity, force,

and effect that such Liens or Claims had prior to the Transaction, subject to any claims and defenses that the Debtors and their estates may possess with respect thereto.

R.    The Transaction is deemed a sale under the Plan entitled to all of the protections associated with a sale under a plan, including without limitation the protections afforded to recipients of the Debtors' assets pursuant to sections 363 and 1123(a)(5) of the Bankruptcy Code, under the Plan, and exemption from certain taxes pursuant to Bankruptcy Code section 1146.

**VIII.   Cure Costs and Adequate Assurance of Future Performance.**

S.    The assumption and assignment to the Buyer of the Assumed Contracts listed in the APA (as further defined in the APA, the "Assumed Contracts") pursuant to the terms of this Sale Order is integral to the APA and is in the best interests of the Debtors and their estates, their creditors, and all other parties in interest, and represents the reasonable exercise of sound and prudent business judgment by the Debtors. Subject to the terms and conditions of the APA, the Buyer shall cure, or provide adequate assurance of cure, of any default existing prior to the date hereof with respect to the Assumed Contracts, within the meaning of sections 365(b)(1)(A) and 365(f)(2)(A) of the Bankruptcy Code. The Buyer's promise to pay the Cure Costs shall constitute adequate assurance of future performance within the meaning of sections 365(b)(1)(C) and 365(f)(2)(B) of the Bankruptcy Code.

**IX.    Compelling Circumstances for an Immediate Sale.**

T.    Good and sufficient reasons for approval of the APA and the Transaction have been articulated. The relief requested in the Sale Motion is in the best interests of the Debtors, their estates, their creditors, and other parties in interest. The Debtors have demonstrated both (a) good, sufficient, and sound business purposes and justifications for approving the APA and (b) compelling circumstances for the Transaction outside the ordinary course of business, pursuant to section 363(b) of the Bankruptcy Code, and outside of a plan of reorganization, in that, among

other things, the immediate consummation of the Transaction with the Buyer is necessary and appropriate to maximize the value of the Debtors' estates and the Transaction will provide the means for the Debtors to maximize distributions to creditors.

**NOW, THEREFORE, IT IS HEREBY ORDERED, ADJUDGED, AND DECREED THAT:**

**I.    General Provisions.**

1.    The findings and conclusions set forth herein constitute the Court's findings of fact and conclusions of law pursuant to Bankruptcy Rule 7052, made applicable to these chapter 11 cases pursuant to Bankruptcy Rule 9014. To the extent that any of the following findings of fact constitute conclusions of law, they are adopted as such. To the extent any of the following conclusions of law constitute findings of fact, they are adopted as such.

2.    The relief requested in the Sale Motion and the Transaction contemplated thereby and by the APA are approved as set forth in this Sale Order and on the record of the Sale Hearing, which is incorporated herein as if set forth fully in this Sale Order, and the Transaction contemplated thereby is approved.

3.    All objections to the Sale Motion, the Transaction, or the relief requested therein that have not been withdrawn, waived, or settled as announced to the Court at the Sale Hearing or by stipulation filed with the Court, and all reservations of rights included in such objections or otherwise, are hereby denied and overruled on the merits with prejudice. Those parties who did not object or withdrew their objections to the Sale Motion are deemed to have consented pursuant to section 363(f)(2) of the Bankruptcy Code.

II.     **Approval of the APA.**

4.      The APA and all other ancillary documents, and all of the terms and conditions thereof, are hereby approved, pursuant to sections 105, 363, 364, and 554 of the Bankruptcy Code and Bankruptcy Rules 2002, 4001, 6004, and 9014, each as applicable.

5.      Pursuant to sections 363(b) and (f) of the Bankruptcy Code, the Debtors are authorized and empowered to take any and all actions necessary or appropriate to (a) consummate the Transaction pursuant to and in accordance with the terms and conditions of the APA, (b) close the Transaction as contemplated in the APA and this Sale Order, and (c) execute and deliver, perform under, consummate, implement, and fully close the APA, including the assumption and assignment to the Buyer of the Assumed Contracts, together with all additional instruments and documents that may be reasonably necessary or desirable to implement the APA and the Transaction.

6.      Subject to the restrictions set forth in this Sale Order and the APA, the Debtors and the Buyer are authorized to take any and all actions as may be necessary or desirable to implement the Transaction, and any actions taken by the Debtors or the Buyer necessary or desirable to implement the Transaction prior to the date of this Sale Order, hereby are approved and ratified.

7.      This Sale Order and the terms and provisions of the APA shall be binding in all respects upon the Debtors, their affiliates, their estates, all creditors of and holders of equity interests in any Debtor, any holders of Liens, Claims, or other interests (whether known or unknown) in, against, or on all or any portion of the Acquired Assets, all counterparties to any executory contract or unexpired lease of the Debtors, the Buyer and all successors and assigns of the Buyer, the Acquired Assets, and any trustees, examiners, or receivers, if any, subsequently appointed in any of the Debtors' chapter 11 cases or upon a conversion to chapter 7 under the Bankruptcy Code of any of the Debtors' cases. The APA shall not be subject to rejection or

avoidance by the Debtors, their estates, their creditors, their equity holders, or any trustees, examiners, or receivers. Any trustee appointed in these cases (including a Chapter 7 trustee) shall be and hereby is authorized to operate the business of the Debtors to the fullest extent necessary to permit compliance with the terms of this Sale Order. This Sale Order and the APA shall inure to the benefit of the Debtors, their estates and creditors, the Buyer, and the respective successors and assigns of each of the foregoing.

**III.    Transfer of the Acquired Assets.**

8.    Except as otherwise provided in paragraphs 16, 25, 36 and 37 of this Sale Order, pursuant to sections 105(a), 363(b), 363(f), 365(b), and 365(f) of the Bankruptcy Code, the Debtors are authorized to transfer the Acquired Assets to the Buyer and in accordance with the terms of the APA and such transfer shall constitute a legal, valid, binding, and effective sale and shall vest the Buyer with title to the Acquired Assets, and, other than the Permitted Obligations, the Acquired Assets shall be free and clear of all Liens, Claims, and other interests of any kind or nature whatsoever, with all such Liens, Claims, or other interests to attach to the cash proceeds of the Purchase Price ultimately attributable to the property against or in which such Liens, Claims, or other interests are asserted, subject to the terms thereof, with the same validity, force, and effect, and in the same order of priority, which such Liens, Claims, or other interests had prior to the Transaction, subject to any rights, claims, and defenses the Debtors or their estates, as applicable, may possess with respect thereto.

9.    The Debtors are hereby authorized to take any and all actions necessary to consummate the APA, including any actions that otherwise would require further approval by shareholders, members, or its board of directors, as the case may be, without the need of obtaining such approvals.

10.     The sale of the Acquired Assets to the Buyer pursuant to the APA and the consummation of the transactions contemplated by the APA do not require any consents other than as specifically provided for in the APA or this Sale Order. Each and every federal, state, and local governmental agency or department is hereby authorized to accept any and all documents and instruments necessary and appropriate to consummate the transactions contemplated by the APA. A certified copy of this Sale Order may be filed with the appropriate clerk or recorded with the recorder of any state, county, or local authority to act to cancel any of the Liens, Claims, and other encumbrances of record except those assumed as Permitted Obligations.

11.     The provisions of Rule 70 of the Federal Rules of Civil Procedure, made applicable to these Cases by Bankruptcy Rule 7070, are specifically made applicable to Icecap, LLC and the Frontier Alaska Aviation Trust. JJM, Inc. is authorized to direct Icecap, LLC, as trustee for the Frontier Alaska Aviation Trust, to execute all documents and take all actions, including the delivery of assets, necessary to implement and/or consummate the APA and this Sale Order. JJM, Inc. is authorized to execute all such documents and take all such actions on behalf of Icecap, LLC and the Frontier Alaska Aviation Trust, and such documents and actions will have the same effect as if executed or performed by Icecap, LLC or the Frontier Alaska Aviation Trust, as applicable.

12.     If any person or entity that has filed statements or other documents or agreement evidencing Claims or Liens on, or interests in, all or any portion of the Acquired Assets (other than statements or documents with respect to Permitted Obligations) shall not have delivered to the Debtors, in proper form for filing and executed by the appropriate parties, termination statements, instruments of satisfaction, releases of liens and easements, and any other documents necessary for the purpose of documenting the release of all Claims, Liens, or interests which the person or entity has or may assert with respect to all or any portion of the Acquired Assets, the Debtors are

hereby authorized, and the Buyer is hereby authorized, on behalf of the Debtors and the Debtors' creditors, to execute and file such statements, instruments, releases and other documents on behalf of such person or entity with respect to the Acquired Assets. The Debtors and the Buyer are each authorized to file a copy of this Sale Order, which, upon filing, shall be conclusive evidence of the release and termination of such Claim, Lien, or interest.

13.     This Sale Order is and shall be binding upon and govern the acts of all persons and entities, including, without limitation, all filings, filing officers, title agents, title companies, recorders of mortgages, recorders of deeds, registrars of deeds, administrative agencies, governmental departments, secretaries of state, federal, state, and local officials, and all other persons and entities who may be required by operation of law, the duties of their office, or contract, to accept, file, register, or otherwise record or release any documents or instruments, or who may be required to report or insure any title or state of title in or to any lease; and each of the foregoing persons and entities is hereby directed to accept for filing any and all of the documents and instruments necessary and appropriate to consummate the transactions contemplated by the APA.

14.     Except as otherwise provided in paragraphs 16, 25, 36 and 37 of this Sale Order, all persons and entities that are presently, or on the Closing may be, in possession of some or all of the Acquired Assets to be sold, transferred, or conveyed to the Buyer pursuant to the APA are hereby directed to surrender possession of the Acquired Assets to the Buyer on the Closing Date. Subject to the terms, conditions, and provisions of this Sale Order, all persons and entities are hereby forever prohibited and enjoined from taking any action that would adversely affect or interfere with the ability of the Debtors to sell and/or transfer the Acquired Assets to the Buyer in accordance with the terms of the APA and this Sale Order.

15.     Except as otherwise provided in paragraphs 16, 25, 36 and 37 of this Sale Order, to the maximum extent permitted by applicable law, and in accordance with the APA, the Buyer shall be authorized, as of the Closing, to operate under any license, permit, registration, and governmental authorization or approval (collectively, the "Licenses") of the Debtors with respect to the Acquired Assets and the Sale. To the extent the Buyer cannot operate under any Licenses in accordance with the previous sentence, such Licenses shall be in effect while the Buyer, with assistance from the Debtors, works promptly and diligently to apply for and secure all necessary government approvals for new issuance of Licenses to the Buyer.

16.     Notwithstanding anything in this Sale Order, subject to section 525(a) of the Bankruptcy Code, no governmental unit may revoke or suspend any right, license, trademark, or other permission relating to the use of the Acquired Assets sold, transferred, or conveyed to the Buyer on account of the filing or pendency of these Chapter 11 Cases; provided, however, that notwithstanding anything in this Sale Order to the contrary, unless otherwise approved or determined by the FAA, the Debtor's FAA Operating Certificates are non-transferable. The FAA may issue a new operating certificate to the Buyer only after the FAA has evaluated the Buyer and determined that it is properly and adequately equipped and able to conduct safe operations in accordance with applicable federal law. The DOT Certificate cannot be transferred without the prior approval of the Department of Transportation.

## IV.     Assumption and Assignment of Assumed Contracts.

17.     The Debtors are hereby authorized and directed in accordance with sections 105(a), 363, and 365 of the Bankruptcy Code to (a) assume and assign to the Buyer, in accordance with the terms of the APA, the Assumed Contracts free and clear of all Liens, Claims, and other interests of any kind or nature whatsoever (other than the Permitted Obligations), and (b) execute and

deliver to the Buyer such documents or other instruments as the Buyer deems may be necessary to assign and transfer the Assumed Contracts to the Buyer.

18.     Except as otherwise provided in paragraphs 16, 25, 36 and 37 of this Sale Order, with respect to the Assumed Contracts: (a) the Debtors may assume each of the Assumed Contracts in accordance with section 365 of the Bankruptcy Code; (b) the Debtors may assign each Assumed Contract in accordance with sections 363 and 365 of the Bankruptcy Code, and any provisions in any Assumed Contract that prohibit or condition the assignment of such Assumed Contract or allow the party to such Assumed Contract to terminate, recapture, impose any penalty, condition renewal or extension, or modify any term or condition upon the assignment of such Contract, constitute unenforceable anti-assignment provisions which are void and of no force and effect; (c) all other requirements and conditions under sections 363 and 365 of the Bankruptcy Code for the assumption by the Debtors and assignment to the Buyer of each Assumed Contract have been satisfied; and (d) the Assumed Contracts shall be transferred and assigned to, and following the closing of the Transaction remain in full force and effect for the benefit of, the Buyer, notwithstanding any provision in any such Assumed Contract (including those of the type described in sections 365(b)(2) and (f) of the Bankruptcy Code) that prohibits, restricts, or conditions such assignment or transfer.

19.     All defaults or other obligations of the Debtors under the Assumed Contracts arising or accruing prior to the closing of the Transaction, or required to be paid pursuant to section 365 of the Bankruptcy Code in connection with the assumption and assignment of the Assumed Contracts, shall be cured by the Buyer in the amount as set forth in, and pursuant to the terms of, the APA.

20.     Upon the Closing, in accordance with sections 363 and 365 of the Bankruptcy Code, the Buyer shall be fully and irrevocably vested in all right, title, and interest of each Assumed Contract. To the extent provided in the APA, the Debtors shall cooperate with, and take all actions reasonably requested by, the Buyer to effectuate the foregoing.

21.     Except as otherwise provided in paragraphs 16, 25, 36 and 37 of this Sale Order, each Assumed Contract counterparty is deemed to have consented to assumption and assignment, and the Buyer shall be deemed to have demonstrated adequate assurance of future performance with respect to such Assumed Contract pursuant to sections 365(b)(1)(C) and 365(f)(2)(B) of the Bankruptcy Code.

22.     Upon the Debtors' assignment of the Assumed Contracts to the Buyer under the provisions of this Sale Order, any additional orders of this Court, and the Buyer's payment of any Cure Costs pursuant to the terms of the APA, no default shall exist under any Assumed Contract, and no counterparty to any Assumed Contract shall be permitted (a) to declare a default by the Buyer under such Assumed Contract or (b) to otherwise take action against the Buyer as a result of any Debtors' financial condition, bankruptcy, or failure to perform any of its obligations under the relevant Assumed Contract. Each non-Debtor party to an Assumed Contract hereby is also forever barred, estopped, and permanently enjoined from (i) asserting against the Debtors or the Buyer, or the property of any of them, any default or Claim arising out of any indemnity obligation or warranties for acts or occurrences arising prior to or existing as of the closing of the Transaction, or, against the Buyer, any counterclaim, defense, setoff, or any other Claim asserted or assertable against the Debtors and (ii) imposing or charging against the Buyer or its affiliates any rent accelerations, assignment fees, increases, or any other fees as a result of the Debtors' assumption and assignments to the Buyer of the Assumed Contracts.

23.     The Buyer shall be deemed to be substituted for the Debtors as a party to the applicable Assumed Contracts.

24.     All counterparties to the Assumed Contracts shall cooperate and expeditiously execute and deliver, upon the reasonable requests of the Buyer, and shall not charge the Debtors or the Buyer for any instruments, applications, consents, or other documents that may be required or requested by any public authority or other party or entity to effectuate the applicable transfers in connection with the sale of the Acquired Assets.

25.     For the avoidance of doubt, the assumption and assignment and transfer of any contract or lease with the United States and/or the provision of essential air service shall require the consent of the United States.

**V.     Prohibition of Actions Against the Buyer.**

26.     Except for the Permitted Obligations in the case of the Acquired Assets, or as otherwise expressly provided for in this Sale Order or the APA, the Buyer shall not have any liability or other obligation of the Debtors arising under or related to any of the Acquired Assets. Without limiting the generality of the foregoing, and except as otherwise specifically provided herein or in the APA, the Buyer shall not be liable for any Claims or Liens against the Debtors or any of their predecessors or affiliates, and the Buyer shall have no successor or vicarious liabilities of any kind or character, including, but not limited to, under any theory of antitrust, environmental, successor, or transferee liability, labor law, *de facto* merger, mere continuation, or substantial continuity, whether known or unknown, now existing or hereafter arising, whether fixed or contingent, whether asserted or unasserted, whether legal or equitable, whether liquidated or unliquidated, including, but not limited to, liabilities on account of warranties, intercompany loans, and receivables among the Debtors, and any taxes arising, accruing, or payable under, out of, in

connection with, or in any way relating to the operation of any of the Acquired Assets except as expressly assumed under the APA.

27.      Pursuant to Bankruptcy Code section 1146(a), any transfer of the Acquired Assets to the Buyer or made in connection with the Transaction shall not be subject to any document recording tax, stamp tax, conveyance fee, intangibles or similar tax, mortgage tax, stamp act, real estate transfer tax, mortgage recording tax, Uniform Commercial Code filing or recording fee, regulatory filing or recording fee, or other similar tax or governmental assessment to the fullest extent contemplated by Bankruptcy Code section 1146(a). The appropriate state or local governmental officials or agents shall forgo the collection of any such tax or governmental assessment and shall accept for filing and recordation any of the foregoing instruments or other documents without the payment of any such tax or governmental assessment.

28.      Except with respect to Permitted Obligations, or as otherwise permitted by the APA or this Sale Order, all persons and entities, including, but not limited to, all debt security holders, equity security holders, governmental, tax and regulatory authorities, lenders, trade creditors, litigation claimants, and other creditors, holding Liens, Claims, or other interests of any kind or nature whatsoever against or in all or any portion of the Acquired Assets (whether legal or equitable, secured or unsecured, matured or unmatured, contingent or non-contingent, liquidated or unliquidated, senior or subordinate), arising under or out of, in connection with, or in any way relating to the Debtors, the Acquired Assets, the operation of the Debtors' business prior to the closing of the Transaction, or the transfer of the Acquired Assets to the Buyer, hereby are forever barred, estopped, and permanently enjoined from asserting against the Buyer, any of the foregoing's affiliates, successors, or assigns, their property or the Acquired Assets, such persons' or entities' Liens, Claims, or interests in and to the Acquired Assets, including, without limitation,

the following actions:  (a) commencing or continuing in any manner any action or other proceeding against the Purchase and each of its affiliates, successors, Acquired Assets or properties; (b) enforcing, attaching, collecting, or recovering in any manner any judgment, award, decree, or order against the Buyer, and each of its affiliates, successors, Acquired Assets, or properties; (c) creating, perfecting, or enforcing any Lien or other Claim against the Buyer, and each of its affiliates, successors, Acquired Assets, or properties; (d) asserting any setoff, right of subrogation, or recoupment of any kind against any obligation due the Buyer, its affiliates or its successors; (e) commencing or continuing any action, in any manner or place, that does not comply or is inconsistent with the provisions of this Sale Order or other orders of the Court, or the APA or actions contemplated or taken in respect thereof; or (f) revoking, terminating, or failing or refusing to transfer or renew any license, permit, or authorization to operate any of the Acquired Assets or conduct any of the businesses operated with the Acquired Assets.

29.    Except as otherwise provided in paragraphs 16, 25, 36 and 37 of this Sale Order, all persons and entities are hereby forever prohibited and enjoined from taking any action that would adversely affect or interfere with the ability of the Debtors to sell and transfer the Acquired Assets to the Buyer in accordance with the terms of the APA or this Sale Order.

30.    Except as provided in the APA and this Sale Order and without limiting other applicable provisions of this Sale Order, the Buyer is not, by virtue of the consummation of the Transaction, assuming, nor shall it be liable or responsible for, as a successor or otherwise (including with respect to successor or vicarious liabilities of any kind or character), under any theory of law or equity, including any theory of antitrust, environmental successor or transferee liability, labor law, de facto merger, or substantial continuity, whether known or unknown, now existing or hereafter raised, which may be asserted or unasserted, fixed or contingent, liquidated

or unliquidated with respect to the Debtors, or any of their predecessors or affiliates or any obligations of the Debtors or their predecessors or affiliates, for any liabilities, debts, commitments, or obligations (whether known or unknown, disclosed or undisclosed, absolute, contingent, inchoate, fixed or otherwise) in any way whatsoever relating to or arising from the Acquired Assets or the Debtors' operation of their businesses or use of the Acquired Assets or any such liabilities, debts, commitments, or obligations that in any way whatsoever are to be observed, paid, discharged, or performed (in each case, including any liabilities that result from, relate to or arise out of tort or product liability claims), or any liabilities calculable by reference to the Debtors or their Acquired Assets or operations (including by reference to the Debtors' experience or similar ratings), or relating to continuing conditions existing, including with respect to any of Debtors' predecessors or affiliates, which liabilities, debts, commitments, and obligations are hereby extinguished insofar as they may give rise to successor liability, without regard to whether the claimant asserting any such liabilities, debts, commitments, or obligations has delivered to the Buyer a release thereof. The Buyer has each given substantial consideration under the APA for the benefit of the holders of any Liens or Claims. The consideration given by the Buyer shall constitute valid and valuable consideration for the releases of any potential claims of successor liability of the Buyer, which releases shall be deemed to have been given in favor of the Buyer by all holders of Liens or Claims against or interests in the Debtors or any of the Acquired Assets.

## VI.    Other Provisions.

31.    The consideration provided by the Buyer to the Debtors pursuant to the APA for the Acquired Assets constitutes reasonably equivalent value and fair consideration under the Bankruptcy Code, Uniform Fraudulent Transfer Act, Uniform Fraudulent Conveyance Act, Uniform Voidable Transactions Act, and under the laws of the United States, any state, territory, possession, or the District of Columbia.

32.     The transactions contemplated by the APA are undertaken by the Buyer without collusion and in good faith, as that term is defined in section 363(m) of the Bankruptcy Code, and, accordingly, the reversal or modification on appeal of the authorization provided herein to consummate the Transaction shall not affect the validity of the Transaction, or the assumption and assignment of the Assumed Contracts, unless such authorization and such Transaction are duly stayed pending such appeal. The Buyer is a good faith buyer within the meaning of section 363(m) of the Bankruptcy Code and, as such, are each entitled to the full protections of section 363(m) of the Bankruptcy Code.

33.     For cause shown, pursuant to Bankruptcy Rules 6004(h) and 7062(g), this Sale Order shall not be stayed, shall be effective immediately upon entry, and the Debtors and the Buyer are authorized to close the Transaction immediately upon entry of this Sale Order.

34.     The failure to specifically include any particular provision of the APA in this Sale Order shall not diminish or impair the effectiveness of such provision, it being the intent of the Court that the APA be authorized and approved in its entirety; provided that this Sale Order shall govern if there is any inconsistency between the APA (including all ancillary documents executed in connection therewith) and this Sale Order.

35.     The APA and any related documents or other instruments may be modified, amended, or supplemented by the parties thereto and in accordance with the terms thereof, without further order of the Court.

36.     Nothing in this Sale Order or the APA releases, nullifies, precludes or enjoins the enforcement of any police or regulatory liability to a governmental unit that any entity would be subject to as the post-sale owner or operator of property after the date of entry of this Sale Order. Nothing in this Sale Order or the APA authorizes the transfer or assignment of any governmental

(a) license, (b) permit, (c) registration, (d) authorization, or (e) approval, or the discontinuation of any obligation thereunder, without compliance with all applicable legal requirements and approvals under police or regulatory law. Nothing in this Sale Order divests any tribunal of any jurisdiction it may have under police or regulatory law to interpret this Sale Order or to adjudicate any defense asserted under this Order. Nothing in this Sale Order shall enjoin, release, impair or otherwise preclude the United States from pursuing any criminal action or any police or regulatory action or from pursuing any liability to the United States that is not a "claim" within the meaning of section 101(5) of the Bankruptcy Code.

37.    Nothing in this Sale Order shall enjoin, release, impair or otherwise preclude the United States from exercising any valid and otherwise enforceable right of setoff or recoupment subsequent to the Petition Date, and such rights are preserved.

38.    For the avoidance of doubt, to the extent that Saab Defense and Security USA LLC n/k/a Saab, Inc. has any setoff or recoupment rights in existence as of the Petition Date that are valid and not avoidable, nothing in this Sale Order or in any documents, agreements or orders associated with or entered into in connection with the Sale Order or sale shall impair such rights, and nothing in this Sale Order or in any of the documents set forth in this paragraph shall impair any setoff or recoupment rights that are valid and not avoidable in existence subsequent to the Petition Date, and the Debtors, their estates and the Liquidation Trust as a successor in interest to the Debtors reserve all of their rights with respect to any prepetition or post-petition setoff and recoupment.

39.    Except as otherwise provided in paragraphs 16, 25, 36 and 37 of this Sale Order, the Court shall retain exclusive jurisdiction to, among other things, interpret, implement, and enforce the terms and provisions of this Sale Order and the APA, all amendments thereto, and any

waivers and consents thereunder and each of the agreements executed in connection therewith to which any Debtor is a party or which has been assigned by the Debtors to the Buyer, and to adjudicate, if necessary, any and all disputes concerning or relating in any way to the Transaction, including, but not limited to, retaining jurisdiction to: (a) compel delivery of the Acquired Assets to the Buyer; (b) interpret, implement, and enforce the provisions of this Sale Order; (c) protect the Buyer against any Liens, Claims, or other interest in or against the Debtors or the Acquired Assets of any kind or nature whatsoever; and (d) enter any orders under sections 363 and 365 of the Bankruptcy Code with respect to the Assumed Contracts.

40.    To the extent that this Sale Order is inconsistent with any prior order or pleading with respect to the Sale Motion in these chapter 11 cases, the terms of this Sale Order shall govern.

## EXHIBIT 1

**The APA**

Execution Version

## ASSET PURCHASE AGREEMENT

THIS ASSET PURCHASE AGREEMENT (this "Agreement"), dated as of July 1, 2020 (the "Signing Date"), is entered into by and among Wright Air Service, Inc., an Alaska corporation or its Affiliates (collectively, "Buyer"), and Ravn Air Group, Inc. ("RAG"), JJM, Inc. ("JJM"), Frontier Flying Service, Inc. ("FFS"), Corvus Airlines, Inc. ("Corvus"), and Hageland Aviation Services, Inc. ("HAS" and together with RAG, JJM, FFS and Corvus, "Seller" and, together with Buyer, the "Parties" and each of Buyer and Seller a "Party").

## RECITALS

Seller provides air transportation and logistics services to the passenger, mail, charter and freight markets in Alaska (the "Business").

On April 5, 2020 (the "Petition Date"), RAG, Ravn Air Group Holdings, LLC ("RAG Holdings"), JJM, HoTH, Inc. ("HoTH"), Peninsula Aviation Services, Inc. ("PAS"), Corvus, FFS and HAS each filed a voluntary petition for relief pursuant to chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101-1532 (the "Bankruptcy Code") in the United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Court"), commencing the chapter 11 cases captioned *In re Ravn Air Group, Inc.*, Case No. 20-10755 (the "RAG Case"), *In re Ravn Air Group Holdings, LLC*, Case No. 20-10756 (the "RAG Holdings Case"), *In re JJM, Inc.*, Case No. 20-10757 (the "JJM Case"), *In re HoTH, Inc.*, Case No. 20-10758 (the "HoTH Case"), *In re Peninsula Aviation Services, Inc.*, Case No. 20-10762 (the "PAS Case"), *In re Corvus Airlines, Inc.*, Case No. 20-10759 (the "Corvus Case"), *In re Frontier Flying Service, Inc.*, Case No. 20-10760 (the "FFS Case") and *In re Hageland Aviation Services, Inc.*, Case No. 20-10761 (the "HAS Case" and together with the RAG Case, the RAG Holdings Case, the JJM Case, the HoTH Case, the PAS Case, the Corvus Case and the FFS Case, the "RAVN Bankruptcy Cases").

On April 7, 2020, the Bankruptcy Court entered an order consolidating the RAVN Bankruptcy Cases for procedural purposes, and the RAVN Bankruptcy Cases are presently being administered under the caption and on the docket of the RAG Case.

Pursuant to an order of the Bankruptcy Court, Seller conducted an auction (the "Auction") of the Acquired Assets (as defined below) at which Buyer submitted the highest and best bid for the Acquired Assets.

Subject to approval of the Bankruptcy Court, Seller desires to sell, convey, assign, and transfer the Acquired Assets, and Buyer desires to purchase the Acquired Assets from Seller, for the consideration and on the terms set forth in this Agreement.

**AGREEMENT**

The parties, intending to be legally bound, agree as follows:

**ARTICLE 1**
**DEFINITIONS**

1.1    <u>Definitions</u>

For purposes of this Agreement, the following terms have the meanings specified or referred to in this Section 1.1:

"<u>Acquired Assets</u>" means all right, title and interest of Seller in and to: (a) (i) the Real Property listed on Exhibit A and all improvements, furniture, fixtures and equipment located at such Real Property, (ii) the Personal Property listed on Exhibit A under the heading "Ground Service Equipment" and all accessories and related parts of such Personal Property, (iii) the Aircraft listed on Exhibit A, and (iv) the Assumed Contracts listed on Exhibit A, <u>provided</u>, <u>however</u>, that each of the foregoing clauses (i) through (iv) does not include any Excluded Assets, and (b) the Wright Air Service/Warbelow's Air Causes of Action for trespassing, lost rent, and reputational harm (including without limitation, with respect to activities in North Slope Borough).

"<u>Affiliate</u>" means, with respect to any Person, any other Person directly or indirectly controlling, controlled by, or under common control with such Person, and in the case of any natural Person includes, without limitation, all relatives and family members of such Person.

"<u>Agreement</u>" has the meaning set forth in the preamble of this document.

"<u>Aircraft</u>" means either collectively or individually, as applicable, the aircraft described in <u>Part  3.12 of the Disclosure Schedule</u> (as may be supplemented from time to time by Seller with the approval of Buyers in accordance with this Agreement), comprised of an Airframe, together with the Engines and Propellers, associated with such Airframe, and, where the context permits, references to an "Aircraft" shall include Manuals and Technical Records associated therewith.

"<u>Airframe</u>" means, at any time, the airframe which is part of the relevant Aircraft at such time, together with all Parts relating to such airframe.

"<u>Ancillary Documents</u>" means any certificate, agreement, document or other instrument (other than this Agreement) to be executed and delivered by a party in connection with the consummation of the transactions contemplated by this Agreement.

"<u>Assignment and Assumption Agreement</u>" has the meaning set forth in Section 2.6(a)(iii).

"<u>Assumed Contracts</u>" means the Contracts to which Seller is a party that Buyer has expressly agreed to assume, which Contracts are listed on <u>Exhibit A</u>.  Buyer shall have the right, by written notice delivered to Seller at any time from and after the Signing Date and until the Closing Date to delete any such Contract from <u>Exhibit A</u>.  Buyer shall also have the right by written notice delivered to Seller at any time during the period from and after the Signing Date and until the Closing Date to add any Contract to which Seller is a party to Exhibit A; <u>provided</u> that such

2

Contract has not been previously rejected in the RAVN Bankruptcy Cases or assumed and assigned to another third party, and subject to Bankruptcy Court approval if added after entry of the Sale Order.  Notwithstanding the foregoing, the Assumed Contracts are only those Contracts listed on <u>Exhibit A</u> as it appears in its final form as of the Closing Date.

"<u>Assumed Liabilities</u>" means, with respect to the Business, the obligations of Seller with respect to (i) all Liabilities set forth on Exhibit B and (ii) any obligations arising out of or relating to the ownership or operation of the Acquired Assets after the Closing Date.

"<u>Auction</u>" has the meaning set forth in the Recitals of this Agreement.

"<u>Avoidance Actions</u>" means all claims and causes of action of Seller or the bankruptcy estate of Seller, that are or may be the subject of any suit at law or equity or an adversary proceeding under Sections 510, 542, 544, 546, 547, 548, 549, 550, 551, or 553 of the Bankruptcy Code, or similar preference, avoidance or fraudulent transfer claims or causes of action arising under applicable non-bankruptcy law.

"<u>Bankruptcy Code</u>" has the meaning set forth in the Recitals of this Agreement.

"<u>Bankruptcy Court</u>" has the meaning set forth in the Recitals of this Agreement.

"<u>Benefit Plan</u>" means (i) all "employee benefit plans" (including, without limitation, as defined in Section 3(3) of ERISA), including all employee benefit plans that are "pension plans" (including, without limitation, as defined in Section 3(2) of ERISA, and Seller's Bargaining Unit Employees Pension Plan) and any other employee benefit arrangements or payroll practices (including severance pay, vacation pay, company awards, salary continuation for disability, sick leave, death benefit, hospitalization, welfare benefit, group or individual health, dental, medical, life, insurance, fringe benefit, deferred compensation, profit sharing, retirement, retiree medical, supplemental retirement, bonus or other incentive compensation, stock purchase, equity-based, stock option, stock appreciation rights, restricted stock and phantom stock arrangements or policies) and (ii) all other employment, termination, bonus, severance, change in control, collective bargaining or other similar plans, programs, policies, contracts, or arrangements (whether written or unwritten), in each case, adopted, sponsored by, entered into, maintained, contributed to, or required to be contributed to by any Seller or any ERISA Affiliate for the benefit of any current or former employee, director, officer or independent contractor of any Seller, under or with respect to which any Seller or ERISA Affiliate has any Liability.

"<u>Bidding Procedures</u>" has the meaning set forth in the Sale Procedures Order.

"<u>Breach</u>" means a breach of a covenant, obligation or other provision of this Agreement or any instrument delivered pursuant to this Agreement.

"<u>Break-Up Fee</u>" means an amount equal to three percent (3%) of the Purchase Price.

"<u>Business</u>" has the meaning set forth in the Recitals of this Agreement.

"<u>Buyer</u>" has the meaning set forth in the preamble of this Agreement.

"Buyer's Advisors" has the meaning set forth in Section 5.2.

"Cape Town Convention" means, together, the Convention on International Interests in Mobile Equipment and its Protocol on Matters Specific to Aircraft Equipment.

"Cash and Cash Equivalents" means all of Seller's cash (including petty cash and checks received prior to the close of business on the Closing Date), checking account balances, marketable securities, certificates of deposits, time deposits, bankers' acceptances, commercial paper, security entitlements, securities accounts, commodity Contracts, commodity accounts, government securities, and any other cash equivalents, whether on hand, in transit, in banks or other financial institutions, or otherwise held.

"Claim" or "claim" has the meaning given that term in Section 101(5) of the Bankruptcy Code and includes, *inter alia*, all rights, claims, causes of action, defenses, debts, demands, damages, offset rights, setoff rights, recoupment right, obligations, and Liabilities of any kind or nature under contract, at law, or in equity, known or unknown, contingent or matured, liquidated or unliquidated, and all rights and remedies with respect thereto.

"Closing" has the meaning set forth in Section 2.3 of this Agreement.

"Closing Date" has the meaning set forth in Section 2.3 of this Agreement.

"Code" means the United States Internal Revenue Code of 1986, as the same may be amended from time to time.

"Collective Bargaining Agreement" means any Contract with a labor union, works council, labor organization, or any other Person representing or purporting to represent employees.

"Consent" means any approval, consent, ratification, waiver or other authorization (including any Governmental Authorization).

"Contract" means any written or oral contract, purchase order, service order, sales order, indenture, note, bond, lease, sublease, license, understanding, instrument, or other agreement, arrangement, or commitment that is binding upon a Person or its property, whether express or implied.

"Control" or "control" means, when used with reference to any Person, the power to direct the management, actions, or policies of such Person, directly or indirectly, by or through stock or other equity ownership, agency, or otherwise, or pursuant to, or in connection with, any Contract; and the terms "Controlling", "controlling", "Controlled", and "controlled" have meanings correlative to the foregoing.

"Cure Costs" means the amounts, if any, required to cure any past defaults with respect to an Assumed Contract pursuant to 11 U.S.C. § 365(b)(1).

"Current Liabilities" means the unpaid Liabilities of the Seller that are exclusively related to the operation of the Business after the Petition Date and before the Closing Date.

4

"<u>Deposit</u>" has the meaning set forth in Section 2.2(b) of the Agreement.

"<u>Disclosure Schedules</u>" means the Schedules and Exhibits delivered by Seller to Buyer on the date hereof, and attached hereto and incorporated herein.

"<u>Employee</u>" means any employee (or individual classified for tax purposes as an independent contractor) of Seller who performs work primarily related to the operation of the Business.

"<u>Encumbrance</u>" means any charge, claim, community property interest, right of way, easement, covenant, condition, equitable interest, Lien, option, pledge, security interest, right of first refusal, or restriction of any kind, including any restriction on use, voting, transfer, receipt of income or exercise of any other attribute of ownership.

"<u>Engine</u>" means, with respect to any Airframe, the engine listed as attached to such Airframe on Exhibit A and any and all related Parts.

"<u>Environment</u>" means soil, land surface or subsurface strata, surface waters (including navigable waters, ocean waters, streams, ponds, drainage basins and wetlands), groundwaters, drinking water supply, stream sediments, ambient air (including indoor air), plant and animal life, and any other environmental medium or natural resource.

"<u>Environmental Law</u>" means any Law that requires or relates to the protection of human health with respect to Hazardous Materials, or to the Environment, including the following:

      (a)     advising appropriate authorities, employees, and the public of intended or actual Releases of Hazardous Materials, violations of discharge limits, or other prohibitions, and of the commencements of activities, such as resource extraction or construction, that could have significant impact on the Environment;

      (b)     preventing or reducing to acceptable levels the Release of any Hazardous Materials into the Environment;

      (c)     reducing the quantities, preventing the Release, or minimizing the hazardous characteristics of wastes or other Hazardous Materials that are generated;

      (d)     reducing to acceptable levels the risks inherent in the transportation of Hazardous Materials;

      (e)     protection of human health due to exposure to any Hazardous Materials; or

      (f)     cleaning up Hazardous Materials that have been Released, preventing the Threat of Release, or paying the costs of such clean up or prevention.

"<u>Environmental Liabilities and Obligations</u>" means all Liabilities arising from any impairment, impact or damage to the Environment, health or safety, or any failure to comply with Environmental Law in connection with the operation of the Business, the Acquired Assets, or the Real Property, including Liabilities related to: (i) the transportation, storage, use, arrangement for

5

disposal or disposal of, or exposure to, Hazardous Materials; (ii) the Release of Hazardous Materials, including migration onto or from the Real Property; (iii) any other pollution or contamination of the Environment; (iv) any other obligations imposed under Environmental Law including pursuant to any applicable Permits issued pursuant to under any Environmental Law; (v) Orders, notices to comply, notices of violation, alleged noncompliance and inspection reports with respect to any Liabilities pursuant to Environmental Law; and (vi) all obligations with respect to personal injury, property damage, wrongful death and other damages and losses arising under applicable Environmental Law but only as a result of any of the matters identified in clauses (i)-(v).

"ERISA" means the Employee Retirement Income Security Act of 1974, as amended, and the regulations promulgated thereunder.

"ERISA Affiliate" means any entity which is a member of (i) a controlled group of corporations (as defined in Section 414(b) of the Code), (ii) a group of trades or businesses under common control (as defined in Section 414(c) of the Code), (iii) an affiliated service group (as defined under Section 414(m) of the Code), or (iv) any group specified in the Treasury Regulations promulgated under Section 414(o) of the Code, any of which includes or included any Seller.

"Excluded Assets" has the meaning set forth in Section 2.4 of this Agreement.

"Excluded Liabilities" are, collectively, all of Seller's Liabilities not expressly included in the Assumed Liabilities, including, without limitation, any Current Liabilities, any Liability related to (i) ERISA or any Benefit Plan, (ii) any pre-Closing Collective Bargaining Agreement, (iii) Tax or Tax Proceeding or (iv) Environmental Liabilities and Obligations.

"Ex-Im Laws" means all U.S. and applicable non-U.S. Laws relating to export, reexport, transfer, and import controls, including the Export Administration Regulations, the International Traffic in Arms Regulations, and the customs and import Laws administered by U.S. Customs and Border Protection.

"FAA" means the United States Federal Aviation Administration or any successor thereto.

"Federal Aviation Act" means the Federal Aviation Act of 1958, as amended, together with the aviation regulations of the FAA, as the same may be in effect from time to time.

"Final Order" means an order or judgment, the operation or effect of which is not stayed, and as to which order or judgment (or any revision, modification, or amendment thereof), the time to appeal or seek review or rehearing has expired, and as to which no appeal or petition for review or motion for re-argument has been taken or been made and is pending for argument.

"GAAP" means United States generally accepted accounting principles as in effect from time to time.

"Governmental Authorization" means any approval, Consent, license, permit, waiver, or other authorization issued, granted, given or otherwise made available by or under the authority of any Governmental Body or pursuant to any Law.

6

"Governmental Body" means the following:

(a)    any nation, state, county, city, town, village, district, or other jurisdiction of any nature;

(b)    any federal, state, local, municipal, foreign, or other government;

(c)    any governmental or quasi-governmental authority of any nature (including any governmental agency, branch, department, official, or entity and any court or other tribunal);

(d)    any multi-national organization or body; or

(e)    any body exercising or entitled to exercise any administrative, executive, judicial, legislative, police, regulatory, or taxing authority or power of any nature.

"Ground Lease" means any long-term lease of land in which most of the rights and benefits comprising ownership of the land and the improvements thereon or to be constructed thereon, if any, are transferred to the tenant for the term thereof.

"Hazardous Materials" means any material waste, chemical substance, or product or other substance (i) that is listed, defined, designated, or classified as or otherwise determined to be, hazardous, radioactive, infectious, toxic, or a pollutant or contaminant under or pursuant to any Environmental Law or (ii) the generation, handling, recycling, use, treatment, storage, transportation, Release, disposal, or exposure of or to which is subject to regulation under any Environmental Law, including any admixture or solution thereof and specifically including petroleum and all derivatives thereof and synthetic substitutes therefore, chlorides, naturally occurring radioactive material, polychlorinated biphenyls or "N.O.R.M.", and asbestos or asbestos-containing materials.

"Improvements" has the meaning set forth in Section 3.3(k).

"Inventory" means inventories of raw materials and supplies, manufacturing, spare, and purchased parts, goods in process, subassemblies, and finished goods, janitorial and office supplies, and other disposables and consumables on hand or under order for use by Seller in connection with the Business, wherever located and whether or not obsolete or carried on the Seller's books of account, in each case with any transferable warranty and service rights of Seller with respect to such Acquired Assets as of the Closing Date.

"Law" means any federal, state, local, municipal, foreign, or international, multinational or other law, treaty, statute, constitution, principle of common law, resolution, ordinance, code, edict, decree, rule, regulation, ruling, or requirement issued, enacted, adopted, promulgated, implemented, or otherwise put into effect by or under the authority of any Governmental Body.

"Liability" or "Liabilities" means any debt, liability, or obligation of whatever kind or nature (whether direct or indirect, known or unknown, asserted or unasserted, absolute or contingent, accrued or unaccrued, liquidated or unliquidated, and due or to become due), including, without limitation, any liability for Taxes and any Claim.

7

"<u>Lien</u>" means any mortgage, pledge, hypothecation, right of others, claim, security interest, encumbrance, lease, sublease, license, occupancy agreement, adverse claim or interest, easement, covenant, encroachment, burden, title defect, title retention agreement, voting trust agreement, interest, equity, option, lien, right of first refusal, charge, or other restrictions or limitations of any nature whatsoever, including, without limitation, such as may arise under any Contracts, and any "claim," "lien," or "security interest," as those terms are defined in the Bankruptcy Code.

"<u>Manuals and Technical Records</u>" means the documents, data and records with respect to the Aircraft as maintained by Seller, including all additions, renewals, revisions, miscellaneous documents and replacements from time to time made in accordance with Seller's maintenance program.

"<u>Material Adverse Effect</u>" means any event, change, occurrence, or state of facts that has had, or is reasonably likely to have, individually or in the aggregate, a material adverse effect on the assets, Liabilities, Business, properties, financial condition, or results of operations of Seller, taken as a whole; <u>provided</u>, <u>however</u>, that in no event shall any of the following, alone or in combination, be deemed to constitute, or be taken into account, in determining whether there has been, or would be, a Material Adverse Effect: (i) changes in economic or political conditions in the United States or regionally, but that do not have a disproportionate effect on Seller relative to other participants in the industry in which Seller conducts its Business; (ii) changes that affect generally the industry in which Seller operates but that do not have a disproportionate effect on Seller relative to other participants in the industry in which Seller conducts its Business; (iii) changes in financial, credit or securities markets generally, including any changes in prevailing interest rates, but that do not have a disproportionate effect on Seller relative to other participants in the industry in which Seller conducts its Business; (iv) changes after the Signing Date in any applicable Law or GAAP; (v) any actions or omissions taken or omitted to be taken as a requirement pursuant to this Agreement or otherwise at the written instruction of Buyer; (vi) the negotiation, execution, or the announcement of, the consummation of the transactions contemplated hereby, or the performance of obligations under this Agreement or the other Ancillary Documents, including, without limitation, effects related to any action permitted hereby and compliance with the covenants contained herein or the failure to take any action as a result of any restrictions or prohibitions set forth herein; (vii) the commencement and existence of the RAVN Bankruptcy Cases; or (viii) the effects of the COVID-19 pandemic.

"<u>Order</u>" or "<u>order</u>" means any award, decision, injunction, judgment order, ruling, subpoena, or verdict entered, issued, made, or rendered by any court, administrative agency, or other Governmental Body or by any arbitrator.

"<u>Organizational Documents</u>" means, with respect to a particular entity Person, (i) if a corporation, the articles or certificate of incorporation and bylaws, (ii) if a general partnership, the partnership agreement and any statement of partnership, (iii) if a limited partnership, the limited partnership agreement and certificate of limited partnership, (iv) if a limited liability company, the articles or certificate of organization or formation and any limited liability company or operating agreement, (v) if another type of Person, all other charter and similar documents adopted or filed in connection with the creation, formation or organization of the Person, and (vi) all amendments or supplements to any of the foregoing.

8

"Part" means, with respect to an Airframe, Engine or Propeller, any auxiliary power unit, avionics, appliance, part, instrument, appurtenance, accessory, furnishing or other item of equipment of whatever nature (other than an Engine or Propeller) which may from time to time be incorporated or installed in or attached to the relevant Airframe, Engine or Propeller and to which the Seller that owns such Airframe, Engine or Propeller has title or, after removal therefrom, so long as title thereto shall remain vested in the related Seller.

"Party" or "party" has the meaning set forth in the preamble of this Agreement.

"Parties" or "parties" has the meaning set forth in the preamble of this Agreement.

"Permits" means all notifications, licenses, permits (including environmental, construction and operation permits), franchises, certificates, approvals, Consents, waivers, clearances, exemptions, classifications, registrations, variances, and other similar documents and authorizations issued by any Governmental Body to Seller and used, or held for use, in connection with or applicable to ownership of the Acquired Assets to the extent such Permits are held by Seller.

"Permitted Encumbrances" means all items listed on Part 1.1 of the Disclosure Schedule.

"Person" means any individual, corporation (including any non-profit corporation), general or limited partnership, limited liability company, joint venture, estate, trust, association organization, labor union, or other entity or Governmental Body.

"Personal Property" has the meaning set forth in Section 3.3 of this Agreement.

"Petition Date" has the meaning set forth in the Recitals.

"Pre-Closing Tax Period" means any Taxable period ending on or before the Closing Date and the portion of any Straddle Period that ends as of the end of the Closing Date.

"Propeller" means, with respect to any Engine, the propeller that is listed as being attached thereto in Exhibit A and any and all related Parts.

"Property Tax Amount" means the amount of Property Taxes allocable to any Pre-Closing Tax Period as set forth on the Property Tax Schedule (as finally agreed to by Buyer and Seller) and in accordance with Section 10.2(d).

"Property Tax Claim" has the meaning set forth in Section 5.7 of this Agreement.

"Property Tax Schedule" has the meaning set forth in Section 10.2(d) of this Agreement.

"Purchase Price" has the meaning set forth in Section 2.2(a) of this Agreement.

"Purchase Price Allocation Schedule" has the meaning set forth in Section 2.8 of this Agreement.

"RAVN Bankruptcy Cases" has the meaning set forth in the Recitals of this Agreement.

"Real Property" has the meaning set forth in Section 3.3(b).

"Release" means any spilling, leaking, emitting, discharging, depositing, escaping, leaching, dumping or other releasing into the Environment, whether intentional or unintentional.

"Remedial Action" means all actions to (i) investigate, clean up, remove, treat or in any other way address any Hazardous Material; (ii) prevent the Release of any Hazardous Material; (iii) perform pre-remedial studies and investigations or post-remedial monitoring and care; or (iv) correct or abate a condition of noncompliance with Environmental Laws.

"Representative" means with respect to a particular Person, any member of the board of directors, manager, executive officer, employee, agent, consultant, advisor or other representative of such Person, including legal counsel, accountants, contractors, agents and financial advisors.

"Sale Motion" is the *Motion for Entry of an Order: (i)(a) Authorizing and approving the bidding procedures, (b) approving procedures related to the assumption of certain executory contracts and unexpired leases, (c) approving the notice procedures, (d) authorizing entry into one or more stalking horse agreements, and (e) setting a date for the sale hearing; and (ii) authorizing and approving (a) the sale of certain assets free and clear of all liens, claims encumbrances and interests, (b) the assumption of certain contracts, and (c) payment of bid protections, if applicable* [Bankruptcy Court Docket No. 197], entered in the RAVN Bankruptcy Cases on May 14, 2020.

"Sale Order" means an Order of the Bankruptcy Court, in form and substance acceptable to Buyer in its discretion, among other things, (a) approving (i) this Agreement and the execution, delivery, and performance by Seller of this Agreement and the other instruments and agreements contemplated hereby, (ii) the sale of the Acquired Assets to Buyer free and clear of all Encumbrances (other than any Permitted Encumbrances), and (iii) the assumption and assignment to Buyer of the Assumed Contracts on the terms set forth herein; (b) determining that Buyer is a good-faith purchaser and has provided adequate assurance of future performance with respect to the Assumed Contracts; and (c) providing that (w) the Closing will occur in accordance with the terms and conditions hereof; (x) Buyer will not have any derivative, successor, transferee or vicarious liability for Liabilities of Seller or any Affiliates of Seller by reason of any theory of Law or equity (whether under federal or state Law or otherwise) as a result of the transactions contemplated by this Agreement, including Liabilities on account of any Taxes arising, accruing, or payable under, out of, in connection with, or in any way relating to the Business prior to the Closing; and (y) to the maximum extent permitted by the Bankruptcy Code, the so-called "bulk sales," "bulk transfer" and similar Laws (including those relating to Taxes) in any applicable jurisdictions do not apply.

"Sale Procedures Order" is the *Order (a) Authorizing and approving the bidding procedures, (b) approving procedures related to the assumption of certain executory contracts and unexpired leases, (c) approving the notice procedures, (d) authorizing entry into one or more stalking horse agreements, and (e) setting a date for the sale hearing* [Bankruptcy Court Docket No. 295], entered in the RAVN Bankruptcy Cases on June 3, 2020.

"Seller" has the meaning set forth in the preamble of this Agreement.

10

"Seller's Knowledge" or similar references to the Knowledge of Seller means the current, actual knowledge of Seller's chief executive officer or chief financial officer.

"Signing Date" has the meaning set forth in the preamble of this Agreement.

"Space Lease" means any lease or rental agreement pertaining to the occupancy of any improved space on any parcel or tract of land in which Seller has an interest.

"Straddle Period" means any Taxable period that includes (but does not end on) the Closing Date.

"Tax" means any tax (including, without limitation, any income tax, capital gains tax, value-added tax, franchise tax, sales tax, property tax, gift tax, or estate tax), levy, assessment, tariff, duty (including any customs duty), deficiency or other fee, and any related charge or amount (including any fine, penalty, interest, or addition to tax), imposed, assessed, or collected by or under the authority of any Governmental Body or payable pursuant to any tax-sharing agreement or any other Contract relating to the sharing or payment of any such tax, levy, assessment, tariff, duty, deficiency, or fee.

"Tax Proceeding" means any action, suit, investigation, audit, Claim, investigation, or other action or proceeding with respect to Taxes.

"Tax Return" means any return (including any information return), report, statement, schedule, notice, form or other document, or information filed with or submitted to or required to be filed with or submitted to, any Governmental Body in connection with the determination, assessment, collection, or payment of any Tax or in connection with the administration, implementation, or enforcement of, or compliance with, any Law relating to any Tax.

"Third Party" means any Person that is neither a party to this Agreement nor an Affiliate of a party to this Agreement.

"Threat of Release" means a substantial likelihood of a Release that may require any Remedial Action to prevent or mitigate damage to the Environment that may result from such Release.

## ARTICLE 2
## SALE AND TRANSFER OF ASSETS; EXCLUDED ASSETS; ASSUMED/CREDITED DEBT; CLOSING

2.1    Acquired Assets

Pursuant to Sections 105, 363, 365 and 1123(a)(5) of the Bankruptcy Code, and subject to the terms and conditions of this Agreement, at the Closing Seller will sell and transfer the Acquired Assets to Buyer, and Buyer will purchase the Acquired Assets from Seller.

11

2.2     Purchase Price

(a)     The aggregate consideration for the sale and transfer of the Acquired Assets will be (i) Twelve Million Eight Hundred Thousand and 00/100 Dollars ($12,800,000) (the "Purchase Price"), which amount is payable and deliverable in cash, free and clear of, and without reduction for, any Tax due in connection with the execution and delivery of this Agreement or the consummation of the transactions contemplated in this Agreement, to Seller at the Closing minus the Property Tax Amount, plus (i) the assumption by Buyer of the Assumed Liabilities and (ii) the aggregate amount of all Cure Costs.

(b)     Buyer shall have deposited with Seller on the business day immediately following the earlier of (i) the date on which Buyer is designated as a Stalking Horse Bidder (as defined in the Bidding Procedures) or (ii) the Bid Deadline (as defined in the Bidding Procedures), an amount in cash equal to One Million Two Hundred Eighty Hundred Thousand and 00/100 Dollars ($1,280,000) (the "Deposit") by wire transfer of immediately available funds, which Deposit shall be held by Seller in trust and distributed to either Buyer or Seller as follows:

(i)     if the Closing occurs, then the Deposit shall be applied towards the Purchase Price payable by Buyer to Seller;

(ii)     if Buyer is a Back-Up Bidder (as defined in the Bidding Procedures), then the Deposit may be retained by Seller in accordance with the Bidding Procedures, otherwise the Deposit shall be returned to Buyer in accordance with the Bidding Procedures; or

(iii)     if the Closing does not occur, or this Agreement is terminated by either Party or both Parties in accordance with Article 9 of this Agreement, then the Deposit shall be returned to Buyer within five (5) business days of such termination.

2.3     Closing

The purchase and sale (the "Closing") provided for in this Agreement will take place by electronic communications and transmission of PDF documents on the Closing Date, commencing at 11:00 a.m. Central Time on the date that is the first Business Day after the date on which all conditions to the obligations of Seller and Buyer to consummate the transactions contemplated by this Agreement have been satisfied or waived, or at such other location and time as shall be mutually agreed upon by Seller and Buyer in writing (the "Closing Date").  Subject to the provisions of Article 9, failure to consummate the purchase and sale provided for in this Agreement on the date and time and at the place determined pursuant to this Section 2.3 will not result in the termination of this Agreement and will not relieve any party of any obligation under this Agreement.

2.4     Excluded Assets

Notwithstanding anything in this Agreement to the contrary, all assets of Seller that are not Acquired Assets shall be Excluded Assets (collectively, the "Excluded Assets").

2.5    Assumed Liabilities; Excluded Liabilities

On the terms and subject to the conditions set forth in this Agreement and the Sale Order, effective as of the Closing, Buyer shall assume from Seller and become responsible for, and the Seller shall irrevocably convey, transfer and assign to Buyer, the Assumed Liabilities and will timely pay, honor, and discharge, or cause to be timely paid, honored, and discharged, all of the Assumed Liabilities in accordance with the terms thereof.  Notwithstanding anything in this Agreement to the contrary, Buyer will not assume, and will not be deemed to have assumed, or be obligated to pay, perform or otherwise discharge any of the Excluded Assets or Excluded Liabilities, or any Liability or obligation of Seller or any of its Affiliates, direct or indirect, known or unknown, absolute or contingent, that are not expressly assumed by Buyer pursuant to this Agreement.

2.6    Closing Obligations

At the Closing, the following shall occur:

(a)    Seller will deliver to Buyer the following:

(i)    a quitclaim bill of sale conveying to Buyer the Personal Property, in the form attached hereto as Exhibit C-1;

(ii)    one or more quitclaim deeds conveying to Buyer fee title to the Owned Real Property, subject to the Permitted Encumbrances, in the form attached hereto as Exhibit E;

(iii)    an assignment and assumption agreement assigning to Buyer each Ground Lease Real Property listed on Exhibit A, in the form attached hereto as Exhibit C-2;

(iv)    a Warranty Bill of Sale in the form attached hereto as Exhibit C-3 (the "Aircraft Bill of Sale") for each Aircraft;

(v)    an assignment and assumption agreement assigning to Buyer the Assumed Contracts, in the form attached hereto as Exhibit D (the "Assignment and Assumption Agreement");

(vi)    to the extent Seller is capable of delivery, copies of all instruments, certificates, documents and other filings (if applicable) necessary to release the Acquired Assets from all Encumbrances (other than Permitted Encumbrances), including, without limitation, any applicable UCC release or termination statements, as reasonably required by the Buyer, all in a form reasonably satisfactory to Buyer;

(vii)    an officer's certificate, dated as of the Closing Date, executed by a duly authorized officer of Seller certifying that the conditions set forth in Article 7 have been satisfied;

13

(viii)   possession of the Real Property;

(ix)   possession of the tangible Acquired Assets;

(x)   certificates of title or origin (or like documents) with respect to any vehicles or other equipment included in the Acquired Assets for which a certificate of title or origin is required or customary in order to transfer title;

(xi)   such other bills of sale, deeds, endorsements, assignments, and other good and sufficient instruments of conveyance and transfer, in form reasonably satisfactory to Buyer, as Buyer may reasonably request to vest in Buyer all of Seller's right, title, and interest of Seller in, to, or under any or all the Acquired Assets, including all Real Property;

(xii)   such ordinary and customary documents (including any factually accurate affidavits) as may be reasonably required by any title company or title insurance underwriter to enable Buyer to acquire, at Buyer's sole election and Buyer's sole cost and expense, one or more owners or leasehold policies of title insurance issued by such title company covering any or all of the Owned Real Property or Ground Lease Real Property;

(xiii)   an affidavit, executed by Seller under penalties of perjury, stating that Seller is not a "foreign person" pursuant to Treasury Regulation Section 1.1445-2(b)(2), dated as of the Closing Date;

(xiv)   the Property Tax Schedule in accordance with Section 10.2(d) hereof (to which Seller and Buyer shall have agreed to at least three (3) Business Days prior to the Closing Date);

(xv)   the power of attorney described in Section 5.6; and

(xvi)   such other documents as Buyer may reasonably request that are not inconsistent with the terms of this Agreement and customary for a transaction of this nature and necessary to evidence or consummate the transactions contemplated by this Agreement.

(b)   Buyer will deliver to Seller the following:

(i)   the balance of the Purchase Price, after application of the Deposit;

(ii)   the Cure Costs, by wire transfer to such accounts as the creditor of Seller has directed payment, or if such payment is not yet due, to an account specified by Seller from which Seller will make payment to effectuate the cure of any default under an Assumed Contract;

(iii)   the Assignment and Assumption Agreement duly executed by Buyer;

14

(iv)    an officer's certificate, dated as of the Closing Date, executed by a duly authorized officer of Buyer certifying that the conditions set forth in Article 8 have been satisfied; and

(v)    such endorsements, assignments and other good and sufficient instruments of transfer and assumption, in form reasonably satisfactory to Seller, as Seller may reasonably request.

### 2.7    Closing Costs

Buyer and Seller will prorate customary closing costs associated with the Real Property as of the Closing Date, including real estate Taxes.

### 2.8    Purchase Price Allocation

At least ten (10) days prior to the Closing Date, Buyer shall prepare and deliver to Seller a schedule allocating the Purchase Price among the Acquired Assets in accordance with Section 1060 of the Code and the Treasury regulations promulgated thereunder.  Seller shall have seven (7) days from the date of such delivery to review and request the consent of Buyer to any proposed changes to such schedule, such consent not to be unreasonably withheld (such schedule, as revised as contemplated hereby, if applicable, the "Purchase Price Allocation Schedule").  Seller and Buyer agree, for all income Tax purposes, to report the transactions consistently with the Purchase Price Allocation Schedule and to not take any position during the course of any income Tax audit or other income Tax Proceeding inconsistent with the Purchase Price Allocation Schedule, except in each case as otherwise required by a change in Law or pursuant to the good faith resolution of a Tax contest.  Seller and Buyer shall make appropriate adjustments to the Purchase Price Allocation Schedule to reflect any adjustments to the Purchase Price.

### 2.9    Withholding

Notwithstanding any other provision in this Agreement to the contrary, Buyer and any other applicable payor shall be entitled to deduct and withhold from any amount payable pursuant to this Agreement such amounts as are required to be deducted and withheld under applicable Law.  Amounts withheld pursuant to this Section 2.9 shall be treated for all purposes of this Agreement as having been paid to the Person in respect of which such deduction and withholding was made.

## ARTICLE 3
## REPRESENTATIONS AND WARRANTIES OF SELLER

Seller represents and warrants to Buyer as of the Signing Date (except, in each case, to the extent that any representation or warranty is expressly made as of another date, in which case, as of such date), except as otherwise set forth in the Disclosure Schedules, as follows:

### 3.1    Organization and Good Standing

RAG is a corporation, duly organized, validly existing, and in good standing under the laws of the State of Delaware, with the requisite corporate power and authority to conduct the Business as now being conducted by RAG.  JJM is a corporation, duly organized, validly existing, and in good standing under the laws of the State of Alaska, with the requisite corporate power and authority to conduct the Business as now being conducted by JJM.  FFS is a corporation, duly organized, validly existing, and in good standing under the laws of the State of Alaska, with the requisite corporate power and authority to conduct the Business as now being conducted by FFS.  HAS is a corporation, duly organized, validly existing, and in good standing under the laws of the State of Alaska, with the requisite corporate power and authority to conduct the Business as now being conducted by HAS.  Seller has previously delivered, made available or will make available to Buyer complete and correct copies of all its Organizational Documents, as amended and in effect on the Signing Date.

3.2    Enforceability

Subject to the entry of the Sale Order, Seller has all requisite power and authority to execute and deliver this Agreement and each Ancillary Document to which it is a party, to perform its obligations hereunder and thereunder, and to consummate the transactions contemplated hereby and thereby.  The execution and delivery of this Agreement and each of the Ancillary Documents to which it is a party, the performance by Seller of its obligations hereunder and thereunder and the consummation of the transactions contemplated hereby and thereby have been duly and validly authorized by all necessary action on the part of Seller.

3.3    Title to Properties; Encumbrances

(a)    Owned Real Property.

(i)    Exhibit A.1(a) sets forth a complete list of all parcels of real property owned by Seller (the "Owned Real Property") to be transferred to Buyer.  Seller owns good, marketable, valid, insurable and indefeasible fee simple title to the Owned Real Property, subject to the Permitted Encumbrances.

(ii)    Except for the Permitted Encumbrances and for items that will not survive entry of the Sale Order, the Owned Real Property is not subject to any lease or grant to any Person of any right to the use, purchase, occupancy or enjoyment of the Owned Real Property or any portion thereof required to conduct the Business.  Except for Permitted Encumbrances, the Owned Real Property is not subject to any Encumbrances or to any use restrictions, exceptions, reservations or limitations, which in any material respect interfere with or impair the present and continued use thereof in the ordinary course of business and in the same manner after the Closing as conducted by Seller prior to Closing.

(iii)    There are no pending or, to Seller's Knowledge, threatened condemnation proceedings relating to the Owned Real Property.

(iv)    Seller is not obligated by any options, obligations, rights of first refusal or contractual rights to sell, lease or purchase the Owned Real Property.

16

(v)     Seller has removed from the Owned Real Property the Excluded Assets in a good and workmanlike manner, repairing any damage caused by such removal and restoring the applicable area of the Owned Real Property to good and operable condition, such removal, repair and restoration at Seller's sole cost and expense.

(b)     Ground Lease Real Property

(i)     Exhibit A.1(b) sets forth a complete list of all parcels of real property subject to a Ground Lease (the "Ground Lease Real Property") to be transferred to Buyer.  Seller owns good, marketable, valid and insurable leasehold title to the Ground Lease Real Property, subject to the Permitted Encumbrances. None of Seller's possession and quiet enjoyment of the Ground Lease Real Property under any such Ground Lease has been disturbed in any material respect and there are no disputes with respect to any such Ground Lease Real Property.

(ii)     Except for the Permitted Encumbrances and for items that will not survive entry of the Sale Order, the Ground Lease Real Property is not subject to any sublease or grant to any Person of any right to the use, occupancy or enjoyment of the Ground Lease Real Property or any portion thereof required to conduct the Business.  Except for Permitted Encumbrances, the Ground Lease Real Property is not subject to any Encumbrances or to any use restrictions, exceptions, reservations or limitations, which in any material respect interfere with or impair the present and continued use thereof in the ordinary course of business and in the same manner after the Closing as conducted by Seller prior to Closing.

(iii)     There are no pending or, to Seller's Knowledge, threatened condemnation proceedings relating to the Ground Lease Real Property.

(iv)     Seller is not obligated by any options, obligations, rights of first refusal or contractual rights to sell, lease or purchase the Ground Lease Real Property.

(v)     Seller has removed from the Ground Lease Real Property the Excluded Assets in a good and workmanlike manner, repairing any damage caused by such removal and restoring the applicable area of the Ground Lease Real Property to good and operable condition, such removal, repair and restoration at Seller's sole cost and expense.

(c)     Space Lease Real Property

Seller is not currently party to a Space Lease.

(d)     The transactions contemplated by this Agreement do not require the consent of any party which is not a party to such transactions;

(e)     All buildings, structures, fixtures, building systems and equipment, and all components thereof (including without limitation the roof, HVAC, electrical, plumbing, sprinklers

17

and fire safety systems), included in the Real Property (the "<u>Improvements</u>") are in good condition and repair, there are no physical, structural or mechanical defects thereto, and are sufficient for the operation of the business of Seller.  No Improvements are in need of replacement or major overhaul and are adequate for the uses to which they are being put by Seller.  None of the Real Property or Improvements has suffered any material damage by fire or other casualty which has not been repaired and restored in all material respects.  There are no facts or conditions affecting any of the Improvements that would, individually or in the aggregate, interfere in any material respect with the use or occupancy of the Improvements or any portion thereof in the operation of the business of Seller as currently conducted thereon.

(f)     The Real Property is in material compliance with all applicable building, zoning, subdivision, health, fire and safety and other land use Laws, including the Americans with Disabilities Act of 1990, as amended, and all insurance requirements affecting the Real Property (collectively, the "<u>Real Property Laws</u>").  Seller has not received any notice of violation of any Real Property Law, and there is no basis for the issuance of any such notice or the taking of any action for such violation.

(g)     All certificates of occupancy and other material permits, consents or approvals necessary under all Real Property Laws with respect to the current occupancy and use of the Real Property by Seller have been obtained and are currently in effect, and Seller has not received written notice of any threatened suspension, modification or cancellation of such certificates of occupancy, permits, consents and other approvals.

(h)     All water, oil, gas, electrical, steam, compressed air, telecommunications, sewer, storm and wastewater systems and other utility services or systems for the Real Property have been installed and are operational and sufficient for the operation of the business of Seller as currently conducted thereon.

(i)     Seller's use or occupancy of the Real Property or any portion thereof and the operation of the business of Seller as currently conducted thereon is not dependent on a "permitted non conforming use" or "permitted non conforming structure" or similar variance, exemption or approval from any Governmental Body.

(j)     No Real Property or any portion thereof is located in a flood hazard area (as defined by the Federal Emergency Management Agency).

(k)     No Real Property (or any portion thereof) has been appropriated, condemned or taken by any Governmental Body, nor (whether by eminent domain or otherwise) is any such appropriation, condemnation or taking, to Seller's Knowledge, pending or threatened. Seller has not received written (or any other) notice of any proposed special assessment which would affect the Real Property and with respect to which Seller would be responsible to pay; or any notice of a material increase in taxes, assessments, insurance premiums or other similar charges relating to the Real Property with respect to which Seller would be responsible to pay.

(l)     Seller has not caused any work or improvements to be performed upon or made to any Real Property or any Improvements thereon for which there remains any outstanding work or any payment obligation that could result in the imposition of any Lien thereon.  To Seller's

18

Knowledge, there is no pending or necessary work, repairs, or improvements for which Seller is responsible to pay or which may materially disrupt Seller's operations.

(m)    Seller owns good and indefeasible title to the Personal Property.  Part 3.3(m) of the Disclosure Schedule sets forth a list, as of the Signing Date, of all major movable and non-movable equipment of Seller that is material to Seller's use of the Real Property (the "Personal Property").

3.4    Title to Acquired Assets

Other than the Permitted Encumbrances and Encumbrances securing Seller's secured obligations, Seller has good and valid title to the Acquired Assets and, at the Closing, Buyer, pursuant to the Sale Order, shall acquire good and valid title in, and under all of such Acquired Assets, in each case free and clear of all Encumbrances (other than Permitted Encumbrances) to the fullest extent permissible under Section 363(f) of the Bankruptcy Code, as may be determined by a court of competent jurisdiction.  No debtor in the RAVN Bankruptcy Cases (other than Seller) has any ownership or other interest in the Acquired Assets.

3.5    Intentionally Omitted

3.6    Assumed Contracts

(a)    The Assumed Contracts are listed on Part 3.6 of the Disclosure Schedule, as it appears in its final form as of the Closing Date.  To Seller's Knowledge, the Cure Costs provided by Seller in connection with the Assumed Contracts are accurate and correct.

(b)    Seller has not, and, to Seller's Knowledge, no other party to any Assumed Contract has, commenced any action against any of the parties to any Assumed Contract or given or received any written notice of any default or violation under any Assumed Contract that has not been withdrawn or dismissed except to the extent such default or violation will be cured as a result of the payment of the applicable Cure Costs.  Assuming payment of the Cure Costs, each Assumed Contract is, or will be upon the Closing, valid, binding and in full force and effect in accordance with its terms, subject to applicable bankruptcy, insolvency, reorganization, moratorium, and similar Laws affecting creditors' rights and remedies generally and subject as to enforceability, to general principles of equity (regardless of whether enforcement is sought in a proceeding at law or in equity).

3.7    Disclosure Schedules

The Disclosure Schedules are material to the Agreement and the transactions contemplated herein.  Buyer's satisfaction in its sole discretion to the form and content of the Disclosure Schedules is a condition precedent to the Closing.

3.8    Insurance

Seller has delivered, made available, or will make available to Buyer true and complete copies of all policies of insurance to which Seller currently is a party with respect to the Acquired

VP/#37016248

Assets, including, with respect to any policy of insurance insuring any Aircraft, the type and amount of coverage, and the expiration dates of such policies of insurance.

3.9     Brokers or Finders

Other than expressly authorized by order of the Bankruptcy Court, (a) no Person has acted, directly or indirectly, as a broker, finder or financial advisor for Seller in connection with the transactions contemplated by this Agreement, and (b) Seller and its agents will not pay for any brokerage or finders' fees or agents' commissions or other similar payment in connection with this Agreement.  Buyer will not be responsible for any brokerage or finders' fees, agents' commissions, or other similar payments incurred by Seller in connection with this Agreement or the transactions provided for herein.

3.10    FIRPTA

Seller is not a "foreign person", "foreign trust" or "foreign corporation" within the meaning of the United States Foreign Investment in Real Property Tax of 1980, as amended.

3.11    Environmental Liabilities

Except as set forth on Part 3.11 of the Disclosure Schedule, Seller has received no notice, order, letter or other information regarding, and to Seller's Knowledge there are no Threat of Release, Remedial Action, Environmental Liabilities or Obligations related to the Real Property or Acquired Assets.

3.12    Aircraft Owned and Related Leases; Expected Purchases

Part 3.12 of the Disclosure Schedule lists each Aircraft, together with its related Engines (each, by its model number and manufacturer, and related serial number) and its related Propellers (each, by its model number and manufacturer, and related serial number), as of the Agreement Date legally are beneficially (directly or indirectly) owned by the Seller (with the title owner being the applicable owner trustee) free and clear of all Liens (except Permitted Liens) and the country in which each Aircraft is registered.

3.13    No Other Representations and Warranties

EXCEPT FOR THE EXPRESS REPRESENTATIONS AND WARRANTIES CONTAINED IN THIS ARTICLE 3 AND IN THE DISCLOSURE SCHEDULES, BUYER ACKNOWLEDGES THAT IT IS ACQUIRING AND PURCHASING THE ACQUIRED ASSETS ON AN "AS IS" AND "WHERE AS" BASIS AND ACCORDINGLY IS DOING SO WITHOUT ANY REPRESENTATION OR WARRANTY OF ANY KIND WHATSOEVER, INCLUDING THE WARRANTY OF MERCHANTABILITY AND FITNESS.  SELLER MAKES NO EXPRESS OR IMPLIED REPRESENTATION OR WARRANTY WITH RESPECT TO SELLER OR ITS AFFILIATES, THE PROBABLE SUCCESS OR PROFITABILITY OF THE ACQUIRED ASSETS, OR ANY OTHER RIGHTS OR OBLIGATIONS TO BE TRANSFERRED OR ASSUMED PURSUANT HERETO, AND SELLER DISCLAIMS ANY OTHER REPRESENTATIONS, WARRANTIES, FORECASTS,

20

PROJECTIONS, STATEMENTS OR INFORMATION, WHETHER MADE OR FURNISHED BY SELLER OR ANY OF ITS AFFILIATES OR ANY OF ITS OR THEIR REPRESENTATIVES.

## ARTICLE 4
## REPRESENTATIONS AND WARRANTIES OF BUYER

As of the Signing Date, Buyer represents and warrants to Seller as follows:

4.1     Organization and Good Standing

Buyer is a corporation duly organized, validly existing and in good standing under the laws of the State of Alaska, with the requisite corporate power and authority to own, lease and operate its properties and conduct its business as it is now being conducted, except as would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect on Buyer's ability to consummate the transactions contemplated hereby.

4.2     Enforceability

Buyer has the requisite power and authority to execute and deliver this Agreement and each of the Ancillary Documents to which it is a party, to perform its obligations hereunder and thereunder, and to consummate the transactions contemplated hereby and thereby.  The execution and delivery of this Agreement by Buyer and each of the Ancillary Documents to which it is a party, the performance by Buyer of its obligations hereunder and thereunder, the consummation of the transactions contemplated hereby and thereby have been duly and validly authorized by all necessary actions on the part of Buyer.  This Agreement has been, and at or prior to the Closing, each of the Ancillary Documents to which it is a party will be, duly and validly executed and delivered by Buyer.  Assuming the due authorization, execution and delivery of this Agreement and the Ancillary Documents by Seller and subject to the effectiveness of the Sale Order, this Agreement constitutes, and each Ancillary Document to which Buyer is a party when so executed and delivered will constitute, legal, valid and binding obligations of Buyer, enforceable against Buyer in accordance with their terms.  Except for the entry of the Sale Order, no filing with, notice to or Consent from any Person is required in connection with the execution, delivery and performance by Buyer of this Agreement or the Ancillary Documents to which it is a party, the consummation of the transactions contemplated hereby or thereby, or the taking by Buyer of any other action contemplated hereby or thereby.

4.3     Brokers or Finders

No Person has acted, directly or indirectly, as a broker, finder or financial advisor for Buyer in connection with the transactions contemplated by this Agreement and Seller is not and will not become obligated to pay any fee or commission or like payment to any broker, finder or financial advisor as a result of the consummation of the transactions contemplated by this Agreement based upon any arrangement made by or on behalf of Buyer.

4.4     Inspections; No Other Representations

21

Buyer is an informed and sophisticated purchaser, and has engaged expert advisors, experienced in the evaluation and purchase of property and assets such as the Acquired Assets as contemplated hereunder.  Buyer has undertaken such investigation and has been provided with and has evaluated such documents and information as it has deemed necessary to enable it to make an informed and intelligent decision with respect to the execution, delivery and performance of this Agreement.  Buyer acknowledges and agrees that, except as expressly set forth in this Agreement, the Acquired Assets are sold "as is" and Buyer agrees to accept the Acquired Assets in the condition they are in on the Closing Date based on its own inspection, examination and determination with respect to all matters, and without reliance upon any express or implied representations or warranties of any nature made by or on behalf of or imputed to Seller (other than those representations and warranties set forth in Article 3 of this Agreement).

4.5     Financing

Buyer shall provide Seller with true, correct and complete copies of commitment letters for each component of its debt and/or equity financing (the "Financing") prior to the Bid Deadline. As of the date hereof, each commitment letter is in full force and effect and constitutes the legal, valid and binding obligation of Buyer and each of the other parties thereto. Prior to the date hereof, the commitment contained in each commitment letter has not been withdrawn or rescinded in any respect (and no party thereto has indicated an intent to so withdraw or rescind) or otherwise amended or modified in any respect. As of the date hereof, Buyer is not in breach of any of the terms or conditions set forth in each commitment letter and no event has occurred which, with or without notice, lapse of time or both, could reasonably be expected to constitute a breach by Buyer or failure by Buyer to satisfy a condition precedent set forth therein. As of the date hereof, Buyer has fully paid any and all commitment fees or other fees on the dates and to the extent required by each commitment letter. There are no conditions precedent or other contingencies relating to the funding of the full amount of the proceeds of the Financing. The aggregate proceeds contemplated by each Commitment Letter, together with available cash on hand of Buyer, shall be sufficient to enable Buyer to pay the Purchase Price and consummate the transactions contemplated by this Agreement. Buyer affirms that it is not a condition to Closing or to any of its other obligations under this Agreement that Buyer obtains financing for or related to any of the transactions contemplated by this Agreement. Buyer shall have at the Closing, sufficient cash, available lines of credit, or other sources of immediately available funds to make payment of all amounts to be paid by it and all other monetary obligations hereunder on the Closing Date.

4.6     Citizenship

Buyer is a "citizen of the United States" as defined in the Federal Aviation Act.

## ARTICLE 5
## COVENANTS OF SELLER

5.1     Conduct of Business of Seller

Except (i) as otherwise expressly provided in or contemplated by this Agreement, or (ii) required or restricted pursuant to the Bankruptcy Code or an Order of the Bankruptcy Court,

on or prior to the Closing Date, Seller may not, without the prior written consent of Buyer, which shall not be unreasonably withheld, take any of the following actions with respect to the Acquired Assets:

(a)    remove or permit to be removed from any Real Property any Acquired Asset;

(b)    sell, lease or otherwise dispose of, mortgage, hypothecate or otherwise encumber any Acquired Asset (other than any Liens provided for in the various cash collateral orders entered by the Bankruptcy Court);

(c)    except in accordance with cash collateral orders entered by the Bankruptcy Court, amend, terminate or renew any Assumed Contract;

(d)    fail to use commercially reasonable efforts to renew and maintain all material Permits of Seller, used in the operation of the Acquired Assets;

(e)    make any change in its method of accounting, except in accordance with GAAP;

(f)    fail to use commercially reasonable efforts to maintain any insurance policy providing insurance coverage for the Acquired Assets and in effect on the date hereof or amend any such policy (other than extensions, replacements or amendments thereof in the ordinary course of business), except as set forth in Part 5.1(f) of the Disclosure Schedule;

(g)    sell, pledge, assign or transfer to any other Person any Acquired Asset (whether now existing or hereafter transferred hereunder) or any interest therein or grant, pledge, assign or suffer to exist any Lien on its interest in the Acquired Assets (other than sales of Inventory in the ordinary course of business and other than any Liens provided for in cash collateral Orders). Seller will promptly notify Buyer of any Lien or other claim asserted against the Acquired Assets that arises after the Signing Date;

(h)    consolidate with or merge into any other Person or convey or transfer any Acquired Assets; and

(i)    agree, whether in writing or otherwise, to do any of the foregoing.

5.2    Assignability of Certain Contracts

To the extent that the assignment to Buyer of any Assumed Contract pursuant to this Agreement is not permitted without the consent of a Third Party and such restriction cannot be effectively overridden or canceled by the Sale Order or other related order of the Bankruptcy Court, then this Agreement will not be deemed to constitute an assignment of or an undertaking or attempt to assign such Contract or any right or interest therein unless and until such Consent is obtained; provided, however, that Seller will use its commercially reasonable efforts, before the Closing, to obtain all such Consents; provided, further, that if any such Consents are not obtained prior to the Closing Date (the "Required Consent") any transfer or assignment to Buyer by Seller of any such Contract or interest therein (a "Delayed Contract"), and any assumption by Buyer of any obligation

23

under such Contract (a "<u>Delayed Liability</u>"), shall be subject to all such Required Consents in respect of such Delayed Contract being obtained.  If there are any Delayed Contracts, Seller shall use its commercially reasonable efforts to obtain all Required Consents in respect thereof as promptly as practicable following the Closing, all without any cost or detriment to Seller, Buyer or any of their respective Affiliates, and Buyer shall reasonably cooperate with Seller in connection therewith.  Notwithstanding the foregoing, any Delayed Contract for which a Required Consent is not received within sixty (60) days of the Closing Date shall not become an Assumed Contract.

5.3    Rejected Contracts

Except as set forth in Section 5.2, Seller shall not reject any Assumed Contract in any bankruptcy proceeding following the Signing Date without the prior written consent of Buyer, which Buyer may withhold, condition or delay, in its sole discretion.

5.4    Required Approvals; Efforts

As promptly as practicable after the Signing Date, Seller will request the consent of the State of Alaska Department of Transportation to the assignment of the Ground Lease Real Property to Buyer in order to consummate the transactions contemplated hereunder.  Without limiting the foregoing, Seller shall use its commercially reasonable efforts to take all action required of it and to do all things necessary, proper, or advisable on its part in order to cause the satisfaction, but not waiver, of the conditions set forth in Article 7.

5.5    Notification of Certain Matters

Seller shall give prompt notice to Buyer, and Buyer shall give prompt notice to Seller, of (a) any written notice or other written communication from any Person alleging that the Consent of such Person which is or may be required in connection with the transactions contemplated by this Agreement or the Ancillary Documents is not likely to be obtained prior to Closing, (b) any written objection or proceeding that challenges the transactions contemplated hereby or the entry of the approval of the Bankruptcy Court and (c) the status of matters relating to the completion of the transactions contemplated hereby, including promptly furnishing the other with copies of written notices or other written communications received by Seller or Buyer or by any of their respective Affiliates (as the case may be), from any Third Party (including any Financing source) and/or any Governmental Body with respect to the transactions contemplated by this Agreement.

5.6    Property Tax Contests

After the Closing, Buyer shall have the right to represent the interests of Seller in any Property Tax assessment, audit, examination or other administrative or court proceeding, suit, dispute, appeal or other claim with respect to the Real Property (each a "<u>Property Tax Claim</u>") at Buyer's expense, and Buyer shall be entitled to any Property Tax refund (including any interest received with respect thereto) resulting from any Property Tax Claim.  At Closing, Seller shall deliver to Buyer a power of attorney, in form and substance reasonably satisfactory to Buyer, to enable Buyer to represent the interests of Seller in any Property Tax Claim and to cause any resulting Property Tax refund (including any interest received with respect thereto) to be paid by Seller to Buyer.

24

5.7    <u>Casualty Loss</u>

Notwithstanding any provision of this Agreement to the contrary, if, before the Closing, all or any portion of the Acquired Assets is (a) condemned or taken by eminent domain, or (b) damaged or destroyed by fire, flood or other casualty, Seller shall notify Buyer promptly in writing of such fact, (i) in the case of condemnation or taking, Seller shall assign or pay, as the case may be, any proceeds thereof to Buyer at the Closing, and (ii) in the case of fire, flood or other casualty, Seller shall assign the insurance proceeds therefrom to Buyer at Closing. Notwithstanding the foregoing, the provisions of this Section 5.7 shall not in any way modify Buyer's other rights under this Agreement.  This Section shall not apply and Buyer shall not be entitled to any insurance proceeds in the event Buyer exercises its right to terminate this Agreement.

5.8    <u>No Successor Liability</u>

The parties intend that, except where expressly prohibited under applicable Law, upon the Closing, Buyer shall not be deemed to: (a) be the successor of Seller, (b) have, *de facto*, or otherwise, merged with or into Seller, (c) be a mere continuation or substantial continuation of Seller or the enterprise(s) of Seller, or (d) be liable for any acts or omissions of Seller in the conduct of the Business or arising under or related to the Acquired Assets other than as set forth in this Agreement.  Without limiting the generality of the foregoing, and except as otherwise provided in this Agreement, the parties intend that Buyer shall not be liable for any Encumbrance (other than Permitted Encumbrances) against Seller or any of Seller's predecessors, and Buyer shall have no successor or vicarious liability of any kind or character whether known or unknown as of the Closing Date, whether now existing or hereafter arising, or whether fixed or contingent, with respect to the Business, the Acquired Assets or any Liabilities of Seller arising prior to the Closing Date, subject only to Assumed Liabilities.  The parties agree that the provisions substantially in the form of this Section 5.8 shall be requested in the Sale Order.

5.9    <u>Aircraft Matters</u>

(a)    <u>Risk of Loss</u>.  As between Seller, on the one hand, and Buyer, on the other hand, all risk of loss of or damage to each Aircraft shall pass (through the direct and/or indirect ownership of the Aircraft through the applicable owner trusts) from Seller to Buyer upon the execution and delivery of the Aircraft Bill of Sale for such Aircraft.

(b)    <u>Delivery</u>.  At Closing, Seller shall deliver to Buyer physical possession of each Aircraft at the location thereof as set forth on <u>Part 3.12 of the Disclosure Schedule</u>.

(c)    <u>Filings; Etc.</u>  Seller and Buyer agree that they shall register the sale of each Aircraft to Buyer as a sale (as defined in the Cape Town Convention) at the International Registry established pursuant to the Cape Town Convention (the "<u>International Registry</u>") and with the Federal Aviation Administration.  In addition, to the extent also applicable, Seller and Buyer agree that they shall register the sale of each Aircraft to Buyer and with any other Governmental Body as is reasonably necessary in order to effect such sale.  All such registrations shall be initiated by counsel (such counsel to be agreed in advance of the Closing Date by Seller and Buyer) on the Closing Date immediately following the Closing.  No prospective sale or prospective international

25

interest (each as defined in the Cape Town Convention) shall be registered with the International Registry or be permitted in respect of any Aircraft by Buyer or any related entity.

## ARTICLE 6
## COVENANTS OF BUYER

### 6.1    Approvals of Governmental Bodies; Efforts

As promptly as practicable after the Signing Date, Buyer will make all filings required by applicable Laws to be made by it to consummate the transactions contemplated hereunder. Between the Signing Date and the Closing Date, Buyer will cooperate with Seller with respect to all filings that Seller is required by applicable Laws to make in connection with the transactions contemplated hereunder.   Without limiting the foregoing, Buyer shall use its commercially reasonable efforts to take all action required of it and to do all things necessary, proper, or advisable on its part in order to cause the satisfaction, but not waiver, of the conditions of set forth in Article 8.

### 6.2    Financing

Buyer shall use commercially reasonable efforts to cause the Financing, subject to the terms and conditions set forth in each commitment letter, to be available at the Closing; provided, however, that if funds in the amounts set forth in each commitment letter become unavailable to Buyer on the terms and conditions set forth therein, Buyer shall obtain the funds necessary to consummate the transactions contemplated by this Agreement.

### 6.3    Adequate Assurance of Future Performance

Buyer shall provide information and cooperate as reasonably requested by Seller to assist in establishing adequate assurance of future performance within the meaning of Section 365 of the Bankruptcy Code with regard to the Assumed Contracts.

## ARTICLE 7
## CONDITIONS PRECEDENT TO BUYER'S OBLIGATION TO CLOSE

Buyer's obligation to purchase the Acquired Assets and to take the other actions required to be taken by Buyer at the Closing is subject to the satisfaction, at or prior to the Closing, of each of the following conditions (any of which may be waived by Buyer, in whole or in part):

### 7.1    Seller's Performance

(a)    All of the covenants and obligations that Seller is required to perform or to comply with pursuant to this Agreement at or prior to the Closing (considered collectively), and each of these covenants and obligations (considered individually), must have been duly performed and complied with in all material respects.

26

(b)      Each document required to be delivered by Seller pursuant to Section 2.6(a) must have been delivered.

(c)      The representations and warranties made by Seller in this Agreement or in any Ancillary Document attached as an Exhibit hereto shall be true and correct in all material respects (provided, that any such representation or warranty that is subject to any materiality, Material Adverse Effect or similar qualification shall be true and correct in all respects after giving effect to any such qualification), in each case as of the Signing Date and as of the Closing Date, with the same force and effect as though all such representations and warranties had been made as of the Closing Date (other than representations and warranties that by their terms address matters only as of another specified date, which shall be so true and correct only as of such other specified date).

(d)      No later than ten (10) days prior to the Closing Date, but in no event later than July 7, 2020, Seller shall deliver to Buyer (i) a complete schedule of the projected Cure Costs in connection with the Assumed Contracts, and (ii) the most recent final Phase I environmental site assessment report (if any) for the Real Property, along with any other report, Order, notice, or consent agreement which Seller has received, ordered or is bound by, relating to environmental issues of the Real Property.

(e)      On the Closing Date, each Acquired Asset is in substantially the same condition and repair as such Acquired Asset was on June 26, 2020, as reasonably determined by Buyer in good faith.

7.2    Additional Documents

Seller shall have delivered to Buyer (a) each of the Exhibits to the Agreement in form satisfactory to Buyer in its reasonable discretion, (b) the complete Disclosure Schedules in form satisfactory to Buyer in its reasonable discretion, and (c) such other documents as Buyer may reasonably and in good faith request for the purpose of (i) evidencing the accuracy of any of Seller's representations and warranties, (ii) evidencing the performance by Seller of, or the compliance by Seller with, any covenant or obligation required to be performed or complied with by Seller, (iii) evidencing the satisfaction of any condition referred to in this Article 7 or (iv) otherwise facilitating the consummation or performance of any of the transactions contemplated hereunder.

7.3    No Restraint, Litigation or Injunction

No action, suit, investigation or proceeding other than the RAVN Bankruptcy Cases shall have been instituted or threatened to restrain or prohibit or otherwise challenge the legality or validity of the transactions contemplated hereby.  There must not be in effect any Laws or any injunction or other Order that (a) prohibits the sale of the Acquired Assets by Seller to Buyer and (b) has been adopted or issued, or has otherwise become effective, since the Signing Date.

7.4    Entry of Sale Order

The Sale Order, which shall be in form and substance acceptable to Buyer shall have been entered by the Bankruptcy Court and shall be in full force and effect and shall be a Final Order, which Final Order shall not have been reversed, modified, amended or stayed, and all conditions contemplated by the Sale Order to consummate the transactions contemplated hereby shall have been satisfied or waived.  Notwithstanding the foregoing, nothing in this Agreement shall preclude Seller from consummating the transactions contemplated herein if Buyer, in its sole discretion, waives the requirement that the Sale Order shall have become a Final Order.  No notice of such waiver of this condition or any other condition to the Closing need be given except to Seller, it being the intention of the parties that Buyer shall be entitled to, and is not waiving, the protection of Section 363(m) of the Bankruptcy Code, the mootness doctrine and any similar statute or body of law if the Closing occurs in the absence of the Sale Order becoming a Final Order.

## ARTICLE 8
## CONDITIONS PRECEDENT TO SELLER'S OBLIGATION TO CLOSE

Seller's obligation to sell the Acquired Assets and to take the other actions required to be taken by Seller at the Closing is subject to the satisfaction, at or prior to the Closing, of each of the following conditions (any of which may be waived by Seller, in whole or in part):

8.1     Buyer's Performance

(a)     All of the covenants and obligations that Buyer is required to perform or to comply with pursuant to this Agreement at or prior to the Closing (considered collectively), and each of these covenants and obligations (considered individually), must have been performed and complied with in all material respects.

(b)     Each document required to be delivered by Buyer pursuant to Section 2.6(b) must have been delivered.

(c)     The representations and warranties made by Buyer in this Agreement or in any Ancillary Document attached as an Exhibit hereto shall be true and correct in all material respects (provided, that any such representation or warranty that is subject to any materiality, Material Adverse Effect or similar qualification shall be true and correct in all respects after giving effect to any such qualification), in each case as of the Signing Date and as of the Closing Date, with the same force and effect as though all such representations and warranties had been made as of the Closing Date (other than representations and warranties that by their terms address matters only as of another specified date, which shall be so true and correct only as of such other specified date).

(d)     Buyer has delivered the Purchase Price in good and available funds.

8.2     Governmental Orders

There shall not be in effect any order, writ, injunction, judgment or decree entered by a Governmental Body of competent jurisdiction, or any Law preventing, enjoining, restraining, making illegal or otherwise prohibiting the consummation of the transactions contemplated by this Agreement or the Ancillary Documents.

8.3     Additional Documents

Buyer must have delivered to Seller such other documents as Seller may reasonably request for the purpose of (a) evidencing the accuracy of any representation or warranty of Buyer, (b) evidencing the performance by Buyer of, or the compliance by Buyer with, any covenant or obligation required to be performed or complied with by Buyer, (c) evidencing the satisfaction of any condition referred to in this Article 8 or (d) otherwise facilitating the consummation of any of the transactions contemplated hereunder.

8.4     No Injunction

There must not be in effect any Laws or any injunction or other Order that (a) prohibits the sale of the Acquired Assets by Seller to Buyer and (b) has been adopted or issued, or has otherwise become effective, since the Signing Date.

8.5     Entry of Sale Order

The Sale Order shall have been entered by the Bankruptcy Court and shall be in full force and effect and not subject to any stay of enforcement or effectiveness, and all conditions contemplated by the Sale Order to consummate the transactions contemplated hereby shall have been satisfied or waived.

# ARTICLE 9
# TERMINATION

9.1     Termination Events

Except as otherwise provided for in this Article 9, this Agreement is irrevocable.  This Agreement may, by notice given prior to or at the Closing, be terminated:

(a)     by Buyer (so long as Buyer is not in material Breach of any of its representations, warranties, covenants, or agreements contained in this Agreement such as would give rise to a failure of any condition set forth in Article 8) if a material Breach of any provision of this Agreement has been committed by Seller and such Breach has not been cured or waived after diligent efforts by Seller;

(b)     by Seller (so long as Seller is not in material Breach of any of its representations, warranties, covenants, or agreements contained in this Agreement such as would give rise to a failure of any condition set forth in Article 7) if a material Breach of any provision of this Agreement has been committed by Buyer and such Breach has not been cured or waived after diligent efforts by Buyer;

(c)     by Buyer if (i) any condition in Article 7 has not been satisfied as of the Closing (other than through the failure of Buyer to comply with its obligations under this Agreement) and (ii) such condition cannot be or has not been cured within thirty (30) days following delivery of notice to Seller of such breach or failure to perform (other than through the failure of Seller to comply with its obligations under this Agreement); provided, however, that Buyer may not rely on the failure of any condition in Article 7 to

29

be satisfied if such failure was caused by Buyer's failure to use its required efforts to consummate the transactions contemplated hereby;

(d)     by Seller if (i) any condition in Article 8 has not been satisfied as of the Closing (other than through the failure of Seller to comply with its obligations under this Agreement) and (ii) such condition cannot be or has not been cured within thirty (30) days following delivery of notice to Buyer of such breach or failure to perform (other than through the failure of Seller to comply with its obligations under this Agreement); provided, however, that Seller may not rely on the failure of any condition in Article 8 to be satisfied if such failure was caused by Seller's failure to use its required efforts to consummate the transactions contemplated hereby;

(e)     by mutual written consent of Buyer and Seller;

(f)     by Buyer or Seller if Buyer is not the Successful Bidder or Back-Up Bidder at the conclusion of the Auction;

(g)     by Buyer, if prior to Closing (i) Seller seeks to have the Bankruptcy Court enter an Order dismissing, or converting into cases under chapter 7 of the Bankruptcy Code, either of the cases commenced by Seller under chapter 11 of the Bankruptcy Code and comprising the RAVN Bankruptcy Cases, or appointing a trustee in the RAVN Bankruptcy Cases or appointing a responsible officer or an examiner with enlarged power relating to the operation of the Business (beyond those set forth in Section 1106(a)(3) or (4) of the Bankruptcy Code) under Bankruptcy Code Section 1106(b), or (ii) an order of dismissal, conversion or appointment is entered for any reason and is not reversed or vacated within fourteen (14) days after entry thereof; or

(h)     by Buyer, if (i) the Sale Order has not become a Final Order within fourteen (14) days after the entry thereof or (ii) following its entry, the Sale Order shall fail to be in full force and effect or shall have been stayed (and such stay results in the Closing not being consummated prior to the Outside Closing Date), vacated, reversed, modified, supplemented or amended in any material respect without the prior written consent of Buyer.

Each condition set forth in this Section 9.1, pursuant to which this Agreement may be terminated, shall be considered separate and distinct from each other such condition. If more than one of the termination conditions set forth in this Section 9.1 is applicable, the applicable party shall have the right to choose the termination condition pursuant to which this Agreement is to be terminated.

9.2    <u>Effect of Termination</u>

Each party's right of termination under Section 9.1 is in addition to any other rights it may have under this Agreement or otherwise, and the exercise of a right of termination will not be an election of remedies. If this Agreement is terminated pursuant to Section 9.1, then all further obligations of the parties under this Agreement will terminate; provided, however, that if this Agreement is terminated by a party because of the Breach of this Agreement by the other party, or

30

because one or more of the conditions to the terminating party's obligations under this Agreement is not satisfied as a result of the other party's failure to comply with its obligations under this Agreement, then the terminating party's right to pursue all legal remedies will survive such termination unimpaired; provided that Seller's and Buyer's sole and exclusive remedy in all instances shall be limited to (a) the amount of the Deposit set forth in Section 2.2(b)(ii), with respect to Buyer's Breach and (b) the reasonable expenses incurred by Buyer through the date of termination, with respect to Seller's Breach. Notwithstanding the foregoing, this Section 9.2 and Section 11.1 shall survive any termination of this Agreement.

## ARTICLE 10
## EMPLOYEES AND EMPLOYEE BENEFITS MATTERS; TAX MATTERS; OTHER AGREEMENTS

10.1    <u>Employment</u>

(a)    Buyer may (but shall not be required to), in its sole and absolute discretion, offer employment to any and all individuals employed by the Business as of the Closing Date to commence immediately following the Closing, each such offer contingent upon the issuance of the Sale Order of the Bankruptcy Court and the Closing. Buyer's employment of any individuals previously employed by the Business shall be on an "at will" basis and on such other terms and conditions of employment as Buyer shall offer in its sole discretion. Except as otherwise agreed to in writing, Buyer shall be under no obligation to employ or continue to employ any individual for any period. The employees who accept Buyer's offer of employment and who commence employment with Buyer from and after the Closing Date shall be referred to herein as the "<u>Hired Employees</u>." Under no circumstance shall any individual employed or formerly employed by the Business become an employee of Buyer unless such individual becomes a Hired Employee.

(b)    Except as expressly provided herein, nothing herein shall be construed as transferring to Buyer (i) any Contract or agreement with any current of former employee of the Business or for the employment of any Person or engagement of any independent contractor by the Business or (ii) any rights or obligation the Business may owe to or be owed by any current or former Employee of the Business.

(c)    Nothing herein, express or implied, shall confer upon any Employee or former Employee of the Business any rights or remedies (including any right to employment or continued employment for any specific period) of any nature or kind whatsoever, under or by reason of this Agreement. Buyer agree that the provisions contained herein are not intended to be for the benefit of or otherwise be enforceable by, any third Person, including any Employee or former Employee of the Business.

(d)    Buyer shall have no obligation to pay severance to any individual previously employed by the Business, irrespective of whether such individual becomes a Hired Employee, and any such obligations remain obligations of Sellers.

31

(e)     Nothing contained in this Agreement shall be construed to require, or prevent the termination of, employment of any individual, require minimum benefit or compensation levels or prevent any change in the employee benefits provided to any individual Employee.  No provision of this Agreement shall create any third party beneficiary rights in any Employee or former Employee of the Business or any other Persons or entities (including any beneficiary or dependent thereof) in respect of continued employment (or resumed employment) for any specified period of any nature or kind whatsoever.

(f)     Under no circumstances shall Buyer assume or be obligated to pay, and the Acquired Assets shall not be or become liable for or subject to, any claims of or liabilities of the employees of the Business including, but not limited to, any claims or liabilities related to employment practices, COBRA, equal employment opportunity, nondiscrimination, harassment, wrongful termination, breach of contract, immigration, wage and hour laws, any other state, federal or local labor and employment laws, liability under the WARN Act, salaries, vacations, sick pay, incentives, severance pay, bonus, overtime, meal period, pension profit sharing retirement and/or deferred compensation and any other compensation or benefits (the "Employee Claims"), which Employee Claims shall be and remain the liability, responsibility and obligation of the Sellers.

10.2    Tax Matters

(a)     Transfer Taxes.    All sales, transfer, filing, recordation, registration, documentary, stamp, value-added, goods and services and similar Taxes and fees arising from or associated with the Transactions (collectively, "Transfer Taxes"), whether levied on Buyer or Seller, shall be paid and borne by Seller.  At least five (5) business days prior to the Closing Date, Seller shall prepare at Seller's expense, with Buyer's cooperation to the extent reasonably requested by Seller, and deliver to Buyer for its review and approval any necessary Tax Returns and other documentation with respect to any Transfer Taxes ("Transfer Tax Returns").  The Party required by law to file such Tax Return shall timely do so.  Seller shall also pay the Governmental Body the amount of any Transfer Taxes required to be paid when due, unless, with respect to a Transfer Tax Return for which Buyer is required to file under applicable law, Buyer otherwise directs payment by Seller to another Person (including Buyer).  Buyer and Seller shall cooperate in an effort to exempt the transfer of the Acquired Assets from any Tax pursuant to any applicable law.

(b)     Tax Returns and Payments.  Except as otherwise provided herein, after the Closing, Buyer shall prepare and file (or cause to be prepared and filed) all Tax Returns required to be filed with respect to the Acquired Assets for any Taxable period that begins after Closing Date.  With respect to any Tax Return prepared by Buyer, Seller shall pay Buyer, prior to the payment due date, any amounts attributable to any Tax obligation which is an Excluded Liability or otherwise Seller's responsibility under any provision of this Agreement; provided, however, that (1) Buyer shall deliver to Seller at least ten (10) days prior to the filing thereof a copy of any material Tax Return prepared by Buyer in respect of the Acquired Assets, if any Taxes reported thereon are the responsibility of Seller's (by indemnity, as an Excluded Liability or otherwise) under the terms of this Agreement, (2) with respect to any Tax Return required to be so delivered by Buyer, Buyer shall consider in good faith any comments submitted by Seller at least five (5) days prior to the due date for filing such Tax Return, and (3) with respect to any payment of Taxes required by Sellers in respect of a notice received by Buyer from a Taxing Authority, Buyer

32

shall deliver to Seller a copy of any notice of any material Tax payment obligation at least ten (10) days prior to the date on which such payment is required to be made to the relevant Taxing Authority, as set forth (or in accordance with) such notice.

(c)    Straddle Periods.    Whenever it is necessary to determine liability for Taxes allocable to a Pre-Closing Tax Period of a Straddle Period, (i) in the case of income Taxes or any other Taxes resulting from, or imposed on, sales, receipts, uses, transfers or assignments of property or other assets, payments or accruals to other Persons (including, without limitation, wages), or any other similar transaction or transactions, the amount of such Taxes allocable to the Pre-Closing Tax Period shall be the amount that would be payable if the relevant Tax period ended as of the close of business on the Closing Date (and for such purpose, the Taxable period of any entity classified as partnership or other pass-through entity shall be deemed to terminate at such time) and (ii) in the case of any other Taxes, the amount allocable to the Pre-Closing Tax Period shall be deemed to be the amount of such Tax for the entire Straddle Period multiplied by a fraction, the numerator of which is the number of days in the portion of the Straddle Period ending on (and including) the Closing Date and the denominator of which is the number of days in the entire Straddle Period.   For purposes of this subsection (c), Taxes in the form of interest, penalties, additions to Tax or other additional amounts that relate to Taxes for any Pre-Closing Tax Period shall be treated as occurring in a period ending on or before the Closing Date whether such items are incurred, accrued, assessed or similarly charged on, before, or after the Closing Date, and with respect to special assessments of Property Taxes, if any, Seller shall be responsible for all such Taxes which accrued (regardless of when due and payable) on or prior to the Closing Date.

(d)    Property Tax Matters.

(i)    Notwithstanding anything to the contrary contained in this Agreement or any other Transaction Document, regardless of the relevant lien date, Seller shall be responsible Taxes attributable to Real Property or Acquired Assets ("Property Taxes") payable for any Pre-Closing Tax Period; provided that, with respect to any Straddle Period, any Property Taxes allocable to a Pre-Closing Tax Period shall be determined in a manner consistent with the allocation principles of Section 10.2(c).

(ii)    With respect to Property Taxes for any Pre-Closing Tax Period (including any portion of a Straddle Period) that are not yet due and payable as of the Closing Date, including such Taxes which accrue during the calendar year in which the Closing occurs, such Taxes shall be prorated and adjusted as of the Closing Date and treated as a reduction to the Cash Purchase Price.  In addition, at least ten (10) business days prior to the Closing Date, Seller shall provide Buyer (for its review and approval) with a written schedule (the "Property Tax Schedule") specifically setting forth all such Property Taxes, the assets to which such Taxes relate, and the calculations for determining such Taxes.  If, with respect to any Property Taxes, the relevant Tax bills for any calendar year(s) during and/or prior to the calendar year in which the Closing Date occurs are not finally determined, then the proration thereof shall be predicated upon 115% of the most recent tax bill if same is for the prior fiscal year, or 120% if same is for the fiscal year which is two (2) years prior.  Buyer shall be responsible for preparing and remitting any

33

Property Taxes required to be reported on any Tax Return (or payment thereof) that is first due after the Closing Date, and to the extent not specifically included in the Property Tax Amount, Seller shall be responsible for all such Taxes allocable to a Pre-Closing Tax Period.

(e)    <u>Cooperation</u>.    Seller and Buyer will provide each other with such cooperation and information and documentation as either of them reasonably may request of the other in filing any Tax Return, amended Tax Return or claim for refund, determining a liability for Taxes or a right to a refund of Taxes, or participating in or conducting any audit or other proceeding in respect of Taxes.  Such cooperation and information shall include providing copies of relevant Tax Returns or portions thereof, together with accompanying schedules, related work papers and documents relating to rulings and other determinations by Taxing Authorities.  With respect to any Non-Debtor Subsidiary classified as a "partnership" for income Tax purposes, unless requested by Buyer, no Seller shall (or cause any Non-Debtor Subsidiary to) file or take any actions to cause an election under Section 754 of the Code; provided that, if requested by Buyer, Seller shall (and shall cause their Affiliates to) file or take any action necessary to make an election under Section 754 in respect of any such Non-Debtor Subsidiary.  In addition, such cooperation shall include Seller, if requested by Buyer, taking any action to cause the distributive shares of income of any Non-Debtor Subsidiary classified as a partnership for income Tax purposes to be allocated in a manner consistent with the allocation provisions of this Section 10.2.  Any information obtained under this Section 10.2 shall be kept confidential except to the extent disclosure of such information may be necessary or appropriate in connection with the filing of Tax Returns or claims for refund or in conducting any audit or other proceeding.

## ARTICLE 11
## GENERAL PROVISIONS

11.1    <u>Expenses</u>

Except as otherwise expressly provided in this Agreement and the Sale Procedures Order, Seller and Buyer will each bear their respective expenses incurred in connection with the preparation, execution and performance of this Agreement and the transactions contemplated hereunder, including all fees and expenses of agents, representatives, counsel and accountants. Notwithstanding the foregoing, Buyer shall be entitled to payment of the Break-Up Fee if it is not the Successful Bidder at the Auction, subject to the Bankruptcy Court's approval of the Break-Up Fee.

11.2    <u>Preservation of Records</u>

Seller and Buyer agree that each of them shall preserve and keep the books and records held by it relating to the Acquired Assets for a period commencing on the date hereof and ending at such date on which an orderly wind-down of Seller's operations has occurred in the reasonable judgment of Buyer and Seller (and no later than six (6) years from the date hereof) and each party shall make such books and records available to the other party (and permit the other party to make extracts and copies of such books and records at its own expense) as may be reasonably required by the other party in connection with, among other things, any insurance claims by, legal

34

proceedings or Tax audits against or governmental investigations of Seller or Buyer or in order to enable Seller or Buyer to comply with their respective obligations under this Agreement and each other agreement, document or instrument contemplated hereby or thereby.  In the event Seller or Buyer wishes to destroy such records, such party shall first give thirty (30) days' prior written notice to the other and such other party shall have the right at its option and expense, upon prior written notice given to such party within that thirty (30)-day period, to take possession of the records within thirty (30) days after the date of such notice.

### 11.3    Public Announcements

Seller and Buyer will consult with each other concerning the means by which Seller's employees, customers and suppliers and others having dealings with Seller will be informed of the transactions contemplated hereunder, and Buyer will have the right to be present for such communication.

### 11.4    Disclosure Schedules

The information contained in the Disclosure Schedules attached hereto are disclosures, exceptions, enhancements or listings to the representations and warranties of Seller, set forth herein, and the disclosures in any section or subsection of the Disclosure Schedules shall be deemed to be disclosed or to qualify, as applicable, all other sections or subsections of the Disclosure Schedules for which applicability of such information and disclosure is reasonably apparent on its face. Seller and Buyer agree to cooperate with regard to completion of the Disclosures Schedules in a form mutually agreeable to the parties.  No disclosure of any matter contained in the Disclosure Schedules shall create an implication that such matter meets any standard of materiality (matters reflected in the Disclosure Schedules are not necessarily limited to matters required by the Agreement to be reflected in the Disclosure Schedules, and such additional matters are set forth for informational purposes only and do not necessarily include other matters of a similar nature, nor shall the inclusion of any item be construed as implying that any such item is "material" for any purpose).  Any capitalized terms used in the Disclosure Schedule shall have the meanings set forth herein.  Any sections that are marked "None" indicate that Seller has no exceptions with regard to such representations and warranties.  To the extent a statement of fact or the occurrence of any event is described in the Disclosure Schedules for purposes of qualifying a representation, warranty or covenant of Seller, the existence of such a state of facts or the occurrence of such event shall not be deemed to constitute a breach of such representation, warranty or covenant of Seller.  No disclosure relating to any possible breach or violation of any agreement, law or regulation shall be construed as an admission or indication that any such breach or violation exists or has actually occurred.  Where the terms of a Contract or other disclosure item have been summarized or described in the Disclosure Schedules, such summary or description does not purport to be a complete statement of the material terms of such Contract or other item.  Document summaries herein are provided solely for convenience and merely supplement the disclosure provided in such documents and such document summaries are qualified in their entirety by the specific details of such contract or disclosure item with respect to such referenced items.  Nothing in the Disclosure Schedules shall constitute an admission of any Liability or obligation of Seller to any Third Party, or an admission to any Third Party against Seller's interests.  The Disclosure Schedules are qualified by reference to specific provisions of this Agreement.  Headings may have been inserted on the sections of the Disclosure Schedules for

convenience of reference only and shall not have the effect of amending or changing the express description of the sections as set forth in the Agreement.  Nothing in this Section 11.4 is intended to or shall modify Seller's representations in Section 3.7.

11.5    <u>Notices</u>

All notices, consents, waivers and other communications under this Agreement must be in writing and will be deemed to have been duly given when (a) delivered by hand (with written confirmation of receipt), (b) sent by facsimile or email (with written confirmation of receipt), <u>provided</u> that a copy is mailed by registered mail, return receipt requested or (c) when received by the addressee, if sent by a nationally recognized overnight courier service (receipt requested), in each case to the appropriate addresses, facsimile numbers and email addresses set forth below (or to such other addresses, facsimile numbers and email addresses as a party may designate by notice to the other parties):

<u>Buyer</u>:

> Brett Carlson
> Wright Air Service, Inc.
> PO Box 60142
> Fairbanks, AK 99706
> brett@northernalaska.com

with a copy to:

> Michael L. Schein, Esq.
> Vedder Price P.C.
> 1633 Broadway, 31st Floor
> New York, NY 10019
> mschein@vedderprice.com

<u>Seller</u>:

> c/o Ravn Air Group, Inc.
> 4700 Old International Airport Road
> Anchorage, AK 99502
> Attention: John Mannion, Chief Financial Officer
> E-mail: JJM79@ravnairgroup.com

with copies to:

> Keller Benvenutti Kim LLP
> 650 California Street, Suite 1900
> San Francisco, California   94108
> Attn:  Tobias S. Keller & Jane Kim
> Email: Admin@kbkllp.com

36

and

Blank Rome LLP
1271 Avenue of the Americas
New York, New York 10020
Attn: Peter Schnur, Esq.
Email: pschnur@blankrome.com

### 11.6    Further Assurances

Prior to, at or after the Closing, the parties agree (a) to furnish upon request to each other such further information, (b) to execute and deliver to each other such other documents and (c) to do such other acts and things, all as the other party may reasonably request for the purpose of carrying out the intent of this Agreement and the documents referred to in this Agreement, except that nothing in this Section 11.6 will require Buyer or any of its Affiliates to assume any Liabilities other than the Assumed Liabilities.  After the Closing, Seller shall promptly transfer or deliver to Buyer cash, checks (which shall be properly endorsed) or other property that Seller may receive in respect of any deposit, prepaid expense, receivable or other item that constitutes part of the Acquired Assets.

### 11.7    No Waiver

The rights and remedies of the parties to this Agreement are cumulative and not alternative. Neither the failure nor any delay by any party in exercising any right, remedy, power or privilege under this Agreement or the documents referred to in this Agreement will operate as a waiver of such right, remedy, power or privilege, and no single or partial exercise of any such right, remedy, power or privilege will preclude any other or further exercise of such right, remedy, power or privilege or the exercise of any other right, remedy, power or privilege.  To the maximum extent permitted by applicable law, (a) no claim or right arising out of this Agreement or the documents referred to in this Agreement can be discharged by one party, in whole or in part, by a waiver or renunciation of the claim or right unless in writing signed by the other party; (b) no waiver that may be given by a party will be applicable except in the specific instance for which it is given; and (c) no notice to or demand on one party will be deemed to be a waiver of any obligation of such party or of the right of the party giving such notice or demand to take further action without notice or demand as provided in this Agreement or the documents referred to in this Agreement.

### 11.8    Entire Agreement and Modification

This Agreement supersedes all prior agreements between the parties with respect to its subject matter and constitutes (along with the documents referred to in this Agreement) a complete and exclusive statement of the terms of the agreement between the parties with respect to its subject matter.  This Agreement may not be amended except by a written agreement executed by the party to be charged with the amendment.

11.9    <u>Assignments, Successors and Third-Party Rights</u>

Neither party may assign any of its rights under this Agreement without the prior consent of the other party, except that Buyer may assign all (but not part) of its rights under this Agreement to any Affiliate of Buyer (provided Buyer shall not be deemed released from its Liability hereunder as a result of such assignment), including without limitation to a newly formed entity formed for the purpose of purchasing the Acquired Assets hereunder.  Subject to the preceding sentence, this Agreement will apply to, be binding in all respects upon and inure to the benefit of the successors and permitted assigns of the parties.  Except as set forth below, nothing expressed or referred to in this Agreement will be construed to give any Person other than the parties to this Agreement any legal or equitable right, remedy or claim under or with respect to this Agreement or any provision of this Agreement.

11.10    <u>Section Headings; Construction</u>

The headings of Sections in this Agreement are provided for convenience only and will not affect its construction or interpretation.  All references to "Section" or "Sections" refer to the corresponding Section or Sections of this Agreement.  All words used in this Agreement will be construed to be of such gender or number as the circumstances require.  Unless otherwise expressly provided, the word "including" does not limit the preceding or following words or terms.

11.11    <u>Time of Essence</u>

With regard to all dates and time periods set forth or referred to in this Agreement, time is of the essence.

11.12    <u>Severability</u>

If any provision of this Agreement or the application of any such provision to any Person or circumstance is held invalid, illegal or unenforceable in any respect by a court of competent jurisdiction, the remainder of the provisions of this Agreement (or the application of such provision in other jurisdictions or to Persons or circumstances other than those to which it was held invalid, illegal or unenforceable) will in no way be affected, impaired or invalidated and, to the extent permitted by applicable Law, any such provision will be restricted in applicability or reformed to the minimum extent required for such provision to be enforceable; <u>provided</u>, <u>however</u>, that the foregoing shall apply only to the extent necessary to preserve the benefit of the parties' respective bargains under the Agreement.  This provision will be interpreted and enforced to give effect to the original written intent of the parties prior to the determination of such invalidity or unenforceability.

11.13    <u>Governing Law; Jurisdiction; Waiver of Jury Trial</u>

This Agreement will be governed by and construed in accordance with, the laws of the State of Delaware, regardless of the laws that might otherwise govern under principles of conflict of laws thereof.  Buyer and Seller irrevocably submit to the non-exclusive jurisdiction and venue of the Bankruptcy Court.  <u>To the fullest extent possible, each of Buyer and Seller irrevocably and</u>

unconditionally waives trial by jury in any action, suit or proceeding relating to a dispute under this Agreement and for any counterclaim with respect thereto.

11.14   Counterparts

This Agreement may be executed and delivered (including by facsimile or Portable Document Format (pdf) transmission) in one or more counterparts, all of which will be considered one and the same agreement and will become effective when one or more counterparts have been signed by each of the parties and delivered to the other parties. Any such facsimile documents and signatures shall, subject to applicable Laws, have the same force and effect as manually signed originals and shall be binding on the parties hereto.

## ARTICLE 12
## BANKRUPTCY REQUIREMENTS

12.1   Acquired Assets to Be Sold

Seller will sell the Acquired Assets pursuant to the Sale Order and the Sale Procedures Order and subject in all respects to the limitations set forth in Section 3.13 and Section 4.4 of this Agreement notwithstanding any other provision of this Agreement. The Acquired Assets will be sold free and clear of all Encumbrances (with all such Encumbrances to attach to the proceeds in the same priority and validity that such Liens existed on the Acquired Assets), other than the Permitted Encumbrances.

(a)     The Sale Order shall be in form and substance acceptable to Buyer. The Sale Order, among other things, must:

(i)     authorize Seller to consummate this Agreement;

(ii)     provide that such sale of the Acquired Assets pursuant to this Agreement shall, pursuant to Sections 105, 363(b) and 363(f) of the Bankruptcy Code, vest Buyer with good title to the Acquired Assets free and clear of Encumbrances (other than Permitted Encumbrances);

(iii)     provide that the sale of the Acquired Assets pursuant to this Agreement does not and will not subject Buyer or any Affiliate thereof to any pre-closing Liability by reason of such transfer under the laws of the United States, any State, territory or possession thereof or the District of Columbia based, in whole or in part, directly or indirectly, on any theory of Law, including, without limitation, any theory of successor or transferee Liability;

(iv)     include a finding that the Purchase Price to be paid by Buyer constitutes reasonably equivalent value and fair consideration under the Bankruptcy Code or under the Laws of the United States, any State, territory, possession, or the District of Columbia;

(v)     include a finding that Buyer is a good-faith purchaser pursuant to Section 363(m) of the Bankruptcy Code;

39

(vi)    provide that the Bankruptcy Court retains jurisdiction to enforce the provisions of this Agreement in all respects, including retaining jurisdiction to protect Buyer against any Liabilities or otherwise in accordance with the provisions of the Agreement;

(vii)    provide that the provisions of the Sale Order are nonseverable and mutually dependent;

(viii)    subject to the right of any counter-party to an Assumed Contract to object to assignment or Cure Costs, approve the assumption and assignment by Seller pursuant to section 365 of the Bankruptcy Code of the Assumed Contracts, if any, and such Assumed Contracts will be transferred and assigned to, and remain in full force and effect for the benefit of Buyer, notwithstanding any provision in such Contracts (including those described in sections 365(b)(2) and (f) of the Bankruptcy Code) that prohibits such assignment or transfer;

(ix)    subject to the right of any counter-party to an Assumed Contract to object to Cure Costs, fix the Cure Costs for any Contracts to be assumed by Buyer, if any, and provide for Buyer to pay the respective Cure Costs associated with each such Contract; and

(x)    subject to the right of any counter-party to an Assumed Contract to object to Cure Costs, provide that upon payment of the Cure Costs to the respective counterparties to the Assumed Contract, if any, all defaults under such Assumed Contracts shall be deemed cured at the time of assumption and assignment and Buyer shall not be responsible for any default that arises prior to the date of Closing.

12.2    Cooperation

(a)    Subject to the other provisions hereof, each party shall use its commercially reasonable efforts to perform its obligations hereunder and to take, or cause to be taken, and do, or cause to be done, all things necessary, proper or advisable under applicable Law to cause the transactions contemplated herein to be effected as soon as practicable, in accordance with the terms hereof and shall cooperate in a commercially reasonable manner with each other party and its Representatives in connection with any step required to be taken as a part of its obligations hereunder.

(b)    In the event that any of the parties to this Agreement discovers a Contract to which Seller is a party that is related to the Acquired Assets during the period from and after the Signing Date, and such Contract (i) was unknown as of the Signing Date and (ii) is a Contract for which Buyer wishes to assume the rights and obligations, Buyer and Seller shall execute, acknowledge and deliver such other instruments and take such further actions as are reasonably practicable for Buyer to assume the rights and obligations under such Contract.

(c)    The obligations of Seller pursuant to this Section 12.2 shall be subject to any Orders entered, or approvals or authorizations granted or required, by or under the

Bankruptcy Court or the Bankruptcy Code (including in connection with the RAVN Bankruptcy Cases), and Seller's obligations as a debtor-in-possession to comply with any order of the Bankruptcy Court (including the Sale Order) and Seller's duty to seek and obtain the highest or otherwise best price for the Business as required by the Bankruptcy Code.

(d)    Seller and Buyer (i) shall promptly inform each other of any communication from any Governmental Body concerning this Agreement, the transactions contemplated hereby, and any filing, notification or request for approval and (ii) shall permit the other to review in advance, with a reasonable opportunity for comment thereon, any proposed written or material oral communication or information submitted to any such Governmental Body in response thereto.  In addition, neither party shall agree to participate in any meeting with any Governmental Body in respect of any filings, investigation or other inquiry with respect to this Agreement or the transactions contemplated hereby, unless such party consults with the other party in advance and, unless prohibited by any such Governmental Body, gives the other party the opportunity to attend and participate thereat, in each case to the maximum extent practicable.  Subject to restrictions under any Law, each of Buyer and Seller shall furnish the other with copies of all correspondence, filings and communications (and memoranda setting forth the substance thereof) between it and its respective Representatives on the one hand, and the Governmental Body or members of its staff on the other hand, with respect to this Agreement, the transactions contemplated hereby or any such filing, notification or request for approval.  Each party shall also furnish the other party with such necessary information and assistance as such other party may reasonably request in connection with their preparation of necessary filings, registration or submissions of information to the Governmental Body in connection with this Agreement, the transactions contemplated hereby and any such filing, notification or request for approval.  Notwithstanding the foregoing, the terms of this Section 12.2 shall not require the disclosure of information that is subject to preexisting confidentiality agreements, the attorney-client privilege or work product doctrine or that refers to a valuation of the Business.

12.3    <u>Transfer Taxes</u>

If and to the extent not exempted from Taxes by Order of the Bankruptcy Court, Seller shall pay all Transfer Taxes in accordance with Section 10.2(a) of this Agreement.

[THE REMAINDER OF THIS PAGE IS INTENTIONALLY LEFT BLANK]

IN WITNESS WHEREOF, the parties have executed and delivered this Agreement as of the date first written above.

**BUYER:**

**WRIGHT AIR SERVICE, INC.**

By: *Brett Carlson*

Name:   Brett Carlson

**SELLER:**

**RAVN AIR GROUP, INC.**

By: _____
Name: _____
Title: _____

**JJM, INC.**

By: _____
Name: _____
Title: _____

**FRONTIER FLYING SERVICES, INC.**

By: _____
Name: _____
Title: _____

**CORVUS AIRLINES, INC.**

By: _____
Name: _____
Title: _____

**HAGELAND AVIATION SERVICES, INC.**

By: _____
Name: _____
Title: _____

Signature Page to
Asset Purchase Agreement

IN WITNESS WHEREOF, the parties have executed and delivered this Agreement as of the date first written above.

**BUYER:**

**WRIGHT AIR SERVICE, INC.**

By: _____
Name: Brett Carlson
Title: _____

**SELLER:**

**RAVN AIR GROUP, INC.**

By: _____
Name:    John Mannion
Title:    Chief Financial Officer

**JJM, INC.**

By: _____
Name:    John Mannion
Title:    Chief Financial Officer

**FRONTIER FLYING SERVICES, INC.**

By: _____
Name:    John Mannion
Title:    Chief Financial Officer

**CORVUS AIRLINES, INC.**

By: _____
Name:    John Mannion
Title:    Chief Financial Officer

**HAGELAND AVIATION SERVICES, INC.**

By: _____
Name:    John Mannion
Title:    Chief Financial Officer

Signature Page to
Asset Purchase Agreement

## **DISCLOSURE SCHEDULES**

[TO BE ATTACHED]

## EXHIBIT A

1. REAL PROPERTY

    (a)   Owned Real Property

        (i)    Utqiagvik [aka Barrow]

| Info: State Of Alaska DOT/PF | | | Info: Ravn | | | |
| --- | --- | --- | --- | --- | --- | --- |
| **Block** | **Lot** | **Location** | **Address** | **Property Description** | **Sq Feet** | **Built** |
| | | Loc. 7 / Bldg 1 | 6008 Boxer Street | Duplex - Pilot Housing | 1,440 | 1992 |
| | | NA | 2063 Ahkovak Street | Barrow House | NA | NA |

    (b)   Ground Lease Real Property

        (i)    Utqiagvik [aka Barrow]

| Info: State Of Alaska DOT/PF | | | | | Info: Ravn | | | | | |
| --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- |
| **Block** | **Lot** | **AK DOT Lease** | **SQ FT** | **Leaseholder** | **Location** | **Address** | **Property Description** | **Sq Feet** | **Built** | **Cure Cost** |
| 100 | 2A | ADA-71013 | 30,000 | Frontier Flying Service, Inc. | Loc. 3 / Bldg 8 | Lot 2, Block 100, Wiley Airport | Aircraft Hangar / Office | 7,225 | 1978 | $0.00 |
| 100 | 3C | ADA-71013 | 30,000 | Frontier Flying Service, Inc. | Not Identified In Ravn Real Estate Evaluation Document | | | | | |
| 100 | 4A | ADA-71915 | 67,500 | Frontier Flying Service, Inc. | Loc. 3 / Bldg 9 | Lot 4A, Block 100 | Freight / Cold Storage | 1,800 | 1983 | $0.00 |
| | | | | | Loc. 3 / Bldg 33 | Lot 4A, Block 100 | 2 ATCO Trailers | 1,440 | 2012 | |

Exhibit A – Page 1

VP/#37016248

| | | Info: State Of Alaska DOT/PF | | | | Info: Ravn | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| Block | Lot | AK DOT Lease | SQ FT | Leaseholder | Location | Address | Property Description | Sq Feet | Built | Cure Cost |
| | | | | | Loc. 3 / Bldg 10 | Will Rogers Memorial Airport, Lot 4A, Block 100 | Shell Hangar | 11,900 | 2010 | |
| 100 | 7A | ADA-71892 | 35,000 | JJM, Inc. | Loc. 3 / Bldg 7 | Wiley Post Airport, Lot 7A, Block 100 | Hangar/Pax Terminal/Cargo Storage | 8,300 | 1994 | $0.00 |
| 300 | 4 | ADA-70401 | 20,250 | Frontier Flying Service, Inc. | Loc. 3 / Bldg 1 | Lot 4, Block 300, Wiley Post Airport | Terminal | 2,500 | NA | $3,799.51 |
| 300 | 5 | ADA-71925 | 20,702 | JJM, Inc. | Loc. 3 / Bldg 6 | Wiley Post Airport, Lot 5, Block 300 | Bev Dist Center/Hangar/Pax & Cargo Term | 8,370 | 1990s | $0.00 |

(ii)    Deadhorse Airport

| | | Info: State Of Alaska DOT/PF | | | | Info: Ravn | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| Block | Lot | AK DOT Lease | SQ FT | Leaseholder | Location | Address | Property Description | Sq Feet | Built | Cure Cost |
| 900 | 13 | ADA-72045 | 39,100 | JJM, Inc. | Loc. 18 / Bldg 35 | Lot 13 & 14, Block 900, Deadhorse Airport | Hangar / Office / Terminal | 14,250 | 2013 | $26,348.80 |
| 900 | 14 | | 34,500 | JJM, Inc. | | Lot 13 & 14, Block 900, Deadhorse Airport | | | | |

(iii)    Galena Airport

| | | Info: State Of Alaska DOT/PF | | | | Info: Ravn | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| Block | Lot | AK DOT Lease | SQ FT | Leaseholder | Location | Address | Property Description | Sq Feet | Built | Cure Cost |
| 10 | 7 | ADA-72230 | 18,000 | FFS | Loc. 16 / Bldg 30 | Lot 7 & 8, Block 10, Galena Airport | Pax Terminal / Warehouse | 6,000 | 1969 | $202.57 |
| 10 | 8 | | 18,000 | FFS | Loc. 16 / Bldg 31 | Lot 7 & 8, Block 10, Galena Airport | Above Ground Fuel Tank | NA | 1997 | |
| 12 | 1A | ADA-70708 | 28,700 | FFS | Loc. 2 / Bldg 1 | Lot 1 , Block 12, Galena Airport | Equipment Storage Hangar | NA | NA | $0.00 |

Exhibit A – Page 2

(iv)    Fairbanks International Airport

| Info: State Of Alaska DOT/PF | | | | | Info: Ravn | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| Block | Lot | AK DOT Lease | SQ FT | Leaseholder | Location | Address | Property Description | Sq Feet | Built | Cure Cost |
| 1 | 8 | ADA-01351 | 345,950 | FFS | Loc. 1 / Bldg 1 | 5245 Airport Industrial Rd., Lot 8A, Block 1 | Hangar | 31,360 | 1970 | $10,378.50 |
|  |  |  |  |  | Loc. 1 / Bldg 2 | 5245 Airport Industrial Rd., Lot 8A, Block 1 | Hangar / Freight | 5,000 | 1970 |  |
|  |  |  |  |  | Loc. 1 / Bldg 3 | 5245 Airport Industrial Rd., Lot 8A, Block 1 | Parts Warehouse | 2,400 | 2006 |  |

2.    GROUND SERVICE EQUIPMENT

(a)    Utqiagvik [aka Barrow]

| Company | Asset ID | Location | Make | Model | YOM | Place In Service Date |
|---|---|---|---|---|---|---|
| Hageland | HAS GSE-105 | Barrow | Cat | Loader IT28G | Not Provided | 7/31/2015 |
| Hageland | HAS GSE-34 | Barrow | Cat | Loader, 908H LMD00349 | Not Provided | 5/6/2004 |
| Hageland | HAS GSE-74 | Barrow | Cat | Loader, 924HDCA1 C6E35985 | Not Provided | 7/31/2015 |
| Hageland | HAS GSE-76 | Barrow | Chevy | Van, Express 1GNSHBF42B1175880 | 2011 | 7/31/2015 |
| Hageland | HAS GSE-39 | Barrow | Chevy | Van, Express Cargo, White, 1GCFH25T731147688 | 2003 | 8/1/2005 |
| Hageland | HAS GSE-7 | Barrow | Ford | Van, White, 1FBNE31L26HAD3496 | 2005 | 9/4/1997 |
| Hageland | HAS GSE-52 | Barrow | International Loadstar | Truck, Durastar Fuel, 3HAMKAAN2BL354454 | 2010 | 7/8/2010 |
| Hageland | HAS GSE-105 | Barrow | Isuzu | Van, Isuzu Box, JALC4B1K7W7002159 | 1998 | 8/6/1998 |
| Hageland | HAS GSE-109 | Barrow | Jeep | Patriot, Black, 1C4NJPBA5GD502362 | 2016 | 9/1/2015 |
| Hageland | HAS GSE-117 | Barrow | Jeep | Patriot, 1C4NJRBB6HD197069 | 2017 | 3/1/2017 |
| Hageland | HAS GSE-70 | Barrow | Jeep | Truck, Patriot, 1C4NJRBB9CD543639 | 2012 | 7/31/2015 |
| Hageland | HAS GSE-97 | Barrow | Maximal | Forklift, Electric, FB25 1325B3307 | 2013 | 7/31/2015 |
| Hageland | HAS GSE-68 | Barrow | Eagle | TT-8 AWD Red 8714 | 2009 | 7/31/2015 |
| Hageland | HAS GSE-12 | Barrow | Foxcart | Ground Power Unit (Yellow) | Not Provided | 2/15/1999 |
| Hageland | Not Provided | Barrow | Toyota | Forklift, Model #8FGU30, Serial #64700 | Not Provided | Not Provided |

VP/#37016248

(b)  Deadhorse Airport

| Company | Asset ID | Location | Make | Model | YOM | Place In Service Date |
|---------|----------|----------|------|-------|-----|------------------------|
| Hageland | HAS GSE-59 | Deadhorse | Cat | Forklift, 2ET4000 | Not Provided | 7/31/2015 |
| Hageland | HAS GSE-27 | Deadhorse | Cat | Loader, 950B | Not Provided | 6/1/2003 |
| Hageland | HAS GSE-112 | Deadhorse | Ford | F-450 Deice Truck | 2012 | 3/31/2016 |
| Hageland | HAS GSE-30 | Deadhorse | Ford | F-150 with Grumman Box | 2011 | 9/3/2003 |
| Hageland | HAS GSE-58 | Deadhorse | John Deere | Loader, 244J | 2011 | 7/31/2015 |

(c)  Galena

| Company | Asset ID | Location | Make | Model | YOM | Place In Service Date |
|---------|----------|----------|------|-------|-----|------------------------|
| Hageland | HAS GSE-29 | Galena | Cat | Forklift, DP40K | Not Provided | 9/3/2003 |
| Hageland | HAS GSE-104 | Galena | Cat | Loader, 906H | 2013 | 7/31/2015 |
| Hageland | HAS GSE-2 | Galena | Chevy | Truck, ChevyFlatbed, Blue, CCS532V150291 | Not Provided | 7/11/1990 |
| Hageland | HAS GSE-14 | Galena | Ford | Truck, Box, White | 1993 | 6/30/1999 |
| Hageland | HAS GSE-95 | Galena | Ford | Truck , Utility F350 White | 1995 | 7/31/2015 |
| Hageland | HAS GSE-103 | Galena | Tank | Tank, 2000 Fireguard Tank | Not Provided | 7/31/2015 |

(d)  Fairbanks

| Company | Asset ID | Location | Make | Model | YOM | Place In Service Date |
|---------|----------|----------|------|-------|-----|------------------------|
| Hageland | HAS GSE-42 | FAI | Ford | Truck F350 Silver | 2002 | 5/1/2006 |
| Hageland | HAS GSE-98 | FAI | Ford | Truck F350 Silver | 2012 | 7/31/2015 |
| Hageland | HAS GSE-92 | FAI | International Loadstar | Truck Intl Fuel White | 1977 | 7/31/2015 |
| Hageland | HAS GSE-44 | FAI | Mitsubishi | Forklift Green | 1994 | 5/7/2006 |
| Hageland | HAS GSE-86 | FAI | Tug | Tug - SS #6217 | Not Provided | 7/31/2015 |
| Hageland | HAS GSE-66 | FAI | Bobcat | Bobcat,2006 White 530114698 | 2006 | 7/31/2015 |

Exhibit A – Page 4

| Company | Asset ID | Location | Make | Model | YOM | Place In Service Date |
|---------|----------|----------|------|-------|-----|----------------------|
|  |  | FAI | Cat | IT28B Loader #088 & Attachments |  |  |
|  |  | FAI | Toyota | Forklift Toyota Orange #138 |  |  |
|  |  | FAI | Toyota | Forklift Toyota Orange #176 |  |  |

The Acquired Assets include the Paintbooth located within the Fairbanks facility.

VP/#37016248

3.    AIRCRAFT

| Aircraft | YOM | Tail # | SN | TSN | Engine | Prop |
|---|---|---|---|---|---|---|
| Cessna 208B EX | 2016 | N761RV | 208B5334 | 3708.0 | VA0369 | BUA33658 |
| Cessna 208B EX | 2016 | N762RV | 208B5340 | 3581.2 | PCE-VA0327 | BUA33658 |
| Cessna 208B | 2007 | N288PC | 208B1270 | 4286.4 | PCE-PC2172 | BUA33524 |
| Cessna 208B | 2006 | N233PC | 208B1179 | 7891.9 | PCE-PC2249 | BUA31003 |

VP/#37016248

4.      ASSUMED CONTRACTS

| Debtor Name | Description of Contract or Lease | Party | Address | Cure Cost |
|---|---|---|---|---|
| Corvus Airlines, Inc. | 7714 Yugit St., Apartment A | Baker Construction Inc. | PO Box 2246, Barrow, AK 99723 | $1,800.00 |
| Corvus Airlines, Inc. | 7714 Yugit St., Apartment B | Baker Construction Inc. | PO Box 2246, Barrow, AK 99723 | $1,800.00 |
| Ravn Air Group, Inc. | House #275, Pisokak St. | Tagiugmiullu Nunamiullu Housing Authority | 1634 Okpik St, Utqiagvik, AK  99723 | $1,500.00 |

The Ground Lease Real Property set forth on Exhibit A.1 are incorporated herein by reference and are Assumed Contracts.

**<u>EXHIBIT B</u>**

<u>ASSUMED LIABILITIES</u>

None.

VP/#37016248

# **EXHIBIT C-1**

## FORM OF BILL OF SALE

## BILL OF SALE

### JULY 1, 2020

FOR GOOD AND VALUABLE CONSIDERATION, including, without limitation, the payment of the Purchase Price to Seller, pursuant to that certain Asset Purchase Agreement dated as of July 1, 2020 (the "Purchase Agreement"), by and among (i) Wright Air Service, Inc., an Alaska corporation or its Affiliates (collectively, "Buyer"), and (ii) Ravn Air Group, Inc. ("RAG"), (iii) JJM, Inc. ("JJM"), (iv) Frontier Flying Service, Inc. ("FFS"), (v) Corvus Airlines, Inc. ("Corvus") and (vi) Hageland Aviation Services, Inc. ("HAS" and together with RAG, JJM, FFS, and Corvus, "Seller" and, together with Buyer, the "Parties" and each of Buyer and Seller a "Party"), the receipt, adequacy and sufficiency of which are hereby acknowledged, Seller does hereby sell, convey, assign, transfer and deliver to Buyer all right, title and interest in and to the Acquired Assets (as defined in the Purchase Agreement). Capitalized terms not otherwise defined herein shall have the meanings assigned to such terms in the Purchase Agreement.

TO HAVE AND TO HOLD all of the Acquired Assets that are hereby sold, transferred, conveyed, assigned and delivered, unto Buyer and its successors and assigns forever.

Seller represents and warrants to Buyer that Seller is the true and lawful owner of the Acquired Assets and that the Acquired Assets are conveyed hereby to Buyer free and clear of all liens (other than Permitted Encumbrances), and that Seller has full right, power and authority to transfer the Acquired Assets and to make and deliver this Bill of Sale.

Seller has covenanted and hereby does covenant with Buyer that Seller shall do, execute, acknowledge and deliver all such further acts, assurances, deeds, assignments, transfers, conveyances, powers of attorney and other instruments and papers as may be required to sell, assign, transfer, convey and deliver to and vest in Buyer and protect its right, title and interest in and to all of the Acquired Assets intended to be assigned, transferred, conveyed and delivered pursuant hereto and as may be appropriate otherwise to carry out the transactions contemplated hereby and in the Purchase Agreement.

Notwithstanding anything herein to the contrary, the provisions of this Bill of Sale shall be subject to the provisions of the Purchase Agreement, and, if and to the extent the provisions of this Bill of Sale are inconsistent in any way with the provisions of the Purchase Agreement, the provisions of the Purchase Agreement shall control.

This Bill of Sale shall be deemed to have been made in the State of Delaware. The internal law, not the law of conflicts, of the State of Delaware shall govern all questions concerning the construction, validity and interpretation of this Bill of Sale and the performance of the obligations imposed by this Bill of Sale. Whenever possible, each provision of this Bill of Sale shall be interpreted in such a manner as to be effective and valid under applicable law, but if any provision of this Bill of Sale is held to be prohibited by or invalid under applicable law, such provision shall be ineffective only to the extent of such prohibition or invalidity, without invalidating the remainder of such provision or the remaining provisions of this Bill of Sale. This Bill of Sale may be executed in several counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same agreement. A signature page of this Bill of Sale

executed and transmitted via facsimile or electronic mail shall be deemed an original for all purposes.  This Bill of Sale shall be binding upon Seller and its successors and assigns and shall inure to the benefit of Buyer and its successors and assigns.

**[SIGNATURE PAGE FOLLOWS]**

IN WITNESS WHEREOF, the undersigned have caused this Bill of Sale to be executed as of the date first written above.

**BUYER:**
[NAME]
By: _____
Name:
Title:

**SELLER:**
RAVN AIR GROUP, INC.


By: _____
Name:
Title:

JJM, INC.


By: _____
Name:
Title:

FRONTIER FLYING SERVICES, INC.


By: _____
Name:
Title:

CORVUS AIRLINES, INC.

By: _____
Name:
Title:

HAGELAND AVIATION SERVICES, INC.


By: _____
Name:
Title:

Exhibit C-1 – Page 1

VP/#37016248

**EXHIBIT C-2**

FORM OF LEASE ASSIGNMENT

## ASSIGNMENT AND ASSUMPTION OF LEASE

This ASSIGNMENT AND ASSUMPTION AGREEMENT (this "**Agreement**") is entered into and made effective on [_____], 2020 (the "**Effective Date**"), by and among [_____, a(n) _____] ("**Assignor**"), [WRIGHT AIR SERVICE, INC., an Alaska corporation], with an address at [_____] ("**Assignee**"), and [_____, a(n) _____] ("**Landlord**"). Assignee, Assignor, and Landlord are referred to herein individually as a "**Party**" and collectively as the "**Parties**."

## RECITALS

**WHEREAS**, Assignor is selling certain assets to Assignee pursuant to that certain Asset Purchase Agreement, dated of even date herewith, by and between Assignor, as seller, and Assignee, as buyer (the "**APA**");

**WHEREAS**, Assignor entered into that certain [Lease Agreement, dated _____] (the "**Lease**") with Landlord for the purpose of leasing the [Premises] (as defined and more particularly described in the Lease) with a common address of [_____];

**WHEREAS**, in connection with the transaction contemplated under the APA, Assignor desires to assign to Assignee one hundred percent (100%) of Assignor's interests and rights in, under, and to the Lease (collectively, the "**Assigned Interest/Rights**"), on the terms and subject to the conditions contained herein; and

**WHEREAS**, Assignee desires to assume the Assigned Interest/Rights on the terms and subject to the conditiions contained herein.

## AGREEMENT

**NOW, THEREFORE**, for good and valuable consideration, the receipt and the sufficiency of which are hereby acknowledged, the Parties hereby agree as follows:

1.    Recitals; Defined Terms.  The foregoing Recitals are hereby incorporated as if fully re-written.  Unless otherwise specified herein, all capitalized terms used herein without definition shall have the meanings ascribed to such terms in the Lease.

2.    Assignment and Assumption.  Assignor hereby assigns to Assignee the Assigned Interest/Rights effective on the Effective Date, together with all present and future rights, benefits and claims arising therefrom and together with all of the rights, privileges and appurtenances with respect to the leasehold estate created thereby.  All obligations under the Lease arising, accruing or relating to the period before the Effective Date are allocated to Assignor.  Assignor will indemnify, defend and hold Assignee harmless from and against any and all demands, claims, actions, losses, damages, liabilities, litigation and costs and expenses thereof including, without limitation, reasonable attorneys' fees and disbursements of any kind and nature whatsoever, that may be imposed on, asserted against or otherwise incurred by Assignee by or on behalf of any person or entity whatsoever due to or arising from the failure or alleged failure of Assignor to undertake, perform, pay, discharge or observe any of the covenants, terms and conditions of the Lease that first arose or accrued prior to the Effective Date.  Assignee hereby assumes all the duties, the

obligations and the liabilities of Assignor arising under the Lease on or after the Effective Date with respect to the Assigned Interest/Rights. Assignee hereby expressly agrees to be bound by the terms and conditions of the Lease on and after the Effective Date with respect to the Assigned Interest/Rights.

3.  <u>Representations, Warranties and Covenants</u>.

a.  Assignor and Landlord hereby acknowledge, agree, represent and warrant to Assignee as follows as of the Effective Date: (a) a true, complete and accurate copy of the Lease (including all amendments, modifications, and/or supplements thereto, if any) is attached hereto as <u>Exhibit A</u>; (b) the Lease represents the entire understanding by and between Landlord and Assignor with respect to the leasing of the Properties; (c) the Lease is in full force and effect; (d) Assignor is the "Lessee" under the Lease and is the sole owner of its interest under the Lease, and Landlord is the "Lessor" under the Lease; (e) neither Assignor nor Landlord has assigned, transferred or pledged the Lease or any of their respective interests therein (except as otherwise in connection with Landlord's existing financing with respect to the Properties, if any) **[or sublet all or any portion of the Premises;]** (f) Assignor is the sole owner of the leasehold interests under the Lease, has full right to assign the Lease, and has the requisite power and authority to enter into and perform this Agreement, and (g) neither Assignor nor Landlord is in default under any of their respective obligations under the Lease (nor do a state of facts exist (including the occurrence of any event) that, with the passage of time or the giving of notice or both, could ripen into a default or event of default or breach under the Lease on the part of Assignor and Landlord, as applicable).

b.  Landlord consents to Assignor's assignment of the Lease to Assignee (and the Assigned Interest/Rights in connection therewith) in accordance with this Agreement. Nothing herein shall: (i) operate as a consent to or approval by Landlord of any of the terms, covenants or conditions of the APA, and Landlord shall not be bound thereby, it being expressly understood and agreed by Assignor and Assignee that Landlord has not approved or ratified any of the specific provisions of the APA and is not hereby consenting thereto; (ii) be construed to modify, waive or affect: (A) any of the provisions, covenants or conditions in the Lease, except as specifically set forth in this Agreement; (B) any rights of "**[Lessee/Tenant]**" under the Lease; or (C) any rights of Landlord as "Lessor" under the Lease; and (iii) be construed to enlarge or increase Landlord's obligations under the Lease. Landlord's consent to Assignor's assignment of the Lease to Assignee (and the Assigned Interest/Rights in connection therewith) is not a waiver of Landlord's right to consent to or impose restrictions upon any future assignment of the Lease or subletting of the Properties in accordance with the terms and conditions of the Lease.

4.  <u>Further Assurances</u>. Each Party shall promptly execute and deliver such further documents as the other may reasonably request for the purpose of better assuring, confirming or carrying out the transactions contemplated hereby.

5.  <u>Governing Law; Construction of Assignment and Assumption Agreement</u>. This Agreement shall be governed by and construed in accordance with the laws of the State of Delaware. The Parties and their respective counsel have reviewed, revised, and approved this Agreement; accordingly, the normal rule of construction that any ambiguities are to be resolved against the drafting party shall not be employed in the interpretation of this Agreement, or any amendments or exhibits hereto.

6.  <u>Counterparts; Authority</u>. This Assignment and Assumption Agreement may be executed in multiple counterparts, each of which shall be deemed an original, but all of which shall be deemed one

and the same instrument.  The Parties acknowledge and agree that, notwithstanding any law or presumption to the contrary, an electronic (transmitted by electronic mail in a PDF format) or telefaxed signature of the Parties upon this Agreement shall be deemed valid and binding on the Parties as if same were an original ink signature.  The Parties (a) intend to be bound by the signatures to this Agreement sent by facsimile or electronic mail, and (b) hereby waive any defenses to the enforcement of the terms of this Agreement based on the foregoing forms of signature.  Each individual executing this Agreement on behalf of an applicable Party represents and warrants that she or he is duly authorized to execute and deliver this Agreement on behalf of Assignor, Assignee, or Landlord, as applicable.

       7.    <u>No Brokers</u>.  Assignor and Assignee mutually represent and warrant to one another that they have not dealt with any broker, agent or finder in connection with this Agreement, and Assignee and Assignor hereby agree to indemnify and hold each other and their respective employees, agents and affiliates harmless from all damages, judgments, liabilities and expenses (including reasonable attorneys' fees) arising from any claims or demands of any other broker, agent or finder with whom Assignor or Assignee respectively has dealt for any commission or fee alleged to be due in connection with this Agreement.

       8.    <u>Miscellaneous</u>.  This Agreement is binding upon and shall inure to the benefit of the Parties hereto and their respective heirs, legal representatives, successors and assigns.  If any provision of this Agreement or the application thereof to any person or circumstance is or shall be deemed illegal, invalid, or unenforceable, the remaining provisions hereof shall remain in full force and effect and this Agreement shall be interpreted as if such legal, invalid, or unenforceable provision did not exist herein.  Should any Party be required to bring legal action to enforce its rights under this Agreement, the prevailing Party in such action, as determined by a final, non-appealable order entered by a court of competent jurisdiction, shall be entitled to recover from the losing Party its reasonable attorneys' fees and costs in addition to any other relief to which it is entitled.  Such recovery of attorneys' fees shall include any attorneys' fees incurred in connection with any bankruptcy or reorganization proceeding, including stay litigation.  The Parties further agree that any attorneys' fees incurred in enforcing any judgment are recoverable as a separate item, and that this provision is intended to be severable from the other provisions of this Agreement, shall survive the judgment, and is not to be deemed merged into the judgment.

    [REMAINDER OF PAGE INTENTIONALLY LEFT BLANK; SIGNATURE PAGE FOLLOWS]

**IN WITNESS WHEREOF**, the Parties have executed and delivered this Assignment and Assumption of Lease as of the Effective Date.

<u>**ASSIGNOR**</u>:

[_____, a(n)
_____]


By: _____
Name: _____
Title: _____


<u>**ASSIGNEE**</u>:

[**WRIGHT AIR SERVICE, INC.**, an Alaska corporation]


By: _____
Name: _____
Title: _____


<u>**LANDLORD**</u>:

[_____, a(n)
_____]


By: _____
Name: _____
Title: _____

## **Exhibit A to Assignment and Assumption of Lease**

Lease Agreement

[Attached]

Exhibit C-2 – Page 1

## **EXHIBIT C-3**

<u>FORM OF AIRCRAFT BILL OF SALE</u>

[TO BE ATTACHED]

Exhibit C-3 – Page 1

VP/#37016248

## **EXHIBIT D**

FORM OF ASSIGNMENT AND ASSUMPTION AGREEMENT

[TO BE ATTACHED]

# **EXHIBIT E**

## FORM OF QUIT CLAIM DEED

VP/#37016248

[Barrow] Recording District

After Recording Return To:

[Wright Air Service, Inc.

_____

_____

_____]

## QUITCLAIM DEED

THE GRANTOR [_____], whose mailing address is [_____], for and in consideration of TEN DOLLARS ($10.00) and other valuable consideration, receipt of which is hereby acknowledged, hereby conveys and quitclaims to [WRIGHT AIR SERVICE, INC., an Alaska corporation], whose mailing address is [_____], all of Grantor's right, title and interest, if any, nor or hereafter owned or acquired in the following described real property, together with all tenements, hereditaments, and appurtenances:

[Insert Legal Description]

DATED this ____ day of _____, 20___

*[Signature on the Following Page]*

Exhibit E – Page 2

VP/#37016248

IN WITNESS WHEREOF, the Grantor has caused this Quitclaim Deed to be duly executed and delivered under seal the day and year first above written.

GRANTOR:

[_____, a(n)

_____

By:    _____

Name: _____

Its:    _____]

STATE OF _____ )

                                                    )      ss.

COUNTY OF _____ )

I certify that I know or have satisfactory evidence that _____ is the person who appeared before me, and said person acknowledged that said person signed this instrument, on oath stated that said person was authorized to execute the instrument and acknowledged it as the _____ of _____, to be the free and voluntary act of such party for the uses and purposes mentioned in the instrument.

GIVEN under my hand and official seal this _____ day of _____, 20____.

_____

_____

(print notary's name)

Notary Public in and for the State of _____,

residing at _____.

My commission expires: _____

VP/#37016248